41,864-02

This document contains some
pages that are of poor quality
at the time of imaging.

RECEIVED IN
COURT OF CRIMINAL APPEALS

NOV 30 2015

Abel Acosta. Clerk

THE STATE OF TEXAS
COUNTY OF Brazos

I, Marc Hamlin , Clerk of the 272ND DISTRICT COURT of Brazos County, Texas do hereby certify that the documents contained in this record to which this certification is attached are all of the documents specified by Texas Rule of Appellate Procedure 34.5(a) and all other documents timely requested by a party to this proceeding under Texas Rule of Appellate Procedure 34.5(b).

GIVEN UNDER MY HAND AND SEAL OF SAID COURT, at my office

in Brazos County, Texas, this the 26th day of February,2013.



Marc Hamlin, District Clerk
Brazos County, Bryan Texas

*Ashley Morgan*

Deputy Clerk

REPORTER'S RECORD

Volume 1 of 6 Volumes

Trial Court Cause No. 12-03324-CRF-272

Court of Appeals No. 10-13-00049-CR

THE STATE OF TEXAS              :        IN THE DISTRICT COURT OF
                                :
VS.                             :        BRAZOS COUNTY, TEXAS
                                :
DAVID DUANE GREER               :        272nd JUDICIAL DISTRICT

FILED
MAY 1 4 2013

---

**MASTER INDEX**

---

CERTIFIED
TRANSCRIPT

Denise C. Phillips, Texas CSR #6482
Official Court Reporter - 272nd District Court
300 East 26th Street, Suite 204
Bryan, Texas    77803
979-361-4221

**A P P E A R A N C E S**

ATTORNEY(S) FOR STATE:

    RYAN CHARLES CALVERT
    SBOT NO. 24036308
    WILLIAM LEE WARD
    SBOT NO. 24077302
    Assistant District Attorneys
    300 East 26th Street, Suite 310
    Bryan, Texas    77803
    Telephone:  979-361-4320

ATTORNEY(S) FOR DEFENDANT:

    EARL R. GRAY
    SBOT: 24007265
    Gray, Granberry & Jones
    103 N. Main Street
    Bryan, Texas    77803-3235
    Telephone:  979-822-4759

VOLUME INDEX

                                                          Page

Chronological Index                                         4

Alphabetical Index                                         10

Exhibit Index                                              11

DENISE C.PHILLIPS, CSR
OFFICIAL COURT REPORTER
272ND DISTRICT COURT

## CHRONOLOGICAL INDEX

October 29, 2012                                                        Volume 2

                                                                            Page

Opening Remarks by the Court                                                   4
Announcements of Ready                                                         4
Defense Request for Audio/Video Evidence                                       4
The Court's Ruling on Request                                                  5
Adjournment                                                                    6
Court Reporter's Certificate                                                   7


November 13, 2012                                                       Volume 3

Venire panel seated                                                           5
Voir Dire Examination by The Court                                           5
Voir Dire Examination by Mr. Calvert                                        11
Venire panel retired                                                       99
Discussion at bench:

Venireperson No. 1                                                         99
Venireperson No. 5 excused for cause                                      104
Venireperson No. 17                                                       104
Venireperson No. 17 excused by agreement                                  107
Venireperson No. 22                                                       107
Venireperson No. 22 excused for cause                                     108
Venireperson No. 24                                                       108
Venireperson No. 30                                                       111
Venireperson No. 30 excused by agreement                                  111
Venireperson No. 57 excused by agreement                                  112
Venireperson No. 53 excused by agreement                                  112
Venireperson No. 48                                                       112

Short recess                                                              114
Venire panel reseated                                                     114
Venireperson No. 30 excused by agreement                                  114
Voir Dire Examination by Mr. Gray                                         114
Venirepersons Nos. 54 through 60 excused                                  142
Venire panel retired                                                      142
Short recess                                                              143
Discussion at bench:

Venireperson No. 9                                                        143
Venireperson No. 38                                                       150
Defense challenge as to Venireperson No. 38                               153
Court's ruling                                                            153

DENISE C.PHILLIPS, CSR
OFFICIAL COURT REPORTER
272ND DISTRICT COURT

# CHRONOLOGICAL INDEX

November 13, 2012 — Volume 3

Page

Venireperson No. 39 — 153
Venireperson No. 39 excused for cause — 157
Venireperson No. 40 — 157

Discussion with Defendant — 159
Strikes made — 161
Venire panel reseated — 162
Jury seated — 162
Remaining venire panel released — 162
Instructions read to Jury — 164
Jury retired — 165
Evening recess — 174
Reporter's Certificate — 175

November 14, 2012 — Volume 4

Witness sworn — 20
Discussion with Defendant — 20
Jury seated — 22
Jury sworn — 22
Indictment presented — 22
Defendant's plea — 22
Opening Statement by Mr. Calvert — 22
Witness sworn — 26

STATE'S WITNESSES:

TERRY YOUNG:

Direct Examination By Mr. Calvert — 26
Cross-Examination By Mr. Gray — 57
Redirect Examination By Mr. Calvert — 73
Recross-Examination By Mr. Gray — 74

Jury retired — 76
Short recess — 76
Discussion with the Defendant — 76
Jury seated — 78
Witness sworn — 78

DENISE C. PHILLIPS, CSR
OFFICIAL COURT REPORTER
272ND DISTRICT COURT

# CHRONOLOGICAL INDEX

November 14, 2012                                              Volume 4

                                                                   Page

RICARDO LEDESMA:

    Direct Examination By Mr. Ward                                 78
    Cross-Examination By Mr. Gray                                  87
    Redirect Examination By Mr. Ward                               91
    Recross-Examination By Mr. Gray                                93

Witness sworn                                                      95

LAKETH McKINNEY:

    Direct Examination By Mr. Calvert                              95
    Cross-Examination By Mr. Gray                                  97

State rests                                                       100
Jury retired                                                      100
Defendant's Motion to Suppress                                   100
Court's ruling                                                   112
Jury seated                                                      112

DEFENDANT'S WITNESSES:

MONISHIA RENE CAMPBELL:

    Direct Examination By Mr. Gray                                112
    Cross-Examination By Mr. Calvert                              122
    Redirect Examination By Mr. Gray                              137

Defendant rests                                                  142

STATE'S REBUTTAL WITNESSES:

RICARDO LEDESMA:

    Direct Examination By Mr. Ward                                144
    Cross-Examination By Mr. Gray                                 147
    Redirect Examination By Mr. Ward                              150

Jury retired                                                     151
Noon recess                                                      153
Jury seated                                                      154

CHRONOLOGICAL INDEX

November 14, 2012                                        Volume 4

                                                           Page


TERRY YOUNG:

   Direct Examination By Mr. Calvert                      154
   Cross-Examination By Mr. Gray                          156

Witness sworn                                             157

JASON WARE:

   Direct Examination By Mr. Calvert                      157
   Cross-Examination By Mr. Gray                          159

State closes                                             160
Defendant rests and closes                              160
Jury retired                                            160
Objections to Charge                                    160
Jury seated                                             161
Charge read                                             162
Closing Argument by Mr. Ward                            162
Closing Argument by Mr. Gray                            168
Closing Argument by Mr. Calvert                         176
Jury retired for deliberations                          183
Jury request to view video                              183
Jury continued deliberations                            183
Jury seated                                             183
Verdict                                                 184
Jury retired and released                               185
Evening recess                                          185
Reporter's Certificate                                  186

November 15, 2012                                       Volume 5

Enhancement paragraphs presented                           5
Defendant's plea                                           5
Witness sworn                                              6

STATE'S WITNESSES:

BRYAN WADE RUEBUSH:

   Direct Examination By Mr. Ward                           6
   Cross-Examination By Mr. Gray                            8

DENISE C.PHILLIPS, CSR
OFFICIAL COURT REPORTER
272ND DISTRICT COURT

# CHRONOLOGICAL INDEX

November 15, 2012                                    Volume 5

                                                          Page

Witness sworn                                              12

GREG SILBER:

    Direct Examination By Mr. Calvert                     12
    Voir Dire Examination By Mr. Gray                     20
    Direct Examination Continued By Mr. Calvert           25
    Voir Dire Examination By Mr. Gray                     26
    Direct Examination Continued By Mr. Calvert           27
    Cross-Examination By Mr. Gray                         36

State rests                                               36
Witness sworn                                             37

DEFENDANT'S WITNESSES:

KENNETH GREER:

    Direct Examination By Mr. Gray                        37
    Cross-Examination By Mr. Ward                         41
    Redirect Examination By Mr. Gray                      44

Witness sworn                                             45

ANNETTE GREER

    Direct Examination By Mr. Gray                        45
    Cross-Examination By Mr. Ward                         50
    Redirect Examination By Mr. Gray                      52

Defendant rests                                           53
State closes                                              53
Closing Argument by Mr. Calvert                           54
Closing Argument by Mr. Gray                              56
Ruling of Court                                           58
Reporter's Certificate                                    61

# CHRONOLOGICAL INDEX

Volume 6

Reporter's certificate 3
State's Exhibit No. 1 5
State's Exhibit No. 2 6
State's Exhibit No. 3 7
State's Exhibit No. 4 8
State's Exhibit No. 5 9
State's Exhibit No. 6 10
State's Exhibit No. 7 11
State's Exhibit No. 8 12
State's Exhibit No. 9 13
State's Exhibit No. 10 14
State's Exhibit No. 11 15
State's Exhibit No. 12 16
State's Exhibit No. 14 17
State's Exhibit No. 15 18
State's Exhibit No. 16 19
State's Exhibit No. 17 20
State's Exhibit No. 18 21
State's Exhibit No. 19 22
State's Exhibit No. 19-A 23
State's Exhibit No. 20 24
State's Exhibit No. 21 25
State's Exhibit No. 22 26
State's Exhibit No. 23 27
State's Exhibit No. 24 28

DENISE C. PHILLIPS, CSR
OFFICIAL COURT REPORTER
272ND DISTRICT COURT

## ALPHABETICAL INDEX

| | Direct | Cross | V.Dire | Vol |
|---|---|---|---|---|
| Campbell, Monishia Rene | 112 137 | 122 | | 4 |
| Greer, Annette | 45 52 | 50 | | 5 |
| Greer, Kenneth | 37 44 | 41 | | 5 |
| Ledesma, Ricardo | 78 91 | 87 93 | | 4 |
| Ledesma, Ricardo | 144 150 | 147 | | 4 |
| McKinney, Laketh | 95 | 97 | | 4 |
| Ruebush, Bryan Wade | 6 | 8 | | 5 |
| Silber, Greg | 12 25 27 | 36 | 20 26 | 5 |
| Young, Terry | 26 73 | 57 74 | | 4 |
| Young, Terry | 154 | 156 | | 4 |
| Ware, Jason | 157 | 159 | | 4 |

DENISE C.PHILLIPS, CSR
OFFICIAL COURT REPORTER
272ND DISTRICT COURT

**EXHIBIT INDEX**

**State's Exhibits**

| EXHIBIT | DESCRIPTION | OFFERED | ADMITTED | VOL |
|---------|-------------|---------|----------|-----|
| 1 | Arrest Warrant | 16 | 19 | 4 |
| 2 | Arrest Warrant | 16 | 19 | 4 |
| 3 | Video | 34 | 34 | 4 |
| 3 | Video | 143 | 144 | 4 |
| 4 | Photograph | 48 | 48 | 4 |
| 5 | Photograph | 48 | 48 | 4 |
| 6 | Photograph | 48 | 48 | 4 |
| 7 | Photograph | 48 | 48 | 4 |
| 8 | Photograph | 48 | 48 | 4 |
| 9 | Photograph | 48 | 48 | 4 |
| 10 | Leather jacket | 41 | 41 | 4 |
| 11 | Weapon | 41 | 41 | 4 |
| 12 | Bullets from weapon | 54 | 54 | 4 |
| 14 | Stipulation | 20 | 22 | 4 |
| 14 | Stipulation | 99 | 100 | 4 |
| 15 | Inventory form | 90 | 90 | 4 |
| 16 | Inventory Search Policy | 107 | | 4 |
| 17 | Judgment and Sentence | 15 | 17 | 5 |
| 18 | Pen Pack | 26 | 27 | 5 |
| 19 | Pen Pack | 20 | 25 | 5 |
| 19-A | Judgment and Sentence | 20 | 22 | 5 |
| 20 | Judgment and Sentence | 30 | 30 | 5 |
| 21 | Judgment and Sentence | 30 | 30 | 5 |
| 22 | Indictment | 28 | | 5 |
| 23 | Judgment and Sentence | 28 | 29 | 5 |
| 24 | Fingerprint card | 36 | 36 | 5 |

REPORTER'S RECORD
VOLUME 2 OF 6 VOLUMES

TRIAL COURT CAUSE NO. 12-03324-CRF-272

APPELLATE COURT CASE NO. 10-13-00049-CR

| | |
|---|---|
| THE STATE OF TEXAS | § IN THE DISTRICT COURT OF |
| | § |
| v. | § BRAZOS COUNTY, TEXAS |
| | § |
| DAVID DUANE GREER | § 272ND JUDICIAL DISTRICT |

------------------------------

DOCKET CALL

------------------------------

On the 29th day of October, 2012, the following proceedings came to be heard in the above-entitled and -numbered cause before the Honorable Travis B. Bryan, III, Judge presiding, held in Bryan, Brazos County, Texas:

Proceedings reported by computerized stenotype shorthand.

CERTIFIED TRANSCRIPT

A P P E A R A N C E S

Mr. Ryan C. Calvert
Brazos County District Attorney's Office
SBOT No. 24036308
300 East 26th Street, Suite 310
Bryan, Texas 77803
(979) 361-4320
ATTORNEY FOR THE STATE OF TEXAS


Mr. Earl R. Gray
Gray, Granberry & Jones
SBOT No. 24007265
103 N. Main Street
Bryan, Texas 77803
(979) 822-4759
ATTORNEY FOR THE DEFENDANT

CHRONOLOGICAL INDEX
VOLUME 2
(DOCKET CALL)

                                                    PAGE   VOL.
OCTOBER 29, 2012

Opening Remarks by the Court................    4      2
Announcements of Ready......................    4      2

Defense Request For Audio/Video Evidence....    4      2
The Court's Ruling on Request...............    5      2

Adjournment.................................    6      2

Court Reporter's Certificate................    7      2

ALPHABETICAL WITNESS INDEX
VOLUME 2
(DOCKET CALL)


(No witnesses this volume.)


EXHIBIT INDEX
VOLUME 2
(DOCKET CALL)


(NO exhibits this volume.)

PROCEEDINGS

(Open court, defendant present, no jury, 10:01 AM.)

THE COURT:  David Greer.

THE COORDINATOR:  Possibly be number one, depending on what Mrs. Lowry does.

THE COURT:  Be number one case.

MR. GRAY:  Good morning, Judge.

THE COURT:  Good morning, sir.  What says the State?

MR. CALVERT:  We're ready, Judge.

MR. GRAY:  Judge, we'll announce ready on the condition that if there is audio and video and an inventory list of what was actually seized at the time of the arrest, that we get that sometime week.  If I get something this week, I have still have time to prepare.

THE COURT:  Audio and video on what?

MR. GRAY:  On the arrest.

MR. CALVERT:  There was a traffic stop, Judge.  At present, we don't have any audio or video. We have requested it.  Requested it, I believe, last week but have not heard anything yet.  So I don't know if those things exist or not; but if they do, we'll get them to counsel as soon as we get them.

THE COURT:  When are you going to be able

to do that?

MR. CALVERT:  Hopefully today.

THE COURT:  May go to trial and may be inadmissible if you don't.

MR. CALVERT:  Yes, sir.

MR. GRAY:  Judge, we normally wouldn't be concerned about a codefendant's video or audio or anything of that nature; but when he was arrested -- not getting into the details of the case -- but whenever he was arrested, he was arrested with a female.  And the statements that she may or may not have made may be beneficial to the defense as well.  I just don't know.

THE COURT:  When do you need to have that by?

MR. GRAY:  Any time --

THE COURT:  No later than?

MR. GRAY:  Any time this week and I'll have time to prepare.  I contacted their office.  I know they have contacted PD but --

THE COURT:  State is ordered to have it to them by the end of this week or risk it not being admitted.

MR. CALVERT:  Yes, sir.

THE COURT:  Thank you very much.

MR. GRAY:  Okay, thank you, Judge.

(Proceedings concluded at 10:03 AM.)

Kaetheryne B. Kyriell, CSR
Official Court Reporter
272nd District Court, Brazos County, Texas

REPORTER'S CERTIFICATE

THE STATE OF TEXAS

COUNTY OF BRAZOS

I, Kaetheryne B. Kyriell, Official Court Reporter in and for the 272nd District Court of Brazos County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and -numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $*39.00* and was paid/will be paid by Brazos County.

WITNESS MY OFFICIAL HAND this the 19th day of February 2013.

Kaetheryne B. Kyriell, Texas CSR 6083
Expiration Date: 12/31/2013
Official Court Reporter
272nd District Court
Brazos County, Texas
Bryan, Texas 77803

CERTIFIED
TRANSCRIPT

REPORTER'S RECORD

Volume 3 of 6 Volumes

Trial Court Cause No. 12-03324-CRF-272

Court of Appeals No. 10-13-00049-CR

| | | |
|---|---|---|
| THE STATE OF TEXAS | : | IN THE DISTRICT COURT OF |
| VS. | : | BRAZOS COUNTY, TEXAS |
| DAVID DUANE GREER | : | 272nd JUDICIAL DISTRICT |

---

**JURY VOIR DIRE PROCEEDINGS**

---

On the 13th day of November, 2012, the following proceedings came on to be held in the above-titled and numbered cause before the Honorable Travis B. Bryan, III, Judge Presiding, held in Bryan, Brazos County, Texas.

Proceedings reported by computerized stenotype machine.

Denise C. Phillips, Texas CSR #6482
Official Court Reporter - 272nd District Court
300 East 26th Street, Suite 204
Bryan, Texas   77803
979-361-4221

**CERTIFIED TRANSCRIPT**

DENISE C. PHILLIPS, CSR
OFFICIAL COURT REPORTER
272ND DISTRICT COURT

APPEARANCES

ATTORNEY(S) FOR STATE:

    RYAN CHARLES CALVERT
    SBOT NO. 24036308
    WILLIAM LEE WARD
    SBOT NO. 24077302
    Assistant District Attorneys
    300 East 26th Street, Suite 310
    Bryan, Texas   77803
    Telephone:  979-361-4320


ATTORNEY(S) FOR DEFENDANT:

    EARL R. GRAY
    SBOT: 24007265
    Gray, Granberry & Jones
    103 N. Main Street
    Bryan, Texas   77803-3235
    Telephone:  979-822-4759

# CHRONOLOGICAL INDEX

November 13, 2012                                    Volume 3

                                                        Page

Venire panel seated                                        5
Voir Dire Examination by The Court                         5
Voir Dire Examination by Mr. Calvert                      11
Venire panel retired                                      99
Discussion at bench:

Venireperson No. 1                                        99
Venireperson No. 5 excused for cause                     104
Venireperson No. 17                                      104
Venireperson No. 17 excused by agreement                 107
Venireperson No. 22                                      107
Venireperson No. 22 excused for cause                    108
Venireperson No. 24                                      108
Venireperson No. 30                                      111
Venireperson No. 30 excused by agreement                 111
Venireperson No. 57 excused by agreement                 112
Venireperson No. 53 excused by agreement                 112
Venireperson No. 48                                      112

Short recess                                             114
Venire panel reseated                                    114
Venireperson No. 30 excused by agreement                 114
Voir Dire Examination by Mr. Gray                        114
Venirepersons Nos. 54 through 60 excused                 142
Venire panel retired                                     142
Short recess                                             143
Discussion at bench:

Venireperson No. 9                                       143
Venireperson No. 38                                      150
Defense challenge as to Venireperson No. 38              153
Court's ruling                                           153
Venireperson No. 39                                      153
Venireperson No. 39 excused for cause                    157
Venireperson No. 40                                      157

Discussion with Defendant                                159
Strikes made                                             161
Venire panel reseated                                    162
Jury seated                                              162
Remaining venire panel released                          162

DENISE C. PHILLIPS, CSR
OFFICIAL COURT REPORTER
272ND DISTRICT COURT

# CHRONOLOGICAL INDEX

November 13, 2012                                    Volume 3

Page

Instructions read to Jury                                164
Jury retired                                             165
Evening recess                                           174
Reporter's Certificate                                   175

DENISE C.PHILLIPS, CSR
OFFICIAL COURT REPORTER
272ND DISTRICT COURT

**P R O C E E D I N G S**

November 13, 2012

(Venire panel seated.)

THE COURT:  This is the State of Texas v. David Greer.  This is a criminal accusation.  Unlawful possession of a firearm by a felon is the title of the charge.

What says the State of Texas?

MR. CALVERT:  State is present and ready.

THE COURT:  What says the Defense?

MR. GRAY:  Ready, Judge.

**VOIR DIRE EXAMINATION BY THE COURT**

THE COURT:  We're about to embark on the jury selection process.  I'm going to speak to you for a little while; and then, I'll turn it over to the lawyers to begin to ask you questions.

Let me ask you to turn your cell phones off. And another admonition about the cell phone, we've had a couple of mistrials over the last couple of years of jurors who got on their Smart phones and looked up information about the case, Googled names, Googled the lawyer's name, looked up the law; and they do that before the trial even starts; and it caused a mistrial in two cases.

So, please do not look up any information.

Don't Tweet anybody about your experience on the jury panel today. We like to make sure that all the evidence you receive comes from that witness box over there and you're not contaminated by outside information.

Don't discuss the case among yourselves and don't relay any personal experiences, "While I was on the jury one time; and they did this, that or the other," to the other jurors. We like for you to remain as pure as possible as far as information about the criminal law, about your jury service or about this particular charge or these people. Now, I thank you for doing that.

They're going to be asking you some questions, trying to determine who they do not want on the jury. The way we pick the jury is actually we pick -- they pick the people they do not want, and the leftovers are the ones that serve. And that is usually a pretty fair system because the leftovers generally can be fair.

They're going to be asking you questions -- my wife is always asking me, "How do I get out of serving on the jury?" And I always tell her, "Go down there and answer every question they ask you as completely as possible," and someone will figure out something about you they don't like, and they'll strike your name off the list.

Of course, the other side of that is if you

want to serve -- how many of you want to serve on the jury? Raise your hand now.

(Show of hands.)

THE COURT: Just two or maybe three. That's about par for the course.

The rest of you are here because it's your duty, and you're glad to give your time and serve, but you'd rather be somewhere else. And you are the norm. Very few would actually like to serve on the jury, but that's always good, too.

So, they get a list of you at the end of this; and they strike a certain number of names that they have off the list and the first 12 that are left are on the jury.

We've already let about 12 people go to get the number down to about 60, and I think it's now down to about 59 because we don't need 70 to try to pick up a jury. But we do need the 59 because sometimes we actually get into the 50s because there's another way you could be discharged. And that is through a challenge for cause which is a legal reason. That's not a strike that they use because they don't like you. That's a legal reason that comes up during the questioning that you're not -- you're not able to serve.

So, after all the challenges for cause and

after all these strikes are used, the 12 that are first left are the jurors in the case.

They're going to be asking you about a couple of areas. They're going to be going into your past, asking you about your life experiences because our life experiences make impressions upon us. And if we get on a jury and something similar to that comes into play, some of those old feelings, those old -- even subconsciously sometimes, those old impressions come into play in this case.

And that might mean that you couldn't be fair to one side or the other. So, if they begin to ask you questions that you believe touch on things that might make you less than fair or unable to be fair to one side or the other, please express that to the lawyers. They need to know that.

If they bring up something that is a little bit private -- and if they're doing their job, they will border on invading your privacy -- you can say, "I'd rather talk to the Judge about that later," if you feel that you'd rather not talk about it in front of the entire group. We'll bring you up at a long break at the end of the group questioning, and we'll allow you to talk to us just by yourself and the lawyers and me here at the front later on.

So, all you need to do is just say, "I'd like to talk to you about that or talk to the Judge about that later."

You know, for instance, if you have been -- if this was a drunk driving case, hypothetically speaking -- which it's not -- and you had been the victim of a drunk driver or were close to someone who was, you might not be able to be fair to the accused, if this were a drunk driving case. So, you need to -- you would need to let us know about that.

On the other hand, if you had been mistreated by a police officer and if this was a police testifying case and due to that what you felt was mistreatment you just didn't believe you could ever believe a police officer or you'd be prejudiced against the State because of that -- how you were mistreated in that case, that also is something you should tell the lawyers about.

The other area they're going to be going into is law. Each side always has certain laws that they depend on for to represent their respective sides. They may touch on a law that you don't agree with, that you don't know if you could follow that law. This inevitably happens when laws are being discussed with jurors.

I want to assure you, if we sat here and

talked about the law long enough, we would come to a law that each and every one of you would have a problem with. Not all of you would have a problem with the same one, but some one law that you personally would have a problem following.

That is another thing you should tell the lawyers. If they bring up a law you just don't think you could follow, it's okay to say, "Judge, I just don't believe I can follow that law if I'm on the jury." Be sure and let them know that.

Keep your voice up. Our court reporter over here, Denise Phillips, is trying to take down everything you say and I say. Hold up your card when you begin to answer questions. That's so that we can get your number for the record. If the lawyer's standing between you and the eyes of the court reporter where she can't see your number, try to hold it out to the side.

We don't need for you to just hold it up the entire time you're answering, because your arm will get sore doing that. Just hold it long enough for her to see it, for the lawyer to see it, call on you and then make sure she can see it; and then, you can put your card down.

The -- the work that we're doing here is very serious. We're looking for 12 jurors that can be fair to both sides of this case. If you've ever been the

victim of a crime or were the close relative or a loved one of somebody who was, I think you probably personally understand and realize how important the criminal justice system is because you've been down that path before.

On the other hand, if you've ever been wrongfully accused of a crime in your life or were close to someone who was -- and I assure you it does happen from time to time, ladies and gentlemen -- you also know how important our criminal justice is.

I am proud of the fact that we bring in people like you to make these decisions. I'm a firm believer in the jury system. We don't want to turn the system over to lawyers, ladies and gentlemen. We'll mess it up. As long as we're bringing in people like you off the street to sit in that box and make decisions, we're going to have a good brand of justice down here.

Thank you for coming today. At this point, I'll turn it over to the lawyers. The State gets to go first because they have the burden of proof. And each side will introduce their respective parties in the case.

Go right ahead, sir.

MR. CALVERT: Thank you, Judge.

VOIR DIRE EXAMINATION BY MR. CALVERT

MR. CALVERT: Good morning.

VENIREPERSONS: Good morning.

MR. CALVERT: That wasn't bad for a Tuesday morning. My name is Ryan Calvert. I'm a prosecutor here at the District Attorney's Office in Brazos County. I work for your elected D.A., Bill Turner. Trying the case with me this week is going to be Will Ward. Will is another Assistant D.A. here.

Right here is the Defendant in this case, Mr. David Greer. And up here is the Defense attorney, Mr. Earl Gray.

Does anybody out there know anybody up here?

Yes, sir, who do you know?

VENIREPERSON NO. 4: Mr. Greer.

MR. CALVERT: You know Mr. Greer? Okay. And you are Mr. Kelling?

VENIREPERSON NO. 4: Sparks.

MR. CALVERT: Oh, I apologize. Mr. Sparks.

How do you know Mr. Greer?

VENIREPERSON NO. 4: Mutual friend of the family.

MR. CALVERT: How long have you known him?

VENIREPERSON NO. 4: Gosh, about 20 years.

MR. CALVERT: Long time. Okay. Fair to say as a friend that you've known for 20 years, probably couldn't be -- probably wouldn't be the most impartial or objective juror on Mr. Greer's case? Would that be fair?

VENIREPERSON NO. 4: Yes.

MR. CALVERT: Okay.

VENIREPERSON NO. 4: I wouldn't be comfortable convicting him or not convicting him.

MR. CALVERT: I understand. I appreciate that, Mr. Sparks.

Anybody else know anybody up here? Wow. All right.

Yes, ma'am?

VENIREPERSON NO. 23: I know the attorney.

MR. CALVERT: You know Mr. Gray? You don't need to be shy about it. It's okay to know Mr. Gray. He's a good guy.

How do you know him?

VENIREPERSON NO. 23: My professor.

MR. CALVERT: He was your professor? Okay. And you're a paralegal; is that right? What type of work do you do?

VENIREPERSON NO. 23: Real estate.

MR. CALVERT: All right. So, you come to court -- y'all come to court a lot and do a lot of the jury trials, right? No, it's all paper, isn't it?

VENIREPERSON NO. 23: Uh-huh.

MR. CALVERT: All right.

VENIREPERSON NO. 23: Tom Geisenschlag,

Brazos County Abstract Company.

THE COURT: Let me have the lawyers come up here just a minute.

(Bench conference:)

THE COURT: I've got a problem with No. 4. Do you have any problem letting 4 go?

MR. CALVERT: That's fine, Judge.

MR. GRAY: No, that's fine.

(Bench proceedings concluded.)

THE COURT: Juror No. 4, I think we probably need to let you go. And there's no use in keeping you around all morning.

So, you can go, sir.

VENIREPERSON NO. 4: Okay. Thank you very much.

THE COURT: You can leave the courtroom.

Ladies and gentlemen, we're going to be going here most of the morning; and I should have done this before I turned it over to the State. I pardon this interruption.

Both sides are going to be talking to you. Each side is going to talk to you for about an hour, maybe a little more, ask you questions. We'll be here for most of the morning, and we may even go into the noon hour.

So, here's the question I want to ask you:

How many of you would rather just go ahead and work through the noon hour and get through with this and get out of here -- those of you who are not on the jury -- as soon as we can? As opposed to the other option, and that is, to take a lunch break, an hour and 15 minutes, come back and get through later in the afternoon then you would otherwise?

How many of you would rather just work on through the noon hour and get through? Raise your hands.

(Show of hands.)

THE COURT: And how many of you would rather take a noon break and come back later?

(Show of hands.)

THE COURT: All right. The Option 1s have it; so, that's what we'll do.

Go right ahead, Mr. Calvert.

MR. CALVERT: Thank you, Judge.

All right. Ms. Henry, when was Earl your professor? How long ago was that?

VENIREPERSON NO. 23: Two years ago.

MR. CALVERT: Okay. Is there anything about the fact that he was your professor or that relationship that's causing you to come in here biased in favor of him, against him --

VENIREPERSON NO. 23: I am friends with one

of his paralegals.

MR. CALVERT: Okay. Is that something -- if you're honest with me and honest with yourself, is that something that would make you uncomfortable as a juror?

VENIREPERSON NO. 23: No.

THE COURT: Okay. So, you're good?

VENIREPERSON NO. 23: Yes.

MR. CALVERT: All right. Thank you, ma'am. I appreciate it.

Anybody else that I missed know anybody up here? I'm shocked after one person said, "Yeah, I know somebody," and that person isn't here anymore, there's no more.

Yes, ma'am?

VENIREPERSON NO. 1: I just know Mr. --

MR. CALVERT: You know Ernie?

VENIREPERSON NO. 1: A long time ago I used to be a cashier at Kroger, but I just know him -- he was a police guard of the store.

MR. CALVERT: Yes, ma'am. Anything about that that is going to make you --

VENIREPERSON NO. 1: No.

MR. CALVERT: All right. Very good.

Anybody have questions about anything before we jump into some law? Anything y'all are curious about

or wondering about right now? I know there are -- what's the first question everybody always has in situations like this? How long is this going to take, right? Heads are nodding. Yes, that's my question.

Well, myself and Will in the next six to eight weeks, we look forward to presenting this case to 12 of y'all. No, this is going to be -- it's going to be pretty quick. Scheduling-wise here's how this is going to go.

You asked the question about are we just talking about jury selection? That's all we're going to do today. Okay. We're going to do this process today. And it'll take most of the day.

Like the Judge said, I'm going to talk to y'all for an hour, hour and 15, somewhere in there. When I'm done, Earl will have a chance to talk to y'all. The good news is invariably because we go first, we always end up going over stuff that they were going to go over so usually -- no pressure, Earl -- but usually theirs doesn't take quite as long as ours does because a lot of it would be repetitive.

But we're going to get through that process today; and then, the Judge will give y'all a fairly long break, 20, 30 minutes, give us a change to make our strikes, maybe talk to some of y'all individually; and

then, at the end of the day, we'll have a jury seated and that will be what we'll do today.

We'll start tomorrow morning with the actual evidence portion of the trial. We usually start around 9:00 o'clock in the morning, 9:00, 9:30, somewhere in there. And the Judge is real good about keeping business hours, try to break as close to 5:00 o'clock at the end of the day as we can. And I think this case will probably -- there's an outside chance it could be over tomorrow, or it might bleed into Thursday. I don't think it will go any past that. All right?

I almost made a mistake. We were in trial last week or I guess two weeks ago, and I was doing this part of the trial. And I made the comment that somebody said they had nonrefundable plane tickets Thursday of the next week, which was last week; and I said, "Man, if we're still here Thursday of next week, something has gone horribly, horribly wrong." And, boy, we almost made it. We made it until late Tuesday night -- probably should have gone into Wednesday, but I was getting nervous.

This one isn't going to take that long, but it is very important.

So, that's kind of what the schedule is going to look like for the rest of the day. Is there anybody that has, like, nonrefundable plane tickets

tomorrow or the next day going to Hawaii or anything like that?

VENIREPERSON NO. 8: Not necessarily nonrefundable, but I'm leaving the state Thursday and Friday.

MR. CALVERT: Thursday and Friday?

VENIREPERSON NO. 8: Correct.

MR. CALVERT: Is that for work?

VENIREPERSON NO. 8: For work.

MR. CALVERT: Okay. If -- let me ask you this: If this trial were still going, is that something that would be a real hardship on you if you were not able to go?

VENIREPERSON NO. 8: It's -- I'm the main assistant, and I have to go.

MR. CALVERT: You have to go.

VENIREPERSON NO. 8: Yes.

MR. CALVERT: Okay. Obviously, if something were to happen and you couldn't go, is that something that would be a distraction to you, the fact that you're not going on this trip that you have to go on?

VENIREPERSON NO. 8: I mean, if -- if -- it could be, yeah.

MR. CALVERT: Okay. All right. And you're a -- is it Mr. Schlechte?

VENIREPERSON NO. 8: Yes.

MR. CALVERT: Did I say that correctly?

VENIREPERSON NO. 8: Yes.

MR. CALVERT: What type of work do you do?

VENIREPERSON NO. 8: Accident reconstruction.

MR. CALVERT: Who do you work for?

VENIREPERSON NO. 8: James Locke.

MR. CALVERT: Okay. And do y'all work primarily for attorneys or what?

VENIREPERSON NO. 8: Correct.

MR. CALVERT: Insurance companies, or do y'all do work for criminal lawyers or what?

VENIREPERSON NO. 8: A little bit of everything.

MR. CALVERT: Okay. Okay. How long have you been doing that?

VENIREPERSON NO. 8: Four years.

THE COURT: All right. Very good.

VENIREPERSON NO. 8: And I don't know if it's important, but we had a former employee that the D.A. is investigating.

MR. CALVERT: Oh, okay. Well, let's talk about that. How do you feel about that?

VENIREPERSON NO. 8: I'm not too happy about

it.

MR. CALVERT: Not too happy with our office?

VENIREPERSON NO. 8: No, with her.

MR. CALVERT: Oh, okay. So, you're very happy with our office? I like your attitude, Mr. Schlechte.

VENIREPERSON NO. 8: Yes.

MR. CALVERT: Is there anything about that situation besides the fact that our office is currently investigating somebody that you used to work with that would affect you in any way in this case as a juror?

VENIREPERSON NO. 8: Only towards her.

MR. CALVERT: Okay. Very good. I don't think she's going to be involved in this case, but I appreciate it.

VENIREPERSON NO. 8: No.

MR. CALVERT: All right. Any other questions about anything before we kick off?

What's the second -- the first question is always how long is this going to take? The second question is always what? What is this case about, right? And what's the one thing we can't tell you at this point? What is this case about? We're not allowed at this point to go into what this specific case is about, what the facts of this case are. If you think about that, that

makes sense.

It would not be fair to Mr. Greer if I could get up here and go, "All right. We have X fact, Y fact and Z fact. What would you do? I like that answer. You can stick around. You, nope, I don't think I like that one. You're gone," and so on and so on.

We can't do that. Okay? So, if it seems to y'all that myself or Earl are speaking in very broad terms and in general terms, in hypothetical terms, it's because that's exactly what we're doing because that's what the law requires of us at this point. All right?

Let me ask y'all this: Let's go back to high school, high school civics. This is a criminal case. How many of y'all watch the law shows on TV? I know more people than that watch the law shows. That's all that's on TV now, right? You can't turn the TV on without a law show being on.

In a criminal case, who has the burden of proof, me or them?

VENIREPERSONS: You.

MR. CALVERT: We do, Ryan and Will. Always, always, always. The burden of proof is here with the State. It never, never shifts over here. As he sits here right now, Mr. Greer is what?

VENIREPERSONS: Innocent.

MR. CALVERT: Innocent. And he stays innocent until when?

VENIREPERSONS: Proven guilty.

MR. CALVERT: Until proven guilty by who?

VENIREPERSONS: By you.

MR. CALVERT: By Ryan and Will, right?

Okay. Now, those of you that watch the law shows, what's the burden of proof in a criminal case? Proof beyond a?

VENIREPERSONS: Reasonable doubt.

MR. CALVERT: Y'all are good. Usually I trick somebody up, and they go, "shadow of a doubt," because that's what I saw on TV.

Okay. We're going to talk about that in a minute. But let's talk for a minute about what that means, what the burden of proof means and what specifically we have to prove.

The Legislature in this big old fat book right here has defined each and every crime in the State of Texas. And the way they define crimes are through what are called elements. Element are just specific factual things that Ryan and Will have to prove. And if we prove each element of the offense to the jury beyond a reasonable doubt, the jury is required by law to come back with what verdict?

VENIREPERSONS: Guilty.

MR. CALVERT: Guilty, right? If we fail to prove any element of the offense, the jury is required by law to come back with what verdict?

VENIREPERSONS: Not guilty.

MR. CALVERT: Not guilty, right? Everybody with me?

Like the Judge said, in this case, Mr. Greer is charged with unlawful possession of a firearm by a felon. These are the elements of that offense. These are the specific things that we have to prove.

One, the defendant, we have to prove that the person on trial is actually the same person that committed the offense. Two, has been convicted of a felony and possessed a firearm. Okay?

That's kind of a bare-bones outline. That's the elements of unlawful possession of a firearm by a felon in Texas.

Now, we're lawyers; and so, for lawyers, nothing is ever this simple, right? We have to have long definitions and stuff. The possession of a firearm has to be within five years of the defendant's release from either confinement or parole, whichever is later. All right?

So, if somebody is convicted of a felony and

they go to prison and they're in prison for five years and then they're on parole for another ten after that, the possession has to be within five years of the time they get off of parole. Does that make sense? All right.

MR. GRAY: Judge, my only objection would be there's also the rest of it entails probation as well.

MR. CALVERT: Well, it does, Judge --

MR. GRAY: Parole and probation.

MR. CALVERT: Yeah.

MR. GRAY: That's the entire definition.

MR. CALVERT: It is, Judge; but I'm only talking about the portions of the law that would be relevant in the case.

MR. GRAY: Well, then, Judge, I would object --

THE COURT: Come on up.

MR. GRAY: -- that's a *Standifer* objection.

THE COURT: Come on up here.

(Bench proceedings:)

THE COURT: Tell me what you're talking about on probation now. What's the law on that?

MR. GRAY: Well, the way the Penal Code reads, it's five years after discharge from the penitentiary or parole or probation. They left out the probation part.

THE COURT: Is he one of those or not?

MR. CALVERT: No, he doesn't qualify.

MR. GRAY: But in commenting on that, I would object under *Standifer*, Judge, he's basically now committing the jury panel to the fact that he's either in prison, which he isn't; so, he's on parole. So, we're getting into the facts of the case.

THE COURT: He's on parole?

MR. CALVERT: It's an element of the offense that we have to -- I'm going over the elements of the offense.

THE COURT: Okay. So, you're going under release from confinement?

MR. CALVERT: No, no, no, it's release from confinement, penitentiary or release -- discharge from parole.

THE COURT: Which is applicable in this case?

MR. CALVERT: He's still on parole.

MR. GRAY: Still on parole.

THE COURT: How are you prosecuting if he's still on parole because that would be five years after?

MR. CALVERT: No, no, it has to be within while you're still on supervision or --

THE COURT: Okay.

(Bench proceedings concluded.)

THE COURT: All right. I'm going to overrule the objection.

MR. CALVERT: All right. Let's talk about what some of these words mean. Possession -- where's my chart.

Ms. -- I would pick a hard one right up front. Is it Galimbertti?

VENIREPERSON NO. 15: (Nods head.)

MR. CALVERT: Did I say that correctly?

VENIREPERSON NO. 15: Close enough.

MR. CALVERT: All right. Close enough anyway?

VENIREPERSON NO. 15: Yes.

MR. CALVERT: Possession, what does that mean to you? What does it mean to possess something?

VENIREPERSON NO. 15: That you have it.

MR. CALVERT: That you have it. Okay.

Ms. Blair, how about you? What do you think?

VENIREPERSON NO. 14: In your hands.

MR. CALVERT: In your hands.

All right. Is it Dr. Schlitter?

VENIREPERSON NO. 13: Yes.

MR. CALVERT: Dr. Schlitter, what do you

think, that word possession? What does it mean to possess something?

VENIREPERSON NO. 13: If you have it under your control.

MR. CALVERT: Okay. Under your control. And what -- you were a professor, correct?

VENIREPERSON NO. 13: Yes.

MR. CALVERT: And what did you teach?

VENIREPERSON NO. 13: Biology.

MR. CALVERT: Biology?

VENIREPERSON NO. 13: Yes.

THE COURT: Thank you, ma'am.

Ms. Bernal, what do you think? Possession, what does that word mean to you?

VENIREPERSON NO. 12: To have something.

MR. CALVERT: To have something. All right.

Mr. -- is it Slovak?

VENIREPERSON NO. 11: Yes.

MR. CALVERT: What do you think, sir?

VENIREPERSON NO. 11: Well, it doesn't say ownership, so I would think possession means within your control.

MR. CALVERT: Okay. Very good. It doesn't say ownership, right? That's exactly right. Okay.

Mr. -- is it Dr. Smith?

VENIREPERSON NO. 10:  No.

THE COURT:  Mr. Smith, you're a professor as well, right?

VENIREPERSON NO. 10:  Yes.

MR. CALVERT:  What do you teach?

VENIREPERSON NO. 10:  History, American History.

MR. CALVERT:  Okay.  What do you think possession means?

VENIREPERSON NO. 10:  I would say it's control but not ownership.

MR. CALVERT:  All right.  Y'all are exactly right.  Okay.  Possession is one of these words that is legally defined in Texas.  And the legal definition of possession is care, custody, control, like y'all said, or management.  Any one of those things.  Okay?

Now, Ms. Blair, you said in your hand, right?

VENIREPERSON NO. 14:  Uh-huh.

MR. CALVERT:  Are you possessing that No. 14 right now?

VENIREPERSON NO. 14:  Yes.

MR. CALVERT:  Yeah.  Because it's in your hand, right?

VENIREPERSON NO. 14:  Uh-huh.

MR. CALVERT:  Is your purse in your hand?  Do you have a purse with you today?

VENIREPERSON NO. 14:  I do.

MR. CALVERT:  Are you possessing that purse right now?

VENIREPERSON NO. 14:  Yes.

MR. CALVERT:  Why?  It's not in your hand?

VENIREPERSON NO. 14:  It's close enough to me.

MR. CALVERT:  Okay.

VENIREPERSON NO. 14:  It's in my hand in a split second.

MR. CALVERT:  Okay.  Very good.  Is this yours, Will?  I walked off with Will's pen.

This is -- this is my pen.  I stole it from Will.  Will you hold that for me?

VENIREPERSON NO. 12:  Yes.

MR. CALVERT:  Thank you.  I want you to hold that for me, but don't give it away or anything.  I'm going to need it back later.  Okay?

VENIREPERSON NO. 12:  Okay.

MR. CALVERT:  Okay.  Thanks.  Just hang on to it for me.

Ms. -- is it Nieto?

VENIREPERSON NO. 2:  Uh-huh.

MR. CALVERT: Did I say that correctly?

VENIREPERSON NO. 2: Yes.

MR. CALVERT: All right. I just gave her that pen to hold for me, but I'm going to get it back later. Okay?

VENIREPERSON NO. 2: Okay.

MR. CALVERT: Is she possessing that pen right now?

VENIREPERSON NO. 2: At the moment, yes.

MR. CALVERT: Yeah. Why?

VENIREPERSON NO. 2: Because you gave it to her to hold on to.

MR. CALVERT: Yeah. Am I possessing it?

VENIREPERSON NO. 2: No.

MR. CALVERT: Anybody think otherwise? Oh, I see a head nodding back here. Is it Ms. -- help me.

VENIREPERSON NO. 42: Ford.

MR. CALVERT: Ms. Ford. Ms. Ford, you're hiding back there, Ms. Ford. You say I am still possessing it. Why?

VENIREPERSON NO. 42: Because it's yours, and you intend to get it back from her.

MR. CALVERT: Yeah. Okay. What do you think about, Mr. Davis?

VENIREPERSON NO. 41: I think that's

correct.

MR. CALVERT: You think that's correct.

What do you think -- is it Mr. Irvin?

VENIREPERSON NO. 33: Yes.

MR. CALVERT: What do you think? They say I'm possessing that right now. I'm not even touching it, man. She's got it over there. Why am I possessing it? What do you think?

VENIREPERSON NO. 33: Because you gave her instructions that it remain in her possession and to return it to you.

MR. CALVERT: Okay.

THE REPORTER: What number are you, sir?

MR. CALVERT: Okay. I'm sorry. Mr. Irvin, No. 33, right? As opposed to the other Mr. Irvin who was No. 88.

Okay. Mr. -- let's go down that row.

Mr. Moore, what do you think about that? Am I possessing that pen?

VENIREPERSON NO. 30: You still have it. I say you still have control and management over it.

MR. CALVERT: Okay. Okay.

What do you think, Mr. Masterson?

VENIREPERSON NO. 35: I think that you are no longer possessing it.

MR. CALVERT: Okay. Tell me why.

VENIREPERSON NO. 35: Because she now has the care and management of it until she gives it back to you.

MR. CALVERT: All right. What do you think, Ms. -- is it Strickman?

VENIREPERSON NO. 36: Steckman.

MR. CALVERT: Steckman. I apologize. What do you think, ma'am? I mean, you're No. 36; is that right?

VENIREPERSON NO. 36: Yes.

MR. CALVERT: Okay.

VENIREPERSON NO. 36: The pen would belong to you, but you have no control over it right now because it is in her possession and whatever she does with it, it's her fault.

MR. CALVERT: Okay. Let's go forward.

Mr. -- is it Mr. Hernandez, No. 19, what do you think, Mr. Hernandez?

VENIREPERSON NO. 19: I say she has possession of it.

MR. CALVERT: She does, clearly. Does anybody in here dispute that she has possession? You're not disputing you possess my pen, right?

VENIREPERSON NO. 12: No.

MR. CALVERT: Okay. Don't throw it away or anything.

No question she has possession. But what do you think? Can she possess it and I possess it? Is that possible? What do you think, Mr. Hernandez? Can two people or three people or 20 people possess the same thing at the same time?

VENIREPERSON NO. 19: I would say no.

MR. CALVERT: You would say no. Okay. What do you think? Let's go right down that row. What do you think, Ms. -- you're going to have to help me with this one.

VENIREPERSON NO. 18: Defrancesco.

MR. CALVERT: That's exactly what I was going to say. What do you think, Ms. Defrancesco?

VENIREPERSON NO. 18: I don't think you have possession of it. You don't have control over it.

MR. CALVERT: Okay. Yes, sir. What do you think? Were you holding up your hand?

VENIREPERSON NO. 11: Well, I do have a question about it.

MR. CALVERT: Yeah.

VENIREPERSON NO. 11: What about the reason for giving it away? Is -- what if the reason for giving it away is because I'm not supposed to have it.

MR. CALVERT: Okay. How does that work? Tell me what you're thinking. Flesh that out for me. What are you thinking?

VENIREPERSON NO. 11: If I'm not supposed to be in possession of something, so I give it away to somebody else, I don't have it anymore.

MR. CALVERT: This is not a box of Kleenex. I know it looks like one. But it's not. It's a kilo of cocaine. Okay? I don't want that. Here you take it. I'm not supposed to have that, right? And you're, like, wait, no, I don't want that either. I'll take it.

I knew what this was, right? Okay. I knew what this was, and I had this -- you bring up an interesting point. If you -- legally, are you in possession of something -- let's -- let's do this a little bit different. What your name, ma'am?

VENIREPERSON NO. 3: Marilyn Mathis.

MR. CALVERT: Marilyn, let's say on a break you leave the courtroom; and you leave your purse. You've got a big red bag down there. You leave your purse here, and I take some methamphetamine that we have back there in the evidence deal, and I put it in your purse while you're out there. Okay? You don't know that this has happened. All right?

VENIREPERSON NO. 3: Uh-huh.

MR. CALVERT: And you come back in and you leave for the day and take your bag with you. Are you exercising, custody, control or management over that methamphetamine?

VENIREPERSON NO. 3: Evidently, but that ain't going to happen. I'm not leaving my purse.

MR. CALVERT: Well, a wise policy for sure. But what do you think? Let's say that happened. Are you in possession of the methamphetamine?

VENIREPERSON NO. 3: Sadly, yes.

MR. CALVERT: Yeah, you are. Under those circumstances, though, would you be committing a crime? It is illegal to possess methamphetamine except you have to know you're possessing it, right? And that kind of gets to what you're talking about, Mr. Slovak, right?

VENIREPERSON NO. 11: Yes.

MR. CALVERT: In order to possess something and it be a crime to possess it, you have to be aware of your possession of it for a long enough period that you could have terminated your control over it at any point.

For example, if you are -- you go to get your keys and you find a little Baggie of meth and you go, "Good Lord, this is a Baggie of meth;" and there's a cop standing there; and you go, "Officer, I just found this in my bag. I think somebody planted it in here." At that

point, you haven't committed a crime. You actually did exercise care, custody, control or management over the meth. Okay? But that wouldn't have been illegal because as soon as you knew about it, you're getting rid of it, right?

Does that make sense? Does that kind of get to what you were talking about?

VENIREPERSON NO. 11: Well, I'd be interested in the question about, well, at what point did someone get possession?

MR. CALVERT: Sure.

VENIREPERSON NO. 11: And did they -- when they found -- when they knew that they weren't supposed to have it, did they take steps to get rid of it?

MR. CALVERT: Okay. So, what you're talking about is let's say instead of when she discovers the methamphetamine finding the nearest officer and going, "Officer, I just found this," she takes it home and says, "Look what I found in my purse?"

Is that a different scenario? What do you think? Is she probably committing a crime at that point by possessing that methamphetamine?

VENIREPERSON NO. 11: I don't know. I'd want to hear that argument.

MR. CALVERT: Okay. Well, what do you

think? Make the argument. What do you think? She's known about it for --

VENIREPERSON NO. 11: I don't know all the details of the circumstances.

MR. CALVERT: Okay.

VENIREPERSON NO. 11: I'd need to know more.

MR. CALVERT: Okay. What do you think? Are you committing a crime by taking that meth home and --

VENIREPERSON NO. 3: Well, I wouldn't know what it looked like, so I don't know.

MR. CALVERT: That's good. What do you think, Mr. Cessna?

VENIREPERSON NO. 6: Well, I think that if she knowingly possessed it, then she'd be a liability.

MR. CALVERT: Okay. Ms. -- is it Manchi?

VENIREPERSON NO. 7: Manchi.

MR. CALVERT: Manchi. Okay. Ms. Manchi, what do you think? Do you agree with Mr. Cessna that if she knows about it and she continues to possess it, at that point, she's committing the offense? Do you agree?

VENIREPERSON NO. 7: Yes.

MR. CALVERT: Okay. What do you think, Mr. -- Ms. Welsh? Where are you, Ms. Welsh? There you are.

VENIREPERSON NO. 9: I think whenever

something is knowingly done, then, yes, that's when it revolves into a crime.

MR. CALVERT: Okay. Y'all are right. Y'all are right. And that's the law. Okay. That's the law. If you are aware of your possession of something for a long enough period of time that you could have terminated your control over it and you continue to possess it, at that point, you're guilty of the offense of possessing, whether it's dope or whatever. Does that make sense?

Any questions about that? Now, one of the cool things about my job is I get to talk to a lot of folks. And a lot of people, say, "You know, Ryan, I get that. I get what the law is; but for me, personally, I couldn't find somebody guilty. I couldn't convict somebody of a felony as a juror unless it's like in their hands or on their person," right? "I mean, that's just me. I couldn't do it."

And a lot of folks feel that way, and there's nothing wrong with feeling that way. But who kind of thinks that way? Because there's a lot of people when they hear the word "possession," they think -- kind of like we heard from Ms. Blair, in your hand, in your pocket, in your purse, right? That was the first thought that went into your head.

I mean, how do you feel about that? Do you

think it's fair to -- that somebody could be convicted of possessing something that literally is not on their person, that's not in their hands? Are you okay with that?

VENIREPERSON NO. 14: I think if you don't have control at that point, somebody else could have put it somewhere without you knowing it; then, I don't think you should be in trouble for that. Like her, if she wouldn't -- I wouldn't know what it looks like either; but if somebody put it in there and she walked off and then two weeks later she went through her big purse and found it, you know, I don't think she should be the one getting in trouble for it.

MR. CALVERT: Okay. What do you think, Ms. -- is it Steckman? Did I say your name right?

VENIREPERSON NO. 36: Yes, Steckman.

MR. CALVERT: Steckman. Okay. Ms. Steckman, what do you think? Are you okay with the notion that somebody can possess something that is not physically in their hand or on their person? How do you feel about that?

VENIREPERSON NO. 36: Oh, definitely.

MR. CALVERT: But why? Why do you say that?

VENIREPERSON NO. 36: Because he could have -- he or she could have it, like, on -- in the car,

in their house.

MR. CALVERT: Okay.

VENIREPERSON NO. 36: And to me, you could possess it.

MR. CALVERT: Okay. Mr. Arias, what do you think about that?

VENIREPERSON NO. 37: I agree. You can have -- you know, I have tools in my truck right now. They're clearly in my possession.

MR. CALVERT: Did -- you drove your truck to the courthouse today?

VENIREPERSON NO. 37: Yes, sir.

MR. CALVERT: It's parked out in the parking lot?

VENIREPERSON NO. 37: Yes, sir.

MR. CALVERT: You didn't bring your tools into the courtroom, did you?

VENIREPERSON NO. 37: No, sir.

MR. CALVERT: Okay. And you said those tools, even though they're in your vehicle, they're in your possession, right?

VENIREPERSON NO. 37: Yes, sir, they are.

MR. CALVERT: Why? Why do you think so?

VENIREPERSON NO. 37: Because they're under my care. I can manage those tools.

MR. CALVERT: Okay. Very good.

What do you think about that, Mr. -- let's keep going down that row. Is it Mr. Pfitzer?

VENIREPERSON NO. 38: Yes, sir. I agree with the previous gentleman's statement.

MR. CALVERT: Okay. So, you agree that his tools are in his truck. They're not even in the same building as him, but he's saying they're still in his possession, right?

VENIREPERSON NO. 38: They're in his vehicle.

MR. CALVERT: Okay. And you're comfortable with him in being in possession -- saying that he's in possession of those even though they're in his vehicle in another part of the --

VENIREPERSON NO. 38: I am.

MR. CALVERT: Okay. Ms. Nelson, what do you think?

VENIREPERSON NO. 39: I think he put them in his vehicle. He parked his vehicle. They're in his possession, and nobody got him to do it.

MR. CALVERT: All right. Mr. Cobos, what do you think about that?

VENIREPERSON NO. 16: I agree.

MR. CALVERT: Okay. Are you comfortable

bad

with that, that if something's in your vehicle or in your home or something, it's in an area that you control, that you are in possession of that? Are you okay with that notion?

VENIREPERSON NO. 16: Uh-huh.

MR. CALVERT: All right. How about you, Mr. Holt?

VENIREPERSON NO. 17: Yes, I agree with that.

MR. CALVERT: All right. Ms. -- is it Albernaz? Did I say that right?

VENIREPERSON NO. 46: Yes.

MR. CALVERT: All right. What do you think about that?

VENIREPERSON NO. 46: I agree.

MR. CALVERT: Who feels the other way? You know, a lot of folks do. They feel like, "Yeah, I couldn't convict somebody of a felony unless it's like on them, in their pocket, in their hand."

What do you think about that, Ms. Blair?

VENIREPERSON NO. 14: Well, his tools are in his truck in the parking garage. What if somebody walks by and drops something in the bed of that pickup truck?

MR. CALVERT: That's a good --

VENIREPERSON NO. 14: Is he still in -- you

know, are you in possession then?

MR. CALVERT: Well, and again, this is where we get into two different things. Is he in possession in that he has care, custody or control over whatever item you're talking about? Say it's a drug, right? Would he have care, custody, control or management over those drugs?

VENIREPERSON NO. 14: Right.

MR. CALVERT: Would he? Yes. But would that be a crime? No. And the reason is why?

VENIREPERSON NO. 8: Because he doesn't know it.

MR. CALVERT: Because he doesn't know it. He didn't know it. Those are two different things. Okay? Those are two different things. Does that make sense?

VENIREPERSON NO. 14: Uh-huh.

MR. CALVERT: Okay. Ms. Galimbertti, am I getting that right?

VENIREPERSON NO. 15: Galimbertti.

MR. CALVERT: Okay. What do you think about that? Are you okay with this notion that you can just possess something that is not physically on your person?

VENIREPERSON NO. 15: Yes.

MR. CALVERT: Yeah? Dr. Schlitter, how about you? Are you okay with that?

VENIREPERSON NO. 13:  Yes.

MR. CALVERT:  How about you, Ms. Bernal?

VENIREPERSON NO. 12:  I don't think so.

MR. CALVERT:  Okay.  Talk to me.

VENIREPERSON NO. 12:  If it's not on me, then I shouldn't claim something that doesn't belong to me or that's -- it could be belong to somebody else.

MR. CALVERT:  That's a good point.  It could belong to somebody else, right?  That pen that you were holding for me, that was my pen, right?

VENIREPERSON NO. 12:  Yes.

MR. CALVERT:  Actually, it wasn't even mine. It was Will's, right?

VENIREPERSON NO. 12:  That's what I was going to say, also.  I mean, it could be a third party's item the second party gave to me.

MR. CALVERT:  Right.

VENIREPERSON NO. 12:  So, I --

MR. CALVERT:  Right.

VENIREPERSON NO. 12:  -- I can always pass the blame to somebody.  I wouldn't want to take the blame.

MR. CALVERT:  Okay.  But that brings up a good point.  Well, let me square this up with you first. A lot of folks feel exactly like you do, that I just don't think that's fair for somebody to be convicted of a felony

for something unless it's like on them, in their pocket or in their hand, right? Is that kind of how you feel?

VENIREPERSON NO. 12: If it's not mine -- legally, if it's not mine, I was just asked to hold it for somebody --

MR. CALVERT: Uh-huh.

VENIREPERSON NO. 12: -- I wouldn't want to take responsibility for it --

MR. CALVERT: Well --

VENIREPERSON NO. 12: -- other than --

MR. CALVERT: Well, I understand you not wanting to take responsibility for it.

VENIREPERSON NO. 12: Well, I shouldn't be having to take the blame.

MR. CALVERT: Okay. Okay. Then let's -- let's explore that for a minute, and then I'm going to -- I've got you, Ms. Blair.

What I hear you saying -- and I don't want to put words in your mouth, so let's talk about this -- is just in your mind, you don't think it's fair for somebody to be held responsible for possessing something unless they own it, unless it's theirs, right?

VENIREPERSON NO. 12: Correct.

MR. CALVERT: Okay. Okay. And so, in your mind, even if the evidence proves that maybe somebody was

exercising care, custody, control or management over property, a firearm, right; and they knew they had it; but it wasn't theirs, I mean, they didn't own it --

VENIREPERSON NO. 12: Right.

MR. CALVERT: -- right? In your mind, you couldn't convict somebody of a felony under those circumstances; is that true?

VENIREPERSON NO. 12: I probably -- I would be able to only because it's not me. But if it were somebody else, I could -- I can -- if the evidence were proven then, yes, I could.

MR. CALVERT: Okay. Ms. Bernal -- or, I'm sorry, Ms. Blair, what were you going to say?

VENIREPERSON NO. 14: Well, I think the question is access. You know, is it limited access? Is it -- if it's not your possession or, at the time, it's in my car, then I'm the only one who could possibly, then I would say, yes, you're in possession. But if there's six other people that have keys to that car, then I'm not sure you could establish possession immediately.

MR. CALVERT: Okay. Ms. -- let's go straight back. Ms. Moore, what do you think about that? Can -- what do you think about the notion, first of all, Ms. Moore, that somebody can possess something that's not physically on them? Are you okay with that?

VENIREPERSON NO. 30: Yes.

MR. CALVERT: Okay. Let's take it a step further. What about the notion that -- well, are you married?

VENIREPERSON NO. 30: Yes.

MR. CALVERT: Okay. Do you own a home?

VENIREPERSON NO. 30: Yes, sort of.

MR. CALVERT: Sort of. That's okay. Do you have a TV?

VENIREPERSON NO. 30: Yes.

MR. CALVERT: Is it in your house?

VENIREPERSON NO. 30: It should be.

MR. CALVERT: Okay. Do you possess that TV?

VENIREPERSON NO. 30: Yes.

MR. CALVERT: Yeah. Why?

VENIREPERSON NO. 30: Oh, well --

MR. CALVERT: It's not a trick question.

VENIREPERSON NO. 30: I possess it in the material sense, but I don't possess what could happen to it because unless you have control of the remote control, that's not possession.

MR. CALVERT: Yes, but here's the problem with what you just said. You're the wife; therefore, you always have control.

VENIREPERSON NO. 30: I'm also a mother, and

I never have control.

MR. CALVERT: All right. Would you agree that your TV is in your house; and because it's in your house, you have control or management over that TV, right?

VENIREPERSON NO. 30: Yes.

MR. CALVERT: Because it's in your house. You didn't bring it with you today, right?

VENIREPERSON NO. 30: Right, I did not bring it with me.

MR. CALVERT: Well, I mean, Ms. Moore, are you okay with the notion -- are you comfortable saying that you are in possession of the things that are in your home, like a TV or a refrigerator, things that you know about?

VENIREPERSON NO. 30: I'm more comfortable with the refrigerator.

MR. CALVERT: Why aren't you comfortable with the idea of -- do you have a flat screen or a big one?

VENIREPERSON NO. 30: Yes.

MR. CALVERT: Okay. And you're not comfortable saying you possess that?

VENIREPERSON NO. 30: No, no, I possess it, I just can't control what -- I just can't control what comes across it or what people view.

MR. CALVERT: I'm not talking about the use of it.

VENIREPERSON NO. 30: Okay.

MR. CALVERT: I'm not talking about the use of it. I'm talking about the actual item, the TV itself. Okay. Is that in your possession?

VENIREPERSON NO. 30: Yes.

MR. CALVERT: Yeah. Why? Because it's in your house, right?

VENIREPERSON NO. 30: Yeah.

MR. CALVERT: What's your husband doing today?

VENIREPERSON NO. 30: He's at work.

MR. CALVERT: Is that TV in his possession?

VENIREPERSON NO. 30: Yes.

MR. CALVERT: Yeah. So, what about -- what about that? How can two people or more than two people have possession of the same thing at the same time?

VENIREPERSON NO. 30: Well for us, I guess, it's because we're in a marriage; and you have mutual possession.

MR. CALVERT: Sure. Okay. Ms. Carter, what do you think about that? Do you agree that more than one person can possess the same thing at the same time? You're No. 29.

VENIREPERSON NO. 29: Yes.

MR. CALVERT: Why? Explain to me how that's possible.

VENIREPERSON NO. 29: We share it.

MR. CALVERT: Okay. Mr. -- is it Lavender?

VENIREPERSON NO. 28: Yes.

MR. CALVERT: What do you think about that?

VENIREPERSON NO. 28: I agree.

MR. CALVERT: Why?

VENIREPERSON NO. 28: Because more than person can have care and control of everything to do with it.

MR. CALVERT: Okay. Ms. Frosch, do you agree with that?

VENIREPERSON NO. 27: I agree with him.

MR. CALVERT: Yeah.

VENIREPERSON NO. 27: I agree with what he said because more than one person can have control or management of the things in the home.

MR. CALVERT: Okay. Dr. Hash, do you agree with that?

VENIREPERSON NO. 26: Yes.

MR. CALVERT: And you're a physician; is that correct?

VENIREPERSON NO. 26: Yes.

MR. CALVERT: Let's say that -- let's say, Dr. Hash, that you have -- you ever seen the movie "Scar Face"?

VENIREPERSON NO. 26: Portions of it.

MR. CALVERT: Portions of it. Okay. What's it about? Tell me.

VENIREPERSON NO. 26: It's about Al Pacino being a gangster, and he was essentially running things up in Miami.

MR. CALVERT: Ends up in Miami, not just a gangster but what's his business? Cocaine. Cocaine, right? He's a drug lord. He's a drug lord, right?

VENIREPERSON NO. 26: Yes.

MR. CALVERT: And he -- by the end of the movie, he's top dog, right? He's sitting in the mansion on Miami Beach. And he is responsible for a cocaine empire, right? Sending out dealers all over the place selling cocaine.

Now, let's take cocaine as an example. The guy standing on the street corner, Dr. Hash, slinging, you know, 1 gram bags of cocaine, is that guy in possession of the cocaine that he's selling?

VENIREPERSON NO. 26: Yeah.

MR. CALVERT: Yeah. What about the guy over him that gave him that cocaine to deal as part of that

same operation? Is he in possession of that cocaine?

VENIREPERSON NO. 26: Under that definition, yes.

MR. CALVERT: Yeah. Why?

VENIREPERSON NO. 26: He controls it.

MR. CALVERT: And what about the guy over him, all the way up to Al Pacino sitting in the mansion in Miami, right? Is Al Pacino, who is not touching the cocaine, he doesn't even see it, right; but he knows it's there. He's running the operation of it. Is he in possession of the cocaine that his organization is selling? What do you think?

VENIREPERSON NO. 26: Under that definition I would say, yes.

MR. CALVERT: Yeah. Why?

VENIREPERSON NO. 26: He controls the distribution.

MR. CALVERT: How do you feel about that? Is that fair?

VENIREPERSON NO. 26: That Al Pacino controls the industry?

MR. CALVERT: Is that fair that a person who is not physically touching the items possessed, a lot of time doesn't even see them, but can still be held to be in possession of them and legally responsible for them if the

evidence shows that they are in control or they're somehow managing that property or those items? Is that fair in your mind?

VENIREPERSON NO. 26: Yes.

MR. CALVERT: Okay. What do you think? Is it Ms. -- help me with your name.

VENIREPERSON NO. 25: Miao.

MR. CALVERT: Miao. Okay. What do you think about what Dr. Hash said?

VENIREPERSON NO. 25: I don't know because I don't know what's the difference between the possess and the ownership.

MR. CALVERT: Okay. That's a good question. What's the difference between possession and ownership? What number are you, Ms. Miao? No. 25. Do you own that No. 25?

VENIREPERSON NO. 25: No.

MR. CALVERT: No. But are you in possession of it?

VENIREPERSON NO. 25: Yes.

MR. CALVERT: Why?

VENIREPERSON NO. 25: Because it's in my hand.

MR. CALVERT: Right. That's kind of the difference, okay.

VENIREPERSON NO. 25: Okay.

MR. CALVERT: The Court owns it, right?

VENIREPERSON NO. 25: Yeah.

MR. CALVERT: So, let's use Ms. Miao's No. 25 as an example and let's go down that row.

Is it Mr. McIntyre?

VENIREPERSON NO. 24: Right.

MR. CALVERT: Mr. McIntyre, do you agree with Ms. Miao that she is in control of that 25 or that No. 25?

VENIREPERSON NO. 24: Yes, I do.

MR. CALVERT: Yeah. What about Mr. Montoya who is in charge of handing those numbers out to y'all and picking them back up at the end of the jury selection? Is Mr. Montoya also in possession of that No. 25?

VENIREPERSON NO. 24: I would agree with that.

MR. CALVERT: Yeah. Yeah. What about -- what about Judge Bryan who's in charge of everything in here? This is his world, right?

VENIREPERSON NO. 24: Going back to the example of the drug lord, yes, he's in the control of the courtroom, so everything in here is under him.

MR. CALVERT: Are you comfortable with that?

VENIREPERSON NO. 24: Yeah.

MR. CALVERT: Okay. Ms. Henry, how about you? What do you think? Do you agree with Mr. McIntrye?

VENIREPERSON NO. 23: Yes, because of care, kind of like what you have in your house. You put locks, alarms, possession. You take care and do what you can, whether that means bringing that with you inside, like, you know, people's credit cards, cash, driver's license. Well, not your car; but leaving tools or something like that, he made the choice to leave it in his truck. So, it's still in his possession. He took the care and control of doing that.

MR. CALVERT: Mr. Parker, what do you think about that?

VENIREPERSON NO. 22: I agree. I think he was in possession and control. They're side-by-side. But it's like you're talking about the number, yes, the possession is her in hand; but it's actually owned by this court system. Now, she has control whether she's going to give it back or not; but legally, the Court owns the number.

MR. CALVERT: Right. Mr. Lamb, are you okay with that?

VENIREPERSON NO. 21: Yes.

MR. CALVERT: Do you think that's a fair way of defining possession that you can have multiple people

being in possession of the same object at the same time? Are you comfortable with that?

VENIREPERSON NO. 21: Yes.

MR. CALVERT: Okay. What do you think, Mr. Smith?

VENIREPERSON NO. 10: I agree.

MR. CALVERT: Oops. I'm sorry. That was Mr. Smith.

VENIREPERSON NO. 20: I agree.

MR. CALVERT: Okay. Now, some folks, though, feel kind of like we talked with Ms. Bernal over here that ownership to them is the most important. That I just don't think it's fair to convict somebody of a crime unless they own the property. Okay. Even if they're holding it, even if they know about it, I don't think that's fair.

Who feels that way and says, to me ownership kind of trumps everything? Is there anybody that feels that way? Ms. -- who are my quiet ones? Let's go in back. Is it Ms. Heidick?

VENIREPERSON NO. 49: Yes.

MR. CALVERT: How do you feel about that? Do you think that it's fair that somebody could be held responsible for possessing something even if they don't own it?

VENIREPERSON NO. 49: Yes.

MR. CALVERT: Okay. How come?

VENIREPERSON NO. 49: You have a bunch of drugs and you gave them to me, and I possessed them. I shouldn't get away because I don't own them.

MR. CALVERT: All right. Mr. -- help me, right next door.

VENIREPERSON NO. 50: Bardenhagen.

MR. CALVERT: Bardenhagen. What do you think about that, Mr. Bardenhagen?

VENIREPERSON NO. 50: I agree.

MR. CALVERT: Okay. How about you, Ms. Good?

VENIREPERSON NO. 51: I agree.

MR. CALVERT: Is there anybody that disagrees with that? Is there anybody that feels differently? Yes, ma'am, help me with your number. No. 54.

VENIREPERSON NO. 54: 54.

MR. CALVERT: No. 54, Ms. Dean. What are you thinking, Ms. Dean?

VENIREPERSON NO. 54: It could be either way. Like in a situation you're living with roommates; and a roommate has a controlled substance in their room or alcohol, you know, whatever; and you know it's there --

MR. CALVERT: Yeah.

VENIREPERSON NO. 54: -- but you're not in control of it or, you know, in possession; but it's in your house.

MR. CALVERT: Right. What do y'all think about that? That's a great example. Let's use that. Let's say you live with somebody, and they have -- we'll use drugs because that was the example you used. They have drugs. You know they have drugs in your house that you share with them; but you don't own them, right? You're not using them, right? That's what you're talking about?

VENIREPERSON NO. 54: (Nods head.)

MR. CALVERT: What do you think about that, Ms. Welsh?

VENIREPERSON NO. 9: I was in that same position while I was in college. But I felt uncomfortable because I had a roommate that thought that that was okay, and I didn't agree with their decisions. And, well, if I'm paying rent, it's my property whatever. Well, I don't want to be in a place where I'm around stuff like that. So, I can agree with that. The fact that I had no control of that other than the fact that I got stuck with this girl who thought that it was okay to do drugs.

But, no, like if the cops were to come in, I

would get in trouble. I would not have agreed that it was under my possession, too, because I didn't use them. They weren't in my room. They weren't --

MR. CALVERT: Yeah. And in the house example, you could get into a whole lot of really specific -- I mean, you could change that around a whole bunch of different ways, like whose room was it in or whose stuff was it in, right? There's a million different little variables you could change in there.

But let's -- let's do it this way. What if, like you said, it's your place. It's your house, and you know it's there. You know it's there.

VENIREPERSON NO. 9: Right.

MR. CALVERT: And you just choose to kind of ignore it. It's not yours. You don't own it. You're not using it. You know it's in your house; but, you know, you kind of turn a blind eye and say, "I don't want any part of that."

VENIREPERSON NO. 9: Right.

MR. CALVERT: "I'm just going to" --

VENIREPERSON NO. 9: Which isn't probably the right thing to do; but as an 18-year-old, at the time, you don't really -- I don't know. You don't -- I didn't want to be a part of that.

MR. CALVERT: Absolutely. No, I understand.

VENIREPERSON NO. 9: I didn't want to get in trouble by ratting out my roommate and all that; and so, I don't know. I could understand how seeing it that way.

MR. CALVERT: Sure. Now, and Mr. -- No. 10, Mr. Smith, what do you think about that? Legally -- and not to pick on you, Ms. Welsh --

VENIREPERSON NO. 9: That's fine.

MR. CALVERT: But legally, in that scenario where she knows there's dope in the house, okay? She doesn't own it. She's not using it, but she knows it's there. It's her house. Legally, is she in possession of that -- of those drugs?

VENIREPERSON NO. 10: No.

MR. CALVERT: Okay. Why not?

VENIREPERSON NO. 10: She's not exercising control over it. She has knowledge, but no control. She has a moral obligation but not a legal obligation.

MR. CALVERT: Okay. Who disagrees with that? What do you think?

VENIREPERSON NO. 5: I disagree. I think she's in possession.

MR. CALVERT: Why?

VENIREPERSON NO. 5: Because she has the ability to --

MR. CALVERT: You're Mr. Kelling, No. 5.

VENIREPERSON NO. 5: Sorry. She has the ability to manage the situation by either leaving the situation or having the people and the items removed from the house.

MR. CALVERT: Okay. Yes, ma'am, all the way back in the back, Ms. Hudspeth, No. 60. What do you think?

VENIREPERSON NO. 60: I agree.

MR. CALVERT: All right. You agree with what Mr. Kelling said? Okay. Who else feels that way?

All right. Mr. Cessna, you said you feel that way, and Mr. Parker and Mr. Pfitzer. What do you think about that, Mr. Pfitzer?

VENIREPERSON NO. 38: I agree with that, yes. If under the circumstances, one could do something, they are in control.

MR. CALVERT: Okay. All right.

VENIREPERSON NO. 11: Could I add something?

MR. CALVERT: Absolutely.

VENIREPERSON NO. 11: Technically, you could say someone's in possession of it, but I think the law allows the jury and the Judge a range of punishment for circumstances.

MR. CALVERT: Well done, Mr. Slovak. Absolutely. Say that a little bit louder. The law allows

a range of?

VENIREPERSON NO. 11: Punishment.

MR. CALVERT: Punishment, right? Absolutely. And you're correct about that.

Why is that important? In your mind, what made you say that? What made you think about that?

VENIREPERSON NO. 11: Well, because I think there's different levels of guilt.

MR. CALVERT: Yeah. You're right about that. Okay. You're absolutely 100 percent right about that.

And what you said is exactly how the law works. Okay. There are three phases in any jury trial. You're in the first one right now, jury selection. Or as the Judge correctly pointed out, jury deselection. Okay?

The next phase is the guilty/not guilty phase. In the guilt phase, the only issue -- the only question in front of the jury is did the State prove that? Yes or no, period, the end. Okay. At the guilt phase, that is the only question that the jury has to answer is: Did Ryan and Will prove each one of these elements beyond a reasonable doubt?

And if the answer is yes, they jury is required to come back with what verdict?

VENIREPERSONS: Guilty.

MR. CALVERT: Guilty. And if the answer is no to any one of these, the jury is required to come back not guilty. Is everybody with me?

VENIREPERSONS: Uh-huh.

MR. CALVERT: Once a guilty verdict has been reached, then we get into what phase, Mr. Slovak?

VENIREPERSON NO. 11: Punishment.

MR. CALVERT: Punishment. Okay. And you're correct in that the law builds in punishment ranges, big punishment ranges, specifically for that reason. So, that level -- you know, degrees of guilt or degrees of culpability, I guess we'll say, can be properly addressed as far as the punishment. Does that make sense? Does that make sense to everybody?

Now, in this particular case -- in all criminal cases prior to the time that we get here to this part of the trial, the person on trial has to make an election, a choice. In the event I'm convicted, in the event that I'm found guilty, I want either the jury or the Judge to assess my punishment. All right?

Now, in this particular case, Mr. Greer has opted for the Judge. So, the jury's job in this case will only be this right here (indicating). Okay? It will only be guilt. And the Judge will be handling punishment. Does everybody -- does that make sense? Is everybody okay

with that?

Is there anybody that says, "I don't think that's right. I think if the jury's doing guilt, I think the jury should get to do punishment"?

All right. Getting back to what we were talking about a minute ago, is there anybody here kind of in line with the discussion that we were having, that says, "You know, Ryan, if I look deep down in the depths of my soul and I'm honest with myself, I could not pull the trigger and find somebody guilty of a felony unless they -- it was their property that they owned"?

Ms. Welsh, is that how you feel?

VENIREPERSON NO. 9: Yeah, I don't -- either side of it, I feel sick to my stomach having to send somebody anywhere.

MR. CALVERT: I understand. I understand. And I appreciate that. A lot of folks feel that way. And that's what I was talking about earlier. They just feel like, "Ryan, unless you own it, I couldn't do that." A lot folks feel that way, and there's nothing wrong with that.

Yes, ma'am, No. 42, Ms. Ford?

VENIREPERSON NO. 42: Yes, sir.

MR. CALVERT: Is that how you feel?

VENIREPERSON NO. 42: No, I would have

trouble -- I can see a scenario where someone who was told they couldn't have a gun for a certain period of time and they found a friend or a family member who would keep that well away from them where they would have no access or anything like that, and -- and it was still in their -- technically, I guess, in their possession, but in someone else's and looked after --

MR. CALVERT: Right.

VENIREPERSON NO. 42: -- and nothing was done, that person could legally hold that gun for them.

MR. CALVERT: Yeah. That's not what we're talking about here. In that scenario that you're addressing, that actually happens; and that does exist. And there are certain types of offenses, domestic violence, for example, that you can't have a gun for a period of time. But that's -- that's a very good point, but that's not really what we're discussing in terms of this discussion. Does that make sense? We're talking about -- anybody else that agrees with Ms. Welsh that says, "Unless it's like your property that you're using, that you -- that you own, I can't find you guilty of a felony"? Who else feels that way?

All right. Ms. Welsh, I appreciate that.

VENIREPERSON NO. 9: Sorry.

MR. CALVERT: No, you don't need to

apologize. That's exactly -- you did exactly what you're supposed to do. That's exactly -- look at this point in time, y'all might have noticed when y'all came in here, the very first thing y'all did was you took an oath to what?

VENIREPERSONS: To be honest.

MR. CALVERT: To be honest, right. You might have noticed you did not take an oath to follow the law. And that's one of the really, really cool things about our system, is there's a reason you haven't taken an oath to follow the law because you don't have to at this point, right? All you've got to do is be honest about your opinions. We're allowed to disagree. That's what's so neat about this.

But we have to have that discussion now because the 12 of you that wind up over here, the very first thing that you'll do once you wind up over here is you're going to take a different oath. And that is to render a true verdict based on the law and the evidence in this case.

And so, we can't have it be once you get over here, you go, "Yeah, I don't think I could follow that law." Too late at that point. So, we have to figure that out now. All right?

So, you did exactly the right thing. I

appreciate that.

Mr. Holt, you're one of my quiet ones. How do you feel about that? And you're No. 17.

VENIREPERSON NO. 17: Yes.

MR. CALVERT: Are you okay with what we were talking about, that somebody could not own something and not even physically be in possession; but they can still be in possession of it? Are you okay with that?

VENIREPERSON NO. 17: Yes.

MR. CALVERT: Okay. Ms. Defrancesco, did I get that right?

VENIREPERSON NO. 18: Yes.

MR. CALVERT: All right. How do you feel about that?

VENIREPERSON NO. 18: I think it's --
there's a lot of gray areas, and it's very circumstantial.

MR. CALVERT: Okay.

VENIREPERSON NO. 18: Like going back to the scenario with the tools, he's in possession of his tools.

MR. CALVERT: Yep.

VENIREPERSON NO. 18: He owns those tools, but if somebody comes and steals something out of his truck and uses it to break into somebody else's car or hit somebody over the head, he should not be responsible at that point.

MR. CALVERT: He's not.

VENIREPERSON NO. 18: Great. But going back to he's in possession of his possessions.

MR. CALVERT: He's in possession of the tools, but that's like saying -- you know, I'm in possession of my gun; but if you steal my gun and you murder Mr. Hernandez with it, I'm not guilty of murder, right? I'm just not. I'm not guilty of anything. You're guilty of murder, right, because you shot him; but I'm not. Does that make sense?

VENIREPERSON NO. 18: Uh-huh.

MR. CALVERT: Okay. Mr. Hernandez, how do you feel about that? Are you okay as a juror finding somebody in possession of something that they don't necessarily own?

VENIREPERSON NO. 19: I agree.

MR. CALVERT: Are you okay with it?

VENIREPERSON NO. 19: Yes.

MR. CALVERT: Okay. Mr. Watson, in the back row, how do you feel about that, sir?

VENIREPERSON NO. 48: The same.

MR. CALVERT: All right. 47, Mr. Everett, are you okay with that?

VENIREPERSON NO. 47: I'm wondering if they know that they have it --

MR. CALVERT: That's the key. You have to know you have it. Okay. You have to -- for something to be a crime, you have to know you have it. All right. Does that make sense? And that's part of what has to be proven by Ryan and Will. Does that make sense?

VENIREPERSON NO. 48: If they know they have it, then they are in possession.

MR. CALVERT: All right. Let me ask you this, Mr. Watson. That brings up a good point. Let's just say -- and we've been talking about drugs. Let's -- let's keep talking about drugs.

Let's say I have some cocaine; and you know I have some cocaine, right? And I say, "Mr. Watson, can you take me down to the grocery sore for a minute?" And you're like, "Yeah, come on." And you let me in your car knowing I have cocaine. Am I in possession of the cocaine that's in my pocket?

VENIREPERSON NO. 48: Uh-huh.

MR. CALVERT: Absolutely. Is he in possession at that point of the cocaine that's in my pocket?

VENIREPERSON NO. 22: If he knows it's in your pocket --

MR. CALVERT: Yeah, he knows. He knows.

VENIREPERSON NO. 22: Then, yes, he's in

possession.

MR. CALVERT: Everybody comfortable with that?

VENIREPERSONS: Uh-huh.

MR. CALVERT: So, does that make sense to you, Mr. Watson?

VENIREPERSON NO. 47: Everett.

MR. CALVERT: Oh, you're Mr. Everett. I'm sorry. Mr. Everett. Are you okay with that, Mr. Everett?

VENIREPERSON NO. 47: (Nods head.)

MR. CALVERT: I apologize.

Okay. Let's talk about this -- any other questions about possession before we move on to something else? Is there anybody else sitting there right now talking about -- or thinking about possession going, "I just don't think that's fair. I don't think that's a fair definition, Ryan; and I couldn't find somebody guilty of the felony offense under that definition." Speak now or forever hold your peace.

All right. Let's talk about this one for a minute. Normally, during the guilt phase of a trial, a jury is not going to get to know anything, one way or the other, about whether a defendant has any criminal history. But this is one of the offenses where the jury -- it is an element of the offense. It's something that we have to

prove that the person who's on trial is a convicted felon. Okay? We have to prove that.

It's kind of like if -- y'all have heard of the offense failure to register as a sex offender, right? Well, Element No. 1, we have to prove the person on trial is what, a sex offender, right?

How many of y'all when you walked in here, you're kind of eyeballing us up here and trying to figure out who everybody is? Were y'all doing that? Yeah.

And once the Judge said it was a criminal case, how many of y'all were trying to, you know, figure out who the defendant was; and you had the thought to yourself, "I wonder what that guy did," right? That's perfectly natural. It's a human response. There's nothing wrong with that.

But here's the thing you've always got to keep in mind. And y'all told me this earlier. So, now, as Mr. Greer sits here right now, he is presumed?

VENIREPERSONS: Innocent.

MR. CALVERT: Innocent, right? And so, with regards to having been convicted of a felony, let's -- how many of y'all -- everybody drive? How many of y'all speed? I do.

Let's say you're driving on Monday, and you get a speeding ticket, and you're completely good for it

because you were speeding. And on Tuesday, same thing happens. You get a ticket, and you're completely good for it because you were speeding. And Wednesday, same story, you get a ticket. You're completely good for it. You were speeding again. Thursday, you get another ticket; but this one, honest to God, you were not speeding. The officer got you and another car mixed up. Okay.

So, you were not good for that speeding ticket on Thursday. And you go to trial because you can have a jury trial for a speeding ticket just like you can on a capital murder case. And the prosecutor in the speeding case gets up and goes, "Well, you know, you did it, because look, you did it on Monday, and you did it again on Tuesday, and you did it again on Wednesday," right? Is that fair to you?

VENIREPERSON NO. 15: No.

MR. CALVERT: No? Why not?

VENIREPERSON NO. 15: Because the next day, he wasn't.

MR. CALVERT: Right. Right. And that's exactly how -- does everybody agree with what she said?

VENIREPERSONS: Uh-huh.

MR. CALVERT: She's right. And that's exactly how the criminal law works. Okay. The fact that somebody has previously been convicted of an offense does

not mean that they're now all of a sudden automatically guilty of the new offense.

Can everybody on this half of the room agree with that?

VENIREPERSONS: Yes.

MR. CALVERT: Everybody on that half room agree with that?

VENIREPERSONS: (Nods heads.)

MR. CALVERT: And so, the only reason that the jury even gets to know about a prior felony conviction is because that's what makes the possession of a firearm a crime, okay, under those circumstances. But it has nothing whatsoever to do with whether or not they're guilty of that crime. Does that make sense? Does that make sense?

VENIREPERSON NO. 3: Uh-huh.

MR. CALVERT: Okay. I'm going to go kind of row by row.

First row, can everybody on the first row promise me -- and more importantly, promise Mr. Greer and promise Mr. Gray -- that you're not going to hold against him the fact that he has a prior felony conviction as evidence that he's guilty now of possessing a firearm -- having been convicted of a felony?

Are you okay with that? Can you make that

promise?

VENIREPERSON NO. 1: Yes.

MR. CALVERT: Okay.

VENIREPERSON NO. 2: (Nods head.)

MR. CALVERT: Yeah. How about you?

VENIREPERSON NO. 3: Yes.

VENIREPERSON NO. 4: Yes.

VENIREPERSON NO. 5: Yes.

VENIREPERSON NO. 6: Yes.

VENIREPERSON NO. 7: Yes.

VENIREPERSON NO. 8: Yes.

VENIREPERSON NO. 9: Yes.

VENIREPERSON NO. 10: Yes.

VENIREPERSON NO. 11: Yes.

VENIREPERSON NO. 12: Yes.

VENIREPERSON NO. 13: Yes.

VENIREPERSON NO. 14: Yes.

VENIREPERSON NO. 15: Yes.

MR. CALVERT: Okay. Let's start right there and go back the other way. Second row, can all of y'all make that same promise, that you're not going to convict Mr. Greer or start Ryan and Will off at an advantage simply due to the fact that he has some criminal history? Are you okay with that? Yes? Everybody else?

VENIREPERSON NO. 24: What is the felony?

MR. CALVERT: Well, right now, we can't tell you. That's one of those things that right now we have to keep things very broad and very general.

VENIREPERSON NO. 24: I'm not going truthfully answer that I cannot hold --

MR. CALVERT: And that's okay. Let's talk about that. You know, let me ask you this: Obviously, these are the elements that we have to prove. Let's say that you hear the evidence, whatever the evidence in this case is; and the evidence convinces you beyond a reasonable doubt, yeah, they've got the right guy and, okay, they've proven he was convicted of a felony, whatever the felony was; but the State hasn't proven to me beyond a reasonable doubt that he exercised care, custody or control over that firearm. Under those circumstances, you understand the law would require you to find him not guilty?

VENIREPERSON NO. 24: Right.

MR. CALVERT: Even though you know he's been convicted of a felony. You understand that, right? Is that something that -- is that a law that you could follow and say, "Yeah, I'm going to hold the State to their burden of proof and require them to prove each element of the offense and not give the State a head start simply because I know the person has previously been convicted"?

VENIREPERSON NO. 24: Well, there again, it kind of depends on what that felony was.

MR. CALVERT: Okay.

VENIREPERSON NO. 24: I mean, if it's something involving a firearm, the original felony, that would make me think a little differently.

MR. CALVERT: Okay. I understand. I understand. I understand. Thank you, sir.

Everybody else, the rest of that row, are y'all good promising me, promising Earl, and also promising Mr. Greer that you're not going to hold that against him?

VENIREPERSON NO. 17: Well, to be honest, I'm going to agree with that gentleman right there.

MR. CALVERT: Sure. This is one of those tricky scenarios where y'all are kind of at a disadvantage because you don't know the facts of this case, right? And there's always -- when you're in the position that y'all are in, it's very easy and very natural to say, "Well, if this fact were there or if this fact were there," and that's precisely why for purposes of this discussion, we have to keep it very broad and general.

Let me -- let me use a different example. If -- sometimes we have to come in here and try cases where somebody is charged with, like, you know, horrible

things, like, aggravated sexual assault of a child, right? And people's immediate reaction is anger, outrage; and let's kill somebody, right? Well, that doesn't mean they're guilty, right? That means that's what they've been charged with. You understand that, right?

VENIREPERSON NO. 17: Right.

MR. CALVERT: And so -- and there's a million little different facts. Do they have any history? If so, what for?

Right now, the question for purposes of this discussion that we have to address is for this type of law, for this type of offense, do you agree with me that the defendant is presumed innocent as he sits right now having heard no evidence?

VENIREPERSON NO. 17: Oh, yes, I agree with that.

MR. CALVERT: Okay. And do you agree with me that if the State -- we should have the burden and do have the burden of proof?

VENIREPERSON NO. 17: Yes.

MR. CALVERT: And if -- giving an example of -- give an example of a prior offense that you're talking about that would concern you?

VENIREPERSON NO. 17: Well, unless I misunderstood your question, what I was under the

impression was, if you were to be able to prove that he was a convicted felon and that he had used a gun previously in the felony --

MR. CALVERT: I understand.

VENIREPERSON NO. 17: It's like where there's smoke, there may be fire. I mean, that's --

MR. CALVERT: Sure.

VENIREPERSON NO. 17: -- been my experience. Not always; but I mean, it would definitely jade my thinking a little bit. But I would look at the --

MR. CALVERT: Yeah. And that's -- that's okay. Okay. That's okay. Again, that's going to depend on the facts and evidence in that particular case, right? I guess the point I'm making is that at this point in the discussion, it could be any felony. It could be drugs. It could be anything, right?

Keeping that in mind and not looking for specific facts, "Well, if I hear this fact, that's going to be bad for him." Well, of course, that's true in any case, right? But keeping in mind the fact that you know there's a felony out there or that there's an allegation of a felony conviction out there, can you put that aside and force the State to prove each and every element of the offense and not simply convict him because there's an allegation of a prior felony conviction?

VENIREPERSON NO. 17: I think I can.

MR. CALVERT: Okay. Very good.

VENIREPERSON NO. 17: I think I can.

MR. CALVERT: All right. Mr. Cobos, are you okay with that?

VENIREPERSON NO. 16: Yes, sir.

MR. CALVERT: Mr. -- is it Espino? Did I say that right?

VENIREPERSON NO. 32: Espino.

MR. CALVERT: No. 32. Okay. And you're one of my real quiet ones, Mr. Espino. Do you have any questions about anything so far?

VENIREPERSON NO. 32: Not yet.

MR. CALVERT: All right. Can you, again, promise the Defendant that you're not going to hold it against him or at least start us off at a disadvantage simply because there's an allegation that he's previously been convicted of a felony?

VENIREPERSON NO. 32: I have no problem.

MR. CALVERT: Are you okay with that? Mr. Irvin?

VENIREPERSON NO. 33: Yes.

MR. CALVERT: All right. Mr. Moore?

VENIREPERSON NO. 34: Yes.

MR. CALVERT: Mr. Masterson?

VENIREPERSON NO. 35: Yes.

MR. CALVERT: All right. Ms. Steckman?

VENIREPERSON NO. 36: Yes.

MR. CALVERT: The rest of that row, everybody else -- everybody else good?

VENIREPERSONS: Yes, sir.

MR. CALVERT: Last row, starting back there, and going down this way, is there anybody else that says, "I -- the fact -- I don't care what the felony is, the fact that there's an allegation that somebody's been previously convicted of a felony, I'm starting the State off with an advantage."

Last row, is everybody good?

Yes, sir, No. 48, Mr. Watson?

VENIREPERSON NO. 48: Yeah, I think so because if I know that I have certain circumstances that I'm supposed to abide by to enable me to, you know, be a member of society again, and whether -- if I know my roommate has a gun in the house and I'm not supposed to have a firearm in my possession, then that's on me. I know that he has it in the house.

MR. CALVERT: Sure. Sure. At this point, though -- and that's fair. But the question right now is can you look at the evidence in this case and make the State prove each and every element of the offense and not

simply say, "Well, clearly, he was convicted of a felony before; so, he must be guilty of possessing a firearm here." That's kind of what we're talking about.

VENIREPERSON NO. 48: I'm stuck on the knowledge that it's on -- even if it's not mine, in light of what you said earlier, I'm stuck on the knowledge that it's in my house even though it's not mine personally.

MR. CALVERT: I understand. Okay.

Can anybody tell me what that is? The Fifth Amendment to the United States Constitution?

The Fifth Amendment is protection against self --

VENIREPERSONS: Incrimination.

MR. CALVERT: Incrimination. Very good. What the Fifth Amendment says is in a criminal trial the person charged with a crime has an absolute right if they want to, to not testify at all, period, the end. And if they exercise that right, under absolutely no circumstances can the jury hold that silence against them at all for any reason whatsoever. Does that make sense?

Let me go back to -- let me go to one of my really quiet ones. Mr. Strong, are you okay with that?

VENIREPERSON NO. 45: Yes.

MR. CALVERT: Is it Mr. -- help me with your name, sir?

VENIREPERSON NO. 44: Haque.

MR. CALVERT: Haque?

VENIREPERSON NO. 44: Yes.

MR. CALVERT: Okay. Is it Dr. Haque?

VENIREPERSON NO. 44: Yes.

MR. CALVERT: What do you teach, sir?

VENIREPERSON NO. 44: Structural science.

MR. CALVERT: Okay. Are you okay with the notion, Doctor, of that you don't have to testify? If you're accused of a crime, you don't have to say a word? Are you okay with that?

VENIREPERSON NO. 44: Yes.

MR. CALVERT: Okay. Mr. Barker, how about you? Are you okay with that?

VENIREPERSON NO. 43: I'm okay.

MR. CALVERT: Yeah. If -- very often in criminal trials, a jury will never hear the voice of the defendant. Okay? And that's okay. What the law says is if the defendant chooses not to testify, the jury cannot consider that as evidence against him.

Now, a lot of folks tell me, "Ryan, I get that; but if it was me, wild horses could not keep me off the witness stand. I would want to get up there and defend myself." And that's a perfectly natural way to feel. And it's great to have the luxury to be able to say

that.

But, Mr. Kelling, you agreed with me earlier when we talked about how the State has the burden of proof, right?

VENIREPERSON NO. 5: Right.

MR. CALVERT: Would you agree with me that if a jury was going to hold it against somebody if they don't testify, you're shifting that burden to a degree over here because you're telling the defendant, "You've got to show me something; and if you don't, I'm going to hold it against you," right?

VENIREPERSON NO. 5: I agree, but I also -- I go back to your other statement. If I felt I was innocent, wild horses couldn't keep me from being on the stand.

MR. CALVERT: Sure.

VENIREPERSON NO. 5: And as a juror, I would look at, okay, what is that person afraid to say on the stand? What are they hiding?

MR. CALVERT: Sure. And absolutely. That's a fair way to feel. But can you think of any other reason why somebody may not want to testify? Can anybody?

Yes, ma'am?

VENIREPERSON NO. 42: Their counsel may have advised them not to.

MR. CALVERT: Yeah. What if your lawyer says, "Shut up. You're not testifying," right? Or can anybody think of another one?

Yes, ma'am, No. 54?

VENIREPERSON NO. 54: Incriminating somebody else.

MR. CALVERT: You might incriminate somebody else, right?

Can anybody think of another one?

VENIREPERSON NO. 11: Cross-examination, you can lead the witness.

MR. CALVERT: You can -- anybody here -- anybody here have the feeling as we're -- as I'm up here talking to y'all and in a little bit Earl will be up here talking to y'all, do you get kind of nervous when you know you're going to get called on and asked to talk and answer questions? Anybody have that feeling?

VENIREPERSON NO. 42: Yes.

MR. CALVERT: Yeah. You think that might be a little bit true if you come up here, and we're going to cross-examine you, and it's going to be a lot different than this, right? Anybody here feel like themselves or they know somebody who from whatever reason just does not present well in -- I used to have a boss who was a lawyer and we used to joke that we should have a rule that he's

not allowed to talk in public because it was bad, right, when he talked.

So, can everybody agree there's a lot of reasons why somebody may not testify?

Mr. Kelling, do you agree with that?

VENIREPERSON NO. 5: Again, I'll go back to I don't care how bad of a speaker I am. I don't care how bad of a presence I have. If I truly in my heart feel I'm innocent, I should have nothing to be afraid of.

MR. CALVERT: Okay. Yes, ma'am?

VENIREPERSON NO. 42: I can address that. I had a situation when I was in college where my car was stolen, and the police came to the house, and I don't present well, and my spouse at the time didn't look like he presents well. And they went away clearly believing that we had stolen our car, and -- and they cased the joint for the next week waiting for it to turn back up.

MR. CALVERT: Let me -- that's absolutely -- let me kind of give you a real world example. We tried a case in here, I guess, just a week or two ago where a guy was charged with the offense of assault, okay, on a girlfriend. And he assaulted -- or had been accused of assaulting not one, but two other girlfriends previously, right? And there was a real danger that if you testify and say something, it might open the door to us getting

into these other girls, right?

There's all kinds of reasons, like you said, why somebody may not testify, right?

And so, Mr. Kelling, I'll start with you. And the real question is this: Right now -- you understand and we can agree that the law requires the jury to not hold it against the defendant if he doesn't testify, right?

VENIREPERSON NO. 5: Sure.

MR. CALVERT: At the end of the day the question we have to have answered is: Is that a law that you can promise me and promise the Defense that you can follow?

VENIREPERSON NO. 5: I would have a difficult time with that.

MR. CALVERT: Okay. All right. Everybody else on the first row, can everybody make that promise that if the Defendant exercises his right not to testify, you're not going to hold it against him? All right.

Second row, same question, everybody good?

Oh, talk to me. What's going on? And you're -- hold on. What's your number? You're Mr. Parker? Mr. Parker, No. 22, what are you thinking?

VENIREPERSON NO. 22: If you don't stand up for yourself, why should you think somebody else should?

MR. CALVERT: That's why Earl gets the big bucks.

VENIREPERSON NO. 22: I'm a believer in, you know, you have to speak your side of everything.

MR. CALVERT: Okay.

VENIREPERSON NO. 22: And if you elect not to, then, to me, you're just -- basically you're hiding behind something.

MR. CALVERT: All right.

Yes, ma'am, No. 30, Ms. Moore. What are you thinking?

VENIREPERSON NO. 30: I would say that you probably couldn't help but be somewhat suspicious as to why.

MR. CALVERT: And that's okay. Look, nobody is saying -- there's not a sign downstairs that says, "Please check your life experience and common sense with the courthouse security before coming to jury duty," right? Nobody is saying you can't be people, and nobody is saying you can't be curious about that. That's not what we're saying at all.

What the law says simply is that it requires jurors to compartmentalize and say -- you can be as curious as you want to and think, "Hey, I wonder why he didn't testify." That's fine as long as you don't then

take the next step of saying, "I'm going to take that as evidence that he's hiding something, or he's guilty, or I'm going to see it as evidence in favor of the State."

That's all the law requires. Okay? You can be curious as long as you don't then take that next step of shifting that burden and telling the Defendant, "You have to show me something, or I'm going to find you guilty."

Are you comfortable with that?

VENIREPERSON NO. 30: Right. Right. I'm just saying that, ultimately, there's the chance that it could influence your reaction to things.

MR. CALVERT: Okay. Well, let's talk about that. If the Judge instructs you, as I anticipate the Judge will, in the event the Defendant doesn't testify, that you are not to consider the failure to testify for any purpose whatsoever, is that an instruction, is that a law that you could follow?

VENIREPERSON NO. 30: Well, consciously, I could. Subconsciously, I don't know.

MR. CALVERT: Okay. Ms. Carter, are you okay with that?

VENIREPERSON NO. 29: Yes.

MR. CALVERT: Mr. Lavender, how about you?

VENIREPERSON NO. 28: Yes.

MR. CALVERT: Mr. Strong, are you okay with that?

VENIREPERSON NO. 45: Yes.

MR. CALVERT: Mr. Barker?

VENIREPERSON NO. 43: I think where I struggle with it is that each -- each on its own, I probably could; but when you put the two together, you know, having the past felony and then choosing not to speak for himself, each one erodes the credibility. So, I think it becomes easier in my mind to prove the -- without reasonable doubt, that there was a law broken because each one promotes a little bit more on top. So, it becomes a little more difficult.

MR. CALVERT: Ms. Ford, what you do think? Are you okay if the Judge instructs you that you can't consider it for any reason?

VENIREPERSON NO. 42: I could.

MR. CALVERT: All right. Mr. Davis, how about you, sir?

VENIREPERSON NO. 41: I'm okay with it.

MR. CALVERT: You're okay.

Okay. Ms. Boone?

VENIREPERSON NO. 40: Yes, I'm good.

MR. CALVERT: Okay. The rest of that row is everybody good?

Ms. Nelson, you've been real quiet. Do you have any questions about anything?

VENIREPERSON NO. 39: I just couldn't say. I would try very hard not to hold that against him; but, especially, you know, having a past felony; and if he's -- it would be very -- psychologically, I don't think I can. It would -- I'm afraid I might tend to hold it against him. And if his lawyer is telling him that, get a new lawyer.

MR. CALVERT: I'm going to -- I'm going to -- I'm going to disagree with you for a second, Ms. Nelson, because I'm somebody who's been -- I've done both jobs. I've been a criminal defense attorney, too. And I can tell you that there's a lot of times where you don't want the defendant on the stand. Okay?

And I've been prosecuting long enough now to know that very often if the defendant does get on the stand, it doesn't help him. Okay. And it's a defense attorney's job to know when that might happen and know that that may be a possibility and tell them, "Shut up." Okay.

And so -- and again, the concerns that you have about yourself are very natural. And I think everybody shares those concerns on some level if they're in the position that you're in. But ultimately, the

question is this -- it's kind of like we talked about over here. I anticipate the Judge will instruct you that, again, if the Defendant exercises his right and doesn't testify, you may not consider that as evidence, period, the end. Is that something -- is that an instruction from the Judge you could follow if you really look inside yourself?

VENIREPERSON NO. 39: Yes.

MR. CALVERT: Okay. Thank you, ma'am.

Mr. Pfitzer, what do you think?

VENIREPERSON NO. 38: Yeah, it is an instruction that I could follow certainly. But like Ms. Nelson said, I fear that subconsciously it will influence me. You know, and I'm not speaking about specifics, in general.

MR. CALVERT: Sure.

VENIREPERSON NO. 38: That's just a reality. I mean, it's just -- and I think you said that.

Yes, to answer your question, I could follow it; but it would be difficult.

MR. CALVERT: Sure. Okay. That's fine. The rest of that row, are y'all good?

Mr. Arias, are you okay with that?

VENIREPERSON NO. 37: Yes, sir.

MR. CALVERT: All right. Last row back

here, everybody good?

Yes, ma'am, No. 53, is it Draper?

VENIREPERSON NO. 53: Draper.

MR. CALVERT: What are you thinking?

VENIREPERSON NO. 53: I don't think I could follow that.

MR. CALVERT: Okay. I appreciate that. I appreciate it very much. Anybody else in that last row?

MR. GRAY: What's the number on that?

MR. CALVERT: 53.

All right. Oh, yes, ma'am, No. 60?

VENIREPERSON NO. 60: I want to make a comment that, I mean, if it was my daughter up there on trial and she was totally innocent, I might not want her to speak up.

MR. CALVERT: Okay.

VENIREPERSON NO. 60: That's because I would feel that what she might say might make her look guilty, and that's not fair to her.

MR. CALVERT: Yes, ma'am. Thank you, Ms. Hudspeth.

THE COURT: You've got about three or four minutes to go.

MR. CALVERT: Yes, ma'am -- yes, Your Honor. I'm sorry. I apologize, Judge.

Last thing I want to talk about -- and, again, this is something that we're not going to spend a whole lot of time on now, but I want to reiterate something the Judge said earlier. That if myself or Earl ever ask y'all anything that you're not comfortable discussing in front of a really big group of strangers, we can bring you in with a much smaller group of strangers later on. Okay?

But I want to ask y'all, personal experience, either you or somebody close to you -- and we're going to focus on negative experience with law enforcement. You've been arrested or somebody close to you has been arrested or charged with something. And, again, if you're not comfortable discussing it here, we can discuss it later. I just need to know if there's something there that we need to talk about.

First row, show of hands, anybody, anything that we need to talk about as far as experience with law enforcement, experience with cops?

Yes, ma'am?

VENIREPERSON NO. 1: I'd like to discuss it later.

MR. CALVERT: Talk later. Yes, ma'am. And you're Ms. Cox, No. 1. Thank you.

Anybody else on that first row?

Second row? Yes, sir, Mr. Holt?

VENIREPERSON NO. 17: Yes.

MR. CALVERT: Are you okay talking about it?

VENIREPERSON NO. 17: No, I'd prefer to talk --

MR. CALVERT: Talk later. Okay.

Rest of that second row?

Third row, anybody?

Last row back there?

Yes, sir, Mr. Watson?

VENIREPERSON NO. 48: Speak later, please.

MR. CALVERT: Yes, sir. I thought I saw another one. We've got a couple more back there.

Ms. Nichols, is it?

VENIREPERSON NO. 57: Yes, later.

MR. CALVERT: Later, yes, ma'am.

And Ms. Dean?

VENIREPERSON NO. 54: Make a difference if I have a lot of family in law enforcement in this area?

MR. CALVERT: It would only make a difference if -- well, first of all who?

VENIREPERSON NO. 54: Sergeant Dean who works for College Station.

MR. CALVERT: For College Station? Okay.

VENIREPERSON NO. 54: Uh-huh.

MR. CALVERT: Okay. His name is Dean, Sergeant Dean?

VENIREPERSON NO. 54: Yeah.

MR. CALVERT: Okay. I don't think he's going to be a witness in this case, but if other police officers come in to testify, are you going to start them off more with credibility than anybody else or treat them differently than any other witness because of your family relationships?

VENIREPERSON NO. 54: I know a lot of them, but I wouldn't --

MR. CALVERT: Okay. Anybody else with experience with law enforcement that we need to talk about later?

Yes, sir, No. 20, Mr. Smith?

VENIREPERSON NO. 20: I work for the police department.

MR. CALVERT: Okay.

VENIREPERSON NO. 20 : At Texas A&M.

MR. CALVERT: Is there anything --

VENIREPERSON NO. 20: I'm not an officer.

MR. CALVERT: Is there anything about the fact that you work for a police department that -- you understand the law requires jurors to -- in assessing credibility start everybody off equally, right?

Could you treat a cop the same way you treat everybody else until after you hear what they have to say?

VENIREPERSON NO. 20: Yes.

MR. CALVERT: All right. Anybody else that we missed?

Yes, ma'am, No. 39?

VENIREPERSON NO. 39: I don't know if I'm supposed to say so, but I have a son who was a DPS officer; and now he's in the FBI.

MR. CALVERT: He's in the FBI. Okay. Where is he stationed?

VENIREPERSON NO. 39: He's in Washington.

MR. CALVERT: Washington. Is there anything about the fact that your son is an FBI agent that would, again, cause you to start a police officer witness off with more or less credibility than any other witness before you hear what they have to say?

VENIREPERSON NO. 39: I don't think so.

MR. CALVERT: Okay. Thank you, ma'am.

Anybody else that I missed?

VENIREPERSON NO. 3: I had a cousin who was a police officer in another state, and he was on a stop, was shot and killed by a felon.

MR. CALVERT: Well, I'm sorry to hear that. Was that recent?

VENIREPERSON NO. 3: No.

MR. CALVERT: Can we agree that obviously Mr. Greer had nothing to do with that?

VENIREPERSON NO. 3: Yes.

MR. CALVERT: Would you agree with me that it would not be fair to hold that family experience against Mr. Greer, right?

VENIREPERSON NO. 3: Yes.

MR. CALVERT: Could you promise me and promise the Defense that you're not going to somehow use the fact that your cousin who was an officer was killed, use that in any way against Mr. Greer who had nothing to do with that?

VENIREPERSON NO. 3: No.

MR. CALVERT: Okay. You're okay with that? Thank you, ma'am.

THE COURT: Time has expired.

MR. CALVERT: Yes, sir. I thank y'all very much for your attention and participation and ask that you give Earl the same level of participation, and I look forward to working with 12 of you. Thank you.

THE COURT: Ladies and gentlemen, I'm about to give you a break. It's going to be a little bit longer, 15 minutes. We're going to be in here talking to some of you one-on-one during your 15-minute break. I'm

going to ask these to stay outside the door to be ready to have your name called to come in and talk to us one-on-one.

The rest of you, leave your cards under your seat; and when I excuse you, take a 15-minute break and then gather outside the door. Hold up just a second.

Those people that I need to remain outside the door now are Juror No. 1, Juror No. 5, Juror No. 17, Juror No. 22, Juror No. 24, No. 30, No. 48, No. 53, and No. 57.

The rest of you take a 15-minute break. Thank you very much.

(Venire panel retired.)

THE COURT: Ma'am, wait outside the door; and I'm going to call you in. You'll be the first one to talk. I tell you what. Since you're first, you can just sit right there in the chair. Thank you.

VENIREPERSON NO. 1: Yes, sir.

THE COURT: Okay. Let's take up Juror No. 1. Come on up, ma'am.

(Venireperson No. 1, Kathryn Patricia Cox, at bench.)

THE COURT: You mentioned you had something you wanted to tell us.

VENIREPERSON NO. 1: Hello, sir.

THE COURT: How are you today?

VENIREPERSON NO. 1: I just didn't feel comfortable talking about this in front of everybody.

THE COURT: That's why I wanted to hear from you.

VENIREPERSON NO. 1: There's an experience with police, not really me personally; but I guess in a way me personally; but my older three sons are in trouble with the law. My oldest son, his name is Heath Hopkins. I don't know if it matters to say his name; but, anyway, he has mood disorder bipolar. And in July 2009, he and his girlfriend -- and she has mood disorder bipolar; and they had an argument; and she called me; and then, I came; and apparently, their argument escalated; and she --

THE COURT: Okay. Let me stop you there. You have a son that's had problems with law enforcement.

VENIREPERSON NO. 1: He got tased, and he --

THE COURT: Okay.

VENIREPERSON NO. 1: Anyway, my older three sons and my brother.

THE COURT: And you've got other sons that have been in trouble with law enforcement?

VENIREPERSON NO. 1: Yes.

THE COURT: Anything else you want to tell us? Could you be fair to both sides of this case?

VENIREPERSON NO. 1: I think so.

THE COURT: Any questions from the State?

MR. CALVERT: Ma'am, briefly, do you feel like -- you mentioned your son was tased and that kind of thing. Do you feel law enforcement treated your son fairly?

VENIREPERSON NO. 1: Well, they felt threatened as far as from hearing the case. They asked me to speak, and I gave the best ability, and I watched his jury trial, and they found him guilty. But it was kind of hard on me, but I gave the honesty that I saw that I could see.

MR. CALVERT: So, you --

VENIREPERSON NO. 1: One officer told me to stand back. They thought he was resisting arrest.

MR. CALVERT: Okay. So, your son went to trial like this?

VENIREPERSON NO. 1: Yes.

MR. CALVERT: Okay. Was that here in Brazos County?

VENIREPERSON NO. 1: Yes.

MR. CALVERT: Okay. Let's first talk about the police out there at the scene. Okay? Do you feel like the police were fair to your son in how they treated him and what they did?

VENIREPERSON NO. 1: I guess they felt threatened because he was upset, and they felt he was argumentative.

MR. CALVERT: I understand.

VENIREPERSON NO. 1: I knew he didn't think he was doing any wrong.

MR. CALVERT: I understand. I'm asking for your opinion. Do you think the police were fair in what they did?

VENIREPERSON NO. 1: Well, at the time, I didn't think they needed to tase him; and I was wanting them to let me try to talk to him to calm him down; but they wanted me to stand back. And it was just a hard time at that time.

MR. CALVERT: I understand. And then, with respect to the fact that our office prosecuted your son, is that something that you feel like is going to be a factor in your mind in hearing this case given the fact that we're the same agency that prosecuted your son?

VENIREPERSON NO. 1: I would hopefully not think so because I would look at this like a different thing of someone else. It's just -- he had mental issues, mood disorder bipolar, but not on any medicine; and he had an argument his with girlfriend.

MR. CALVERT: I understand.

VENIREPERSON NO. 1: They did what they thought was best at the time.

MR. CALVERT: I understand. And ultimately, the one question that we have to know from you is: Can you -- would you be able to treat police officers the same as any other witness?

VENIREPERSON NO. 1: Yes, I would treat them with respect and listen impartially.

MR. CALVERT: Okay. And could you -- are you coming in here -- am I coming in here as a prosecutor in Brazos County at a disadvantage in your mind because of the fact that we prosecuted your son?

VENIREPERSON NO. 1: No, you would not be.

MR. CALVERT: All right. Thank you. That's all I have.

VENIREPERSON NO. 1: I just wanted to say what happened.

THE COURT: Thank you. You can take your break now.

VENIREPERSON NO. 1: Okay.

THE COURT: Stay with us.

(Venireperson No. 1 retired to hallway.)

THE COURT: No. 5.

MR. CALVERT: Earl, we'll stipulate on this guy. He was pretty clear.

MR. GRAY: What's that?

MR. CALVERT: No. 5, we'll stipulate on him. He was pretty clear.

MR. GRAY: Okay.

THE COURT: You agreeable?

MR. GRAY: Yeah, that's fine, Judge.

THE COURT: No. 5, for the record is excused for cause.

(Venireperson No. 5 excused for cause.)

THE COURT: No. 17.

THE BAILIFF: Do you want me to tell that to No. 5?

THE COURT: Yes, No. 5 is excused. He can leave the courthouse.

No. 17.

(Venireperson No. 17, Michael Lee Holt, at bench.)

THE COURT: Hello, Mr. Holt, how are you today, sir?

VENIREPERSON NO. 17: I'm doing good. Thank you.

THE COURT: There was something you wanted to bring up privately?

VENIREPERSON NO. 17: Yes.

THE COURT: More privately, anyway.

VENIREPERSON NO. 17: Yes. Well, the question was whether I'd had a bad experience or -- with law enforcement, and I've had three.

THE COURT: Okay.

VENIREPERSON NO. 17: And all of them were when I was younger.

THE COURT: All right.

VENIREPERSON NO. 17: When I was a teenager and going to college at Tarleton State University, and I was going through a little town called Dublin. We had to go through Dublin to get to Proctor where the dance hall was. And I had two other friends with me, and I had a pickup. I had loud pipes on it, and the police officer stopped me outside of the city limits. He and his deputy asked us to step out of the car. He said leave it running. He got in and floorboarded my truck, and --

THE COURT: In the interest of time, we may need to get the details on this later; but let me just jump -- cut to the chase on this. Are those three incidents, are any one of them going to render you in any way unfair to the State in this case?

VENIREPERSON NO. 17: I don't think so.

THE COURT: Are you holding any bad feelings about that against law enforcement?

VENIREPERSON NO. 17: No, I think I'm a

pretty good judge of character; but I will have to say that every time I get stopped, which is not very often, I flinch a little bit because I never know what I'm going to get.

THE COURT: I understand. And you mentioned that you had a few problems with the Fifth Amendment, as I recall -- no --

VENIREPERSON NO. 17: No.

THE COURT: -- the prior conviction, that you might hold that against him on the guilt/innocence issue of the case on trial?

VENIREPERSON NO. 17: It would --

THE COURT: Can you assure me that you would not let that influence you in the guilt or decision?

VENIREPERSON NO. 17: I think it would depend on how it was presented. For example, I mean, I know what the law is saying, that he's innocent until proven guilty.

MR. GRAY: We'll agree.

THE COURT: Do we have an agreement?

MR. CALVERT: We do.

THE COURT: We're going to excuse you for cause, sir. Mr. Holt, you're free to leave the courthouse. You do not have to return. Thank you very much.

VENIREPERSON NO. 17:  Thank you.

(Venireperson No. 17 excused by agreement.)

THE COURT:  No. 22.

MR. GRAY:  Which one was that?

THE REPORTER:  17.

THE COURT:  Mr. Holt, No. 17.

(Venireperson No. 22, Brent Keith Parker, at bench.)

THE COURT:  Mr. Parker.

VENIREPERSON NO. 22:  How are you?

THE COURT:  How are you, sir?

VENIREPERSON NO. 22:  Fine.

THE COURT:  The prosecutor may have some questions for you right now.

MR. CALVERT:  I don't, Judge.

THE COURT:  Do you have any questions?

MR. GRAY:  Yes.  It's Mr. Parker; is that right?

VENIREPERSON NO. 22:  Yes.

MR. GRAY:  Okay.  Whenever the prosecutor had gone through the Fifth Amendment rights, I believe you had indicated that you had some tendency to want the defendant to testify --

VENIREPERSON NO. 22:  Yes.

MR. GRAY:  -- for whatever.  Is that still

your position?

VENIREPERSON NO. 22: That's always been my position.

MR. GRAY: Would that affect your decision in way --

VENIREPERSON NO. 22: Yes, it will.

THE COURT: I'm going to excuse you for cause. You're free to leave the courthouse. You do not have to return.

VENIREPERSON NO. 22: That's just always been one of my pet peeves.

THE COURT: I understand. Thank you for your candor.

MR. CALVERT: Thank you, Mr. Parker.

(Venireperson No. 22 excused for cause.)

THE COURT: No. 24.

(Venireperson No. 24, David P. McIntyre, at bench.)

THE COURT: How are you doing, Mr. McIntyre?

VENIREPERSON NO. 24: Pretty good. And you?

THE COURT: I'm fine. Back to -- and, again, I don't have any problem with your feelings. I just need to know how you feel. All right?

VENIREPERSON NO. 24: I understand.

THE COURT: That you would have trouble not

holding the prior conviction against him on the question of guilt or innocence on this case.

VENIREPERSON NO. 24: I'm not going to say it won't affect me. I mean, again, it gets back, if it were a felony that were not related to this case, I think the bearing would be less. I'm just trying -- I want to be honest to him, and I want to be honest to both sides. I still feel like if I heard the facts, I could still make a honest conviction on the facts.

THE COURT: But I need to understand that you can assure me that it would not affect you on the decision.

Now, you're going to be asked to find whether he was convicted or not.

VENIREPERSON NO. 24: Correct.

THE COURT: If you find that he was convicted, is that going to influence you on the decision of the actual case itself?

VENIREPERSON NO. 24: I think I could make myself do that.

THE COURT: Okay. Do you have any questions?

MR. CALVERT: No, sir.

THE COURT: Do you have any questions?

MR. GRAY: Just a couple.

THE COURT: Go ahead, sir.

MR. GRAY: I notice that you said that you could "make an honest conviction." I don't know if that was a Freudian slip or --

VENIREPERSON NO. 24: Well, an honest decision maybe should be the correct one.

MR. GRAY: Okay. And it's -- and I understand we can't get into the facts just like the prosecutor said.

VENIREPERSON NO. 24: I understand that, too.

MR. GRAY: But if it would affect your ability in any way to serve on this jury, then we need to know about that.

VENIREPERSON NO. 24: Correct.

MR. GRAY: So, you would not hold it against him whatsoever if they first proved beyond a reasonable doubt he's been convicted? You would not then let that go into your thinking as to the possession?

VENIREPERSON NO. 24: Yes, sir.

MR. GRAY: That's correct?

VENIREPERSON NO. 24: I mean, I understand because a lot of time you work with people that don't necessarily -- you have to separate the action. Kind of like with your kids sometimes, you separate actions.

MR. GRAY: Absolutely.

THE COURT: Thank you for your candor. Step outside, and you can go ahead and take your break.

(Venireperson No. 24 retired to hallway.)

THE COURT: No. 30.

MR. CALVERT: What was her issue, Judge?

THE COURT: Failure to testify.

MR. CALVERT: Earl, I'll agree if you'll agree.

MR. GRAY: Yes. That's good.

THE COURT: No. 30 is excused by agreement for cause.

(Venireperson No. 30, Sharon Alice Moore, at bench.)

THE COURT: Madam, the parties have agreed to excuse you. You're free to leave the courthouse. You do not have to return. You're Juror No. 30; is that correct?

VENIREPERSON NO. 30: Right.

THE COURT: Thank you very much.

VENIREPERSON NO. 30: I thought I had questions to answer.

(Venireperson No. 30 excused by agreement.)

THE COURT: No. 48. 57 is so far back. Do you want to just agree on that one?

MR. CALVERT: Yes, sir.

MR. GRAY: Yes, sir.

THE COURT: 57 is excused.

(Venireperson No. 57 excused by agreement.)

THE COURT: Can we agree on 53?

MR. CALVERT: I was about to say, Judge, 53, also.

THE COURT: 53 is excused for cause.

(Venireperson No. 53 excused by agreement.)

THE COURT: Ernie, you can go ahead and excuse for cause Juror No. 53 and Juror No. 57. Those are agreed upon.

(Venireperson No. 48, Jeffrey Matt Watson, at bench.)

THE COURT: Come on up, sir. How are you? Mr. Watson?

VENIREPERSON NO. 48: Yes, sir.

THE COURT: You had an issue you wanted to bring up to us a little more in a private setting, right?

VENIREPERSON NO. 48: Yes, sir. I wanted to let y'all know that I had an arrest for DWI about 15, 16 years ago. I just wanted to let y'all know.

THE COURT: That's a misdemeanor. It doesn't legally disqualify you to serve as a juror.

Do you have any questions?

MR. CALVERT: Do you feel like you were treated fairly by the police?

VENIREPERSON NO. 48: I do, yes.

MR. CALVERT: And by the D.A.'s Office or the County Attorney's Office?

VENIREPERSON NO. 48: Yes.

MR. CALVERT: Okay. Is there anything about that case that would play any role in your decision in this case?

VENIREPERSON NO. 48: No, not at all.

MR. CALVERT: That's all I have, Judge.

THE COURT: All right. Stay with us. Go ahead and take the rest of your break.

(Venireperson No. 48 retired to hallway.)

THE COURT: So, we have agreed, for the record, on 4, 5, 17, 22, 30, 53 and 57.

MR. CALVERT: And I don't know if we were on the record earlier, 31 as well, Judge. Ms. Frederick, was gone before we started.

THE COURT: Yes, 31 is Ms. Frederick. 31 is excused.

All right. Y'all take a five-minute break, and we'll get started again.

MR. GRAY: Yes, sir.

MR. CALVERT: Yes, sir.

(Short recess.)

THE COURT: You ready?

MR. GRAY: Yes, sir.

THE COURT: Bring them in, Ernie.

(Venire panel reseated.)

THE COURT: Y'all notice we've got a few empty chairs. We've excused some of the jurors during the break after we talked to them. Here are the jurors that have been excused so far, that there should be an empty chair, but there should be no other empty chairs: No. 4, No. 5, No. 17, No. 22, No. 30, No. 31, No. 53, and No. 57. Other than those, do any of you see a vacant chair that shouldn't be vacant?

All right. I believe we've got everybody, then. Let me ask you, the court reporter has requested that y'all keep your voices up. She's having a little trouble hearing a couple of you, so keep your voice up if you would, please.

(Venireperson No. 30 excused by agreement.)

THE COURT: Go ahead, sir.

MR. GRAY: Thank you, Judge.

**VOIR DIRE EXAMINATION BY MR. GRAY**

MR. GRAY: Well, I apologize if you're not one of those empty chairs. I'll see what we can do.

The prosecutor has already introduced me. I

want to tell you a little bit more about myself. My name is Earl Gray. I'm with Gray, Granberry and Jones. We specialize in criminal cases. We do some select injury cases, but primarily we do criminal law.

Actually, I was raised in the Brenham area, went to Texas A&M University, graduated and then went to Regent University Law School. That's in Virginia Beach, Virginia. Has anybody heard of the "700 Club" or "Pat Robertson?" It's his school. Okay.

Just as the prosecutor indicated, at this point, if you had to take a vote, what would it be?

VENIREPERSONS: Not guilty.

MR. GRAY: Not guilty. Because at this point, he's only accused. Okay. David Greer is only accused. This is the first time we've had an opportunity to test the evidence in the case. Okay.

Let me ask you this -- and I'm going to do my very best to get you out of here by lunch. Okay. So, I'm going to speed up on some things, but I don't want to rush over things that are important as well.

Who out there would rather be somewhere else?

(Show of hands.)

MR. GRAY: I probably shouldn't raise my hand because this is what I do for a living. But we're

going to get you out of here as soon as we can today.

And if you are selected, we don't anticipate this is going to be a very long trial. As the Judge indicated and the Prosecution, you know, Wednesday, maybe Thursday. So, a day, day and a half is probably about it. Okay.

As the prosecutor also indicated, you're only decision is going to be guilt/innocent. You're not going to have to be around -- stick around for any of the punishment phase, if we get there. Okay?

Now, after the Prosecution's voir dire, who out there, though -- you need to be honest with yourself -- who out there believes that Mr. Greer has been convicted of a felony? All that talk about a felony conviction. Anybody?

VENIREPERSON NO. 11: Well, I would make the assumption -- I was making the assumption that the case would not have been brought up had that not been the foundation already established.

MR. GRAY: Okay. And I'm not going to pick directly on you-all -- and I don't fault the Prosecution. I think it's just kind of the way it sort of went. But does everybody understand that there's been no evidence that's he's been convicted of any felony? Does everybody understand that?

Does everybody also understand that's an element of the offense? Okay. And so, if they do not prove beyond a reasonable doubt that the person is convicted of a felony -- of a felony, what must your ___ verdict be?

VENIREPERSON NO. 8: Not guilty.

VENIREPERSONS: Not guilty.

MR. GRAY: That's even before we get to possession stuff. Does everybody understand that? Anybody have any problem with that?

VENIREPERSONS: No.

MR. GRAY: Okay.

All right. I want to talk a little bit about the burden of proof. I use this chart, and I'll kind of point to -- I don't want to step on the Prosecutor. It's sort of a gradation. You know, we don't have a definition anymore for beyond a reasonable doubt. The court system has said that -- and the cases have said that we're going to leave it up to you guys to decide what that level of proof is. So, about all we can do is compare it to other things. Okay?

At the very bottom, of course, no evidence. That's a pretty easy one, right? If they bring no evidence, what does the verdict have to be? Not guilty obviously.

Scintilla, you hear that in legal case law, that's any amount of evidence.

Reasonable suspicion, that's a higher level of proof. That's enough -- that's what an officer needs to stop a vehicle, talk to you, things of that nature.

Probable cause. Probable cause is a level of proof that an officer needs to arrest a person. Okay. Doesn't need beyond a reasonable doubt. Doesn't even need a preponderance. Okay. But they do have to have probable cause. Okay.

But does an arrest equate to a guilty verdict in a jury trial?

VENIREPERSONS: No.

MR. GRAY: It doesn't. And can you see -- you know, sometimes, you know, an individual may be arrested. For example, in DWIs, this happens sometimes. A person is arrested. They go to jail. Then, we have a jury trial. Okay? Maybe the person is found guilty. Maybe they're acquitted. But at that point, isn't the focus a little bit different on the streets?

Wouldn't we want the level of proof in a DWI to be beyond a reasonable doubt before you could arrest somebody? No, we wouldn't. We want to get them off the streets, right? We want to err on the side of caution. Does everybody see that? Okay.

But I just want to make sure you see the distinction between those.

Preponderance, that's the level of proof that you have to have in a civil case. What level of proof is that, anybody?

VENIREPERSON NO. 11: The greater weight of the evidence.

MR. GRAY: The greater weight of the evidence sounds like what?

VENIREPERSON NO. 11: 51 percent.

MR. GRAY: 51 percent or more likely than not. Okay. Millions of dollars in verdicts awarded every month in this United States of ours under that level of proof, that 51 percent.

Clear and convincing, that's a standard you see in CPS cases. That's a level of proof that's necessary for basically the government to take away your child. Obviously, a higher level of proof. That is defined as a firm belief that the allegations are true. Well, that's pretty convincing, isn't it? A firm belief that the allegations are true? Is that enough? It's not.

What does the level of proof have to be?

VENIREPERSON NO. 9: Beyond a reasonable doubt.

MR. GRAY: Beyond a reasonable doubt. Okay.

got her a set that automatically turned off.

But do you see how you might have had that hesitation in your mind? She had that hesitation. It's a hesitation I'm talking about. Okay. It's a hesitation as to, "Hmmm, I wonder if I know at that level of proof beyond a reasonable doubt that the person committed the offense." Okay? It's that hesitation I'm talking about. And does that go to each and every element or to some of the elements?

VENIREPERSON NO. 11: All of them.

MR. GRAY: All of them, okay. And that's why I wanted to make that distinction between the felony part. That's an element. You cannot go in assuming that anyone has been convicted of a felony. You have to assume that they have not been. Does everybody agree to do that?

VENIREPERSONS: (Nods heads.)

MR. GRAY: Okay. And then, the other elements, it's the same standard. Okay.

So, at the end of the day, if you think he may have done, is that enough?

VENIREPERSONS: No.

MR. GRAY: May have done it?

VENIREPERSONS: No.

MR. GRAY: How about probably did it?

VENIREPERSONS: No.

MR. GRAY: Probably is the preponderance. Even a firm belief that the allegations are true, is that enough?

VENIREPERSONS: No.

MR. GRAY: No. This is critically important stuff. And I said this to the last jury I picked. If I could just get 12 people, the first 12 that will agree to follow that rule, I'm fine. That's how important that is.

My concern is that it sounds all great in theory; and then, we get back there; and we don't follow that rule. Okay? We have to know about that now because once you get in this box, okay, it's too late. Okay. You're going to be sworn as the prosecutor said, to take an oath to follow the law.

And can you see the problems? You know, without hurting your conscience, are you going to be able to do that if you can't follow the law. You're going to have problems. And then, what's the possibility that could occur if you can't come to a decision one way or the other? What happens? It's a mistrial; and then what do we have to do? We have to do the whole thing over again.

So, you know, I'm not trying to convince you to come up with reasons to get off this jury. If you want to be on here, we want you on here. But if there's an issue that we need to know about, then you need to tell us

now. And at the end, I'll give you that option to raise your hand if there's something that we missed.

Okay. All right. Any fans of the "Andy Griffin Show."

(Show of hands.)

MR. GRAY: Let's say this is a DWI case. And we try a fair number of alcohol cases -- go figure, right, in a college town. That's a lot of our clients that hire us. Let's say that they prove beyond a reasonable doubt the elements. Person was driving. They were intoxicated. They were falling down drunk, above a .08; but they didn't prove -- they left out the element of in a public place -- has to be in a public place.

What would your verdict be if they didn't prove that one element?

VENIREPERSONS: Not guilty.

MR. GRAY: Not guilty. But what if he's like the town drunk. Who's the town drunk in Andy Griffin?

VENIREPERSONS: Otis.

MR. GRAY: Otis. Barney was probably my favorite character, and that's what I like about it. Black and white television. So, let's say if it was Otis. Otis is the town drunk. For those of y'all who don't know the show, he would actually sleep in a cell. He'd let

himself into the cell and sleep it off and wake up the next day.

So, let's say this guy is drunker than Otis, falling down drunk; but they didn't prove that one element in a public place. Would your verdict still be not guilty?

VENIREPERSONS: Yes.

MR. GRAY: But what if this is his twentieth DWI and this guy is going to kill somebody, same decision? Does it make any difference whether it's a traffic ticket or murder? No. Ironically, yesterday I had a traffic ticket set at the same time that I had a murder case set. I sent one of our partners, Dan, to take care of the ticket case; and I took care of the murder case.

But the level of proof is the same in both. Does everybody see that? Okay. These Constitutional rights are important for everybody, okay, for any crime. Does everybody see that? Okay.

All right. And, you know, if you are selected as a juror, you know, I want you to stay back there as long as it takes to come to the right decision, whatever that may be. Okay? If your decision -- if you're convinced beyond a reasonable doubt as to all the elements, what is your duty?

VENIREPERSONS: Guilty.

MR. GRAY: You're duty bound to convict, guilty.

On the same accord, if one of the elements are not proven beyond a reasonable doubt, what's your oath; or what do you have to do?

VENIREPERSONS: Not guilty.

MR. GRAY: Not guilty. Okay. And that's why I say stay back there as long as it takes.

Something magical happens right about 5:00 p.m. in jury trials. It's interesting. What could that be? Why do we have so many jury verdicts at 5:00 and 5:05? Any ideas?

VERNIREPERSON NO. 6: Folks want to go home.

MR. GRAY: Yeah, we've got to go home. That's what we call a compromised verdict, right? Would that make you a little suspicious a little bit, right? Okay. Maybe it's just a coincidental timing. I don't know, but the long and short of it is I just want you to stay back there as long as you want.

The Prosecutor did a really good job I think on the Fifth Amendment, going through that. And you notice the seats. Some of the folks are excused because of that issue. I just want to make sure we didn't miss anybody. Does anybody out there that we may have missed on the Fifth Amendment feel that if they do not hear from

Mr. Greer, they would hold that against him in any way? It would enter into your judgment as to guilt or innocence in any way, even 1 percent? Anybody?

Okay. He gave a few examples of why a person would not -- might not want to testify. One of them I found interesting was maybe on the advice of counsel.

Okay. I tried a case, it was a public intoxication by a guy by the name Doug Supernaw was the defendant. Does anybody know who Doug is? He's a country western singer. He was actually really big in his time, but he's had some problems since, and he's been in the media a lot.

We were trying the case down at the municipal court; and he was going to testify, every anticipation he was going to testify. There was news media there and cameras, the reason I believe because he was going testify. I was actually going to have him sing the song that he said he was singing. That's why he had that breach of the peace, and he was arrested. Okay. I did not end up doing that. He did not testify, and it was because I did not believe the State had proven their case beyond a reasonable doubt. Okay.

And so, can you see how that may be a strategic decision. I can assure you he wanted to

testify. Doug loves to talk to the media, and he would have loved to sing. I can tell you that. It would have been interesting. It would have been fun. But I didn't think they had proven their case beyond a reasonable doubt.

So, can everybody see how that may be a strategy. Okay. And just like the Prosecutor alluded to, you know, what's the No. 1 fear outside of the IRS, I guess?

VENIREPERSON NO. 1: Might self-incriminate yourself.

MR. GRAY: Yeah. Public speaking, right? Does anybody want to stand up here and do this? No. As the Prosecutor alluded to, even if you're called on, that makes you feel maybe a little bit uncomfortable. I'm done with that, right? I'm not in school anymore. Okay. And so, that's why we leave you that option if you want to talk up there at the bench. We can visit with you. Okay.

Let's talk about witnesses. I anticipate there's going to be a few witnesses. I don't think it's going to be a real long trial. They're going to testify. But let me ask you this. I have to ask some of these in very specific wording because that's how the case law or the law instructs me to ask these. Okay?

Would anyone automatically disbelieve a

witness because they had been convicted of a crime if they testified? Automatically disbelief a witness because they had been convicted of a crime? Anyone?

Can a person who has been convicted of a crime still tell the truth?

VENIREPERSONS: (Nods heads.)

MR. GRAY: Yeah. Now, once they take the stand and they start testifying, obviously, you can make your own decision as to credibility. And who makes -- while we're on that, who makes that decision as to whether somebody's telling the truth or not? Is it the Prosecutor, me, the Judge? Who makes that call?

VENIREPERSONS: The jury.

MR. GRAY: Yeah, the jury does. Okay. We don't make that call. You guys decide whether an individual is telling the truth or not. If something just didn't make sense, why would that be? Maybe they're not telling the truth. Okay.

I mean, I'd like to think that everyone that takes the oath would tell the truth, right? Wouldn't it be a wonderful world? Does that always happen?

VENIREPERSONS: No.

MR. GRAY: No, it doesn't. Okay.

All right. We talked a little bit -- I think we've talked some on law enforcement, so I won't

spend a lot of time on that. But let me ask you this one question. Again, I have to ask it in a specific way.

Who believes that a police officer, if called to the witness stand, would always tell the truth? Who out there believes a police officer who's called to the stand, takes the oath, would always tell the truth?

Sometimes I get none. Sometimes I get a lot on this one.

Anybody? On the first row, believe a police officer would always tell the truth?

Second row? Even Mr. Smith, you're a security, right?

VENIREPERSON NO. 20: Right. I would say no, that's not necessarily they would all tell the truth.

MR. GRAY: Okay. Does the government make mistakes sometimes?

VENIREPERSON NO. 20: Absolutely.

MR. GRAY: So, would you wait until you heard all the testimony? Would that be fair to say? Okay. Would everybody agree with that?

VENIREPERSONS: (Nods heads.)

MR. GRAY: All right. We've already really covered the felony conviction, so I'm not going to go back over that. I do want to talk a little bit about the possession and the ownership.

The Prosecution spent a lot of time on possession. I think they did a great job; and so, I'm not going to spend a whole lot more time. I may sort of flesh out some of the same things with y'all.

One, we had a lot of talk about ownership. Does everybody understand ownership, that does not equate to possession?

VENIREPERSONS: (Nods heads.)

MR. GRAY: Okay. I can own something. I can own this, hand it to you; and you willfully take it. Are you now in possession of it?

VENIREPERSON NO. 12: Yes.

MR. GRAY: Yes. Otherwise, how would we ever -- how would they prosecute drug cases? It's manufactured, right? It's distributed; and then, it goes from big amounts into smaller amounts where you have the street dealers. Okay.

Does everybody see that, that the street dealer, he may not own the narcotics, right? He may be holding it for a higher -- a higher up; but do you see how that person is still in possession of it? Does anybody got any problems with that?

VENIREPERSONS: No.

MR. GRAY: Okay. Ownership does not equate to possession. Okay. We had the house example, which I

think was real good. I think it was -- was it, Ms. Welsh? You had some issues or some problems with a roommate; is that right?

VENIREPERSON NO. 9: Uh-huh. Yes, sir.

MR. GRAY: Okay. There's a lot of marijuana in this community. More so than I guarantee you most of you folks would ever want to know. I know, they know, because we prosecute and defend these kinds of cases. Okay. So, that's a common deal in college-type situations, and I've had people that have even had prior convictions have gone straight and what are their roommates doing? They're still continuing to smoke marijuana or use marijuana. And that is a problem.

But it falls down to the facts of the case, right? Just like the Prosecutor said, it would be one thing if the marijuana was in an open area, right? It was on the dining room table. Everybody had access to it. Could you see how multiple people might be in possession of it? Okay.

What if it was hidden in the roommate's closet in her purse? Could you see how the other roommate would not have possession of that? Does that make sense? Okay.

What if, though, the other roommate knew about it? Is that enough? Knew the other person had the

marijuana in their purse in their closet, is that enough?

No. Okay. You have to knowingly possess it. Okay.

Juror No. 10, Mr. Smith?

VENIREPERSON NO. 10: Yes, sir.

MR. GRAY: Reach under your chair for me, if you could, all the way back. Okay. You've got to keep going. Anything back there?

VENIREPERSON NO. 10: If I can get to it.

MR. GRAY: All right. What is that?

VENIREPERSON NO. 10: Either a kilo of cocaine or a box of Kleenex.

MR. GRAY: That was the same kilo of cocaine or box that was sitting right up here. Well, come on now. Y'all saw him sit it here. Didn't you wonder where it went? Didn't you check under your chair before you sat down?

VENIREPERSON NO. 10: No.

MR. GRAY: Kind of set him up. I made sure it wasn't any of the females because you put your purse under there, and you might have saw it. But does everybody see the point I'm trying to make? Do you always know necessarily what's in your house or what's in your car if others have used it? Who out there has kids that drive?

(Show of hands.)

MR. GRAY: Do they use your vehicle sometimes? Each time when they get home do you check their vehicle? No? Some folks might. So, can you be assured if you then take the victim to go fill it up with gas that you know every single belonging in there? No.

Okay. So, does it -- does it depend on the facts? Okay. We don't get to talk about the facts here, but I can assure you that's all we're going to be talking about, or that's most of what we're going to be talking about in a criminal case. Okay. So, you will get to hear all that. All right.

All right. Talked about credibility. Objections. If either side feels that the other side is not playing by the rules or it's not going the proper predicate or something of that nature, then we can object. You've seen that on TV shows or whatnot.

You know, it's something that we have to do. Both sides have to do that. Is that anything that you would -- I apologize. I know it's distracting, and we'll try to keep it to a minimum, but is that anything that any of you-all would hold against me and even more importantly against my client, Mr. Greer? Anybody?

Do you understand why that's something that I would have to do? Okay. You know, if you were on -- if you were the accused, would you want your lawyer to

object? Of course.

All right. Let's talk a little bit about technicalities. Let's say that we have a burglary of a home, and they allege in the indictment -- does everybody know what an indictment is? I teach criminal procedure at Blinn to some legal assistants, and we're going through informations and indictments.

An indictment is basically a piece of paper. It's pink. It's the formal charging instrument that the State uses to charge an individual with a crime. The State of Texas -- not all states -- but in the State of Texas, you have a right to an indictment on any felony case. Okay. It spells out those elements that they have to prove. Okay.

Let's say in the indictment, that this is the burglary of a habitation, burglary of a home case; and they allege that the person broke into this home; and they stole a VCR. That's what the indictment says.

They get their witnesses. They come in. The police officer testifies. The owner of the home testifies, and he testifies that, yeah, something was stolen. It was my DVD player. Then they rest.

Now, have they proven beyond a reasonable doubt the person broke into the house and stole a VCR?

VENIREPERSONS: No.

MR. GRAY: So, what would the verdict have to be?

VENIREPERSON NO. 11: Not guilty.

MR. GRAY: Not guilty. Okay. Isn't that just a technicality? Isn't that lawyering? I mean, they still broke into the house, right? Why not just convict the guy? Because the big stuff they proved, right? They proved he broke into a house. So, do we really care what he stole? Is that a technicality, or is that important stuff?

Upstairs in the 361st I was trying a case. I think it was two years ago, and the Judge said -- I think he had heard it from another lawyer -- "that those technicalities," he said, "I call those the Bill of Rights." Okay. So, are they technicalities? Yeah, but they're a big deal. Does everybody see that?

VENIREPERSONS: Yeah.

MR. GRAY: Okay. You know, if we start this sliding slope; and we don't take this oath seriously; and we don't hold the State to the burden, I mean, what's next, right?

I mean, I want you to just envision if a person is wrongfully accused. You know, wouldn't you want the level of proof to be beyond a reasonable doubt and that that jury follow the law? Wouldn't you want that?

Okay. That's all we're going to ask you to do.

Okay. The Judge is going to give you -- you get to hear the facts; and the Judge is going to give you the law, okay, on how you apply that law to the facts of the case. So, there won't be a bunch of questions. All you have to do is follow that law, and that's what we're asking you to do.

All right. I want to talk to a few people -- as the Judge indicated, the folks that end up on the jury, it's -- this is Juror No. 1. So, you're in the hot seat. Okay. And then whoever is left over, we start here, and it's 1 through 12. Okay. So, the back row, Juror -- is it 60? How do you say your name?

VENIREPERSON NO. 60: Hudspeth.

MR. GRAY: You're the least likely person to be on this jury. Probably the whole back row because we just won't get to you. We'll run out of strikes. I get ten strikes. They get ten strikes. Ten and ten is 20. We've got to have 12 people on the jury, so where does it stop? The first 32. Well, there may be some issues because we sometimes double strike, but that's pretty close to the way it works.

Let me ask some other folks.

Ms. Cox, you worked at -- do you work at Wal-Mart currently?

VENIREPERSON NO. 1: Eighteen years cashier.

MR. GRAY: Eighteen years. Wow. You were probably there when I was there. I worked at the Super Center; and then, before it was the Super Center, and then, I also worked at the College Station store; and then, I went to the home office after college.

Any question that the Prosecutor asked or I asked that you need clarity on at all, or is everything -- other than what we talked about at the bench? You think you can be fair to both sides in this case?

VENIREPERSON NO. 1: Yes, sir.

MR. GRAY: Let me see. Ms. Nelson, 39, you were a teacher in Chapel Hill?

VENIREPERSON NO. 39: Yes, sir.

MR. GRAY: Okay. Do you know a guy by the name of Doug Hone?

VENIREPERSON NO. 39: No, sir.

MR. GRAY: He's actually the JP there at Chapel Hill now, Justice of the Peace. He went to A&M with me. He also owns Chapel Hill Sausage Company. You're aware of the sausage company. Okay.

You had some issues, I think, with the Fifth Amendment, wanting a person to testify. Now, that I've kind of explained some of the reasons as to why a person might not want to testify, has that -- has that changed

your viewpoint at all; or would you still need to hear from that person?

VENIREPERSON NO. 39: I would think it would be the wisest decision to testify.

MR. GRAY: Okay.

VENIREPERSON NO. 39: I understand the law. I'm just saying what I would consider the wisest.

MR. GRAY: Yeah. And the way it will work is is that the Judge will give you that law, and that will be one of the things that will be in there if he so chooses. And it's his ultimate choice; but obviously, I'm here to advise. Okay.

Now, if he does not testify, then you would get that instruction. You cannot hold it -- you cannot consider it for any reason. Okay.

VENIREPERSON NO. 39: Yes.

MR. GRAY: And in doing so, if that person was to bring it up, the other jurors have to tell them not to. Okay. So, that's -- that's a concern. I don't want a situation where anyone is in this box; and then, where do you go, right? You can't make that decision.

So, would you be able to follow that law if given that law by the Judge?

VENIREPERSON NO. 39: Yes.

MR. GRAY: Okay. Anyone else out there have

any problem as to the Fifth Amendment? Some reason we've got a lot more hands in this panel than anyone I'm normally come across on the Fifth Amendment.

This is sort of -- we don't go back and forth. It's not like TV. They don't get a shot; and then, I get a shot; and we do this all day. When I sit down, we're done. All right. So, I've got to know. He may have left something out, I may have left something out.

I was picking a jury. I actually tried a murder case from the prosecution side. I was actually a prosecutor twice and a defense attorney twice with the D.A.'s office, so I've gone back and forth.

I was prosecutor, I think, for five years the last time I was with the D.A.'s Office. I was trying a case with Jay Granberry. It was upstairs. It was a murder case. We ended up -- I think it was the last day of testimony. I had two officers coming in from Houston to testify. We were through with the trial. It had been a week-long trial. And we ended up working out a deal. Sometimes that happen. We got back, and we interviewed the jury panel, which I do in every single case. I always talk to the jurors afterwards if they want to talk.

And one of the jurors said, "Oh, thank goodness, you settled this thing because I'm on so many

antipsychotic drugs; and I don't think I could have made it another day."

Well, from the prosecutor's standpoint - I was the prosecutor then -- you could understand why, well, I guess, I should have asked that question.

My point is is that I may -- I may have forgotten something or the Prosecutor may have forgotten something. Okay. And we can still talk about it at the bench if you want. We don't want to embarrass you. That's not our purpose. But we just want to make sure that we get a fair and impartial panel for both sides. can everybody agree to do that?

Okay. Did I leave anything out? Anybody? Okay. Does anybody know either one of the prosecutors or have a close affiliation with the District Attorney's Office? Anybody?

VENIREPERSON NO. 37: I have a niece that works for Marc Hamlin's office.

MR. GRAY: Okay.

THE REPORTER: I can't see his number.

THE COURT: And your number? He said he has a niece that works for Marc Hamlin.

THE REPORTER: Thank you.

MR. GRAY: And that would be the District Clerk's office. They obviously work with the D.A.'s

Office as well. Any problems with that at all?

VENIREPERSON NO. 37: No.

MR. GRAY: I have a close affiliation with the District Attorney's Office. I work with them all the time. I used to work there. Okay. That's not the issue. The issue is whether it will bias you in any way. Okay.

And we talked about bias not in the -- it's not any kind of a racial kind of thing bias. What we're talking about is do you have strong feelings about the law one way or the other, okay, such that it would affect your ability to serve on a jury? Okay?

Is there anything I left out?

Okay. We've got a student of mine, Ms. Henry; is that right?

VENIREPERSON NO. 23: Uh-huh.

MR. GRAY: Okay. Anything about me being your instructor at one point --

VENIREPERSON NO. 23: No.

MR. GRAY: Hopefully, I gave you a good grade. Okay.

All right. Well, I'll sit down. Thank you.

THE COURT: Let me have the lawyers come up just a minute.

(Bench conference:)

THE COURT: I'm thinking about letting 54

through 60 go.

MR. CALVERT: Yes, sir.

MR. GRAY: I agree.

(Bench proceedings concluded.)

THE COURT: Jurors No. 54 through 60, you are excused. You can leave the courthouse. You do not have to return. Have a nice day.

(Venirepersons Nos. 54 through 60 excused.)

THE BAILIFF: As you're going out, please leave your number on the last chair as you're going out.

THE COURT: The rest of you, we're going to take probably a break of about 30 minutes. It could run a little longer, to talk to some of you one-on-one. I don't think there will be many of those. And then the lawyers will strike their lists, and we'll bring you back in and announce the jury. So, take a ten-minute break and then gather outside the door and let's see if we need to talk to you.

THE BAILIFF: As you're going out, place your card on the last chair of your row. If you're going out this way, place your card on the last chair of your row.

(Venire panel retired.)

(Off-the-record discussion.)

(Short recess.)

THE COURT: All right. Bring in No. 9.

Earl, you didn't have any you wanted to bring in, right?

MR. CALVERT: No, he did, Judge. He's got 38, 39 and 40.

MR. GRAY: And 43, Judge.

THE COURT: So, we've got five people.

MR. CALVERT: I don't know that we're going to get to 43.

THE COURT: Probably won't. Right now, we're at one, two, three --

MR. CALVERT: Right now, we're through -- 39 is in range right now.

THE COURT: Yeah, 39 is in range. Okay. If 38 and 39 go, then we'll have to talk to 40.

(Venireperson No. 9, Halley Ann Welsh, at bench.)

THE COURT: All right. Ms. Welsh, how are today?

VENIREPERSON NO. 9: Good. How are you?

THE COURT: All right. The Prosecution will have a couple of questions for you.

MR. CALVERT: Ms. Welsh, just to go back over what we talked about earlier --

THE COURT: Remember, this lady over here is

trying to take down what you say.

VENIREPERSON NO. 9: Okay.

MR. CALVERT: You said that your personal feelings are -- especially in light of a lot of your past personal experience with your roommate, that you couldn't convict somebody of a felony unless it was proven that they knowingly possessed the property, that they owned it as well; is that true?

VENIREPERSON NO. 9: Right.

MR. CALVERT: Okay. That's all I have, Judge.

MR. GRAY: And you understand the law is such that, sort of like the drug example, even though one person could have bought it and owned it, if they transferred it to the other person, it's in their pocket or in their possession, they possessed it?

VENIREPERSON NO. 9: Right.

MR. GRAY: Okay. So, do you have problems with that?

VENIREPERSON NO. 9: No, I understand that. I guess, I don't know. I'm getting confused. It's --

MR. GRAY: Okay. Well, here's how it will work. The Judge will give you the law that has to be applied to the facts. Okay.

VENIREPERSON NO. 9: Right.

MR. GRAY: And the law that the Prosecutor is referring to is possession. It's custody, control and management of an item. You have to know it's there.

VENIREPERSON NO. 9: Right.

MR. GRAY: You have to have custody, control or management. So, there's four different ways, you know, that you can possess something. And if they prove beyond a reasonable doubt that the person had care, custody, control or management of the item, then you have to find the person guilty.

VENIREPERSON NO. 9: Right.

MR. GRAY: And if they don't, then you find the person not guilty.

VENIREPERSON NO. 9: Right.

MR. GRAY: Can you follow that law?

VENIREPERSON NO. 9: Yes, sir.

MR. GRAY: Okay.

THE COURT: Let me understand. Tell me what you believe, at least so far in the best efforts you can make, what the difference between possession and ownership is.

VENIREPERSON NO. 9: Well, I understand that. Like, I understand that even though I might, I guess, not have one of my possessions on me that I could be still held responsible for that even -- like they were

saying with the tools in the truck or whatever.

I guess, I just -- with my own personal experiences on that, where I did not have anything to do with that and I know it was a moral thing to go or -- I don't know if it was a law or not -- but I didn't want to be held responsible for something that I was not in possession of because I didn't agree with it. And what she had in her room was -- I mean, I don't know. And I got out of that situation -- but I guess I'm just getting confused.

THE COURT: Okay. Well, it would depend on the circumstances.

VENIREPERSON NO. 9: Yeah. I guess --

THE COURT: It looks like what you're describing, if you didn't want any part of it and somebody just happened to have it there, and it was not your intent to --

VENIREPERSON NO. 9: Uh-huh.

THE COURT: -- control or be in possession of it at all, then, in those circumstances, a jury might find you not guilty.

VENIREPERSON NO. 9: Right.

THE COURT: Going back to the example of the card. You remember when he told you that the bailiff or -- excuse me -- the Court would own the card.

VENIREPERSON NO. 9: Uh-huh.

THE COURT: Ownership, but the card is put into your hands; and you willingly except it. You would be in possession, right?

VENIREPERSON NO. 9: Correct.

THE COURT: Are you saying that you could not find someone guilty of possession only, that they would have to be proven to be the owner of it before you could find them guilty?

VENIREPERSON NO. 9: Oh, no. Sorry.

THE COURT: Okay. Well, that's kind of the issue we're talking about here.

VENIREPERSON NO. 9: Okay. Right.

THE COURT: Do you have any more questions?

MR. CALVERT: Briefly. The personal experience that you described with your roommate, I get the sense from you that when we were up here talking about possession and people being held responsible for criminal activity for possessing something, that hits kind of close to home to you. Is that --

VENIREPERSON NO. 9: Yeah. Right. And I'm sorry.

MR. CALVERT: No, you don't need to apologize.

VENIREPERSON NO. 9: Okay.

MR. CALVERT: You understand that the law would require any juror to be fair and impartial, right?

VENIREPERSON NO. 9: Uh-huh.

MR. CALVERT: And like the Judge said earlier, there are certain cases and certain scenarios where, due to our personal experience and our personal lives, we can't be completely fair and impartial due to something that happened to us. For example, if I came home from church Sunday and found my house ransacked and then I come in here for jury duty on Monday or Tuesday and it's a burglary of a habitation case, I probably could not be the most fair and impartial juror. Would that be fair?

VENIREPERSON NO. 9: Right.

MR. CALVERT: In light of the fact that you were personally in a situation where your roommate and somebody you shared a living space with put you in a position where you felt like you were in some danger of that, is that something that you feel like you would not be able to put aside if you're on a case involving where you're going to have to decide whether somebody's guilty of a crime by possession?

VENIREPERSON NO. 9: Not necessarily. I think I just was maybe confused with maybe bringing in my own personal thing versus what is actually --

MR. CALVERT: Sure.

VENIREPERSON NO. 9: -- the right way to go, I guess.

MR. CALVERT: And that's okay. That's exactly what we're talking about is what the law requires of jurors is that they -- that they not -- to use your words -- bring in their personal experiences to help them, you know, decide evidence or, you know, decide a case.

VENIREPERSON NO. 9: Right.

MR. CALVERT: That's really what I'm asking is can you promise the Judge that you could completely separate out your personal experience, or do you feel like your personal experience would play a role in how you decide this case?

VENIREPERSON NO. 9: No, that's fine. I mean, I can -- I'll promise you that I'll put that aside. I guess, I was maybe confused.

MR. CALVERT: Okay. Nothing further.

MR. GRAY: And you're the district manager of Fish Daddy's?

VENIREPERSON NO. 9: I do both.

MR. GRAY: It's a great restaurant.

VENIREPERSON NO. 9: Well, thank you.

THE COURT: I've never had a bad meal there.

VENIREPERSON NO. 9: Thank you.

THE COURT: Anything else?

MR. CALVERT: No other questions, Judge.

THE COURT: Stay with us. Step outside and stay with us.

VENIREPERSON NO. 9: Okay.

(Venireperson No. 9 retired to hallway.)

THE COURT: No. 38.

THE COURT: This one said that fears the subconscious would influence me under failure to testify, especially when a prior conviction is brought into it.

(Venireperson No. 38, Anthony D. Pfitzer, at bench.)

THE COURT: How are you doing, sir?

VENIREPERSON NO. 38: Hi.

THE COURT: All right. And this is Juror No. 38, Mr. Pfitzer. The Defense lawyer will have some questions for you.

VENIREPERSON NO. 38: All right.

MR. GRAY: Yes, there was -- I think when the Prosecution was talking about the Fifth Amendment on the defendant's right not to testify, I believe you indicated that if the person did not testify and it was a prior felony-type conviction that you were dealing with, that that might go into your decision as to whether or not the person testified or not.

In other words, you may lower that burden of

proof lower than beyond a reasonable doubt if that person failed to testify; is that fair to say?

VENIREPERSON NO. 38: Yeah, but I perhaps was expanding it beyond that. If there are circumstances -- my point was if something happened to a loved one or a family member, if the defendant had a family member, if something happened -- all I'm saying is human emotions at a subconscious level will impact my decision.

The scenario of the not testifying, yeah, there's something inside that says, "Well, why doesn't he say something?" Or -- or even under questions.

Now, having said all that, I understand the rules, would certainly follow the rules. But in all honesty, inside of me that -- that exists.

MR. GRAY: Well, and that's the thing. If -- if there was a failure to testify, there was no testimony from a particular defendant, that would go into your -- possibly go into your thinking as a decision in the case?

VENIREPERSON NO. 38: I would do everything I could not to let it. I understand the rules. I'm just being honest.

MR. GRAY: Okay. But it may affect your ability. Would that be fair to say? You have to sort of

pick a horse on these deals.

VENIREPERSON NO. 38: It may.

MR. GRAY: Okay.

VENIREPERSON NO. 38: Probably not, but it may.

MR. GRAY: It may. Okay.

THE COURT: Mr. Calvert.

MR. CALVERT: Sir, if the Judge instructs you not to consider the fact that the Defendant didn't testify if he choses not to, can you promise the Judge that you will abide by that law and not allow yourself to consider that fact?

VENIREPERSON NO. 38: Whatever the Judge would instruct me, I would follow that.

MR. CALVERT: Yes, sir. Thank you. That's all I have, Judge.

THE COURT: Okay. Just one question. Can you assure me that failure to testify will not influence you in the least in this case?

VENIREPERSON NO. 38: Is that your instruction to me?

THE COURT: The instruction will be you're not to consider failure to testify. But now is the time to tell me if you couldn't follow that rule.

VENIREPERSON NO. 38: Yes, sir, I would

follow the rule.

THE COURT: All right. Any other questions?

MR. CALVERT: No, sir.

MR. CALVERT: No, sir.

THE COURT: Step out in the hall and stay with us.

(Venireperson No. 38 retired to hallway.)

MR. GRAY: Judge, on 38, we would move to strike for cause; and we would also want the record to reflect the hesitation prior to making his decision that he could follow the law.

THE COURT: Yeah, there was a 30-, 40-second hesitation on the questions that I asked him. What do you say?

MR. CALVERT: Judge, he was thinking about his answer; but he very clearly said on more than one occasion that he would follow whatever instructions the Court gives him; and if the Court specifically instructed him not to consider that, that he would not.

THE COURT: I believe that he equivocated, but in the end he closed the deal that he would not consider it as evidence against the Defendant. Therefore, your challenge is denied.

MR. GRAY: Okay.

(Venireperson No. 39, Nancy Hicks Nelson, at

MR. GRAY: We don't want a situation where you're selected as a juror -- because that will be the instruction. You will have sworn to follow that law.

VENIREPERSON NO. 39: Yes, I understand that.

MR. GRAY: And so, in your heart of hearts, can you say that that would not enter into your thinking whatsoever if the Defendant failed to testify?

VENIREPERSON NO. 39: I can't say it wouldn't.

THE COURT: You couldn't say what?

VENIREPERSON NO. 39: I can't say it wouldn't. I'm trying very hard to be honest with y'all.

THE COURT: All right. Thank you.

MR. CALVERT: Briefly, ma'am. The only question we need answered is if the Judge instructs you, as the Judge will, that in the event a defendant doesn't testify, you are not to consider that as any evidence or circumstances against the defendant for any purpose. Would you be able to follow that instruction from the Judge?

VENIREPERSON NO. 39: I would do my very best to follow that instruction.

MR. CALVERT: Okay. And, unfortunately, at this part of the trial, we kind of have to lock folks down

one way or the other. And so, can you -- I guess, can you promise the Judge that if the Judge instructs you that if the Defendant doesn't testify, you are not to consider that? Can you promise the Judge that you will follow the instruction?

VENIREPERSON NO. 39: I will.

MR. CALVERT: Thank you, ma'am.

THE COURT: All right. Three statements, two statements and a question. First statement is: I'm going to give you an instruction that if you're on the jury you must follow the law that says you can't hold --

VENIREPERSON NO. 39: I understand that.

THE COURT: -- failure to testify against the Defendant. That's Statement 1.

Statement 2 is you're not under that oath yet, and you can tell me that you don't think you could follow that. And there's nothing wrong with saying that.

Question: Can you assure me you would not allow the failure to testify to influence you in any degree against the Defendant?

VENIREPERSON NO. 39: I can't promise you that.

THE COURT: I'm going to excuse you for cause. You're free to leave the courthouse. You do not have to return.

39 is excused.

MR. CALVERT: Thank you, ma'am.

(Venireperson No. 39 excused for cause.)

THE COURT: No. 40.

THE BAILIFF: Judge, No. 41 wanted a bench conference. He's got a calendar conflict.

THE COURT: We may not get to him, Ernie. We're going to talk to 40, and that will be the last one possibly.

Who was that guy who was going on the trip?

MR. CALVERT: We've already excused him. That was No. 8.

THE COURT: Thank you. What is the issue with Juror No. 40?

MR. GRAY: It was just possession, Judge. I believe it was just knowing drugs were in the home was enough.

THE COURT: Okay.

(Venireperson No. 40, Karen K. Boone, at bench.)

THE COURT: Hello, Ms. Boone, how are you today?

VENIREPERSON NO. 40: I am good, Judge. How are you?

THE COURT: Doing well. The Defense lawyer

has some questions for you.

VENIREPERSON NO. 40: Okay.

MR. GRAY: Hello, Ms. Boone. I believe it was during the Prosecutor's voir dire when he was asking the panel questions, and I believe the juror that was in the front -- let me see -- a Ms. -- a Ms. Welsh, she was the blond young lady over here to the right. She had given the example of knowing that the drugs, her roommate's drugs were in the house. And then, I believe the question was: Is possession, just the knowing that the drugs are in the home alone, is -- is that enough in your mind to equate to possession?

VENIREPERSON NO. 40: No.

MR. GRAY: Okay. What is your understanding of possession?

VENIREPERSON NO. 40: Well, I think that if you have the knowledge, you need to do something about it. But I think just knowing doesn't mean that you're in possession.

MR. GRAY: Okay.

VENIREPERSON NO. 40: I wanted to say, like, if I loan somebody my tire jack and they go and commit a crime, I'm not accused of the crime. I'm just the owner.

MR. GRAY: Okay. Well, on that, and there may -- like the other -- one of the jurors had indicated,

it may be a moral obligation; but here in the courtroom, we're just going to be dealing with the legal obligation. And so, I just wanted to make sure that you can be fair to both sides.

VENIREPERSON NO. 40: Sure.

MR. GRAY: Okay.

THE COURT: All right. Step outside and stay with us.

VENIREPERSON NO. 40: All right.

MR. CALVERT: Thank you, ma'am.

(Venireperson No. 40 retired to hallway.)

THE COURT: I don't think we're going to need to talk to 41. He's outside the zone.

Go ahead and strike your lists.

MR. GRAY: We're through 40, is that right?

MR. CALVERT: Through 40.

THE COURT: 40 is the last one in the range. 41 is out of range.

How long do y'all need, ten minutes?

MR. GRAY: That'll be plenty, Judge.

THE COURT: All right. Ten minutes it is.

THE COURT: He's going to put something on the record, gentlemen.

MR. CALVERT: Yes, sir.

MR. GRAY: Come on up. He doesn't need to

be under oath or anything.

THE COURT: He does not.

MR. GRAY: Mr. Greer, I've represented you on this case for a some period of time; is that right?

THE DEFENDANT: Yes, sir.

MR. GRAY: Okay. And you understand that there's been different offers that have gone back and forth; is that right?

THE DEFENDANT: Yes, sir.

MR. GRAY: Specifically pre --

THE COURT: Are you going to go into the offer? If I'm going to assess punishment, I probably ought to go out of the room when you do this. Is that all right?

MR. GRAY: That's fine, Judge.

THE COURT: Y'all got any objection to that?

MR. CALVERT: No, sir.

(Judge retired from courtroom.)

MR. GRAY: Okay. You're still recording?

THE REPORTER: Yes, sir.

MR. GRAY: Okay. Prior to the indictment, there was an eight-year offer in the case. We had filed a -- a motion for an examining trial. You were indicted. That offer then expired as far as eight years; is that correct?

THE DEFENDANT: Yes.

MR. GRAY: Okay. And subsequently to that, several weeks ago, there was an offer of five years TDC; and you rejected that offer; is that right?

THE DEFENDANT: Yes, sir.

MR. GRAY: Okay. You understand that if the Judge finds both of the -- first of all, if you're found guilty of this criminal offense and then in the punishment phase, the Judge finds both enhancement paragraphs as true, then the punishment range would be from 25 to life in prison. Do you understand that?

THE DEFENDANT: Yes.

MR. GRAY: There would not be a possibility of probation because the maximum sentence would be ten years?

THE DEFENDANT: Yes.

MR. GRAY: And you're sure this is what you want to do?

THE DEFENDANT: Yes.

MR. GRAY: Okay. That's it.

(Strikes made.)

THE COURT: Mr. Gray, when you have a chance to look at that, tell me if you have any motions or objections.

MR. GRAY: Okay, Judge. No objections from

the Defense, Judge.

THE COURT: All right. Let's bring them in.

(Venire panel reseated.)

THE COURT: All right. Ladies and gentlemen, I'm going to call the names of the jurors. If I call your name, please step out, come up and have a seat in the jury box.

Lorynn M. Nieto; Robert R. Cessna; Malathi R. Manchi; Robert L. Smith; Marisa Z. Galimbertti; Gilberto Cobos; Chad D. Lamb; Sarah Henry; Robert B. Hash; Victoria Carter; Luis C. Espino; and, finally, Lucas J. Irvin.

I believe that gives us 12. The rest of you, thank you for showing up. Have a nice day.

(Remaining venire panel released.)

MR. CALVERT: Thank y'all very much.

THE COURT: Ladies and gentlemen, if you'll pick up this item here and turn over to Page No. 4, Panel No. 4, I'm required to read you these instructions.

On Page 4 at the top half of the page is the order in which we proceed through trials, so you'll know kind of what's coming. There are about five stages to the trial. We've already completed Stage 1.

The next stage is where we have the State read the indictment, and the Defendant enters his plea to

the indictment. And then the lawyers give their opening statements. That's Stage 2.

Opening statements are just their opportunity to kind of give you a road map, an overview of the case so that when the pieces start to come in, they either fit or they don't fit; and you'll have an overview to kind of know in advance what's coming to you.

The third part of the trial is the presentation of evidence. The State gets to go first. They present their witnesses, and Defense cross-examines. And then the Defendant, if he chooses to, can put on evidence; and the State has an opportunity to cross-examine. Then it goes back to the State. They can put on what's called rebuttal witnesses and then back over to the Defense, and they can put on sur rebuttal witnesses. So, sometimes it goes back and forth two or three times before each side rests and closes their case.

Once that happens, that completes Phase 3 of the trial.

Phase 4 is the Court's Charge. You'll be given a copy of the Court's Charge. That's the law of the State of Texas, and I'll read that to you word-for-word, and you'll hear the law.

And then, finally, the last phase is the jury arguments of the attorneys. Both sides have a chance

to sum up their case and try to persuade you to their side of it.

So, those are the five stages of the trial.

Let me read now these other instructions beginning in the middle of Page 4.

(Instructions read by Court.)

THE COURT: We'll start in the morning at 8:30; and we'll go until about noon and stop at noon, take at least an hour for lunch. And then, we'll come back at 1:15 or so or 1:30 and begin the afternoon.

We usually give like one break in the morning, sometimes two, and usually two, sometimes three breaks in the afternoon. So, those breaks are, like, ten minutes. Sometimes they turn into longer than that. You might want to bring a book to read or something if you're sitting doing nothing for 20, 30 minutes. Those things happen during trials, ladies and gentlemen.

We will supply some note pads for you and writing instruments so you can take notes during the trial, if you choose to do so. There are rules that control how you can use those notes in the deliberation phase of the trial, but you're welcome to take notes if you desire to.

If any of you get under any pressure or stress of any kind, like a panic attack -- we have had

that happen -- or need to go to the bathroom or any kind of health situation, just raise your hand. We'll stop the trial and let you leave and go recover or whatever you need to do.

This trial will probably be over -- could be over late tomorrow; but my guess is probably Thursday. So -- and I can't guarantee you won't go into Friday, although that's not expected. We will certainly be through this week.

Anything from either side before we excuse the jury for the afternoon?

MR. CALVERT: No, Your Honor.

MR. GRAY: Nothing from the Defense, Judge.

THE COURT: All right. Ladies and gentlemen, y'all are now excused. Go with Ernie, and he'll show you how to come into the jury room tomorrow, and we'll see you at 8:30.

(Jury retired.)

THE COURT: Anything else to take up this afternoon or now?

MR. GRAY: I think we're good on this side, Judge.

MR. CALVERT: This doesn't have to be on the record.

(Off-the-record discussion.)

MR. CALVERT: And just to educate the Court, this case began with essentially a traffic stop. A vehicle the Defendant was driving and his girlfriend was in the vehicle with him. They both at the time had warrants, active warrants for their arrest for burglary of a habitation. That was the reason for the stop.

The officers were looking for them to execute those warrants. After the stop was made, they arrested the Defendant and his girlfriend. During an inventory search is when the gun was found. It's our --

THE COURT: Where was the gun found?

MR. CALVERT: It was in the Defendant's truck in the backseat in a jacket pocket.

THE COURT: Who was driving?

MR. CALVERT: The Defendant was.

THE COURT: All right.

MR. CALVERT: At this point, we are not going to illicit any evidence as far as what the warrants were for, what type of offense they were for or anything like that. I have certified copies of both warrants.

THE COURT: What were they for?

MR. CALVERT: Burglary. That case ended up never being prosecuted, but they are for burglary.

THE COURT: All right.

MR. CALVERT: I will be offering both of

those warrants for record purposes only, not for the jury.

THE COURT: Were those cases just refused for prosecution or dismissed?

MR. CALVERT: I don't know if they were declined if they were ever even submitted for prosecution. It was a Bryan PD case. It never went anywhere.

THE COURT: Do you have any objection to all of that?

MR. GRAY: No, Judge. I mean, if there's -- you know, there may be some procedural evidentiary, you know, hearsay, that kind of thing; but I'm not going to object to -- you know, if they're going to limit it to just the warrants --

THE COURT: The warrants, the mentioning of the warrants --

MR. GRAY: Then, yeah, I think that's fine.

THE COURT: Okay.

MR. GRAY: Judge, I have filed a timely suppression hearing. I'm not requesting that we have a separate hearing.

THE COURT: We'll carry it along by agreement, and I'll rule on it whenever you ask me to.

MR. GRAY: Okay.

MR. CALVERT: Judge, the only other issue --

THE COURT: What is the basis of that

motion?

MR. GRAY: The suppression hearing, a couple of things. The basis of the stop, Judge.

THE COURT: The basis -- so, the reasonable articulable suspicious, the stop.

MR. GRAY: Yes. The basis for the stop. And then, also, the basis for the search. I believe the testimony --

THE COURT: Inventory search.

MR. GRAY: -- will be that it was an inventory search, right, not a search incident to arrest.

THE COURT: Why do you contend that a -- if there's a warrant out for them, and they arrest both of them, there wouldn't be an inventory search?

MR. GRAY: Oh, there would be, Judge; but they're also required to follow their policy.

THE COURT: Okay.

MR. GRAY: So, there may be some questions on that.

THE COURT: Okay. I understand. Now, are you going to want to do some of that outside the presence of the jury when the time comes; or is it all going to be okay in the presence of the jury?

MR. GRAY: I think it's all going to be fine, just that urging, after they close their case so as

to protect the record.

THE COURT: All right.

MR. GRAY: And I think we're fine.

MR. CALVERT: Judge, the only other potential evidentiary issue I know of right now is, obviously, it's an element of the offense that we have to prove that the Defendant is a convicted felon, that he is at least within five years of his discharge from supervision or incarceration.

I talked to Earl, and I guess you still don't know whether y'all are going to stipulate --

MR. GRAY: I don't think we can.

MR. CALVERT: Okay.

MR. GRAY: So, you'll probably need to prove that up.

MR. CALVERT: Okay. Just to kind of give the Court a heads-up, in case there's any other objection we can take it up now if we need to. We're going to prove up through a Judgment that the Defendant was convicted of possession of methamphetamine in Grimes County in 1997 for which he received a 40-year sentence. And so, we're going to have to put that in in order to satisfy that elemental retirement that he's within -- at least within five years of his discharge from supervision.

THE COURT: You put in 40 years?

MR. CALVERT: I think we have to, Judge.

THE COURT: You got any objection to that?

MR. GRAY: I'm sure I will at least under, you know, 403.

THE COURT: All right.

MR. GRAY: Unduly prejudicial, but I understand --

THE COURT: But if it's an element of the case, I don't see that I have any option.

MR. GRAY: No, but I guess it depends on what all is contained in the Judgment. You know, sometimes we have issues; and I'll -- I don't -- I don't think it's going to -- this was a jury trial; but if we've got a revocation and things of that nature, some of that stuff may need to be excised. I don't --

THE COURT: All right.

MR. GRAY: I don't think that that's necessarily --

MR. CALVERT: Well, I will say just kind of in that regard, and we can do this tonight or this afternoon just so it's ready to go in the morning, contained in the certified copy of the Judgment, that case was also a 25-to-life case. So, there's two enhancement paragraphs that are listed in the Judgment.

And assuming you don't have any objection to

us redacting those because that's what he was convicted of on the two prior cases, and we will redact that so that all the jury will see is just the one case, the possession of methamphetamine and the 40-year sentence.

THE COURT: Now, what -- tell me -- explain the law to me, again, on this five-year thing. What do you have to prove? What is that element?

MR. CALVERT: We have to prove that either you're still -- still on supervision of some kind or that it hasn't been more than five years since you've been off supervision.

THE COURT: Okay.

MR. CALVERT: So, you're at minimum within five years. There's another way to do it, too. You can possess a firearm in your home after five years, but you can't possess it somewhere other than your home. But the paragraph of the statute that applies in the case is you have to be at least within five years of your discharge from incarceration or some type of supervision, whichever comes later. So, obviously, if you're still on supervision, that qualifies as long as you've been finally convicted.

THE COURT: All right. That's fine.

Now, on the charge, are we going to have any issues there; or is it pretty cut and dried?

MR. CALVERT: I think it's pretty straightforward as far as that goes.

MR. GRAY: Yeah, I don't see any kind of lesser includeds or anything at this point, Judge. So --

MR. CALVERT: No, sir.

THE COURT: No lesser included because you're not going to try to claim you don't have a previous conviction?

MR. GRAY: Well, I'll probably try to argue, but I'm going to see how the --

THE COURT: So, if you produce a scintilla that you haven't been convicted, there could be a lesser included?

MR. CALVERT: Well, I don't think so, Judge, because if he's not convicted, it's not a crime to possess it. I mean, you can have a gun --

THE COURT: What about unlawful -- unlawful carrying of a weapon is not a lesser included?

MR. CALVERT: Not in your car.

MR. GRAY: Not -- yeah, not --

THE COURT: When he's traveling.

MR. GRAY: Not as of this date. And that would have been --

MR. CALVERT: It's 2012. You don't even have to be traveling anymore. They did away with that.

You can just carry a gun in your car now.

MR. GRAY: That's true.

THE COURT: Really? I didn't know that.

MR. GRAY: Yeah.

MR. CALVERT: Yes, sir.

THE COURT: I might just put mine in.

MR. GRAY: It makes no sense, I think, to get a concealed carry permit because the places that you can't take it into, you still can't take it.

THE COURT: Oh, I agree.

MR. CALVERT: Well, you can and we can, because Judges and Prosecutors can; but other people can't.

THE COURT: Well, now, in order for a Judge to do it, we've got to have a concealed to carry, though, don't we?

MR. CALVERT: No, that's what I'm saying. Judges and Prosecutors have specialized -- this doesn't have to be on the record.

(Off-the-record discussion.)

THE COURT: All right. We'll see y'all at 8:30. No other motions in limine for either side?

MR. GRAY: No, Judge, the only issues that I can see as far as the limine is going to be with his priors; and I think we're going to -- we'll handle that on

our own.  We'll approach.

THE COURT:  All right.

MR. CALVERT:  Yeah.  We have no intention -- obviously, if he doesn't testify, we have no intention of going into any priors other than the one that we're required to going into for the element.

THE COURT:  Okay.  We'll see y'all in the morning.

(Evening recess.)

THE STATE OF TEXAS

COUNTY OF BRAZOS

I, DENISE PHILLIPS, Official Court Reporter in and for the 272nd District Court of Brazos, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $ 893⁰⁰ and was paid/will be paid by Brazos County.

WITNESS MY HAND AND OFFICIAL SEAL this the 3rd day of May, 2013.

DENISE PHILLIPS, CSR
Texas CSR 6482
Official Court Reporter
272nd District Court
Brazos County, Texas
300 East 26th Street, Ste. 204
Bryan, Texas 78703
Telephone: 979-361-4221
Expiration: 12/31/13

**CERTIFIED TRANSCRIPT**

DENISE C. PHILLIPS, CSR
OFFICIAL COURT REPORTER
272ND DISTRICT COURT

**.**

.08 [1]  123/12

**/**

/s [1]  175/15

**1**

10 [14]  29/1 29/4 29/6 29/10 57/6 61/4 61/13 61/15 75/13 132/3 132/4 132/8 132/10 132/17
10-13-00049-CR [1]  1/4
100 [1]  63/10
103 [1]  2/11
11 [24]  28/18 28/20 34/20 34/23 35/4 36/16 37/8 37/12 37/23 38/3 38/6 62/18 62/20 63/2 63/7 64/7 75/14 85/10 116/16 119/6 119/10 120/6 121/10 135/3
12 [31]  7/13 7/15 8/1 10/24 17/6 28/15 30/17 30/21 33/25 45/3 45/5 45/11 45/14 45/18 45/20 46/3 46/7 46/10 46/13 46/23 47/4 47/8 67/16 75/15 98/21 122/7 122/7 130/12 136/12 136/19 162/13
12/31/13 [1]  175/20
13 [11]  3/2 4/2 5/2 27/24 28/3 28/7 28/9 28/11 45/1 75/16 175/20
13th [1]  1/14
14 [16]  27/21 29/19 29/20 29/22 29/25 30/3 30/6 30/8 30/11 40/5 43/21 43/25 44/8 44/16 47/14 75/17
15 [13]  15/5 17/15 27/9 27/11 27/14 27/17 44/19 44/23 73/16 73/18 75/18 98/24 112/21
15-minute [3]  98/25 99/5 99/11
16 [4]  42/24 43/5 80/6 112/21
17 [35]  43/8 68/3 68/4 68/9 77/13 78/6 78/15 78/20 78/24 79/5 79/8 80/1 80/3 92/5 95/4 99/8 104/10 104/15 104/16 104/20 104/24 105/1 105/5 105/8 105/22 105/25 106/8 106/12 106/15 107/1 107/2 107/5 107/6 113/16 114/11
18 [8]  34/13 34/16 68/12 68/15 68/18 68/21 69/2 69/11
18-year-old [1]  60/22
19 [5]  33/18 33/20 34/8 69/16 69/18
1997 [1]  169/20
1:15 [1]  164/10
1:30 [1]  164/10
1s [1]  15/14

**2**

20 [14]  12/21 12/23 17/24 34/6 57/9 96/15 96/16 96/19 96/21 97/3 129/13 129/17 136/18 164/16
2009 [1]  100/11
2012 [5]  1/14 3/2 4/2 5/2 172/24
2013 [1]  175/13
204 [2]  1/23 175/18
21 [2]  56/23 57/3
22 [20]  56/14 70/22 70/25 87/23 87/24 88/3 88/6 99/9 107/3 107/7 107/10 107/12 107/19 107/24

108/2 108/6 108/10 108/15 113/16 114/11
23 [12]  13/10 13/15 13/19 13/23 13/25 15/20 15/25 16/5 16/7 56/3 141/15 141/18
24 [24]  55/7 55/11 55/16 55/21 55/25 75/25 76/4 76/18 77/1 77/4 99/9 108/16 108/17 108/20 108/24 109/3 109/15 109/19 110/5 110/10 110/15 110/20 110/22 111/4
24007265 [1]  2/10
24036308 [1]  2/4
24077302 [1]  2/5
25 [14]  54/7 54/10 54/15 54/16 54/17 54/20 54/22 55/1 55/3 55/5 55/9 55/10 55/15 161/10
25-to-life [1]  170/23
26 [12]  51/22 51/25 52/4 52/7 52/13 52/23 53/2 53/5 53/13 53/16 53/20 54/4
26th [3]  1/23 2/6 175/18
27 [2]  51/15 51/17
272 [1]  1/3
272nd [4]  1/8 1/22 175/4 175/17
28 [4]  51/6 51/8 51/10 89/25
29 [4]  50/25 51/1 51/4 89/23

**3**

30 [40]  17/24 32/20 48/1 48/5 48/7 48/10 48/12 48/14 48/16 48/18 48/25 49/5 49/8 49/15 49/20 49/23 50/3 50/7 50/10 50/13 50/15 50/19 88/10 88/12 89/10 89/19 99/9 111/5 111/11 111/13 111/17 111/19 111/21 111/23 113/16 114/11 114/19 142/12 153/12 164/16
300 [3]  1/23 2/6 175/18
31 [4]  113/18 113/20 113/20 114/11
310 [1]  2/6
32 [5]  80/9 80/10 80/13 80/19 136/20
3235 [1]  2/12
33 [4]  32/4 32/9 32/15 80/22
34 [1]  80/24
35 [3]  32/24 33/2 81/1
36 [9]  33/7 33/9 33/11 33/13 40/16 40/22 40/24 41/3 81/3
361st [1]  135/11
37 [9]  41/7 41/12 41/15 41/18 41/22 41/24 92/24 140/17 141/2
38 [22]  42/4 42/10 42/16 62/14 92/11 92/17 143/5 143/15 150/6 150/10 150/13 150/15 150/17 151/3 151/21 152/2 152/4 152/13 152/20 152/25 153/7 153/8
39 [34]  42/19 91/3 92/8 97/6 97/7 97/12 97/18 137/12 137/14 137/17 138/3 138/6 138/16 138/24 143/5 143/12 143/14 143/15 153/25 154/3 154/6 154/15 154/17 154/21 154/25 155/4 155/9 155/12 155/22 156/6 156/12 156/21 157/1 157/3
3rd [1]  175/13

**4**

40 [19]  90/23 143/5 143/15 157/4

157/8 157/14 157/19 157/23 158/2 158/13 158/16 158/21 159/5 159/9 159/11 159/15 159/16 159/17 169/25
40-second [1]  153/12
40-year [2]  169/21 171/4
403 [1]  170/4
41 [5]  31/25 90/20 157/5 159/13 159/18
42 [10]  31/17 31/21 65/22 65/23 65/25 66/9 84/24 85/18 86/11 90/17
4221 [2]  1/24 175/19
43 [4]  83/15 90/5 143/6 143/9
4320 [1]  2/7
44 [5]  83/1 83/3 83/5 83/7 83/12
45 [2]  82/23 90/3
46 [2]  43/12 43/15
47 [4]  69/22 69/24 71/7 71/10
4759 [1]  2/12
48 [16]  69/21 70/6 70/18 81/14 81/15 82/4 95/11 99/9 111/24 112/13 112/17 112/20 113/3 113/6 113/10 113/14
49 [3]  57/21 58/1 58/3

**5**

50 [2]  58/8 58/11
50s [1]  7/19
51 [4]  58/14 119/10 119/11 119/14
53 [12]  93/2 93/3 93/5 93/10 99/9 112/5 112/6 112/8 112/9 112/11 113/16 114/11
54 [17]  58/18 58/19 58/19 58/20 58/22 59/2 59/13 85/4 85/5 95/18 95/22 95/25 96/3 96/10 141/25 142/5 142/8
57 [8]  95/15 99/10 111/24 112/3 112/4 112/11 113/16 114/11
59 [2]  7/17 7/18
5:00 [2]  125/9 125/11
5:00 o'clock [1]  18/7
5:05 [1]  125/12

**6**

60 [11]  7/16 62/6 62/8 93/11 93/12 93/17 136/13 136/14 142/1 142/5 142/8
6482 [2]  1/22 175/16

**7**

70 [1]  7/17
700 [1]  115/8
77803 [2]  1/23 2/7
77803-3235 [1]  2/12
78703 [1]  175/19

**8**

88 [1]  32/16
8:30 [3]  164/8 165/17 173/22

**9**

979-361-4221 [2]  1/24 175/19
979-361-4320 [1]  2/7
979-822-4759 [1]  2/12
9:00 [1]  18/5

9:00 o'clock [1]  18/5
9:30 [1]  18/5

**A**

abide [2]  81/17 152/11
ability [6]  61/24 62/2 101/9 110/13 141/11 151/25
able [11]  7/24 9/8 19/12 47/9 79/1 83/25 103/5 122/16 138/22 148/19 155/20
about [204]
above [4]  1/15 123/11 175/5 175/7
above-styled [1]  175/7
above-titled [1]  1/15
absolute [1]  82/16
absolutely [11]  60/25 62/19 62/25 63/4 63/10 70/19 82/18 84/20 86/18 111/1 129/17
Abstract [1]  14/1
access [4]  47/15 47/15 66/4 131/17
Accident [1]  20/5
accord [1]  125/3
accusation [1]  5/5
accused [9]  9/8 11/6 83/10 86/22 115/14 115/15 133/25 135/23 158/23
acquitted [1]  118/19
across [3]  49/25 120/2 139/3
action [1]  110/24
actions [1]  110/25
active [1]  166/5
activity [1]  147/19
actual [3]  18/3 50/5 109/18
actually [16]  6/14 7/9 7/18 24/13 37/1 45/12 56/17 66/13 115/5 123/25 126/11 126/18 137/18 139/10 139/11 148/24
add [1]  62/18
address [2]  78/11 86/11
addressed [1]  64/12
addressing [1]  66/13
admonition [1]  5/18
advance [1]  163/7
advantage [2]  75/22 81/12
advice [1]  126/6
advise [1]  138/12
advised [1]  84/25
affect [7]  21/11 108/4 109/4 109/11 110/12 141/10 151/24
affiliation [2]  140/15 141/3
afraid [3]  84/18 86/9 91/7
after [14]  7/25 8/1 16/11 25/2 25/23 26/22 66/7 97/2 114/8 116/11 137/6 166/8 168/25 171/15
afternoon [6]  15/6 164/10 164/13 165/11 165/20 170/21
afterwards [1]  139/23
again [21]  44/2 73/5 73/14 73/14 77/1 79/12 80/14 81/18 86/6 91/22 92/3 94/2 94/14 97/15 108/22 109/4 113/23 120/15 122/21 129/2 171/6
against [27]  9/15 15/24 74/21 77/12 80/16 82/11 82/19 83/20 84/7 84/11 87/7 87/19 91/4 91/7

## A

against... [13] 98/7 98/12 105/24 106/10 109/1 110/16 126/1 133/21 133/22 153/22 155/19 156/13 156/20

agency [1] 102/19

agent [1] 97/14

aggravated [1] 78/1

ago [9] 15/19 15/20 16/17 18/13 65/6 86/20 112/22 135/12 161/3

agree [56] 9/22 38/18 38/20 41/7 42/4 42/6 42/24 43/8 43/15 49/2 50/23 51/8 51/14 51/15 51/17 51/20 55/8 55/16 56/2 56/14 57/6 57/9 58/11 58/14 59/19 59/22 62/8 62/9 62/14 69/16 73/21 74/3 74/7 77/14 78/12 78/15 78/17 84/6 84/12 86/3 86/5 87/6 98/2 98/5 106/19 111/8 111/9 111/25 112/5 121/15 122/7 129/20 140/12 142/3 146/7 173/10

agreeable [1] 104/5

agreed [5] 60/1 84/2 111/15 112/12 113/15

agreement [8] 106/20 107/2 111/11 111/23 112/4 112/9 114/19 167/22

agrees [1] 66/19

ahead [9] 11/21 15/1 15/16 110/1 111/3 112/10 113/13 114/20 159/14

ain't [1] 36/6

Al [4] 52/7 53/7 53/8 53/20

alarms [1] 56/5

Albernaz [1] 43/11

alcohol [2] 58/25 123/7

Alice [1] 111/13

all [162] 6/2 7/25 8/1 9/1 10/3 13/8 13/20 13/22 13/24 14/12 15/14 15/18 16/8 16/23 17/11 18/11 19/24 20/19 21/17 22/3 22/11 22/15 24/23 25/4 27/2 27/4 27/12 27/23 28/16 29/12 31/3 33/5 35/24 38/3 42/22 43/6 43/10 43/13 47/23 49/2 52/17 53/7 58/6 61/2 62/5 62/9 62/11 62/17 64/15 64/20 65/5 66/23 67/12 67/24 68/13 69/22 70/3 70/8 71/20 74/1 75/20 80/4 80/14 80/23 81/2 82/17 82/20 87/2 87/16 87/19 88/9 88/21 89/4 90/18 92/25 93/11 95/21 97/4 103/14 103/15 105/5 105/7 108/23 113/10 113/11 113/12 113/22 114/14 116/14 116/21 117/13 117/20 120/1 120/25 121/10 121/11 122/9 123/3 124/19 124/23 128/24 129/14 129/19 129/22 132/6 132/9 133/8 133/11 133/11 133/12 133/21 134/2 134/11 136/1 136/5 136/8 137/8 138/1 139/6 139/7 141/1 141/4 141/21 143/1 143/18 143/21 144/10 146/20 150/14 150/17 151/7 151/13 151/14 152/16 153/2 154/14 154/19 155/14 156/8 159/7 159/9 159/21 160/13 161/7 162/2 162/4

165/14 166/16 166/24 167/7 168/22 168/24 169/2 170/5 170/11 170/16 171/3 171/23 173/21 174/2 175/5 175/7

allegation [4] 79/21 79/25 80/17 81/10

allegations [3] 119/19 119/21 122/2

allege [2] 134/4 134/17

allow [3] 8/23 152/11 156/19

allowed [3] 21/23 67/13 86/1

allows [2] 62/22 62/25

alluded [2] 127/7 127/14

almost [2] 18/12 18/18

alone [1] 158/11

along [1] 167/21

already [6] 7/15 114/25 116/19 129/22 157/11 162/23

also [17] 9/17 11/8 25/6 45/15 48/25 55/15 77/10 84/12 112/7 116/7 117/1 137/5 137/20 153/9 168/7 168/16 170/23

although [1] 165/8

always [27] 6/19 6/20 7/10 9/20 17/2 17/17 21/20 21/21 22/21 22/22 22/22 45/20 48/24 72/16 77/18 79/9 108/2 108/10 120/21 120/24 120/25 128/21 129/4 129/6 129/10 132/21 139/22

am [12] 11/10 15/25 31/13 31/19 32/7 32/18 42/16 44/17 70/16 86/7 103/10 157/23

Amendment [12] 82/10 82/11 82/15 106/6 107/21 125/21 125/25 137/23 139/1 139/3 150/19 154/8

American [1] 29/6

among [1] 6/5

amount [1] 118/2

amounts [2] 130/16 130/16

Andy [2] 123/3 123/18

anger [1] 78/2

Ann [1] 143/16

announce [1] 142/16

another [15] 5/18 7/19 10/6 12/6 25/2 42/15 73/5 73/7 85/3 85/9 95/13 97/22 135/13 140/2 171/14

answer [11] 6/21 10/14 22/4 63/20 63/23 64/1 76/5 85/16 92/19 111/22 153/16

answered [2] 87/11 155/16

answering [1] 10/19

Anthony [1] 150/10

anticipate [4] 89/14 92/2 116/2 127/19

anticipation [1] 126/16

antipsychotic [1] 140/1

any [87] 5/25 6/6 14/6 18/10 21/11 21/17 24/3 29/16 36/20 39/10 60/17 63/13 64/2 71/12 71/23 78/8 79/15 79/19 80/11 82/20 84/21 89/17 90/16 91/2 96/8 97/16 98/12 101/2 102/6 102/23 103/6 105/20 105/20 105/23 107/16 108/22 109/21 109/24 110/13 112/25 113/8 114/12 116/9 116/24 117/10 118/2 123/3 124/10 124/17 125/12 126/1 126/3 130/22

132/19 133/20 134/12 137/7 138/15 139/1 141/1 141/6 141/8 143/2 146/15 147/14 148/2 153/2 154/13 155/18 155/19 156/19 160/16 161/23 164/24 164/24 164/25 165/1 166/18 167/7 169/17 170/2 170/9 170/25 171/24 172/3 174/5 175/10

anybody [51] 6/1 12/10 12/10 13/7 13/7 16/10 16/10 16/24 18/25 31/15 33/23 57/18 58/15 58/16 65/2 65/6 66/19 71/14 81/8 82/9 84/22 85/3 85/9 85/12 85/13 85/17 85/22 93/8 94/17 94/25 95/8 96/7 96/12 97/4 97/20 115/8 116/15 117/10 119/5 120/18 125/24 125/24 126/3 126/10 127/13 129/9 130/21 133/22 140/13 140/14 140/16

anymore [5] 16/12 35/6 117/17 127/16 172/25

anyone [6] 121/14 127/25 128/3 138/20 138/25 139/2

anything [35] 15/21 16/20 16/24 16/25 19/1 21/8 21/18 30/19 34/2 66/5 69/8 71/22 79/16 80/12 91/2 94/5 94/17 96/20 96/22 97/13 100/24 113/7 132/7 133/18 133/20 140/13 141/12 141/16 146/3 149/25 160/1 165/10 165/19 166/19 172/4

anytime [1] 120/22

anyway [4] 27/13 100/10 100/19 104/25

anywhere [2] 65/15 167/6

apologize [8] 12/16 33/8 67/1 71/11 93/25 114/23 133/19 147/24

apparently [1] 100/14

Appeals [1] 1/4

applicable [1] 26/17

applied [1] 144/24

applies [1] 171/17

apply [1] 136/4

appreciate [8] 13/5 16/9 21/15 65/17 66/23 68/1 93/7 93/8

approach [1] 174/1

are [161] 6/16 7/6 7/8 7/13 7/13 8/1 8/1 8/2 9/24 12/14 14/21 15/3 16/25 17/1 17/3 17/10 21/25 22/8 23/11 23/20 23/21 23/21 24/10 24/10 26/21 29/12 29/20 30/4 32/13 32/24 35/3 35/14 36/2 36/8 36/11 36/21 38/7 38/23 38/24 39/3 39/4 39/5 40/3 40/18 41/22 42/7 42/25 43/3 43/3 43/21 44/1 44/14 44/15 44/21 44/25 47/25 48/3 49/10 49/11 49/12 49/12 54/1 54/15 54/18 55/24 56/21 57/2 57/19 58/20 62/16 63/13 66/14 68/5 68/8 69/13 69/17 69/23 70/7 71/9 74/25 75/24 76/8 77/9 77/16 77/19 80/4 80/20 82/22 83/8 83/11 83/14 84/19 87/23 88/10 89/9 89/16 89/21 90/1 90/15 91/23 92/22 92/23 93/4 95/3 96/6 99/8 100/1 100/8 103/9 104/18 105/19 105/20 105/23 107/10 107/11

108/19 112/11 112/15 114/8 115/20 116/2 119/19 119/21 120/4 120/11 122/2 122/16 124/17 124/19 125/4 125/22 130/11 131/11 135/15 142/6 143/18 143/20 144/4 147/6 148/5 150/12 151/4 154/2 155/18 156/3 157/21 157/24 158/11 160/11 162/22 163/3 164/3 164/13 164/20 165/15 166/17 166/23 168/20 169/11 170/24 171/24

area [5] 9/19 43/2 95/19 115/5 131/16

areas [2] 8/4 68/16

aren't [1] 49/17

argue [1] 172/9

argument [5] 37/24 38/1 100/13 100/14 102/24

argumentative [1] 102/3

arguments [1] 163/25

Arias [2] 41/5 92/23

arm [1] 10/19

around [7] 14/12 18/4 22/5 59/21 60/6 116/9 116/9

arrest [8] 101/15 112/21 118/7 118/11 118/22 166/5 168/11 168/13

arrested [6] 94/12 94/13 118/16 118/17 126/20 166/9

articulable [1] 168/5

as [112] 6/8 6/8 6/9 6/9 6/21 6/21 11/14 11/14 12/23 15/3 15/4 15/4 16/4 17/20 17/20 18/7 18/8 21/11 22/23 25/6 29/2 32/15 37/4 37/4 39/15 42/8 52/19 52/25 55/5 60/22 63/14 64/13 64/13 69/13 72/4 72/18 74/22 78/13 83/20 84/17 85/13 85/13 88/13 88/23 88/24 88/25 88/25 89/1 89/3 89/5 89/5 89/14 92/4 94/18 94/18 101/8 101/8 103/6 103/10 106/6 110/19 112/24 113/18 115/10 115/20 116/1 116/1 116/3 116/7 119/19 121/4 122/13 124/20 124/21 124/21 124/23 125/8 125/8 125/19 125/19 126/2 127/13 128/9 128/10 136/9 137/24 139/1 141/1 142/9 142/10 142/19 144/8 150/23 151/19 153/22 154/11 155/2 155/17 155/18 160/24 160/24 161/9 166/18 166/18 168/25 171/21 171/21 172/2 172/2 172/22 173/24 173/24

aside [3] 79/22 148/19 149/15

ask [25] 5/16 5/17 6/21 8/12 14/23 14/25 19/10 22/12 70/8 76/7 94/5 94/9 98/19 99/1 114/15 115/17 120/16 127/22 127/22 127/24 129/1 129/2 136/1 136/23 167/22

asked [10] 17/10 46/4 85/16 101/8 105/15 109/13 137/7 137/8 140/5 153/13

asking [9] 6/12 6/18 6/19 8/3 8/5 102/7 136/7 149/9 158/4

assault [2] 78/1 86/21

assaulted [1] 86/22

assaulting [1] 86/23

## A

assess [2] 64/20 160/12
assessing [1] 96/24
assistant [3] 2/6 12/6 19/15
assistants [1] 134/6
assume [1] 121/14
assuming [2] 121/13 170/25
assumption [2] 116/17 116/17
assure [8] 9/25 11/7 106/13 109/11 126/25 133/8 152/18 156/18
assured [1] 133/4
attack [1] 164/25
attention [1] 98/19
attitude [1] 21/5
attorney [6] 2/3 2/9 12/8 13/10 91/13 139/12
attorney's [5] 12/3 91/19 113/5 140/15 141/4
attorneys [3] 2/6 20/10 163/25
automatically [4] 74/1 121/1 127/25 128/2
awarded [1] 119/12
aware [3] 36/18 39/5 137/21
away [10] 30/19 34/1 34/24 34/25 35/5 58/5 66/4 86/15 119/17 172/25

## B

back [60] 15/6 15/12 22/12 23/24 24/4 30/20 31/4 31/16 31/19 31/22 33/3 35/21 36/1 47/22 55/14 55/21 56/19 57/20 62/6 62/6 63/24 64/2 65/5 68/18 69/2 69/19 75/20 81/7 82/21 84/13 86/6 86/17 92/25 95/9 95/13 101/15 102/13 108/21 109/4 111/24 122/10 124/20 125/8 125/19 129/23 132/6 132/7 136/12 136/16 139/4 139/13 139/21 142/15 143/23 146/23 160/7 163/13 163/14 163/16 164/9
backseat [1] 166/13
bad [8] 12/1 79/19 86/1 86/7 86/8 105/2 105/23 149/23
bag [3] 35/20 36/2 36/25
Baggie [2] 36/22 36/23
bags [1] 52/21
bailiff [1] 146/24
Bardenhagen [3] 58/8 58/9 58/10
bare [1] 24/16
bare-bones [1] 24/16
Barker [2] 83/13 90/4
Barney [1] 123/21
based [1] 67/19
basically [5] 26/4 88/7 119/17 134/8 154/10
basis [5] 167/25 168/3 168/4 168/6 168/7
bathroom [1] 165/1
be [212]
Beach [2] 52/16 115/7
bearing [1] 109/6
because [95] 6/17 7/6 7/17 7/18 7/19 7/22 8/5 9/16 10/19 11/4 11/19 17/17 17/20 22/9 22/10 23/13 26/22 29/23 31/11 31/21

32/9 33/2 33/14 34/25 37/3 39/20 40/24 41/24 44/11 44/13 47/9 48/20 49/3 49/6 50/8 50/20 51/10 51/18 54/10 54/22 56/3 58/5 59/8 59/18 60/2 61/23 63/7 67/11 67/16 69/9 73/1 73/3 73/9 73/13 73/18 74/11 76/25 77/17 79/24 80/17 81/16 84/9 86/1 90/11 91/12 93/17 96/8 102/2 102/21 103/11 106/3 110/23 115/13 115/25 122/11 125/22 126/17 126/22 127/23 128/1 128/2 131/8 132/19 135/7 136/16 136/21 139/25 146/7 155/2 161/14 171/1 172/6 172/15 173/8 173/12
becomes [2] 90/10 90/12
bed [1] 43/23
been [52] 9/4 9/6 9/11 10/25 11/4 11/5 20/17 24/14 37/3 64/5 70/10 72/21 73/25 74/24 76/19 76/25 78/5 79/8 80/18 81/10 86/22 91/1 91/12 91/13 91/16 94/12 94/13 100/22 108/2 108/11 110/18 114/9 116/13 116/18 116/18 116/23 116/24 121/14 121/15 126/12 127/3 127/3 128/1 128/3 128/4 139/19 160/7 171/10 171/10 171/21 172/12 172/23
before [18] 1/16 5/22 11/4 14/19 16/24 21/18 71/13 82/2 88/18 97/17 113/19 117/8 118/22 132/15 137/4 147/8 163/17 165/10
began [1] 166/2
begin [4] 5/16 8/12 10/13 164/10
beginning [1] 164/5
behind [1] 88/8
being [11] 9/24 22/17 42/13 52/8 57/1 84/14 120/7 141/16 147/18 151/23 166/23
belief [3] 119/19 119/20 122/2
believe [18] 8/13 9/14 9/15 10/9 107/21 114/14 126/17 126/22 129/9 145/19 150/20 153/20 157/16 158/3 158/5 158/9 162/13 168/7
believer [2] 11/12 88/3
believes [3] 116/13 129/3 129/5
believing [1] 86/15
belong [4] 33/13 45/6 45/7 45/9
belonging [1] 133/5
bench [22] 3/6 3/17 14/4 14/9 25/19 27/1 99/22 104/17 107/8 108/18 111/14 112/14 127/18 137/9 140/9 141/24 142/4 143/17 150/11 154/1 157/5 157/20
Bernal [4] 28/13 45/2 47/12 57/11
besides [1] 21/9
best [5] 101/9 103/2 115/18 145/19 155/23
between [6] 10/15 54/11 54/14 119/2 121/12 145/20
beyond [23] 23/9 23/23 63/21 76/10 76/14 110/17 117/3 117/17 118/8 118/22 119/23 119/25 121/6 123/9 124/23 125/4 126/23 127/4 134/23 135/24 145/7 151/1 151/4
bias [3] 141/6 141/7 141/8

biased [1] 15/23
big [12] 23/18 35/20 40/11 49/18 64/9 88/1 94/6 120/11 126/11 130/16 135/7 135/16
Bill [2] 12/4 135/14
Biology [2] 28/9 28/10
bipolar [3] 100/11 100/12 102/23
bit [18] 8/18 20/14 35/16 62/25 79/10 85/14 85/20 90/12 98/23 106/3 115/1 117/13 118/20 125/16 127/15 128/24 129/24 134/2
Black [1] 123/23
Blair [6] 27/19 29/17 39/22 43/20 46/17 47/13
blame [3] 45/21 45/21 46/14
bleed [1] 18/10
blind [1] 60/17
Blinn [1] 134/6
blond [1] 158/7
bones [1] 24/16
book [2] 23/18 164/15
Boone [4] 90/22 157/19 157/21 158/3
border [1] 8/19
boss [1] 85/24
both [18] 10/25 14/21 91/13 100/25 109/7 124/15 133/18 137/10 140/11 149/20 159/4 161/7 161/9 163/25 166/4 166/20 166/25 168/13
bottom [1] 117/22
bought [1] 144/14
bound [1] 125/1
box [8] 6/3 11/15 35/7 122/12 132/11 132/13 138/20 162/7
boy [1] 18/18
brand [1] 11/16
BRAZOS [9] 1/7 1/17 12/3 14/1 101/19 103/11 175/2 175/4 175/18
breach [1] 126/20
break [19] 8/22 15/5 15/12 17/24 18/7 35/18 68/23 98/23 98/25 99/5 99/11 103/19 111/3 113/13 113/22 114/8 142/12 142/16 164/11
breaks [2] 164/13 164/13
Brenham [1] 115/5
Brent [1] 107/7
briefly [3] 101/3 147/15 155/15
bring [20] 8/17 8/22 10/7 11/10 35/13 41/16 49/7 49/8 94/7 104/23 112/19 114/4 117/23 138/18 142/15 143/1 143/3 149/6 162/2 164/15
bringing [3] 11/14 56/6 148/23
brings [2] 45/22 70/9
broad [3] 22/8 76/3 77/22
broke [4] 134/17 134/24 135/6 135/8
broken [1] 90/11
brother [1] 100/20
brought [2] 116/18 150/9
Bryan [8] 1/16 1/17 1/23 2/7 2/12 55/19 167/6 175/19
bucks [1] 88/2
building [1] 42/8
builds [1] 64/9
bunch [3] 58/3 60/7 136/5

burden [14] 11/19 22/18 22/22 23/8 23/16 76/23 78/18 78/19 84/3 84/8 89/6 117/14 135/20 150/25
burglary [7] 134/3 134/16 134/16 148/11 166/5 166/22 166/23
business [2] 18/6 52/11

## C

calendar [1] 157/6
call [8] 10/21 99/15 125/15 128/12 128/15 135/14 162/5 162/6
called [9] 23/21 85/16 99/2 100/13 105/10 127/14 129/4 129/5 163/14
calm [1] 102/12
CALVERT [5] 2/4 11/23 12/2 15/16 152/7
came [5] 1/15 67/3 86/13 100/13 148/8
cameras [1] 126/17
can [126] 6/17 8/19 10/9 10/14 10/22 10/22 10/24 14/13 14/16 15/4 18/8 22/5 34/4 34/5 40/19 41/7 41/25 44/21 45/20 47/10 47/23 47/24 50/17 50/24 51/11 51/18 53/24 56/5 56/25 59/22 64/12 66/1 68/7 70/13 73/9 73/10 74/3 74/19 74/25 75/20 79/22 80/1 80/3 80/14 81/24 82/9 82/19 84/21 84/22 85/2 85/9 85/11 85/12 86/3 86/11 87/6 87/12 87/12 87/17 88/23 89/4 91/6 91/14 94/7 94/15 98/2 99/16 103/4 103/18 104/13 106/13 109/11 111/3 112/5 112/10 114/24 116/1 117/20 118/14 122/15 126/24 126/25 127/2 127/6 127/18 128/4 128/8 130/9 130/10 132/8 133/3 133/8 133/15 137/10 140/8 140/11 142/6 145/7 145/15 145/19 149/10 149/15 152/10 152/17 155/7 156/1 156/1 156/4 156/16 156/18 159/3 163/11 163/13 163/15 164/19 164/21 169/12 169/18 170/20 171/14 172/16 173/1 173/11 173/11 173/12 173/24
can't [30] 10/16 21/22 22/7 22/16 49/24 49/24 66/15 66/21 67/21 76/1 88/19 88/20 90/15 110/8 120/15 122/17 122/19 138/21 140/20 148/7 154/21 155/9 155/12 156/11 156/21 165/7 171/16 173/9 173/9 173/13
candor [2] 108/13 111/2
cannot [5] 76/5 83/19 121/13 138/14 138/14
capital [1] 73/11
car [13] 40/25 47/17 47/19 56/8 68/23 70/15 73/7 86/12 86/16 105/15 132/23 172/19 173/1
card [7] 10/13 10/22 142/20 142/21 146/24 146/25 147/2
cards [2] 56/7 99/4
care [19] 29/15 33/3 37/2 41/25 44/4 44/6 47/1 51/11 56/3 56/5 56/10 76/14 81/9 86/7 86/7 124/13 124/14 135/8 145/8

**C**

carry [4] 167/21 173/1 173/8 173/15
carrying [1] 172/18
Carter [3] 50/22 89/21 162/11
case [97] 5/21 6/5 8/2 8/10 9/5 9/9 9/13 9/17 10/25 11/20 12/4 12/7 12/25 17/6 18/8 21/11 21/14 21/21 21/23 21/24 21/25 22/13 22/18 23/8 24/8 25/13 26/7 26/18 64/15 64/21 64/22 67/20 72/11 73/11 73/12 76/10 77/17 79/13 79/20 81/24 86/20 96/5 100/25 101/8 102/18 105/21 106/11 109/2 109/5 109/18 113/8 113/9 115/16 116/17 118/1 119/4 123/6 124/12 124/14 124/14 126/8 126/14 126/22 127/4 127/23 131/14 133/10 134/13 134/16 135/11 136/5 137/10 139/11 139/16 139/17 139/22 148/11 148/19 149/7 149/13 151/20 152/19 160/4 160/22 163/5 163/17 164/1 166/2 166/22 167/6 168/25 169/17 170/9 170/22 170/23 171/3 171/17
cased [1] 86/16
cases [14] 5/24 64/16 77/24 115/3 115/4 117/18 119/16 120/9 123/7 130/14 131/8 148/5 167/2 171/2
cash [1] 56/7
cashier [2] 16/18 137/1
cause [20] 1/3 1/16 7/20 7/25 97/15 104/8 104/9 106/23 108/8 108/15 111/12 112/8 112/11 118/6 118/6 118/10 153/9 156/24 157/3 175/7
caused [1] 5/23
causing [1] 15/23
caution [1] 118/24
cell [4] 5/17 5/18 123/25 124/1
Center [2] 137/4 137/4
certain [7] 7/12 9/20 66/2 66/14 81/16 148/5 148/5
certainly [3] 92/12 151/14 165/8
certified [2] 166/20 170/22
certify [3] 175/5 175/9 175/11
Cessna [4] 38/12 38/18 62/11 162/8
Chad [1] 162/10
chair [8] 99/17 114/10 114/12 132/5 132/15 142/10 142/20 142/21
chairs [3] 114/7 114/10 114/24
challenge [2] 7/20 153/23
challenges [1] 7/25
chambers [1] 175/7
chance [5] 17/16 18/9 89/11 161/22 163/25
change [3] 17/24 60/6 60/9
changed [1] 137/25
Chapel [3] 137/13 137/19 137/20
character [2] 106/1 123/22
charge [8] 5/7 6/10 55/13 55/19 134/10 163/20 163/21 171/24
charged [6] 24/9 77/25 78/5 82/16 86/21 94/13

charging [1] 134/9
CHARLES [1] 2/4
chart [2] 27/6 117/14
chase [1] 105/19
check [3] 88/17 132/15 133/2
child [2] 78/1 119/18
choice [3] 56/9 64/18 138/11
choose [2] 60/14 164/20
chooses [3] 83/19 138/11 163/11
choosing [1] 90/8
choses [1] 152/10
CHRONOLOGICAL [2] 3/1 4/1
church [1] 148/9
circumstances [13] 36/12 38/4 47/7 62/15 62/23 74/12 76/15 81/16 82/19 146/12 146/20 151/5 155/19
circumstantial [1] 68/16
city [1] 105/14
civics [1] 22/13
civil [1] 119/4
claim [2] 45/6 172/7
clarity [1] 137/8
Class [1] 120/10
clear [3] 103/25 104/3 119/15
clearly [5] 33/22 41/9 82/1 86/15 153/16
Clerk's [1] 140/25
client [1] 133/22
clients [1] 123/8
close [14] 9/7 11/1 11/6 18/7 27/11 27/12 30/8 94/10 94/12 136/22 140/15 141/3 147/19 168/25
closed [1] 153/21
closes [1] 163/17
closet [2] 131/21 132/1
Club [1] 115/8
Cobos [3] 42/22 80/4 162/10
cocaine [19] 35/9 52/11 52/11 52/16 52/18 52/19 52/21 52/22 52/25 53/1 53/9 53/11 70/12 70/13 70/16 70/16 70/20 132/11 132/12
Code [1] 25/22
coincidental [1] 125/17
college [9] 59/17 86/12 95/23 95/24 105/9 123/8 131/9 137/5 137/6
college-type [1] 131/9
come [38] 8/9 10/1 13/20 13/21 14/2 15/5 15/12 15/23 23/24 24/4 25/16 25/18 36/1 58/2 59/25 63/24 64/2 70/15 77/24 85/20 96/6 99/2 99/20 112/15 120/23 122/19 122/23 124/21 132/13 134/19 139/3 141/22 148/10 159/25 162/6 163/5 164/9 165/16
comes [7] 6/3 7/23 8/7 49/25 68/22 168/22 171/20
comfortable [14] 13/4 42/12 42/25 49/11 49/15 49/17 49/22 55/24 57/2 71/2 89/9 94/5 94/14 100/3
coming [7] 11/17 88/18 103/10 103/10 139/18 162/22 163/7
comment [2] 18/14 93/13
commenting [1] 26/3

commit [1] 158/22
committed [3] 24/14 37/1 121/6
committing [5] 26/5 36/12 37/21 38/8 38/20
common [2] 88/17 131/9
community [1] 131/6
companies [1] 20/12
company [3] 14/1 137/20 137/21
compare [1] 117/21
compartmentalize [1] 88/23
completed [1] 162/23
completely [6] 6/21 72/25 73/2 73/4 148/7 149/10
completes [1] 163/18
compromised [1] 125/15
computerized [1] 1/18
concealed [2] 173/8 173/15
concern [4] 78/23 122/9 138/19 154/24
concerns [2] 91/22 91/24
concluded [3] 14/9 27/1 142/4
conference [3] 14/4 141/24 157/6
confinement [3] 24/23 26/13 26/15
conflict [1] 157/6
confused [4] 144/21 146/10 148/23 149/16
conscience [1] 122/16
consciously [1] 89/19
consider [16] 83/20 89/16 90/16 92/4 138/7 138/15 152/9 152/12 152/23 153/19 153/22 154/12 154/13 154/18 155/18 156/3
Constitution [1] 82/10
Constitutional [1] 124/16
contained [2] 170/11 170/22
contains [1] 175/5
contaminated [1] 6/4
contend [1] 168/12
continue [1] 39/7
continues [1] 38/19
continuing [1] 131/12
control [43] 28/4 28/5 28/22 29/11 29/15 32/21 33/14 34/17 36/3 36/20 37/2 39/7 40/6 43/2 44/4 44/6 47/1 48/20 48/20 48/24 49/1 49/4 49/24 49/24 51/11 51/18 54/1 55/9 55/22 56/11 56/15 56/18 59/3 59/22 61/16 61/16 62/16 76/15 145/2 145/5 145/9 146/19 164/21
controlled [1] 58/24
controls [3] 53/5 53/16 53/21
convict [9] 39/14 43/18 47/6 57/13 75/21 79/24 125/1 135/6 144/6
convicted [32] 24/14 24/25 40/1 45/25 64/18 72/1 72/21 73/25 74/24 76/12 76/20 76/25 79/2 80/18 81/11 82/1 109/14 109/17 110/18 116/14 116/24 117/4 121/14 128/1 128/3 128/4 169/7 169/19 171/1 171/22 172/12 172/15
convicting [2] 13/4 13/4
conviction [13] 74/10 74/22 79/22 79/25 106/9 109/1 109/9 110/3

116/15 129/23 150/9 150/22 172/8
convictions [1] 131/11
convince [1] 122/22
convinced [1] 124/23
convinces [1] 76/10
convincing [2] 119/15 119/20
cool [2] 39/11 67/9
cop [2] 36/23 97/1
copies [1] 166/20
copy [2] 163/21 170/22
corner [1] 52/20
correct [17] 19/7 20/11 28/6 32/1 32/2 46/23 51/24 63/4 64/9 109/15 110/6 110/15 110/21 111/18 147/5 160/25 175/5
correctly [5] 20/2 27/10 31/1 63/15 175/9
cost [1] 175/11
could [78] 7/19 9/14 9/23 10/8 18/9 19/23 22/2 36/20 39/6 40/1 40/6 40/24 40/25 41/3 45/7 45/8 45/15 47/10 47/11 47/17 47/20 48/19 57/23 58/22 60/5 60/6 60/9 61/3 62/15 62/18 62/20 65/9 66/10 67/22 68/6 76/21 79/15 79/15 79/16 83/22 89/12 89/18 89/20 90/7 90/17 92/6 92/12 92/19 93/5 97/1 98/9 100/25 101/11 103/9 109/8 109/19 110/3 118/22 122/7 122/19 125/10 131/18 131/21 132/6 140/1 140/4 142/12 144/14 145/24 147/6 147/9 148/11 149/10 151/22 153/11 156/16 165/5 172/12
couldn't [17] 8/11 12/24 19/19 39/14 39/14 39/17 43/18 47/6 65/19 66/2 71/17 84/14 88/13 91/3 144/5 152/24 155/11
counsel [3] 84/24 126/7 175/6
country [1] 126/10
COUNTY [10] 1/7 1/17 12/3 14/1 101/20 103/11 113/5 169/20 175/2 175/18
couple [8] 5/19 5/19 8/4 95/13 109/25 114/17 143/22 168/2
course [5] 6/25 7/5 79/19 117/22 134/1
court [28] 1/3 1/4 1/6 1/22 1/22 5/12 10/11 10/16 13/21 13/21 55/2 56/18 56/19 114/15 117/18 120/10 126/15 146/25 153/18 153/18 164/6 166/1 169/17 175/4 175/4 175/7 175/17 175/17
Court's [2] 163/20 163/21
courthouse [8] 41/11 88/18 104/14 106/24 108/8 111/16 142/6 156/24
courtroom [6] 14/16 35/19 41/17 55/23 159/1 160/18
cousin [2] 97/21 98/11
covered [1] 129/23
Cox [3] 94/24 99/21 136/24
CPS [1] 119/16
CR [1] 1/4
credibility [6] 90/9 96/7 96/25 97/16 128/9 133/12

5

## C

credit [1] 56/7
CRF [1] 1/3
crime [25] 11/1 11/6 23/19 36/12 36/18 37/1 37/21 38/8 39/2 44/10 57/13 70/3 74/12 74/14 82/16 83/10 124/17 128/1 128/3 128/5 134/10 148/21 158/23 158/23 172/15
crimes [1] 23/20
criminal [23] 5/5 6/9 11/3 11/9 20/13 22/13 22/18 23/8 64/16 71/23 72/10 73/24 75/23 82/15 83/17 91/13 115/3 115/4 120/9 133/10 134/5 147/18 161/8
critically [1] 122/5
cross [4] 85/10 85/21 163/10 163/13
Cross-examination [1] 85/10
cross-examine [2] 85/21 163/13
cross-examines [1] 163/10
CSR [3] 1/22 175/16 175/16
culpability [1] 64/12
curious [4] 16/25 88/20 88/24 89/5
curling [3] 120/19 120/21 120/24
currently [2] 21/9 136/25
custody [10] 29/15 36/3 37/2 44/4 44/6 47/1 76/14 145/2 145/5 145/8
cut [2] 105/19 171/25

## D

D.A [3] 12/4 12/6 20/21
D.A.'s [4] 113/4 139/13 139/15 140/25
Daddy's [1] 149/19
Dan [1] 124/13
dance [1] 105/11
danger [2] 86/24 148/17
date [1] 172/22
dated [1] 120/22
daughter [1] 93/13
DAVID [5] 1/8 5/5 12/8 108/17 115/14
Davis [2] 31/24 90/18
day [19] 1/14 17/13 18/1 18/8 18/24 19/1 36/2 73/18 87/10 116/5 116/5 121/19 124/2 139/6 139/17 140/2 142/7 162/14 175/13
deal [7] 35/22 52/25 120/10 131/9 135/16 139/20 153/21
dealer [1] 130/19
dealers [2] 52/17 130/17
dealing [2] 150/22 159/2
deals [1] 152/1
Dean [6] 58/20 58/21 95/17 95/22 96/1 96/2
death [1] 120/7
decide [6] 117/19 128/15 148/20 149/7 149/7 149/13
decision [20] 106/14 108/4 109/12 109/17 110/6 113/8 116/8 122/19 124/9 124/21 124/22 126/25 128/9 128/10 138/4 138/21 150/23 151/9 151/19 153/10
decisions [3] 11/11 11/15 59/19

declined [1] 167/5
deep [1] 65/8
defend [2] 83/24 131/8
defendant [37] 2/9 12/7 24/12 71/23 72/12 78/13 80/15 83/18 83/19 84/9 87/7 87/18 89/6 89/15 91/15 91/17 92/3 107/23 126/10 151/6 151/18 152/9 153/22 154/12 155/8 155/17 155/19 156/3 156/14 156/20 162/25 163/11 166/3 166/9 166/15 169/7 169/19
defendant's [3] 24/22 150/20 166/12
defense [14] 5/10 12/8 87/12 91/13 91/18 98/10 139/12 150/15 154/4 157/25 162/1 163/10 163/15 165/13
define [1] 23/20
defined [3] 23/19 29/14 119/19
defining [1] 56/25
definitely [2] 40/22 79/9
definition [8] 25/10 29/14 53/2 53/13 71/17 71/18 117/17 120/16
definitions [1] 24/21
Defrancesco [3] 34/13 34/15 68/10
degree [2] 84/8 156/20
degrees [2] 64/11 64/11
deliberation [1] 164/21
denied [1] 153/23
Denise [5] 1/22 10/12 175/4 175/15 175/16
department [2] 96/17 96/23
depend [5] 9/21 79/12 106/16 133/6 146/11
depends [2] 77/2 170/10
depths [1] 65/8
deputy [1] 105/14
described [1] 147/16
describing [1] 146/15
deselection [1] 63/15
desire [1] 164/23
details [2] 38/4 105/18
determine [1] 6/13
did [41] 6/7 20/2 27/10 28/8 31/1 37/1 37/9 37/12 37/14 40/15 41/10 41/17 43/11 49/8 63/18 63/21 67/1 67/4 67/8 67/25 68/10 72/13 73/12 73/13 73/13 73/14 80/7 101/25 102/9 103/1 121/24 125/20 126/21 126/21 126/22 130/2 140/13 143/4 146/3 150/21 172/25
didn't [28] 9/14 41/16 44/14 47/3 49/7 59/19 60/2 60/23 61/1 86/14 88/25 100/2 102/5 102/11 123/12 123/14 124/4 125/23 127/3 128/17 132/14 132/15 143/2 146/5 146/7 146/15 152/9 173/3
difference [7] 54/11 54/14 54/25 95/18 95/21 124/10 145/20
different [16] 35/16 37/20 44/3 44/14 44/15 60/7 60/8 63/8 67/18 77/23 78/8 85/21 102/21 118/20 145/6 160/7
differently [3] 58/17 77/6 96/8
difficult [3] 87/15 90/13 92/20
dining [1] 131/17

dire [6] 1/11 5/12 11/23 114/22 116/11 158/4
directly [1] 116/21
disadvantage [3] 77/16 80/16 103/11
disagree [3] 61/20 67/13 91/11
disagrees [2] 58/16 61/18
disbelief [1] 128/2
disbelieve [1] 127/25
discharge [5] 25/23 26/15 169/8 169/24 171/18
discharged [1] 7/20
discovers [1] 37/16
discuss [3] 6/5 94/15 94/21
discussed [1] 9/24
discussing [3] 66/17 94/6 94/14
discussion [11] 3/6 3/17 65/7 66/18 67/15 77/21 78/11 79/15 142/24 165/25 173/20
dismissed [1] 167/3
disorder [3] 100/11 100/12 102/23
dispute [1] 33/23
disputing [1] 33/24
disqualify [1] 112/24
distinction [2] 119/2 121/12
distracting [1] 133/19
distraction [1] 19/20
distributed [1] 130/15
distribution [1] 53/17
district [11] 1/6 1/8 1/22 2/6 12/3 140/15 140/24 141/4 149/18 175/4 175/17
do [228]
Doctor [1] 83/9
does [68] 11/7 12/10 17/20 25/4 25/7 27/15 27/16 28/1 28/14 33/15 33/22 33/22 35/1 37/6 37/6 39/9 44/15 64/13 64/13 64/25 64/25 66/13 66/18 69/10 70/4 70/5 71/5 73/21 73/25 74/14 74/14 82/20 85/23 91/17 116/23 116/24 117/1 117/9 117/24 118/11 118/25 119/22 121/8 121/15 124/10 124/16 124/18 125/24 126/10 127/13 128/14 128/21 129/15 130/6 130/6 130/18 130/21 130/24 131/22 132/20 133/6 133/6 134/4 135/16 136/19 138/13 140/14 160/2
doesn't [29] 17/19 26/2 28/20 28/23 44/11 44/13 45/6 53/9 53/24 61/10 78/3 87/7 89/15 91/18 92/3 112/24 118/8 118/8 118/14 128/23 151/11 154/3 155/17 156/3 158/18 159/25 165/23 173/18 174/4
dog [1] 52/15
doing [20] 6/11 8/18 10/20 10/23 18/13 20/17 22/10 50/11 56/11 65/3 72/9 102/6 104/20 108/19 126/21 131/12 138/17 150/12 157/25 164/16
dollars [1] 119/12
domestic [1] 66/14
don't [127] 6/1 6/5 6/6 6/23 7/17 7/22 9/22 9/23 10/7 10/8 10/18

11/12 13/11 18/10 20/20 21/13 22/5 30/19 34/1 34/16 34/17 35/6 35/9 35/11 35/23 37/23 38/3 38/10 40/5 40/7 40/12 45/3 45/24 46/18 46/20 48/19 54/10 54/11 57/13 57/15 57/24 58/5 59/10 59/20 60/15 60/17 60/23 60/23 60/23 61/3 65/2 65/13 66/25 67/11 67/22 69/14 71/16 71/16 77/17 81/9 83/9 83/10 84/8 84/10 86/7 86/7 86/13 87/24 88/25 89/5 89/20 91/6 91/15 93/5 96/4 97/7 97/18 100/10 105/22 107/15 108/22 110/3 110/23 113/17 115/19 116/2 116/21 117/15 117/16 122/10 123/24 125/17 127/20 128/15 133/7 135/19 135/20 138/19 139/4 139/5 140/1 140/9 142/13 143/8 144/21 145/12 146/5 146/8 147/23 155/1 156/16 159/12 163/6 167/4 169/11 169/12 170/9 170/12 170/12 170/15 170/17 170/25 172/3 172/7 172/14 172/24 173/16
done [10] 14/18 17/16 39/1 62/24 66/10 91/12 121/20 121/22 127/15 139/7
door [7] 58/7 86/25 99/1 99/6 99/8 99/14 142/17
dope [2] 39/9 61/9
double [1] 136/21
doubt [24] 23/10 23/12 23/24 63/22 76/11 76/14 90/11 110/18 117/3 117/17 118/8 118/22 119/24 119/25 121/6 123/10 124/23 125/4 126/23 127/5 134/24 135/24 145/8 151/1
Doug [4] 126/9 126/10 127/1 137/16
down [25] 6/20 7/16 7/16 10/12 10/22 11/4 11/16 32/17 34/10 35/20 42/3 55/5 65/8 70/14 81/8 102/12 123/11 124/6 126/14 131/14 132/16 139/7 141/21 144/1 155/25
downstairs [1] 88/16
DPS [1] 97/8
Dr [7] 27/25 28/25 44/24 51/20 52/2 52/20 83/4
Dr. [2] 27/23 54/9
Dr. Hash [1] 54/9
Dr. Schlitter [1] 27/23
Draper [2] 93/2 93/3
dried [1] 171/25
drive [3] 72/22 120/25 132/24
driver [1] 9/7
driver's [1] 56/7
driving [6] 9/5 9/9 72/24 123/10 166/3 166/14
drops [1] 43/23
drove [1] 41/10
drug [6] 44/5 52/12 52/12 55/22 130/14 144/13
drugs [15] 44/7 58/4 59/8 59/9 59/9 59/24 61/12 70/10 70/11 79/15 140/1 157/16 158/8 158/9 158/11
drunk [8] 9/5 9/7 9/9 123/11

**D**

drunk... [4] 123/18 123/18 123/24 124/4
drunker [1] 124/3
DUANE [1] 1/8
Dublin [2] 105/10 105/11
due [4] 9/13 75/23 148/6 148/7
during [8] 7/23 71/21 98/25 114/7 158/4 164/17 164/19 166/9
duty [5] 7/7 88/18 124/24 125/1 148/10
DVD [1] 134/22
DWI [4] 112/21 118/21 123/6 124/9
DWIs [1] 118/16

**E**

each [17] 9/20 10/2 11/19 14/22 23/19 23/23 63/21 76/23 79/23 81/25 90/6 90/6 90/9 90/11 121/8 133/2 163/17
EARL [16] 2/10 12/9 15/18 17/16 17/19 22/8 77/10 85/14 88/1 94/4 98/20 103/24 111/8 115/2 143/2 169/10
earlier [8] 65/18 72/17 82/6 84/2 94/4 113/18 143/24 148/5
easier [1] 90/10
East [3] 1/23 2/6 175/18
easy [2] 77/19 117/23
educate [1] 166/1
efforts [1] 145/19
eight [3] 17/6 160/22 160/24
eight-year [1] 160/22
Eighteen [2] 137/1 137/2
either [16] 24/23 26/5 35/11 40/9 58/22 62/2 64/19 65/13 94/10 132/10 133/13 140/14 163/6 165/10 171/8 173/22
elect [1] 88/6
elected [1] 12/4
election [1] 64/18
element [19] 23/21 23/23 24/3 26/9 71/25 72/5 76/23 79/23 81/25 117/2 121/8 121/13 123/12 123/15 124/4 169/6 170/8 171/7 174/6
elemental [1] 169/22
elements [12] 23/21 24/10 24/17 26/10 63/21 76/8 121/9 121/18 123/10 124/24 125/3 134/13
else [35] 7/8 13/7 16/10 35/6 40/6 45/7 45/9 47/10 62/10 66/19 66/22 71/14 71/14 75/24 77/9 81/5 81/5 81/8 85/6 85/8 87/17 87/25 93/8 94/25 96/7 96/12 97/2 97/4 97/20 100/24 102/22 115/22 138/25 149/25 165/19
else's [2] 66/7 68/23
embark [1] 5/13
embarrass [1] 140/9
emotions [1] 151/8
empire [1] 52/17
employee [1] 20/21
empty [4] 114/7 114/9 114/10 114/24
enable [1] 81/17

end [16] 7/11 8/22 17/17 18/1 18/7 52/14 55/14 63/19 82/17 87/10 92/5 121/19 123/1 126/21 136/9 153/21
ended [3] 139/17 139/20 166/22
Ends [1] 52/10
enforcement [10] 94/12 94/19 95/19 96/13 100/16 100/22 101/5 105/3 105/24 128/25
enhancement [2] 161/9 170/23
enough [16] 10/1 10/20 27/11 27/12 30/8 36/19 39/6 91/16 118/4 119/21 121/20 122/3 131/25 132/1 157/17 158/11
entails [1] 25/6
enter [2] 126/2 155/7
enters [1] 162/25
entire [3] 8/21 10/19 25/10
envision [1] 135/22
equally [1] 96/25
equate [4] 118/11 130/6 130/24 158/12
equivocated [1] 153/20
Ernie [5] 16/16 112/10 114/4 157/7 165/15
erodes [1] 90/9
err [1] 118/24
escalated [1] 100/14
especially [3] 91/5 144/4 150/9
Espino [4] 80/7 80/9 80/11 162/11
essentially [2] 52/8 166/2
establish [1] 47/20
established [1] 116/19
estate [1] 13/19
even [33] 5/23 8/8 14/24 32/6 41/20 42/7 42/14 45/12 46/25 53/9 53/24 57/14 57/15 57/24 68/7 74/10 76/19 82/5 82/7 117/8 118/8 122/2 126/3 127/14 129/11 131/10 133/21 144/13 145/23 145/25 151/12 167/5 172/24
Evening [1] 174/9
event [4] 64/18 64/19 89/15 155/17
ever [9] 9/14 10/25 11/5 24/20 52/2 94/5 130/14 131/7 167/5
Everett [5] 69/22 71/7 71/8 71/9 71/9
every [12] 6/21 10/2 23/19 79/23 81/25 106/2 119/12 120/17 121/8 126/15 133/5 139/22
everybody [47] 17/2 24/6 64/3 64/14 64/25 64/25 71/2 72/9 72/22 73/21 74/3 74/6 74/19 75/24 77/9 81/5 81/5 81/13 86/3 87/16 87/17 87/20 90/25 91/24 93/1 96/25 97/2 100/3 114/14 116/23 116/24 117/1 117/9 118/25 121/15 124/16 124/17 124/18 127/6 129/20 130/6 130/18 131/17 132/21 134/4 135/16 140/12
everyone [1] 128/19
everything [9] 10/12 20/15 51/11 55/19 55/23 57/18 88/4 137/8 151/21
evidence [32] 6/2 18/4 35/22 46/25 47/10 54/1 67/19 74/23 76/9

76/9 76/10 78/14 79/13 81/24 83/20 89/2 89/3 92/4 115/16 116/23 117/22 117/24 118/2 119/7 119/9 149/7 153/22 155/18 163/9 163/12 166/18 175/5
evidentiary [2] 167/10 169/5
Evidently [1] 36/5
exactly [13] 22/10 28/24 29/12 34/14 45/24 63/12 67/1 67/1 67/2 67/25 73/21 73/24 149/4
examination [4] 5/12 11/23 85/10 114/22
examine [2] 85/21 163/13
examines [1] 163/10
examining [1] 160/23
example [19] 36/21 52/19 55/5 55/22 59/6 59/8 60/5 66/15 77/23 78/21 78/22 86/19 106/16 118/16 130/25 144/13 146/23 148/8 158/8
examples [1] 126/4
except [2] 36/13 147/3
excised [1] 170/15
excuse [8] 99/5 106/22 108/7 111/16 112/11 146/25 156/23 165/10
excused [22] 104/7 104/9 104/13 107/2 108/15 111/11 111/23 112/3 112/4 112/8 112/9 113/21 114/7 114/9 114/19 125/22 142/6 142/8 157/1 157/3 157/11 165/15
execute [1] 166/8
exercise [2] 37/2 82/18
exercised [1] 76/14
exercises [2] 87/18 92/3
exercising [3] 36/3 47/1 61/15
exhibits [1] 175/9
exist [1] 66/13
exists [1] 151/15
expanding [1] 151/4
expected [1] 165/8
experience [16] 6/1 79/8 88/17 94/10 94/11 94/18 94/19 96/13 98/6 100/6 105/2 144/5 147/16 148/6 149/11 149/12
experiences [5] 6/6 8/5 8/6 146/3 149/6
Expiration [1] 175/20
expired [2] 98/17 160/24
explain [2] 51/2 171/5
explained [1] 137/24
explore [1] 46/16
express [1] 8/15
eye [1] 60/17
eyeballing [1] 72/8
eyes [1] 10/16

**F**

Face [1] 52/3
fact [28] 11/10 15/22 19/20 21/9 22/3 22/3 22/4 26/5 59/22 59/23 73/24 74/22 75/23 77/20 77/20 79/18 79/20 81/9 81/10 96/23 97/14 98/11 102/16 102/18 103/12 148/14 152/9 152/12
factor [1] 102/18
facts [15] 21/25 26/7 77/17 78/8 79/13 79/18 109/8 109/9 110/8

131/14 133/7 133/7 136/3 136/4 144/24
factual [1] 23/21
fail [1] 24/2
failed [2] 151/2 155/8
failure [9] 72/4 89/16 111/7 150/8 151/17 152/18 152/23 156/13 156/19
fair [41] 6/17 6/17 8/12 8/14 8/14 9/8 10/25 12/22 12/25 22/2 40/1 45/25 46/20 53/19 53/22 54/2 56/24 57/13 57/16 57/23 71/16 71/16 73/15 81/23 84/21 93/19 98/6 100/25 101/24 102/8 123/7 129/19 137/10 140/11 148/2 148/7 148/12 148/12 151/2 151/25 159/3
fairly [3] 17/23 101/6 113/2
falling [2] 123/11 124/4
falls [1] 131/14
family [7] 12/19 66/3 95/19 96/8 98/6 151/6 151/7
fans [1] 123/3
far [12] 6/9 64/13 80/12 94/18 101/8 111/24 114/9 145/19 160/24 166/18 172/2 173/24
fat [1] 23/18
fault [2] 33/16 116/21
favor [2] 15/23 89/3
favorite [1] 123/22
FBI [3] 97/9 97/10 97/14
fear [2] 92/13 127/8
fears [1] 150/7
feel [39] 8/20 20/24 39/18 39/25 40/21 43/17 45/24 46/2 53/18 57/11 57/22 62/11 65/12 65/14 65/17 65/18 65/20 65/24 68/3 68/13 69/13 69/20 83/25 84/21 85/22 86/8 93/18 100/2 101/3 101/5 101/23 102/17 108/23 109/8 113/1 125/25 127/15 148/18 149/11
feeling [3] 39/19 85/13 85/17
feelings [5] 8/8 105/23 108/22 141/9 144/4
feels [7] 43/16 57/17 57/18 58/16 62/10 66/22 133/13
felon [7] 5/6 24/10 24/18 72/1 79/2 97/23 169/7
felonies [1] 120/7
felony [42] 24/15 24/25 39/15 43/18 45/25 47/6 65/10 66/22 71/18 72/21 74/10 74/22 74/24 75/25 76/12 76/13 76/20 77/2 77/5 79/3 79/15 79/21 79/22 79/25 80/18 81/9 81/11 82/1 90/8 91/5 109/5 116/14 116/14 116/24 117/4 117/4 121/12 121/14 129/23 134/12 144/6 150/22
felony-type [1] 150/22
felt [7] 9/13 59/17 84/13 101/7 102/1 102/2 148/17
females [1] 132/19
few [7] 7/9 106/6 114/6 126/4 127/20 136/8 154/7
Fifth [12] 82/9 82/11 82/15 106/6 107/21 125/21 125/25 137/22 139/1 139/3 150/19 154/8

**F**

figure [5] 6/22 67/23 72/8 72/11 123/7
filed [2] 160/22 167/18
fill [1] 133/4
finally [4] 120/25 162/11 163/24 171/21
find [14] 36/22 39/14 65/10 66/21 71/17 76/16 89/7 109/13 109/16 145/9 145/12 146/21 147/7 147/9
finding [2] 37/17 69/13
finds [2] 161/7 161/9
fine [17] 14/7 14/8 61/7 88/25 92/21 104/6 107/12 108/21 120/10 122/8 149/14 154/3 160/15 167/16 168/25 169/3 171/23
fine-only [1] 120/10
fire [1] 79/6
firearm [13] 5/6 24/9 24/15 24/17 24/21 47/2 74/11 74/23 76/15 77/5 81/20 82/2 171/15
firm [4] 11/11 119/19 119/20 122/2
first [29] 7/13 8/1 11/19 17/2 17/17 21/19 39/23 45/23 47/23 63/14 67/4 67/17 74/19 74/19 87/17 94/17 94/25 95/21 99/15 99/16 101/22 110/17 115/15 122/7 129/9 136/20 156/9 161/7 163/9
Fish [1] 149/19
fit [2] 163/6 163/6
five [18] 24/22 25/1 25/3 25/23 26/22 113/22 139/14 143/7 161/3 162/22 164/3 169/8 169/23 171/6 171/10 171/14 171/15 171/18
five-minute [1] 113/22
five-year [1] 171/6
flat [1] 49/18
flesh [2] 35/2 130/3
flinch [1] 106/3
floorboarded [1] 105/16
focus [2] 94/11 118/20
folks [15] 39/12 39/18 43/17 45/24 57/10 65/17 65/20 83/21 125/13 125/22 131/7 133/3 136/9 136/23 155/25
follow [34] 9/23 10/8 10/9 67/8 67/11 67/22 76/21 87/13 89/18 92/6 92/12 92/19 93/6 122/8 122/10 122/14 122/17 135/25 136/6 138/22 145/15 151/14 152/14 152/24 153/1 153/11 153/17 155/3 155/20 155/23 156/4 156/11 156/17 168/16
following [2] 1/14 10/5
force [1] 79/23
Ford [6] 31/17 31/18 31/18 31/19 65/22 90/14
foregoing [1] 175/5
forever [1] 71/19
forgotten [2] 140/7 140/7
formal [1] 134/9
former [1] 20/21
forth [4] 139/5 139/13 160/8 163/16
forward [3] 17/6 33/17 98/21

found [14] 36/24 37/13 37/18 37/19 40/11 64/19 66/3 101/10 118/18 126/6 148/9 161/7 166/10 166/11
foundation [1] 116/19
four [3] 20/18 93/22 145/6
Frederick [2] 113/18 113/20
free [4] 106/23 108/8 111/16 156/24
Freudian [1] 110/4
Friday [3] 19/5 19/6 165/7
friend [3] 12/18 12/23 66/3
friends [2] 15/25 105/12
front [7] 8/21 8/24 27/8 63/18 94/6 100/3 158/6
Frosch [1] 51/13
fun [1] 127/3
further [4] 48/3 149/17 175/9 175/11

**G**

Galimbertti [4] 27/8 44/17 44/19 162/9
gangster [2] 52/8 52/11
garage [1] 43/22
gas [1] 133/5
gather [2] 99/6 142/17
gave [10] 31/3 31/11 32/9 45/16 52/25 58/4 101/9 101/11 126/4 141/19
Geisenschlag [1] 13/25
general [4] 22/9 76/3 77/22 92/15
generally [1] 6/17
gentleman [1] 77/14
gentleman's [1] 42/5
gentlemen [9] 11/8 11/13 14/17 98/22 159/23 162/5 162/17 164/17 165/15
get [81] 6/19 7/11 7/15 7/19 8/6 10/14 10/19 15/2 15/2 15/6 15/9 17/22 22/3 25/4 31/4 31/22 36/21 37/6 37/10 37/14 39/11 39/12 39/13 44/3 58/5 60/1 60/5 61/1 64/6 64/16 65/4 67/21 68/11 71/22 72/25 73/2 73/4 73/5 83/21 83/23 85/15 85/16 91/8 91/17 105/11 105/18 106/2 106/4 110/8 113/23 115/18 116/1 116/10 117/8 118/23 120/21 122/7 122/10 122/12 122/23 129/7 129/7 132/8 133/2 133/7 133/10 134/19 136/3 136/17 136/17 136/18 138/14 139/5 139/6 140/11 143/9 147/16 154/11 157/7 164/24 173/8
gets [7] 11/18 36/15 73/12 74/10 88/1 109/4 163/9
getting [9] 18/20 26/7 37/4 40/12 44/18 65/5 86/25 144/21 146/9
Gilberto [1] 162/10
girl [2] 59/24 120/22
girlfriend [5] 86/22 100/12 102/24 166/3 166/9
girlfriends [1] 86/23
girls [1] 87/1
give [22] 7/7 17/23 17/24 30/19 35/5 56/19 76/24 78/22 86/19 98/20 98/23 120/15 123/1 136/2

136/3 138/9 144/23 156/10 163/1 163/4 164/11 169/16
given [4] 102/18 138/23 158/8 163/21
gives [3] 33/3 153/18 162/13
giving [3] 34/24 34/24 78/21
glad [1] 7/7
God [1] 73/6
goes [5] 73/12 130/15 163/13 163/16 172/2
going [162] 5/14 6/12 6/18 8/3 8/4 8/4 9/19 9/19 11/16 12/5 14/17 14/18 14/21 14/22 16/21 17/3 17/7 17/7 17/8 17/11 17/12 17/14 17/18 17/18 17/22 18/21 18/24 19/1 19/11 19/21 21/14 21/20 23/14 26/10 26/12 27/2 30/20 31/4 34/11 34/15 36/6 37/17 42/3 45/15 46/16 47/13 55/21 56/18 60/20 67/18 68/18 69/2 71/15 71/22 74/17 74/21 75/21 76/4 76/22 77/11 77/14 79/12 79/18 80/15 81/8 84/7 84/10 85/16 85/20 85/21 87/19 87/21 89/1 89/3 89/7 91/10 91/10 91/11 94/2 94/11 96/5 96/6 98/10 98/23 98/24 99/1 99/15 102/17 105/9 105/10 105/20 106/3 106/22 108/7 109/3 109/13 109/17 115/17 115/19 116/1 116/3 116/8 116/9 116/20 117/19 122/13 122/16 122/17 124/9 125/21 126/15 126/16 126/18 126/18 127/20 127/21 127/21 129/23 130/3 132/7 133/8 133/9 133/14 134/6 136/1 136/2 136/3 142/9 142/10 142/11 142/19 142/20 143/8 146/23 148/20 156/10 156/23 157/8 157/10 159/2 159/12 159/22 160/11 160/12 162/5 166/18 167/11 167/12 168/21 168/22 168/24 169/11 169/18 169/21 170/13 171/24 172/7 172/10 173/24 173/25 174/5 174/6
gone [8] 18/17 18/20 22/6 107/21 113/19 131/11 139/13 160/7
good [48] 7/10 11/16 11/24 11/25 13/13 16/6 16/23 17/17 18/6 20/19 21/13 23/11 28/23 30/13 36/23 38/11 42/1 43/24 45/8 45/23 54/13 58/13 66/16 70/9 72/25 73/2 73/4 73/8 77/10 80/2 81/5 81/13 82/14 87/20 90/23 90/25 92/22 93/1 104/20 106/1 108/20 111/10 125/20 131/1 141/19 143/20 157/23 165/21
goodness [1] 139/25
Googled [2] 5/21 5/21
Gosh [1] 12/21
got [36] 5/20 14/5 32/7 35/20 42/21 46/17 59/23 67/12 72/16 73/7 76/11 84/10 93/22 95/13 100/17 100/21 105/16 114/6 114/14 121/1 125/14 130/22 132/6 136/19 139/2 139/7 139/21 141/13 143/4 143/7 146/9 157/6 160/16 170/2 170/14 173/15
government [2] 119/17 129/15

gradation [1] 117/16
grade [1] 141/20
graduated [1] 115/6
gram [1] 52/21
Granberry [3] 2/11 115/2 139/16
gray [11] 2/10 2/11 12/9 13/11 13/12 68/16 74/21 114/22 115/2 115/2 161/22
great [6] 59/6 69/2 83/25 122/9 130/2 149/21
greater [2] 119/6 119/8
GREER [22] 1/8 5/5 12/8 12/12 12/13 12/17 22/2 22/24 24/8 64/21 72/18 74/20 75/22 77/11 98/3 98/7 98/12 115/14 116/13 126/1 133/22 160/3
Greer's [1] 12/25
Griffin [2] 123/4 123/19
Grimes [1] 169/20
grocery [1] 70/14
group [4] 8/22 8/23 94/6 94/7
guarantee [2] 131/6 165/7
guard [1] 16/19
guess [23] 18/13 50/19 64/12 66/6 79/14 86/20 100/7 102/1 120/23 120/24 127/9 140/5 144/21 145/24 146/2 146/9 146/13 149/2 149/16 156/1 165/6 169/10 170/10
guilt [12] 63/8 63/17 63/19 64/11 64/24 65/3 71/21 106/10 106/14 109/2 116/8 126/2
guilt/innocence [1] 106/10
guilt/innocent [1] 116/8
guilty [55] 23/3 23/4 24/1 24/2 24/5 24/6 39/8 39/14 63/16 63/16 63/25 64/1 64/3 64/5 64/19 65/10 66/21 69/7 69/8 69/9 71/17 74/2 74/14 74/23 76/17 78/4 82/2 89/2 89/8 93/18 101/10 106/18 115/12 115/13 117/6 117/7 117/24 118/11 118/18 123/16 123/17 124/6 124/25 125/2 125/6 125/7 135/3 135/4 145/10 145/13 146/21 147/7 147/9 148/20 161/8
guilty/not [1] 63/16
gun [11] 66/2 66/10 66/15 69/6 69/6 79/2 81/19 166/10 166/11 172/16 173/1
guy [15] 13/13 52/20 52/21 52/24 53/6 72/13 76/11 86/20 103/25 124/3 124/9 126/9 135/7 137/15 157/10
guys [2] 117/19 128/15

**H**

habitation [3] 134/16 148/11 166/6
half [4] 74/3 74/6 116/5 162/20
hall [2] 105/11 153/5
Halley [1] 143/16
hallway [6] 103/22 111/4 113/14 150/5 153/7 159/11
Hamlin [1] 140/22
Hamlin's [1] 140/18
hand [20] 7/2 9/11 11/5 29/17 29/24 30/1 30/7 30/11 34/19 39/22 40/20 43/19 46/2 54/23 56/17

## H

hand... [5] 115/25 123/2 130/10 165/2 175/13
handing [1] 55/13
handle [1] 173/25
handling [1] 64/24
hands [14] 7/3 15/9 15/10 15/13 27/21 27/22 39/16 40/3 94/17 115/23 123/5 132/25 139/2 147/3
hang [1] 30/22
happen [9] 11/7 19/19 36/6 48/19 91/19 128/21 139/21 164/17 165/1
happened [7] 35/23 36/8 103/17 146/16 148/8 151/5 151/7
happens [7] 9/24 66/13 73/2 118/16 122/20 125/9 163/18
happy [3] 20/25 21/2 21/5
Haque [3] 83/1 83/2 83/4
hard [6] 27/7 91/4 101/11 102/13 154/22 155/13
hardship [1] 19/12
Hash [5] 51/20 52/2 52/20 54/9 162/10
hasn't [2] 76/13 171/10
have [278]
haven't [3] 37/1 67/10 172/12
having [11] 46/14 62/3 65/7 65/14 72/21 74/24 78/14 90/8 91/5 114/16 151/13
Hawaii [1] 19/1
He'd [1] 123/25
he'll [1] 165/16
he's [49] 13/13 26/4 26/5 26/6 26/8 26/19 26/21 42/8 42/13 50/13 52/12 52/12 52/15 52/15 52/22 53/10 55/22 68/19 69/1 69/3 69/4 70/25 74/23 76/19 80/17 85/25 89/2 89/2 91/5 96/4 97/9 97/10 97/12 106/17 110/18 115/14 116/24 123/17 126/10 126/12 126/12 137/18 143/4 157/6 159/13 159/22 169/23 172/15 172/21
head [8] 27/9 31/16 39/24 59/13 68/24 71/10 75/4 76/24
heads [7] 17/3 74/8 121/16 128/6 129/21 130/8 169/17
heads-up [1] 169/17
health [1] 165/2
hear [16] 37/24 39/21 46/18 76/9 79/18 83/17 97/2 97/17 97/24 100/4 118/1 125/25 133/10 136/3 138/1 163/23
heard [7] 39/22 72/3 78/14 109/8 115/8 129/19 135/13
hearing [6] 101/8 102/18 114/17 167/19 167/20 168/2
hearsay [1] 167/11
heart [2] 86/8 155/6
hearts [1] 155/6
Heath [1] 100/9
Heidick [1] 57/20
held [8] 1/15 1/17 46/21 53/24 57/23 145/25 146/6 147/18
Hello [4] 99/25 104/18 157/21 158/3
help [9] 31/16 34/11 54/6 58/6

58/17 82/24 88/13 91/18 149/6
Henry [4] 15/18 56/1 141/14 162/10
her [24] 6/20 10/20 21/3 21/12 31/3 31/12 31/22 32/9 32/10 33/15 33/16 40/8 40/11 56/17 61/11 93/14 93/18 93/19 111/6 120/24 121/1 131/21 146/8 158/8
here [81] 7/6 8/24 9/25 10/12 10/23 11/16 12/2 12/6 12/7 12/8 12/10 13/7 14/3 14/18 14/23 15/3 15/23 16/11 16/12 18/17 22/3 22/22 22/23 22/23 23/19 25/18 31/16 33/23 35/9 35/20 36/25 55/20 55/23 57/12 64/16 64/23 65/6 66/12 67/3 67/16 67/17 67/22 72/7 72/8 72/18 77/24 82/3 84/9 85/12 85/13 85/13 85/14 85/20 85/22 86/20 92/2 93/1 94/14 98/24 101/19 103/10 103/10 114/8 115/18 116/1 120/5 122/24 122/24 127/13 132/13 132/14 133/7 136/12 138/12 143/25 147/12 147/17 148/10 158/7 159/1 162/18
here's [5] 14/25 17/8 48/22 72/16 144/22
hereby [1] 175/5
Hernandez [5] 33/18 33/19 34/5 69/7 69/12
hesitation [7] 121/3 121/3 121/4 121/4 121/7 153/10 153/13
Hey [1] 88/24
Hi [1] 150/13
Hicks [1] 153/25
hidden [1] 131/20
hiding [4] 31/19 84/19 88/7 89/2
high [3] 22/13 22/13 120/4
higher [4] 118/3 119/18 130/20 130/20
highest [1] 120/3
Hill [3] 137/13 137/19 137/20
him [48] 12/20 13/4 13/4 13/14 15/23 15/24 16/18 42/8 42/13 42/21 51/15 52/25 52/25 53/7 55/23 69/9 74/22 76/16 77/12 79/19 79/24 80/16 83/20 87/19 91/4 91/8 91/8 91/18 101/10 101/25 102/11 102/12 102/12 104/2 106/10 109/1 109/7 110/17 126/1 126/18 132/14 132/18 153/13 153/18 153/19 157/7 157/11 166/4
himself [2] 90/9 124/1
hire [1] 123/9
his [43] 16/1 42/6 42/7 42/8 42/10 42/14 42/20 42/20 42/20 43/21 43/22 50/14 52/11 53/11 55/20 56/9 56/10 68/19 68/22 69/3 87/18 91/8 92/3 96/1 100/9 100/10 100/12 101/9 102/24 105/14 115/9 124/8 126/11 138/11 140/20 153/10 153/16 162/25 166/3 166/9 169/8 169/24 173/24
history [5] 29/6 29/7 71/23 75/23 78/8
hit [1] 68/23
hits [1] 147/19

Hmmm [1] 121/5
hold [34] 10/13 10/17 10/18 10/20 30/16 30/18 31/4 31/12 46/4 66/10 71/19 74/21 76/5 76/22 77/11 80/15 82/19 84/7 84/11 87/7 87/19 87/22 91/4 91/7 98/6 99/6 106/10 110/16 120/13 126/1 133/21 135/20 138/14 156/11
holding [6] 34/19 45/10 57/15 105/23 109/1 130/20
Holt [7] 43/7 68/2 95/1 104/16 104/18 106/23 107/6
home [22] 37/18 38/8 43/2 48/6 49/13 51/19 120/17 120/25 125/13 125/14 133/2 134/4 134/16 134/17 134/20 137/6 147/20 148/9 157/16 158/11 171/15 171/16
Hone [1] 137/16
honest [16] 16/3 16/3 65/9 67/6 67/7 67/12 73/6 77/13 109/7 109/7 109/9 110/3 110/5 116/12 151/23 155/13
honesty [2] 101/11 151/15
Honor [2] 93/24 165/12
Honorable [1] 1/16
hopefully [2] 102/20 141/19
Hopkins [1] 100/9
horrible [1] 77/25
horribly [2] 18/18 18/18
horse [1] 152/1
horses [2] 83/22 84/14
hot [1] 136/11
hour [8] 14/22 14/24 15/2 15/5 15/9 17/15 17/15 164/9
hours [1] 18/7
house [27] 41/1 48/11 49/3 49/4 49/6 50/9 56/4 59/4 59/9 60/4 60/11 60/16 61/9 61/11 62/4 81/19 81/21 82/7 86/13 120/18 130/25 132/22 134/24 135/6 135/8 148/9 158/9
Houston [1] 139/18
how [89] 6/19 7/1 9/16 11/3 11/8 12/17 12/20 13/14 15/1 15/8 15/11 15/19 17/3 17/8 20/16 20/24 21/20 22/14 26/21 27/19 35/1 39/25 40/20 43/6 44/24 45/2 46/2 50/17 51/2 53/18 56/1 57/22 58/2 58/12 61/3 63/12 65/12 65/24 68/2 68/13 69/12 69/20 72/7 72/11 72/21 72/22 73/21 73/24 75/5 83/13 84/3 86/7 86/7 89/24 90/18 100/1 101/24 104/18 106/16 107/10 107/11 108/19 108/23 112/15 121/2 121/24 122/8 126/24 127/6 127/23 130/13 130/14 130/20 131/18 131/21 136/4 136/13 143/18 143/20 144/22 149/12 150/12 154/2 157/21 157/23 159/19 164/21 165/16 172/10
Hudspeth [3] 62/6 93/21 136/14
huh [21] 13/23 29/19 29/25 30/25 35/25 43/5 44/16 46/6 64/4 69/11 70/18 71/4 73/22 74/16 95/25 131/4 141/15 146/18 147/1 148/3 154/15
human [2] 72/14 151/8

hurting [1] 122/16
husband [1] 50/11
hypothetical [1] 22/9
hypothetically [1] 9/5

## I

I'd [9] 8/19 9/1 37/8 37/23 38/6 94/21 95/4 105/2 128/19
I'll [16] 5/15 11/18 35/11 86/6 87/4 111/8 114/24 117/14 123/1 141/21 149/15 149/15 163/22 167/22 170/12 172/9
I'm [124] 5/14 10/9 11/11 12/2 16/11 17/14 17/16 19/4 19/14 20/25 25/11 26/10 27/2 30/19 31/4 32/6 32/6 32/14 34/25 35/4 35/10 36/6 46/16 47/12 47/17 47/19 48/25 49/15 50/1 50/4 50/5 57/7 59/20 59/21 60/20 64/18 64/19 65/9 69/5 69/7 69/8 69/8 69/9 69/24 71/8 74/17 76/4 76/22 77/14 79/14 81/11 81/17 81/19 82/4 82/6 83/15 84/10 85/13 86/8 88/3 89/1 89/3 89/7 89/10 90/20 90/23 91/7 91/10 91/10 91/11 91/12 92/14 93/25 96/21 97/7 97/24 98/22 98/25 99/15 102/7 104/20 105/25 106/3 108/7 108/21 109/3 109/6 115/2 115/17 115/19 116/20 121/4 121/7 122/8 122/22 127/15 127/16 129/23 130/2 132/21 138/7 138/11 139/2 139/25 141/25 144/21 146/9 147/21 149/9 151/7 151/22 155/13 156/9 156/23 158/23 158/23 160/12 162/5 162/19 167/11 167/19 170/3 172/10 173/17
I've [12] 14/5 46/17 91/12 91/13 91/16 105/3 131/10 137/23 139/7 139/13 149/23 160/3
idea [1] 49/18
ideas [1] 125/12
ignore [1] 60/15
III [1] 1/16
illegal [2] 36/13 37/3
illicit [1] 166/18
immediate [1] 78/2
immediately [1] 47/20
impact [1] 151/8
impartial [5] 12/24 140/11 148/2 148/7 148/12
impartially [1] 103/8
important [12] 11/3 11/9 18/22 20/21 57/12 63/5 115/20 120/12 122/5 122/8 124/17 135/9
importantly [2] 74/20 133/21
impression [1] 79/1
impressions [2] 8/6 8/9
incarcerated [1] 120/7
incarceration [2] 169/9 171/19
incident [1] 168/11
incidents [1] 105/20
included [4] 172/6 172/13 172/18 175/6
includeds [1] 172/4
incriminate [2] 85/7 127/10
Incriminating [1] 85/5
Incrimination [2] 82/13 82/14

**I**

INDEX [2] 3/1 4/1
indicated [7] 107/22 115/10 116/4 116/7 136/9 150/21 158/25
indicating [1] 64/23
indicted [1] 160/23
indictment [9] 134/4 134/5 134/8 134/12 134/15 134/18 160/21 162/25 163/1
indictments [1] 134/7
individual [3] 118/15 128/16 134/10
individually [1] 17/25
industry [1] 53/21
inevitably [1] 9/23
influence [7] 89/12 92/14 106/14 109/17 150/8 152/18 156/19
information [4] 5/21 5/25 6/4 6/9
informations [1] 134/7
injury [1] 115/3
innocence [3] 106/10 109/2 126/2
innocent [11] 22/25 23/1 23/2 72/19 72/20 78/13 84/14 86/9 93/14 106/17 116/8
inside [4] 56/6 92/6 151/11 151/15
instance [1] 9/4
instead [1] 37/16
instruct [2] 92/2 152/14
instructed [1] 153/18
instruction [12] 89/17 92/5 92/12 138/14 152/21 152/22 154/11 155/3 155/20 155/23 156/5 156/10
instructions [5] 32/10 153/17 162/19 164/4 164/6
instructor [1] 141/17
instructs [6] 89/14 90/15 127/24 152/8 155/16 156/2
instrument [1] 134/9
instruments [1] 164/19
Insurance [1] 20/12
intend [1] 31/22
intent [1] 146/16
intention [2] 174/3 174/4
interest [1] 105/17
interested [1] 37/9
interesting [4] 35/14 125/10 126/6 127/3
interruption [1] 14/20
interviewed [1] 139/21
intoxicated [1] 123/11
intoxication [1] 126/9
introduce [1] 11/20
introduced [1] 114/25
invading [1] 8/19
invariably [1] 17/17
inventory [4] 166/10 168/9 168/11 168/14
investigating [2] 20/22 21/10
involved [1] 21/14
involving [2] 77/5 148/19
iron [3] 120/20 120/21 120/24
Ironically [1] 124/11
IRS [1] 127/8
Irvin [5] 32/3 32/14 32/15 80/21 162/12

is [370]
isn't [10] 13/22 16/12 18/21 26/6 60/21 118/19 119/20 120/9 135/4 135/5
issue [12] 63/17 106/11 111/6 112/18 122/25 125/23 141/5 141/6 147/12 157/13 167/24 169/5
issues [8] 102/22 131/2 136/20 137/22 154/9 170/12 171/25 173/23
it'll [1] 17/13
it's [128] 7/6 7/16 9/6 10/8 13/12 13/22 17/7 19/14 20/21 22/9 25/23 26/9 26/14 29/10 29/23 30/7 30/8 30/11 31/21 33/16 35/8 35/8 39/9 39/15 40/1 41/13 43/2 43/18 44/5 45/5 46/1 46/3 46/4 46/20 46/22 47/9 47/16 47/16 48/17 49/3 49/6 50/8 50/20 52/7 53/9 54/22 56/10 56/16 56/17 57/13 57/23 58/25 59/3 59/20 60/11 60/11 60/12 60/12 60/15 60/16 61/10 61/11 66/20 68/15 68/16 70/22 71/25 72/3 72/14 77/4 77/19 79/5 82/5 82/5 82/7 82/7 83/25 85/21 91/18 92/1 92/18 98/23 102/22 107/17 110/7 115/9 116/22 117/16 119/21 120/2 120/12 121/3 121/4 121/7 121/18 122/12 122/20 124/10 125/10 125/17 127/20 130/14 130/15 133/14 133/17 133/19 134/9 134/9 136/10 136/12 138/11 139/5 141/7 144/15 144/21 145/2 145/3 148/11 149/21 166/10 168/24 169/6 170/8 170/13 170/21 172/1 172/15 172/24
item [6] 44/4 45/16 50/5 145/3 145/9 162/18
items [3] 53/23 54/2 62/3
its [1] 90/6
itself [2] 50/5 109/18

**J**

jack [1] 158/22
jacket [1] 166/13
jade [1] 79/9
jail [1] 118/17
James [1] 20/8
Jay [1] 139/16
Jeffrey [1] 112/13
job [6] 8/18 39/11 64/22 91/19 125/20 130/2
jobs [1] 91/13
joint [1] 86/17
joke [1] 85/25
Jones [2] 2/11 115/2
JP [1] 137/18
judge [90] 1/17 5/11 8/20 9/2 10/8 11/22 14/7 15/17 17/14 17/23 18/6 24/8 25/5 25/7 25/11 25/14 26/4 55/19 62/22 63/15 64/20 64/22 64/24 72/10 89/14 89/15 90/15 92/2 92/6 93/25 94/4 104/6 106/1 107/15 111/6 112/6 113/11 113/18 114/21 116/3 128/12 135/12 136/2 136/3 136/9 138/9 138/23 143/4 143/6 144/11 144/23 148/4 149/10

150/1 152/8 152/10 152/13 152/16 153/8 153/15 154/12 155/16 155/17 155/21 156/2 156/2 156/4 157/5 157/15 157/23 159/20 160/15 160/18 161/7 161/9 161/25 162/1 165/13 165/22 167/9 167/18 167/24 168/3 168/15 169/4 170/1 172/4 172/14 173/14 173/23
Judges [2] 173/12 173/18
judgment [5] 126/2 169/19 170/11 170/22 170/24
JUDICIAL [1] 1/8
July [1] 100/11
jump [2] 16/25 105/19
juror [28] 12/25 14/10 16/4 21/11 39/15 69/13 84/17 99/8 99/8 99/8 99/9 99/9 99/19 111/17 112/11 112/11 112/24 124/20 132/3 136/10 136/13 148/2 148/12 150/14 154/11 155/2 157/14 158/5
jurors [16] 5/20 6/8 8/2 9/24 10/24 88/23 96/24 114/7 114/8 138/18 139/23 139/24 142/5 149/5 158/25 162/5
jury [75] 1/11 5/14 6/1 6/7 6/10 6/14 6/14 6/20 7/2 7/9 7/14 7/18 8/7 10/9 11/12 13/22 15/3 17/11 18/1 23/23 23/24 24/3 26/5 55/14 62/22 63/13 63/14 63/15 63/18 63/20 63/23 64/2 64/19 65/4 71/22 71/24 73/10 74/10 82/19 83/17 83/19 84/7 87/6 88/18 101/10 110/13 118/12 118/18 122/6 122/23 125/10 125/11 128/13 128/14 135/25 136/10 136/16 136/19 139/10 139/22 141/11 142/16 146/20 148/10 156/11 162/7 163/25 165/11 165/16 165/18 167/1 168/22 168/23 170/13 171/3
jury's [2] 64/22 65/3
just [104] 7/4 8/24 9/1 9/14 10/7 10/8 10/18 10/20 14/3 15/1 15/8 16/15 16/18 17/10 23/21 30/22 31/3 36/24 37/18 39/16 44/21 45/24 46/4 46/20 48/23 49/24 49/24 52/10 57/13 60/14 60/20 65/18 69/8 70/10 71/16 73/10 85/23 86/20 88/7 89/11 91/3 92/17 92/18 94/15 99/6 99/16 100/2 102/13 102/22 103/16 105/18 108/10 108/23 109/6 109/25 110/8 111/25 112/22 115/10 116/22 119/1 120/4 122/7 125/17 125/18 125/23 127/7 128/16 131/15 135/5 135/6 135/22 136/17 138/7 140/10 141/23 143/23 146/2 146/9 146/16 148/23 151/22 152/17 154/3 154/7 157/15 157/16 158/10 158/18 158/23 159/2 159/3 163/3 165/2 166/1 167/2 167/13 168/25 169/16 170/19 170/21 171/3 173/1 173/6
justice [4] 11/3 11/9 11/16 137/19

**K**

Karen [1] 157/19
Kathryn [1] 99/21

keep [13] 10/11 42/3 66/3 70/11 72/17 76/3 77/22 83/22 84/14 114/16 114/17 132/6 133/20
keeping [4] 14/11 18/6 79/17 79/20
Keith [1] 107/7
Kelling [6] 12/14 61/25 62/10 84/2 86/5 87/4
key [1] 70/1
keys [2] 36/22 47/19
kick [1] 21/18
kids [2] 110/25 132/23
kill [2] 78/3 124/9
killed [2] 97/23 98/11
kilo [3] 35/8 132/10 132/12
kind [46] 18/23 24/16 36/14 37/6 39/19 39/21 46/2 54/24 56/4 57/11 57/18 60/14 60/17 65/6 72/3 72/8 74/17 77/2 77/16 82/3 85/15 86/19 92/1 101/4 101/10 110/24 116/22 117/15 120/10 132/18 137/24 141/8 141/8 147/11 147/19 155/25 162/22 163/4 163/7 164/25 165/1 167/11 169/16 170/19 171/9 172/3
kinds [2] 87/2 131/8
Kleenex [2] 35/7 132/11
knew [8] 35/12 35/12 37/4 37/13 47/2 102/5 131/24 131/25
know [151] 8/16 9/4 9/10 9/23 10/10 11/8 12/10 12/11 12/13 12/17 13/7 13/10 13/11 13/12 13/14 16/10 16/11 16/15 16/16 16/18 17/1 20/20 22/14 35/8 35/23 36/14 37/23 38/3 38/6 38/9 38/10 39/12 40/9 40/12 41/8 43/17 44/1 44/11 44/13 44/14 47/15 49/13 52/21 54/10 54/11 56/7 57/15 58/25 58/25 59/3 59/9 60/12 60/12 60/16 60/16 60/23 61/3 64/11 65/8 69/5 69/25 70/2 70/3 70/6 70/12 71/22 72/11 73/12 74/10 76/7 76/19 76/25 77/17 77/25 79/20 81/16 81/17 81/18 81/21 85/15 85/23 88/4 89/20 90/8 91/5 91/17 91/19 91/19 92/14 94/15 96/10 97/7 100/10 103/4 106/3 106/17 108/23 110/3 110/14 112/21 112/22 113/17 116/4 117/16 118/15 118/15 121/5 122/11 122/15 122/22 122/25 123/24 124/19 124/20 125/18 126/10 127/8 131/7 131/7 131/7 132/22 133/5 133/17 133/19 133/24 134/5 135/18 135/23 137/15 139/7 140/14 143/8 144/21 145/3 145/6 146/4 146/5 146/8 149/7 149/7 162/21 163/7 167/4 167/10 167/11 167/12 169/5 169/11 170/4 170/11 173/3
knowing [6] 40/7 70/16 157/16 158/8 158/10 158/18
knowingly [4] 38/14 39/1 132/2 144/7
knowledge [4] 61/16 82/5 82/6 158/17
known [3] 12/20 12/23 38/2
knows [7] 38/19 53/9 61/9 61/10

**K**

knows... [3] 70/22 70/24 70/24
Kroger [1] 16/18

**L**

ladies [8] 11/8 11/13 14/17 98/22 162/4 162/17 164/17 165/14
lady [2] 143/25 158/7
Lamb [2] 56/21 162/10
land [1] 120/2
last [18] 5/19 18/13 18/16 81/7 81/13 92/25 93/8 94/1 95/9 122/6 139/15 139/17 142/10 142/20 142/21 157/8 159/17 163/24
late [4] 18/19 67/23 122/12 165/6
later [20] 8/20 8/25 9/3 15/6 15/12 24/23 30/20 31/5 40/11 94/8 94/15 94/22 94/23 95/6 95/11 95/15 95/16 96/14 105/18 171/20
Lavender [2] 51/5 89/24
law [85] 5/22 6/9 9/20 9/22 9/23 10/1 10/1 10/4 10/7 10/9 16/25 22/11 22/14 22/15 22/16 23/7 23/24 24/4 25/12 25/21 39/4 39/4 39/13 62/21 62/25 63/12 64/9 67/9 67/11 67/19 67/23 73/24 76/16 76/21 78/12 83/18 87/6 87/11 88/22 89/4 89/18 90/11 94/11 94/18 95/19 96/13 96/24 100/9 100/16 100/22 101/5 105/3 105/24 106/17 115/4 115/7 118/1 122/14 122/17 127/23 127/24 128/25 135/25 136/4 136/4 136/6 138/6 138/9 138/22 138/23 141/9 144/12 144/23 145/1 145/15 146/5 148/1 149/4 152/11 153/11 155/3 156/11 163/21 163/23 171/6
laws [2] 9/20 9/24
lawyer [10] 10/21 85/1 85/24 91/8 91/9 133/25 135/13 150/15 154/4 157/25
lawyer's [2] 5/22 10/15
lawyering [1] 135/5
lawyers [14] 5/15 8/15 8/24 9/18 10/7 11/13 11/18 14/2 20/13 24/19 24/19 141/22 142/14 163/1
lead [1] 85/11
least [9] 80/16 136/15 145/19 152/19 164/9 169/8 169/23 170/3 171/18
leave [19] 14/16 35/19 35/19 35/20 36/2 56/9 99/4 104/14 105/15 106/23 108/8 111/16 117/19 127/17 140/13 142/6 142/10 156/24 165/3
leaving [4] 19/4 36/6 56/8 62/2
LEE [2] 2/5 104/16
left [11] 7/13 8/2 25/24 120/17 120/17 120/24 123/12 136/11 139/8 139/8 141/12
leftovers [2] 6/15 6/17
legal [7] 7/21 7/22 29/14 61/17 118/1 134/6 159/2
legally [10] 29/14 35/14 46/4 53/25 56/19 61/5 61/8 61/11 66/10 112/24

Legislature [1] 23/18
less [3] 8/14 97/16 109/6
lesser [4] 172/4 172/6 172/12 172/18
let [39] 5/17 7/15 9/10 10/10 14/2 14/11 19/10 22/12 45/23 70/8 70/15 76/7 77/23 77/23 82/21 82/21 86/18 86/19 100/15 102/12 105/18 106/14 110/18 112/21 112/22 114/15 115/17 120/16 123/25 127/22 129/1 136/23 137/12 141/22 145/18 151/22 158/6 164/4 165/3
let's [53] 20/23 22/12 23/15 27/4 32/17 33/17 34/10 35/15 35/15 35/18 36/8 37/16 42/2 46/15 46/16 46/19 47/21 48/2 52/1 52/1 52/19 55/4 55/5 57/19 59/6 59/7 60/10 60/10 70/9 70/10 70/11 70/12 71/12 71/20 72/21 72/24 75/19 76/6 76/8 78/3 89/13 99/19 101/22 123/6 123/9 123/23 124/3 127/19 134/2 134/3 134/15 142/17 162/2
letting [2] 14/6 141/25
level [19] 64/11 91/24 98/20 117/20 118/3 118/6 118/21 119/3 119/4 119/13 119/16 119/18 119/22 120/3 120/13 121/5 124/15 135/24 151/8
levels [1] 63/8
liability [1] 38/14
liberty [1] 120/9
license [1] 56/7
life [7] 8/5 8/6 11/6 88/17 120/8 161/10 170/23
light [3] 82/5 144/4 148/14
like [88] 6/2 6/8 6/23 7/9 7/22 9/2 11/11 11/14 17/2 17/14 18/24 18/25 19/1 21/5 22/4 22/5 24/8 29/15 35/8 35/10 38/10 39/15 39/22 40/8 40/9 40/25 43/17 43/18 45/24 46/1 49/13 56/4 56/6 56/8 56/16 57/11 58/23 59/21 59/25 60/7 60/11 65/19 66/5 66/20 68/18 69/5 70/15 72/3 73/10 77/25 78/1 79/5 85/22 86/14 87/2 92/1 92/12 94/21 101/4 101/17 101/24 102/17 102/21 109/8 110/8 110/25 113/1 119/9 123/18 123/22 127/7 128/19 131/15 139/5 144/13 145/23 145/25 146/14 148/4 148/17 148/18 149/11 158/21 158/25 164/11 164/13 164/25 166/20
likely [2] 119/11 136/15
limine [2] 173/22 173/24
limit [1] 167/12
limited [1] 47/15
limits [1] 105/14
line [1] 65/7
list [3] 6/24 7/11 7/13
listed [1] 170/24
listen [1] 103/8
lists [2] 142/15 159/14
literally [1] 40/2
little [30] 5/15 8/17 14/23 20/14 35/15 36/22 60/9 62/25 77/6 78/8 79/10 85/14 85/20 90/12 90/13

98/23 105/10 106/3 112/19 114/16 115/1 117/13 118/20 125/16 125/16 127/15 128/24 129/24 134/2 142/13
live [1] 59/7
lives [1] 148/7
living [3] 58/23 115/25 148/16
loan [1] 158/22
lock [1] 155/25
Locke [1] 20/8
locks [1] 56/4
long [29] 8/22 10/1 10/20 11/14 12/20 12/22 15/19 16/17 17/3 17/20 17/23 18/21 20/16 21/20 24/20 36/19 39/6 88/25 89/5 91/16 116/3 124/21 125/8 125/18 125/19 127/21 139/20 159/19 171/21
longer [4] 32/25 98/24 142/13 164/14
look [17] 5/25 17/6 18/24 37/19 65/8 67/2 73/13 79/10 81/24 84/18 86/14 88/15 92/6 93/18 98/20 102/21 161/23
looked [4] 5/20 5/22 38/10 66/7
looking [3] 10/24 79/17 166/7
looks [3] 35/8 40/9 146/14
lord [4] 36/23 52/12 52/12 55/22
Lorynn [1] 162/8
lot [33] 13/21 13/21 17/20 39/11 39/12 39/18 39/20 41/14 43/17 45/24 53/23 60/5 65/17 65/20 68/16 83/21 85/21 86/3 91/14 94/3 95/19 96/10 110/23 123/8 126/13 129/1 129/7 130/1 130/3 130/5 131/5 139/2 144/4
loud [1] 105/13
louder [1] 62/25
loved [3] 11/1 127/2 151/6
loves [1] 127/1
lower [2] 150/25 151/1
Lucas [1] 162/11
Luis [1] 162/11
lunch [3] 15/5 115/18 164/9
luxury [1] 83/25

**M**

ma'am [32] 13/9 16/8 16/14 16/20 28/12 33/9 35/16 58/17 62/5 65/22 84/23 85/4 86/10 88/10 92/9 93/2 93/11 93/20 93/24 94/20 94/23 95/16 97/6 97/19 98/16 99/14 99/20 101/3 155/15 156/7 157/2 159/10
machine [1] 1/19
Madam [1] 111/15
made [11] 18/12 18/14 18/18 18/19 56/9 63/6 63/6 132/18 140/1 161/21 166/8
magical [1] 125/9
main [2] 2/11 19/14
make [55] 6/2 8/6 8/14 10/21 11/11 11/15 16/4 16/21 17/24 25/4 37/6 38/1 39/9 44/15 64/13 64/14 64/17 64/25 66/18 69/10 70/4 70/5 71/5 74/14 74/15 74/25 75/21 77/6 81/24 82/20 87/17 93/12 93/18 95/18 95/20 109/8 109/19 110/3

116/16 119/1 121/12 124/10 125/16 125/23 128/8 128/15 128/17 129/15 131/22 132/21 138/21 140/10 145/20 154/17 159/3
makes [7] 22/1 74/11 127/15 128/9 128/10 122/12 173/7
making [3] 79/14 116/17 153/10
Malathi [1] 162/8
man [2] 18/16 32/7
manage [2] 41/25 62/2
management [12] 29/16 32/21 33/3 36/3 37/2 44/6 47/1 49/4 51/19 145/3 145/6 145/9
manager [1] 149/19
manager of [1] 149/19
managing [1] 54/2
Manchi [5] 38/15 38/16 38/17 38/17 162/9
mansion [2] 52/15 53/7
manufactured [1] 130/15
many [12] 7/1 15/1 15/8 15/11 22/14 72/7 72/11 72/22 72/22 125/11 139/25 142/14
map [1] 163/4
Marc [2] 140/18 140/22
marijuana [5] 131/5 131/13 131/13 131/16 132/1
Marilyn [2] 35/17 35/18
Marisa [1] 162/9
marriage [1] 50/20
married [1] 48/4
Mart [1] 136/25
Masterson [2] 32/23 80/25
material [1] 48/19
Mathis [1] 35/17
Matt [1] 112/13
matters [1] 100/10
maximum [1] 161/14
may [39] 9/22 14/24 79/6 84/22 84/24 86/4 87/3 91/20 92/4 105/17 107/13 118/15 121/20 121/22 124/22 125/24 126/24 127/6 130/3 130/19 130/19 136/20 139/8 139/8 140/6 140/6 140/7 150/25 151/24 152/2 152/5 152/6 157/7 158/25 159/1 167/10 168/18 170/15 175/13
maybe [15] 7/4 14/22 17/25 46/25 110/6 116/4 118/18 118/19 125/17 126/6 127/15 128/17 148/23 148/23 149/16
McIntrye [1] 56/2
McIntyre [4] 55/6 55/8 108/17 108/19
meal [1] 149/23
mean [33] 8/11 19/22 27/5 27/16 27/16 28/1 28/14 33/9 39/16 39/25 45/15 47/3 49/10 60/6 74/1 77/4 78/3 79/6 79/9 92/18 93/13 106/16 109/4 110/22 128/19 135/5 135/20 135/22 146/8 149/15 158/18 167/9 172/16
means [6] 23/16 23/16 28/21 29/9 56/6 78/4
media [3] 126/13 126/17 127/1
medicine [1] 102/23

## M

member [4] 66/3 81/18 151/6 151/7
mental [1] 102/22
mentioned [3] 99/23 101/4 106/5
mentioning [1] 167/14
mess [1] 11/13
meth [4] 36/22 36/23 37/3 38/8
methamphetamine [8] 35/21 36/4 36/9 36/13 37/17 37/22 169/20 171/4
Miami [4] 52/9 52/10 52/16 53/8
Miao [4] 54/7 54/8 54/15 55/9
Miao's [1] 55/4
Michael [1] 104/16
middle [1] 164/5
might [28] 8/11 8/13 9/8 18/10 67/3 67/8 85/7 85/19 86/25 91/7 91/19 93/14 93/18 93/18 106/10 121/2 126/5 127/10 131/18 132/20 133/3 137/25 145/23 146/20 150/23 154/9 164/15 173/6
million [2] 60/8 78/8
Millions [1] 119/12
mind [13] 46/20 46/25 47/5 54/3 63/5 72/17 79/17 79/20 90/10 102/18 103/11 121/3 158/12
mine [7] 45/12 46/3 46/4 82/5 82/7 141/13 173/6
minimum [2] 133/20 171/13
minute [13] 14/3 23/15 23/15 46/16 65/6 70/14 71/21 98/25 99/5 99/11 113/22 141/23 142/16
minutes [9] 15/5 17/24 93/23 98/24 142/12 159/19 159/21 164/14 164/16
misdemeanor [1] 112/23
miss [1] 125/23
missed [5] 16/10 97/5 97/20 123/2 125/24
mistake [1] 18/12
mistakes [1] 129/16
mistreated [2] 9/12 9/16
mistreatment [1] 9/14
mistrial [2] 5/23 122/20
mistrials [1] 5/19
misunderstood [1] 78/25
mixed [1] 73/7
moment [1] 31/9
Monday [3] 72/24 73/13 148/10
month [1] 119/13
Montoya [2] 55/12 55/15
mood [3] 100/11 100/12 102/23
Moore [7] 32/18 47/22 47/24 49/10 80/23 88/10 111/13
moral [3] 61/17 146/4 159/1
more [26] 14/23 16/13 22/14 38/6 49/15 50/17 50/23 51/10 51/18 74/20 90/12 90/13 95/13 96/7 97/16 104/25 112/19 115/1 119/11 130/3 131/6 133/21 139/2 147/14 153/16 171/10
morning [12] 11/24 11/25 12/2 14/12 14/18 14/24 18/3 18/5 164/7 164/12 170/21 174/8
most [8] 12/24 14/18 14/23 17/13

57/12 131/6 133/9 148/12
mother [1] 48/25
motion [2] 160/23 168/1
motions [2] 161/23 173/22
mouth [1] 46/19
move [2] 71/13 153/8
movie [2] 52/2 52/15
movies [1] 120/23
MR [111] 11/23 12/12 12/13 12/14 12/16 12/25 13/6 13/11 13/12 15/16 16/15 21/5 22/2 22/24 24/8 28/17 28/25 29/2 31/24 32/3 32/14 32/15 32/17 32/18 32/23 33/18 33/18 33/19 34/5 36/15 38/12 38/18 38/23 41/5 42/2 42/22 43/7 51/5 55/6 55/8 55/12 55/15 56/2 56/12 56/21 57/8 58/6 58/10 61/4 61/5 61/25 62/10 62/12 62/12 62/13 62/24 64/6 64/21 68/2 69/7 69/12 69/19 69/22 70/9 70/13 71/6 71/8 71/9 71/9 72/18 74/20 74/21 75/22 77/11 80/4 80/7 80/11 80/21 80/23 80/25 81/14 82/22 82/24 83/13 84/2 86/5 87/4 87/23 89/24 90/1 90/4 90/18 92/10 95/1 96/15 98/3 98/7 98/12 104/18 106/23 107/9 108/19 114/22 126/1 129/11 132/3 133/22 150/15 152/7 160/3 161/22
Mr. [15] 12/8 12/9 12/17 19/25 42/3 57/5 62/11 87/23 92/23 95/10 107/6 107/17 108/14 112/16 116/13
Mr. Arias [1] 92/23
Mr. Cessna [1] 62/11
Mr. David [1] 12/8
Mr. Earl [1] 12/9
Mr. Greer [2] 12/17 116/13
Mr. Holt [1] 107/6
Mr. Parker [3] 87/23 107/17 108/14
Mr. Pfitzer [1] 42/3
Mr. Schlechte [1] 19/25
Mr. Smith [1] 57/5
Mr. Watson [2] 95/10 112/16
Ms [72] 15/18 27/7 27/19 28/13 29/17 30/24 31/16 31/18 31/18 31/19 33/6 34/11 34/15 38/15 38/17 38/23 38/23 39/22 40/15 43/10 43/20 44/17 45/2 46/17 47/12 47/13 47/21 47/22 47/24 49/10 50/22 51/13 54/6 54/15 55/4 55/9 56/1 57/11 57/19 57/20 58/13 58/20 58/21 59/15 61/6 62/6 65/12 65/22 66/19 66/23 81/2 88/10 89/21 90/14 90/22 91/1 91/12 92/13 93/21 95/14 95/17 113/18 113/20 131/1 136/24 137/12 143/18 143/23 157/21 158/3 158/6 158/6
Ms. [5] 40/18 42/17 68/10 94/24 141/14
Ms. Cox [1] 94/24
Ms. Defrancesco [1] 68/10
Ms. Henry [1] 141/14
Ms. Nelson [1] 42/17
Ms. Steckman [1] 40/18

much [8] 14/15 93/8 94/7 98/19 99/12 106/25 111/20 162/16
multiple [2] 56/25 131/18
municipal [1] 126/15
murder [9] 69/7 69/7 69/9 73/11 124/11 124/12 124/14 139/11 139/17
must [3] 82/2 117/4 156/11
mutual [2] 12/18 50/20
my [71] 6/19 12/2 13/15 17/4 25/5 27/5 30/11 30/15 33/24 36/6 36/25 37/19 39/11 41/8 41/9 41/25 45/10 47/17 54/22 57/19 59/20 60/2 60/3 61/2 64/20 65/9 65/14 68/2 69/6 69/6 70/17 70/20 79/8 79/9 80/11 81/18 81/20 82/7 82/21 86/8 86/12 86/14 90/10 93/13 100/8 100/9 100/19 100/20 105/16 108/2 108/11 115/1 115/18 115/24 120/23 122/9 123/21 133/22 134/22 140/6 145/24 146/2 148/9 148/23 151/5 151/8 154/22 155/22 158/22 165/6 175/13
myself [8] 17/5 22/8 65/9 83/24 94/4 109/20 115/1 154/17

## N

name [16] 5/22 6/23 12/2 35/16 40/15 54/6 82/25 96/1 99/2 100/9 100/10 115/1 126/9 136/13 137/16 162/6
names [3] 5/21 7/12 162/5
Nancy [1] 153/25
narcotics [1] 130/19
natural [4] 72/14 77/19 83/24 91/23
nature [3] 118/5 133/15 170/14
nearest [1] 37/17
neat [1] 67/14
necessarily [7] 19/3 69/15 110/24 129/14 132/22 148/22 170/18
necessary [1] 119/17
need [41] 7/17 7/18 8/16 9/1 9/9 9/9 10/18 13/12 14/11 30/20 38/6 66/25 94/15 94/16 94/18 96/13 99/7 105/18 108/23 109/10 110/13 116/12 118/8 118/8 120/3 122/25 122/25 137/8 138/1 142/17 147/23 155/16 158/17 159/13 159/19 159/25 165/1 165/4 169/14 169/18 170/15
needed [1] 102/11
needs [2] 118/4 118/7
negative [1] 94/11
Nelson [6] 42/17 91/1 91/12 92/13 137/12 153/25
nervous [2] 18/20 85/15
never [8] 22/23 22/23 49/1 83/17 106/3 149/23 166/23 167/6
new [2] 74/2 91/8
news [2] 17/17 126/16
next [13] 17/5 18/16 18/17 19/1 58/7 63/16 73/18 86/17 89/1 89/5 124/2 135/21 162/24
nice [2] 142/7 162/14
Nichols [1] 95/14
niece [2] 140/17 140/22

Nieto [2] 30/24 162/8
night [1] 18/19
no [711]
No. [3] 1/3 58/18 99/20
No. 1 [1] 99/20
No. 12-03324-CRF-272 [1] 1/3
No. 54 [1] 58/18
nobody [4] 42/21 88/15 88/19 88/19
nodding [2] 17/4 31/16
Nods [9] 27/9 59/13 71/10 74/8 75/4 121/16 128/6 129/21 130/8
none [1] 129/7
nonrefundable [3] 18/15 18/25 19/4
noon [6] 14/24 15/2 15/9 15/12 164/8 164/8
nope [1] 22/5
norm [1] 7/8
normally [2] 71/21 139/3
Nos [1] 142/8
not [259]
note [1] 164/18
notes [3] 164/19 164/21 164/22
nothing [13] 24/20 39/19 65/20 66/9 72/15 74/13 86/9 98/3 98/12 149/17 156/17 164/16 165/13
notice [3] 110/2 114/6 125/22
noticed [2] 67/3 67/8
notion [7] 40/19 43/4 44/21 47/23 48/3 49/11 83/9
November [4] 1/14 3/2 4/2 5/2
now [74] 6/11 7/2 7/16 17/1 22/16 22/24 23/7 24/19 25/21 26/4 29/17 29/21 30/5 31/8 32/6 33/2 33/14 39/10 41/8 52/19 56/18 57/10 61/4 63/14 64/15 64/21 67/15 67/24 71/14 71/18 72/17 72/18 74/1 74/23 76/1 76/2 78/10 78/13 81/23 83/21 87/5 91/16 94/3 97/9 99/8 103/19 107/14 109/13 116/11 120/1 122/11 123/1 128/7 130/11 132/13 134/23 137/19 137/23 138/13 143/10 143/12 143/13 151/13 152/23 164/4 165/15 165/20 168/20 169/5 169/18 171/5 171/24 173/1 173/14
number [15] 7/12 7/16 10/14 10/17 32/13 54/15 56/16 56/20 58/17 87/22 93/9 123/7 140/20 140/21 142/10
numbered [2] 1/16 175/7
numbers [1] 55/13

## O

o'clock [2] 18/5 18/7
oath [11] 67/4 67/8 67/11 67/18 122/14 125/5 128/20 129/6 135/19 156/15 160/1
object [6] 25/15 26/4 57/1 133/15 134/1 167/12
objection [8] 25/5 25/17 27/3 160/16 167/7 169/17 170/2 170/25
objections [3] 133/13 161/24 161/25
objective [1] 12/25
obligation [4] 61/17 61/17 159/1

# O

obligation... [1]  159/2
obviously [11]  19/18 76/7 98/2 117/25 119/18 128/8 138/11 140/25 169/6 171/20 174/4
occasion [1]  153/17
occur [1]  122/19
occurred [1]  175/7
off [24]  5/17 6/23 7/13 11/14 21/18 25/4 30/14 40/10 75/22 80/16 81/12 83/22 96/7 96/25 97/15 118/23 120/25 121/1 122/23 124/1 142/24 165/25 171/10 173/20
Off-the-record [3]  142/24 165/25 173/20
offender [2]  72/4 72/6
offense [24]  23/23 24/3 24/10 24/14 26/9 26/11 38/20 39/8 71/18 71/25 72/4 73/25 74/2 76/24 78/12 78/22 79/24 81/25 86/21 117/2 121/7 161/8 166/19 169/6
offenses [2]  66/14 71/24
offer [5]  160/12 160/22 160/24 161/3 161/4
offered [1]  175/10
offering [1]  166/25
offers [1]  160/7
office [15]  12/3 21/2 21/5 21/9 102/16 113/4 113/5 137/6 139/13 139/15 140/16 140/18 140/25 141/1 141/4
officer [19]  9/12 9/15 36/24 37/17 37/18 73/7 96/21 97/9 97/15 97/22 98/11 101/14 105/13 118/4 118/7 129/3 129/5 129/10 134/20
officers [4]  96/6 103/5 139/18 166/7
Official [4]  1/22 175/4 175/13 175/17
often [3]  83/16 91/17 106/2
Oh [14]  12/16 20/23 21/4 31/15 40/22 48/16 71/8 78/15 87/21 93/11 139/24 147/10 168/15 173/10
okay [362]
old [5]  8/8 8/8 8/9 23/18 60/22
older [2]  100/8 100/19
oldest [1]  100/9
once [7]  64/5 67/17 67/21 72/10 122/12 128/7 163/18
one [90]  6/7 8/12 8/14 10/2 10/3 10/4 11/2 15/25 16/11 18/21 21/22 22/6 24/12 26/1 27/7 29/13 29/16 34/12 35/8 39/10 40/12 47/17 49/19 50/23 51/18 62/15 63/14 63/21 64/2 67/9 68/2 71/20 71/22 71/24 73/6 76/2 77/15 80/10 82/21 85/3 85/9 86/23 90/9 90/12 95/13 98/25 98/25 99/3 99/3 99/15 101/14 103/4 105/20 107/4 108/11 110/6 111/25 114/24 117/23 122/19 123/15 124/4 124/13 125/3 126/5 129/1 129/8 130/5 131/15 138/10 139/24 140/14 141/10 141/17 142/13 142/13 143/11 144/13 145/24 150/7 151/6 152/17 153/16 156/1 157/8 158/25 159/17 164/11 171/3 174/5
one-on-one [3]  98/25 99/3 142/13
ones [5]  6/16 57/19 68/2 80/11 82/22
only [22]  21/12 25/5 25/11 47/9 47/17 63/17 63/17 63/20 64/23 64/23 74/9 95/20 115/14 115/14 116/8 120/10 147/7 155/15 167/1 167/24 169/4 173/23
Oops [1]  57/7
open [3]  86/25 131/16 175/7
opening [2]  163/1 163/3
operation [2]  53/1 53/10
opinion [1]  102/8
opinions [1]  67/13
opportunity [3]  115/15 163/4 163/12
opposed [2]  15/4 32/15
opted [1]  64/22
option [5]  15/4 15/14 123/1 127/17 170/9
order [4]  36/17 162/21 169/22 173/14
organization [1]  53/11
original [1]  77/5
other [56]  6/7 6/8 6/25 8/12 8/15 9/11 9/19 11/5 15/4 21/17 32/15 43/16 46/10 47/19 59/23 71/12 71/23 75/20 84/13 84/21 86/23 87/1 96/5 96/8 97/16 100/21 103/6 105/12 114/10 114/12 117/21 121/17 122/20 131/21 131/24 131/25 133/13 136/23 137/9 138/18 141/10 144/15 150/1 150/25 153/2 156/1 158/25 164/4 167/24 169/4 169/17 171/16 173/12 173/22 174/5 175/6
others [1]  132/23
otherwise [3]  15/7 31/15 130/13
Otis [5]  123/20 123/21 123/23 123/24 124/3
ought [1]  160/13
our [18]  8/5 10/11 11/9 17/24 21/2 21/5 21/9 67/10 86/16 102/16 123/8 124/13 140/10 148/6 148/6 154/24 166/10 174/1
ours [2]  17/20 119/13
out [51]  6/19 6/22 10/17 12/10 15/3 25/24 35/2 35/23 41/13 52/17 55/13 61/2 63/15 67/24 68/22 72/9 72/12 79/21 79/22 101/23 105/15 115/18 115/21 116/1 116/12 116/13 120/16 123/12 125/24 129/5 130/4 132/23 134/13 136/17 138/25 139/8 139/9 139/20 140/13 141/12 142/9 142/10 142/19 142/21 146/9 149/11 153/5 159/18 160/13 162/6 168/13
outline [1]  24/16
outrage [1]  78/2
outside [14]  6/4 18/9 99/1 99/6 99/7 99/14 105/14 111/3 127/8 142/17 150/2 159/7 159/13 168/21
over [48]  5/15 5/19 6/3 10/11 11/13 11/18 14/19 17/18 17/18 18/9 22/23 26/10 32/7 32/21 33/14 34/17 36/3 36/20 37/2 39/7 44/4 44/6 47/1 49/4 52/17 52/24 53/6 57/11 61/16 67/16 67/17 67/22 68/24 76/15 84/9 92/1 115/20 120/23 122/21 129/24 136/11 143/24 143/25 158/7 162/18 163/14 165/5 165/6
overrule [1]  27/3
overview [2]  163/4 163/6
own [23]  46/22 47/3 48/6 54/15 57/14 57/25 58/5 59/10 60/15 61/10 65/19 66/21 68/6 69/15 90/6 128/9 130/9 130/10 130/19 146/2 146/25 148/24 174/1
owned [4]  56/17 65/11 144/7 144/14
owner [3]  134/20 147/8 158/23
ownership [13]  28/21 28/24 29/11 54/12 54/14 57/12 57/17 129/25 130/5 130/6 130/24 145/20 147/2
owns [4]  55/2 56/19 68/21 137/20

# P

p.m [1]  125/10
Pacino [4]  52/7 53/7 53/8 53/20
pads [1]  164/18
page [6]  3/3 4/3 162/18 162/20 162/20 164/5
Page 4 [1]  162/20
paid [2]  175/12 175/12
paid/will [1]  175/12
panel [13]  5/3 6/2 26/5 99/13 114/5 139/2 139/22 140/11 142/23 158/5 162/3 162/15 162/18
panic [1]  164/25
paper [2]  13/22 134/8
par [1]  7/5
paragraph [1]  171/17
paragraphs [2]  161/9 170/24
paralegal [1]  13/17
paralegals [1]  16/1
pardon [1]  14/19
parked [2]  41/13 42/20
Parker [8]  56/12 62/12 87/23 87/23 107/7 107/9 107/17 108/14
parking [2]  41/13 43/22
parole [11]  24/23 25/2 25/4 25/8 25/24 26/6 26/8 26/16 26/19 26/20 26/22
part [12]  18/14 25/25 42/15 52/25 60/17 60/24 64/17 70/4 121/13 146/15 155/25 163/8
participation [2]  98/19 98/20
particular [5]  6/10 64/15 64/21 79/13 151/18
parties [4]  11/20 111/15 175/6 175/10
partners [1]  124/13
party [1]  45/16
party's [1]  45/15
pass [1]  45/20
past [5]  8/5 18/11 90/8 91/5 144/4
Pat [1]  115/8
path [1]  11/4
Patricia [1]  99/21
paying [1]  59/20

PD [1]  167/6
peace [3]  71/19 126/20 137/19
peeves [1]  108/11
pen [9]  30/14 30/15 31/4 31/7 32/19 33/13 33/24 45/9 45/10
Penal [1]  25/22
penitentiary [2]  25/24 26/15
people [28]  6/11 6/15 7/15 11/11 11/14 22/15 34/6 34/6 34/6 39/11 39/20 47/19 49/25 50/17 50/17 56/25 62/3 88/19 99/7 110/23 122/7 131/10 131/18 136/9 136/19 143/7 147/18 173/12
people's [2]  56/7 78/2
percent [5]  63/10 119/10 119/11 119/14 126/3
perfectly [2]  72/14 83/24
perhaps [1]  151/3
period [9]  36/19 39/6 63/19 66/2 66/16 82/17 92/4 120/22 160/4
permit [1]  173/8
person [45]  16/11 16/12 24/13 24/13 39/16 40/3 40/20 44/22 50/24 51/11 51/18 53/22 64/17 66/10 72/1 72/5 76/25 82/16 84/18 117/3 118/7 118/17 118/18 121/6 123/10 126/5 128/4 130/21 131/25 134/17 134/24 135/23 136/15 137/23 137/24 138/2 138/17 144/14 144/15 145/8 145/10 145/13 150/21 150/24 151/1
personal [12]  6/6 94/9 144/3 144/5 146/2 147/15 148/6 148/6 148/24 149/6 149/11 149/12
personally [7]  10/4 11/2 39/13 82/7 100/7 100/8 148/15
persuade [1]  164/1
pet [1]  108/11
Pfitzer [6]  42/3 62/12 62/13 92/10 150/10 150/15
phase [12]  63/16 63/17 63/17 63/19 64/6 71/21 116/10 161/9 163/18 163/20 163/24 164/22
phases [1]  63/13
Phillips [5]  1/22 10/12 175/4 175/15 175/16
phone [1]  5/18
phones [2]  5/17 5/20
physically [5]  40/20 44/22 47/25 53/23 68/7
physician [1]  51/23
pick [9]  6/14 6/14 6/15 7/17 27/7 61/6 116/20 152/1 162/18
picked [1]  122/6
picking [2]  55/14 139/10
pickup [2]  43/23 105/13
piece [1]  134/8
pieces [1]  163/5
pink [1]  134/9
pipes [1]  105/13
place [9]  52/17 59/21 60/11 120/23 123/13 123/13 124/5 142/19 142/21
places [1]  173/8
plane [2]  18/15 18/25
planted [1]  36/25
play [4]  8/7 8/10 113/8 149/12

# P

player [1]  134/22
playing [1]  133/14
plea [1]  162/25
please [7]  5/25 8/15 88/17 95/11 114/18 142/9 162/6
plenty [1]  159/20
pocket [8]  39/23 43/19 46/1 70/17 70/21 70/23 144/15 166/13
point [34]  11/17 21/22 21/23 22/11 35/14 36/20 37/1 37/9 37/21 38/20 39/8 40/6 45/8 45/23 66/16 67/2 67/12 67/23 68/25 70/9 70/20 79/14 79/14 81/22 115/11 115/14 117/15 118/19 132/21 140/6 141/17 151/5 166/17 172/4
pointed [1]  63/15
police [21]  9/12 9/12 9/15 16/19 86/13 96/5 96/16 96/23 97/15 97/22 100/7 101/23 101/24 102/8 103/5 105/13 113/2 129/3 129/5 129/9 134/20
policy [2]  36/7 168/16
portion [1]  18/4
portions [4]  25/12 52/4 52/5 175/5
position [6]  59/17 77/18 91/25 108/1 108/3 148/17
possess [27]  27/16 28/1 33/24 34/4 34/4 34/6 36/13 36/17 36/18 38/19 39/7 40/19 41/4 44/22 47/24 48/13 48/18 48/19 49/22 49/23 50/24 54/11 132/2 145/7 171/15 171/16 172/15
possessed [6]  24/15 38/14 53/23 58/4 144/7 144/16
possessing [18]  29/20 30/4 31/7 31/13 31/20 32/6 32/7 32/19 32/25 36/14 37/22 39/8 40/2 46/21 57/24 74/23 82/2 147/19
possession [104]  5/6 24/9 24/17 24/21 25/3 27/5 27/15 28/1 28/13 28/21 29/9 29/13 29/15 32/10 33/15 33/21 33/23 34/3 34/17 35/5 35/15 36/9 36/19 37/10 39/5 39/21 41/9 41/21 42/9 42/13 42/14 42/21 43/3 44/1 44/3 47/16 47/18 47/20 48/21 49/12 50/6 50/14 50/18 50/21 52/21 53/1 53/11 53/25 54/14 54/18 55/15 56/5 56/10 56/15 56/17 56/25 57/1 59/3 60/2 61/11 61/21 62/21 66/6 68/7 68/8 68/19 69/3 69/4 69/6 69/14 70/7 70/16 70/20 71/1 71/13 71/15 74/11 81/20 110/19 117/9 129/25 130/2 130/7 130/11 130/21 130/25 131/18 131/22 144/16 145/2 145/20 146/7 146/19 147/4 147/7 147/18 148/21 157/15 158/10 158/12 158/15 158/19 169/20 171/3
possessions [2]  69/3 145/24
possibility [3]  91/20 122/18 161/13
possible [4]  6/9 6/22 34/5 51/3
possibly [3]  47/17 151/19 157/9

potential [1]  169/5
pre [1]  160/10
precisely [1]  77/21
predicate [1]  133/15
prefer [1]  95/4
prejudiced [1]  9/15
prejudicial [1]  170/6
preparation [1]  175/11
preponderance [4]  118/9 119/3 120/4 122/1
presence [3]  86/8 168/21 168/23
present [4]  5/9 85/24 86/14 163/10
presentation [1]  163/9
presented [1]  106/16
presenting [1]  17/6
presents [1]  86/15
Presiding [1]  1/17
pressure [2]  17/19 164/24
presumed [2]  72/18 78/13
pretty [11]  6/16 17/8 103/25 104/3 106/1 108/20 117/23 119/20 136/21 171/25 172/1
previous [2]  42/5 172/7
previously [6]  73/25 76/25 79/3 80/17 81/11 86/23
primarily [2]  20/10 115/4
prior [13]  64/16 74/10 74/22 78/22 79/25 106/9 109/1 131/10 150/9 150/22 153/10 160/21 171/2
priors [2]  173/25 174/5
prison [4]  25/1 25/1 26/6 161/11
privacy [1]  8/19
private [2]  8/18 112/19
privately [2]  104/23 104/25
probable [3]  118/6 118/6 118/9
probably [27]  11/2 12/23 12/24 14/10 18/8 18/19 37/21 47/8 60/21 88/13 90/7 115/24 116/5 121/24 122/1 123/21 136/16 137/3 142/12 143/10 148/11 152/4 160/12 165/5 165/6 169/14 172/9
probation [6]  25/6 25/8 25/21 25/24 25/25 161/14
problem [12]  10/2 10/3 10/4 14/5 14/6 48/22 80/19 108/22 117/10 131/13 139/1 154/16
problems [9]  100/16 106/6 122/15 122/18 126/12 130/22 131/2 141/1 144/18
procedural [1]  167/10
procedure [1]  134/5
proceed [1]  162/21
proceedings [9]  1/11 1/15 1/18 14/9 25/19 27/1 142/4 175/6 175/9
process [3]  5/14 17/12 17/22
Proctor [1]  105/11
produce [1]  172/11
professor [6]  13/15 13/16 15/19 15/22 28/6 29/2
promise [17]  74/20 74/20 74/21 75/1 75/21 80/15 87/12 87/12 87/17 98/9 98/10 149/10 149/15 152/10 156/2 156/4 156/21
promising [3]  77/10 77/10 77/11
promotes [1]  90/12
proof [27]  11/19 22/19 22/22 23/8

23/9 23/16 76/23 78/19 84/4 117/14 117/20 118/4 118/7 118/21 119/3 119/5 119/14 119/16 119/18 119/22 120/2 120/3 120/13 121/5 124/15 135/24 151/1
proper [1]  133/14
properly [1]  64/12
property [7]  47/2 54/2 57/14 59/20 65/11 66/20 144/7
prosecute [2]  130/14 131/8
prosecuted [4]  102/16 102/19 103/12 166/23
prosecuting [2]  26/21 91/16
prosecution [9]  116/4 116/21 130/1 139/11 143/21 150/19 154/8 167/3 167/5
Prosecution's [1]  116/11
prosecutor [22]  12/2 73/11 103/10 107/13 107/20 110/9 114/25 115/10 116/7 117/16 122/13 125/20 127/7 127/14 128/12 131/15 137/7 139/12 139/14 140/4 140/7 145/1
prosecutor's [2]  140/3 158/4
prosecutors [3]  140/14 173/12 173/18
protect [1]  169/1
protection [1]  82/11
proud [1]  11/10
prove [29]  23/17 23/22 23/22 24/3 24/11 24/12 63/18 63/21 72/1 72/2 72/5 76/8 76/23 79/1 79/23 81/25 90/10 117/3 123/9 123/12 123/15 124/4 134/14 145/7 169/7 169/14 169/18 171/7 171/8
proved [3]  110/17 135/7 135/8
proven [13]  23/3 23/4 47/11 70/5 76/12 76/13 106/18 125/4 126/22 127/4 134/23 144/6 147/8
proves [1]  46/25
psychologically [1]  91/6
public [6]  86/1 123/13 123/13 124/5 126/8 127/12
pull [1]  65/9
punishment [15]  62/22 63/2 63/3 64/7 64/8 64/9 64/10 64/13 64/20 64/24 65/4 116/10 160/12 161/8 161/10
pure [1]  6/8
purpose [3]  89/17 140/10 155/19
purposes [4]  77/21 78/10 154/14 167/1
purse [13]  30/1 30/2 30/4 35/19 35/20 35/22 36/6 37/19 39/23 40/11 131/21 132/1 132/19
put [21]  10/22 35/22 40/6 40/10 42/19 46/19 56/4 79/22 90/7 132/19 147/2 148/16 148/19 149/15 159/22 163/11 163/14 163/15 169/22 169/25 173/6

# Q

qualifies [1]  171/21
qualify [1]  26/2
question [34]  6/21 14/25 17/2 17/4 17/10 21/19 21/21 34/3 34/21 37/9 47/15 48/17 54/13 63/18

63/20 78/10 78/25 81/23 87/5 87/11 87/20 92/1 92/19 103/4 105/2 109/1 129/2 137/7 140/5 152/17 155/16 156/9 156/18 158/10
questioning [2]  7/23 8/23
questions [33]  5/16 6/13 6/18 8/13 10/14 14/23 16/24 21/18 39/10 71/13 80/12 85/17 91/2 101/2 107/14 107/16 109/22 109/24 111/22 112/25 136/5 143/22 147/14 150/1 150/16 151/12 153/2 153/13 154/5 154/7 158/1 158/5 168/18
quick [1]  17/8
quiet [5]  57/19 68/2 80/11 82/22 91/1
quite [1]  17/20

# R

racial [1]  141/8
raise [5]  7/2 15/9 115/24 123/1 165/2
raised [1]  115/5
range [7]  62/22 63/1 143/13 143/14 159/17 159/18 161/10
ranges [2]  64/9 64/10
ransacked [1]  148/9
rather [7]  7/8 8/20 8/21 15/1 15/8 15/11 115/21
ratting [1]  61/2
Reach [1]  132/5
reached [1]  64/6
reaction [2]  78/2 89/12
read [6]  162/19 162/25 163/22 164/4 164/6 164/15
reads [1]  25/23
ready [5]  5/9 5/11 99/1 114/2 170/21
real [10]  13/19 18/6 19/12 80/11 86/19 86/24 87/5 91/1 127/21 131/1
reality [1]  92/17
realize [1]  11/3
really [15]  60/5 60/23 66/17 67/9 67/9 82/22 92/6 94/6 100/7 125/20 126/11 129/22 135/8 149/9 173/3
reason [16]  7/21 7/22 34/23 34/24 44/10 64/10 67/10 74/9 82/20 84/21 85/23 90/16 126/17 138/15 139/1 166/6
reasonable [25]  23/10 23/24 63/22 76/11 76/14 90/11 110/17 117/3 117/17 118/3 118/8 118/22 119/23 119/25 121/6 123/10 124/23 125/4 126/23 127/4 134/23 135/24 145/8 151/1 168/4
reasons [4]  86/4 87/2 122/23 137/24
rebuttal [2]  163/14 163/15
recall [1]  106/7
receive [1]  6/3
received [1]  169/21
recent [1]  97/25
recess [3]  114/1 142/25 174/9
reconstruction [1]  20/6
record [17]  1/1 10/15 104/7

## R

record... [14] 113/16 113/18 142/24 153/9 159/23 165/24 165/25 167/1 169/1 173/19 173/20 175/7 175/9 175/11
recording [1] 160/19
recover [1] 165/3
red [1] 35/20
redact [1] 171/2
redacting [1] 171/1
referring [1] 145/2
reflect [1] 153/10
reflects [1] 175/9
refrigerator [2] 49/13 49/16
refused [1] 167/2
regard [1] 170/20
regards [1] 72/21
Regent [1] 115/7
register [1] 72/4
reiterate [1] 94/3
rejected [1] 161/4
related [1] 109/5
relationship [1] 15/22
relationships [1] 96/9
relative [1] 11/1
relay [1] 6/6
release [4] 24/22 26/13 26/14 26/15
released [1] 162/15
relevant [1] 25/13
remain [3] 6/8 32/10 99/7
Remaining [1] 162/15
remember [2] 143/25 146/24
remote [1] 48/20
removed [1] 62/3
render [2] 67/19 105/20
rent [1] 59/20
repetitive [1] 17/21
reported [2] 1/18 175/8
reporter [6] 1/22 10/11 10/16 114/15 175/4 175/17
REPORTER'S [4] 1/1 175/7 175/9 175/11
represent [1] 9/21
represented [1] 160/3
requested [2] 114/15 175/6
requesting [1] 167/19
require [3] 76/16 76/23 148/2
required [7] 23/24 24/3 63/24 64/2 162/19 168/16 174/6
requires [6] 22/11 87/6 88/22 89/4 96/24 149/4
reseated [2] 114/5 162/3
resisting [1] 101/15
respect [2] 102/16 103/8
respective [3] 9/21 11/20 175/10
response [1] 72/14
responsibility [2] 46/8 46/12
responsible [8] 46/21 52/16 53/25 57/24 68/24 145/25 146/6 147/18
rest [14] 7/6 18/24 25/6 77/9 81/4 90/24 92/22 95/7 99/4 99/11 113/13 134/22 142/11 162/13
restaurant [1] 149/21
rests [1] 163/17
retired [10] 99/13 103/22 111/4

113/14 142/23 150/5 153/7 159/11 160/18 165/18
retirement [1] 169/23
return [6] 32/11 106/24 108/9 111/17 142/7 156/25
revocation [1] 170/14
revolves [1] 39/2
rid [2] 37/4 37/14
right [298]
rights [3] 107/21 124/17 135/15
road [1] 163/4
Robert [3] 162/8 162/9 162/10
Robertson [1] 115/9
role [2] 113/8 149/12
room [9] 58/24 60/3 60/7 74/3 74/6 131/17 146/8 160/13 165/16
roommate [10] 58/24 59/18 61/2 81/19 131/2 131/21 131/24 144/5 147/16 148/15
roommate's [2] 131/20 158/9
roommates [2] 58/23 131/12
row [32] 32/17 34/10 42/3 55/5 69/20 74/18 74/18 74/19 74/19 75/20 77/9 81/4 81/7 81/13 87/17 87/20 90/24 92/22 92/25 93/8 94/17 94/25 95/1 95/7 95/8 95/9 129/9 129/11 136/12 136/16 142/20 142/22
rule [7] 85/25 122/8 122/11 152/24 153/1 154/10 167/22
rules [5] 133/14 151/14 151/14 151/22 164/20
run [2] 136/17 142/12
running [3] 52/8 53/10 105/16
rush [1] 115/20
RYAN [13] 2/4 12/2 22/21 23/6 23/22 39/12 63/21 65/8 65/19 70/5 71/17 75/22 83/21

## S

Sadly [1] 36/10
said [40] 16/11 17/14 18/15 18/16 24/8 29/15 29/17 41/19 48/23 51/18 54/9 60/11 62/10 62/11 63/12 72/10 73/21 82/6 87/2 92/13 92/18 94/4 105/15 110/2 110/9 117/18 117/18 122/6 122/13 126/19 131/15 135/12 135/14 139/24 140/21 144/3 148/4 150/7 151/13 153/16
same [29] 10/3 24/13 34/6 34/7 42/7 50/18 50/18 50/24 50/24 53/1 57/1 57/1 59/16 69/21 73/1 73/3 75/21 87/20 97/1 98/20 102/19 103/5 121/18 124/9 124/12 124/15 125/3 130/4 132/12
Sarah [1] 162/10
sat [2] 9/25 132/15
satisfy [1] 169/22
sausage [2] 137/20 137/21
saw [5] 23/13 95/12 101/11 132/14 132/20
say [86] 8/19 9/1 10/8 10/13 10/13 12/22 20/2 27/10 28/20 28/24 29/10 31/1 31/19 32/5 32/21 33/20 34/8 34/9 34/15 35/18 36/8 37/16 39/12 40/15 40/23 43/11 44/5

45/15 47/13 47/18 52/1 52/1 53/14 59/7 60/17 62/21 62/25 63/6 64/12 70/10 70/12 70/13 72/24 76/8 76/22 77/19 80/8 82/1 83/10 83/25 84/18 86/25 88/12 88/23 91/3 93/18 97/2 97/8 97/17 100/10 103/16 106/1 109/3 112/6 123/6 123/9 123/23 124/3 125/8 129/13 129/19 134/3 134/15 136/13 144/1 151/2 151/12 151/25 153/14 154/21 155/7 155/9 155/11 155/12 158/21 170/19
saying [19] 42/8 42/13 46/18 49/11 49/22 69/5 88/16 88/19 88/20 88/21 89/1 89/11 106/17 138/7 146/1 147/6 151/7 156/17 173/17
says [16] 5/8 5/10 37/18 57/17 65/2 65/8 66/20 81/8 82/15 83/18 85/2 88/16 88/22 134/18 151/11 156/11
SBOT [3] 2/4 2/5 2/10
Scar [1] 52/2
scenario [6] 37/20 61/8 66/1 66/12 68/19 151/10
scenarios [2] 77/16 148/5
scene [1] 101/23
schedule [1] 18/23
Scheduling [1] 17/8
Scheduling-wise [1] 17/8
Schlechte [2] 19/25 21/6
Schlitter [3] 27/23 27/25 44/24
school [5] 22/13 22/13 115/7 115/9 127/16
science [1] 83/7
scintilla [2] 118/1 172/11
screen [1] 49/18
SEAL [1] 175/13
search [6] 166/10 168/7 168/9 168/11 168/11 168/14
seat [3] 99/5 136/11 162/6
seated [2] 5/3 18/1
seats [1] 125/22
second [12] 21/19 21/20 30/12 45/16 75/20 87/20 91/11 95/1 95/7 99/6 129/11 153/12
security [2] 88/18 129/12
see [41] 10/16 10/20 10/21 10/22 31/16 53/9 53/24 66/1 89/3 101/12 114/12 114/24 118/14 118/25 119/1 119/16 121/2 122/15 124/16 124/18 126/24 127/6 130/18 130/20 131/18 131/21 132/21 135/16 137/12 140/20 142/17 154/24 158/6 165/17 170/9 171/3 172/3 172/10 173/21 173/24 174/7
seeing [1] 61/3
seems [1] 22/7
seen [2] 52/2 133/16
select [1] 115/3
selected [4] 116/2 124/20 154/11 155/2
selection [4] 5/14 17/11 55/14 63/14
self [2] 82/12 127/10
self-incriminate [1] 127/10
selling [3] 52/18 52/22 53/12

send [1] 65/14
Sending [1] 52/17
sense [22] 22/1 25/4 37/6 39/9 44/15 48/19 64/13 64/14 64/25 66/18 69/10 70/4 70/5 71/5 74/14 74/15 82/20 88/17 128/17 131/22 147/17 173/7
sent [1] 124/13
sentence [3] 161/14 169/21 171/4
separate [4] 110/24 110/25 149/11 167/20
Sergeant [2] 95/22 96/2
serious [1] 10/24
seriously [1] 135/19
serve [9] 6/16 7/1 7/1 7/7 7/9 7/24 110/13 112/24 141/11
service [1] 6/10
serving [1] 6/19
set [4] 121/1 124/12 124/12 132/18
setting [1] 112/19
settled [1] 139/25
several [1] 161/3
sex [2] 72/4 72/6
sexual [1] 78/1
shadow [1] 23/12
share [2] 51/4 59/10
shared [1] 148/16
shares [1] 91/24
Sharon [1] 111/13
she [44] 10/16 10/22 31/7 33/2 33/3 33/15 33/20 33/22 33/23 34/3 34/4 37/16 37/18 37/21 38/14 38/19 38/19 40/8 40/10 40/11 40/12 40/25 55/9 56/18 61/9 61/9 61/10 61/11 61/16 61/16 61/23 62/1 73/21 93/14 93/18 100/12 100/13 100/14 120/23 120/23 121/3 146/8 158/6 158/7
she'd [1] 38/14
she's [10] 21/14 32/7 38/1 38/20 56/18 61/10 61/15 61/21 73/23 114/16
shifting [2] 84/8 89/6
shifts [1] 22/23
shocked [1] 16/11
short [3] 114/1 125/18 142/25
shot [4] 69/9 97/23 139/5 139/6
should [18] 9/17 10/6 14/18 18/19 40/8 40/12 48/12 65/4 68/24 78/18 85/25 86/9 87/25 87/25 110/6 114/9 114/10 140/5
shouldn't [5] 45/6 46/13 58/5 114/13 115/24
show [13] 7/3 15/10 15/13 22/17 84/10 89/7 94/17 115/23 123/4 123/5 123/25 132/25 165/16
showing [1] 162/14
shows [5] 22/14 22/15 23/8 54/1 133/16
Shut [2] 85/2 91/20
shy [1] 13/12
sick [1] 65/14
side [20] 6/25 8/12 8/14 9/20 10/17 11/20 14/22 56/15 56/15 65/14 88/4 118/24 133/13 133/13 139/11 163/17 164/1 165/10

**S**

side... [2] 165/21 173/22
side-by-side [1] 56/15
sides [10] 9/21 10/25 14/21
 100/25 109/7 133/18 137/10
 140/11 159/4 163/25
sign [1] 88/16
silence [1] 82/19
similar [1] 8/7
simple [1] 24/20
simply [6] 75/23 76/24 79/24
 80/17 82/1 88/22
since [3] 99/16 126/12 171/10
sing [2] 126/18 127/2
singer [1] 126/11
singing [1] 126/19
single [2] 133/5 139/22
sir [65] 11/21 12/11 14/13 28/19
 32/13 34/18 41/12 41/15 41/18
 41/22 42/4 65/23 69/20 77/8 80/6
 81/6 81/14 82/25 83/6 90/19 92/24
 95/1 95/10 95/12 96/15 98/18
 99/18 99/25 104/19 106/23 107/11
 109/23 110/1 110/20 112/1 112/2
 112/15 112/17 112/20 113/24
 113/25 114/3 114/20 131/4 132/4
 137/11 137/14 137/17 142/2
 145/16 150/12 152/8 152/15
 152/25 153/3 153/4 154/6 159/24
 160/5 160/9 160/17 160/20 161/5
 172/5 173/5
sit [5] 11/15 99/17 132/14 139/6
 141/21
sits [3] 22/23 72/18 78/13
sitting [5] 52/15 53/7 71/14
 132/13 164/16
situation [10] 21/9 58/23 62/2
 62/3 86/12 138/20 146/9 148/15
 155/1 165/2
situations [2] 17/2 131/10
six [2] 17/5 47/18
sleep [2] 123/25 124/1
sliding [1] 135/19
slinging [1] 52/20
slip [1] 110/4
slope [1] 135/19
Slovak [4] 28/17 36/15 62/24 64/6
smaller [2] 94/7 130/16
Smart [1] 5/20
Smith [9] 28/25 29/2 57/5 57/8
 61/5 96/15 129/11 132/3 162/9
smoke [2] 79/6 131/12
society [1] 81/18
some [49] 6/12 8/8 10/4 16/25
 17/25 27/5 35/21 57/10 70/12
 70/13 75/23 91/24 98/25 107/13
 107/22 114/7 115/3 115/19 120/7
 120/22 121/8 125/22 126/12
 127/22 128/25 130/4 131/2 131/2
 133/3 134/6 136/20 136/23 137/22
 137/24 139/1 142/13 148/17
 150/15 154/4 154/9 158/1 160/4
 164/18 167/10 168/18 168/21
 170/14 171/9 171/19
somebody [57] 11/2 16/12 18/14
 21/10 23/12 24/25 35/6 36/25

39/14 39/15 40/1 40/6 40/10 40/19
 43/18 43/22 45/7 45/9 45/21 45/25
 46/5 46/20 46/25 47/6 47/10 47/24
 57/13 57/23 59/7 65/10 65/15 68/6
 68/22 68/23 68/24 69/14 71/17
 73/25 77/25 78/3 84/7 84/22 85/5
 85/7 85/23 86/4 87/3 87/25 91/12
 94/10 94/12 118/23 124/9 144/6
 146/15 148/16 158/22
somebody's [3] 81/10 128/11
 148/20
somehow [2] 54/1 98/10
someone [8] 6/22 9/7 11/7 37/10
 66/1 66/6 102/22 147/7
someone's [1] 62/21
something [78] 6/22 8/7 8/17 9/17
 16/2 16/4 18/17 19/11 19/18 19/19
 27/16 28/2 28/15 28/16 35/5 35/15
 36/17 39/1 39/5 40/2 40/19 43/2
 43/23 44/22 45/6 46/1 46/21 47/24
 56/8 57/24 62/15 62/18 68/6 68/22
 69/14 70/2 71/13 71/25 76/21 77/5
 84/10 86/25 88/8 89/2 89/7 92/5
 94/2 94/4 94/13 94/16 99/23
 102/17 104/22 120/17 123/2 125/9
 128/16 130/9 133/15 133/17
 133/23 134/21 139/8 139/8 140/7
 140/8 145/7 146/6 147/19 148/8
 148/18 151/5 151/7 151/11 151/12
 158/17 159/22 164/15
something's [1] 43/1
sometimes [17] 7/18 8/9 77/24
 110/25 118/15 118/16 129/7 129/7
 129/16 133/2 136/21 139/21
 163/16 164/12 164/12 164/14
 170/12
somewhat [1] 88/13
somewhere [6] 7/8 17/15 18/5
 40/7 115/21 171/16
son [11] 97/8 97/14 100/9 100/16
 101/4 101/5 101/16 101/24 102/16
 102/19 103/12
song [1] 126/19
sons [3] 100/8 100/20 100/21
soon [3] 15/4 37/4 116/1
sore [2] 10/20 70/14
sorry [10] 32/14 47/13 57/7 62/1
 66/24 71/9 93/25 97/24 147/10
 147/22
sort [8] 48/7 48/8 116/22 117/16
 130/3 139/4 144/13 151/25
soul [1] 65/9
sounds [2] 119/9 122/9
space [1] 148/16
Sparks [3] 12/15 12/16 13/6
speak [7] 5/14 71/18 88/4 90/9
 93/15 95/11 101/9
speaker [1] 86/7
speaking [4] 9/6 22/8 92/14
 127/12
specialize [1] 115/3
specialized [1] 173/18
specific [8] 21/24 23/21 24/11
 60/6 79/18 120/15 127/23 129/2
specifically [4] 23/17 64/10
 153/18 160/10
specifics [1] 92/15

speed [2] 72/23 115/19
speeding [8] 72/25 73/1 73/3 73/5
 73/6 73/8 73/10 73/12
spells [1] 134/13
spend [3] 94/2 129/1 130/3
spent [1] 130/1
split [1] 30/12
spouse [1] 86/14
square [1] 45/23
stage [3] 162/23 162/24 163/2
stages [2] 162/22 164/3
stand [12] 83/23 84/15 84/19
 87/24 91/15 91/18 101/15 102/13
 127/13 128/8 129/4 129/6
standard [3] 119/15 120/2 121/18
Standifer [2] 25/17 26/4
standing [3] 10/15 36/24 52/20
standpoint [1] 140/3
start [15] 18/3 18/4 75/19 75/22
 76/24 80/16 87/4 96/6 96/25 97/15
 128/8 135/18 136/11 163/5 164/7
started [2] 113/19 113/23
starting [2] 81/7 81/11
starts [1] 5/23
state [38] 1/6 2/3 5/4 5/8 5/9 9/16
 11/18 14/19 19/4 22/23 23/19
 63/18 76/13 76/22 76/24 78/18
 79/23 81/11 81/25 84/3 89/3 97/22
 101/2 105/9 105/21 120/13 126/22
 134/10 134/11 134/11 135/20
 162/24 163/9 163/12 163/13
 163/22 175/1 175/4
statement [5] 42/5 84/13 156/9
 156/14 156/15
statements [4] 156/8 156/9 163/2
 163/3
states [4] 82/10 119/13 120/1
 134/11
Station [3] 95/23 95/24 137/5
stationed [1] 97/11
statute [1] 171/17
stay [10] 99/1 103/21 113/12
 124/20 125/8 125/19 150/2 150/3
 153/5 159/8
stays [1] 23/1
Ste [1] 175/18
steal [1] 69/6
steals [1] 68/22
Steckman [7] 33/7 33/8 40/15
 40/16 40/17 40/18 81/2
stenotype [1] 1/18
step [10] 48/2 89/1 89/5 105/15
 111/2 117/15 150/2 153/5 159/7
 162/6
steps [1] 37/14
stick [2] 22/5 116/9
still [32] 18/17 19/11 26/19 26/20
 26/22 26/24 31/19 32/20 32/21
 42/8 43/25 53/24 56/10 66/5 68/7
 107/25 109/8 109/8 124/5 128/5
 130/21 131/12 135/6 138/1 140/8
 145/25 160/19 169/10 171/9 171/9
 171/20 173/9
stipulate [3] 103/24 104/2 169/11
stole [4] 30/15 134/18 134/24
 135/9
stolen [3] 86/13 86/16 134/22

stomach [1] 65/14
stop [12] 97/22 100/15 118/5
 136/20 164/8 165/2 166/2 166/6
 166/8 168/3 168/5 168/6
stopped [2] 105/14 106/2
store [2] 16/19 137/5
story [1] 73/3
Stove [1] 120/19
straight [2] 47/22 131/11
straightforward [1] 172/2
strangers [2] 94/6 94/7
strategic [1] 126/25
strategy [1] 127/7
street [8] 1/23 2/6 2/11 11/15
 52/20 130/17 130/18 175/18
streets [2] 118/20 118/24
stress [1] 164/25
Strickman [1] 33/6
strike [7] 6/23 7/12 7/21 136/21
 142/15 153/9 159/14
strikes [6] 8/1 17/25 136/17
 136/18 163/18 161/21
strong [3] 82/22 90/1 141/9
Structural [1] 83/7
struggle [1] 90/6
stuck [3] 59/23 82/4 82/6
student [1] 141/13
stuff [9] 17/18 24/21 59/21 60/8
 117/9 122/6 135/7 135/10 170/15
styled [1] 175/7
subconscious [2] 150/8 151/8
subconsciously [3] 8/9 89/20
 92/13
submitted [1] 167/5
subsequently [1] 161/2
substance [1] 58/24
such [2] 141/10 144/13
sudden [1] 74/1
Suite [2] 1/23 2/6
sum [1] 164/1
Sunday [1] 148/9
Super [2] 137/3 137/4
Supernaw [1] 126/9
supervision [7] 26/24 169/9
 169/24 171/9 171/11 171/19
 171/21
supply [1] 164/18
supposed [8] 34/25 35/4 35/10
 37/13 67/2 81/17 81/19 97/8
suppression [2] 167/19 168/2
sur [1] 163/15
sure [26] 6/2 10/10 10/22 36/7
 37/11 47/19 50/22 61/4 77/15 79/7
 81/22 81/22 84/16 84/20 87/9
 92/16 92/21 119/1 125/23 132/18
 140/10 148/25 159/3 159/5 161/17
 170/3
suspicion [1] 118/3
suspicious [3] 88/13 125/16 168/5
sworn [2] 122/13 155/3
system [7] 6/17 11/4 11/12 11/13
 56/18 67/10 117/18

**T**

table [1] 131/17
take [51] 10/12 15/5 15/12 17/3
 17/13 17/20 18/21 21/20 35/9

**T**

take... [42]  35/11 35/21 36/2 37/14 45/21 46/8 46/12 46/14 48/2 52/19 56/5 67/8 67/18 70/14 89/1 89/1 89/5 99/5 99/11 99/19 103/18 111/3 113/13 113/22 115/11 119/17 122/13 124/13 128/7 130/10 133/4 135/19 142/12 142/16 144/1 164/8 164/19 164/22 165/19 169/18 173/9 173/9

taken [1]  67/10

takes [5]  37/18 124/21 125/8 128/20 129/6

taking [1]  38/8

talk [53]  8/20 8/21 8/23 9/2 9/2 14/22 17/14 17/16 17/25 20/23 23/14 23/15 27/4 39/11 45/4 46/19 71/12 71/20 76/6 85/16 86/1 87/21 89/13 94/1 94/16 94/18 94/23 95/5 95/6 96/13 99/2 99/16 101/22 102/12 116/14 117/13 118/5 127/1 127/18 127/19 129/24 130/5 133/7 134/2 136/8 139/23 139/23 140/8 142/13 142/17 143/15 157/8 159/13

talked [14]  10/1 57/11 84/3 86/2 92/1 114/8 128/24 128/25 133/12 137/9 141/7 143/24 154/8 169/10

talking [40]  14/21 17/11 25/12 25/20 36/15 37/7 37/15 44/5 50/1 50/4 50/5 56/16 59/11 65/6 65/18 66/12 66/18 68/6 70/10 70/11 71/15 78/23 82/3 85/14 85/15 95/3 98/24 100/3 120/5 120/6 120/8 121/4 121/7 133/8 133/9 141/9 147/12 147/17 149/4 150/19

Tarleton [1]  105/9

tase [1]  102/11

tased [2]  100/17 101/4

TDC [1]  161/3

teach [4]  28/8 29/5 83/6 134/5

teacher [1]  137/13

technicalities [3]  134/3 135/14 135/15

technicality [2]  135/5 135/9

technically [2]  62/20 66/6

teenager [1]  105/8

Telephone [3]  2/7 2/12 175/19

television [1]  123/23

tell [32]  6/20 9/17 10/6 21/22 25/20 33/1 35/2 52/6 76/1 82/9 83/21 91/14 91/20 99/16 99/24 100/24 104/11 115/1 122/25 127/2 128/5 128/20 129/4 129/6 129/10 129/14 138/18 145/18 152/24 156/16 161/23 171/5

telling [6]  84/9 89/6 91/8 128/11 128/16 128/18

ten [10]  25/2 136/18 136/18 136/18 136/18 142/16 159/19 159/21 161/14 164/13

ten-minute [1]  142/16

tend [1]  91/7

tendency [1]  107/22

terminated [2]  36/20 39/6

terms [4]  22/8 22/9 22/9 66/17

test [1]  115/16

testified [2]  128/2 150/24

testifies [3]  134/20 134/21 134/21

testify [44]  82/17 83/9 83/19 84/8 84/22 86/4 86/24 87/3 87/8 87/18 88/25 89/15 89/16 92/4 96/6 107/23 111/7 126/5 126/15 126/16 126/18 126/21 127/1 127/21 137/23 137/25 138/4 138/13 139/19 150/8 150/20 150/21 151/2 151/17 152/10 152/18 152/23 154/13 155/8 155/18 156/3 156/13 156/19 174/4

testifying [4]  9/13 85/2 128/8 151/10

testimony [4]  129/19 139/18 151/18 168/8

TEXAS [22]  1/6 1/7 1/17 1/22 1/23 2/7 2/12 5/4 5/8 23/20 24/18 29/14 96/19 115/6 134/11 134/12 163/22 175/1 175/4 175/16 175/18 175/19

than [24]  8/14 22/15 46/10 50/17 50/23 51/10 51/18 59/23 85/22 96/7 96/8 97/16 114/12 119/11 124/3 131/6 137/9 139/2 151/1 153/16 164/14 171/10 171/16 174/5

thank [41]  6/11 11/17 11/22 14/14 15/17 16/8 28/12 30/18 77/8 92/9 93/20 94/24 97/19 98/16 98/18 98/21 99/12 99/17 103/14 103/18 104/20 106/24 107/1 108/12 108/14 111/2 111/20 114/21 139/24 140/23 141/21 149/22 149/24 152/15 155/14 156/7 157/2 157/13 159/10 162/14 162/16

thanks [2]  30/22 154/3

that [960]

That'll [1]  159/20

that's [163]  7/4 7/10 7/21 7/22 10/14 14/7 14/8 15/15 15/23 17/4 17/11 18/23 22/10 22/10 22/15 22/15 23/13 24/16 24/16 25/10 25/17 28/24 31/25 32/2 34/14 38/11 39/1 39/4 39/4 39/16 40/3 43/24 45/7 45/8 45/14 45/25 47/24 48/8 48/21 51/2 54/13 54/24 56/24 57/16 59/6 59/11 61/7 65/3 65/18 66/11 66/16 66/16 66/17 67/1 67/2 67/9 67/13 69/5 70/1 70/4 70/17 70/20 71/16 71/16 72/13 73/20 73/23 74/11 76/2 76/6 77/21 78/4 79/6 79/11 79/11 79/12 79/12 79/18 79/19 81/20 81/23 82/3 83/18 83/24 84/20 86/18 88/1 88/15 88/20 88/25 89/4 92/17 92/21 93/17 93/19 100/4 100/16 103/14 104/6 108/2 108/10 110/21 111/10 112/23 113/11 115/7 116/24 117/1 117/8 117/23 118/2 118/3 118/4 118/4 119/3 119/15 119/16 119/16 119/20 120/12 121/11 121/13 122/8 123/8 123/22 125/7 125/15 126/19 127/17 127/23 129/14 131/9 133/8 133/9

133/23 134/18 136/1 136/6 136/21 138/19 138/19 140/10 141/5 144/10 147/11 149/3 149/3 149/9 149/14 151/16 152/15 156/14 160/15 161/20 163/2 163/21 165/8 167/16 170/17 171/1 171/23 173/2 173/17

the decision [1]  109/17

their [43]  5/20 8/18 9/21 11/20 39/15 39/16 40/2 40/3 40/20 40/20 41/1 43/19 43/19 46/1 46/2 58/24 59/19 65/11 66/5 66/6 76/22 84/24 100/14 126/22 127/4 131/11 132/1 132/1 133/3 134/19 142/15 144/15 144/16 149/6 163/1 163/3 163/10 163/17 164/1 164/1 166/5 168/16 168/25

theirs [3]  17/19 46/22 47/3

them [45]  10/10 22/19 42/19 43/19 46/1 47/25 53/24 53/25 53/25 55/14 57/12 58/4 58/4 58/5 59/10 59/10 59/11 60/2 66/4 66/10 76/23 82/19 84/25 91/20 96/6 96/7 96/10 102/12 103/7 105/5 105/20 114/4 114/8 118/23 121/10 121/11 126/6 138/18 141/4 147/9 149/6 162/2 166/7 168/13 168/14

themselves [1]  85/22

then [72]  5/15 10/21 10/22 15/6 17/23 18/1 25/2 25/14 38/14 39/1 40/7 40/10 44/1 45/6 46/15 46/16 47/11 47/17 47/17 47/19 64/6 70/7 70/25 81/20 88/7 88/25 89/5 90/8 99/6 100/13 102/15 110/13 110/18 114/15 115/6 118/17 121/17 122/10 122/18 122/20 122/25 130/15 133/4 133/15 134/22 136/11 137/4 137/5 137/6 138/13 138/20 139/6 140/4 142/14 142/16 143/15 145/9 145/12 146/20 148/10 158/9 160/24 161/8 161/10 163/1 163/11 163/13 163/14 163/24 164/9 167/16 168/7

theory [1]  122/10

there [108]  6/3 6/20 12/10 15/21 17/1 17/15 18/6 18/24 21/8 31/19 32/7 35/20 35/21 35/23 36/24 38/23 40/10 53/10 57/18 58/15 58/16 58/25 60/9 60/12 60/12 61/11 63/13 65/2 65/6 66/14 71/14 71/14 75/19 77/1 77/14 77/20 77/20 79/6 79/21 79/22 81/7 81/8 83/23 86/24 90/11 93/13 94/16 95/9 95/13 96/20 96/22 97/13 99/17 100/15 101/23 104/22 113/7 114/9 114/10 115/21 116/10 116/12 116/13 120/16 122/10 124/21 125/8 125/19 125/24 126/16 126/17 127/18 129/5 132/7 132/20 132/23 133/5 136/5 136/20 137/3 137/3 137/18 138/10 138/25 141/5 141/12 142/14 145/3 146/16 148/5 149/23 150/18 151/4 151/17 151/17 153/12 158/24 160/22 161/3 161/13 162/22 164/20 167/10 168/14 168/15 168/18 171/25 172/12

there's [45]  7/19 14/11 16/12 18/9 25/6 36/23 39/19 39/20 47/18 60/8 61/9 63/8 65/20 67/10 68/16 72/14 77/18 78/7 79/6 79/21 79/21 79/24 80/17 81/10 86/3 87/2 88/16 89/11 91/14 94/15 100/6 116/23 122/24 123/2 127/20 131/5 145/6 151/11 156/17 160/7 167/9 168/13 169/17 170/23 171/14

therefore [2]  48/23 153/22

these [20]  6/11 8/1 11/11 24/10 24/10 27/5 29/13 63/21 64/2 76/8 87/1 99/1 120/11 124/16 127/22 127/24 131/8 152/1 162/19 164/4

they [160]  5/22 6/7 6/13 6/15 6/15 6/21 6/23 7/11 7/12 7/12 7/21 7/22 8/12 8/15 8/17 8/18 9/20 9/21 10/7 11/19 17/18 18/15 23/12 23/20 25/1 25/3 25/24 32/5 37/12 37/13 37/13 37/13 37/14 39/21 39/21 41/22 43/17 46/22 47/2 47/2 47/3 54/1 57/14 57/15 57/24 59/7 59/8 59/9 60/2 60/3 62/16 63/23 65/11 65/11 65/18 66/2 66/3 66/4 68/7 69/14 69/24 69/25 70/6 70/6 70/7 78/8 82/16 82/18 84/7 84/19 85/23 86/15 86/16 97/2 97/17 100/13 101/7 101/8 101/10 101/15 101/24 101/25 102/1 102/2 102/9 102/11 102/13 103/1 103/1 110/17 117/2 117/23 118/9 118/17 120/17 121/15 123/9 123/10 123/11 123/12 123/12 123/14 124/4 125/25 126/1 127/4 128/1 128/1 128/2 128/7 128/8 129/14 130/2 130/14 131/7 133/1 133/2 134/4 134/13 134/17 134/17 134/19 134/19 134/22 134/23 135/5 135/7 135/7 135/15 136/18 139/5 139/23 140/25 144/7 144/7 144/14 144/16 145/7 145/12 145/25 147/7 149/5 149/5 158/22 163/5 163/6 163/10 163/13 163/15 164/14 166/4 166/8 166/19 166/21 166/23 167/4 167/5 168/13 168/25 172/25

they'll [1]  6/23

they're [31]  6/12 6/18 8/3 8/4 8/18 9/19 25/1 25/2 41/9 41/20 41/20 41/24 42/7 42/8 42/10 42/14 42/20 54/1 56/15 57/14 74/1 74/13 78/4 91/24 118/19 127/21 128/17 131/12 135/16 167/12 168/16

they've [3]  76/11 76/12 78/4

thing [23]  10/6 21/22 34/6 50/18 50/24 60/22 67/4 67/17 67/25 72/16 73/1 94/1 101/5 102/22 122/21 131/16 139/25 141/8 146/4 148/24 151/16 167/11 171/6

things [27]  8/13 23/22 24/11 29/16 39/11 44/3 44/14 44/15 49/12 49/13 51/19 52/8 67/9 76/2 76/3 78/1 89/12 115/19 115/20 117/21 118/5 120/11 130/4 138/10 164/16 168/3 170/14

think [168]  7/16 10/7 11/2 14/10 18/8 18/10 21/14 21/25 22/5 27/20 28/1 28/13 28/19 28/21 29/8 31/15

**T**

think... [152]  31/24 31/25 32/2 32/3 32/5 32/8 32/18 32/23 32/24 33/5 33/9 33/19 34/4 34/5 34/10 34/11 34/15 34/16 34/19 36/8 36/25 37/21 38/1 38/1 38/7 38/12 38/13 38/18 38/22 38/25 39/21 40/1 40/5 40/7 40/12 40/14 40/18 41/6 41/23 42/2 42/18 42/19 42/23 43/13 43/20 44/20 45/3 45/25 46/20 47/14 47/22 47/23 50/23 51/7 53/12 54/5 54/9 56/2 56/12 56/14 56/24 57/4 57/13 57/15 57/23 58/10 59/5 59/14 61/5 61/19 61/20 62/7 62/13 62/21 63/6 63/7 65/2 65/3 65/3 67/22 68/15 71/16 71/16 77/6 80/1 80/3 81/15 84/21 85/3 85/9 85/19 87/25 88/24 90/5 90/10 90/14 91/6 91/23 92/10 92/18 93/5 96/4 97/18 101/1 102/5 102/8 102/11 102/21 105/22 105/25 106/15 109/5 109/19 116/22 120/1 121/19 125/20 127/4 127/20 128/19 128/25 130/2 131/1 131/1 135/12 135/13 137/9 137/22 138/3 139/14 139/17 140/1 142/14 148/23 150/18 154/7 156/16 158/16 158/18 159/12 165/21 167/16 168/24 169/3 169/12 170/1 170/13 170/17 172/1 172/14 173/7 173/25

thinking [15]  35/2 35/3 58/21 71/15 79/10 87/23 88/11 93/4 110/19 141/25 151/19 153/15 154/20 154/22 155/7

thinks [1]  39/20

third [3]  45/15 95/8 163/8

this [185]

those [44]  8/8 8/8 8/9 15/3 23/7 26/1 29/16 36/11 41/19 41/25 42/14 44/6 44/14 44/15 47/6 54/2 55/13 61/12 68/21 74/12 76/2 76/15 77/15 91/24 99/7 105/19 112/11 114/12 114/24 119/2 123/24 134/13 135/13 135/14 142/14 146/20 164/3 164/13 164/16 164/21 166/8 167/1 167/2 171/1

though [12]  36/12 41/20 42/14 57/11 76/19 81/23 82/7 116/12 131/24 144/13 145/23 173/15

thought [9]  39/23 59/18 59/24 72/12 95/12 101/15 103/2 111/21 120/17

threatened [2]  101/8 102/2

three [12]  7/4 34/6 63/13 93/22 100/8 100/19 105/3 105/19 143/11 156/8 163/17 164/12

through [25]  7/20 15/2 15/2 15/6 15/9 15/9 17/22 23/20 40/11 105/10 105/11 107/21 125/21 134/6 136/12 139/19 142/1 142/5 142/8 143/12 159/15 159/16 162/21 165/9 169/19

throw [1]  34/1

Thursday [9]  18/10 18/15 18/17 19/4 19/6 73/5 73/9 116/5 165/6

ticket [9]  72/25 73/2 73/4 73/5 73/9 73/10 124/10 124/12 124/14

tickets [2]  18/15 18/25

time [45]  6/7 7/7 10/19 11/8 11/8 12/22 16/17 25/3 34/7 39/6 47/16 50/18 50/24 53/24 57/1 60/22 64/16 66/2 66/16 67/3 86/14 87/15 94/3 98/17 102/10 102/13 102/14 103/2 105/17 106/2 110/23 115/15 120/22 124/12 126/11 129/1 130/1 130/3 133/2 139/15 141/5 152/23 160/4 166/4 168/22

timely [1]  167/18

times [2]  91/14 163/17

timing [1]  125/17

tire [1]  158/22

title [1]  5/6

titled [1]  1/15

today [16]  6/2 11/17 17/12 17/12 17/23 18/2 30/2 41/11 49/7 50/12 100/1 104/19 116/1 143/19 154/2 157/22

together [1]  90/7

told [4]  66/1 72/17 101/14 146/24

Tom [1]  13/25

tomorrow [5]  18/3 18/9 19/1 165/6 165/16

tonight [1]  170/20

too [9]  7/10 20/25 21/2 60/2 67/23 91/13 110/11 122/12 171/14

took [3]  56/10 67/4 124/14

tools [12]  41/8 41/16 41/20 41/25 42/7 43/21 56/8 68/19 68/19 68/21 69/5 146/1

top [3]  52/15 90/12 162/20

total [1]  175/11

totally [1]  93/14

touch [2]  8/13 9/22

touching [3]  32/6 53/8 53/23

towards [1]  21/12

town [5]  105/10 123/8 123/18 123/18 123/24

traffic [3]  124/10 124/11 166/2

transcription [1]  175/5

transferred [1]  144/15

traveling [2]  172/21 172/25

Travis [1]  1/16

treat [5]  96/7 97/1 97/1 103/5 103/7

treated [3]  101/5 101/24 113/2

trial [37]  1/3 5/23 18/4 18/12 18/14 19/11 24/13 63/13 64/17 64/17 71/21 72/1 72/5 73/9 73/10 82/15 93/14 101/10 101/17 106/11 116/3 118/12 118/18 127/21 139/19 139/20 155/25 160/23 162/23 163/8 163/19 164/3 164/20 164/22 165/3 165/5 170/13

trials [5]  13/22 83/17 125/10 162/21 164/17

trick [2]  23/12 48/17

tricky [1]  77/16

tried [3]  86/19 126/8 139/10

trigger [1]  65/10

trip [2]  19/21 157/10

trouble [9]  40/8 40/13 60/1 61/2 66/1 100/8 100/22 108/25 114/17 truck [10]  41/8 41/10 42/7 43/22 43/23 56/9 68/23 105/16 146/1 166/13

true [11]  47/7 67/19 79/19 85/20 119/19 119/21 122/2 144/8 161/10 173/2 175/5

truly [2]  86/8 175/9

trumps [1]  57/18

truth [9]  128/5 128/11 128/16 128/18 128/20 129/4 129/6 129/10 129/14

truthfully [1]  76/5

try [12]  7/17 10/17 18/7 77/24 91/4 102/12 123/7 133/20 154/22 164/1 172/7 172/9

trying [13]  6/13 10/12 12/4 72/8 72/11 109/6 122/22 126/14 132/21 135/11 139/15 144/1 155/13

Tuesday [5]  12/1 18/19 73/1 73/14 148/10

turn [9]  5/15 5/17 11/12 11/18 22/16 60/17 86/17 162/18 164/14

turned [2]  14/19 121/1

Turner [1]  12/4

TV [13]  22/14 22/16 22/16 23/13 48/9 48/13 49/3 49/4 49/13 50/5 50/14 133/16 139/5

Tweet [1]  6/1

twentieth [1]  124/8

twice [2]  139/12 139/12

two [25]  5/23 7/4 15/20 18/13 24/14 34/5 40/11 44/3 44/14 44/15 50/17 50/17 86/20 86/23 90/7 105/12 135/12 139/18 143/11 156/9 163/16 164/12 164/12 170/23 171/2

type [8]  13/17 20/4 78/11 78/12 131/9 150/22 166/19 171/19

types [1]  66/14

**U**

Uh [21]  13/23 29/19 29/25 30/25 35/25 43/5 44/16 46/6 64/4 69/11 70/18 71/4 73/22 74/16 95/25 131/4 141/15 146/18 147/1 148/3 154/15

Uh-huh [21]  13/23 29/19 29/25 30/25 35/25 43/5 44/16 46/6 64/4 69/11 70/18 71/4 73/22 74/16 95/25 131/4 141/15 146/18 147/1 148/3 154/15

ultimate [1]  138/11

ultimately [3]  89/11 91/25 103/3

unable [1]  8/14

uncomfortable [3]  16/4 59/17 127/15

under [28]  26/4 26/12 28/3 28/5 36/11 41/24 47/6 53/2 53/13 55/23 60/2 62/15 71/18 74/12 76/15 78/25 82/18 99/4 119/13 132/5 132/15 132/20 150/8 151/12 156/15 160/1 164/24 170/3

understand [52]  11/3 13/5 46/11 60/25 61/3 65/16 65/16 76/16 76/20 77/7 77/8 77/8 78/5 79/4 82/8 87/6 96/24 102/4 102/7 102/15 102/25 103/3 106/5 108/12 108/24 109/10 110/8 110/10 110/22 116/23 116/25 117/1 117/9 130/6 133/23 138/6 140/4 144/12 144/20 145/18 145/22 145/23 148/1 151/13 151/22 155/4 156/12 160/6 161/6 161/11 168/20 170/7

understanding [1]  158/14

Unduly [1]  170/6

unfair [1]  105/21

unfortunately [1]  155/24

United [2]  82/10 119/13

University [3]  105/9 115/6 115/7

unlawful [5]  5/5 24/9 24/17 172/17 172/17

unless [12]  39/15 43/18 46/1 46/21 46/22 48/20 57/14 65/10 65/19 66/20 78/24 144/6

until [8]  18/19 23/2 23/4 33/3 97/2 106/17 129/18 164/8

up [84]  5/20 5/22 5/25 7/17 7/23 8/17 8/22 10/7 10/11 10/13 10/18 11/14 12/8 12/10 13/7 14/2 16/10 17/18 22/3 23/12 25/16 25/18 27/7 34/19 35/13 45/22 45/23 52/8 52/10 53/7 55/14 67/16 67/17 70/9 72/8 73/7 73/12 83/23 85/2 85/13 85/14 85/20 86/17 87/24 91/20 93/13 93/15 99/6 99/19 99/20 104/23 112/15 112/19 114/16 114/17 115/19 116/18 117/19 122/23 124/1 126/21 127/13 127/18 130/20 132/13 132/18 133/4 136/9 138/18 139/17 139/20 141/22 147/17 159/25 162/6 162/14 162/18 164/1 165/19 166/22 169/15 169/17 169/18 169/19

upon [2]  8/6 112/12

upset [1]  102/2

upstairs [2]  135/11 139/16

urging [1]  168/25

us [25]  8/6 8/23 9/10 17/24 22/11 50/19 72/8 80/16 86/25 99/2 99/24 100/25 103/21 105/15 112/19 113/12 122/25 123/9 148/8 150/2 150/3 153/6 159/8 162/13 171/1

use [16]  7/22 14/11 50/1 50/4 55/4 59/6 59/8 60/2 77/23 98/10 98/12 117/14 131/13 133/1 149/5 164/21

used [9]  8/1 16/17 21/10 59/8 79/2 85/24 85/25 132/23 141/5

uses [2]  68/23 134/10

using [4]  59/11 60/16 61/10 66/20

usually [7]  6/16 17/19 17/19 18/4 23/11 164/11 164/12

**V**

vacant [2]  114/12 114/13

variables [1]  60/9

VCR [2]  134/18 134/24

vehicle [11]  41/20 42/11 42/14 42/20 42/20 43/1 118/5 133/1 133/3 166/3 166/4

venire [6]  5/3 99/13 114/5 142/23 162/3 162/15

VENIREPERSON [528]

**V**

Venirepersons [1]  142/8
verdict [12]  23/25 24/4 63/24 64/5 67/19 117/5 117/24 118/12 123/14 124/5 125/15 135/1
verdicts [2]  119/12 125/11
versus [1]  148/24
very [43]  7/9 10/24 14/14 16/23 18/22 20/19 21/4 21/13 22/8 28/23 30/13 42/1 66/16 67/4 67/16 68/16 76/3 76/3 77/19 77/19 77/22 80/2 82/14 83/16 91/4 91/6 91/17 91/23 93/8 98/18 99/12 106/2 106/24 111/20 115/18 116/3 117/22 127/23 153/16 154/22 155/13 155/22 162/16
victim [3]  9/6 11/1 133/4
Victoria [1]  162/11
view [1]  49/25
viewpoint [1]  138/1
violence [1]  66/15
Virginia [2]  115/7 115/8
visit [1]  127/18
voice [3]  10/11 83/17 114/17
voices [1]  114/16
voir [6]  1/11 5/12 11/23 114/22 116/11 158/4
volume [4]  1/2 3/2 4/2 175/6
Volumes [1]  1/2
vote [1]  115/11

**W**

wait [3]  35/11 99/14 129/18
waiting [1]  86/17
wake [1]  124/1
Wal [1]  136/25
Wal-Mart [1]  136/25
walked [3]  30/14 40/10 72/7
walks [1]  43/22
want [73]  6/13 6/15 7/1 7/1 9/25 11/12 14/25 30/18 35/9 35/11 37/24 45/21 46/7 46/18 59/21 60/17 60/24 61/1 64/19 82/17 83/23 84/22 88/24 91/15 93/12 93/14 94/1 94/3 94/9 100/24 104/11 107/22 109/6 109/7 111/25 115/1 115/19 117/13 117/15 118/21 118/23 118/24 119/1 122/23 122/24 124/20 125/13 125/18 125/19 125/23 126/5 127/13 127/17 129/24 131/7 133/25 135/22 135/23 135/25 136/8 137/25 138/19 139/23 140/7 140/9 140/10 146/5 146/15 153/9 155/1 161/18 164/15 168/21
wanted [14]  99/24 100/4 102/13 103/16 104/22 112/18 112/20 112/22 121/12 126/25 143/2 157/5 158/21 159/3
wanting [3]  46/12 102/11 137/23
WARD [2]  2/5 12/5
warrant [1]  168/13
warrants [9]  166/5 166/5 166/8 166/18 166/20 167/1 167/13 167/14 167/15
was [185]

Washington [2]  97/12 97/13
wasn't [5]  12/1 45/12 47/3 73/19 132/19
watch [3]  22/14 22/15 23/7
watched [1]  101/9
Watson [8]  69/19 70/9 70/13 71/6 81/14 95/10 112/13 112/16
way [49]  6/14 7/19 21/11 23/20 25/22 39/18 39/19 39/20 43/16 53/7 56/24 57/17 57/19 58/23 60/10 61/3 62/5 62/10 62/12 65/17 65/20 66/22 71/22 75/20 81/8 83/24 84/21 97/1 98/12 100/8 105/21 108/5 110/13 116/22 120/25 122/19 126/1 126/3 129/2 132/6 136/22 138/8 141/6 141/10 142/21 149/1 154/10 156/1 171/14
ways [2]  60/7 145/6
we [191]
we'd [1]  120/22
we'll [28]  8/22 8/23 11/13 14/23 15/15 18/1 18/2 18/3 59/7 64/12 103/24 104/2 106/19 113/23 133/19 136/17 142/15 143/15 164/7 164/8 164/9 165/2 165/17 167/21 173/21 173/25 174/1 174/7
we're [58]  5/13 10/23 10/24 11/14 11/15 14/17 17/11 17/12 17/22 18/16 21/23 22/10 23/14 24/19 26/6 50/20 66/11 66/17 66/18 67/13 82/3 85/13 85/20 88/21 94/2 94/11 98/24 102/19 106/22 115/25 117/19 120/6 120/8 120/10 128/10 133/8 133/9 134/6 136/1 136/6 139/7 141/8 142/11 143/8 143/11 143/12 147/12 149/4 157/8 159/2 159/12 159/15 165/21 169/3 169/18 169/21 173/25 174/5
we've [19]  5/18 7/15 70/10 95/13 114/6 114/7 114/14 115/15 125/14 128/25 129/22 136/19 139/1 141/13 143/7 157/11 162/23 170/13 173/15
weapon [1]  172/18
Wednesday [4]  18/20 73/3 73/14 116/4
week [9]  12/5 18/13 18/16 18/16 18/17 86/17 86/20 139/20 165/9
week-long [1]  139/20
weeks [4]  17/6 18/13 40/11 161/3
weight [2]  119/6 119/8
welcome [1]  164/22
well [81]  17/5 20/23 25/6 25/7 25/14 25/22 28/20 29/3 34/20 36/7 37/8 37/9 37/25 38/9 38/13 43/21 44/2 45/23 46/9 46/11 46/13 47/14 48/3 48/16 49/10 50/19 56/8 59/19 59/20 62/24 63/7 66/4 72/5 73/12 76/1 77/1 77/13 77/19 78/3 78/24 79/18 79/19 82/1 85/24 86/14 86/15 89/13 89/19 95/21 97/24 101/7 102/10 105/1 110/5 113/18 114/23 115/20 116/16 119/20 132/13 136/20 140/3 140/4 141/1 141/21 144/8 144/22 145/22 146/11 147/11 149/22 151/11 151/16 157/25 158/16 158/24

170/19 172/9 172/14 173/11 173/14
Welsh [12]  38/23 38/23 59/15 61/6 65/12 66/19 66/23 131/1 143/16 143/18 143/23 158/6
went [11]  39/24 40/11 86/15 101/16 115/6 115/6 116/22 132/15 137/6 137/19 167/6
were [62]  9/7 9/8 9/16 11/1 11/6 17/18 18/12 19/11 19/12 19/19 28/6 34/19 37/7 45/9 47/9 47/10 47/13 59/25 65/5 65/7 68/5 72/9 72/11 73/1 73/3 73/5 73/6 73/8 77/20 77/20 79/1 101/24 102/8 105/5 109/5 109/5 113/1 113/17 123/11 123/11 126/14 133/24 133/25 137/2 137/13 139/19 145/25 147/17 148/15 148/17 150/22 157/16 158/9 160/23 166/7 166/16 166/19 166/21 167/2 167/4 167/5 175/8
weren't [3]  37/13 60/3 60/3
western [1]  126/11
what [244]
what's [24]  17/1 21/19 21/22 23/8 25/21 50/11 52/5 52/11 54/11 54/14 67/13 87/21 87/22 93/9 104/1 122/18 125/4 127/8 132/22 132/22 135/20 162/22 163/7 163/14
whatever [14]  33/15 39/9 44/4 58/25 59/20 76/9 76/13 85/23 107/25 124/22 146/1 152/13 153/17 165/3
whatnot [1]  133/16
whatsoever [6]  74/13 82/20 89/17 110/17 154/20 155/8
when [37]  9/24 10/13 15/18 17/15 23/2 37/12 37/13 37/16 39/1 39/20 67/3 72/7 77/18 84/3 85/15 86/2 86/12 90/7 91/19 99/5 105/6 105/8 133/2 137/3 139/6 146/24 147/17 150/9 150/18 154/8 158/4 160/13 161/22 163/5 166/10 168/22 172/21
whenever [3]  38/25 107/20 167/22
where [30]  10/16 38/23 44/2 59/21 61/9 66/1 66/4 71/24 77/16 77/25 79/5 86/12 86/20 90/5 91/14 97/10 105/11 130/16 132/14 136/19 138/20 138/20 146/3 148/6 148/15 148/17 148/19 155/1 162/24 166/11
where's [1]  27/5
whether [15]  39/9 56/6 56/18 71/23 74/13 81/18 105/2 109/14 124/10 128/10 128/15 141/6 148/20 150/23 169/11
which [13]  7/21 9/6 18/16 26/6 26/17 60/21 106/2 107/4 130/25 139/22 162/21 169/21 175/7
whichever [2]  24/23 171/19
while [6]  5/15 6/6 26/24 35/22 59/17 128/10
white [1]  123/23
who [52]  5/20 6/13 9/7 11/2 11/7

12/11 15/3 20/7 22/18 23/4 32/15 39/19 43/16 47/17 53/8 53/22 55/13 57/17 57/19 59/24 61/18 62/10 66/1 66/3 66/22 72/9 72/12 85/23 85/24 95/21 95/22 97/8 97/21 98/11 98/12 115/21 116/11 116/13 120/16 120/24 123/24 126/10 128/4 128/9 128/10 128/12 129/3 129/5 132/23 157/10 157/10 166/14
who's [5]  55/19 72/1 91/12 123/18 129/5
whoever [1]  136/11
whole [6]  60/5 60/6 94/3 122/21 130/3 136/16
whose [2]  60/7 60/8
why [49]  30/7 31/10 31/20 32/7 33/1 40/23 40/23 41/23 41/23 44/10 48/15 49/17 50/8 51/2 51/9 53/4 53/15 54/21 61/14 61/22 63/5 73/17 77/21 84/22 86/4 87/3 87/25 88/1 88/14 88/24 100/4 120/1 120/2 120/3 120/4 120/12 121/12 125/8 125/11 126/4 126/19 127/17 128/17 133/23 135/6 137/24 140/4 151/11 168/12
wife [2]  6/19 48/23
wild [2]  83/22 84/14
will [64]  6/22 8/18 10/19 11/20 12/5 12/5 17/5 17/16 17/23 18/2 18/8 18/10 22/21 23/6 23/22 30/14 30/16 30/16 63/21 64/22 64/23 64/24 70/5 75/22 83/17 85/14 89/15 92/2 92/13 106/1 108/6 122/7 133/10 138/8 138/9 138/9 138/10 141/6 142/14 142/15 143/21 144/22 144/23 150/15 151/8 152/11 152/18 152/22 155/2 155/3 155/17 156/4 156/6 157/8 164/18 165/5 165/8 166/25 168/10 170/3 170/19 171/2 171/3 175/12
Will's [2]  30/14 45/13
willfully [1]  130/10
WILLIAM [1]  2/5
willingly [1]  147/3
wind [2]  67/16 67/17
wise [2]  17/8 36/7
wisest [2]  138/4 138/7
within [9]  24/22 25/3 26/23 28/21 169/8 169/23 169/23 171/13 171/18
without [4]  22/16 40/7 90/10 122/16
witness [12]  6/3 83/23 85/11 96/5 96/8 97/15 97/16 103/6 128/1 128/2 129/4 175/13
witnesses [6]  127/19 127/20 134/19 163/10 163/14 163/16
won't [6]  109/4 128/25 136/5 136/17 143/10 165/7
wonder [4]  72/13 88/24 121/5 132/14
wonderful [1]  128/21
wondering [2]  17/1 69/24
word [6]  28/1 28/14 39/21 83/10 163/22 163/22
word-for-word [1]  163/22

**W**

wording [1] 127/23
words [5] 27/5 29/13 46/19 149/6 150/25
work [23] 10/23 12/4 13/17 15/1 15/8 19/8 19/9 20/4 20/7 20/9 20/13 21/10 35/1 50/13 96/16 96/23 110/23 136/24 138/8 140/25 141/4 141/5 144/23
worked [3] 136/24 137/3 137/5
working [2] 98/21 139/20
works [7] 63/13 73/24 95/23 136/22 140/18 140/22 154/10
world [3] 55/20 86/19 128/21
would [157] 7/9 9/9 10/1 10/2 10/3 10/4 12/25 15/1 15/6 15/8 15/11 16/4 17/20 19/12 19/20 21/11 22/2 22/4 25/5 25/12 25/14 26/4 26/22 27/7 28/21 29/10 33/13 34/8 34/9 36/12 44/5 44/9 44/9 47/8 47/18 49/2 53/14 55/16 60/1 60/1 65/25 66/3 66/4 76/16 77/6 78/23 79/9 79/10 83/23 84/6 84/17 87/14 88/12 91/4 91/6 91/7 92/20 93/17 95/20 97/14 98/5 98/6 102/20 102/21 103/5 103/7 103/13 106/12 106/13 106/15 108/4 108/25 109/6 109/11 110/12 110/16 110/18 113/8 114/18 115/11 115/21 116/16 116/18 120/2 120/3 123/14 123/25 124/5 125/15 126/1 126/2 126/5 127/1 127/2 127/3 127/25 128/17 128/20 129/4 129/6 129/10 129/13 129/14 129/18 129/19 129/20 130/13 130/14 131/7 131/15 131/22 133/19 133/21 133/24 133/25 135/1 138/1 138/3 138/3 138/7 138/13 138/22 140/24 141/10 146/11 146/25 147/3 147/8 148/2 148/12 148/18 149/12 150/8 151/14 151/18 151/21 151/25 152/14 152/14 152/25 153/8 153/9 153/17 153/19 153/21 154/16 154/17 154/22 155/7 155/20 155/22 156/18 161/10 161/13 161/14 168/15 172/23
wouldn't [19] 12/24 13/3 37/3 38/9 40/9 40/9 45/21 46/7 96/11 118/21 118/23 128/20 135/23 135/25 154/19 154/22 155/10 155/13 168/14
Wow [2] 13/7 137/2
writing [2] 164/19 175/6
wrong [6] 18/18 39/19 65/20 72/15 102/6 156/17
wrongfully [2] 11/6 135/23

**Y**

y'all [55] 13/21 16/25 17/7 17/15 17/16 17/23 17/25 20/9 20/13 22/8 22/12 22/14 23/11 29/12 29/15 39/3 39/3 55/13 59/5 67/3 67/3 67/4 72/3 72/7 72/9 72/11 72/17 72/22 72/22 75/20 77/10 77/16 77/18 85/14 85/15 92/22 94/5 94/9 98/18 112/21 112/22 113/22 114/6 114/16 123/24 130/4 132/14 155/13 159/19 160/16 162/16 165/15 169/11 173/21 174/7
yeah [65] 16/11 19/23 25/9 29/23 31/10 31/13 31/23 34/22 36/11 43/17 44/24 48/15 50/8 50/10 50/16 51/16 52/23 52/24 53/4 53/15 55/3 55/12 55/18 55/18 55/25 59/1 60/4 63/9 65/13 66/11 67/22 70/15 70/24 72/9 75/5 76/11 76/22 79/11 81/15 83/16 85/1 85/19 92/11 96/3 104/6 120/8 125/14 127/12 128/7 128/14 134/21 135/15 135/17 138/8 143/14 146/13 147/21 151/3 151/10 153/12 167/16 172/3 172/20 173/4 174/3
year [5] 60/22 160/22 169/21 171/4 171/6
years [25] 5/19 12/21 12/23 15/20 20/18 24/22 25/1 25/3 25/23 26/22 112/22 135/12 137/1 137/2 139/14 160/24 161/3 161/15 169/8 169/23 169/25 171/10 171/14 171/15 171/18
Yep [1] 68/20
yes [193]
yesterday [1] 124/11
yet [2] 80/13 156/16
you [966]
you'd [3] 7/8 8/21 9/15
you'll [10] 67/17 99/15 111/8 154/11 162/17 162/21 163/6 163/20 163/23 169/14
you're [129] 6/4 7/7 7/23 7/24 10/19 13/17 16/3 16/6 19/20 19/24 21/4 22/6 25/20 26/12 26/24 29/2 31/18 33/9 33/23 34/11 35/2 35/10 35/22 36/14 36/15 37/4 37/15 39/8 42/12 44/5 47/18 48/23 49/21 50/25 51/23 56/16 58/23 59/2 59/11 59/11 60/15 61/25 63/4 63/9 63/10 63/14 64/8 66/12 66/20 67/1 67/18 68/2 68/3 69/8 70/15 71/8 72/8 72/24 72/25 73/2 73/4 74/21 75/21 77/11 77/18 78/22 80/10 80/15 83/10 84/8 84/9 85/2 85/16 87/19 87/22 87/22 88/7 88/7 90/21 91/25 94/5 94/14 94/24 98/10 98/15 99/16 106/23 108/8 109/13 111/16 111/17 114/23 116/7 116/8 122/13 122/17 124/23 125/1 127/14 129/11 136/10 136/15 137/21 142/9 142/10 142/19 142/20 146/14 148/19 148/20 149/18 152/22 154/11 154/12 154/13 155/2 156/10 156/15 156/24 158/18 160/19 161/7 161/17 164/15 164/22 171/9 171/13 171/20 172/7
you've [16] 10/25 11/4 11/5 12/23 35/19 67/12 72/16 84/9 91/1 93/22 94/12 100/21 132/6 133/16 171/10 171/21
you-all [2] 116/21 133/21
young [1] 158/7
younger [1] 105/6
your [187]
yours [3] 30/14 31/21 60/15
yourself [9] 8/24 16/3 72/13 87/25 91/23 92/7 116/13 127/11 152/11
yourselves [1] 6/5

**Z**

zone [1] 159/13

REPORTER'S RECORD

Volume 4 of 6 Volumes

Trial Court Cause No. 12-03324-CRF-272

Court of Appeals No. 10-13-00049-CR

| | | |
|---|---|---|
| THE STATE OF TEXAS | : | IN THE DISTRICT COURT OF |
| VS. | : | BRAZOS COUNTY, TEXAS |
| DAVID DUANE GREER | : | 272nd JUDICIAL DISTRICT |

---

**JURY TRIAL**

---

On the 14th day of November, 2012, the following proceedings came on to be held in the above-titled and numbered cause before the Honorable Travis B. Bryan, III, Judge Presiding, held in Bryan, Brazos County, Texas.

Proceedings reported by computerized stenotype machine.

Denise C. Phillips, Texas CSR #6482
Official Court Reporter - 272nd District Court
300 East 26th Street, Suite 204
Bryan, Texas    77803
979-361-4221

CERTIFIED TRANSCRIPT

DENISE C. PHILLIPS, CSR
OFFICIAL COURT REPORTER
272ND DISTRICT COURT

**A P P E A R A N C E S**

ATTORNEY(S) FOR STATE:

    RYAN CHARLES CALVERT
    SBOT NO. 24036308
    WILLIAM LEE WARD
    SBOT NO. 24077302
    Assistant District Attorneys
    300 East 26th Street, Suite 310
    Bryan, Texas   77803
    Telephone:  979-361-4320

ATTORNEY(S) FOR DEFENDANT:

    EARL R. GRAY
    SBOT: 24007265
    Gray, Granberry & Jones
    103 N. Main Street
    Bryan, Texas   77803-3235
    Telephone:  979-822-4759

## CHRONOLOGICAL INDEX

November 14, 2012                                    Volume 4

                                                        Page

Witness sworn                                            20
Discussion with Defendant                               20
Jury seated                                             22
Jury sworn                                              22
Indictment presented                                    22
Defendant's plea                                        22
Opening Statement by Mr. Calvert                        22
Witness sworn                                            26

STATE'S WITNESSES:

TERRY YOUNG:

    Direct Examination By Mr. Calvert                   26
    Cross-Examination By Mr. Gray                       57
    Redirect Examination By Mr. Calvert                 73
    Recross-Examination By Mr. Gray                     74

Jury retired                                            76
Short recess                                            76
Discussion with the Defendant                           76
Jury seated                                             78
Witness sworn                                            78

RICARDO LEDESMA:

    Direct Examination By Mr. Ward                      78
    Cross-Examination By Mr. Gray                       87
    Redirect Examination By Mr. Ward                    91
    Recross-Examination By Mr. Gray                     93

Witness sworn                                            95

LAKETH McKINNEY:

    Direct Examination By Mr. Calvert                   95
    Cross-Examination By Mr. Gray                       97

State rests                                             100
Jury retired                                            100
Defendant's Motion to Suppress                          100
Court's ruling                                          112

# CHRONOLOGICAL INDEX

November 14, 2012                                    Volume 4

                                                       Page

Jury seated                                             112

DEFENDANT'S WITNESSES:

MONISHIA RENE CAMPBELL:

    Direct Examination By Mr. Gray                     112
    Cross-Examination By Mr. Calvert                   122
    Redirect Examination By Mr. Gray                   137

Defendant rests                                        142

STATE'S REBUTTAL WITNESSES:

RICARDO LEDESMA:

    Direct Examination By Mr. Ward                     144
    Cross-Examination By Mr. Gray                      147
    Redirect Examination By Mr. Ward                   150

Jury retired                                           151
Noon recess                                            153
Jury seated                                            154

TERRY YOUNG:

    Direct Examination By Mr. Calvert                  154
    Cross-Examination By Mr. Gray                      156

Witness sworn                                          157

JASON WARE:

    Direct Examination By Mr. Calvert                  157
    Cross-Examination By Mr. Gray                      159

State closes                                           160
Defendant rests and closes                             160
Jury retired                                           160
Objections to Charge                                   160
Jury seated                                            161
Charge read                                            162

DENISE C. PHILLIPS, CSR
OFFICIAL COURT REPORTER
272ND DISTRICT COURT

**CHRONOLOGICAL INDEX**

November 14, 2012                                          Volume 4

                                                          Page

Closing Argument by Mr. Ward                              162
Closing Argument by Mr. Gray                              168
Closing Argument by Mr. Calvert                           176
Jury retired for deliberations                            183
Jury request to view video                                183
Jury continued deliberations                              183
Jury seated                                               183
Verdict                                                   184
Jury retired and released                                 185
Evening recess                                            185
Reporter's Certificate                                    186

**ALPHABETICAL INDEX**

|                          | Direct | Cross | V.Dire |
|--------------------------|--------|-------|--------|
| Campbell, Monishia Rene   | 112    | 122   |        |
|                          | 137    |       |        |
| Ledesma, Ricardo          | 78     | 87    |        |
|                          | 91     | 93    |        |
| Ledesma, Ricardo          | 144    | 147   |        |
|                          | 150    |       |        |
| McKinney, Laketh          | 95     | 97    |        |
| Young, Terry              | 26     | 57    |        |
|                          | 73     | 74    |        |
| Young, Terry              | 154    | 156   |        |
| Ware, Jason               | 157    | 159   |        |

# EXHIBIT INDEX

November 14, 2012                                    Volume 4

### State's Exhibits

| EXHIBIT | DESCRIPTION | OFFERED | ADMITTED |
|---------|-------------|---------|----------|
| 1 | Arrest Warrant | 16 | 19 |
| 2 | Arrest Warrant | 16 | 19 |
| 3 | Video | 34 | 34 |
| 3 | Video | 143 | 144 |
| 4 | Photograph | 48 | 48 |
| 5 | Photograph | 48 | 48 |
| 6 | Photograph | 48 | 48 |
| 7 | Photograph | 48 | 48 |
| 8 | Photograph | 48 | 48 |
| 9 | Photograph | 48 | 48 |
| 10 | Leather jacket | 41 | 41 |
| 11 | Weapon | 41 | 41 |
| 12 | Bullets from weapon | 54 | 54 |
| 14 | Stipulation | 20 | 22 |
| 14 | Stipulation | 99 | 100 |
| 15 | Inventory form | 90 | 90 |
| 16 | Inventory Search Policy | 107 | |

**P R O C E E D I N G S**

November 14, 2012

THE COURT: Good morning.

MR. WARD: Good morning, Judge.

MR. GRAY: Judge, we think we're going to have a stipulation, but I just need to visit with their print expert for 35 seconds.

THE COURT: Okay.

MR. GRAY: He may be -- we think he's probably in the D.A.'s Office. I can run up there and talk to him.

THE COURT: Go ahead and take care of that.

MR. GRAY: Okay. Thank you.

MR. CALVERT: Can we put something else on the record real quick?

Judge, I forgot to do this yesterday. I had talked to Earl about it beforehand; and I think we talked to you about it, but we forgot to do it on the record.

In 19, I believe, 84, you represented this Defendant on a case. I believe it resulted in a guilty plea. We realized that going through his priors. We brought it to Earl's attention. I don't want to speak for Earl, but I think both parties are more than comfortable in waiving any issues with having you hear this case, Judge. But I wanted the record to reflect that both

parties were aware that in the early '80s you represented this individual, and both parties are comfortable with you going ahead and hearing this case.

THE COURT: Well, for the record, I don't remember the case. And that's no slight to you, Mr. Greer, because I don't remember a lot of things that happened in the '80s.

But is that okay with you?

THE DEFENDANT: Yes.

THE COURT: Okay. Because this came up a couple, three weeks ago. Lisa came in and told me about it, and I said if either side wants me off the case, I'll willingly recuse myself. And I was advised that neither side wanted that to happen.

MR. GRAY: We have no objection, Judge. And I think Judge Langley was the prosecutor at the time.

THE COURT: Yeah.

MR. CALVERT: Yeah.

THE COURT: So, I still hold with that. I mean, if anybody's got a problem with it, then I'll take a look at what I need to do.

MR. GRAY: We don't. We don't have any objections.

THE COURT: Okay.

MR. GRAY: Actually, his print guy is here,

so I'll just take a minute.

THE COURT: All right. That will be fine.

(Brief pause.)

MR. GRAY: Sorry about that, Judge; but that saved us about 30 minutes of testimony.

THE COURT: Thank you very much. So, you got it done, then?

MR. GRAY: Yes, sir.

(Off-the-record discussion.)

MR. CALVERT: Judge, can we take up another brief matter?

THE COURT: Yes, sir.

MR. CALVERT: The witness for this particular thing is not here, but I've talked to Earl, and he's read the report, and I think we can pretty well represent to the Court what it's going to be.

One of the things that the State intends to introduce during the -- our case-in-chief is, as Your Honor is aware, the Defendant is charged with felon in possession of a firearm.

On August 29th, he was over in the jail and had a -- essentially what it was is his bunk area was in disorder. A detention officer instructed him to clean it up. He refused. The detention officer responded that the Defendant needed to follow the rules, and the Defendant's

response to that was, "I don't follow rules. I'm in here for not following the rules; and so, I'm not going to start now."

My intent -- of course, the focus of the testimony that I intend to introduce during our case-in-chief is the Defendant's statement as he's in jail on this charge that "I'm in here for not following the rules."

I did not intend to go into the details of like what the disciplinary infraction was or -- there was some other stuff that happened after that. The confrontation kind of escalated with the jailer at that point. I'm not going into that.

Essentially, what the testimony will amount to with the detention officer is I will ask him, "Did you have occasion to have a conversation with the Defendant about -- or did you instruct him to do something?"

"Yes, I did."

"And did you instruct him to follow the rules?"

"Yes, I did."

"And what was his response when you told him he needed to follow the rules?"

And it will be that one statement, and that's all it's going to be, Judge.

I talked to Earl at that time, and he indicated he might have an objection to that, and we wanted to take it up now so we didn't waste the jury's time later.

THE COURT: All right.

MR. GRAY: And just for the record, what's the guy's last name?

MR. CALVERT: His name is Lakesh, L-A-K-E-S-H, McKinney, M-C-K-I-N-N-E-Y.

THE COURT: So, you're saying that was a custodial statement that was not due to interrogation --

MR. CALVERT: Correct.

THE COURT: -- that was an admission of guilt?

MR. CALVERT: Correct.

THE COURT: All right.

MR. GRAY: Judge, we'd object on a couple of grounds. One would be relevance. How does that in any way help their case as to guilt or innocence? Such a generalized statement as "I don't follow the rules," or "I'm in here because I don't follow the rules," you know, it's too general. It's not specific as to this particular case.

He also -- because he's on parole, he also had a Blue Warrant. So, he could be referencing not

following the rules as to his parole.

The problem with this is that -- and the context is going to place him in a jail cell. And that's unduly prejudicial. If they're going to know that he is in custody, that he's in a jail cell, I mean, we might as well take the clothes that I got him and replace them with the orange jumpsuit and put handcuffs on him in front of the jury.

I just don't think when you use the balancing test, the 403 balancing test, I think the prejudice very much outweighs any probative value of that statement.

And, again, it's so general. We don't know exactly what he was talking about.

THE COURT: Was he in jail for anything else other than this particular cause of action?

MR. CALVERT: He was not, Judge. He had originally been incarcerated from February until, I believe, it was sometime in March or April on the Blue warrant, and then he got out. And then he was out, like a month; and then he went back in when he got indicted on this case.

So, the only thing he was in for at the time of this incident we're talking about was this particular offense. He does have a parole revocation pending; but

the -- as I understand it, the sole basis for that revocation is this case.

MR. GRAY: But, Judge, he was also -- he was also arrested however at that time for -- for an arrest warrant -- an arrest warrant for burglary of a habitation.

MR. CALVERT: He was, Judge. That's correct.

MR. GRAY: And so, that ultimately was dismissed or refused. So, maybe that's not following the rules. And then the D.A.'s Office ultimately dismissed that case.

THE COURT: Now, what -- he was in jail for the burglary of a habitation?

MR. GRAY: Yes, that's why he was arrested.

MR. CALVERT: He got arrested originally -- when this offense occurred, he was placed under arrest on a warrant for burglary. That case was never prosecuted. He got out of jail subsequent to that and then went back in jail at the time he got indicted for this case.

And it was about three months after he was indicted on this case that this conversation we're talking about happened. And by that point, the burglary case was long since declined or whatever they did with it.

THE COURT: What do you say about his probative/prejudice argument?

MR. CALVERT: Judge, I think we limit the prejudicial effect by, of course, limiting the conversation to, you know, not a description of what was going on; and we do not talk about any of the escalation that happened after that.

THE COURT: I understand you limit it, but is the limited portion even --

MR. CALVERT: I don't believe it is, Judge.

THE COURT: -- prohibitive of the rules.

MR. CALVERT: I don't believe it is, Judge. I think in order for it to be admissible -- or excuse me, inadmissible, the probative effect has to substantially outweigh any -- or excuse me -- the prejudicial effect has to substantially outweigh the probative value.

The probative value in this case is you have a defendant who's in jail on this particular offense, which it's my understanding is -- their defense is going to be it was not his gun. He didn't even know it was there. It belonged to someone else. And yet under those circumstances and in the context of that defense, you have him telling somebody "I'm in here for not following the rules."

And I think just doing an analysis of it, Judge, I don't think that it would be appropriate to find that the -- the substantial probative value of that

conversation is substantially outweighed by any probative -- prejudicial effect that it would have.

MR. GRAY: What was the date on the --

MR. CALVERT: August 29th, I believe, late August.

MR. GRAY: Judge, again, I just think -- I think a small amount of probative value is not worth the prejudicial effect. Again, it's going to be a comment on him being incarcerated for this -- for these other offenses.

You know, we just can't -- we just can't know what he was referring to because it's not really taken in context. I mean, if he was talking about some specific acts or specific offense, then maybe so. But it's just too general.

THE COURT: All right. The objection is overruled.

Ready to bring the jury out?

MR. GRAY: We're ready, Judge.

MR. CALVERT: We'll be momentarily, Judge.

THE COURT: All right.

I'll give you a running objection to all the jail incident.

MR. GRAY: Okay. Thank you, Judge.

MR. CALVERT: I believe we're ready.

Actually, before the jury comes in -- before the jury comes in, Judge, I was going to offer for record purposes only, State's Exhibits 1 and 2. These are certified copies of the arrest warrants for the Defendant and Monishia Campbell, that they were stopped and arrested for on the date of the offense. This was the basis for the initial detention and the arrest which ultimately led to the inventory search. It's my understanding Mr. Gray has filed a motion to suppress. And for that purpose, I'm offering State's Exhibits 1 and 2 for record purposes only. These will not go back to the jury.

(State's Exhibits No. 1 and 2, Arrest Warrants, offered for record purposes only.)

MR. GRAY: Judge, we agree it shouldn't go to the jury, but we would also object that it's hearsay. If they want to have an officer come up and testify as to some of this in a separate hearing outside the presence of the jury, that's one thing; but we're not going to agree to --

THE COURT: Now, is hearsay admissible in a motion to suppress?

MR. CALVERT: It is, Judge. And also, these are not the affidavits. These are certified copies of the actual warrants, which it's always been my experience if you're challenging a detention or search based on a

warrant, we need to be ready with a certified copy of the warrant; and that's what those are.

MR. GRAY: And, Judge, we're not attacking those warrants. That's not going to be our basis for the suppression hearing.

THE COURT: Okay.

MR. GRAY: We're not saying those weren't valid warrants. So, we would, therefore, argue as to it's not relevant; and it's -- well, it's not relevant. But if they have -- if they have the testimony, that's fine. But then, this would be cumulative even in front of you. We're not attacking the validity of the arrest warrants. I don't -- I don't know what the purpose in introducing --

(Noise in courtroom.)

THE COURT: We're going to have that stopped. That's too loud.

MR. GRAY: So -- but we agree it shouldn't go in front of the jury.

THE COURT: I don't understand. Why are you offering these warrants?

MR. CALVERT: Judge, Mr. Gray said yesterday that he was moving to suppress the evidence in this case based upon -- what he told the Court yesterday was based upon the detention and the subsequent inventory search, and that was what he advised the Court, and that was what

he, you know, advised us. That he's challenging the initial detention.

The sole basis for the initial detention was those warrants. It wasn't a traffic stop. They didn't see him speeding. They were out there specifically to -- the Sheriff's office was out there specifically to execute those warrants on those two individuals.

THE COURT: Uh-huh.

MR. CALVERT: They located them driving the vehicle, and that was the one and only reason they stopped them.

THE COURT: And you're not offering these in front of the jury, just for purposes --

MR. CALVERT: Just for record purposes, just for purposes of the motion to suppress.

THE COURT: Yeah:

MR. GRAY: Judge, you know, we -- I am going to -- I'm not going to allow hearsay to come in. I am going to object to hearsay. If an officer is talking about what other officers said in regards to the stop. But I'm not attacking the validity of those arrest warrants. That's not where I'm going at all.

THE COURT: You're attacking the existence of the -- or the --

MR. GRAY: The arrest warrants? No, not at

all. Just the basis for the stop. I mean, just because an arrest warrant existed, how did that officer find out that information? Was he told it on the street? Did he get it from dispatch? Was it --

THE COURT: All right.

MR. GRAY: -- quadruple hearsay. Because those kind of things I will object to.

THE COURT: I'm going to overrule your objection.

Anything else?

MR. CALVERT: No, sir.

THE COURT: Those are admitted for purposes of the motion to suppress only outside the presence of the jury.

(State's Exhibits No. 1 and 2 admitted.)

MR. CALVERT: That's correct, Judge.

THE COURT: Now, do we have a stipulation to something?

MR. CALVERT: We do, Judge.

THE COURT: Now, as I understand, the stipulation in the midst of a trial has got to be in writing.

MR. CALVERT: It is in writing, and it's signed. And I was going to -- it's marked as State's Exhibit No. 14, and I plan on offering it into evidence

for all purposes later in the trial.

(State's Exhibit No. 14, Stipulation, offered.)

THE COURT: And you have no objection to the stipulation?

MR. GRAY: No, Judge, but I'd like to ask him some questions first.

THE COURT: All right. Raise your right hand, Mr. Greer.

(Witness sworn.)

MR. GRAY: Mr. Greer, I explained to you basically the pros and cons of this stipulation as to the prior conviction as well as the -- this offense occurring prior to the expiration of five years from the anniversary -- the fifth anniversary after you were through in regards to supervision; is that right?

THE DEFENDANT: Yes.

MR. GRAY: Okay. One way they can prove it -- they can prove it a couple of ways. They can bring in your parole officer to testify that you're the same person that's on parole. That's one way to do it.

Quite often, however, what they'll do, a simpler and quicker way is through the Judgment and Sentence process, with a penitentiary packet. I had indicated to you that I did have some issues with the

fingerprints, and I had actually called one of my fingerprint experts in Houston and visited with him yesterday.

THE DEFENDANT: Uh-huh.

MR. GRAY: He indicated the number of points that he would like to see, which would be eight. I have visited with their expert, and he saw between 15 and 20 points on the print.

With that information, I believe it would be better strategy to go ahead to stipulate to this, such that the jury does not find out what the actual sentence was, which was 40 years.

THE DEFENDANT: Uh-huh.

MR. GRAY: This also removes any possibility that they would see any type of enhancement paragraphs as far as those other two convictions that got you to that point. Does that make sense?

THE DEFENDANT: Yes, sir.

MR. GRAY: And so, I just want to make sure, you know, this is something we're giving up; but I want to make sure this is what you want to do as far as your stipulation.

THE DEFENDANT: Yeah.

MR. GRAY: Okay. That's all I have, Judge.

THE COURT: All right. The stipulation is

admitted.

(State's Exhibit No. 14 admitted.)

You ready to bring the jury out?

MR. CALVERT:  Yes, sir.

THE COURT:  Bring them out.

(Jury seated.)

THE COURT:  Have a seat.

All right.  Ladies and gentlemen, raise your right hand and let me swear you in.

(Jury sworn.)

THE COURT:  All right.

We'll now have the reading of the indictment.

(Indictment presented.)

THE COURT:  Mr. Greer, how do you plead to that indictment?

THE DEFENDANT:  Not guilty, sir.

THE COURT:  All right.  A not guilty plea will be noted.

We'll now have opening statements of counsel.  Go ahead, sir.

MR. CALVERT:  Thank you, Judge.

**OPENING STATEMENT BY MR. CALVERT**

MR. CALVERT:  February 16th of this year, there were arrest warrants that had been issued for this

individual, Dave Greer, and his girlfriend, Monishia Campbell. The -- a number of deputies from the Brazos County Sheriff's Office were out that day looking for Mr. Greer and Ms. Campbell to serve those warrants, to execute those warrants and place them under arrest.

Mr. Greer and Ms. Campbell were located together. They were in Mr. Greer's pickup. He owns it. The deputies see them driving the pickup and initiated a traffic stop. It's not a traffic stop like somebody was speeding. They knew that these individuals had arrest warrants, and that's what they were stopping them for was to execute these warrants.

They saw who was in the vehicle. They recognized them, and they knew who they were looking for. And so, they get behind them. They turn the emergency lights on. There's a number of Sheriff's vehicles there. Some of them are marked, and some of them not marked.

The Defendant is driving. Monishia Campbell is in the passenger seat. They don't stop immediately when the lights go on. They keep driving a little bit; and then, eventually, an unmarked Sheriff's Office car or van actually, pulls kind of in front of them, boxes them in.

And you're going to see video of it. Officers get out. They're executing the warrants. They

get out with weapons drawn, and they remove the Defendant and Ms. Campbell from the truck.

They're going to jail on those warrants. The truck is there sitting in the road and pursuant to Sheriff's Office policy, like virtually every other law enforcement agency, if a vehicle is going to be towed -- you can't just leave a vehicle sitting out in public. They have a policy that that vehicle has to have what's called an inventory done where officers go in, and they literally make an inventory of everything in the vehicle that's going to be towed and taken to the tow yard or the wrecking yard.

That protects the officers if something turns up missing. It also protects the property of the people who own it, the people whose property is being towed away.

So, the officers go in; and they're doing an inventory on the truck. And there's a lot of stuff in the truck, and you'll see photographs of it and hear testimony about it. And as they're going through, one of the things that they find -- you'll hear that Monishia Campbell had some stuff in the truck. She had a purse and, like, a duffle bag with some of her clothing in it. And then there was some equipment, like, a winch and a jack and various other things.

But then one of the things they find kind of in the backseat of this truck is a large black men's leather jacket. And you'll see pictures of it and the jacket itself. And when they go to pick that jacket up to do the inventory search, they realize it feels kind of heavy, and they start going through the pockets of it, and they find a pistol. They find a gun in the -- I believe in the right-hand front pocket on the jacket.

It was his jacket, and it was his vehicle. And that's what bring us here today. You're going to hear evidence -- and I believe the Defense is going to stipulate that he is a convicted felon. That he was convicted of possession of methamphetamine out of Grimes County, and that we are still within -- the offense date of that is February 16th -- was still within that time frame that we talked about yesterday during jury selection, prior to five years going by after he'd been discharged from supervision.

So, again, what you're going to hear from the evidence in this case is that the Defendant, who is a convicted felon, had in his possession, in his vehicle, in his jacket, a .22 caliber pistol.

Now, I anticipate you're going to hear from Monishia Campbell in this trial. And to be honest with you, I'm not 100 percent sure exactly what she's going to

tell you. But I will tell you that I anticipate whatever she says today is probably going to be good for him because Monishia Campbell does not want him in trouble.

Monishia Campbell is not a convicted felon. And so, I believe you're probably going to hear Monishia Campbell come in and try to say it was her gun. But the evidence is going to show you otherwise.

And at the end of this case, I'm going to ask you to go back there and find the Defendant guilty.

THE COURT: Mr. Gray, do you care to make an opening statement?

MR. GRAY: Reserve.

THE COURT: All right.

Call your first.

MR. CALVERT: Terry Young.

(Witness sworn.)

THE COURT: Have a seat.

Go right ahead.

MR. CALVERT: Thank you, Judge.

**TERRY YOUNG,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

**BY MR. CALVERT:**

Q. Good afternoon -- or morning, sir. Would you introduce yourself to the members of the jury, please?

A.    My name is Terry Young.

Q.    And, Terry, what do you do for a living?

A.    I'm an investigator with the Brazos County Sheriff's Office.

Q.    How long have you been a cop?

A.    Since 1978.

Q.    And how long have you been specifically with Brazos County?

A.    I've been with Brazos County since February of 2005.

Q.    Where were you before?

A.    I was with a Narcotics task force in Central Texas.

Q.    Within Brazos County Sheriff's Office, what division or what unit are you assigned to?

A.    I'm with the Criminal Investigation Division.

Q.    All right.  Describe for the jury what that means and what that is.

A.    Criminal Investigation Division is like what you see on TV.  It's the investigators, the detectives of the department, do all the follow-up on different offenses that occur and try to do the more in-depth investigation on cases.

Q.    So, you're a detective or investigator for lack of a better word, right?

A.    Yes, sir.

Q.    Okay.    How long have you been doing that type of work as opposed to street-level patrol work?

A.    I guess an easy 15 years.

Q.    Okay.    And you said you've been a police officer total for how many years?

A.    Since 1978.

Q.    Okay.    So one or two years?

A.    One or two.

Q.    Obviously, a lot of training in that time, right?

A.    Yes, sir.

Q.    A lot of experience in that time?

A.    Yes, sir.

Q.    On a variety of different areas?

A.    Yes, sir.

Q.    Including firearms?    Do you have training in firearms?

A.    Yes, sir.

Q.    I want to take you back to February 16th of this year.    Were you on duty that day?

A.    Yes, sir, I was.

Q.    And did you have occasion to participate in and help execute some arrest warrants on some individuals named David Greer and Monishia Campbell?

A.    Yes, sir, I did.

Q. And the person that you know as David Greer, do you see that individual in the courtroom here today?

A. Yes, sir, I do.

Q. Would you please point to him and describe an article of clothing that he's wearing?

A. He's sitting over here at the Defense table wearing a tan shirt, and he has a ponytail.

MR. CALVERT: Judge, I ask that the record reflect he has identified the Defendant?

THE COURT: So noted.

Q. (By Mr. Calvert) Now, you're a -- you said you're a detective. You're an investigator, right?

A. Correct.

Q. So, can we agree that you don't normally go out and, like, pull people over for speeding or things like that. You're not driving around in a marked patrol car.

A. That is correct, sir.

Q. Okay. On this particular occasion, who all was with you when you went out to serve these warrants on David Greer and Ms. Campbell?

A. There were several members of the Criminal Investigation Division. I could probably list them all if you want, but there was probably at least six of us.

Q. Okay. How many vehicles were involved?

A. Probably at least that many. Everybody was

probably one to a vehicle, to the best of my memory. And then, we also had a couple of marked patrol units with uniformed officers.

Q. And now, at some point, were y'all kind of concentrating your -- your efforts to locate the Defendant and Ms. Campbell in one particular area of town?

A. Yes, sir, we were.

Q. And where was that?

A. That was around the 31st Street, I believe it is, area.

Q. In what city?

A. In Bryan.

Q. And silly question, but I have to ask it. Is that area of town that you're talking about, is that located in Brazos County?

A. Yes, sir, it is.

Q. Is it also located in the State of Texas?

A. Yes, it is.

Q. While y'all were out there kind of searching that area for the Defendant and Ms. Campbell, did y'all see them and kind of make contact with them?

A. Yes, sir, we did.

Q. And were they in a vehicle?

A. Yes, sir, they were.

Q. Whose vehicle?

A. They were in a black Ranger pickup that comes back registered to Greer.

Q. Okay. And did y'all recognize -- it was daytime?

A. Yes, sir, it was.

Q. Okay. Did y'all recognize -- just from being able to see who was in the truck?

A. Yes, sir, we did.

Q. And who was that?

A. It was Mr. Greer and Ms. Campbell.

Q. And are they in a relationship; or at the time, were they in a relationship?

A. That's what I understood, sir.

Q. Okay. Was there anybody else in the truck?

A. No, sir.

Q. What, if anything, did y'all do once the Defendant and Ms. Campbell had been identified as the people y'all were looking for?

A. Once we had identified them that they were -- we saw that they were in the vehicle and that the vehicle was driving down the roadway, we had patrol units pull them over for the purpose of executing the arrest warrants.

Q. Okay. And you say "patrol units." Does that mean like the marked police cars that we see driving around?

A. Yes, sir, it does.

Q. Where are the unmarked cars while that stop is being made?

A. We're at various locations behind, beside and just kind of around the area of where the -- everything is.

Q. So, all those vehicles that you described earlier, the marked cars and the unmarked cars, are they all kind of right there together?

A. Yes, sir.

Q. Okay. What happened when the -- I guess, the lead police car got behind the Defendant's truck and turned the lights on? Did the Defendant immediately stop?

A. No, sir, it looked like it took approximately a block for him to go ahead and pull over and stop.

Q. Okay. Were there places he could have pulled over prior to the time that he did?

A. Yes, sir, there was.

Q. Ultimately, did any of y'all's vehicles, the Sheriff's Office vehicles, do anything to kind of facilitate getting that truck stopped?

A. Yes, sir.

Q. What happened?

A. One of the other vehicles, a black Tahoe, ended up pulling in front of the vehicle and pulling over and stopping, and the driver of that vehicle actually ended up

at gunpoint helping stop the vehicle.

Q. Okay. So, using the cars, did y'all kind of box the truck in?

A. Yes, sir.

Q. Okay. And you said something about gunpoint. Y'all were executing a warrant. Did officers get out with weapons drawn pointed at the Defendant's truck?

A. Some did, yes, sir.

Q. Okay. And at that point in time, were both the Defendant and Ms. Campbell arrested and taken into custody on those warrants?

A. Yes, sir, they were.

Q. Now, I'm going to --

MR. CALVERT: May I approach the witness, Judge?

THE COURT: Yes, sir.

Q. (By Mr. Calvert) I'm going to show you what's been marked for identification purposes as State's Exhibit No. 3. Have you reviewed that video of the stop?

A. Yes, sir, I have.

Q. And is that a fair and accurate recording of what happened in terms of what y'all could see in the movement of the vehicles?

A. Yes, sir.

Q. Okay.

MR. CALVERT: Judge, we would offer State's Exhibit 3. This has previously been provided to Defense counsel.

(State's Exhibit No. 3, Video, offered.)

MR. GRAY: No objection.

THE COURT: That will be admitted.

(State's Exhibit No. 3 admitted.)

MR. CALVERT: Permission to publish State's Exhibit 3, Judge?

MR. GRAY: No objection as previously agreed.

MR. CALVERT: Judge, the parties have a stipulation regarding the publishing of this exhibit. And pursuant to that stipulation -- we can put that on the record later.

THE COURT: Yeah.

MR. GRAY: We have an agreement.

THE COURT: And I assume you have no further objection other than your motion; is that right?

MR. GRAY: No, Judge, that's correct.

THE COURT: All right.

Q. (By Mr. Calvert) Mr. Young, after -- while I'm kind of getting this going, once the -- once the arrests were made -- you said earlier, there was nobody else in the Defendant's truck, right?

A. That's correct, sir.

Q. How does that work? Describe for me and describe for the jury how that works when y'all make an arrest in a vehicle, and the vehicle is just sitting in the middle of the road, and everybody in the vehicle is now going to jail. What do y'all do? What's y'all's procedure?

A. Well, to preserve the person's property in their vehicle, make sure that nothing happens to it, that it's not stolen, damaged, whatever, a wrecker is called to pick up the vehicle and remove it to a secure location.

Q. And do y'all have -- does the Sheriff's Office have a policy with what, if anything, you should do as arresting officers when you're going to have somebody's vehicle and all the stuff in the vehicle towed away?

A. Yes, sir, we do.

Q. And describe for me what that is. What's your policy?

A. We will inventory the vehicle to have an accounting of all the property in it.

Q. What does that mean, "inventory"? Is that the same thing as, like -- I mean, you've been a cop for a long time. You've searched a lot of vehicles, right?

A. Yes, sir.

Q. Is that what we're talking about? Like, where you're looking for evidence?

A. No, sir.

Q. What are you doing?

A. Inventory, we're just going through and making a list of all the items that are in the vehicle so that we can show that this is what was present in it when it was picked up by the wrecker.

Q. The -- we're having some computer problems over here, so we're going to go get a replacement and then watch the video. Okay?

A. Yes, sir.

Q. After the arrests were made, did -- did you and other officers engage in an inventory search like you're talking about to document all the property that's in there to protect you and protect Mr. Greer?

A. Yes, sir, we did inventory the vehicle.

Q. And describe for me how that works. Procedurally, how do you go about doing an inventory search.

A. We have a specific form that the Department has that as we go through and inventory the vehicle, items that are found in it are listed on it. We also have a description of the vehicle to include the tag number and the color, who was operating the vehicle at the time.

Q. Now, would it be correct in saying because this is an inventory and not an evidence search, y'all's

policies limit you to, like, the passenger compartment, the trunk, the glove box, under the hood. You can't starting ripping seats out or anything like that?

A. That is correct.

Q. Okay. Did you participate in the inventory search on the Defendant's truck?

A. Yes, I participated in the inventory.

Q. Describe for me and describe for the jury the condition of that truck and what it looked like, you know, when you started getting in there looking through it?

A. It's a small truck, kind of an extended-cab Ford Ranger pickup; so, it's not a large passenger compartment. And there was a lot of items that were stacked up in there.

Q. Let's start, first of all, with the bed of the truck. What kind of stuff was in the bed of truck?

A. I can remember a power winch, seems like pieces of metal, various, I think, tools, such as that.

Q. Okay. In the cab of the truck -- is it -- is that like a full-sized backseat or what's the --

A. No, it's a small compartment. I can't remember if it had jump seats or a small fold-down bench, but it's just a small extended area behind the seats in the vehicle.

Q. What kind of items did you find in the cab of the

truck?  What kind of condition was the cab of the truck?

A.  All kinds of clothing, just various items, a cane, a bag that had a lot more clothing in it.

Q.  Now, at one point -- well, let me back up a step. You're doing the inventory yourself, right?

A.  I'm one of the ones doing the inventory, yes.

Q.  You described that you found a bag with some clothing in it, right?

A.  Yes, sir.

Q.  The clothing that was in that bag, did it appear to belong to Mr. Greer or Ms. Campbell?

A.  It appeared to belong to Ms. Campbell.

Q.  Why do you say that?

A.  Most of it was women's clothing, and it was very small.

Q.  Okay.  And Ms. Campbell is a little girl, right?

A.  Yes, she's very petite.

Q.  With regard to the -- well, did Ms. Campbell, for example, did she have a purse in there?

A.  Yes.

Q.  So, it would be fair to say that some of the stuff -- some of the items that were in the cab of the truck clearly were associated with Ms. Campbell, right?

A.  Yes, sir.

Q.  And others were clearly not.  Would that be fair?

A. Yes, sir.

Q. At one point, did you recover a -- a large black leather jacket?

A. Yes, sir, I did.

Q. And describe for me where that was in the truck.

A. It was in the back compartment area behind the seats, just laying with the rest of the items that were back there.

Q. Okay. Was it buried under a bunch of stuff or mixed in with Ms. Campbell's stuff or in her bag of clothing or anything like that?

A. It was laying out there with the rest of the items that were there.

Q. Okay.

A. It was not in the bag of clothing.

Q. While you were doing the inventory search, did you -- did you pick up that jacket?

A. Yes, sir, I did.

Q. Did you notice anything about it when you picked it up?

A. It seemed a little bit heavier on one side than the other.

Q. Okay. What did you do after you noticed that it was heavier?

A. I checked the pockets of the jacket.

Q.    When you checked the pockets, what did you find?

A.    I found a small .22 revolver in the pocket.

MR. CALVERT:  May I approach the witness, Judge?

THE COURT:  You may.

Q. (By Mr. Calvert)  I'm going to show you what's been marked for identification purposes as State's Exhibit 10 and ask you do you recognize that?

A.    Yes, sir, I do.

Q.    And is this the jacket that you pulled out of the Defendant's truck?

A.    Yes, sir, it is.

Q.    And is it in the same or substantially the same condition today as it was when you pulled it out of the truck that day?

A.    Yes, sir, it is.

Q.    I'm now going to show you what's been marked for identification purposes as State's Exhibit 11 and ask you if you recognize that?

A.    Yes, sir, I do.

Q.    Is that the pistol that you pulled out of State's Exhibit No. 10?

A.    Yes, sir, it is.

Q.    And is that in the same or substantially the same condition as it was when you found it?

A. Yes, sir.

MR. CALVERT: Judge, we would offer State's Exhibits 10 and 11. Defense counsel has previously had an opportunity to look at each of these.

(State's Exhibit Nos. 10-11, Jacket and .22 Pistol, offered.)

MR. GRAY: No additional objections other than what we talked about earlier, Judge.

THE COURT: Thank you. That will be admitted.

(State's Exhibit Nos. 10-11 admitted.)

MR. CALVERT: Your Honor, may the witness step down?

THE COURT: Yes, he may.

Q. (By Mr. Calvert) Can you come down here, Terry?

A. (Witness complied.)

Q. Now, this jacket and this pistol -- I'm going to take this -- I've had Ernie check it and make sure it's not loaded.

It's not loaded, right?

A. That's correct, sir.

Q. Where was this in this jacket?

A. It was in this pocket.

Q. Okay. Now, I notice on State's 10, the jacket, there's a big rip at the bottom of this pocket. Is

that -- if you put something in there, is it going to eventually come out of the bottom?

A. No, sir.

Q. Okay. What's poking out there?

A. This is the pocket itself on the inside of the jacket.

Q. Okay. So, it's just the exterior that's ripped and not the interior?

A. Yes, sir.

Q. All right. Thank you, sir. Have a seat.

A. (Witness complied.)

Q. A silly question, Terry, but State's Exhibit No. 11, is that a firearm?

A. Yes, sir, it is.

MR. CALVERT: Judge, I think we're going to go ahead and publish State's No. 3.

THE COURT: Has that been admitted?

MR. CALVERT: It has, Judge.

THE COURT: All right.

(State's Exhibit No. 3, video, published.)

Q. (By Mr. Calvert) Terry, I know it's kind of hard to see in the courtroom, but right there (indicating), is that the Defendant?

A. Yes, sir, it is.

Q. What is he wearing?

A. Wearing a tank top and camouflage pants.

Q. Okay. That's February, right?

A. Yes, sir.

Q. I notice a lot of you guys were wearing jackets that day; is that right?

A. Yes, sir.

Q. Was the Defendant wearing any kind of jacket at all when y'all took him into custody?

A. No, sir.

Q. Okay. Where are you? Are you in the video right now?

A. I'm on the passenger side?

Q. You're right over in here (indicating)?

A. Yes, sir.

Q. Okay. What's going on right here?

A. At this point, they're getting everybody secured.

Q. Was Ms. Campbell -- was she in the front in the passenger seat?

A. Yes.

Q. Okay. The -- would it be fair to say so we don't waste a lot of the jury's time -- the next, you know, 15, 20 minutes of this video is just kind of this, right?

A. Yes, sir.

Q. It's just y'all walking around --

A. Yes, sir.

Q.    -- doing stuff with the truck, right?

A.    Yes, sir.

Q.    All right.  Now, right here (indicating), who's that that we're looking at the back of?

A.    That's Ms. Campbell.

Q.    Okay.  Now, I notice on here she's wearing a coat, right?

A.    Yes, sir.

Q.    Who's that talking with Ms. Campbell?

A.    That's Investigator Ledesma.

Q.    Rick Ledesma?

A.    Yes, sir.

Q.    Is he another Sheriff's deputy?

A.    Yes, sir.

Q.    Now, Terry, where are you right now?  Is this the point in time where y'all are inventorying the truck and seeing what's all in there?

A.    Yes, sir, it is.  And I am on -- still on the passenger's side right there (indicting).

Q.    Is that you standing basically right inside the open passenger's door?

A.    No, I'm standing more toward the back here.  I just set a case of some kind up on the side of the truck and opened it to look inside it.

Q.    Okay.

A. I'm got a dark jacket. That's me walking --

Q. That's you walking right there (indicating)?

A. Yes, sir.

Q. What are you holding up right there? I know it's hard to see on here, but --

A. I believe I'm holding up the black jacket.

Q. Okay.

A. That's what it looks like. Yes, sir.

Q. Would that be the point in time when you pulled that out of the truck and started going through the pockets?

A. Yes, sir.

Q. Now, right there, was that your hand that we saw reach up on top of the truck?

A. Yes, sir, it was.

Q. What was that?

A. That was the pistol I found. I was setting it on the roof of the truck for safekeeping.

Q. Okay. So, that was -- was that literally the moment when you found that gun and pulled it out of that jacket that you were holding up?

A. Yes, sir.

Q. Okay. Now --

MR. CALVERT: May I approach the witness, Judge?

THE COURT:  Yes, sir.

Q.  (By Mr. Calvert)  I'm going to show you -- well, let me show you State's Exhibit No. 11 again.  Now, this is that gun we just saw you take out of the jacket and put on the truck, right?

A.  Yes, sir, it is.

Q.  Now, I notice that it's got some -- appears to be powder kind of all over it.  Can you tell me what that is?

A.  That is part of the fingerprinting process.  It's some residue left from it.

Q.  Did you and other officers try to lift fingerprints off that weapon to see if there were any there?

A.  Yes, sir, we did.

Q.  Let me back up for a step.  You watch TV, right?

A.  Yes.

Q.  And "CSI" is exactly how it is in real life, right?

A.  No, sir.

Q.  No.  With regards to fingerprints, is it -- is it easy, or is it even common to actually find fingerprints on something like a gun?

A.  It's common to find maybe little partial pieces.

Q.  Let me clarify what I'm talking about.  That was a bad question.

Is it common to find actually usable identifiable prints on a gun?

A. No, sir, it's not that common.

Q. Okay. Even if people are touching it?

A. Correct.

Q. Did you attempt to find usable fingerprints on State's Exhibit No. 11?

A. Yes, sir.

Q. And were there any usable prints at all of anybody on there?

A. No, sir, there were no prints on there that could be identified.

Q. Okay. Now, when y'all were going through -- when y'all were going through the truck, you told me earlier that Ms. Campbell had a bag of clothing, like a duffle bag full of her clothing in there, right?

A. Correct.

Q. And when you're inventorying something like clothing, do you also go through the pockets and see what's all in that clothing?

A. Yes, sir.

Q. Did you do that in this case?

A. Yes, sir.

Q. When you were going through Ms. Campbell's clothing --

MR. CALVERT: May I approach the witness, Judge?

THE COURT: Yes, sir.

Q. (By Mr. Calvert) I'm first going to show you what has been marked for identification purposes as State's Exhibits 4 through 9 and ask if you recognize those?

A. Yes, sir. No. 4 is the jacket. No. 5 is a close-up of the pocket, the torn pocket. No. 6 is a photograph of the pistol. No. 7 is a photograph of the bed of the pickup and items in it.

Q. And then we'll start with these. Are all of these -- well, actually are all of these, 5 through 9 -- 4 through 9 -- excuse me -- are all of them fair and accurate depictions of what y'all were photographing out there as you were doing the inventory?

A. Yes, sir, they are.

MR. CALVERT: We would offer State's Exhibits 4 through 9.

(State's Exhibit Nos. 4-9, Photographs, offered.)

MR. GRAY: No objection.

THE COURT: No further objection. Those will be admitted.

(State's Exhibit Nos. 4-9 admitted.)

Q. (By Mr. Calvert) Now, these photographs, some of

these are just kind of like the stuff you talked about in the bed of truck and that gun, State's Exhibit No. 11, the jury has already seen, right?

A.    Correct.

Q.    The -- I want to talk about State's Exhibits 8 and 9.  First of all, State's Exhibit No. 9, is that a pair of blue jeans?

A.    Yes, sir, it is.

Q.    And did that come out of the duffle bag that contained Monishia Campbell's stuff?

A.    Yes, sir, it did.

Q.    And State's Exhibit No. 8, is that a close-up of that same pair of jeans?

A.    Yes, sir, it is.

Q.    Now, in the pocket of this pair of jeans, did y'all find a bullet?

A.    Yes, sir, we did.

Q.    And is the bullet that you found in State's Exhibit -- in those jeans, is that shown in State's Exhibit No. 8?

A.    Yes, sir, it is.

Q.    And what type of bullet was that?

A.    It's a .22 long rifle.

Q.    Okay.  Now, let me back up for a minute because you said that -- you said in almost 30 years of law

enforcement, you have some familiarity with firearms; is that fair?

A. Yes.

Q. Now, you said that bullet that was in those jeans is a .22, right?

A. Correct.

Q. And this is a .22, right?

A. Yes, sir.

Q. So, does that bullet go with this gun?

A. No, sir, it does not.

Q. Why not if they're both .22s? Explain that to the jury.

A. The bullet that we found is a .22 long rifle, which is a different round. The pistol is chambered only for .22 short. The .22 short round is substantially shorter. The .22 long rifle, if it's put in the cylinder of this, it's too long and sticks out a little bit from the end of the cylinder.

THE COURT: Do you mind checking that in the presence of the jury to make sure it's clear?

MR. CALVERT: We've done it twice. But we can do it again.

THE COURT: I like to do it in front of the jury.

(Witness checking weapon.)

THE WITNESS: Yes, sir.

THE COURT: Okay.

Q. (By Mr. Calvert) With regards to the difference between .22 long and .22 short, you said if you put a .22 long rifle bullet like that one into that gun, it would -- what would happen?

A. The end of it sticks out of the cylinder, and it won't rotate.

Q. Okay. I now want to show you three bullets that I've marked for identification purposes as State's Exhibit 13, and I'll put these in the Baggie later. But do you recognize what these are?

A. Yes, sir.

Q. And to be fair, these are not the same -- they're not the actual bullet -- the single bullet that came out of that pair of jeans, right?

A. No, sir, they are not.

Q. Did we ask you to bring these up here yesterday -- or we asked the Sheriff's Office to bring them up?

A. Yes, sir, you did.

Q. Are these the same type of bullet as the one that was in Monishia Campbell's jeans?

A. Yes, sir, they are.

Q. And yesterday, did we actually -- did you witness

us actually try to put those in this weapon?

A.   Yes, sir, I did.

Q.   And will they fit in the chamber?

A.   Yes, they will fit in the chamber.

Q.   Could you fire this weapon with those rounds?

A.   No, sir.

Q.   Why not?

A.   The cylinder won't rotate into the proper position for it to fire because the end of the bullet sticks out and catches.

Q.   Okay.  So, these are too long?

A.   Yes, sir.

Q.   Now, with regards to the bullet in Monishia Campbell's jeans, did y'all actually seize that and take it into evidence?

A.   No, sir.

Q.   Why not?

A.   It wasn't illegal for Monishia Campbell to possess that.

Q.   Had the bullet that was in Ms. Campbell's jeans or any bullets that you found anywhere else in the -- in the truck, had they been the same type of ammunition that goes with State's Exhibit No. 11, would you have kept those?

A.   Yes, sir.

Q. Was the fact that it was a different type of ammunition a reason why you didn't keep it?

A. Yes, sir.

Q. And is it -- was it illegal at all for Monishia Campbell to have that?

A. No, sir.

Q. Okay.

A. It was not.

Q. The -- I'm now going to show you State's Exhibit No. 12, this is an envelope, but you know what's contained in that envelope?

A. Yes, sir, I do.

Q. And are those the .22 short bullets that were actually loaded in State's Exhibit No. 11 when you found it?

A. Yes, sir, they are.

Q. Okay. So, it was loaded and ready to shoot?

A. Yes, sir.

Q. Okay. Are these in the same or substantially the same condition as they were when you pulled them out of that gun other than the fact that they're now in the envelope?

A. Yes, sir.

MR. CALVERT: We offer State's Exhibit 12, Judge.

(State's Exhibit No. 12, Bullets from Weapon, offered.)

MR. GRAY: Would you open them? I'd just like to look at the bullets themselves.

Q. (By Mr. Calvert) I've just handed you the contents of State's Exhibit No. 12. Are those the .22 short rounds that you found in the gun?

A. Yes, sir, they are.

MR. CALVERT: Any objection?

MR. GRAY: No objection.

THE COURT: Those will be admitted.

(State's Exhibit No. 12 admitted.)

THE COURT: State's 12 is admitted.

Q. (By Mr. Calvert) Terry, briefly --

MR. CALVERT: May the witness step down for a second?

THE COURT: Yes, sir.

Q. (By Mr. Calvert) Terry, if you could come down here.

A. (Witness complied.)

Q. For folks that may not be very familiar with firearms, could you just describe for me in kind of laymen's terms how a revolver works? And you can use State's Exhibit 11 if you need to to kind of demonstrate.

A. Yes, sir. Once again -- again, I'll go through

and show that it's empty. The cylinder is empty. Bullets will go into the cylinder in these different holes that you see, and they sit there.

Whenever you pull the trigger on this -- and it's empty obviously -- the hammer comes back. The cylinder rotates into position to put a bullet underneath it, and the hammer goes so far back, and then it will snap forward and the firing pin -- this little thing on the trigger (indicating) -- will impact the round causing it to go off. The bullet will then exit the barrel in whatever direction you have it pointed.

And every time you cock it or pull the trigger back, it will rotate up a new round into the chamber.

Q. Now, you said earlier that these .22 long rifle bullets are too long, and they don't -- they'll stick out the front end, right?

A. Yes, they stick out the front of the cylinder just a little bit. As you can see, there's some fairly close tolerance between the frame and the cylinder. And whenever it tries to rotate the nose of the bullet will impact the frame causing it to not rotate.

Q. And if you could come up here. This right here (indicating), is this one of the bullets that's in State's Exhibit No. 12 that was actually loaded in that weapon?

A.    Yes, sir.

Q.    And -- now, I'm going to show you one of the long rifle bullets.  Is that -- I mean, is there a fairly substantial size difference, length difference between those two?

A.    Yes, sir, there is.

Q.    And is that a problem with this ammunition going in that weapon?

A.    Yes, sir, it is.

Q.    Okay.  Thank you, sir.

You can have a seat.

A.    (Witness complied.)

Q.    Now, you said that -- you told the jury earlier that the truck that the Defendant was driving was his, right?

A.    Yes, sir.

Q.    Now, we can agree, right, that the -- the jacket, State's Exhibit No. 10, was not on the Defendant at any point while y'all were out there, right?

A.    That's correct.

Q.    What was there about that jacket and the circumstances -- I don't want you to go into what anybody said -- but about the circumstances of that jacket that led you to conclude that that jacket belonged to the Defendant as opposed to Ms. Campbell?

A. The fact that the jacket is an extra large size, and that would be about the right size to fit the Defendant, being quite a bit bigger than what Ms. Campbell would wear.

Q. Okay. As I think you showed us in the video earlier, Ms. Campbell was already wearing a jacket, right?

A. Yes, sir, she was.

MR. CALVERT: I'll pass the witness at this point, Judge.

THE COURT: All right. Cross-examination?

MR. GRAY: Thank you, Judge.

**CROSS-EXAMINATION**

BY MR. GRAY:

Q. You actually assisted Deputy Ficke in the inventory; is that right?

A. Yes, sir, that is correct.

Q. Okay. And did he actually prepare a report separately from yours? Do you know?

A. Yes, sir, he did. He did an inventory sheet.

Q. Okay. And let's talk about that inventory sheet a little bit. You did not actually fill out that inventory sheet; is that right? That was Ficke; is that correct?

A. Yes, sir.

Q. Okay. Now, I understand that the Prosecution had

asked you as far as the vehicle -- who were you riding with actually whenever the vehicle was pulled over?

A.    I was by myself.

Q.    You were by yourself.  Okay.

And so, the vehicle goes a short distance, would you agree with me, before it comes to a stop?

A.    Yes, sir.

Q.    Okay.  Now, were you actually watching, I guess, your camera and your speedometer and, I guess, things of that nature to see how fast he was traveling?

A.    I didn't have a camera.  I wasn't in a marked unit.  I was a little ways behind, so I don't know what speed it was.

Q.    Okay.  You in no way felt he was speeding in any way at that point?

A.    From what I've seen on the video, no, sir.

Q.    How far back were you, I guess?

A.    I may have been about a block or so behind everybody else.

Q.    Okay.  But you could, I guess, see from your vantage point -- Help him see

A.    Yes, sir.

Q.    -- the white vehicle pulling in front of him and the stop and everything?

A.    Yes, sir.

Q. Okay. And you didn't witness any type of a traffic violation or anything of that nature; is that right?

A. That is correct.

Q. Now you-all did not have a search warrant when you actually inventoried that victim; is that right?

A. That is correct, sir.

Q. And, David -- I guess when you began your search, he was in custody and in handcuffs; is that correct?

A. Yes, sir.

Q. Okay. And so, it wouldn't really be possible for him to get at any evidence or tamper with something or go for a knife or anything like that; is that right?

A. That is correct, sir.

Q. And that's primarily the reason that you want to secure -- secure the scene or secure whatever the area the car is to make sure that the occupants are detained. They're handcuffed. They're away from any potential problem for law enforcement or the evidence; is that right?

A. Yes, sir.

Q. Okay. Now, I know you indicated that it was an inventory-type search, and there is -- the Sheriff's Office does have a policy that you-all are to follow in regards to that; is that correct?

A.    Yes, sir.

Q.    Okay.  And you're familiar with that policy?

A.    Yes, sir.

Q.    Prior to the actual searching of the interior, I know that the Prosecutor had alluded or you had mentioned that the truck was sort of in disarray; is that fair to say?

A.    Yes, sir.

Q.    Okay.  So, there was a lot of stuff in the backseat as well as the front or just primarily the back?

A.    Primarily the back, but there was stuff everywhere.

Q.    Stuff everywhere.

And did you have an opportunity to take any pictures; or to your knowledge, did anyone take any pictures, I guess, of the interior of that cab and where the different items were located prior to starting the search?

A.    No, sir.

Q.    Okay.  So, can you remember precisely as to that black jacket, its location?

A.    Precisely in the back compartment where it was? No, sir, I cannot.

Q.    Okay.  Is it possible that some other clothes were on top or other items on top of the jacket as well?

A. It's possible, sir.

Q. Now, I know you had indicated that you had -- you had lifted the jacket up, and it felt heavy, and that's -- I guess, that's what clued you into the gun was in there, and that's when you located the gun; is that right?

A. Correct.

Q. Okay. Was there any other identifying information, driver's license, anything like that in the coat?

A. No, sir, there was not.

Q. Okay. Now, we talked a little bit about the report; but as the Prosecutor had indicated, the purpose of the inventory report is to list all items in the vehicle because if it gets towed away, you don't want to have a liability-type issue; is that correct?

A. Yes, sir.

Q. Okay. And that's why you go through, and you list everything that's -- that you find in the truck; is that correct?

A. Yes, sir.

Q. Okay. Now, I know you indicated that Officer Ficke or Deputy Ficke, I guess, had -- had actually filled out the report; is that correct?

A. Yes, sir.

Q. Okay. And then, it's to be signed by the officer

doing the inventory and then the wrecker driver and then also the owner of the driver of the vehicle when feasible; is that right?

A. Yes, sir, I believe that's correct.

Q. Okay. And have you reviewed that report at all, that inventory report?

A. Not recently, sir.

Q. Okay.

MR. GRAY: May I approach, Judge?

THE COURT: Yes, sir.

Q. (By Mr. Gray) Just in all fairness, I don't want to -- if you haven't looked at it, I want to give you an opportunity to. Kind of focusing in on the bottom there as far as the signatures. It does have Deputy Ficke's --

A. Yes, sir.

Q. -- signature. Okay. And then, we also have the wrecker driver; is that right?

A. Yes, sir, we do.

Q. Okay. And then -- but we don't have any type of signature from Mr. Greer; is that correct?

A. That is correct, sir.

Q. Okay. And you didn't sign the form because you didn't actually fill out the form; is that right?

A. That is correct.

Q. Now, the reason that you have the vehicle towed

and -- and, therefore, you have to inventory it to make sure, you know, nothing comes up missing, is because there's no one there to drive the vehicle away; is that right?

A. That is correct, sir.

Q. So, there's certain situations, though -- I know all law enforcement makes a lot of alcohol-related arrests in this town; is that fair to say?

A. Yes, sir.

Q. Okay. That there are times where we may have an intoxicated driver, someone you believe to be intoxicated who may have a passenger who's not; and you'll let that person drive the vehicle; is that correct?

A. Yes, sir, I have seen that.

Q. Okay. That wasn't the case here because Monishia was also placed under arrest; is that right?

A. That's correct, sir.

Q. But there has been opportunities where you've allowed folks to call a loved one or primarily if it's a college student, their parents, something of that nature to allow them to come get the gun -- the car; is that correct?

A. I've seen it happen, yes, sir.

Q. But that didn't happen in this case, though, did it?

A.    No, sir, it did not.

Q.    And I know the Prosecutor has already talked about this .22 shell that was found in the -- I guess it was a pair of jeans; is that right?

A.    Yes, sir.

Q.    And those were size 5?

A.    Yes, sir.

Q.    Now, are there -- I know there's talk -- he talked about and you talked about the .22 short and the .22 long rifle.  Is there also, though, a .22 long --

A.    Yes, sir.

Q.    -- shell?

      Okay.  And where does that fall, I guess --

A.    It's between the .22 short and the .22 long rifle --

Q.    All right.

A.    -- size-wise.

Q.    And so, you indicated -- and did you -- you did actually try to place the .22 long rifle shell in the -- in the chamber of this particular gun; is that right?

A.    We did with counsel, yes.

Q.    Okay.  And then -- and we won't do it in front of the jury, so we're not loading the pistol in the courtroom, but fair to say it wouldn't rotate?

A.    Correct.

Q. Okay. Now, you would agree with me it just protruded by a hair. It wasn't by much; is that right?

A. That is correct.

Q. Okay. Would you, therefore, agree with me that a .22 long would likely fit in there, in that particular chamber as it would be a little bit shorter?

A. Yes, you're right. It probably would.

Q. Okay. And as to that .22 caliber shell that was found in those size 5 jeans, that was not collected; is that correct?

A. That is correct.

Q. Okay. We have a photo of it, but we don't have the shell; is that fair to say?

A. That's correct, sir.

Q. Okay. And there's not really -- I tried to blow it up. There's really no markings or indications that I could see as far as a brand or anything of that nature. Is it at least possible that that could have been a .22 long, that shell?

A. I don't believe it was, sir.

Q. But is it possible?

A. I don't think so, sir.

Q. Why is that?

A. I've had a lot of experience with .22s, and my personal belief is that it's a long rifle.

Q. You'd agree with me, though, that if we actually had it here, that would be the better option, correct?

A. Yes, sir.

Q. That way we could try that particular shell ourselves?

A. Yes, sir.

Q. Now, I know that you and the Prosecutor have talked and had taken a look at the pistol and tried the shells and things like that yesterday, but that pistol had never been -- any kind of ballistics tests or anything like that; is that correct?

A. No, sir.

Q. I know you indicated it's a firearm, but you don't, in fact, know whether or not that pistol can fire a shell?

A. No, sir, I have not tested that personally.

Q. Now -- and I know you've worked different crime scenes in your experience; is that correct?

A. Yes, sir.

Q. Anywhere from DWIs all the way up to murder; is that fair to say?

A. Yes, sir.

Q. Okay. Now -- and I understand that every -- every offense is different. Every crime scene is different. But it is possible to swab certain types of

evidence and then have that sent off to the DPS lab to test for DNA; is that right?

A. Yes, sir.

Q. And I guess the way that it works is you have a piece of evidence, you know, potentially a knife or even a gun in this particular case; and you could swab -- potentially swab the different areas that you believe would have likely have come in contact with a potential suspect's hands; is that correct?

A. Yes, sir.

Q. And would you agree with me some of those key areas would be the trigger, the hammer and the handle?

A. Yes, sir.

Q. Okay. And so, it is at least possible to take a swab of those areas and then send that off to the DPS lab and then get a known sample from various suspects; is that right?

A. Yes, sir.

Q. For example, it would have been possible to at least get a sample from David Greer as well as Monishia; is that correct?

A. Yes, sir.

Q. And for that matter any other potential suspects that you may have had; is that right?

A. Yes, sir.

Q. Okay. And then the DNA in your experience, whenever it is sent off to the lab, the crime lab, they compare those to see if there's a match; is that correct?

A. Yes, that is correct.

Q. They can't always get a complete match. Sometimes they even get a partial match; is that right?

A. Yes, sir, I believe that's correct.

Q. Okay. And so -- and the reason we do that is it can -- it cannot only link a particular suspect to a crime, but it can also potentially exclude those folks from the crime as well; is that right?

A. Yes, sir.

Q. That way you know that you're focusing in on the right person?

A. Yes, sir.

Q. Okay. Now, no DNA swabs or any kind of DNA testing was done in the case; is that right?

A. That is correct.

Q. Now, there were also -- and -- and the Prosecutor had taken those shorts, the shells that were actually you believe were found in the gun and showed those to you; is that correct?

A. Yes, sir.

Q. Now, those shells, those were not swabbed in any way and sent off for any kind of DNA testing either; is

that correct?

A. That is correct.

Q. The Prosecutor had indicated that because there was dust on the pistol, that it had been tested for prints; is that right?

A. Yes, sir.

Q. And whether or not -- in your experience sometimes we find prints, sometimes we don't. In this particular case, there were no latent print that was found and matched to David Greer; is that right?

A. That is correct.

Q. Now, that initial printing and testing was not done the month of this offense in February; is that correct?

A. That is correct.

Q. When was that actually done, the testing?

A. It was done last week.

Q. Okay. And was that at the request of the District Attorney's Office?

A. Yes, sir.

Q. Okay. Now, you would agree with me that when evidence is seized and it's bagged, we bag it so that potentially we don't have any kind of spoliation of evidence as well as we don't want an officer's prints on the gun, so to speak. We want it preserved; is that

right?

A. Yes, sir.

Q. And you'd agree with me that when a particular piece of evidence is -- is taken and bagged, that the more it's handled the more unlikely it is to find a full latent print because it can get smudged, and it just -- it hurts the quality of the evidence; is that fair to say?

A. Yes, sir.

Q. Now, the gun itself was -- was eventually dusted and printed last week. Were the shells contained therein -- were they ever dusted or printed?

A. No, sir.

Q. Okay. And it is possible to get potentially not a full print but at least a partial print from bullets; is that correct?

A. Yes, sir.

Q. Okay. And bullets are a little bit different than the gun itself because if -- if the bullets were contained in the gun for a period of time, they're almost self-preserving in that they can't be tampered with because they're in the chamber; is that right?

A. Yes, sir.

Q. Okay. Now, I know that you had indicated that due to the size of that -- that coat being a large, a large men's coat, that you did not believe that that

belonged to Monishia; is that right?

A. That's correct, sir.

Q. Okay. But when she was arrested and you can sort of see it, I guess whenever she comes up to the patrol car -- it may have been when Ledesma was going to talk to her. I don't know. But you saw in the video where she -- and that was Monishia that was right in front of the patrol car in the camera?

A. Yes, sir.

Q. Okay. And she was actually wearing an over-sized coat then as well, wasn't she?

A. Yes, sir.

Q. Okay. And that coat looked like it was too big for her as well; is that fair to say?

A. Yes, sir.

Q. Okay. And the Prosecutor's already mentioned it, but just so the records clear, David Greer did not actually have that coat on his person at the time; is that right?

A. That's correct.

Q. And nor did he have that gun on his person at the time?

A. That's correct.

Q. So, there's a certain amount of speculation as to whose jacket and whose gun that was because you can't tell

us for sure that that was David Greer's jacket nor can you tell us for sure that that was his gun; is that fair to say?

A. That's correct. That's fair.

Q. Okay. Do you know, was the -- was the gun -- was it ever traced or tracked to see who the original owner was, do you know?

A. I do know that an ATF gun trace has been done on it. There's been no result come back.

Q. Okay. When was that performed or sent off, I guess?

A. I believe it was last week, week before.

Q. Okay. Is that -- and that's Alcohol, Tobacco and Firearms, right, ATF?

A. Yes, sir.

Q. And they pretty much -- they keep all those types of records and those types of things for guns and firearms that are sold; is that right?

A. Yes.

Q. Because, really, the Federal deal you have to fill out that one-page Federal form; and that all gets sent off to the ATF; is that right?

A. Yes, sir.

Q. Now, the vehicle that Mr. Greer was driving, that's actually registered to a Kenneth Greer; is that

right?

A. Yes, sir.

Q. And so, that would be -- that would be David's dad, not actually David; is that correct?

A. Yes, sir.

Q. There was never a time where you had witnessed David Greer saying "that's my gun" or anything like that, right?

A. Where he said it was his gun?

Q. Yeah.

A. No, sir.

MR. GRAY: I'll pass the witness, Judge.

### REDIRECT EXAMINATION

**BY MR. CALVERT:**

Q. Monishia Campbell, that jacket that he was just asking you about, she was wearing that when y'all first stopped them, right?

A. Yes, sir.

Q. And like you said earlier, the Defendant was wearing a tank top and was not wearing any jacket, right?

A. Yes, sir.

Q. The -- oh, Counsel asked you a minute ago about Deputy Ledesma going back and talking to Monishia Campbell at some point, correct?

A. Yes, sir.

Q. Now, I don't want you to go into what Ledesma told you and I don't want you to go into what Campbell said, but after you found the gun in State's Exhibit No. 10, did Deputy Ledesma go back and have a conversation with Monishia Campbell about it?

A. Yes, sir.

MR. CALVERT: I'll pass the witness.

## RECROSS-EXAMINATION

**BY MR. GRAY:**

Q. Now, you had indicated that you were tracking a little bit behind the rest of the units; is that fair to say?

A. Yes, sir.

Q. And who was the actual arresting officer? Was that Officer -- or Deputy Ficke?

A. Yes, sir.

Q. Okay. And so, you don't have any direct knowledge as to why he had actually performed that traffic stop; is that right?

A. Why Deputy Ficke performed the traffic stop?

Q. Do you have any personal direct knowledge, not what other officers may have told you or you may have heard on dispatch or anything like that, but do you have any personal knowledge as to why Deputy Ficke had pulled over Mr. Greer?

A. Yes, I do.

Q. And what is that?

A. This was -- we were stopping the vehicle to execute the arrest warrants.

Q. Okay. And as to that arrest warrant, did you just hear that over Dispatch, or how did that -- how did information come to you?

A. Investigator Ledesma had received information that Ms. Campbell and Mr. Greer were together in the vehicle and that they had warrants, and he checked records and confirmed that there were arrest warrants outstanding for them.

Q. Okay. That was Investigator Ledesma?

A. Yes, sir.

Q. Okay. The actual vehicle itself, it had dark tinted windows; is that right?

A. I don't remember, sir.

Q. Okay. So, is it fair to say that -- do you know if all the windows were open or closed, or do you know?

A. No, sir, I really don't remember.

Q. If -- if the windows were, in fact, up; and they were dark tinted windows, would you agree that it may be hard to see the occupants -- not that occupants were in the vehicle but able to identify the occupants at least from the side or the back?

A. Yes, I do.

Q. And what is that?

A. This was -- we were stopping the vehicle to execute the arrest warrants.

Q. Okay. And as to that arrest warrant, did you just hear that over Dispatch, or how did that -- how did information come to you?

A. Investigator Ledesma had received information that Ms. Campbell and Mr. Greer were together in the vehicle and that they had warrants, and he checked records and confirmed that there were arrest warrants outstanding for them.

Q. Okay. That was Investigator Ledesma?

A. Yes, sir.

Q. Okay. The actual vehicle itself, it had dark tinted windows; is that right?

A. I don't remember, sir.

Q. Okay. So, is it fair to say that -- do you know if all the windows were open or closed, or do you know?

A. No, sir, I really don't remember.

Q. If -- if the windows were, in fact, up; and they were dark tinted windows, would you agree that it may be hard to see the occupants -- not that occupants were in the vehicle but able to identify the occupants at least from the side or the back?

A.    Yes, sir.

Q.    Obviously, the front -- you don't generally have the front windows tinted; and obviously, you could see the persons in the interior; is that right?

A.    Yes, sir.

MR. GRAY:  I'll pass the witness.

MR. CALVERT:  I'll pass the witness, Judge. We'd like him to be subject to recall, though.

THE COURT:  All right.  You can step down. You're subject to recall.

Let's take a ten-minute break, ladies and gentlemen.

(Jury retired.)

(Short recess.)

THE COURT:  He's under oath.  I swore him in earlier.  Go ahead.

MR. GRAY:  Mr. Greer, we've talked about, you know, your Constitutional right to testify; is that correct?

THE DEFENDANT:  Yes, sir.

MR. GRAY:  And you have a Fifth Amendment right to testify, but you also have a Fifth Amendment right if you don't want to testify, you don't have to; is that right?

THE DEFENDANT:  Yes, sir.

MR. GRAY: We talked about the good things and the bad things, the pros and the cons, to testifying. If you testify, they get to hear your side of the story; is that correct?

THE DEFENDANT: Yes, sir.

MR. GRAY: But I've also advised you that the State can impeach you with any types of felonies, convictions or any kind of crimes of moral turpitude, that could include misdemeanors; is that right?

THE DEFENDANT: Yes, sir.

MR. GRAY: And is it your decision and your decision only to not testify in this case in the guilt/innocence?

THE DEFENDANT: Yeah, you advised me of that. So, yes, sir.

MR. GRAY: I advised you, but it's your decision.

THE DEFENDANT: Yes, sir.

MR. GRAY: So, you do not want to testify; is that correct?

THE DEFENDANT: Yes, sir.

MR. GRAY: Okay.

THE COURT: Let me ask you: Do you intend to ask for sequestration should the situation present itself?

MR. GRAY: I don't think so, Judge.

THE COURT: All right. We ready to bring the jury out?

MR. CALVERT: Yes, sir.

THE COURT: Bring them out.

(Jury seated.)

THE COURT: Everyone be seated. Call your next.

MR. WARD: State calls Rick Ledesma, Judge.

(Witness sworn.)

THE COURT: Have a seat. Go right ahead.

**RICARDO LEDESMA,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

BY MR. WARD:

Q. Would you introduce yourself to the jury, sir?

A. Yes, sir. My name is Ricardo Ledesma. It's R-I-C-A-R-D-O L-E-D-E-S-M-A.

Q. Okay. And how are you employed?

A. I'm an investigator with the Brazos County Sheriff's Office.

Q. How long have you been with the Sheriff's Office?

A. About 21, 21 and a half years.

Q. Are you a certified peace officer?

A. Yes, sir.

Q. How long have you been a certified peace officer?

A. Approximately 34 years.

Q. Okay.

A. It'll be 34 years in January.

Q. And what's your current assignment with the Sheriff's Office?

A. Criminal Investigator.

Q. Okay. How long have you been there?

A. Four years.

Q. What did you do before that?

A. I worked with the Brazos Valley Narcotics Task Force.

Q. And how long did you do that?

A. About 17 and a half years.

Q. Are you partners with Terry Young?

A. Yes, sir.

Q. Work pretty closely with him?

A. Yes, sir.

Q. See his ugly face everyday?

A. Yes, sir.

Q. Okay. I'll direct your attention to February 16th, 2012. Were you on duty that day?

A. Yes, sir, I was.

Q. Okay. What were you doing at approximately 2:00 p.m. in the afternoon?

A.    At the time, we were driving back to the office, myself and Investigator Ware.

Q.    Okay.  Why were you doing that?

A.    We had gone out and checked some locations on some other -- follow-up on some other investigations.

Q.    Okay.  Something happened that kept you from making it back to the office?

A.    Yes, sir.

Q.    What was that?

A.    I received a phone call from an informant.

Q.    Okay.  And without going into what was said, what did y'all ultimately decide to do?

A.    We started looking for a vehicle that we were told that someone was in it.

            MR. GRAY:  Objection as to hearsay, Judge.

Q.  (By Mr. Ward)  Okay.  Who were you looking for at the end of all this?

A.    David Greer and Monishia Campbell.

Q.    Okay.  And why were you looking for them?

A.    Because they had outstanding --

Q.    Let me stop you real quick.

A.    Yes, sir.

Q.    Without going into the specifics of it, very bare bones, did they have outstanding warrants?

A.    Yes, sir.

Q. How did you know they had outstanding warrants?

A. We checked through Dispatch.

Q. Okay. Did you personally check through Dispatch?

A. Yes, sir.

Q. Did you personally see the -- the -- so, you received first-hand information that they had open warrants?

A. Yes, sir.

Q. Okay. Were you able to finally locate David Greer?

A. Yes, sir.

Q. All right. Was he with anybody else?

A. Yes, sir.

Q. And who was that?

A. Monishia Campbell.

Q. Okay. Now, were you in a vehicle with someone else? Were you in a single vehicle by yourself when he was located?

A. No, sir, myself and Investigator Ware.

Q. So, it was you and Ware in the vehicle? I'm sorry.

A. Yes, sir.

Q. Now, were you involved with the actual stop of Dave Greer and Monishia Campbell?

A. Yes, sir.

Q. Okay. Where were you during the stop?

A. I was in the vehicle at the very back. I came in after -- right after the stop.

Q. Okay. So, you didn't really see anything that happened during the initial moments of the stop?

A. Well, I was right behind him before the vehicle actually stopped.

Q. Okay.

A. I was a pretty good distance behind.

Q. Okay. Now, February 16th, do you remember what the weather was like that day?

A. I think it was cloudy, kind of cool.

Q. Do you remember what you were wearing?

A. Yes, sir.

Q. What were you wearing?

A. I was wearing a black -- it's what we call our hidden agenda jackets. They're just like a -- like a windbreaker-type jacket that has the "Agenda" markings on them, where you can flip them out and, you know, show them the department.

Q. Okay. Do you remember how Ms. Campbell was dressed that day?

A. Yes, sir.

Q. Can you describe that for me?

A. She had on -- I believe it was a red shirt or

blouse and had on a camouflage jacket.

Q. Okay. Now, during the stop, did you deal with either Dave Greer or Monishia Campbell?

A. Yes, sir.

Q. And who did you deal mostly with?

A. Monishia Campbell.

Q. Okay. Now, were the Defendant and Ms. Campbell ultimately arrested and taken into custody for the outstanding warrants?

A. Yes, sir.

Q. Okay. And did you speak to Ms. Campbell during the arrest?

A. Yes, sir, I did.

Q. Okay. Did you advise Ms. Campbell of her Miranda rights and rights under the Texas Constitution?

A. Yes, sir, I did.

Q. Okay. Now, without going into what was said, did Ms. Campbell continue to want to speak with you after you had advised her of her rights?

A. Yes, sir.

Q. Okay. Have you dealt with Ms. Campbell before this particular arrest?

A. Yes, sir, I have.

Q. Okay. And without getting into the specifics, why have you dealt with her?

A.    Investigated another case.

Q.    And is she a victim or a defendant in that case?

A.    She's a victim.

Q.    Okay.  Now, was -- to the best of your knowledge, when you were speaking with her, were you speaking with her right at the Ford Ranger; or did you take her somewhere else to talk to her?

A.    We talked to her briefly there by the Ford Ranger and then walked her back to Sergeant Ballew's vehicle, patrol vehicle.

Q.    Okay.  Do you remember if anyone was called to come pick up the vehicle that they were arrested in?

A.    Yes, sir.

Q.    Okay.  Is that just like a towing company?

A.    Yes, sir, it's a towing --

Q.    Okay.  Now, when you need to tow a vehicle, what happens once it's decided -- let me rephrase that better.

      What happens to the vehicle once it's decided that you need to tow it somewhere, and you're arresting everybody in the vehicle?

A.    Do an inventory.

Q.    Okay.  Did you conduct the inventory search?

A.    No, sir.

Q.    What were you doing while that inventory search was going on?

A.   I talked to Monishia Campbell.

Q.   Now, at some point, while you were talking with Monishia Campbell, were you called over to look at something that had been found during the search?

A.   I don't think they called me.  I think I actually walked up.

Q.   Okay.  And what did you see when you walked up to the Ranger?

A.   They were talking about the -- found a gun in the jacket there.

Q.   Okay.  And once you saw the gun and the jacket, what did you decide to do?

A.   To ask whose jacket it was.

Q.   All right.  And now, without going into what was said again, did you take the jacket and gun back to Ms. Campbell and continue investigating about who owned it?

A.   I took the jacket up.  I didn't take the gun.

Q.   Okay.  What was her physical demeanor when you were investigating about who owned the jacket?

A.   Talking about when I asked her about the jacket?

Q.   Uh-huh.

A.   She was almost like complete denial.

     MR. GRAY:  Objection, Judge, as to hearsay.

     THE COURT:  Sustain the objection.

Ladies and gentlemen, disregard the last statement of the witness.

Go right ahead.

Q    (By Mr. Ward) What I meant to say was can you describe her -- her demeanor?

A.    Okay.  Okay.  Yes, sir.

Q.    How she --

A.    It was more of a surprised look and just kind of shook her head as no.

Q.    Okay.

A.    That's the best way I can describe it.

Q.    All right.  Now, from the answers that -- that she gave you, again, without going into what was said, did you go talk to Mr. Greer?

A.    Yes, sir, I did.

Q.    Okay.  And did you ask Mr. Greer if he owned the jacket?

A.    Yes, sir.

Q.    What was his response?

A.    He said it was not his.

Q.    Okay.  And from all the answers that -- that you had received from talking to Ms. Campbell and Mr. Greer, who is it ultimately decided that was the owner in possession of that jacket and gun?

MR. GRAY:  Objection, Judge, that calls for

speculation. That's also the purview of the jury. They make that decision.

THE COURT: Well --

MR. GRAY: As to who's in possession.

THE COURT: Backdoor hearsay, so I'll sustain it.

Q (By Mr. Ward) Let me -- who was ultimately arrested for possession of the gun that day?

A. David Greer.

*Arrested 5-12-12 ?*

MR. WARD: Pass the witness, Judge.

**CROSS-EXAMINATION**

**BY MR. GRAY:**

Q. Now, you indicated that you received a call describing, I guess, the vehicle as well as Mr. Greer; is that correct?

A. Yes, sir.

Q. Okay. And was that an anonymous call?

A. No, sir, it was from an informant.

Q. An informant?

A. Yes, sir.

Q. Okay. And can you give us a name of the informant?

A. No, sir.

Q. Does Dispatch have any type of a link or listing as to that person so that if we needed to we could

interview that person?

A. No, sir.

Q. And that's where you received your information that Mr. Greer might be in this particular vehicle; is that right?

A. Yes, sir.

Q. Okay. Prior to receiving that call from the confidential informant, you had no direct personal knowledge that Mr. Greer was, in fact, in that particular vehicle; is that correct?

A. Yes, sir.

Q. Okay.

A. Not prior to the call, no.

Q. Not prior to the call. Okay. The -- you didn't actually participate in the inventory search, but you're aware of how those are to be handled; is that correct?

A. Yes, sir.

Q. Okay. And there's a -- there's a Sheriff's Office policy that everybody's supposed to follow; is that fair to say?

A. Yes, sir.

Q. And basically, you're to inventory all the contents of the vehicles; is that correct?

A. Yes, sir.

Q. Okay.

MR. GRAY: May I approach the witness, Judge?

THE COURT: Yes, sir.

Q. (By Mr. Gray) I'm going to hand you this document, and can you tell me what that is?

A. Yes, sir, this is an inventory -- vehicle inventory sheet.

Q. Okay. Does it appear to reference this particular case?

A. Well, I didn't check everything in the car myself, so I can't tell you everything in detail, but some things on here that do.

Q. Okay. So, that looks like the right report?

A. Yes, sir.

Q. Okay. And does it also have Deputy Ficke's signature on it as well?

A. Yes, sir.

Q. I don't anticipate that he's going to be called, but he was the one that actually prepared this sheet; is that correct?

A. Yes, sir. To my knowledge, yes, sir.

Q. To your knowledge?

A. Yes, sir.

MR. CALVERT: Judge, at this point, we'll offer State's Exhibit 15, which is the inventory form; and

we have no objections to -- well, we'll offer that at this point.

(State's Exhibit No. 15, Inventory form, offered.)

MR. GRAY: We have no objection, Judge.

THE COURT: No further objection?

MR. GRAY: No further objection. Judge, that was actually at our urgence, and that should prevent the deputy from having to testify.

THE COURT: All right. 15 is admitted.

(State's Exhibit No. 15 admitted.)

Q. (By Mr. Gray) We talked a little bit about Monishia's demeanor when you had visited with her; is that right? The Prosecutor asked you some questions?

A. Yes, sir.

Q. Okay. Now, not going into what she said or anything, but let's just talk a little bit on her demeanor.

You had the jacket. You walked from, I guess, the vehicle that Mr. Greer was -- was driving, and you had the jacket, but you didn't have the gun; is that right?

A. No, sir.

Q. Okay. And you walked up to Monishia -- was she in the patrol car?

A.    Yes, sir, she was in the back of the patrol car.

Q.    Okay.    And, again, not going into what she said, but when you presented that jacket or showed her that jacket, what was her immediate response as far as her demeanor?

A.    As far as her demeanor was is that she had that type of demeanor when you ask somebody a question -- or even children, you ask them a question, and they immediately deny it.

Q.    Okay.

A.    That look of denial.

Q.    Okay.    And you don't -- you don't recall her gasping or sighing, like, ahhh?

A.    She might have.    She might have made some type of verbal -- I don't know.    I don't know if sigh is what you call it.

Q.    Okay.    As to the jacket -- she was also wearing a fairly large oversized jacket, too; is that right?

A.    Yes, sir.

        MR. GRAY:    Pass the witness.

                    **REDIRECT EXAMINATION**

BY MR. WARD:

Q.    Detective, the confidential informant, have you worked with that confidential informant before?

A.    Yes, sir, I have.

Q. Are they reliable, truthful?

A. Yes, sir.

Q. Okay. Did that informant provide you anything other than a possible location for David Greer?

A. No, sir.

Q. And with Monishia Campbell, you had mentioned before that you had worked with her previously as a victim?

A. Yes, sir.

Q. So, did she know you?

A. Yes, sir.

Q. Had she worked with you before?

A. Yes, sir.

Q. Was there any type of relationship between you and her that you had -- you had cultivated since she was a victim in one of your cases?

A. Yes, sir, just a friendly -- a friendly relationship, just talked to each other.

MR. WARD: Pass the witness.

MR. GRAY: Just a couple of quick questions, Judge. May I approach?

THE COURT: Yes, sir.

MR. GRAY: Where are the pictures?

MR. CALVERT: They should be up there with the court reporter.

RECROSS-EXAMINATION

BY MR. GRAY:

Q.   Were you aware that there was a .22 shell found in a pair of jeans size 5?

A.   Yes, sir.

Q.   Okay.  When were you told that?  Was it during the investigation, or was it after the fact?

A.   It was during the investigation.

Q.   During the investigation?

A.   Yes, sir.

Q.   Would that have been prior to you interviewing -- not going into what she said, but would that have been prior to you interviewing Monishia?

A.   No, sir.

Q.   Okay.  It was after that?

A.   After.

Q.   Because, in fact, if you knew that there was a .22 shell found in jeans that could only fit a female, that's something that you would at least ask her about in her interview -- not going into what was said?

A.   Correct.

Q.   And I'll show you what's been marked as State's Exhibit 8.  Is that you're understanding of the jeans and the shell that they found?

A.   Yes, sir.

Q. That's obviously not a .22 short?

A. No, sir.

Q. Can you distinguish whether that's a .22 long or a .22 long rifle just by looking at the picture?

A. That's a .22 long rifle.

Q. How do you know that?

A. I'm familiar with a .22. I have enough .22s that I know the difference between a short and a long.

Q. Okay. And so, what's the long -- how much shorter would the long be from the long rifle?

A. I don't know the exact measure, but there's a difference where if you have a gun that's a short, you can't fire a long rifle through a short barrel or -- or on pistols.

Q. Because the cylinder won't --

A. Correct. Most weapons will specify whether they can be fired with a long rifle or not.

Q. Okay. You would agree with me, though, even though some pistols are designed for shorts, folks will or can fire longs in that particular pistol. It may not be as safe; but as long as it fits in the chamber, it discharges because your circumference is the same; is that right?

A. Yes, sir; but it's the length that's the difference, which if you do it with the pistol. Maybe

with a rifle, it's not that big of a difference; but in a pistol, it will not allow -- especially revolvers, it will not allow the cylinder to function properly, which you may not get the proper rotation to line up with the barrel itself. You can cause a misfire for malfunction on the firearm.

Q. Okay. But you-all did not do any kind of test or actual ballistics or -- or anything of that nature, that you're aware of, on this particular gun or the shells; is that right?

A. No, we didn't do any ballistics, no, sir.

MR. GRAY: Pass the witness.

MR. WARD: Nothing further, Judge.

THE COURT: You can step down.

Call your next.

MR. CALVERT: Laketh McKinney. And, Denise, I had a typo. It's not Lakesh. It's Laketh. It should be T-H and not S-H.

(Witness sworn.)

THE COURT: Have a seat.

Go right ahead.

**LAKETH MCKINNEY,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

BY MR. CALVERT:

Q. Good morning, sir. Would you introduce yourself to the folks in the jury, please?

A. I'm Officer McKinney of the Brazos County Sheriff's Department.

Q. And your first name, pronounce it for me?

A. Laketh.

Q. And it's L-A-K-E-T-H?

A. That's right.

Q. All right. What do you do for a living?

A. I'm an officer with the Brazos County Sheriff's Department.

Q. You're a detention officer?

A. Yes.

Q. You work in the jail?

A. Yes, sir.

Q. Okay. I want to direct your attention to the guy sitting two seats to my left, Mr. David Greer. Do you recognize him and know him?

A. Yes, I do.

Q. And I want to go back to August 29th of this year, a couple of months ago. Were you, I guess, supervising the Defendant in a part of the jail?

A. Yes, I was.

Q. And did you have an occasion to have a discussion with him and basically tell him that he needed to follow

the rules?

A. Yes, sir, I did.

Q. What was the Defendant's response to you -- well, at the time, you were aware he was in jail for this case, correct?

A. Yes, sir.

Q. Okay. What was the Defendant's response when you told him that he needed to follow the rules?

A. His response to me was that he was in jail for not following the rules, and he wasn't about to start now.

MR. CALVERT: Pass the witness.

**CROSS-EXAMINATION**

BY MR. GRAY:

Q. And was this conversation recorded?

A. Was it recorded?

Q. Yes, sir.

A. I wrote a report.

Q. Okay. I understand you wrote a report, but was there any type of audio that we can review and the jury can take a look at to -- to give us a better sense of the conversation and what was said?

A. There are cameras in there that records everything that goes on. But I'm not for sure about the audio of the cameras. But as I stated earlier, I did write the report.

Q. Okay. Is it then possible that there is an audio and a video?

A. I know there's a video, but I'm not for sure about the audio.

Q. Okay. Now, you'd agree with me that when you-all were having the conversation that Mr. Greer was upset; would that be fair to say?

A. I guess it would be safe to say that he may have been upset. But it was just a mere question that he was asked to do, to follow the rules.

Q. Oh, I understand. I'm not trying to indicate that you weren't being fair or anything like that. I'm just saying from your vantage point did he appear to not to be real happy with you at that point?

A. Well, none of them are when it comes to following the rules.

Q. Well, I understand. But if you're telling him to follow the rules and he didn't want to follow the rules, it's fair to say in his mind he didn't want to do what you were asking him to do; is that fair to say?

A. That was an ongoing thing with him. So --

Q. All right. You would agree with me that if he was upset, sometimes we do and say things that we don't necessarily mean; is that fair to say?

A. Not with Mr. Greer.

Q.   So, everything Mr. Greer -- in your experience, every word out of this man's mouth was exactly what he means?

A.   Yes.

MR. GRAY:   Pass the witness.

MR. CALVERT:   Judge, I have nothing further.

THE COURT:   You can step down.

MR. CALVERT:   I ask that the witness be finally excused.

THE COURT:   You're finally excused.

Call your next.

MR. CALVERT:   Judge, at this point in time, we have no further witnesses.   We will offer for all purposes State's Exhibit 14, which is a written stipulation between the parties signed by the Defendant, his attorney and myself which stipulates that the Defendant is one and the same individual convicted of possession of methamphetamine in a prior felony listed in the indictment that was read to the jury.

And also that the offense date of this case, February 16th, 2012, is within the time frame outlined in the statute for this offense.

(State's Exhibit No. 14, Stipulation, offered.)

THE COURT:   That will be admitted.

(State's Exhibit No. 14 admitted.)

MR. GRAY: No objection.

MR. CALVERT: And we will rest.

(State rests.)

THE COURT: The State has rested its case.

Does the Defense care --

MR. GRAY: Judge, I just have one issue that will be brief outside the presence of the jury.

THE COURT: All right. Step into the jury room, ladies and gentlemen, and let's take a ten-minute break.

(Jury retired.)

THE COURT: All right. What is the matter?

MR. GRAY: Judge, the State has rested, and they have concluded their presentation of the evidence in the case-in-chief.

Judge, at this point, we would urge our suppression motion. It was timely filed, and the law is such that we can carry that into the trial for judicial economy, and that's what we did. But this is the proper junction to urge that motion.

A couple of things, Judge, the -- we believe that the basis of the stop was an illegal stop. It was not based upon any traffic offense or any offense whatsoever that was seen by any of the officers. There's

no testimony as to that.

Investigator Ledesma had indicated that the information that they received linking them to my client and Monishia was that there was a description that they were -- and that they were in this vehicle, and they were driving this particular vehicle.

The problem we run into, if this was a identifiable person, if even Dispatch had a name or a phone number or an address, somewhere where we could talk to this person, we could potentially determine their veracity, whether they're telling the truth or not. Just the generalized statement that this is a reliable confidential informant, I don't think that gets us there.

It's not my intention to expose a confidential informant, but they don't get it both ways.

THE COURT: Well, let me ask you this: Are they really depending on the informant? Looks like they're basing it on the fact there were two active warrants for the person, and he was identified in the vehicle.

MR. GRAY: But, Judge, that was only after Ledesma was contacted by this CI. This whole thing started from the CI. They wouldn't even have looked into this case, known where he was driving, any of that information --

THE COURT: But they -- they did come up on the vehicle and identify him before they pulled him over, correct?

MR. GRAY: No.

THE COURT: Did not?

MR. GRAY: They came upon a vehicle matching the description of the vehicle, but there was no license number --

THE COURT: A license number or what -- what --

MR. GRAY: We didn't hear that. And that's why I -- I visited with the one individual, the officer as to the tinted windows because, obviously, that would go into whether -- you know, an officer may have known him and was able to identify him. And if there were tinted windows, then he would not be able to. And so, we would --

THE COURT: So, we are depending on an informant to pull him over?

MR. GRAY: Yes.

THE COURT: Who has been identified as reliable and credible.

MR. GRAY: But, Judge, just a statement that he's reliable and credible, I mean, that's -- you know, we -- you know, it also violates my client's right to

confrontation. You know, we need to have the ability to test that evidence. We just can't have an officer say, "Well, it's reliable." Well, how many times? How many times? I mean, how many controlled buys did you do? You know, each time was the money counted? Is there -- is there videos that we can review to see that this confidential informant is -- is -- you know, is reliable? Is there a pending case?

THE COURT: What's the difference in this and a search warrant where all you have is an unnamed informant who's done transactions in the past and proven to be reliable and credible? And that is sufficient to base a search warrant on. What's the difference in this and that?

MR. GRAY: Well, just that, there's not a search warrant.

THE COURT: Well --

MR. GRAY: You know, if there was a search warrant that was reviewed by a magistrate and within those four corners, even if there was hearsay, it was sufficient for that magistrate or judge to sign off on it. That would be one thing. And that's what the law prefers is a search warrant. And there was no search warrant in this case, Judge.

On sort of a side issue, too, Judge, the

inventory, the reason I had that admitted as to the inventory listing was the two officers testified that they are to -- the whole purpose of an inventory search is to list all the items found within that -- that vehicle so that there's no issue as far as that. They have to follow that policy, and that's just the rule on the inventory searches.

There really is no true, search incident to arrest anymore as long as the Defendant, my client, would not be able to harm or tamper with evidence. And we've -- there was no issue as to that. He was in custody. He was in handcuffs.

THE COURT: Well, isn't that -- isn't that the law where, you know, if they're not able to reach for a weapon, then that -- that part of it's absolved, and the inventory search doesn't depend upon reaching for a weapon.

MR. GRAY: Right. Yeah, absolutely, Judge. I just wanted to make that distinction that, you know, they don't get there on a search incident to arrest for sure.

THE COURT: Right.

MR. GRAY: And I don't think anyone's argued that, and I don't think the State --

THE COURT: No, nobody's arguing that.

MR. GRAY: Okay. So, what we're left with is the inventory search; and it is their policy and procedure to inventory all items that are found in that particular vehicle. We've got an inventory list that inventories items found there within that cab, but nowhere will you find a distinction -- it says miscellaneous clothes, but any distinction as to those size 5 jeans that we have a picture of that's in evidence or more precisely that .22 long or long rifle shell.

So -- and the whole purpose of this is so -- and even in the policy of the Sheriff's Office so that we can't cloak a -- a search for evidence by calling it an inventory search.

So, you don't get it both ways. If you're going to do an inventory search, you've got to inventory all the items. You don't get to pick and choose because if you're picking and choosing, then it's really a search for evidence.

THE COURT: So, a poor inventory search is not admissible? If it had been a complete inventory search, it would have been admissible?

MR. GRAY: I think it's closer. I think that goes to whether it's a true inventory search. Otherwise, Judge, why not? If you've got 50 items in the car and you've got two pieces of evidence, why not just

pull out the cocaine and the gun; and we're going to call that an inventory search. We're going to put those two items on there. That didn't happen here.

THE COURT: But the fact remains they would always do an inventory search when there's an arrest. The fact that there may be an ulterior motive, a reason to search for other reasons, is, to me, not determinative because if they had a valid reason to do an inventory search even though that might not have been their primary motive, they can rely on that even though their primary motive was something else. I may be wrong about that.

MR. GRAY: Well, Judge --

THE COURT: The facts support a valid inventory search, and they say that was one of the reasons we did the search.

MR. GRAY: Well, Judge; and this is -- I mean, that's the whole thing. Even their policy states: This inventory procedure may not be used as a pretext to conduct an exploratory search for incriminating evidence. That's their own policy.

THE COURT: Okay.

MR. GRAY: So, again, I have real --

THE COURT: Is that in evidence?

MR. GRAY: No, Judge; but it's a suppression hearing; so -- I mean, I can offer it. It's the policy.

Do you have any objection?

MR. CALVERT: No, I was actually going to offer it myself, so go ahead.

MR. GRAY: That's my only copy.

MR. CALVERT: I've got another one.

MR. GRAY: And so, that's their copy of their policy; and that's what I was referencing.

THE COURT: What is -- what exhibit is this?

MR. CALVERT: I have one that's marked, if you need --

MR. GRAY: Do you?

MR. CALVERT: Yeah.

MR. GRAY: I have no objection if he wants to offer it.

MR. CALVERT: This will be State's 16?

THE REPORTER: Yes.

MR. CALVERT: Do you have a stapler?

THE REPORTER: Yes.

MR. CALVERT: Here you go, Judge.

THE COURT: All right. Is that it?

MR. GRAY: Yes, Judge. Again, their policy is that, you know, you can't -- you can't just call it -- call it an inventory search and it not be an inventory search. It's an exploration for evidence. So, we would argue as to that, that that's an illegal search. There

was no search warrant.

We also -- again, we have real issues with the initial detention was by confidential informant. We don't have any specifics about how many times that person has testified, if they've testified truthfully, only that the person is reliable. We don't have any specific information as to, you know, the description of my client, large male. He was wearing a coat. He wasn't wearing a coat. The vehicle was a black truck, small black truck. Whether there was an LP -- I mean, there's just -- we just don't know these things.

THE COURT: All right. I'm a little more concerned about the fact that he was never identified in the vehicle, merely by a description of a confidential informant. And, yes, there were warrants out; but they actually have to see him in there and identify him before they pull the vehicle over.

MR. CALVERT: Judge, in response to that, the evidence is clear and the evidence in the record supports that this informant was a known individual. He was known to Detective Ledesma. Detective Ledesma knows this individual and has worked with him before.

The case law is very well established and goes back a long ways, that a tip from a known identified individual is presumptively reliable.

THE COURT: Now, he's not identified.

MR. CALVERT: He is identified -- he's not identified in this courtroom, but he's identified to the person receiving the tip.

THE COURT: Okay.

MR. CALVERT: And there is no right to confrontation at that stage, and we are not relying on any -- in this courtroom in terms of evidence in front of this jury, we are not relying on any, you know, information from that informant for purposes of this trial. Therefore, there's no right to confrontation here.

The only basis for that is the stop. And so, you have a tip from a known identified individual to Investigator Ledesma that is presumptively reliable in and of itself simply due to the fact that this is a known person, identified person making the tip.

We haven't got yet to the fact that this person has proven to be credible and reliable in the past. That's over and above what's required by law. Moreover, Your Honor absolutely correctly pointed a critical distinction in this particular scenario when you referenced a search warrant.

The standard of proof required for a search warrant in which case this would be sufficient is probable cause. We're not talking about probable cause here.

We're talking about an investigative detention. We're talking about a traffic stop. All that's required is reasonable suspicion.

The officers only have to have reasonable suspicion that this individual and the other individual, Monishia Campbell, were in that vehicle. And so, then, you go back to what we have. We have a known inform -- a known person making a presumptive -- a legally presumptively reliable tip to law enforcement that these two people are in this vehicle. That's the -- and they're in this area. That's the evidence that's in the record so far.

Moreover, in addition to it being presumptively reliable under the law, that individual that's telling them that, has already previously been found to be credible and reliable in the past. They go out there. Sure enough, there's the vehicle. There's no way that that is not reasonable suspicion for those officers to stop that vehicle and further investigate what's going on.

And so, on the basis of the stop, because reasonable suspicion is the only standard, the low standard that we're using for the stop, there's more than enough. There's ample evidence to support a finding of reasonable suspicion that the stop is good. And as

Counsel already said, there's no question that the warrants are good, and the evidence is very clear that the resulting search was conducted pursuant to their inventory policy. If it was not as thorough as Counsel would have liked, that goes to weight, not admissibility.

MR. GRAY: Judge, I agree. The standard as to a detention is there must be reasonable suspicion to pull over the vehicle; but with that, you need specific articulable facts to get into that. And they don't have that.

They've got a confidential informant that we don't know what in the world the person said to Investigator Ledesma. We don't know about any of the specifics, how he described my client, the vehicle, any of these things. And the person hasn't been determined to be -- all he said was a broad statement. He's reliable, or the CI is reliable. That's not enough. It's not specific and articulable.

If we can't go to that person and get specific facts as to how do you know that was the right person, how do you know that was the right truck? And then, we have no ability to cross-examine this person because they won't give us the information.

THE COURT: I'm going to deny the motion to suppress.

Ready to bring out the jury?

MR. CALVERT: Yes, sir.

MR. GRAY: Yes, Judge.

THE COURT: Bring them out.

(Jury seated.)

THE COURT: Everyone be seated.

Mr. Gray?

MR. GRAY: Judge, we would call Monishia Campbell.

THE COURT: All right.

I believe I have previously placed this witness under oath.

Go right ahead, Mr. Gray.

MR. GRAY: Thank you, Judge.

**MONISHIA RENE CAMPBELL,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

**BY MR. GRAY:**

Q. Could you go ahead and state your name for the record?

A. Monishia Rene Campbell.

Q. Okay. And just to kind of look forward right away, do you know David Greer?

A. Yes, I do.

Q. How do you know him?

A. I was in a relationship with him for years.

Q. Okay. About how long were you two in a relationship?

A. Two years.

Q. Two years. Okay. And let me draw your attention to February the 16th, 2012. Were you with David in a vehicle that was pulled over by the police?

A. Yes, sir.

Q. Okay. And not going into the specifics as to the arrest, you were arrested and placed in handcuffs; is that right?

A. Yes, sir.

Q. Okay. And was David -- was he also arrested and placed in handcuffs?

A. Yes, sir.

Q. Now, we've talked about February 16th, which was the day of the arrest. The day before that, did anything happen between you and David?

A. We got in an argument.

Q. Okay. And not going into what anybody said, was it your intention at that point that you guys were going to break up?

A. I needed some space away from him. I was mad.

Q. Okay. And so, in response to that, what did you do as far as your belongings?

A.   I grabbed whatever clothes and items I could grab, and I grabbed a gun and placed it in my bag and left.

Q.   Okay.

A.   I had called him the following day, the next day and asked him to come get me, and he did, and we got pulled over.

Q.   Let's back up just a little bit.  So, you grabbed all your belongings.  What all did you grab?

A.   I grabbed the gun.  I grabbed some clothes, a jacket, just a bunch of stuff.  I mean, it was the heat of the moment.  I was mad.  Whatever I could grab.

Q.   And where did you -- where did you place those items?

A.   In a bag, kind of like a duffle bag.

Q.   Okay.

A.   I just crammed it all in there.

Q.   And then, where did those items ultimately go?

A.   In the back of the truck.

Q.   Okay.

A.   But they -- it was all mine.

Q.   Okay.  So, we have these items that you put in the back of the truck.  Is that the same truck that David was driving on the date that y'all got pulled over?

A.   Yes, sir.

Q.    Okay.

MR. GRAY:  May I approach, Judge?

THE COURT:  Yes, sir.

Q. (By Mr. Gray)  Let me show you a couple of items. One of which is going to be this jacket.  Do you recognize this jacket?

A.    Yes, sir.

Q.    Okay.  And how do you recognize it?

A.    That's a jacket that I had in my property.

Q.    Okay.  Is that one of the items that you grabbed when you were getting your belongings together?

A.    Big possibility, because like I said, I was mad; and I just grabbed a bunch of stuff.

Q.    Okay.

MR. GRAY:  What did we do with the gun?  Is it locked up?

Q. (By Mr. Gray)  We've already checked to make sure there's no ammunition; and it's not a live pistol; but just looking at this, do you recognize this?

A.    Yes, sir.

Q.    What is that?

A.    That is a .22 revolver.

Q.    Okay.  And whose revolver is that?

A.    That is mine.

Q.    Okay.  And does it look -- I guess other than the

dust, the fingerprint dust, does it look to be in about the same condition as the last time you saw it?

A. Pretty much.

Q. Okay. And you say that that's your gun; is that right?

A. Yes, sir.

Q. That's not David's gun?

A. No.

Q. Okay. Why would you need a gun?

A. I had been sexual assaulted and kidnapped a little while ago. Protection.

Q. Okay. I drew your attention to the date of February 16th. Was the rape and kidnapping, did that happen before this date?

A. Yes.

Q. Okay. Now, my intention is not to go into the details of that or to bring that up, but is it fair to say that's why you had the pistol with you?

A. That's exactly why I had it.

Q. Okay. Now, when you grabbed that, that pistol and your clothes, do you recall precisely where you put the pistol?

A. No, I was -- like I said, it was the heat of the moment. I just stuffed whatever I could wherever I could. I just wanted -- I was mad, and I just wanted to get up

and get out of there. But I definitely didn't want to leave the house without being armed with something.

Q. Was that -- was it such that you left the -- even though you don't know where precisely you put the pistol, is it -- do you recall whether you left it out in the open; or would it have been potentially covered with something?

A. Pretty much I would have covered it with something because I wouldn't want him knowing that I had it.

Q. Why is that?

A. Because I knew he was a felon. I didn't want to get him in trouble.

Q. Okay. And when you grabbed your clothes, was it just one or two garments; or was it a pile?

A. It was a bunch of stuff.

Q. Okay. So, not a situation where you planned a trip to the Bahamas; and you neatly folded and packed everything?

A. Exactly, I just crammed and stuffed.

Q. Okay. At the time that you-all were pulled over on February 16th and a day or so before that, would it be fair to say that you were concerned for your safety?

A. Yes, I still am.

Q. Now, at least at that time, to your knowledge,

was that individual out on bond that committed those acts against you?

A.    Yeah, he was.  They put some bracelet around his ankle thinking that would keep him away.

Q.    Okay.  Now, that -- that -- that, in fact, is David's jacket; is that right?

A.    Yeah.

Q.    Okay.  But would you wear it from time to time?

A.    I wore all his jackets.

Q.    Okay.  Do you -- do you tend to wear -- I mean, you're a petite -- you're a small person.  Do you tend to wear larger jackets?

A.    I stay cold, and bigger jackets keep me warm. I'm able to tuck myself up in them.

Q.    Okay.  And we've already looked at the video; and the Prosecutor may play some of that for you here in a little bit; but when you were arrested, were you wearing an oversized jacket then?

A.    I was wearing an extra large.

Q.    When you were arrested?

A.    Yes.

Q.    And then, I guess, more recently when I and my legal assistant came out to the country -- and we won't get into the address and disclose the location as to where you're living right now -- but when we went out there,

were you wearing a jacket then?

A. I was wearing a XL -- an XL jacket.

Q. Okay. And that was different than the black one and the one you were wearing at the time of your arrest; is that right?

A. Yes.

Q. Had you ever seen David Greer handle that gun?

A. No.

Q. Did you have any information or anything to lead you to believe that he was aware that gun was back there?

A. I know for a fact he didn't have no clue. Like I said, I wasn't mad at him; but I wasn't wanting to get anybody in trouble.

Q. When you stayed with -- were you guys sort of living together at that time?

A. Yes, we were.

Q. Okay. When you would stay with him and you were living with him, where would you keep that gun at then?

A. I had a hole in the wall, out of sight, out of mind.

Q. Again, I don't -- my intention is not to upset you, and I don't want you relive the past, but there's a few other questions I need to visit with you on.

Have you -- have you been convicted of any felonies or crimes of moral turpitude that would be

misdemeanors?

A.   That would be misdemeanors?

Q.   Any felonies.  First of all, let's talk about felonies.  Have you been convicted of any felonies?

A.   Yeah, possession of crack cocaine of less than a gram.

Q.   And where was that out of?

A.   Galveston County.

Q.   Okay.  At the time of the arrest in February of this year, were you on probation for that felony offense?

A.   At the time of that arrest?

Q.   Yes.

A.   I was -- yeah, I was supposed to be.  I had a warrant for my arrest in Galveston County when they pulled us over in Bryan.  I went and did eight months in Galveston County after I had gotten the other charges dropped.

Q.   Okay.  So, let me stop you there.  This probation that you were on, eventually, you were revoked; and you spent some time in jail; is that right?

A.   Yes, sir.

Q.   So, it's fair to say you were convicted at some point of that offense?

A.   Yes.

Q.   Okay.  But going back to the date of February of

this year when you guys were pulled over, were you -- you had not been revoked; is that correct?

A. When this happened and not -- not at the time. I think it was pending is -- when I got there, they said it was pending [sic] on whether they needed to revoke it or if they were going to reinstate it or just let me do my time; and I chose to just do time.

Q. Okay. I think there's a little bit of confusion there. So, let me try to clear it up.

You understand that the way it works is if you're placed on probation and you do everything you're supposed to, everything is good and you don't get arrested; is that right?

A. Exactly.

Q. Okay. But if you violate your probation in any way, there's a possibility they could file a motion to adjudicate or a motion to revoke; is that fair to say?

A. Yes.

Q. Now, even though there may be a warrant out pending, until a District Judge accepts -- either has a hearing or accepts a plea, then that case is not final. Does that make sense?

A. Exactly.

Q. Okay. So, I want to go back in time again to February. There may have been a motion to proceed filed,

but had you been revoked and sent to jail yet?

A. No.

Q. Okay. And do you know what type of probation you were on there in Galveston?

A. I was on deferred, deferred adjudication.

Q. Okay. And is that such that you're not convicted --

A. If you complete the deferred, you don't have it no longer on your record. I didn't complete it.

Q. Okay. And then -- okay. So, then, that's the felony. And then, are there any misdemeanors, the moral-turpitude-type crimes, which would be thefts or --

A. I've got two thefts. I've got prostitution.

Q. And those were convictions as well?

A. (Nods head.)

Q. And you went to jail there in Galveston for awhile on that one case; is that right?

A. Yes.

Q. Okay. And are you and David currently together now?

A. (Shakes head.)

Q. No? Okay.

MR. GRAY: Pass the witness.

**CROSS-EXAMINATION**

BY MR. CALVERT:

Q. At the time, y'all were living -- in February of 2012, you were living with him, right?

A. (Nods head.)

Q. You have to yes or no for the court reporter.

A. Yes.

Q. Okay. And the day before, you said that y'all got in an argument; and you were packing your things. Where was David when that was going on? You said it was heated. He was still there, right?

A. Yeah, we were -- had arguments; and he -- usually, when we fight or had an argument, he walks out.

Q. And so, he was still at the house when you told this jury you were packing up your things?

A. Yes.

Q. Now, you told the jury a minute ago that the Defendant didn't know that there was a gun in that jacket; is that right?

A. Yeah.

Q. And let me back up for a step. Your testimony was that -- that you had taken that gun that you're now saying is yours; and you'd taken it from home; and then, were with the Defendant and going back home at the time y'all got stopped, right?

A. Yes.

Q. And you said that -- you made it a point to tell

the jury -- you specifically said when you were packing up your things, you made it a point to get that gun and take it with you, right?

A.   Yes.

Q.   Now, I think when you told Earl just a minute ago what it was in -- I think your words were -- and I'm more or less quoting -- "pretty much, I think I would have wrapped it up to hide it from him."  That's what you said, right?

A.   Yeah.

Q.   So, you -- are you saying you think you wrapped it up; or are you saying you did wrap it up?

A.   There's a big possibility I did wrap it up because I -- No. 1, I wouldn't want him -- not just him to see but anybody else.

Q.   Okay.

A.   And it's really hard for me to remember a lot at that time because, like I said, we were fighting; and it was the heat of the moment.

Q.   I understand.  And I understand some time has past, but I'm asking -- I'm not talking about possibilities.  I'm asking about what you remember.

Are you telling this jury today that you don't specifically remember wrapping up the gun before you took it with you?

A.    No, I'm not saying that.

Q.    Okay.  So, you do specifically remember wrapping up the gun before you took it with you?

A.    Yeah, I'm going to go ahead and say that because that's usually what my actions would do.

Q.    Are you saying it?

A.    I'm saying, yes, I wrapped the gun.

Q.    Right.  I understand you're saying that.  Are you saying it because that's what you would normally do, or are you saying that because that's specifically what you remember in this scenario?

A.    That's what I can vaguely remember.

Q.    Okay.  Well, do you remember talking to me yesterday out in the hallway?

A.    Yes.

Q.    And that was the first time you and I have ever spoken about this case, right?

A.    Yes.

Q.    And you remember telling me specifically that you, quote, "wrapped it up in clothes."  Do you remember saying that?

A.    Yes.

Q.    And you didn't equivocate on that, did you?  You didn't -- there was no hesitation when you told me that, right?

A.    There was.    There was a pause.

Q.    So, it's your testimony now that you -- are you aware that I was recording that conversation?

A.    No, I wasn't aware that you were recording anything.

Q.    Okay.    And then you said that you wrapped it up in clothes, and you put it in a black duffle bag with the rest of your clothes, right?

A.    Yes.

Q.    And you then said that it was still wrapped up in your clothes and in that black duffle bag when y'all got pulled over, correct?

A.    Yes.

Q.    So, that gun was in your bag, right?

A.    Yeah, it should have been.

Q.    Right.    There's no reason for, like, in the car ride for y'all to, like, take it out and do anything with it, right?

A.    Well, I remember specifically being -- before being put into the police car, there were officers already digging in the back of the seat digging through my items.

Q.    I understand.    I'm talking -- my question is when y'all were driving around, there was no reason for y'all to -- to have that gun out or anything like that, right?

A.    There shouldn't have been, no; but I did have all

my stuff thrown in the back when he picked me up. The majority of my clothes were all in a bag. My jacket --

Q. Let me try that again. While y'all were driving around that day, before you got pulled over, there was no reason for y'all to be having that gun out, was there?

A. No.

MR. CALVERT: May I approach the witness, Judge?

THE COURT: Yes, sir.

Q. (By Mr. Calvert) You testified a minute ago to Mr. Gray -- and I want to make this really clear. This jacket right here, State's Exhibit No. 10, that's his jacket, right?

A. Yes.

Q. He got this from his mom --

A. Yes.

Q. -- correct?

And it survived a fire. That's why it was significant, correct?

A. Yes.

Q. And you told Detective Ledesma all about that, how that was his jacket, right?

A. Yes.

Q. And where it came from, correct?

A. Yes.

Q. Now, your testimony today, though, is that this jacket was actually -- well, we can agree you weren't wearing this that day, right?

A. Right.

Q. Because you were wearing another jacket. You were wearing a camouflage jacket that day, correct?

A. I wasn't wearing a camouflage jacket, no. Dave was wearing the camouflage jacket. I was wearing a black and red flowery satin jacket which was an extra L.

Q. Okay. Are you aware that he wasn't wearing any jacket when y'all got stopped?

A. He had a camouflage hoody jacket on when we got arrested.

Q. So, it's your testimony that at the time y'all got stopped, when the police got behind y'all, Mr. Greer was wearing a camouflage jacket?

A. Yes.

Q. Okay. And this, according to you today, was in your black duffle bag in the backseat?

A. Yes.

Q. There was no reason because you were wearing a jacket and you said that he was wearing a jacket -- there was no reason for this, State's Exhibit 10, to be out, and y'all doing anything with it while you're driving around that day, correct?

A. Correct.

Q. Okay. Oh, another thing is you told Earl a minute go that you know for certain -- well, obviously, he knows -- the Defendant knows this is his jacket, correct?

A. Yeah.

MR. GRAY: Objection. Calls for speculation as to what someone else knows.

MR. CALVERT: I think the Defendant --

THE COURT: Overruled.

Q. (By Mr. Calvert) There's no question -- I mean, this is his jacket. It belongs to him, correct?

A. Yes.

Q. He got it from his mother, correct?

A. Yes.

Q. Okay. He'd had that for a long time prior to that day, correct?

A. Somewhat, a few months.

Q. Months, right? He didn't get it the day before. It had been there for a while, correct?

A. Correct.

Q. Now, a minute ago, you told Earl that you -- that the Defendant did not know that that gun, State's Exhibit No. 11, was in that truck. Do you remember telling Earl that a minute ago?

A. Yes.

Q. And so, there's certainly -- you know, did you carry that gun in that jacket? I mean, or -- or what did you wrap the gun up in when you -- when you wrapped -- you say you wrapped it up in your clothes?

A. I wrapped it up in my clothes and stuck it in my bag.

Q. Okay.

A. I --

Q. So, when you say "wrapped it up," you didn't like specifically put it in a particular pocket. You just kind of wrapped it up and stuffed it in, right?

A. (Nods head.)

Q. You have to say yes for the court reporter.

A. Yes. Yes. Yes. Yes. Yes.

Q. And you're telling this jury that the Defendant had no idea that there was a gun or anything illegal in that vehicle, correct?

A. Correct.

Q. And you're telling this jury that there's no question at all in your mind, in his mind and anybody's mind that was there, that that jacket belongs to him, correct?

A. Correct.

Q. So, we can agree that there was absolutely -- if he knew -- or excuse me -- if he did not have any idea

that there was anything illegal in that truck or that there was a gun in that truck, would you agree with me that there was absolutely no reason at all for him to lie to the police about that being his jacket?

A.   Exactly.

Q.   Okay.  When you talked to Rick Ledesma -- and you knew Rick Ledesma before that day, right?

A.   Yes.

Q.   Y'all had a relationship, correct?

A.   He was the investigator on my kidnapping case.

Q.   Right.  He's a nice guy, right?

A.   (Nods head.)

Q.   Was he always good to you, friendly to you?

A.   Yeah.

Q.   He came -- do you remember him coming up to you while you were sitting in back of the squad car after you got arrested and having a conversation with you?

A.   He had asked me --

Q.   Well, before we get into that.  Do you remember him coming back there and having a conversation with you? Yes or no.

A.   Yes.

Q.   And when he came back there, he had that jacket with him, correct?

A.   Yeah.

Q.   And he asked you whose jacket that was, correct?

A.   Yes.

Q.   And then before you answered, he told you something, didn't he?  He said tell me the what?

A.   Truth.

Q.   Uh-huh.  And what did you say?

A.   I told him the truth.

Q.   You said -- and let me clarify.  You refer to him as Hillbilly, right?

A.   Yes.

Q.   That's his name to you.  You don't call him Dave or David.  You call him Hillbilly?

A.   I call him Hillbilly, yes.

Q.   You told Rick Ledesma, "That's Hillbilly's jacket," correct?

A.   Yes.

Q.   And then, Investigator Ledesma asked you, "Do you want to claim the gun that was in this jacket"?  Do you remember him asking you that?

A.   He asked me word for word if I knew whose gun it was.  If I knew that gun -- that there was a gun in it.

Q.   Are you aware that you were being videotaped at that point in time?

A.   No, I wasn't.

Q.   Okay.  So, can we agree that the videotape would

probably be a little bit more clear on that conversation than your recollection? Would you agree with me on that?

A. Yeah.

Q. Okay. And so, if the videotape shows Investigator Ledesma going back there and saying -- well, I'll come back to that in a minute.

He asked you about the gun that was found in that jacket, correct?

A. Yes.

Q. And when he asked you about the gun, you were really surprised to find out there was a gun in that jacket or a gun anywhere in the truck, weren't ever?

A. I wasn't really surprised. I was scared.

Q. So, it's your testimony that you were not surprised when Investigator Ledesma told you that they had found a gun in that jacket?

A. Exactly.

Q. And you immediately said no, no, no, no, no, that's not my gun, right?

A. Yeah.

Q. And you were not a convicted felon at that point, right?

A. No.

Q. There was nothing illegal about you having a gun at all, was there?

A. No, there wasn't; but I did not know that specifically at that time either.

Q. Now, you several times told Investigator Ledesma, "That is not my gun. That is not my gun -- or not my jacket. That's Hillbilly's jacket, and I didn't know that there was a gun. It's not my gun. It's not my gun." You told him that?

A. I told him it's not my gun.

Q. And the next thing you asked him was you were really concerned about Hillbilly getting in trouble, right?

A. (Nods head.)

Q. You have to say yes.

A. Yes.

Q. In fact, you asked him, "Is Hillbilly going to get in trouble for a long time?" Do you remember asking him that?

A. Yes.

Q. At that point in time, it was clear based on the conversation y'all were having that if they found a gun, this could be real bad, right?

A. Yeah.

Q. And you told the jury a minute ago that you knew he was a convicted felon, right?

A. Yeah.

Q. And you knew that that could be real bad for him, real bad for him if he gets caught with a gun?

A. Yeah.

Q. And you knew that in that moment, correct?

A. Yes, sir.

Q. There was no question in your mind about that?

A. No, sir.

Q. And you didn't want to see anything bad happen to him, right?

A. Not for something he didn't do.

Q. Y'all were still in a relationship, right?

A. Yes.

Q. Loved him?

A. Yes.

Q. Lived with him?

A. Yes.

Q. And at no point in time at all while y'all were out there on the roadside did you ever tell Investigator Ledesma or anybody else out there that that wasn't his gun?

A. I did tell Ledesma that it was not his gun.

Q. Are you telling me and are you telling this jury that in that conversation right there on February 16th, 2012, you told Rick Ledesma that was not his gun?

A. I told him it wasn't Hillbilly's gun, and I told

him it wasn't my gun, but the jacket was his.

Q. And so, you -- I want to make clear I'm understanding you. It is your testimony that that day in that moment when you knew how bad it would be for him if he got caught with a gun, you told Rick Ledesma that that gun did not belong to him? Is that your testimony? Yes or no.

A. I'm telling you, yes, because he had asked me if that was Hillbilly's gun; and I told him, "No." I said, "Is Hillbilly going to get in a lot of trouble"?

He said, "Is this your gun?"

I said, "No."

Q. Later on that day, when you were being transported -- as you were being transported by another officer, another Sheriff's deputy named Sam Ballew. Do you remember that? Do you remember being in the car ride to the jail?

A. Yes.

Q. And during that car ride, you told Deputy Ballew that you had no idea that there was a gun in the car? Do you remember that?

A. Yes.

Q. And that was after you had a conversation with -- the conversation that you just talked about with Deputy Ledesma; is that right?

A. Yes.

Q. Because, obviously, the talk with Investigator Ledesma happened before you got transported to the jail, correct?

A. Yeah, it was right in the door of the vehicle.

Q. Right.

MR. CALVERT: Judge, right now, I'm going to pass the witness.

## REDIRECT EXAMINATION

BY MR. GRAY:

Q. Just to clarify a few things, going back to when you visited with Investigator Ledesma, okay?

As to the jacket, you did indicate that -- this was on the February arrest date -- that it was Hillbilly's jacket; is that right?

A. Yes.

Q. Hillbilly referring to David?

A. Yes.

Q. And as to the gun, you did not take ownership of the gun; is that correct?

A. Yes.

Q. Okay. You didn't say that it was Hillbilly's or whose it was. You just didn't take --

A. I didn't claim it.

Q. Now -- but you, in fact -- I mean, that was your

gun; is that right?

A. Yes.

Q. All right. So, I mean, why did you lie to -- it maybe splitting hairs as far as ownership and stuff, but you weren't completely truthful with Investigator Ledesma at that time; is that fair to say?

A. Yes.

Q. Okay. Why not?

A. I was scared.

Q. Okay. Why --

A. I didn't know if I had a warrant for my arrest or if I had a felony due to Galveston County charges on my probation. I didn't know if I had a felony or not.

Q. Okay.

A. I didn't want to get in trouble. And so, yeah; and I told him I -- I kind of have trust issues when it comes to police.

Q. Okay. When this conversation happened between Investigator Ledesma, you were under arrest; is that right?

A. Yes.

Q. Okay. And were you in handcuffs?

A. Yes.

Q. Were you in the back of the patrol car?

A. Yes.

Q. Now, you indicated that you told Ledesma that -- that it wasn't Hillbilly's gun, that it was your gun; is that right?

A. Yes.

Q. Okay. Did that conversation happen after this February date in the jail?

A. Yeah.

Q. Okay. And do you remember the specifics of that conversation -- well, let me back up.

Was Investigator Ledesma there and visited you there as to the kidnapping case that you were a victim on?

A. He -- he only talked to me a few times on that case, but it wasn't -- it wasn't too much on when I was in jail. He was asking me --

Q. We don't want to go into a lot of specifics of other things, but is it fair to say this was after -- this was after the date of the offense, though?

A. Yes.

Q. And were you still in custody in the Brazos County Jail?

A. Yes, I did two months in Brazos County.

Q. Okay. And is that when you told him that the gun -- that you had to get a gun?

A. Yes.

Q.    Did you indicate why?

A.    Self-defense.

Q.    Did you tell him why?

A.    Self-defense because the way I look at it is you get kidnapped and you get raped, that's somebody that doesn't want you to live.  And they just put a bracelet on their foot and all they have to do is cut that bracelet off.  That guy could cut it off and come find me at any time; and if he ever gets his hands on me again, I'm dead.  I told him that's why I had that gun, was for protection.

Q.    And I know this has been a while back, February of this year.  You grabbed your belongings and the clothes and the jacket and the gun.  Do you have any distinct memory as to where you put each item at all?

A.    No, I mean, I have a vague memory.  I mean, No. 1, it has been a while.  No. 2, I was mad at the time that all of this was happening and going through a lot, and my mind is already foggy.  I do remember sticking it in -- I do remember sticking it in a bag in my -- in my belongings.  I do remember doing that.

Q.    Is it possible at some point you could have placed the gun in that jacket?

A.    There's a big possibility I probably grabbed the jacket, wrapped the gun up and stuck it in there with a bunch of my other clothes.  I mean, there's a huge

possibility of that. Because like I said, I just grabbed stuff and started stuffing. I was mad, and I wanted to get out of there.

Q. And now, when you were -- when you were placed under arrest, they actually took you to a patrol car just a little bit aways from the truck; is that fair to say?

A. Yes.

Q. So, you were not present and observed the investigators as they went through an inventory or looked for items; is that right?

A. Yes.

MR. GRAY: Pass the witness.

MR. CALVERT: Judge, I have no further questions at this point in time.

THE COURT: You can step down.

MR. GRAY: Judge, we would ask that she be excused.

THE COURT: All right. You're finally excused.

MR. CALVERT: As long as we got a number on her, Judge, if we need to get her back up here.

THE COURT: You are subject to recall. We need to have your phone number.

MR. GRAY: I've got it.

MR. CALVERT: Earl's been able to get ahold

of her. We trust him.

THE COURT: Call your next.

MR. GRAY: Judge, we would rest.

THE COURT: Defense has rested its case.

MR. CALVERT: We'll going to have some rebuttal, Judge. Do you want to do that now or after lunch?

THE COURT: Let's go ahead and get started.

MR. CALVERT: We'll recall Rick Ledesma.

(Bench conference:)

MR. GRAY: Judge, I anticipate that they're calling Ledesma to dispute Monishia's testimony. I would object at this point in that it's been established that she told the Investigator Ledesma that the jacket was Hillbilly's, which is what they had asked her. So, that's not an issue. She's admitted that she said that. And then, that she did not take ownership of the gun. I clarified the conversation as to her telling Ledesma it was her gun. She needed it for protection at a later date while she was in jail.

So, I would object to any extrinsic evidence to prove up -- to impeach the witness when the witness has effectively admitted that she wasn't truthful with the police on that date.

THE COURT: So, you're saying that this guy

can't impeach anything that she's testified to?

MR. GRAY: Well, I mean, if she admits that yes, she didn't tell the truth, he can't use extrinsic evidence.

THE COURT: What do you say to that?

MR. CALVERT: Two things: One, she testified -- and I asked her three or four different times three or four different ways if that conversation she was talking about with Ledesma where she told him it was not the Defendant's gun was at the scene that day. She very, very clearly said: "Yeah, it was at the scene that day."

Once she found out she was being videotaped, on redirect, she changed her testimony and said that happened later.

And so, we can --

(Bench proceedings concluded.)

THE COURT: Overruled.

MR. CALVERT: Judge, at this point in time, we had previously offered State's Exhibit No. 3, pursuant to a stipulation with Defense, certain portions of the audio were redacted. For these purposes now, we are going to offer all of State's Exhibit No. 3 with the audio included.

THE COURT: Any further objection?

MR. GRAY: No additional objection.

THE COURT: Go right ahead. It's admitted.

**RICARDO LEDESMA,**

having been previously duly sworn, testified as follows:

**DIRECT EXAMINATION**

**BY MR. WARD:**

Q. Detective Ledesma --

MR. WARD: Judge, may we get the lights dimmed just a bit?

THE COURT: Yes, sir.

(Video playing.)

Q. (By Mr. Ward) This is the in-car audio and video from Officer Ballew's patrol car. Do you recognize any of the individuals that are in this right now?

A. Yes, sir, I do.

Q. Okay. Who are they?

A. That's myself and Monishia Campbell.

Q. Okay. And can you specifically describe what she's wearing right now?

A. She's wearing a camouflage jacket.

Q. Okay. I'm going to rewind this just a little bit, Detective. Okay. And is there an individual sitting on -- on the tailgate of that Ford Ranger?

A. Yes, sir.

Q. And do you know who that individual is?

A. Yes, sir.

Q. Who is that?

A. It's David Greer.

Q. Okay. Can you describe what he's wearing right now?

A. He's wearing a black -- looks like a cut-off T-shirt and some camouflage pants.

Q. And you testified earlier that although you weren't there immediately when the stop happened, you got on scene pretty quick?

A. Yes, sir, right as the traffic stop was being made.

Q. And we can actually -- we can actually rewind this whole video, and we can see you rolling up because your pretty distinctive when you roll into the camera right there?

A. Yes, sir.

Q. From the time that you were on scene until the time that everyone left, did you ever observe the Defendant wearing a jacket?

A. No, sir.

Q. Now, I'm going to fast forward this a little bit. And you also had a conversation with the Defendant later on that day, didn't you?

A. Yes, sir.

Q. Was he in the backseat of a patrol car?

A. Yes, sir.

Q. Was that conversation recorded?

A. Yes, sir.

Q. Did you ask him any questions concerning the ownership of the black leather jacket?

A. Yes, sir.

Q. And what was his response?

A. He said it was not his.

Q. He specifically said that that leather jacket was not his jacket?

A. Yes, sir. He said that he had -- that his was camouflage.

(Video playing.)

Q. (By Mr. Ward) Is that you right there with the jacket?

A. Yes, sir.

(Video playing.)

Q. (By Mr. Ward) Detective, at any time during your entire conversation with Monishia Campbell on scene, did she say that gun was not David Greer's gun?

A. No, sir.

Q. Did you have a conversation with her a couple of weeks later, not specifically about this case, but about another -- her case?

A. Well, it wasn't about her case specifically. It

was about other information.

Q. Her own stuff?

A. Yes, sir.

Q. Okay. Did -- did she ever say anything to you during that time about her owning a gun?

A. Yes, sir.

Q. Or getting a gun?

A. Yes, sir, she said she got a gun.

Q. Okay. And anytime during that conversation, did she say that the gun she had got was the gun that was in that truck that day?

A. No, sir.

MR. WARD: Pass the witness, Judge.

CROSS-EXAMINATION

BY MR. GRAY:

Q. So, as to the gun on this particular day in February, the time of the arrest, you told the Prosecutor that she never indicated that the gun wasn't David Greer's; is that right?

A. No, that the gun --

Q. She never said that the gun was not David Greer's, is what your testimony to the Prosecutor was?

A. That it was. It's David Greer's.

Q. The gun?

A. Oh, the jacket. I'm sorry. The jacket, yeah.

Q. Okay. Just the gun. They had elicited your testimony that she never said that the gun was not David's; is that correct?

A. Yes, sir. Well, I believe I asked her if she claimed the gun that was in there.

Q. Right. And she said no, as to her?

A. That's correct.

Q. So, she said -- she didn't say one way or the other as to David?

A. No, sir.

Q. She didn't say it's not his, but she also didn't say it is his?

A. No.

Q. Okay. And then, when you did visit with her in the jail, she did indicate to you that -- this was after the February arrest, I guess. You visited her in the jail at some point; is that right?

A. Yes, sir.

Q. Okay. And she did -- she didn't specify as to what gun or this particular gun, but she did say that she had to get a gun for protection; is that right?

A. Yes, sir.

Q. Okay. And were you -- she's testified -- not to a lot of the specifics -- but that she was a victim in a rape and a kidnapping. And there's no reason to doubt

that; is that correct? Did you work up that case as well?

A. Yes, sir, I did.

Q. Okay. Is that a pretty serious case?

A. Yes, sir, absolutely.

Q. Okay. Is it still pending?

A. Yes, sir.

Q. Now, whenever you initially walked up, you had indicated -- asked about the jacket, asked her who it belonged to; and then, she says that jacket; but then, you hear a sigh, "that jacket, ahhhh," okay? Does that not mean to you that she knew something was bad about that jacket, or why would she sigh? There's nothing wrong with just having a jacket, right?

A. No, there's nothing wrong with that, no, sir.

Q. And so, there would be no reason for a person to say "that jacket" and then sigh?

A. I'm not sure I understand your question.

Q. Well, if it was just a piece of clothing with nothing illegal in it, if she had no knowledge that there was anything illegal, a gun, whatever, in that jacket, she would have just answered your question. "It's my jacket. It's his jacket. It's whoever's jacket."

It wouldn't make sense for a person if you ask, you know, "Is this your jacket?" And she says, "That jacket," and then she sighs, like, "Oh, heck, I'm in

trouble. Oh, heck, they found something in the jacket." Do you see where I'm going?

A. Yes, sir.

Q. Okay. And so, to you, when she sighed, did that give you some information that she had some knowledge there was something going on with that jacket?

A. I'm not sure I caught the sigh at that time. I was more looking at her expression.

Q. And I understand; but -- and I know you haven't reviewed the tape probably as I have and the Prosecutor has.

A. Yes, sir.

Q. At least then when you reviewed it -- and I know it's been a long time, and I apologize. But when you just heard that, did you hear her sign?

A. You can hear her take a breath.

Q. Okay. And she says initially, "No, that's not my gun;" and then, later on, she says," I didn't know anything about the gun"?

A. Correct.

Q. That is right?

MR. GRAY: Pass the witness.

### REDIRECT EXAMINATION

BY MR. WARD:

Q. Detective, I'm going to show you here in a second

what's been marked --

MR. CALVERT: It's already in evidence.

Q. (By Mr. Ward) It's already in evidence -- State's Exhibit 17.

MR. CALVERT: No, 3. Still on 3.

Q. (By Mr. Ward) Now, Monishia Campbell was pretty clear that that was Dave Greer's jacket from the prior video; is that correct?

A. Yes, sir.

(Video playing.)

Q. (By Mr. Ward) And just to be clear, this is the front facing patrol vehicle there; and Dave Greer's in the backseat being recorded there at this time; is that correct?

A. Correct. This is Officer -- Deputy Ficke's vehicle.

(Video playing.)

MR. WARD: Pass the witness, Judge.

MR. GRAY: No further questions.

THE COURT: You can step down.

All right. Ladies and gentlemen, we'll resume at 1:30. We've got a couple of other matters to take up between 1:00 and 1:30. So, be back at 1:30. We'll continue the trial at that time.

(Jury retired.)

THE COURT: Let's talk about the Charge.

MR. CALVERT: I'm going to work on it over lunch.

THE COURT: All right. Can you get it to Earl and let him look at it, so he can be thinking about it?

MR. CALVERT: Certainly.

MR. GRAY: Do you just want to e-mail it to me, and I can pull it up?

MR. CALVERT: Okay.

THE COURT: Now, how many more witnesses are you going to have?

MR. CALVERT: Judge, I've got, I believe, two more rebuttal witnesses; but I believe both of them are going to be incredibly, incredibly brief. Probably less than ten minutes apiece.

THE COURT: All right. And you don't have anybody?

MR. GRAY: No, Judge.

THE COURT: So, hopefully, at 1:30, we can agree on the Charge. If not, maybe I can get some idea of where the disagreement is.

MR. CALVERT: Yes, sir.

MR. GRAY: I can't anticipate anything.

MR. CALVERT: I think it's pretty

straightforward, Judge.

THE COURT: We'll see you at 1:30.

(Noon recess.)

THE COURT: Y'all agree on the Charge?

MR. CALVERT: I believe Earl is still looking at it.

MR. GRAY: I'm going through it right now. I can't anticipate anything, but I'll be quick.

THE COURT: Okay.

MR. CALVERT: Judge, I think we have an agreement except it would help if I had the right style and information on the verdict form.

COURT COORDINATOR: It also printed a blank page on here.

MR. CALVERT: It did. It's because I deleted a whole bunch of stuff.

MR. GRAY: Actually, I'm fine with it just the way it is because I find it hard to believe he would be found guilty of an offense that's not charged or alleged.

MR. CALVERT: Right. I'm fixing the verdict form now, Judge.

THE COURT: We ready -- well, no, we're not. Ready to bring the jury out?

MR. CALVERT: Yes, Judge.

THE COURT: Did you say you had two more witnesses?

MR. CALVERT: Two more, but they're going to be very quick.

THE COURT: All right. Let's bring them out.

(Jury seated.)

THE COURT: Everyone be seated.

MR. CALVERT: We recall Terry Young.

THE COURT: Mr. Young is still under oath. Go right ahead, sir.

**TERRY YOUNG,**

having been previously duly sworn, testified as follows:

**DIRECT EXAMINATION**

**BY MR. CALVERT:**

Q. Are you the same Terry Young that testified in the case this morning?

A. Yes, sir.

MR. CALVERT: May I approach the witness, Judge?

THE COURT: Yes, sir.

Q. (By Mr. Calvert) Investigator Young, when you were doing the inventory on the Defendant's truck, you told the jury earlier that you found this jacket with that gun in it in the backseat; is that correct?

A.   Yes, sir.

Q.   I believe you also said during the inventory you found a black duffle bag that contained a bunch of clothing, correct?

A.   Yes, sir.

Q.   I'm going to show you what's been entered into evidence as State's Exhibit 15.  And is this the inventory form that Deputy Ficke filled out while y'all were doing the inventory?

A.   Yes, sir.

Q.   Flipping over onto the back, you made reference to one black canvas bag -- one black canvas bag with CDs; is that right?

A.   Yes.

Q.   Okay.  And then you had assorted clothing; is that correct?

A.   Yes, sir.

Q.   Okay.  The -- the jacket, State's Exhibit 10, was this thing found inside the black duffle bag that you described that contained all of Monishia Campbell's clothing?

A.   No, sir, it was not.

Q.   Okay.  Thanks.

MR. CALVERT:  I'll pass the witness.

## CROSS-EXAMINATION

BY MR. GRAY:

Q. In all fairness, you can't recall exactly where the location as to the jacket was, though, can you?

A. It was in the back area, but exactly whether right behind the driver's seat, right behind the passenger's seat, in between, the exact particular location, no.

Q. Okay. Same thing as far as whether the clothes were beside it, under it, on top of it, do you have any knowledge of that?

A. I can't remember specifically, no.

Q. Okay. And on that inventory list, I know that the jacket and the gun and the bullets that were found inside the gun was listed on a separate evidence list; is that correct?

A. Yes, I think so.

Q. Okay. But that one bullet that was retrieved that we talked so much about, long rifle or long, that was not included on either one of those sheets; is that right?

A. I guess not, sir.

MR. GRAY: Pass the witness.

MR. CALVERT: Nothing further, Judge. And we would ask that he be finally excused.

MR. GRAY: No objection.

THE COURT: You're finally excused.

THE WITNESS: Thank you, sir.

MR. CALVERT: We'll call Jason Ware.

(Witness sworn.)

THE COURT: Have a seat. Go right ahead.

MR. CALVERT: Thank you, Judge.

**JASON WARE,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

**BY MR. CALVERT:**

Q. Would you introduce yourself to the folks in the jury, please?

A. I'm Jason Ware. I'm a Criminal Investigator with the Brazos County Sheriff's Office.

Q. And were you working as a detective with the Sheriff's Office back on February 16th of 2012?

A. Yes, I was.

Q. And were you present as one of the officers that was helping to execute the arrest warrants on Defendant David Greer and Monishia Campbell?

A. Yes, I was.

Q. And after they were taken into custody, did you stick around on the scene?

A. Yes, I did.

Q. And did you become aware that Deputy Ficke and

Investigator Terry Young were conducting an inventory search of the Defendant's truck?

A. Yes, I was.

Q. And the jury saw the video earlier. If they saw Terry Young standing there are on the passenger's side of the truck doing the inventory, would you have been the guy standing literally right behind him?

A. Correct, that was me.

Q. So, were you standing right there behind Investigator Young while that inventory was being conducted?

A. Yes, I was.

Q. Were you kind of keeping an eye on what they were doing just out of curiosity?

A. Yes, pretty much.

Q. Okay.

MR. CALVERT: May I approach the witness, Judge?

THE COURT: Yes, sir.

Q. (By Mr. Calvert) Do you recall Investigator Young finding what I'm going to show you that's been entered into evidence as State's Exhibit No. 10, this black jacket?

A. Yes.

Q. Where was this?

A. In the vehicle. I'm not exactly sure where he pulled the vehicle -- where he pulled the jacket from.

Q. Okay. When -- you saw him recover this, though?

A. Correct.

Q. And when he recovered it, was this like inside a bag full of other stuff? Did he have to pull it out, or was just in the truck?

A. I don't believe so.

Q. Okay. You didn't -- certainly didn't see him have to remove it from any kind of bag or any other container?

A. No.

Q. Okay. Thank you, sir.

MR. CALVERT: I'll pass the witness.

**CROSS-EXAMINATION**

BY MR. GRAY:

Q. And you don't -- but you don't exactly know where that jacket was, just that it was in that backseat area?

A. Correct, I do not know exactly where it was.

MR. GRAY: Okay. I'll pass the witness.

MR. CALVERT: Nothing further. We'd ask that he be finally excused.

THE COURT: You're finally excused.

THE WITNESS: Thank you.

THE COURT: Thank you.

MR. CALVERT: We'll close.

THE COURT: State has closed their case.

MR. GRAY: We close and rest.

THE COURT: Both sides have rested and closed.

Ladies and gentlemen, we've come to the end of the presentation of evidence. We have the Court's Charge prepared. We need to go over it one final time before we read it to you and hear the final arguments of the attorneys, so let's take a ten-minute break, and that will hopefully give us enough time to do this. Thank you.

(Jury retired.)

THE COURT: All right. Are we ready to talk?

MR. CALVERT: Yes, sir.

MR. GRAY: Yes, Judge.

THE COURT: Have you had an adequate opportunity to review the Charge?

MR. GRAY: Yes, Judge; and we have no objection.

THE COURT: No objection.

State?

MR. CALVERT: No objection.

THE COURT: The Charge is in final form.

Are we ready to bring out the jury?

MR. CALVERT: Yes, sir.

MR. GRAY: Yes, sir.

MR. CALVERT: As far as warnings, Judge, can I have 15 minutes. Is that --

THE COURT: How long do you want?

MR. CALVERT: Earl is 15 okay?

MR. GRAY: Yeah. You don't mind if I go twice, do you?

MR. CALVERT: I do. I would object to that.

MR. GRAY: Yeah, 15 is fine, Judge.

THE COURT: Fifteen for both sides. Do y'all want a warning on this side?

MR. WARD: Seven, Judge.

THE COURT: Seven expired?

MR. WARD: Yes, Judge.

MR. CALVERT: If I get to two left, Judge.

THE COURT: Two left.

MR. CALVERT: Yes, sir.

MR. GRAY: Same with me, Judge.

THE COURT: Same with you. All right. All right. Let's bring them out.

(Jury seated.)

THE COURT: Ladies and gentlemen, sit over there and twiddle your thumbs for a little while. We forgot to make copies for you.

(Brief pause.)

THE COURT: Go ahead and hand them out.

All right. Ladies and gentlemen, I'm going to go ahead -- the law requires that I read this Charge to you word-for-word; and then, you'll have your copy to read along there.

(Charge read.)

THE COURT: I've placed a Blueback on the official version of the Court's Charge. Mr. Montoya will place it on the table when you-all enter the room to begin your deliberations.

At this time, we'll hear the final arguments of the attorneys. The State has the right to go first, and they have the right to go last, and the Defendant gets to make an argument in between the two.

Go right ahead, Mr. Ward.

**CLOSING ARGUMENT BY MR. WARD**

MR. WARD: A couple of weeks ago, I stood up here; and I told the jury that they had the dubious honor of being the first jury that I ever addressed. So, you now have the honor of being the second jury I've ever addressed. And I'm hoping like an NFL quarterback this isn't like a sophomore slump for me. So, here I go.

I used to be in the Marine Corps. I spent about ten years in the Marine Corps, traveled all around

the world, met a lot of different people, a lot of different cultures, spent a lot of time in Iraq. They've got an inquisitorial system in Iraq. And the inquisitorial system means basically that the judge and the prosecutor are the same person and that the defendant has to prove his innocence.

But this is the United States of America. More specifically, this is Texas; and we don't play that way. We have you, the jury. And the Judge talked to you out of this form and said that you are finders of fact, and you are judges of credibility.

I'm going to cycle back to both of those things while I'm talking to you today.

Ryan spend a lot time talking with you during voir dire about elements, the elements of this particular charged crime.

And what do we have? Let's talk about it. You have on or about February 16th, 2012. Is there any doubt in your mind that this happened on that date?

Let's move on. In Brazos County. Yes, we know it's in Brazos County.

Do we know that the Defendant, David Greer, is a convicted felon? Yes, we do. There's a stipulation to that.

Do we know that this offense happened within

that window of five years between the finality of his conviction and this date? Yes, we know that that happened because it's stipulated to it.

So, what does this all boil down to? This boils down to a whole day spent on possession, knowingly or intentionally possessing a firearm. Because you know that was a firearm because that was stipulated to, and you saw it as well.

So, what do we have? We have a video. We showed you the video. We brought police officers in here to testify. You saw that video. You saw them pull Dave Greer out of the driver's seat of that vehicle after taking a little bit to stop, after the lights were popped. You saw him come out of that vehicle not wearing a jacket, even though it's February.

You saw the passenger come out of the vehicle wearing a jacket. You heard Monishia Campbell say that Dave Greer had a camouflage jacket and that she wasn't wearing that camouflage jacket. But we know from watching the video that he wasn't. The only other jacket in that truck was a black leather jacket.

We know that the gun was in the right pocket of that black leather jacket. We know from Monishia Campbell stating on the witness stand and also in the video that that's Dave Greer's jacket. His mother gave it

to him after a fire.

You know that you just saw a video where Investigator Ledesma asked him if that was his jacket. He said no. Why would he deny it? Everyone said it's his jacket, not my jacket. Why would he tell the investigators at the scene that it wasn't his jacket if there was nothing wrong?

This is an elements case. It's a building-block case. I can't show you a video with Dave Greer with a gun in his hand. I can show you the little bits and pieces of information that add up to it, because remember, you are the finders of fact. You can find these facts and add them up.

It does not have to be beyond a reasonable doubt because, remember, just like Ryan told you in voir dire, how is the only way you can know beyond a shadow of a doubt that it happened? Either you did it, or you watched it. None of us were there. We didn't see it. But we heard credible testimony.

You're judges of fact, finders of fact, and judges of credibility.

Let's talk about credibility. We put officers on who have spent literally combined decades within the State of Texas and Brazos County conducting criminal investigations. Training, experience, video,

that proves that they're credible witnesses.

Do we have fingerprints on the gun? No, sadly, this isn't a television show. Okay. At the end of this trial, you're not going to get a dun-dun; and then, Ryan and I go up and talk to the D.A.; and we have a shot of whiskey; and it's all over; and then, we move on to the next case. That's not going to happen. That happens on TV. Okay?

Ask yourselves, was he wearing a coat? No. Was there a coat in the vehicle? Yes. Was it within grabbing distance? Yes. It's a Ford Ranger. The backseat of a Ford Ranger. You can use your personal experience from outside. Do you remember what the size of a Ford Ranger backseat is?

You saw Monishia Campbell get up on the stand and tell you that Dave Greer was wearing a jacket that day. He wasn't. She said she was wearing a different jacket that day. She wasn't. She, in fact, was wearing a camouflage jacket. You saw it from the front seat of Sam Ballew's vehicle. You heard her. You heard the surprise in her voice when Rick Ledesma asked her, "Do you want to claim responsibility for this gun?" "No."

And then, you immediately heard her ask it: "Is Hillbilly going to get in trouble for a long time?"

You're judges of credibility. You can add

two and two together to come to a decision. And at the end of the day, this is a possession case; and it's a credibility case. Ask yourself whose credibility are you going to believe from the witness stand about who possessed that firearm?

Add it up in your mind. When you go back into the jury room, add it up. I think we've shown you beyond a reasonable doubt that Dave Greer possessed that gun in Brazos County on or about February 16th, 2012, that he was a convicted felon and that he was within that five-year window.

You shouldn't feel bad about finding guilt in this case if it all adds up because you're the jury and find facts. You judge credibility, and you ensure that we have a functioning justice system in the United States of America and the State of Texas.

Ryan and I are asking you to find guilt in the case and send Dave Greer a message that you don't get to carry a gun and break the rules, even though he was in jail for not following the rules. You've got to follow the rules and hold him accountable and hold him to the same standard as everyone else in Brazos County.

Thank you.

THE COURT: All right. You used seven minutes.

Mr. Gray?

MR. GRAY: May I proceed, Judge?

THE COURT: Go right ahead, sir.

MR. GRAY: I'm trying to set this up a little before we start, so I'm not clanging around.

**CLOSING ARGUMENT BY MR. GRAY**

MR. GRAY: First, I want to thank each and every one you for your time. I know this has not been a real lengthy trial, and we effectively picked the jury yesterday, and you got all your evidence today. And so, it should be fresh in your mind as to what came through that witness stand.

And remember, also, that what I say and the two prosecutors say is not evidence. It's argument. It's not evidence. You have the evidence. You also have the actual DVD recording that you can play to refresh your memories of those things.

When you go back there, we want you take your God-given common sense back there with you. Okay? We don't expect you to leave that at the courthouse door. And please remember that as to each and every element the State has to prove beyond a reasonable doubt.

If they do, if they prove each and every element beyond a reasonable doubt, you're duty bound to convict. That's what you should do. That's your duty.

But on the other side, if they do not, if they fail on even one element, you're duty bound to acquit.

Now, we talked about the different levels of proof. I'm not going to get into the reasonable suspicion, probable cause. Again, preponderance is more likely than not, 51 percent. Clear and convincing, again, a firm belief that the allegations are true. We don't have a definition for above beyond a reasonable doubt, but we know it's high. It's the highest burden in the land. It's higher than a firm belief that the allegations are true.

And that's how -- those are the glasses that you have to look at each piece of evidence to see if they can come in and establish each one of those elements beyond a reasonable doubt. If they fail on one, you must acquit.

You know, there's not an issue as to whether David is a convicted felon. That's not an issue. Okay. We didn't fight the State on that allegation or that element. We stipulated to it. Okay. That's proof beyond a reasonable doubt. You should not have any doubt in your mind as to that element. And so, we're not really talking about the felon part.

The real issue, as the State has correctly

stated, is the possession. He has to intentionally or knowingly, knowingly, know the gun is there and possess it. Have custody, control or management or care of that item. Okay? And they just haven't met that burden as to the possession.

Let's go through some of what they have and what they don't have. There's no testimony from David -- no testimony at all through this entire trial from any witness, my side or their side, that David ever handled that gun. Not a single witness.

There's no statement from David saying that he ever possessed that gun. Monishia Campbell never stated that he possessed the gun. Even when she was less than truthful with the officers when she was arrested, she never said "That's David's gun. David possessed the gun. David carried that gun." She's never said that.

Now, she was less than truthful with the police officers at that time. Well, I mean, is that a real shocker? She's on felony probation out of Galveston. She's arrested. She's in handcuffs. She's placed in the back of a patrol car. "Hey, is this your jacket?" "No, that's Hillbilly's." It probably was Hillbilly's or David's jacket. It doesn't make any difference who owned it.

She indicated she wears large -- larger

jackets. I don't 100 percent know why. She said it keeps her warm. I don't know. We know that on the day of the offense she was wearing the same size jacket herself. And when I and my legal assistant, Theresa, had gone out there and visited with her, like she testified to, she was also wearing an extra large jacket. So, you know, it's not strange that she would wear that.

You heard her testimony that the day before they were arrested -- they were pulled over and arrested, they got into a fight, an argument. She grabs all of her stuff, and she throws it in the vehicle. Can she specifically remember what she did with the gun? She thinks she wrapped it up in something. It could have been the jacket -- she didn't recall 100 percent -- put it in duffle bag. Okay. She then threw all that stuff in the back of the car. Okay.

Now, the officers went through these items, you know, they're inventorying it. We don't have any pictures as to exactly where that jacket was. I'm in no way attacking any of the officers' credibility at all. I think each one of those officers were truthful, and they're good officers. I know most of them. That's not what I'm talking about.

They simply could not recall exactly where everything was. And I don't know that anyone could, going

all the way back to February.

Now, what could have been done, though -- what could have been done is a photo taken, right, before the inventory started. Two reasons for that. That may protect you on liability, too, because you've got a picture of everything right as they entered the vehicle. Now, that would have helped, but we don't have that.

She doesn't know where that jacket was. I don't know that anyone will ever know exactly where that jacket was in the back area. We do know that a gun was found in that jacket.

When she's initially asked by Investigator Ledesma, "Do you want to take ownership, or do you want to take responsibility for this gun," you know, she said, "Oh, no, it's not my gun." Okay.

THE COURT: Seven gone.

MR. GRAY: She did not say that it was David's gun. Okay?

The jacket is interesting. When he comes and he shows the jacket and asks whose jacket it is, and she goes, "that jacket," and she sighs. Why would she sigh? Why would she be upset about a jacket if she knew nothing was in it? She was upset because she knew the gun was in it.

Later, she does tell Investigator Ledesma

that she did get a gun when he revisits her in jail.

And we don't even have any proof it's a firearm. We got testimony from a seasoned veteran officer that it's a firearm, but was it ever tested? Have we ever fired it? Do we know it can expel a shell? We can guess, but we don't know because it was never tested.

And does she have a reason to carry a gun? You bet she does. She was -- previously weeks before this event, she was brutally raped and kidnapped. She was terrified. So, yes, she possessed a gun. Is it reasonable to believe that maybe when the officer's asking about this stuff, she's not going to take responsibility for something because she's afraid she may get in trouble?

Found a live .22 shell in her jeans. The officer said if it is a long rifle, it wouldn't fit. The problem is is that we don't know for sure if it was a long rifle. We've got the picture, but we've got no identifying markings. It would have been nice, though, to have that bullet, wouldn't it, so we could test it? But we don't have that. That was not included on the inventory sheet or the evidence sheet.

Fingerprints, the gun is finally fingerprinted a week ago. Not fingerprinted in February, March, April, May. Okay. And then they counter this when I sat down and said, "Well, we didn't need that stuff."

If you didn't need it, why did you ask to get it? If you didn't need it, why have it done?

Same thing on the ATF check. If you weren't concerned about who that gun was going to come back to, why did you run the check a week ago -- and we don't have the result. That right there is reasonable doubt. What if that comes back to Monishia, that she purchased it? Well, we don't know.

No DNA was collected. No DNA was compared. The officer indicated that that's done in crime scenes. It's possible to get DNA matches or exclusions.

You know, as to Monishia's testimony, take it for what it's worth, you know. I don't know. I wasn't there. You weren't there. You assess the credibility. You can tell if as she was crying up there, she was making that up. Even if you discount every bit of Monishia's testimony, they still don't get to beyond a reasonable doubt.

They simply do not have enough. They're going to talk about David's coat, you know, him saying that's not his. Think about this. You've got a convicted felon. He's in a police car, just like Monishia, in handcuffs. Officer comes up with a coat, "Hey, is this yours?"

What do you think he's going to say? The

officer wouldn't be bringing a coat unless he found something in the coat, right? So, is it shocking that he would say that's not my coat? No. And the coat isn't the issue. It's the gun. They cannot connect him to the gun in any way.

That's not enough just to be in the backseat of a vehicle.

You know, maybe Monishia possessed it. You may even think when you get back there, maybe, just maybe, he possessed it; but you can't know. There's no way I can know. There's no way you can know. That's the problem we're running into here.

Sure, it's possible that either one or both could have possessed it. But see, it's not my job to stand up here and prove who possessed it. It's not even my job to disapprove that David possessed it. It's their job 100 percent to prove beyond -- each element beyond a reasonable doubt. Even if you're at a point where you have a firm belief that the allegations are true to each allegation, that is not enough. It has to be above that burden.

Each of you, you took an oath initially whenever we were picking the jury that you were going to tell the truth. And I believe you did. I asked you about that. Remember what I said? I'd take the first 12 people

officer wouldn't be bringing a coat unless he found something in the coat, right? So, is it shocking that he would say that's not my coat? No. And the coat isn't the issue. It's the gun. They cannot connect him to the gun in any way.

That's not enough just to be in the backseat of a vehicle.

You know, maybe Monishia possessed it. You may even think when you get back there, maybe, just maybe, he possessed it; but you can't know. There's no way I can know. There's no way you can know. That's the problem we're running into here.

Sure, it's possible that either one or both could have possessed it. But see, it's not my job to stand up here and prove who possessed it. It's not even my job to disapprove that David possessed it. It's their job 100 percent to prove beyond -- each element beyond a reasonable doubt. Even if you're at a point where you have a firm belief that the allegations are true to each allegation, that is not enough. It has to be above that burden.

Each of you, you took an oath initially whenever we were picking the jury that you were going to tell the truth. And I believe you did. I asked you about that. Remember what I said? I'd take the first 12 people

if they would just follow this rule of beyond a reasonable doubt. And I'm satisfied that you-all will.

Monishia testified she's not with David anymore, but she does not want an innocent man to be convicted of a crime he did not commit. I don't want that either, and I know you-all don't want it either.

There's simply no way to know. Probably is not enough. Even if you think you have this strong conviction, that's still not enough. You have to be satisfied in your mind as to each element beyond a reasonable doubt or you're duty bound to say not guilty.

You told me you'd do that in voir dire. That's what I'm asking you to do now. You took an oath. At this point, as jurors, will you follow that oath?

**CLOSING ARGUMENT BY MR. CALVERT**

MR. CALVERT: Earl, a minute ago, talked to y'all about using your common sense and applying that in your deliberations. So, let's do that.

Why do people lie? Because one thing is important -- please leave that up there. One thing that's important to consider is -- and sometimes we lose track of this doing this job and being in this courthouse everyday -- we lose track of the fact that there's a perception sometimes that there's something magical or weird happens in the courtroom. The same rules that apply

in our daily lives, rules of common sense, rules of how we make decisions are somehow suspended or go away once you get in this room. And they're not.

That's exactly why there is not that sign downstairs like we talked about in jury selection of "Please check your life experiences and common sense with courthouse security before reporting to jury duty," because that's not there. Because it's those things, those experiences that allow you to do things like judge credibility. Because every day in your life whether you realize you're doing it or not, you're judging the credibility of everything that's ever told to you by anybody.

And that's really what it falls on in this case. Because like Will said, you know, we'd all be in trouble if in order to prosecute somebody for, say, possession of a weapon or possession of drugs or any possession crime, it has to be in their hand or on their person. That's just not the law, and it never has been. And it's nonsensical, and everybody told me that in voir dire.

And so, it gets down to how do you decide credibility and what things do you actually know about a case? And so, let's go back to what the Defense counsel just talked to you about with this business of proof

beyond a reasonable doubt. Shoot, let's throw reasonable doubt out the window, and let's go all the way to shadow of a doubt. That's not the burden of proof, but let's play in that range.

Applying your common sense and applying your life experience and things that you know as reasonable people that you've learned through your lives, ask yourself this question: Why do people lie? Why does anybody lie about anything?

And our common sense tells us it's because there's always a reason, there's always a purpose, an objective behind the lie. Otherwise, you wouldn't bother to lie. But if you're lying about something, it's because you don't want the truth to come out.

We're getting an education on that with the whole General Petraeus thing right now. There's always a reason for a lie. So, playing the realm of proof beyond a shadow of a doubt and with the knowledge that there's always a reason, there's always a purpose, an objective behind the lie, look at what you know about this case.

You know, Defense counsel gets up here and says "being in the backseat of a vehicle." Well, we're kind of washing over some facts there. It's not a vehicle. It's his vehicle. There is no question. None. We are beyond a shadow of a doubt. The vehicle was his.

Monishia told you that. It's registered to his parents, but that's his truck. That's his truck.

There was no question about that. That's specifically the vehicle that the police were sent to find because it's associated with him. So, No. 1, it's in his vehicle.

And they got up here a minute ago, and they talked about this is really a case about possession. And I'm going to disagree with that a little bit. The issue -- the lone issue in front of you is not possession. There can be no dispute. Again, we are there beyond a shadow of a doubt that this man was exercising care, custody, control or management over that pistol. We know that. Why? Because it was in his vehicle that he was driving.

The question, then, is not one of possession. It's one did he know it was there? It's one of knowledge.

So, we also know beyond a shadow of a doubt that not only was the gun in his vehicle, the gun was in his jacket. His jacket. We know beyond a shadow of a doubt that not only was the gun in his vehicle in his jacket, we know that he lied about that being his jacket.

We know that 100 percent beyond any and all possible shadow of a doubt. Even his girlfriend, Monishia

Campbell, acknowledged that. This is his, came from his mom.

Why is he lying about that? Because there's always an objective. There's always a reason behind a lie.

Why lie? Because that's what it really comes down to. If Monishia's testimony today -- if any of that were true, there's no reason for him to lie. She told you that. Oh, no, he had no reason to lie. He had no reason to ever deny that this was his jacket, except that we know for certain, beyond a reasonable doubt, beyond a shadow of a doubt that he did. We know he lied.

Why? And we know beyond any shadow of a doubt that Monishia lied and lied and lied. Why? What is the purpose? What is the objective behind all of those lies by Monishia if not to protect him? Because if she's telling the truth, there's no need to lie.

You do not evaluate a case in a vacuum. You do not look -- this -- when you're putting together a jigsaw puzzle, you don't pick up one piece of the puzzle, look at it by itself and say, "What is the image? Well, I can't tell." Throw away. Go to the next one. You've got to put each of those little pieces together; and at the end, take a step back and look at what you've got.

And if you do that in this case, it's his

truck. It's his jacket. He lied about it being his jacket. Why?

And then you get to Monishia. Monishia comes in here -- and what -- you're allowed to watch that video, or I encourage you to do it again, but when you do, listen to her voice when she's talking to Ledesma and ask yourself this question: Did Monishia sound more credible then or today?

There's no contest. Because then listen to her voice when he says, "Are you going to claim this gun?" "No." Gun? What are you talking about gun? "Is Hillbilly going to get in trouble for a long time?" That was her immediate concern.

But then, listen to what she says today. "I told Ledesma. I told Ledesma on the roadside February 16th, 2012, that is not his gun. I told him that. I told him in the back of the squad car that day."

I probably asked her that three or four different times three or four different ways. Each and every time, she made it crystal clear. "I told Rick Ledesma that day, in that conversation on the side of that road that is not Dave Greer's gun."

THE COURT: Two minutes left.

MR. CALVERT: Except she didn't. You've seen the video. She's lying about that. Why?

And then, you look at how her testimony changes. She gets up on redirect, "Oh, well, maybe that happened later in that other interview," except she didn't tell him that then, either. She said I bought a gun, but not that gun. Not that gun. Why?

You know beyond a reasonable doubt, beyond all doubt, she told you "I was wearing a satiny flowery jacket. That is not true. You know it beyond a shadow of a doubt. You saw it on the video.

You know she told you, "He was wearing a camouflage jacket when we got stopped." She was very forceful on that. You know beyond a shadow of a doubt that is a lie. That is not true. You've seen the video of it. Why did she lie?

It is your job to put all this together. It is your job to look at this jigsaw puzzle, all these little pieces. And if you do, just like that jigsaw puzzle you do on your coffee table, at the end, when you take that step back and you look at it, it's a very simple and very clear picture.

You've got a guy who's a convicted felon, driving his truck, in his jacket, with a gun that he lied about, that his girlfriend, immediately, upon her discovery and her shock to find out there was a gun in the car, says, "It's not mine." And does it in an appropriate

way, a believable way. You can listen to her voice.

But the one thing she told you that was true is she knew in that moment, this is real bad for Dave Greer. He's in trouble. This is real, real, real, real bad for Dave Greer. What can I do to help him?

That day she didn't come out and say, "It's not his. It's not his." That happened today.

THE COURT: Time has expired.

MR. CALVERT: Do the right thing and find him guilty.

THE COURT: All right. Ladies and gentlemen, please retire to the jury room and begin your deliberations.

(Jury retired for deliberations.)

(Jury request to view video.)

(Jury continued deliberations.)

THE COURT: Ready to bring them out?

MR. CALVERT: Yes, sir.

THE COURT: Let's bring them out.

(Jury seated.)

THE COURT: Everyone be seated. Has the jury reached a verdict?

THE FOREPERSON: We have, Your Honor.

THE COURT: Defendant, please rise.

(Defendant complied.)

THE COURT: Flip over to the verdict page and read the verdict, please, sir.

THE FOREPERSON: We, the jury, find the Defendant, David Greer, guilty of unlawful possession of a firearm by a felon as charged in the indictment.

THE COURT: Either side wish to have the jury polled?

MR. CALVERT: No, Your Honor.

MR. GRAY: Defense does not.

THE COURT: All right. Pass the verdict over to the bailiff, please.

(Foreperson complied.)

THE COURT: The verdict form appears to be in proper order. It will be received and filed in the Minutes of the Court.

Does either side wish to visit with the jury after the case?

MR. CALVERT: If they want to.

MR. GRAY: If they have time.

THE COURT: All right. Ladies and gentlemen, I'm about to discharge you and let you go. If you'd like to stay behind and visit with the attorneys, you can remain in the jury room for a few minutes. They'll come in there and be real nice to you, but they like to get feedback from you on the case if you care to

do that.

On the other hand, if you care not to do that, you're free to leave immediately and go to your car and get out of here.

Thank you so much for your time and for your attention in this matter. You've been an excellent jury. We appreciate you very much. And at this time, you're released from all instructions. You can talk to whoever you want to about the case, and you are no longer under any instructions.

You're now discharged. Thank you very much.

(Jury retired and released.)

THE COURT: We'll begin at 9:00 o'clock in the morning.

MR. CALVERT: Yes, sir.

(Evening recess.)

THE STATE OF TEXAS

COUNTY OF BRAZOS

I, DENISE C. PHILLIPS, Official Court Reporter in and for the 272nd District Court of Brazos, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $ _947.00_ and was paid/will be paid by _Brazos County_ .

WITNESS MY HAND AND OFFICIAL SEAL this the 3rd day of May, 2013.

DENISE C. PHILLIPS, CSR
Texas CSR 6482
Official Court Reporter
272nd District Court
Brazos County, Texas
300 East 26th Street, Ste. 204
Bryan, Texas 78703
Telephone:  979-361-4221
Expiration:  12/31/13

CERTIFIED
TRANSCRIPT

1

**'**

'80s [2]  8/1 8/7

**.**

.22 [36]  25/22 40/2 41/5 49/23 50/5 50/7 50/13 50/15 50/16 51/4 51/4 51/4 53/13 54/6 55/15 64/3 64/9 64/10 64/10 64/14 64/14 64/19 65/5 65/8 65/18 93/3 93/18 94/1 94/3 94/4 94/5 94/7 105/9 115/22 173/14
.22s [3]  50/11 65/24 94/7

**1**

10 [10]  40/7 40/22 41/3 41/24 56/18 74/4 127/12 128/23 155/18 158/22
10-11 [2]  41/5 41/11
10-13-00049-CR [1]  1/4
100 [4]  25/25 171/1 171/14 179/24
100 percent [1]  175/17
103 [1]  2/11
11 [12]  40/18 41/3 41/5 41/11 42/13 46/3 47/7 49/2 52/23 53/14 54/24 129/23
112 [1]  5/13
12 [8]  53/10 53/24 54/1 54/6 54/12 54/13 55/25 175/25
12/31/13 [1]  186/20
122 [1]  5/13
13 [2]  51/11 186/20
137 [1]  5/13
14 [11]  3/2 4/2 5/2 6/2 7/2 19/25 20/2 22/2 99/14 99/23 100/1
144 [1]  5/16
147 [1]  5/16
14th [1]  1/14
15 [11]  21/7 28/4 43/21 89/25 90/3 90/10 90/11 155/7 161/4 161/6 161/10
150 [1]  5/16
154 [1]  5/20
156 [1]  5/20
157 [1]  5/21
159 [1]  5/21
16 [1]  107/15
16th [15]  22/24 25/15 28/19 79/22 82/10 99/21 113/6 113/16 116/13 117/22 135/23 157/16 163/18 167/9 181/16
17 [2]  79/14 151/4
19 [1]  7/19
1978 [2]  27/6 28/7
1:00 [1]  151/23
1:30 [5]  151/22 151/23 151/23 152/20 153/2

**2**

20 [2]  21/7 43/22
2005 [1]  27/10
2012 [15]  1/14 3/2 4/2 5/2 6/2 7/2 79/22 99/21 113/6 123/2 135/24 157/16 163/18 167/9 181/16
2013 [1]  186/13
204 [2]  1/23 186/18

21 [2]  78/23 78/23
24007265 [1]  2/10
24036308 [1]  2/4
24077302 [1]  2/5
26 [1]  5/18
26th [3]  1/23 2/6 186/18
272 [1]  1/3
272nd [4]  1/8 1/22 186/4 186/17
29th [3]  9/21 15/4 96/20
2:00 [1]  79/24

**3**

30 [2]  9/5 49/25
300 [3]  1/23 2/6 186/18
310 [1]  2/6
31st [1]  30/9
3235 [1]  2/12
34 [2]  79/2 79/4
35 [1]  7/7
3rd [1]  186/13

**4**

4 through [1]  48/13
4-9 [2]  48/19 48/24
40 [1]  21/12
403 [1]  12/10
4221 [2]  1/24 186/19
4320 [1]  2/7
4759 [1]  2/12

**5**

50 [1]  105/24
51 percent [1]  169/7
57 [1]  5/18

**6**

6482 [2]  1/22 186/16

**7**

73 [1]  5/19
74 [1]  5/19
77803 [2]  1/23 2/7
77803-3235 [1]  2/12
78 [1]  5/14
78703 [1]  186/19

**8**

84 [1]  7/19
87 [1]  5/14

**9**

91 [1]  5/15
93 [1]  5/15
95 [1]  5/17
97 [1]  5/17
979-361-4221 [2]  1/24 186/19
979-361-4320 [1]  2/7
979-822-4759 [1]  2/12
9:00 [1]  185/13

**A**

ability [2]  103/1 111/22
able [9]  31/6 75/24 81/9 102/15 102/16 104/10 104/14 118/14 141/25
about [121]  7/17 7/18 8/11 9/4 9/5 10/17 12/14 12/24 13/20 13/22 13/24 14/4 15/13 18/20 24/20 25/16 30/14 33/5 35/24 36/13 36/17 39/19 41/8 46/24 49/1 49/5 56/21 56/23 57/2 57/20 58/18 61/11 64/3 64/9 64/9 73/16 73/22 74/5 76/17 77/1 78/23 79/14 85/9 85/16 85/20 85/21 85/21 90/12 93/19 97/10 97/23 98/4 106/11 108/4 108/13 109/25 110/1 110/2 111/13 113/2 113/16 116/1 120/3 124/21 124/22 125/17 127/21 131/4 133/7 133/10 133/24 134/10 135/6 136/24 143/9 146/23 146/23 146/25 147/1 147/5 149/8 149/11 150/19 152/1 152/5 156/19 162/25 163/15 163/17 163/18 165/22 167/4 167/9 167/12 169/4 169/24 171/23 172/22 173/12 174/4 174/20 174/21 175/24 176/17 177/5 177/23 177/25 178/9 178/13 178/20 179/3 179/8 179/8 179/23 180/3 181/1 181/11 181/25 182/23 184/21 185/9
above [6]  1/15 109/19 169/9 175/20 186/5 186/7
above-styled [1]  186/7
above-titled [1]  1/15
absolutely [5]  104/18 109/20 130/24 131/3 149/4
absolved [1]  104/15
accepts [2]  121/20 121/21
according [1]  128/18
accountable [1]  167/21
accounting [1]  35/19
accurate [2]  33/21 48/14
acknowledged [1]  180/1
acquit [2]  169/3 169/17
action [1]  12/16
actions [1]  125/5
active [1]  101/18
acts [2]  15/14 118/1
actual [9]  16/24 21/11 51/15 60/4 74/14 75/15 81/23 95/8 168/16
actually [43]  8/25 16/1 21/1 23/22 32/25 46/21 47/1 48/12 51/25 52/1 52/14 53/14 55/25 57/14 57/17 57/21 58/2 58/8 59/6 61/22 62/23 64/19 66/1 68/20 69/16 71/10 71/18 72/25 73/4 74/18 82/7 85/5 88/15 89/19 90/8 107/2 108/16 128/2 141/5 145/12 145/12 153/17 177/23
add [5]  165/11 165/13 166/25 167/6 167/7
addition [1]  110/13
additional [2]  41/7 143/25
address [2]  101/9 118/24
addressed [2]  162/20 162/22
adds [1]  167/13
adequate [1]  160/17
adjudicate [1]  121/17
adjudication [1]  122/5
admissibility [1]  111/5
admissible [4]  14/11 16/20 105/20 105/21
admission [1]  11/13
admits [1]  143/2
admitted [23]  6/4 19/12 19/15

22/1 22/2 34/6 34/7 41/10 41/11 42/17 48/23 48/24 54/11 54/12 54/13 90/10 90/11 99/25 100/1 104/1 142/16 142/23 144/1
advise [1]  83/14
advised [7]  8/13 17/25 18/1 77/6 77/14 77/16 83/19
affidavits [1]  16/23
afraid [1]  173/13
after [29]  10/11 13/20 14/5 20/15 25/17 34/22 36/11 39/23 74/3 82/3 82/3 83/18 93/7 93/15 93/16 101/21 120/16 131/16 136/23 139/5 139/17 139/18 142/6 148/15 157/22 164/12 164/13 165/1 184/17
afternoon [2]  26/24 79/25
again [22]  12/13 15/6 15/8 25/19 46/3 50/22 54/25 54/25 85/15 86/3 91/2 106/22 107/21 108/2 119/21 121/24 127/3 140/9 169/6 169/7 179/11 181/5
against [1]  118/2
agency [1]  24/6
agenda [2]  82/17 82/18
ago [15]  8/11 73/22 96/21 116/11 123/15 124/5 127/10 129/21 129/24 134/23 162/18 173/23 174/5 176/16 179/7
agree [24]  16/14 16/18 17/17 29/14 56/17 58/6 65/1 65/4 66/1 67/11 69/21 70/3 75/22 94/18 98/5 98/22 111/6 128/2 130/24 131/2 132/25 133/2 152/21 153/4
agreed [1]  34/11
agreement [2]  34/17 153/11
ahead [23]  7/12 8/3 21/10 22/21 26/18 32/14 42/16 76/16 78/11 86/3 95/21 107/3 112/13 112/19 125/4 142/8 144/1 154/11 157/5 162/2 162/4 162/16 168/3
ahhh [1]  91/13
ahhhh [1]  149/10
ahold [1]  141/25
alcohol [2]  63/7 72/13
alcohol-related [1]  63/7
all [138]  9/2 10/25 11/5 11/16 15/16 15/21 15/22 18/22 19/1 19/5 20/1 20/8 21/24 21/25 22/8 22/11 22/18 26/13 27/17 27/21 29/18 29/22 32/6 32/8 34/21 35/14 35/19 36/4 36/13 37/15 38/2 42/10 42/19 43/8 44/3 44/17 46/8 47/9 47/20 48/11 48/12 48/13 49/6 53/4 57/10 59/5 59/24 61/13 62/5 62/11 63/7 64/16 66/20 72/16 72/21 75/19 76/9 78/2 80/17 81/12 85/14 86/12 86/21 88/22 90/10 95/7 96/9 98/5 98/22 99/13 100/9 100/13 103/10 104/4 105/3 105/16 107/20 108/12 110/2 111/16 112/10 114/9 114/9 114/17 114/21 117/21 118/9 120/3 126/25 127/2 127/21 130/20 131/3 133/25 135/17 138/3 140/7 140/14 140/17 141/18 143/22 151/21 152/4 152/17 154/5 155/20 156/3 160/13 161/20 161/21 162/3

**A**

all... [27] 162/10 162/25 164/4 166/6 167/13 167/24 168/10 170/8 171/10 171/15 171/20 172/1 176/2 176/6 177/15 178/2 179/24 180/15 182/7 182/15 182/16 183/11 184/10 184/20 185/8 186/5 186/7

allegation [2] 169/20 175/20

allegations [3] 169/8 169/11 175/19

alleged [1] 153/20

allow [5] 18/18 63/21 95/2 95/3 177/9

allowed [2] 63/19 181/4

alluded [1] 60/5

almost [3] 49/25 70/19 85/23

along [1] 162/6

ALPHABETICAL [1] 5/11

already [12] 49/3 57/6 64/2 71/16 110/15 111/1 115/17 118/15 126/20 140/18 151/2 151/3

also [36] 11/24 11/24 13/3 13/4 16/15 16/22 21/14 24/14 30/2 30/17 36/21 47/19 62/2 62/16 63/16 64/10 68/10 68/19 76/22 77/6 87/1 89/15 91/17 99/20 102/25 108/2 113/13 145/22 148/11 153/13 155/2 164/24 168/13 168/15 171/5 179/19

although [1] 145/7

always [11] 16/24 68/5 106/5 131/13 178/11 178/11 178/16 178/19 178/19 180/4 180/4

am [4] 18/17 18/18 44/18 117/24

Amendment [2] 76/21 76/22

America [2] 163/7 167/16

ammunition [4] 52/22 53/2 56/7 115/18

amount [3] 10/14 15/7 71/24

ample [1] 110/24

analysis [1] 14/23

ankle [1] 118/4

anniversary [2] 20/15 20/15

anonymous [1] 87/17

another [9] 9/10 44/13 84/1 107/5 128/5 129/2 136/14 136/15 146/24

answered [2] 132/3 149/21

answers [2] 86/12 86/21

anticipate [6] 25/23 26/1 89/18 142/11 152/24 153/8

any [85] 7/24 8/22 11/18 12/11 14/4 14/13 15/1 21/14 21/15 32/18 43/7 46/12 47/9 52/21 54/9 56/18 58/14 59/1 59/12 59/18 60/14 60/15 61/7 62/19 66/10 67/23 68/16 68/24 68/25 69/23 73/20 74/17 74/21 74/24 77/7 77/8 87/24 92/14 95/7 95/11 97/19 100/24 100/24 100/25 101/24 105/7 107/1 108/4 108/6 109/8 109/9 111/13 111/14 119/9 119/24 120/3 120/4 121/15 122/11 128/10 130/25 140/8 140/13 142/21 143/24 144/12 146/4 146/18 156/10 159/10 159/10 163/18 169/22 170/8 170/23 171/18 171/20 173/2

175/5 177/17 179/24 180/7 180/13 185/10 186/10

anybody [11] 31/13 47/10 56/22 81/12 113/20 119/13 124/15 135/19 152/18 177/13 178/9

anybody's [2] 8/20 130/20

anymore [2] 104/9 176/4

anyone [4] 60/15 84/11 171/25 172/9

anyone's [1] 104/23

anything [36] 12/15 19/10 31/15 32/19 35/12 37/3 39/11 39/19 59/2 59/13 61/8 65/17 66/10 73/7 74/23 82/4 90/17 92/3 95/8 98/12 113/17 119/9 126/5 126/17 126/24 128/24 130/16 131/1 135/8 143/1 147/4 149/20 150/19 152/24 153/8 178/9

anytime [1] 147/9

anywhere [3] 52/21 66/20 133/12

apiece [1] 152/16

apologize [1] 150/14

Appeals [1] 1/4

appear [3] 38/10 89/8 98/13

appeared [1] 38/12

appears [2] 46/7 184/13

apply [1] 176/25

applying [3] 176/17 178/5 178/5

appreciate [1] 185/7

approach [11] 33/14 40/3 45/24 48/1 62/9 89/1 92/21 115/2 127/7 154/19 158/17

appropriate [2] 14/24 182/25

approximately [3] 32/13 79/2 79/24

April [2] 12/19 173/24

are [103] 7/23 8/2 16/3 16/23 16/23 17/2 17/19 19/12 23/17 25/14 27/15 31/10 32/1 32/7 36/2 36/4 36/21 36/21 43/10 43/10 44/15 44/16 45/4 47/4 48/11 48/12 48/13 48/16 49/1 51/12 51/14 51/17 51/22 51/24 52/11 53/13 53/16 53/19 54/6 54/8 55/16 59/17 59/24 63/10 64/8 70/17 72/18 78/19 78/24 79/15 88/16 92/1 92/23 94/19 97/22 98/15 101/16 102/18 104/3 105/3 109/7 109/9 110/10 111/2 122/11 122/19 124/11 124/12 124/23 125/6 125/8 125/10 126/2 128/10 132/22 135/22 135/22 141/22 143/21 144/13 144/15 152/11 152/15 154/16 158/5 160/13 160/25 163/5 163/10 163/11 165/12 167/3 167/17 169/8 169/11 169/13 175/19 177/2 178/25 179/11 181/10 181/11 185/9

area [13] 9/22 30/6 30/10 30/14 30/20 32/4 37/23 39/6 59/16 110/11 156/5 159/18 172/10

areas [4] 28/14 67/7 67/12 67/15

argue [2] 17/8 107/25

argued [1] 104/23

arguing [1] 104/25

argument [10] 13/25 113/19 123/7 123/11 162/15 162/17 168/6 168/14 171/10 176/15

arguments [3] 123/10 160/9 162/12

armed [1] 117/2

around [12] 29/16 30/9 31/24 32/4 43/24 118/3 126/23 127/4 128/24 157/23 162/25 168/5

arrest [40] 6/5 6/5 13/4 13/5 13/16 16/4 16/7 16/12 17/12 18/21 18/25 19/2 22/25 23/5 23/10 28/23 31/21 35/3 63/16 75/4 75/5 75/11 83/12 83/22 104/9 104/20 106/5 113/10 113/17 119/4 120/9 120/11 120/14 137/14 138/11 138/19 141/5 147/17 148/16 157/19

arrested [20] 13/4 13/14 13/15 16/5 33/10 71/3 83/8 84/12 87/8 113/10 113/13 118/17 118/20 121/13 128/13 131/17 170/14 170/20 171/9 171/9

arresting [3] 35/13 74/14 84/20

arrests [3] 34/23 36/11 63/7

article [1] 29/5

articulable [2] 111/9 111/18

as [160] 9/18 10/6 11/19 11/20 11/22 12/1 12/5 13/1 16/16 17/8 19/20 19/24 20/12 20/13 20/13 21/15 21/16 21/21 21/21 24/20 26/21 28/3 29/1 31/16 33/18 34/10 35/12 35/21 36/20 37/18 40/7 40/14 40/18 40/25 48/5 48/15 51/10 51/22 53/20 55/19 56/25 57/5 58/1 58/1 60/10 60/10 60/20 60/25 61/12 62/14 62/14 65/6 65/8 65/17 65/17 67/20 67/20 68/11 69/24 69/24 71/11 71/14 71/24 74/18 74/24 75/5 78/13 80/15 85/24 86/9 87/4 87/14 87/14 87/25 89/16 91/4 91/4 91/6 91/6 91/17 92/7 93/22 94/21 94/21 94/21 95/23 97/24 101/1 102/12 102/21 104/1 104/5 104/5 104/9 104/9 104/11 105/7 106/18 107/25 108/7 110/25 111/4 111/4 111/6 111/20 112/16 113/9 113/25 113/25 116/2 118/24 122/14 129/7 132/9 136/14 137/13 137/19 138/4 138/4 139/11 140/14 141/9 141/20 141/20 142/18 144/3 145/10 147/16 148/6 148/9 148/19 149/1 150/10 154/13 155/7 156/4 156/9 156/9 157/8 157/15 157/18 158/22 161/3 161/3 164/8 167/22 168/11 168/21 169/18 169/23 169/25 170/4 171/19 172/6 174/12 174/15 176/10 176/14 178/6 184/5

ask [29] 10/15 20/6 26/9 29/8 30/13 40/8 40/18 48/6 51/18 77/23 77/24 85/13 86/16 91/7 91/8 93/19 99/8 101/16 141/16 146/4 149/24 156/24 159/21 166/9 166/23 167/3 174/1 178/7 181/6

asked [26] 51/19 58/1 73/22 85/21 90/14 98/10 114/6 131/18 132/1 132/17 132/20 133/7 133/10 134/9 134/15 136/8 142/15 143/7 148/4 149/8 149/8 165/3 166/21 172/12 175/24 181/18

asking [10] 73/16 98/20 124/21 124/22 132/19 134/16 139/15 167/17 173/11 176/13

asks [1] 172/20

assaulted [1] 116/10

assess [1] 174/14

assigned [1] 27/15

assignment [1] 79/5

assistant [3] 2/6 118/23 171/4

assisted [1] 57/14

associated [2] 38/23 179/5

assorted [1] 155/15

assume [1] 34/18

ATF [4] 72/8 72/14 72/22 174/3

attacking [5] 17/3 17/12 18/21 18/23 171/20

attempt [1] 47/6

attention [6] 7/22 79/21 96/16 113/5 116/12 185/6

attorney [3] 2/3 2/9 99/16

Attorney's [1] 69/19

attorneys [4] 2/6 160/10 162/13 184/22

audio [7] 97/19 97/24 98/1 98/4 143/21 143/22 144/11

August [4] 9/21 15/4 15/5 96/20

August 29th [3] 9/21 15/4 96/20

aware [12] 8/1 9/19 88/16 93/3 95/9 97/4 119/10 126/3 126/4 128/10 132/22 157/25

away [10] 24/16 35/14 59/18 61/14 63/3 112/23 113/23 118/4 177/2 180/22

aways [1] 141/6

awhile [1] 122/17

**B**

back [72] 12/21 13/18 16/11 26/9 28/19 31/2 38/4 39/6 39/8 44/4 44/22 46/15 49/24 55/5 55/7 55/13 58/17 60/10 60/11 60/22 72/9 73/23 74/4 75/25 80/1 80/7 82/2 84/9 85/15 91/1 96/20 108/24 110/7 114/8 114/19 114/23 119/10 120/25 121/24 123/19 123/22 126/21 127/1 131/16 131/20 131/23 133/5 133/6 137/11 138/24 139/9 140/11 141/21 151/23 155/11 156/5 157/16 163/12 167/6 168/18 168/19 170/21 171/16 172/1 172/10 174/4 174/7 175/9 177/24 180/24 181/17 182/19

Backdoor [1] 87/5

backseat [12] 25/2 37/20 60/10 128/19 145/25 151/13 154/25 159/18 166/12 166/14 175/6 178/22

bad [11] 46/25 77/2 134/21 135/1 135/2 135/8 136/4 149/11 167/12 183/3 183/5

bag [27] 24/23 38/3 38/7 38/10 39/10 39/15 47/15 47/15 49/9 69/22 114/2 114/15 114/15 126/7 126/11 126/14 127/2 128/19 130/6 140/19 155/3 155/12 155/12 155/19 159/6 159/10 171/15

bagged [2] 69/22 70/4

## B

Baggie [1] 51/11
Bahamas [1] 117/18
bailiff [1] 184/11
balancing [2] 12/10 12/10
Ballew [2] 136/15 136/19
Ballew's [3] 84/9 144/12 166/20
ballistics [3] 66/10 95/8 95/11
bare [1] 80/23
barrel [3] 55/10 94/13 95/4
base [1] 103/13
based [5] 16/25 17/23 17/23
100/24 134/19
basically [5] 20/12 44/20 88/22
96/25 163/4
basing [1] 101/18
basis [8] 13/1 16/6 17/4 18/3 19/1
100/23 109/12 110/21
be [124] 1/15 7/9 9/2 9/16 10/24
10/25 11/18 11/25 14/11 14/18
14/24 15/8 15/20 17/1 17/4 17/11
19/21 21/6 21/9 22/19 24/6 24/11
25/24 26/2 34/6 36/24 38/21 38/25
41/9 43/20 45/9 46/7 47/12 48/23
51/14 54/11 54/21 57/2 59/11
61/25 63/11 65/6 66/2 67/12 70/20
73/3 73/3 75/22 76/8 78/7 79/4
88/4 88/16 89/18 92/24 94/10
94/17 94/20 95/18 98/7 98/8 98/14
99/8 99/25 100/8 102/16 103/12
103/22 104/10 106/6 106/11
106/18 107/15 107/23 109/18
109/24 110/16 111/7 111/16 112/6
115/5 116/1 117/22 119/25 120/2
120/13 121/19 122/12 127/5
128/23 133/1 134/21 135/1 136/4
141/16 149/15 151/11 151/23
152/5 152/15 153/8 153/19 154/4
154/8 156/24 159/22 162/24
165/14 168/11 172/22 175/1 175/6
175/20 176/4 176/9 177/15 177/18
179/11 183/21 184/13 184/14
184/24 186/6 186/12
because [70] 8/6 8/10 11/21 11/24
15/12 19/1 19/6 26/3 36/24 49/24
52/9 61/14 62/22 63/2 63/15 69/3
70/6 70/18 70/21 71/25 72/20
80/20 93/17 94/15 94/22 102/13
105/16 106/8 110/21 111/23
115/12 117/9 117/12 124/14
124/18 125/4 125/9 125/10 128/5
128/21 136/8 137/2 140/4 141/1
145/13 153/15 153/18 164/3 164/6
164/7 165/11 165/15 167/13 172/5
172/23 173/6 173/13 176/19 177/8
177/8 177/10 177/15 178/10
178/13 179/5 179/14 180/3 180/6
180/16 181/9
become [1] 157/25
bed [4] 37/15 37/16 48/10 49/2
been [74] 12/18 16/24 22/25
25/17 26/21 27/5 27/7 27/9 28/2
28/5 31/16 33/17 34/2 35/21 40/6
40/17 42/17 48/5 52/22 58/18
63/18 65/18 66/10 67/19 69/4 71/5
72/8 72/9 78/13 78/22 79/1 79/8

85/4 93/11 93/12 93/22 95/23 98/9
102/21 105/20 105/21 106/9
110/15 111/15 112/16 116/10
117/6 119/24 120/4 121/2 121/25
122/1 126/15 126/25 129/19
140/11 140/16 141/25 142/13
144/3 150/14 151/1 154/13 155/6
157/8 158/6 158/21 168/8 171/13
172/2 172/3 173/18 177/19 185/6
before [34] 1/16 16/1 16/1 27/11
58/6 72/12 79/10 82/6 83/21 91/24
92/7 92/12 102/2 108/16 108/22
113/17 116/14 117/22 123/6
124/24 125/3 126/19 127/4 129/18
131/7 131/19 132/3 137/3 160/9
168/5 171/8 172/3 173/8 177/7
beforehand [1] 7/17
began [1] 59/8
begin [3] 162/10 183/12 185/13
behind [20] 23/15 32/3 32/11
37/23 39/6 58/12 58/18 74/11 82/6
82/9 128/15 156/6 156/6 158/7
158/9 178/12 178/20 180/4 180/15
184/22
being [26] 15/9 24/15 31/5 32/2
57/3 70/24 98/12 110/13 117/2
126/19 126/20 131/4 132/22
136/13 136/14 136/16 143/12
145/10 151/13 158/10 162/20
162/21 176/22 178/22 179/23
181/1
belief [4] 65/25 169/8 169/11
175/19
believable [1] 183/1
believe [35] 7/19 7/20 12/19 14/8
14/10 15/4 15/25 21/9 25/7 25/11
26/5 30/9 45/6 62/4 63/11 65/20
67/7 68/7 68/21 70/25 72/12 82/25
100/22 112/11 119/10 148/4
152/13 152/14 153/5 153/18 155/2
159/8 167/4 173/11 175/24
belong [3] 38/11 38/12 136/6
belonged [4] 14/19 56/24 71/1
149/9
belongings [5] 113/25 114/9
115/11 140/12 140/20
belongs [2] 129/11 130/21
bench [3] 37/22 142/10 143/16
beside [2] 32/3 156/10
best [3] 30/1 84/4 86/11
bet [1] 173/8
better [5] 21/10 27/25 66/2 84/17
97/20
between [14] 21/7 51/4 55/20
56/4 64/14 92/14 94/8 99/15
113/18 138/18 151/23 156/7
162/15 164/1
beyond [27] 165/14 165/16 167/8
168/22 168/24 169/9 169/16
169/21 174/17 175/17 175/17
176/1 176/10 178/1 178/17 178/25
179/11 179/19 179/21 179/24
180/11 180/12 180/13 182/6 182/6
182/8 182/12
big [6] 41/25 71/13 95/1 115/12
124/13 140/23
bigger [2] 57/3 118/13

bit [23] 23/20 39/21 50/17 55/19
57/3 57/21 61/11 65/6 70/17 74/11
90/12 90/17 114/8 118/17 121/8
133/1 141/6 144/8 144/21 145/21
164/13 174/16 179/9
bits [1] 165/11
black [23] 25/2 31/1 32/23 39/2
45/6 60/21 82/16 108/9 108/9
119/3 126/7 126/11 128/8 128/19
145/5 146/5 155/3 155/12 155/12
155/19 158/22 164/21 164/23
blank [1] 153/13
block [3] 32/14 58/18 165/9
blouse [1] 83/1
blow [1] 65/15
blue [3] 11/25 12/19 49/7
Blueback [1] 162/8
boil [1] 164/4
boils [1] 164/5
bond [1] 118/1
bones [1] 80/24
both [12] 7/23 7/25 8/2 33/9
50/11 101/15 105/14 152/14 160/4
161/11 163/12 175/13
bother [1] 178/12
bottom [3] 41/25 42/2 62/13
bought [1] 182/4
bound [3] 168/24 169/2 176/11
box [2] 33/2 37/2
boxes [1] 23/22
bracelet [3] 118/3 140/6 140/7
brand [1] 65/17
BRAZOS [23] 1/7 1/17 23/2 27/3
27/8 27/9 27/14 30/15 78/20 79/11
96/3 96/10 139/20 139/22 157/14
163/20 163/21 165/24 167/9
167/22 186/2 186/4 186/18
break [5] 76/11 100/11 113/22
160/10 167/19
breath [1] 150/16
brief [5] 9/3 9/11 100/8 152/15
162/1
briefly [2] 54/14 84/8
bring [18] 15/18 20/19 22/3 22/5
25/10 51/18 51/19 78/2 78/5 112/1
112/4 116/17 153/24 154/5 160/25
161/21 183/17 183/19
bringing [1] 175/1
broad [1] 111/16
brought [2] 7/22 164/10
brutally [1] 173/9
Bryan [8] 1/16 1/17 1/23 2/7 2/12
30/12 120/15 186/19
building [1] 165/9
building-block [1] 165/9
bullet [18] 49/16 49/18 49/22 50/4
50/9 50/13 51/5 51/15 51/15 51/22
52/9 52/13 52/20 55/6 55/10 55/21
156/18 173/19
bullets [14] 6/11 51/9 52/21 53/13
54/1 54/4 55/1 55/16 55/24 56/3
70/14 70/17 70/18 156/14
bunch [7] 39/9 114/11 115/13
117/16 140/25 153/16 155/3
bunk [1] 9/22
burden [4] 169/10 170/4 175/21
178/3

burglary [4] 13/5 13/13 13/17
13/22
buried [1] 39/9
business [1] 177/25
buys [1] 103/4

## C

cab [7] 37/11 37/19 37/25 38/1
38/22 60/16 105/5
caliber [2] 25/22 65/8
call [22] 26/14 63/19 78/7 80/10
82/16 87/13 87/17 88/7 88/13
88/14 91/16 95/15 99/11 106/1
107/22 107/23 112/8 132/11
132/12 132/13 142/2 157/3
called [8] 21/1 24/9 35/9 84/11
85/3 85/5 89/18 114/5
calling [2] 105/12 142/12
calls [3] 78/9 86/25 129/6
CALVERT [9] 2/4 22/23 26/23
73/14 95/25 122/25 154/15 157/10
176/15
came [12] 1/15 8/10 8/11 51/15
82/2 102/6 118/23 127/24 131/15
131/23 168/11 180/1
camera [4] 58/9 58/11 71/8
145/14
cameras [2] 97/22 97/24
camouflage [14] 49/1 83/1 128/6
128/7 128/8 128/12 128/16 144/19
145/6 146/12 164/18 164/19
166/19 182/11
Campbell [67] 5/13 16/5 23/2
23/4 23/6 23/18 24/2 24/21 25/24
26/3 26/4 26/6 28/24 29/20 30/6
30/20 31/9 31/16 33/10 38/11
38/12 38/16 38/18 38/23 43/17
44/5 44/9 47/15 52/18 53/5 56/25
57/3 57/6 73/15 73/23 74/2 74/5
75/9 80/18 81/15 81/24 82/21 83/3
83/6 83/7 83/11 83/14 83/18 83/21
85/1 85/3 85/16 86/22 92/6 110/6
112/9 112/15 112/21 144/16
146/19 151/6 157/20 164/17
164/24 166/15 170/12 180/1
Campbell's [7] 39/10 47/24 49/10
51/23 52/14 52/20 155/20
can [83] 7/10 7/14 9/10 9/15
20/18 20/19 20/19 29/14 34/14
36/5 37/17 41/15 46/8 50/22 54/23
55/19 56/11 56/17 60/20 66/14
68/9 68/10 70/6 71/3 72/1 76/9
77/7 82/19 82/24 86/4 86/11 87/21
89/5 94/3 94/17 94/20 95/5 95/14
97/19 97/20 99/7 100/19 103/6
106/10 106/25 125/12 128/2
130/24 132/25 141/15 143/15
144/17 145/3 145/12 145/12
145/13 150/16 151/20 152/4 152/5
152/9 152/20 152/21 156/4 161/3
165/10 165/12 165/16 166/12
166/25 168/16 169/15 171/11
173/5 173/5 174/15 175/10 175/11
179/11 183/1 183/5 184/23 185/8
can't [24] 15/11 15/11 24/7 37/2
37/21 68/5 70/20 71/25 89/11
94/13 103/2 105/12 107/22 107/22

**C**

can't... [10] 111/19 143/1 143/3 152/24 153/8 156/3 156/12 165/9 175/10 180/22
cane [1] 38/3
cannot [3] 60/23 68/9 175/4
canvas [2] 155/12 155/12
car [28] 23/21 29/16 32/11 59/17 63/21 71/5 71/8 89/10 90/25 91/1 105/25 126/16 126/20 131/16 136/16 136/19 136/20 138/24 141/5 144/11 144/12 145/25 170/21 171/16 174/22 181/17 182/25 185/3
care [7] 7/12 26/10 100/6 170/3 179/12 184/25 185/2
carried [1] 170/16
carry [4] 100/19 130/2 167/19 173/7
cars [5] 31/23 32/1 32/7 32/7 33/2
case [70] 7/20 7/24 8/3 8/5 8/12 9/18 10/6 11/19 11/23 12/22 13/2 13/11 13/17 13/19 13/21 13/22 14/15 17/22 25/20 26/8 44/23 47/22 63/15 63/24 67/6 68/17 69/9 77/12 84/1 84/2 89/9 97/4 99/20 100/5 100/16 101/24 103/8 103/24 108/23 109/24 121/21 122/17 125/17 131/10 139/11 139/14 142/4 146/23 146/24 146/25 149/1 149/3 154/17 160/2 165/8 165/9 166/7 167/2 167/3 167/13 167/18 177/15 177/24 178/20 179/8 180/18 180/25 184/17 184/25 185/9
case-in-chief [3] 9/18 10/6 100/16
cases [2] 27/23 92/16
catches [1] 52/10
caught [3] 135/2 136/5 150/7
cause [8] 1/3 1/16 12/16 95/5 109/25 109/25 169/6 186/7
causing [2] 55/9 55/22
CDs [1] 155/12
cell [2] 12/3 12/5
Central [1] 27/12
certain [6] 63/6 66/25 71/24 129/3 143/20 180/11
certainly [3] 130/1 152/7 159/9
certified [5] 16/3 16/23 17/1 78/24 79/1
certify [3] 186/5 186/9 186/11
challenging [2] 16/25 18/1
chamber [7] 52/3 52/4 55/14 64/20 65/6 70/21 94/21
chambered [1] 50/14
chambers [1] 186/7
changed [1] 143/13
changes [1] 182/2
charge [10] 10/7 152/1 152/21 153/4 160/8 160/18 160/24 162/4 162/7 162/9
charged [4] 9/19 153/19 163/16 184/5
charges [2] 120/16 138/12
CHARLES [1] 2/4
check [6] 41/18 81/3 89/10 174/3

174/5 177/6
checked [6] 39/25 40/1 75/10 80/4 81/2 115/17
checking [2] 50/19 50/25
chief [3] 9/18 10/6 100/16
children [1] 91/8
choose [1] 105/16
choosing [1] 105/17
chose [1] 121/7
CHRONOLOGICAL [3] 3/1 4/1 5/1
CI [3] 101/22 101/23 111/17
circumference [1] 94/22
circumstances [3] 14/20 56/22 56/23
city [1] 30/11
claim [4] 132/18 137/24 166/22 181/10
claimed [1] 148/5
clanging [1] 168/5
clarified [1] 142/18
clarify [3] 46/24 132/8 137/11
clean [1] 9/23
clear [14] 50/20 71/17 108/19 111/2 121/9 127/11 133/1 134/19 136/2 151/7 151/11 169/7 181/20 182/20
clearly [3] 38/23 38/25 143/11
client [4] 101/3 104/9 108/7 111/14
client's [1] 102/25
cloak [1] 105/12
close [5] 48/8 49/12 55/20 160/1 160/3
close-up [2] 48/8 49/12
closed [3] 75/19 160/2 160/5
closely [1] 79/17
closer [1] 105/22
CLOSING [3] 162/17 168/6 176/15
clothes [17] 12/6 60/24 105/7 114/1 114/10 116/21 117/14 125/20 126/7 126/8 126/11 127/2 130/4 130/5 140/12 140/25 156/9
clothing [18] 24/23 29/5 38/2 38/3 38/8 38/10 38/14 39/11 39/15 47/15 47/16 47/19 47/20 47/25 149/18 155/4 155/15 155/21
cloudy [1] 82/12
clue [1] 119/11
clued [1] 61/4
coat [17] 44/7 61/9 70/24 70/25 71/11 71/13 71/18 108/8 108/9 166/9 166/10 174/20 174/23 175/1 175/2 175/3 175/3
cocaine [2] 106/1 120/5
cock [1] 55/12
coffee [1] 182/18
cold [1] 118/13
collected [2] 65/9 174/9
college [1] 63/20
color [1] 36/23
combined [1] 165/23
come [26] 16/16 18/18 26/6 41/15 42/2 49/9 54/18 55/23 63/21 67/8 72/9 75/7 84/12 102/1 114/6 133/6 140/8 160/6 164/14 164/16 167/1

169/15 174/4 178/14 183/6 184/24
comes [14] 16/1 16/2 31/1 55/5 58/6 63/2 71/4 98/15 138/17 172/19 174/7 174/23 180/7 181/4
comfortable [2] 7/23 8/2
coming [2] 131/15 131/20
comment [1] 15/8
commit [1] 176/5
committed [1] 118/1
common [10] 46/21 46/23 47/1 47/3 168/19 176/17 177/1 177/6 178/5 178/10
company [1] 84/14
compare [1] 68/3
compared [1] 174/9
compartment [5] 37/1 37/12 37/21 39/6 60/22
complete [5] 68/5 85/23 105/20 122/8 122/9
completely [1] 138/5
complied [6] 41/16 42/11 54/20 56/12 183/25 184/12
computer [1] 36/7
computerized [1] 1/18
concentrating [1] 30/5
concern [1] 181/13
concerned [4] 108/13 117/23 134/10 174/4
concerning [1] 146/4
conclude [1] 56/24
concluded [2] 100/15 143/16
condition [6] 37/9 38/1 40/14 40/25 53/20 116/2
conduct [2] 84/22 106/19
conducted [2] 111/3 158/11
conducting [2] 158/1 165/24
conference [1] 142/10
confidential [9] 88/8 91/23 91/24 101/13 101/15 103/7 108/3 108/14 111/11
confirmed [1] 75/11
confrontation [4] 10/12 103/1 109/7 109/11
confusion [1] 121/8
connect [1] 175/4
cons [2] 20/12 77/2
consider [1] 176/21
Constitution [1] 83/15
Constitutional [1] 76/18
contact [2] 30/21 67/8
contacted [1] 101/22
contained [6] 49/10 53/10 70/10 70/19 155/3 155/20
container [1] 159/11
contains [1] 186/5
contents [2] 54/5 88/23
contest [1] 181/9
context [3] 12/3 14/20 15/13
continue [3] 83/18 85/16 151/24
continued [1] 183/16
control [2] 170/3 179/13
controlled [1] 103/4
conversation [27] 10/16 13/21 14/3 15/1 74/4 97/14 97/21 98/6 126/3 131/17 131/20 133/1 134/20 135/23 136/23 136/24 138/18 139/5 139/9 142/18 143/8 145/22

146/2 146/19 146/22 147/9 181/21
convict [1] 168/25
convicted [17] 25/12 25/13 25/21 26/4 99/17 119/24 120/4 120/22 122/7 133/21 134/24 163/23 167/10 169/19 174/21 176/5 182/21
conviction [3] 20/13 164/2 176/9
convictions [3] 21/16 77/8 122/14
convincing [1] 169/7
cool [1] 82/12
cop [2] 27/5 35/21
copies [3] 16/4 16/23 161/25
copy [4] 17/1 107/4 107/6 162/5
corners [1] 103/20
Corps [2] 162/24 162/25
correct [115] 11/12 11/15 13/7 19/16 29/13 29/17 34/20 35/1 36/24 37/4 41/21 47/5 47/17 49/4 50/6 56/20 57/16 57/23 59/4 59/7 59/9 59/14 59/25 61/6 61/15 61/19 61/23 62/4 62/20 62/21 62/24 63/5 63/13 63/17 63/22 64/25 65/3 65/10 65/11 65/14 66/2 66/11 66/18 67/9 67/21 68/3 68/4 68/7 68/18 68/22 69/1 69/2 69/11 69/14 69/15 70/15 71/2 71/20 71/23 72/4 73/4 73/24 76/19 77/4 77/20 87/15 88/10 88/16 88/23 89/20 93/21 94/16 97/5 102/3 121/2 126/12 127/17 127/19 127/24 128/6 128/25 129/1 129/4 129/11 129/13 129/16 129/19 129/20 130/17 130/18 130/22 130/23 131/9 131/24 132/1 132/15 133/8 135/4 137/4 137/20 148/3 148/7 149/1 150/20 151/8 151/14 151/15 154/25 155/4 155/16 156/16 158/8 159/4 159/19 186/5
correctly [3] 109/20 169/25 186/9
cost [1] 186/11
could [37] 11/25 29/22 32/15 33/22 47/11 52/5 54/18 54/22 55/23 58/20 65/17 65/18 66/4 67/6 76/3 77/9 87/25 93/18 101/9 101/10 112/19 114/1 114/12 116/24 116/24 121/16 134/21 135/1 140/8 140/21 171/13 171/24 171/25 172/2 172/3 173/19 175/14
counsel [10] 22/21 34/3 41/3 64/21 73/22 111/1 111/4 177/24 178/21 186/6
counted [1] 103/5
counter [1] 173/24
country [1] 118/23
COUNTY [26] 1/7 1/17 23/3 25/14 27/3 27/8 27/9 27/14 30/15 78/20 96/3 96/10 120/8 120/14 120/16 138/12 139/21 139/22 157/14 163/20 163/21 165/24 167/9 167/22 186/2 186/18
couple [11] 8/11 11/17 20/19 30/2 92/20 96/21 100/22 115/4 146/22 151/22 162/18
course [2] 10/4 14/2
court [17] 1/3 1/4 1/6 1/22 1/22 9/16 17/23 17/25 92/25 123/4

**C**

court... [7]  130/13 184/15 186/4
186/4 186/7 186/17 186/17
Court's [2]  160/7 162/9
courthouse [3]  168/20 176/22
177/7
courtroom [7]  17/14 29/2 42/22
64/24 109/3 109/8 176/25
covered [2]  117/6 117/8
CR [1]  1/4
crack [1]  120/5
crammed [2]  114/17 117/20
credibility [12]  163/11 165/21
165/22 166/25 167/3 167/3 167/14
171/20 174/14 177/10 177/12
177/23
credible [8]  102/22 102/24 103/12
109/18 110/16 165/19 166/1 181/7
CRF [1]  1/3
crime [9]  66/17 66/24 68/2 68/10
68/11 163/16 174/10 176/5 177/18
crimes [3]  77/8 119/25 122/12
criminal [6]  27/16 27/19 29/21
79/7 157/13 165/25
critical [1]  109/20
cross [10]  5/12 57/10 57/12 87/11
97/12 111/22 122/24 147/14 156/1
159/15
Cross-examination [8]  57/10
57/12 87/11 97/12 122/24 147/14
156/1 159/15
cross-examine [1]  111/22
crying [1]  174/15
crystal [1]  181/20
CSI [1]  46/17
CSR [3]  1/22 186/16 186/16
cultivated [1]  92/15
cultures [1]  163/2
cumulative [1]  17/11
curiosity [1]  158/14
current [1]  79/5
currently [1]  122/19
custodial [1]  11/11
custody [10]  12/5 33/10 43/8 59/9
83/8 104/11 139/20 157/22 170/3
179/13
cut [3]  140/7 140/8 145/5
cut-off [1]  145/5
cycle [1]  163/12
cylinder [11]  50/16 50/18 51/7
52/8 55/1 55/2 55/6 55/18 55/20
94/15 95/3

**D**

D.A [1]  166/5
D.A.'s [2]  7/10 13/10
dad [1]  73/4
daily [1]  177/1
damaged [1]  35/9
dark [3]  45/1 75/15 75/22
date [15]  15/3 16/6 25/14 99/20
114/24 116/12 116/14 120/25
137/14 139/6 139/18 142/19
142/24 163/19 164/2
Dave [17]  23/1 81/24 83/3 128/7
132/11 151/7 151/12 164/11

164/18 164/25 165/9 166/16 167/8
167/18 181/22 183/3 183/5
DAVID [43]  1/8 28/24 29/1 29/20
59/8 67/20 69/10 71/17 72/1 73/4
73/7 80/18 81/9 87/9 92/4 96/17
112/23 113/6 113/13 113/18
114/23 119/7 122/19 123/8 132/12
137/17 145/2 146/20 147/18
147/21 147/23 148/9 157/20
163/22 169/19 170/7 170/9 170/11
170/15 170/16 175/16 176/3 184/4
David's [8]  73/3 116/7 118/6
148/3 170/15 170/23 172/18
174/20
day [40]  1/14 23/3 28/20 40/15
43/5 79/22 82/11 82/22 87/8
113/17 113/17 114/5 114/5 117/22
123/6 127/4 128/3 128/6 128/25
129/16 129/18 131/7 136/3 136/13
143/10 143/11 145/23 147/11
147/16 164/5 166/17 166/18 167/2
171/2 171/8 177/10 181/17 181/21
183/6 186/13
daytime [1]  31/3
dead [1]  140/9
deal [3]  72/20 83/2 83/5
dealt [2]  83/21 83/25
decades [1]  165/23
decide [3]  80/12 85/12 177/22
decided [3]  84/17 84/19 86/23
decision [5]  77/11 77/12 77/17
87/2 167/1
decisions [1]  177/2
declined [1]  13/23
defendant [45]  2/9 7/20 9/19 9/25
10/16 14/16 16/4 23/18 24/1 25/20
26/9 29/9 30/5 30/20 31/16 32/12
33/10 42/23 43/7 56/14 56/18
56/25 57/3 73/19 83/7 84/2 96/22
99/15 99/17 104/9 123/16 123/22
129/4 129/8 129/22 130/15 145/19
145/22 157/19 162/14 163/5
163/22 183/24 183/25 184/4
DEFENDANT'S [13]  4/5 9/25
10/6 32/11 33/7 34/25 37/6 40/11
97/3 97/7 143/10 154/23 158/2
defense [14]  14/17 14/20 25/11
29/6 34/2 41/3 100/6 140/2 140/4
142/4 143/20 177/24 178/21 184/9
deferred [3]  122/5 122/5 122/8
definitely [1]  117/1
definition [1]  169/9
deleted [1]  153/16
deliberations [5]  162/11 176/18
183/13 183/14 183/16
demeanor [7]  85/19 86/5 90/13
90/18 91/5 91/6 91/7
demonstrate [1]  54/24
denial [2]  85/23 91/11
Denise [4]  1/22 95/16 186/4
186/16
deny [4]  91/9 111/24 165/4
180/10
department [5]  27/21 36/19 82/20
96/4 96/11
depend [1]  104/16
depending [2]  101/17 102/18

depictions [1]  48/14
depth [1]  27/22
deputies [2]  23/2 23/8
deputy [17]  44/13 57/14 61/22
62/14 73/23 74/4 74/15 74/20
74/24 89/15 90/9 136/15 136/19
136/24 151/15 155/8 157/25
describe [15]  27/17 29/4 35/2
35/2 35/16 36/16 37/8 37/8 39/5
54/22 82/24 86/5 86/11 144/17
145/3
described [4]  32/6 38/7 111/14
155/20
describing [1]  87/14
description [7]  6/4 14/3 36/22
101/4 102/7 108/7 108/14
designed [1]  94/19
detail [1]  89/11
details [2]  10/9 116/17
detained [1]  59/17
detective [11]  27/24 29/12 91/23
108/21 108/21 127/21 144/6
144/21 146/18 150/25 157/15
detectives [1]  27/20
detention [12]  9/23 9/24 10/15
16/7 16/25 17/24 18/2 18/3 96/12
108/3 110/1 111/7
determinative [1]  106/7
determine [1]  101/10
determined [1]  111/15
did [172]  10/9 10/15 10/17 10/18
10/19 10/21 13/23 19/2 19/3 20/25
28/22 28/25 30/20 30/22 31/3 31/5
31/7 31/15 32/12 32/16 32/18 33/2
33/6 33/8 36/11 36/11 36/15 37/5
37/25 38/10 38/18 38/19 39/2 39/4
39/16 39/17 39/18 39/19 39/23
40/1 46/11 46/14 47/6 47/22 49/9
49/11 49/15 49/17 51/18 51/21
51/25 51/25 52/2 52/14 57/17
57/19 57/19 57/21 59/5 60/14
60/15 63/24 64/1 64/18 64/18
64/21 70/25 71/17 71/21 74/4 75/5
75/6 75/6 79/10 79/13 80/12 80/24
81/1 81/3 81/5 83/2 83/5 83/11
83/13 83/14 83/16 83/17 84/6
84/22 85/7 85/12 85/15 86/13
86/15 86/16 92/3 92/10 95/7 96/24
97/2 97/24 98/13 100/20 102/1
102/5 103/4 106/15 113/17 113/24
114/6 114/9 114/13 114/13 114/18
115/15 116/13 119/9 120/15
124/12 124/13 125/23 126/25
129/22 130/1 130/2 130/25 132/6
134/1 135/18 135/21 136/6 137/13
137/19 138/3 139/5 139/22 140/1
140/3 142/17 145/18 146/4 146/19
146/22 147/4 147/4 147/9 148/14
148/15 148/19 148/20 149/1 149/2
150/4 150/15 153/15 154/1 157/22
157/24 157/25 159/6 165/17
171/12 172/17 173/1 174/1 174/5
175/24 176/5 179/17 180/12 181/7
182/14
didn't [56]  11/3 14/18 18/4 53/2
58/11 59/1 62/22 62/23 63/24 82/4
85/18 88/14 89/10 90/21 95/11

98/18 98/19 102/11 106/3 117/1
117/12 119/11 122/9 123/16
125/23 125/24 129/18 130/9 132/4
134/5 135/8 135/10 137/22 137/23
137/24 138/11 138/13 138/15
143/3 145/23 148/8 148/11 148/11
148/19 150/18 159/9 159/9 165/18
169/20 171/14 173/25 174/1 174/2
181/24 182/3 183/6
difference [10]  51/3 56/4 56/4
94/8 94/12 94/25 95/1 103/9
103/13 170/23
different [20]  27/21 28/14 50/14
53/1 55/2 60/17 66/17 66/24 66/25
67/7 70/17 119/3 143/7 143/8
163/1 163/2 166/18 169/4 181/19
181/19
digging [2]  126/21 126/21
dimmed [1]  144/8
dire [4]  163/15 165/16 176/12
177/21
direct [13]  5/12 26/22 74/17
74/21 78/14 79/21 88/8 95/24
96/16 112/17 144/4 154/14 157/9
direction [1]  55/11
disagree [1]  179/9
disagreement [1]  152/22
disapprove [1]  175/16
disarray [1]  60/6
discharge [1]  184/21
discharged [2]  25/18 185/11
discharges [1]  94/22
disciplinary [1]  10/10
disclose [1]  118/24
discount [1]  174/16
discovery [1]  182/24
discussion [2]  9/9 96/24
dismissed [2]  13/9 13/10
disorder [1]  9/23
dispatch [7]  19/4 74/23 75/6 81/2
81/3 87/24 101/8
dispute [2]  142/12 179/11
disregard [1]  86/1
distance [3]  58/5 82/9 166/11
distinct [1]  140/13
distinction [4]  104/19 105/6 105/7
109/21
distinctive [1]  145/14
distinguish [1]  94/3
DISTRICT [8]  1/6 1/8 1/22 2/6
69/19 121/20 186/4 186/17
division [4]  27/15 27/16 27/19
29/22
DNA [8]  67/2 68/1 68/16 68/16
68/25 174/9 174/9 174/11
do [178]  7/16 7/18 8/21 10/17
13/24 14/4 19/17 19/19 20/21
20/22 21/21 22/15 25/5 26/10 27/2
27/2 27/21 27/22 28/16 29/1 29/3
31/15 32/19 35/6 35/6 35/11 35/12
35/15 36/17 38/13 39/23 40/8 40/9
40/20 47/19 47/22 50/19 50/22
50/23 51/11 53/12 57/18 62/18
64/22 68/8 72/5 72/7 72/8 74/21
74/23 75/1 75/18 75/19 77/19
77/23 79/10 79/13 80/12 82/10
82/13 82/21 84/11 84/21 85/12

6

**D**

do... [114]  89/12 94/6 94/25 95/7 95/11 96/9 96/9 96/17 96/19 98/10 98/19 98/20 98/23 103/4 105/15 106/5 106/8 107/1 107/11 107/17 111/20 111/21 112/23 112/24 112/25 113/25 115/5 115/8 115/15 115/19 116/21 117/5 118/10 118/10 118/11 121/6 121/7 121/11 122/3 125/2 125/5 125/9 125/13 125/20 126/17 129/23 131/15 131/19 132/17 132/18 134/16 135/10 136/15 136/16 136/20 139/8 140/7 140/13 140/18 140/19 140/20 142/6 142/6 143/5 144/12 144/14 144/24 150/2 152/8 156/10 158/20 159/19 160/11 161/5 161/8 161/9 161/11 163/17 163/22 163/23 163/25 164/9 166/2 166/13 166/21 168/23 168/25 169/1 172/10 172/13 172/13 173/5 174/19 174/25 176/12 176/13 176/18 176/19 177/9 177/22 177/23 178/8 180/18 180/19 180/25 181/5 181/5 182/17 182/18 183/5 183/9 185/1 185/2 186/4

document [2]  36/13 89/4

does [33]  11/18 12/25 21/11 21/17 26/3 31/22 31/25 35/2 35/11 35/20 50/9 50/10 59/24 62/14 64/13 87/24 89/8 89/15 100/6 115/25 116/1 121/22 149/10 164/4 165/14 172/25 173/7 173/8 176/4 178/8 182/25 184/9 184/16

doesn't [4]  104/16 140/6 170/23 172/8

doing [22]  14/23 24/17 28/2 36/2 36/17 38/5 38/6 39/16 44/1 48/15 62/1 79/24 80/3 84/24 128/24 140/20 154/23 155/8 158/6 158/14 176/22 177/11

don't [99]  7/22 8/4 8/6 8/22 8/22 10/1 11/20 11/21 12/9 12/13 14/8 14/10 14/24 17/13 17/13 17/19 23/19 29/14 43/20 55/16 56/22 58/12 61/14 62/11 62/19 65/12 65/20 65/22 66/14 69/8 69/23 69/24 71/6 74/1 74/2 74/17 75/17 75/20 76/2 76/23 76/23 78/1 85/5 89/18 91/12 91/12 91/15 91/15 94/11 98/23 101/13 101/15 104/20 104/23 104/24 105/14 105/16 108/4 108/6 108/11 111/9 111/12 111/13 117/4 119/21 119/22 121/12 122/8 124/24 132/11 139/16 152/17 159/8 159/17 159/17 161/7 163/8 167/18 168/20 169/8 170/7 171/1 171/2 171/18 171/25 172/7 172/9 173/2 173/6 173/16 173/20 174/5 174/8 174/13 174/17 176/5 176/6 178/14 180/20

done [13]  9/7 24/9 50/21 68/17 69/16 69/17 72/8 103/11 172/2 172/3 174/2 174/10

door [3]  44/21 137/5 168/20

doubt [32]  148/25 163/19 165/15 165/17 167/8 168/22 168/24 169/9 169/16 169/22 169/22 174/6 174/18 175/18 176/2 176/11 178/1 178/2 178/3 178/18 178/25 179/12 179/19 179/22 179/25 180/11 180/12 180/14 182/6 182/7 182/9 182/12

down [16]  31/20 37/22 41/13 41/15 54/15 54/18 76/9 95/14 99/7 141/15 151/20 164/4 164/5 173/25 177/22 180/7

downstairs [1]  177/5

DPS [2]  67/1 67/15

draw [1]  113/5

drawn [2]  24/1 33/7

dressed [1]  82/22

drew [1]  116/12

drive [2]  63/3 63/13

driver [5]  32/25 62/1 62/2 62/17 63/11

driver's [3]  61/8 156/6 164/12

driving [19]  18/9 23/8 23/18 23/20 29/16 31/20 31/23 56/14 72/24 80/1 90/20 101/6 101/24 114/24 126/23 127/3 128/24 179/15 182/22

dropped [1]  120/17

drugs [1]  177/17

DUANE [1]  1/8

dubious [1]  162/19

due [4]  11/11 70/24 109/15 138/12

duffle [10]  24/23 47/15 49/9 114/15 126/7 126/11 128/19 155/3 155/19 171/15

duly [7]  26/21 78/13 95/23 112/16 144/3 154/13 157/8

dun [2]  166/4 166/4

dun-dun [1]  166/4

during [17]  9/18 10/5 25/16 82/1 82/5 83/2 83/11 85/4 93/6 93/8 93/9 136/19 146/18 147/5 147/9 155/2 163/15

dust [3]  69/4 116/1 116/1

dusted [2]  70/9 70/11

duty [7]  28/20 79/22 168/24 168/25 169/2 176/11 177/7

DVD [1]  168/16

DWIs [1]  66/20

**E**

e-mail [1]  152/8

each [16]  41/4 92/18 103/5 140/14 168/7 168/21 168/23 169/14 169/15 171/21 175/17 175/19 175/22 176/10 180/23 181/19

EARL [13]  2/10 7/17 7/23 9/14 11/1 124/5 129/2 129/21 129/23 152/5 153/5 161/6 176/16

Earl's [2]  7/22 141/25

earlier [13]  32/7 34/24 41/8 47/14 55/15 56/13 57/6 73/19 76/16 97/24 145/7 154/24 158/4

early [1]  8/1

East [3]  1/23 2/6 186/18

easy [2]  28/4 46/21

economy [1]  100/20

education [1]  178/15

effect [5]  14/2 14/12 14/13 15/2 15/8

effectively [2]  142/23 168/9

efforts [1]  30/5

eight [2]  21/6 120/15

either [13]  8/12 68/25 83/3 121/20 134/2 156/20 165/17 175/13 176/6 176/6 182/4 184/6 184/16

element [7]  168/21 168/24 169/2 169/21 169/23 175/17 176/10

elements [4]  163/15 163/15 165/8 169/15

elicited [1]  148/1

else [16]  7/14 12/15 14/19 19/10 31/13 34/24 52/21 58/19 81/12 81/17 84/7 106/11 124/15 129/7 135/19 167/22

emergency [1]  23/15

employed [1]  78/19

empty [3]  55/1 55/1 55/5

encourage [1]  181/5

end [11]  26/8 50/18 51/7 52/9 55/17 80/17 160/6 166/3 167/2 180/24 182/18

ended [2]  32/23 32/25

enforcement [5]  24/6 50/1 59/19 63/7 110/9

engage [1]  36/12

enhancement [1]  21/15

enough [10]  94/7 110/17 110/24 111/17 160/11 174/19 175/6 175/20 176/8 176/9

ensure [1]  167/14

enter [1]  162/10

entered [3]  155/6 158/21 172/6

entire [2]  146/19 170/8

envelope [3]  53/10 53/11 53/22

equipment [1]  24/24

equivocate [1]  125/23

Ernie [1]  41/18

escalated [1]  10/12

escalation [1]  14/4

especially [1]  95/2

essentially [2]  9/22 10/14

establish [1]  169/15

established [2]  108/23 142/13

evaluate [1]  180/18

even [29]  14/7 14/18 17/11 46/21 47/4 67/5 68/6 91/8 94/18 101/8 101/23 103/20 105/11 106/9 106/10 106/17 117/3 121/19 164/15 167/19 169/2 170/13 173/2 174/16 175/9 175/15 175/18 176/8 179/25

Evening [1]  185/16

event [1]  173/9

eventually [4]  23/21 42/2 70/9 120/19

ever [18]  70/11 72/6 119/7 125/16 133/12 135/18 140/9 145/18 147/4 162/20 162/21 170/9 170/12 172/9 173/4 173/4 177/12 180/10

every [12]  24/5 55/12 66/23 66/24 66/24 99/2 168/8 168/21 168/23 174/16 177/10 181/20

everybody [6]  29/25 35/5 43/16 58/19 84/20 177/20

everybody's [1]  88/19

everyday [2]  79/19 176/23

everyone [7]  78/7 112/6 145/18 154/8 165/4 167/22 183/21

everything [14]  24/10 32/4 58/24 61/18 89/10 89/11 97/23 99/1 117/19 121/11 121/12 171/25 172/6 177/12

everywhere [2]  60/12 60/13

evidence [47]  17/22 19/25 25/11 25/20 26/7 35/25 36/25 52/15 59/12 59/19 67/1 67/5 69/22 69/24 70/4 70/7 100/15 103/2 104/10 105/8 105/12 105/18 105/25 106/19 106/23 107/24 108/19 108/19 109/8 110/11 110/24 111/2 142/21 143/4 151/2 151/3 155/7 156/15 158/22 160/7 168/10 168/14 168/15 168/15 169/14 173/21 186/5

exact [2]  94/11 156/7

exactly [19]  12/14 25/25 46/17 99/2 116/19 117/20 121/14 121/23 131/5 133/17 156/3 156/5 159/1 159/17 159/19 171/19 171/24 172/9 177/4

examination [21]  26/22 57/10 57/12 73/13 74/8 78/14 87/11 91/21 93/1 95/24 97/12 112/17 122/24 137/9 144/4 147/14 150/23 154/14 156/1 157/9 159/15

examine [1]  111/22

example [2]  38/19 67/19

excellent [1]  185/6

except [4]  153/11 180/10 181/24 182/3

exclude [1]  68/10

exclusions [1]  174/11

excuse [4]  14/11 14/13 48/13 130/25

excused [8]  99/9 99/10 141/17 141/19 156/24 157/1 159/22 159/23

execute [6]  18/6 23/5 23/12 28/23 75/4 157/19

executing [3]  23/25 31/21 33/6

exercising [1]  179/12

exhibit [56]  6/1 6/4 19/25 20/2 22/2 33/18 34/2 34/4 34/7 34/9 34/13 40/7 40/18 40/22 41/5 41/11 42/12 42/20 46/3 47/7 48/19 48/24 49/2 49/6 49/12 49/19 49/20 51/10 52/23 53/9 53/14 53/24 54/1 54/6 54/12 54/24 55/25 56/18 74/3 89/25 90/3 90/11 93/23 99/14 99/23 100/1 107/8 127/12 128/23 129/22 143/19 143/22 151/4 155/7 155/18 158/22

exhibits [10]  6/3 16/3 16/10 16/12 19/15 41/3 48/6 48/18 49/5 186/9

existed [1]  19/2

existence [1]  18/23

exit [1]  55/10

expect [1]  168/20

expel [1]  173/5

**E**

experience [10]  16/24 28/12 65/24 66/18 68/1 69/7 99/1 165/25 166/13 178/6
experiences [2]  177/6 177/9
expert [2]  7/7 21/7
experts [1]  21/2
expiration [2]  20/14 186/20
expired [2]  161/14 183/8
Explain [1]  50/11
explained [1]  20/11
exploration [1]  107/24
exploratory [1]  106/19
expose [1]  101/14
expression [1]  150/8
extended [2]  37/11 37/23
extended-cab [1]  37/11
exterior [1]  42/7
extra [4]  57/1 118/19 128/9 171/6
extrinsic [2]  142/21 143/3
eye [1]  158/13

**F**

face [1]  79/19
facilitate [1]  32/20
facing [1]  151/12
fact [24]  53/1 53/21 57/1 66/14 75/21 88/9 93/7 93/17 101/18 106/4 106/6 108/13 109/15 109/17 118/5 119/11 134/15 137/25 163/10 165/12 165/20 166/18 176/23
facts [6]  106/13 111/9 111/20 165/13 167/14 178/23
fail [2]  169/2 169/16
fair [31]  33/21 38/21 38/25 43/20 48/13 50/2 51/14 60/6 63/8 64/24 65/13 66/21 70/7 71/14 72/2 72/4 74/11 75/18 88/20 98/7 98/12 98/19 98/20 98/24 116/17 117/23 120/22 121/17 138/6 139/17 141/6
fairly [3]  55/19 56/3 91/18
fairness [2]  62/11 156/3
fall [1]  64/13
falls [1]  177/14
familiar [3]  54/21 60/2 94/7
familiarity [1]  50/1
far [15]  21/16 21/21 55/7 58/1 58/17 62/14 65/17 91/4 91/6 104/5 110/12 113/25 138/4 156/9 161/3
fast [2]  58/10 145/21
feasible [1]  62/2
February [31]  12/18 22/24 25/1 27/9 28/19 43/2 69/13 79/21 82/10 99/21 113/6 113/16 116/13 117/22 120/9 120/25 121/25 123/1 135/23 137/14 139/6 140/11 147/17 148/16 157/16 163/18 164/15 167/9 172/1 173/23 181/15
Federal [2]  72/20 72/21
feedback [1]  184/25
feel [1]  167/12
feels [1]  25/5
felon [14]  9/19 25/12 25/21 26/4 117/12 133/21 134/24 163/23 167/10 169/19 169/24 174/22

182/21 184/5
felonies [5]  77/7 119/25 120/3 120/4 120/4
felony [6]  99/18 120/10 122/11 138/12 138/13 170/19
felt [2]  58/14 61/3
female [1]  93/18
few [5]  119/23 129/17 137/11 139/13 184/23
Ficke [9]  57/14 57/22 61/22 61/22 74/15 74/20 74/24 155/8 157/25
Ficke's [3]  62/14 89/15 151/15
Fifteen [1]  161/11
fifth [3]  20/15 76/21 76/22
fight [3]  123/11 169/20 171/10
fighting [1]  124/18
file [1]  121/16
filed [4]  16/9 100/18 121/25 184/14
fill [3]  57/21 62/23 72/21
filled [2]  61/22 155/8
final [5]  121/21 160/8 160/9 160/24 162/12
finality [1]  164/1
finally [9]  81/9 99/9 99/10 141/18 156/24 157/1 159/22 159/23 173/22
find [29]  14/24 19/2 21/11 24/21 25/1 25/7 25/7 26/9 37/25 40/1 46/21 46/23 47/1 47/6 49/16 61/18 69/8 70/5 105/6 133/11 140/8 153/18 165/12 167/14 167/17 179/4 182/24 183/9 184/3
finders [3]  163/10 165/12 165/20
finding [3]  110/24 158/21 167/12
fine [4]  9/2 17/10 153/17 161/10
fingerprint [2]  21/2 116/1
fingerprinted [2]  173/23 173/23
fingerprinting [1]  46/9
fingerprints [7]  21/1 46/12 46/20 46/21 47/6 166/2 173/22
fire [7]  52/5 52/9 66/14 94/13 94/20 127/18 165/1
firearm [10]  9/20 42/13 66/13 95/6 164/6 164/7 167/5 173/3 173/4 184/5
firearms [6]  28/16 28/17 50/1 54/22 72/14 72/17
fired [2]  94/17 173/5
firing [1]  55/8
firm [3]  169/8 169/11 175/19
first [19]  20/7 26/14 26/21 37/15 48/4 49/6 73/16 78/13 81/6 95/23 96/5 112/16 120/3 125/16 157/8 162/13 162/20 168/7 175/25
first-hand [1]  81/6
fit [6]  52/3 52/4 57/2 65/5 93/18 173/15
fits [1]  94/21
five [4]  20/14 25/17 164/1 167/11
five-year [1]  167/11
fixing [1]  153/21
flip [2]  82/19 184/1
Flipping [1]  155/11
flowery [2]  128/9 182/7
focus [1]  10/4
focusing [2]  62/13 68/13

foggy [1]  140/18
fold [1]  37/22
fold-down [1]  37/22
folded [1]  117/18
folks [6]  54/21 63/19 68/10 94/19 96/2 157/11
follow [19]  9/25 10/1 10/19 10/23 11/20 11/21 27/21 59/24 80/5 88/19 96/25 97/8 98/10 98/18 98/18 104/5 167/20 176/1 176/14
follow-up [2]  27/21 80/5
following [10]  1/14 10/2 10/7 12/1 13/9 14/21 97/10 98/15 114/5 167/20
follows [7]  26/21 78/13 95/23 112/16 144/3 154/13 157/8
foot [1]  140/7
force [2]  27/12 79/12
forceful [1]  182/12
Ford [7]  37/11 84/6 84/8 144/22 166/11 166/12 166/14
foregoing [1]  186/5
Foreperson [1]  184/12
forgot [3]  7/16 7/18 161/25
form [13]  6/12 36/19 62/22 62/23 72/21 89/25 90/3 153/12 153/22 155/8 160/24 163/10 184/13
forward [3]  55/8 112/22 145/21
found [38]  36/21 38/7 40/2 40/25 45/17 45/20 49/18 50/13 52/21 53/14 54/7 64/3 65/9 68/21 69/9 74/3 85/4 85/9 93/3 93/18 93/24 104/4 105/3 105/5 110/16 133/7 133/16 134/20 143/12 150/1 153/19 154/24 155/3 155/19 156/14 172/11 173/14 175/1
four [6]  79/9 103/20 143/7 143/8 181/18 181/19
frame [4]  25/16 55/20 55/22 99/21
free [1]  185/3
fresh [1]  168/11
friendly [3]  92/17 92/17 131/13
front [21]  12/7 17/11 17/18 18/13 23/22 25/8 32/24 43/17 50/23 55/17 55/18 58/23 60/10 64/22 71/7 76/2 76/3 109/8 151/12 166/19 179/10
full [5]  37/20 47/16 70/5 70/14 159/6
full-sized [1]  37/20
function [1]  95/3
functioning [1]  167/15
further [15]  34/18 48/22 90/6 90/7 95/13 99/6 99/13 110/19 141/13 143/24 151/19 156/23 159/21 186/9 186/11

**G**

Galveston [7]  120/8 120/14 120/16 122/4 122/16 138/12 170/19
garments [1]  117/15
gasping [1]  91/13
gave [2]  86/13 164/25
general [4]  11/22 12/13 15/15 178/16

generalized [2]  11/20 101/12
generally [1]  76/2
gentlemen [10]  22/8 76/12 86/1 100/10 151/21 160/6 161/23 162/3 183/12 184/21
get [63]  19/4 23/15 23/25 24/1 33/6 36/8 59/12 63/21 67/16 67/20 68/5 68/6 70/6 70/13 77/3 95/4 101/15 104/20 105/14 105/16 111/9 111/19 114/6 116/25 117/1 117/13 118/24 119/12 121/12 124/2 129/18 131/19 134/16 136/10 138/15 139/24 140/5 140/5 141/3 141/21 141/25 142/8 144/7 148/21 152/4 152/21 161/16 166/4 166/15 166/24 167/18 169/5 173/1 173/13 174/1 174/11 174/17 175/9 177/3 181/3 181/12 184/25 185/4
gets [9]  61/14 72/21 101/13 135/2 140/9 162/14 177/22 178/21 182/2
getting [9]  32/20 34/23 37/10 43/16 83/24 115/11 134/10 147/7 178/15
girl [1]  38/16
girlfriend [3]  23/1 179/25 182/23
give [7]  15/22 62/12 87/21 97/20 111/23 150/5 160/11
given [1]  168/19
giving [1]  21/20
glasses [1]  169/13
glove [1]  37/2
God [1]  168/19
God-given [1]  168/19
goes [8]  52/23 55/7 58/5 97/23 105/23 108/24 111/5 172/21
going [125]  7/5 7/21 8/3 9/16 10/2 10/13 10/25 12/3 12/4 14/4 14/17 15/8 16/2 16/18 17/4 17/15 18/17 18/18 18/19 18/22 19/8 19/24 23/24 24/3 24/6 24/11 24/20 25/6 25/10 25/11 25/17 25/19 25/23 25/25 26/2 26/5 26/7 26/8 33/13 33/17 34/23 35/5 35/13 36/3 36/8 40/6 40/17 41/17 42/1 42/15 43/15 45/10 46/2 47/13 47/14 47/24 48/4 53/9 56/2 56/7 71/5 73/23 80/11 80/23 83/17 84/25 85/14 86/13 89/4 89/18 90/16 91/2 93/12 93/20 105/15 106/1 106/2 107/2 110/20 111/24 113/9 113/20 113/21 115/5 120/25 121/6 123/8 123/22 125/4 133/5 134/15 136/10 137/7 137/11 140/17 142/5 143/21 144/20 145/21 150/2 150/6 150/25 152/2 152/12 152/15 153/7 154/3 155/6 158/21 162/3 163/12 166/4 166/7 166/24 167/4 169/5 171/25 173/12 174/4 174/20 174/25 175/23 179/9 181/10 181/12
gone [3]  80/4 171/4 172/16
good [12]  7/3 7/4 26/2 26/24 77/1 82/9 96/1 110/25 111/2 121/12 131/13 171/22
got [60]  8/20 9/7 12/6 12/20 12/21 13/15 13/18 13/19 19/21 21/16 32/11 45/1 46/7 105/4 105/15 105/24 105/25 107/5 109/17

# G

**got...** [41]  111/11 113/19 114/6 114/24 121/4 122/13 122/13 123/7 123/23 126/11 127/4 127/15 128/11 128/12 128/15 128/15 129/13 131/17 136/5 137/3 141/20 141/24 145/8 147/8 147/10 151/22 152/13 163/3 167/20 168/10 171/10 172/5 173/3 173/17 173/17 174/21 179/7 180/22 180/24 182/11 182/21
**gotten** [1]  120/16
**grab** [3]  114/2 114/9 114/12
**grabbed** [12]  114/1 114/2 114/8 114/10 114/10 115/10 115/13 116/20 117/14 140/12 140/23 141/1
**grabbing** [1]  166/11
**grabs** [1]  171/10
**gram** [1]  120/6
**Granberry** [1]  2/11
**GRAY** [20]  2/10 2/11 16/8 17/21 26/10 57/13 74/9 87/12 93/2 97/13 112/7 112/13 112/18 127/11 137/10 147/15 156/2 159/16 168/1 168/6
**GREER** [57]  1/8 8/6 20/9 20/11 22/15 23/1 23/4 23/6 28/24 29/1 29/20 31/2 31/9 36/14 38/11 62/20 67/20 69/10 71/17 72/24 72/25 73/7 74/25 75/9 76/17 80/18 81/10 81/24 83/3 86/14 86/16 86/22 87/9 87/14 88/4 88/9 90/20 92/4 96/17 98/6 98/25 99/1 112/23 119/7 128/15 145/2 157/20 163/22 164/12 164/18 165/10 166/16 167/8 167/18 183/4 183/5 184/4
**Greer's** [10]  23/7 72/1 146/20 147/19 147/22 147/23 151/7 151/12 164/25 181/22
**Grimes** [1]  25/13
**grounds** [1]  11/18
**guess** [24]  28/4 32/10 58/8 58/9 58/17 58/20 59/8 60/16 61/4 61/22 64/3 64/13 67/4 71/4 72/11 87/14 90/20 96/21 98/8 115/25 118/22 148/16 156/21 173/5
**guilt** [5]  11/14 11/19 77/13 167/12 167/17
**guilt/innocence** [1]  77/13
**guilty** [8]  7/20 22/17 22/18 26/9 153/19 176/11 183/10 184/4
**gun** [169]  14/18 25/7 26/6 45/20 46/4 46/22 47/2 49/2 50/9 51/5 53/21 54/7 61/4 61/5 63/21 64/20 67/6 68/21 69/25 70/9 70/18 70/19 71/21 71/25 72/2 72/5 72/8 73/7 73/9 74/3 85/9 85/11 85/15 85/18 86/24 87/8 90/21 94/12 95/9 106/1 114/2 114/10 115/15 116/4 116/7 116/9 119/7 119/10 119/18 123/16 123/20 124/2 124/24 125/3 125/7 126/14 126/24 127/5 129/22 130/2 130/3 130/16 131/2 132/18 132/20 132/21 132/21 133/7 133/10 133/11 133/12 133/16 133/19 133/24 134/4 134/4 134/6 134/6 134/6 134/8 134/20 135/2 135/20 135/21 135/24 135/25 136/1 136/5 136/6 136/9 136/11 136/20 137/19 137/20 138/1 139/2 139/2 139/24 139/24 140/10 140/13 140/22 140/24 142/17 142/19 143/10 146/20 146/20 147/5 147/7 147/8 147/10 147/10 147/16 147/18 147/20 147/21 147/24 148/1 148/2 148/5 148/20 148/20 148/21 149/20 150/18 150/19 154/24 156/14 156/15 164/22 165/10 166/2 166/22 167/9 167/19 170/2 170/10 170/12 170/13 170/15 170/15 170/16 171/12 172/10 172/14 172/15 172/18 172/23 173/1 173/7 173/10 173/22 174/4 175/4 175/4 179/20 179/20 179/22 181/10 181/11 181/11 181/16 181/22 182/4 182/5 182/5 182/22 182/24
**gunpoint** [2]  33/1 33/5
**guns** [1]  72/17
**guy** [7]  8/25 96/16 131/11 140/8 142/25 158/6 182/21
**guy's** [1]  11/7
**guys** [4]  43/4 113/21 119/14 121/1

# H

**habitation** [2]  13/5 13/13
**hair** [1]  65/2
**hairs** [1]  138/4
**half** [2]  78/23 79/14
**hallway** [1]  125/14
**hammer** [3]  55/5 55/7 67/12
**hand** [11]  20/9 22/9 25/8 45/13 81/6 89/4 162/2 165/10 177/18 185/2 186/13
**handcuffed** [1]  59/18
**handcuffs** [8]  12/7 59/9 104/12 113/10 113/14 138/22 170/20 174/23
**handed** [1]  54/5
**handle** [2]  67/12 119/7
**handled** [3]  70/5 88/16 170/9
**hands** [2]  67/9 140/9
**happen** [10]  8/14 51/6 63/23 63/24 106/3 113/18 116/14 135/8 139/5 166/7
**happened** [20]  8/7 10/11 13/22 14/5 32/10 32/22 33/22 80/6 82/5 121/3 137/3 138/18 143/14 145/8 163/19 163/25 164/2 165/17 182/3 183/7
**happening** [1]  140/17
**happens** [5]  35/8 84/17 84/18 166/7 176/25
**happy** [1]  98/14
**hard** [5]  42/21 45/5 75/23 124/17 153/18
**harm** [1]  104/10
**hasn't** [1]  111/15
**have** [234]
**haven't** [4]  62/12 109/17 150/9 170/4
**having** [17]  7/24 26/21 36/7 78/13 90/9 95/23 98/6 112/16 127/5 131/17 131/20 133/24 134/20 144/3 149/13 154/13 157/8
**he'd** [2]  25/17 129/15
**he's** [21]  7/9 9/15 10/6 11/24 12/5 18/1 29/5 29/6 76/15 89/18 102/24 109/1 109/2 109/3 111/16 131/11 145/3 145/5 174/22 174/25 183/4
**head** [7]  86/9 122/15 122/21 123/3 130/12 131/12 134/12
**hear** [15]  7/24 24/19 24/21 25/10 25/19 25/23 26/5 75/6 77/3 102/11 149/10 150/15 150/16 160/9 162/12
**heard** [8]  74/23 150/15 164/17 165/19 166/20 166/20 166/23 171/8
**hearing** [5]  8/3 16/17 17/5 106/25 121/21
**hearsay** [9]  16/15 16/20 18/18 18/19 19/6 80/15 85/24 87/5 103/20
**heat** [3]  114/11 116/23 124/19
**heated** [1]  123/9
**heavier** [2]  39/21 39/24
**heavy** [2]  25/6 61/3
**heck** [2]  149/25 150/1
**held** [2]  1/15 1/17
**help** [4]  11/19 28/23 153/11 183/5
**helped** [1]  172/7
**helping** [2]  33/1 157/19
**her** [71]  24/23 26/6 39/10 47/16 71/6 71/14 83/14 83/19 83/19 83/25 84/5 84/6 84/6 84/7 84/8 84/9 85/19 85/21 86/5 86/5 86/9 90/13 90/17 91/3 91/4 91/4 91/6 91/12 92/7 92/15 93/19 93/20 141/21 141/21 142/1 142/15 142/18 142/19 143/7 143/13 146/22 146/24 146/25 147/2 147/5 148/4 148/6 148/14 148/16 149/8 150/8 150/15 150/16 166/20 166/21 166/21 166/23 171/2 171/5 171/8 171/10 173/1 173/14 181/6 181/10 181/13 181/18 182/1 182/23 182/24 183/1
**here** [42]  8/25 9/14 10/1 10/7 11/21 14/21 25/10 29/2 29/6 36/8 41/15 43/13 43/15 44/3 44/6 44/22 45/5 51/18 54/19 55/23 55/23 63/15 66/2 89/12 106/3 107/19 109/11 109/25 118/16 127/12 141/21 150/25 153/14 162/19 162/23 164/10 175/12 175/15 178/21 179/7 181/4 185/4
**hereby** [1]  186/5
**herself** [1]  171/3
**hesitation** [1]  125/24
**Hey** [2]  170/21 174/23
**hidden** [1]  82/17
**hide** [1]  124/8
**high** [1]  169/10
**higher** [1]  169/11
**highest** [1]  169/10
**Hillbilly** [9]  132/9 132/12 132/13 134/10 134/15 136/10 137/17 166/24 181/12
**Hillbilly's** [10]  132/14 134/5 135/25 136/9 137/15 137/22 139/2 142/15 170/22 170/22
**him** [109]  7/11 9/23 10/15 10/17 10/19 10/22 12/3 12/6 12/7 14/21 15/9 18/5 20/7 21/2 26/2 26/3 29/4 32/14 43/8 58/23 59/12 76/8 76/15 79/17 82/6 96/18 96/18 96/25 96/25 97/8 98/17 98/20 98/21 102/2 102/2 102/14 102/15 102/19 108/16 108/16 108/22 112/25 113/1 113/23 114/5 114/6 117/9 117/13 118/4 119/12 119/17 119/18 123/2 124/8 124/14 124/14 129/11 130/21 131/3 131/15 131/20 131/24 132/7 132/8 132/11 132/12 132/13 132/19 134/7 134/8 134/9 134/15 134/17 135/1 135/2 135/9 135/13 135/15 135/25 136/1 136/4 136/6 136/9 138/16 139/23 140/3 140/10 142/1 143/9 146/4 152/5 158/7 159/3 159/9 164/14 165/1 165/3 167/21 167/21 174/20 175/4 179/5 180/8 180/16 181/16 181/17 182/4 183/5 183/10
**his** [82]  7/21 8/25 9/22 10/22 11/8 12/1 13/24 14/18 23/1 25/9 25/9 25/21 25/21 25/22 56/14 71/18 71/21 72/2 73/9 79/19 86/19 86/20 97/9 98/19 99/16 118/3 118/9 127/12 127/15 127/22 129/4 129/11 129/13 130/20 131/4 132/11 135/19 135/21 135/24 136/1 140/9 146/7 146/8 146/10 146/11 148/11 148/12 149/22 163/6 164/1 164/25 165/3 165/4 165/6 165/10 174/21 178/24 178/25 179/1 179/2 179/2 179/5 179/14 179/20 179/21 179/21 179/22 179/22 179/23 179/25 180/1 180/1 180/10 180/25 181/1 181/1 181/16 182/22 182/22 182/23 183/7 183/7
**hold** [3]  8/19 167/21 167/21
**holding** [3]  45/4 45/6 45/21
**hole** [1]  119/19
**holes** [1]  55/2
**home** [2]  123/21 123/22
**honest** [1]  25/24
**honor** [7]  9/19 41/12 109/20 162/19 162/21 183/23 184/8
**Honorable** [1]  1/16
**hood** [1]  37/2
**hoody** [1]  128/12
**hopefully** [2]  152/20 160/11
**hoping** [1]  162/22
**house** [2]  117/2 123/12
**Houston** [1]  21/2
**how** [48]  11/18 19/2 22/15 27/5 27/7 28/2 28/6 29/24 35/2 35/3 36/16 36/17 46/17 54/23 58/10 58/17 75/6 75/6 78/19 78/22 79/1 79/8 79/13 81/1 82/21 86/7 88/16 94/6 94/9 103/3 103/3 103/4 108/4 111/14 111/20 111/21 112/25 113/2 115/8 127/22 136/4 152/11 161/5 165/16 169/13 177/1 177/22

| **H** | | | |
|---|---|---|---|

**H**

how... [1] 182/1
however [2] 13/4 20/22
huge [1] 140/25
huh [5] 18/8 21/4 21/13 85/22 132/6
hurts [1] 70/6

**I**

I'd [3] 20/6 54/3 175/25
I'll [19] 8/12 8/20 9/1 15/22 51/11 54/25 57/8 73/12 74/7 76/6 76/7 79/21 87/5 93/22 133/6 153/8 155/24 159/14 159/20
I'm [86] 10/1 10/2 10/7 10/13 11/21 14/21 16/9 18/18 18/21 18/22 19/8 25/25 26/8 27/3 27/16 33/13 33/17 34/22 38/6 40/6 40/17 41/17 43/12 44/22 45/1 45/6 46/2 46/24 48/4 53/9 56/2 78/20 81/20 89/4 94/7 96/3 96/10 97/23 98/3 98/11 98/12 108/12 111/24 118/14 124/6 124/21 124/21 124/22 125/1 125/4 125/7 126/22 136/2 136/8 137/7 140/9 144/20 145/21 147/25 149/17 149/25 150/2 150/7 150/25 152/2 153/7 153/17 153/21 155/6 157/13 157/13 158/21 159/1 162/3 162/22 163/12 163/13 168/4 168/5 169/5 171/19 171/23 176/2 176/13 179/9 184/21
I've [16] 9/14 27/9 41/18 51/10 54/5 58/16 63/23 65/24 77/6 107/5 122/13 122/13 141/24 152/13 162/8 162/21
idea [4] 130/16 130/25 136/20 152/21
identifiable [2] 47/2 101/8
identification [5] 33/18 40/7 40/18 48/5 51/10
identified [14] 29/9 31/16 31/18 47/12 101/19 102/21 108/13 108/24 109/1 109/2 109/3 109/3 109/13 109/16
identify [4] 75/24 102/2 102/15 108/16
identifying [2] 61/7 173/18
III [1] 1/16
illegal [9] 52/18 53/4 100/23 107/25 130/16 131/1 133/24 149/19 149/20
image [1] 180/21
immediate [2] 91/4 181/13
immediately [8] 23/19 32/12 91/9 133/18 145/8 166/23 182/23 185/3
impact [2] 55/9 55/22
impeach [3] 77/7 142/22 143/1
important [2] 176/20 176/21
in-car [1] 144/11
in-depth [1] 27/22
inadmissible [1] 14/12
incarcerated [2] 12/18 15/9
incident [4] 12/24 15/23 104/8 104/20
include [2] 36/22 77/9
included [4] 143/23 156/20

173/20 186/6
Including [1] 28/16
incredibly [2] 152/15 152/15
incriminating [1] 106/19
INDEX [5] 3/1 4/1 5/1 5/11 6/1
indicate [4] 98/11 137/13 140/1 148/15
indicated [19] 11/2 20/25 21/5 59/22 61/2 61/12 61/21 64/18 66/13 69/3 70/23 74/10 87/13 101/2 139/1 147/18 149/8 170/25 174/10
indicating [6] 42/22 43/13 44/3 45/2 55/9 55/24
indications [1] 65/16
indicted [3] 12/21 13/19 13/21
indicting [1] 44/19
indictment [5] 22/13 22/14 22/16 99/19 184/5
individual [15] 8/2 23/1 29/2 99/17 102/12 108/20 108/22 108/25 109/13 110/5 110/5 110/14 118/1 144/21 144/24
individuals [4] 18/7 23/10 28/23 144/13
inform [1] 110/7
informant [19] 80/10 87/18 87/19 87/22 88/8 91/23 91/24 92/3 101/13 101/15 101/17 102/19 103/7 103/11 108/3 108/15 108/20 109/10 111/11
information [17] 19/3 21/9 61/8 75/7 75/8 81/6 88/3 101/3 101/25 108/7 109/10 111/23 119/9 147/1 150/5 153/12 165/11
infraction [1] 10/10
initial [6] 16/7 18/2 18/3 69/12 82/5 108/3
initially [4] 149/7 150/17 172/12 175/22
initiated [1] 23/8
innocence [3] 11/19 77/13 163/6
innocent [1] 176/4
inquisitorial [2] 163/3 163/4
inside [6] 42/5 44/20 44/24 155/19 156/15 159/5
instruct [2] 10/17 10/19
instructed [1] 9/23
instructions [2] 185/8 185/10
intend [3] 10/5 10/9 77/23
intends [1] 9/17
intent [1] 10/4
intention [4] 101/14 113/21 116/16 119/21
intentionally [2] 164/6 170/1
interesting [1] 172/19
interior [4] 42/8 60/4 60/16 76/4
interrogation [1] 11/11
interview [3] 88/1 93/20 182/3
interviewing [2] 93/11 93/13
intoxicated [2] 63/11 63/11
introduce [6] 9/18 10/5 26/25 78/16 96/1 157/11
introducing [1] 17/13
inventoried [1] 59/6
inventories [1] 105/5
inventory [73] 6/12 6/13 16/8

17/24 24/9 24/10 24/18 25/5 35/18 35/20 36/3 36/12 36/15 36/17 36/20 36/25 37/5 37/7 38/5 38/6 39/16 48/15 57/15 57/19 57/20 57/22 59/23 61/13 62/1 62/6 63/1 84/21 84/22 84/24 88/15 88/22 89/6 89/7 89/25 90/3 104/1 104/2 104/3 104/6 104/16 105/2 105/3 105/4 105/13 105/15 105/15 105/19 105/20 105/23 106/2 106/5 106/8 106/14 106/18 107/23 107/23 111/3 141/9 154/23 155/2 155/7 155/9 156/13 158/1 158/6 158/10 172/4 173/21
inventory-type [1] 59/23
inventorying [3] 44/16 47/18 171/18
investigate [1] 110/19
Investigated [1] 84/1
investigating [2] 85/16 85/20
investigation [7] 27/16 27/19 27/22 29/22 93/7 93/8 93/9
investigations [2] 80/5 165/25
investigative [1] 110/1
investigator [33] 27/3 27/24 29/12 44/10 75/8 75/13 78/20 79/7 80/2 81/19 101/2 109/14 111/13 131/10 132/17 133/5 133/15 134/3 135/18 137/2 137/12 138/5 138/19 139/10 142/14 154/22 157/13 158/1 158/10 158/20 165/3 172/12 172/25
investigators [3] 27/20 141/9 165/6
involved [2] 29/24 81/23
Iraq [2] 163/2 163/3
is [457]
isn't [5] 104/13 104/13 162/23 166/3 175/3
issue [12] 61/15 100/7 103/25 104/5 104/11 142/16 169/18 169/19 169/25 175/4 179/10 179/10
issued [1] 22/25
issues [4] 7/24 20/25 108/2 138/16
It'll [1] 79/4
it's [133] 9/16 10/25 11/22 11/22 12/13 14/17 15/8 15/12 15/15 16/8 16/15 16/24 17/8 17/9 17/9 19/23 19/24 23/9 27/20 35/8 37/11 37/12 37/21 37/22 41/18 41/20 42/7 42/21 43/24 45/4 46/7 46/9 46/23 47/3 49/23 50/16 50/17 50/20 55/1 55/5 61/1 61/25 63/19 64/14 65/25 66/13 69/22 70/5 77/16 78/17 82/16 84/15 84/17 84/18 94/24 95/1 95/17 95/17 96/7 98/19 101/14 103/3 104/15 105/17 105/22 105/23 106/24 106/25 107/24 111/17 115/18 120/22 124/17 126/2 128/14 133/14 134/6 134/6 134/8 142/13 144/1 145/2 147/23 148/11 149/21 149/22 149/22 150/14 151/2 151/3 152/25 153/15 163/21 164/3 164/15 165/4 165/8 166/6 166/11 167/2 168/14 168/14 169/10 169/10 169/11

171/6 172/15 173/2 173/4 174/11 174/13 175/4 175/13 175/14 175/15 175/16 177/8 177/20 178/10 178/13 178/23 178/24 179/1 179/5 179/5 179/17 179/17 180/25 181/1 182/19 182/25 183/6 183/7
item [2] 140/14 170/4
items [27] 36/4 36/20 37/13 37/25 38/2 38/22 39/7 39/13 48/10 60/17 60/25 61/13 104/4 105/3 105/5 105/16 105/24 106/3 114/1 114/14 114/18 114/22 115/4 115/10 126/21 141/10 171/17
its [3] 60/21 100/5 142/4
itself [9] 25/4 42/5 70/9 70/18 75/15 77/25 95/5 109/15 180/21

**J**

jack [1] 24/24
jacket [166] 6/10 25/3 25/4 25/4 25/8 25/9 25/22 39/3 39/17 39/25 40/10 41/5 41/17 41/22 41/24 42/6 43/7 45/1 45/6 45/21 46/4 48/7 56/17 56/21 56/23 56/24 57/1 57/6 60/21 60/25 61/3 71/25 72/1 73/15 73/20 82/18 83/1 85/10 85/11 85/13 85/15 85/18 85/20 85/21 86/17 86/24 90/19 90/21 91/3 91/4 91/17 91/18 114/11 115/5 115/6 115/9 118/6 118/18 119/1 119/2 123/16 127/2 127/12 127/13 127/22 128/2 128/5 128/6 128/7 128/8 128/9 128/11 128/12 128/16 128/22 128/22 129/4 129/11 130/2 130/21 131/4 131/23 132/1 132/15 132/18 133/8 133/12 133/16 134/5 134/5 136/1 137/13 137/15 140/13 140/22 140/24 142/14 144/19 145/19 146/5 146/9 146/10 146/15 147/25 147/25 149/8 149/9 149/10 149/12 149/13 149/16 149/20 149/21 149/22 149/22 149/24 149/25 150/1 150/6 151/7 154/24 155/18 156/4 156/14 158/23 159/2 159/18 164/14 164/17 164/18 164/19 164/20 164/21 164/23 164/25 165/3 165/5 165/5 165/6 166/16 166/18 166/19 170/21 170/23 171/3 171/6 171/14 171/19 172/8 172/10 172/11 172/19 172/20 172/20 172/21 172/22 179/21 179/21 179/23 179/23 180/10 181/1 181/2 182/8 182/11 182/22
jackets [6] 43/4 82/17 118/9 118/12 118/13 171/1
jail [29] 9/21 10/6 12/3 12/5 12/15 13/12 13/18 13/19 14/16 15/23 24/3 35/6 96/14 96/22 97/4 97/9 120/20 122/1 122/16 136/17 137/3 139/6 139/15 139/21 142/20 148/15 148/16 167/20 173/1
jailer [1] 10/12
January [1] 79/4
Jason [4] 5/21 157/3 157/7 157/13
jeans [16] 49/7 49/13 49/15 49/19

10

## J

**jeans... [12]** 50/4 51/16 51/23 52/14 52/20 64/4 65/9 93/4 93/18 93/23 105/7 173/14
**jigsaw [3]** 180/20 182/16 182/17
**job [6]** 175/14 175/16 175/17 176/22 182/15 182/16
**Jones [1]** 2/11
**judge [125]** 1/17 7/4 7/5 7/16 7/25 8/15 8/16 9/4 9/10 10/25 11/17 12/17 13/3 13/6 14/1 14/8 14/10 14/24 15/6 15/19 15/20 15/24 16/2 16/14 16/22 17/3 17/21 18/17 19/16 19/19 20/6 21/24 22/22 26/19 29/8 33/15 34/1 34/9 34/12 34/20 40/4 41/2 41/8 42/15 42/18 45/25 48/2 53/25 57/9 57/11 62/9 73/12 76/7 78/1 78/9 80/15 85/24 86/25 87/10 89/2 89/24 90/5 90/7 92/21 95/13 99/6 99/12 100/7 100/14 100/17 100/22 101/21 102/23 103/21 103/24 103/25 104/18 105/24 106/12 106/16 106/24 107/19 107/21 108/18 111/6 112/3 112/8 112/14 115/2 121/20 127/8 137/7 141/13 141/16 141/21 142/3 142/6 142/11 143/18 144/7 147/13 151/18 152/13 152/19 153/1 153/10 153/22 153/25 154/20 156/23 157/6 158/18 160/16 160/19 161/3 161/10 161/13 161/15 161/16 161/19 163/4 163/9 167/14 168/2 177/9
**judges [4]** 163/11 165/20 165/21 166/25
**judging [1]** 177/11
**Judgment [1]** 20/23
**judicial [2]** 1/8 100/19
**jump [1]** 37/22
**jumpsuit [1]** 12/7
**junction [1]** 100/21
**jurors [1]** 176/14
**jury [79]** 1/11 12/8 15/18 16/1 16/1 16/11 16/15 16/18 17/18 18/13 19/14 21/11 22/3 22/6 22/10 25/16 26/25 27/17 35/3 37/8 49/3 50/12 50/20 50/24 56/13 64/23 76/13 78/3 78/6 78/16 87/1 96/2 97/19 99/19 100/8 100/9 100/12 109/9 112/1 112/5 123/13 123/15 124/1 124/23 130/15 130/19 134/23 135/22 151/25 153/24 154/7 154/24 157/12 158/4 160/12 160/25 161/22 162/19 162/20 162/21 163/9 167/7 167/13 168/9 175/23 177/5 177/7 183/12 183/14 183/15 183/16 183/20 183/22 184/3 184/7 184/16 184/23 185/6 185/12
**jury's [2]** 11/3 43/21
**just [106]** 7/6 9/1 11/6 12/9 14/23 15/6 15/11 15/11 15/15 18/13 18/14 18/14 19/1 19/1 21/19 24/7 31/5 32/4 35/4 36/3 37/23 38/2 39/7 42/7 43/22 43/24 44/23 46/4

49/1 54/3 54/5 54/22 55/19 60/10 62/11 65/1 70/6 71/17 73/15 75/6 82/17 84/14 86/8 90/17 92/17 92/18 92/20 94/4 98/9 98/13 100/7 101/11 102/23 103/2 103/15 104/6 104/19 105/25 107/22 108/10 108/10 112/22 114/8 114/11 114/17 115/13 115/19 116/24 116/25 116/25 117/15 117/20 121/6 121/7 124/5 124/14 130/10 136/24 137/11 137/23 140/6 141/1 141/5 144/8 144/20 148/1 149/13 149/18 149/21 150/14 151/11 152/8 153/17 158/14 159/7 159/18 165/2 165/15 170/4 174/22 175/6 175/9 176/1 177/19 177/25 182/17
**justice [1]** 167/15

## K

**keep [6]** 23/20 53/2 72/16 118/4 118/13 119/18
**keeping [1]** 158/13
**keeps [1]** 171/1
**Kenneth [1]** 72/25
**kept [2]** 52/23 80/6
**key [1]** 67/11
**kidnapped [3]** 116/10 140/5 173/9
**kidnapping [4]** 116/13 131/10 139/11 148/25
**kind [41]** 10/12 19/7 23/22 25/1 25/5 30/4 30/19 30/21 32/4 32/8 32/19 33/2 34/23 37/11 37/16 37/25 38/1 42/21 43/7 43/22 44/23 46/8 49/1 54/22 54/24 62/13 66/10 68/16 68/25 69/23 77/8 82/12 86/8 95/7 112/22 114/15 130/10 138/16 158/13 159/10 178/23
**kinds [1]** 38/2
**knew [16]** 23/10 23/14 93/17 117/12 130/25 131/7 132/20 132/21 134/23 135/1 135/4 136/4 149/11 172/22 172/23 183/3
**knife [2]** 59/13 67/5
**know [148]** 11/21 12/4 12/13 14/3 14/18 15/11 15/12 17/13 18/1 18/17 21/20 29/1 37/9 42/21 43/21 45/4 53/10 57/18 58/12 59/22 60/5 61/2 61/21 63/2 63/6 64/2 64/8 66/7 66/13 66/14 66/17 67/5 68/13 70/23 71/6 72/5 72/7 72/8 75/18 75/19 76/18 81/1 82/19 91/15 91/15 92/10 94/6 94/8 94/11 96/14 98/3 102/14 102/24 102/25 103/1 103/5 103/7 103/18 104/14 104/19 107/22 108/7 108/11 109/9 111/12 111/13 111/20 111/21 112/23 112/25 117/4 119/11 122/3 123/16 129/3 129/22 130/1 134/1 134/5 138/11 138/13 140/11 144/24 149/24 150/9 150/13 150/18 156/13 159/17 159/19 163/21 163/22 163/25 164/2 164/6 164/19 164/22 164/23 165/2 165/16 168/8 169/10 169/18 170/2 171/1 171/2 171/2 171/6 171/18 171/22 171/25 172/8 172/9 172/9 172/10 172/14

173/5 173/6 173/16 174/8 174/12 174/13 174/13 174/20 175/8 175/10 175/11 175/11 176/6 176/7 177/15 177/23 178/6 178/20 178/21 179/13 179/17 179/19 179/21 179/23 179/24 180/11 180/12 180/13 182/6 182/8 182/10 182/12
**knowing [1]** 117/9
**knowingly [3]** 164/5 170/2 170/2
**knowledge [14]** 60/15 74/18 74/21 74/24 84/4 88/9 89/21 89/22 117/25 149/19 150/5 156/11 178/18 179/18
**known [10]** 67/16 101/24 102/14 108/20 108/21 108/24 109/13 109/15 110/7 110/8
**knows [4]** 108/21 129/4 129/4 129/7

## L

**L-A-K-E-S-H [1]** 11/9
**L-A-K-E-T-H [1]** 96/7
**L-E-D-E-S-M-A [1]** 78/18
**lab [4]** 67/1 67/15 68/2 68/2
**lack [1]** 27/24
**ladies [10]** 22/8 76/11 86/1 100/10 151/21 160/6 161/23 162/3 183/11 184/20
**Lakesh [2]** 11/8 95/17
**Laketh [5]** 5/17 95/16 95/17 95/22 96/6
**land [1]** 169/10
**Langley [1]** 8/16
**large [11]** 25/2 37/12 39/2 57/1 70/24 70/25 91/18 108/8 118/19 170/25 171/6
**larger [2]** 118/12 170/25
**last [7]** 11/7 69/17 70/10 72/12 86/1 116/2 162/14
**late [1]** 15/4
**latent [2]** 69/9 70/5
**later [12]** 11/4 20/1 34/15 51/11 136/13 142/19 143/14 145/22 146/23 150/18 172/25 182/3
**law [13]** 24/5 49/25 59/19 63/7 100/18 103/22 104/14 108/23 109/19 110/9 110/14 162/4 177/19
**laying [2]** 39/7 39/12
**laymen's [1]** 54/23
**lead [2]** 32/11 119/9
**learned [1]** 178/7
**least [10]** 29/23 29/25 65/18 67/14 67/20 70/14 75/24 93/19 117/25 150/13
**leather [7]** 6/10 25/3 39/3 146/5 146/9 164/21 164/23
**leave [5]** 24/7 117/2 168/20 176/20 185/3
**led [2]** 16/7 56/24
**Ledesma [53]** 5/14 5/16 44/10 44/11 71/5 73/23 74/1 74/4 75/8 75/13 78/9 78/12 78/17 101/2 101/22 108/21 108/21 109/14 111/13 127/21 131/6 131/7 132/14 132/17 133/5 133/15 134/3 135/19 135/21 135/24 136/5 136/25 137/3

137/12 138/5 138/19 139/1 139/10 142/9 142/12 142/14 142/18 143/9 144/2 144/6 165/3 166/21 172/13 172/25 181/6 181/15 181/15 181/21
**LEE [1]** 2/5
**left [10]** 46/10 96/17 105/1 114/3 117/3 117/5 145/18 161/16 161/17 181/23
**legal [2]** 118/23 171/4
**legally [1]** 110/8
**length [2]** 56/4 94/24
**lengthy [1]** 168/9
**less [5]** 120/5 124/7 152/16 170/13 170/17
**let [23]** 22/9 38/4 46/3 46/15 46/24 49/24 63/12 77/23 80/21 84/17 87/7 101/16 113/5 115/4 120/18 121/6 121/9 123/19 127/3 132/8 139/9 152/5 184/21
**let's [22]** 37/15 57/20 76/11 90/17 100/10 114/8 120/3 142/8 152/1 154/5 160/10 161/21 163/17 163/20 165/22 170/6 176/18 177/24 178/1 178/2 178/3 183/19
**level [1]** 28/3
**levels [1]** 169/4
**liability [2]** 61/15 172/5
**liability-type [1]** 61/15
**license [3]** 61/8 102/7 102/9
**lie [16]** 131/3 176/19 178/8 178/9 178/12 178/13 178/17 178/20 180/5 180/6 180/8 180/9 180/17 182/13 182/14
**lied [7]** 179/23 180/12 180/14 180/14 180/14 181/1 182/22
**lies [1]** 180/16
**life [4]** 46/17 177/6 177/10 178/6
**lift [1]** 46/11
**lifted [1]** 61/3
**lights [5]** 23/16 23/20 32/12 144/7 164/13
**like [72]** 10/10 12/20 20/6 21/6 23/9 24/5 24/22 24/24 27/19 29/15 29/15 31/23 32/13 35/21 35/24 36/12 37/1 37/3 37/9 37/17 37/20 39/11 45/8 46/22 47/15 47/18 49/1 50/23 51/5 54/4 59/13 61/8 66/9 66/11 71/13 73/7 73/19 74/23 76/8 82/11 82/17 82/17 84/14 85/23 89/13 91/13 98/12 101/17 114/15 115/12 116/23 119/11 124/18 126/16 126/17 126/24 130/9 141/1 145/5 149/25 159/5 162/22 162/23 165/15 171/5 174/22 177/5 177/9 177/15 182/17 184/22 184/25
**liked [1]** 111/5
**likely [3]** 65/5 67/8 169/7
**limit [3]** 14/1 14/6 37/1
**limited [1]** 14/7
**limiting [1]** 14/2
**line [1]** 95/4
**link [2]** 68/9 87/24
**linking [1]** 101/3
**Lisa [1]** 8/11
**list [8]** 29/22 36/4 61/13 61/18 104/4 105/4 156/13 156/15

**L**

listed [3]  36/21 99/18 156/15
listen [4]  181/6 181/9 181/14 183/1
listing [2]  87/24 104/2
literally [4]  24/10 45/19 158/7 165/23
little [31]  23/20 38/16 39/21 46/23 50/17 55/8 55/19 57/21 58/12 61/11 65/6 70/17 74/11 90/12 90/17 108/12 114/8 116/11 118/17 121/8 133/1 141/6 144/20 145/21 161/24 164/13 165/10 168/5 179/9 180/23 182/17
live [3]  115/18 140/6 173/14
Lived [1]  135/15
lives [2]  177/1 178/7
living [7]  27/2 96/9 118/25 119/15 119/18 123/1 123/2
loaded [5]  41/19 41/20 53/14 53/17 55/25
loading [1]  64/23
locate [2]  30/5 81/9
located [7]  18/9 23/6 30/15 30/17 60/17 61/5 81/18
location [6]  35/10 60/21 92/4 118/24 156/4 156/8
locations [2]  32/3 80/4
locked [1]  115/16
lone [1]  179/10
long [52]  13/23 27/5 27/7 28/2 35/22 49/23 50/13 50/16 50/17 51/4 51/5 52/11 55/15 55/16 56/2 64/10 64/10 64/14 64/19 65/5 65/19 65/25 78/22 79/1 79/8 79/13 94/3 94/4 94/5 94/8 94/9 94/10 94/10 94/13 94/17 94/21 104/9 105/9 105/9 108/24 113/2 129/15 134/16 141/20 150/14 156/19 156/19 161/5 166/24 173/15 173/16 181/12
longer [2]  122/9 185/9
longs [1]  94/20
look [22]  8/21 41/4 44/24 54/4 66/8 85/3 86/8 91/11 97/20 112/22 115/25 116/1 140/4 152/5 169/14 178/20 180/19 180/21 180/24 182/1 182/16 182/19
looked [7]  32/13 37/9 62/12 71/13 101/23 118/15 141/9
looking [13]  23/3 23/14 31/17 35/25 37/10 44/4 80/13 80/16 80/19 94/4 115/19 150/8 153/6
looks [4]  45/8 89/13 101/17 145/5
lose [2]  176/21 176/23
lot [21]  8/6 24/18 28/10 28/12 35/22 37/13 38/3 43/4 43/21 60/9 63/7 65/24 124/17 136/10 139/16 140/17 148/24 163/1 163/1 163/2 163/14
loud [1]  17/16
loved [2]  63/19 135/13
low [1]  110/22
LP [1]  108/10
lunch [2]  142/7 152/3
lying [3]  178/13 180/3 181/25

**M**

M-C-K-I-N-N-E-Y [1]  11/9
machine [1]  1/19
mad [7]  113/23 114/12 115/12 116/25 119/12 140/16 141/2
made [9]  32/2 34/24 36/11 91/14 123/25 124/2 145/11 155/11 181/20
magical [1]  176/24
magistrate [2]  103/19 103/21
mail [1]  152/8
Main [1]  2/11
majority [1]  127/2
make [23]  21/17 21/19 21/21 24/10 26/10 30/21 35/3 35/8 41/18 50/20 59/17 63/1 87/2 104/19 115/17 121/22 127/11 136/2 149/23 161/25 162/15 170/23 177/2
makes [1]  63/7
making [5]  36/3 80/7 109/16 110/8 174/15
male [1]  108/8
malfunction [1]  95/5
man [2]  176/4 179/12
man's [1]  99/2
management [2]  170/3 179/13
many [8]  28/6 29/24 29/25 103/3 103/3 103/4 108/4 152/11
March [2]  12/19 173/24
Marine [2]  162/24 162/25
marked [16]  19/24 23/17 23/17 29/16 30/2 31/23 32/7 33/18 40/7 40/17 48/5 51/10 58/11 93/22 107/9 151/1
markings [3]  65/16 82/18 173/18
match [3]  68/3 68/5 68/6
matched [1]  69/10
matches [1]  174/11
matching [1]  102/6
matter [4]  9/11 67/23 100/13 185/6
matters [1]  151/22
may [42]  7/9 33/14 40/3 40/5 41/12 41/14 45/24 48/1 54/15 54/21 58/18 62/9 63/10 63/12 67/24 71/5 74/22 74/22 75/22 89/1 92/21 94/20 95/3 98/8 102/14 106/6 106/11 106/18 115/2 118/16 121/19 121/25 127/7 144/7 154/19 158/17 168/2 172/4 173/13 173/24 175/9 186/13
maybe [11]  13/9 15/14 46/23 94/25 138/4 152/21 173/11 175/8 175/9 175/9 182/2
McKinney [5]  5/17 11/9 95/16 95/22 96/3
mean [26]  8/20 12/5 15/13 19/1 31/23 35/20 35/21 56/3 98/24 102/24 103/4 106/17 106/25 108/10 114/11 118/10 129/10 130/2 137/25 138/3 140/15 140/15 140/25 143/2 149/11 170/18
means [3]  27/17 99/3 163/4
meant [1]  86/4
measure [1]  94/11

members [2]  26/25 29/21
memories [1]  168/17
memory [3]  30/1 140/14 140/15
men's [2]  25/2 70/25
mentioned [3]  60/5 71/16 92/6
mere [1]  98/9
merely [1]  108/14
message [1]  167/18
met [2]  163/1 170/4
metal [1]  37/18
methamphetamine [2]  25/13 99/18
middle [1]  35/4
midst [1]  19/21
might [6]  11/2 12/5 88/4 91/14 91/14 106/9
mind [14]  50/19 98/19 119/20 130/20 130/20 130/21 135/6 140/18 161/7 163/19 167/6 168/11 169/23 176/10
mine [3]  114/21 115/24 182/25
minute [16]  9/1 49/24 73/22 76/11 100/10 123/15 124/5 127/10 129/3 129/21 129/24 133/6 134/23 160/10 176/16 179/7
minutes [8]  9/5 43/22 152/16 161/4 167/25 181/23 184/15 184/23
Miranda [1]  83/14
miscellaneous [1]  105/6
misdemeanors [4]  77/9 120/1 120/2 122/11
misfire [1]  95/5
missing [2]  24/14 63/2
mixed [1]  39/10
mom [2]  127/15 180/2
moment [7]  45/20 114/12 116/24 124/19 135/4 136/4 183/3
momentarily [1]  15/20
moments [1]  82/5
money [1]  103/5
Monishia [57]  5/13 16/5 23/1 23/18 24/21 25/24 26/3 26/4 26/5 28/24 49/10 51/23 52/13 52/18 53/4 63/15 67/20 71/1 71/7 73/15 73/23 74/5 80/18 81/15 81/24 83/3 83/6 85/1 85/3 90/24 92/6 93/13 101/4 110/6 112/8 112/15 112/21 144/16 146/19 151/6 155/20 157/20 164/17 164/23 166/15 170/12 174/7 174/22 175/8 176/3 179/1 179/25 180/14 180/16 181/3 181/3 181/7
Monishia's [5]  90/13 142/12 174/12 174/16 180/7
month [2]  12/21 69/13
months [6]  13/20 96/21 120/15 129/17 129/18 139/22
Montoya [1]  162/9
moral [3]  77/8 119/25 122/12
moral-turpitude-type [1]  122/12
more [21]  7/23 27/22 38/3 44/22 70/4 70/5 86/8 105/8 108/12 110/23 118/22 124/6 133/1 150/8 152/11 152/14 154/1 154/3 163/8 169/6 181/7
Moreover [2]  109/19 110/13

morning [6]  7/3 7/4 26/24 96/1 154/17 185/14
most [3]  38/14 94/16 171/22
mostly [1]  83/5
mother [2]  129/13 164/25
motion [11]  16/9 16/21 18/15 19/13 34/19 100/18 100/21 111/24 121/16 121/17 121/25
motive [3]  106/6 106/10 106/11
mouth [1]  99/2
move [2]  163/20 166/6
movement [1]  33/22
moving [1]  17/22
Mr [56]  8/5 16/8 20/9 22/15 22/23 23/4 23/6 23/7 26/10 26/23 31/9 36/14 57/13 62/20 72/24 73/14 74/9 74/25 75/9 76/17 78/15 86/14 86/16 86/22 87/12 87/14 88/4 88/9 91/22 93/2 95/25 96/17 97/13 98/6 98/25 99/1 112/13 112/18 122/25 127/11 128/15 137/10 144/5 147/15 150/24 154/10 154/15 156/2 157/10 159/16 162/9 162/16 162/17 168/1 168/6 176/15
Mr. [6]  17/21 20/11 34/22 38/11 90/20 112/7
Mr. Gray [2]  17/21 112/7
Mr. Greer [3]  20/11 38/11 90/20
Mr. Young [1]  34/22
Ms [32]  23/4 23/6 24/2 29/20 30/6 30/20 31/9 31/16 33/10 38/11 38/12 38/18 38/23 39/10 43/17 44/5 44/9 47/15 47/24 52/20 56/25 57/3 57/6 75/9 82/21 83/7 83/11 83/14 83/18 83/21 85/16 86/22
Ms. [1]  38/16
Ms. Campbell [1]  38/16
much [14]  9/6 12/11 65/2 72/16 94/9 116/3 117/8 124/7 139/14 156/19 158/15 185/5 185/7 185/11
murder [1]  66/20
must [2]  111/7 169/16
my [59]  10/4 14/17 16/8 16/24 21/1 27/1 30/1 65/24 73/7 78/17 89/21 96/17 101/3 101/14 102/25 104/9 107/4 108/7 111/14 114/2 115/9 116/16 118/22 119/21 120/14 121/6 125/5 126/21 126/22 127/1 127/2 127/2 130/5 130/5 131/10 133/19 134/4 134/4 134/4 134/6 134/6 134/8 136/1 138/11 138/12 140/18 140/19 140/19 140/25 149/21 150/17 165/5 170/9 171/4 172/15 175/3 175/14 175/16 186/13
myself [9]  8/13 58/3 80/2 81/19 89/11 99/16 107/3 118/14 144/16

**N**

name [9]  11/7 11/8 27/1 78/17 87/21 96/5 101/8 112/19 132/11
named [2]  28/24 136/15
Narcotics [2]  27/12 79/11
nature [5]  58/10 59/2 63/20 65/17 95/8
neatly [1]  117/18
necessarily [1]  98/24

**N**

need [18] 7/6 8/21 17/1 54/24 84/16 84/19 103/1 107/10 111/8 116/9 119/23 141/21 141/23 160/8 173/25 174/1 174/2 180/17

needed [8] 9/25 10/23 87/25 96/25 97/8 113/23 121/5 142/19

neither [1] 8/13

never [12] 13/17 66/10 73/6 108/13 147/18 147/21 148/2 170/12 170/15 170/16 173/6 177/19

new [1] 55/13

next [9] 43/21 78/8 95/15 99/11 114/5 134/9 142/2 166/7 180/22

NFL [1] 162/22

nice [3] 131/11 173/18 184/24

no [225]

No. [4] 1/3 33/19 42/13 74/4

No. 10 [1] 74/4

No. 11 [1] 42/13

No. 12-03324-CRF-272 [1] 1/3

No. 3 [1] 33/19

nobody [1] 34/24

nobody's [1] 104/25

Nods [5] 122/15 123/3 130/12 131/12 134/12

Noise [1] 17/14

none [3] 98/15 165/18 178/24

nonsensical [1] 177/20

Noon [1] 153/3

normally [2] 29/14 125/9

Nos [4] 41/5 41/11 48/19 48/24

nose [1] 55/21

not [253]

noted [2] 22/19 29/10

nothing [12] 35/8 63/2 95/13 99/6 133/24 149/12 149/14 149/19 156/23 159/21 165/7 172/23

notice [5] 39/19 41/24 43/4 44/6 46/7

noticed [1] 39/23

November [6] 1/14 3/2 4/2 5/2 6/2 7/2

now [118] 10/3 11/3 13/12 16/20 19/17 19/20 22/12 22/20 25/23 29/11 30/4 33/13 35/5 36/24 38/4 40/17 41/17 41/24 43/11 44/3 44/6 44/15 44/15 45/13 45/23 46/3 46/7 47/13 48/25 49/15 49/24 50/4 51/9 52/13 53/9 53/21 55/15 56/2 56/13 56/17 57/25 58/8 59/5 59/22 61/2 61/11 61/21 62/25 64/8 65/1 66/7 66/17 66/23 68/16 68/19 68/24 69/12 69/21 70/9 70/23 72/24 74/1 74/10 81/16 81/23 82/10 83/2 83/7 83/17 84/4 84/16 85/2 85/14 86/12 87/13 90/16 97/10 98/5 109/1 113/16 116/16 116/20 117/25 118/5 118/25 121/19 122/20 123/15 123/20 124/5 126/2 128/1 129/21 134/3 137/7 137/25 139/1 141/4 142/6 143/21 144/13 144/18 145/4 145/21 149/7 151/6 152/11 153/7 153/22 162/21 169/4 170/17 171/17 172/2 172/7 176/13 178/16

185/11

nowhere [1] 105/5

number [9] 21/5 23/2 23/16 36/22 101/9 102/8 102/9 141/20 141/23

numbered [2] 1/16 186/7

**O**

o'clock [1] 185/13

oath [6] 76/15 112/12 154/10 175/22 176/13 176/14

object [7] 11/17 16/15 18/19 19/7 142/13 142/21 161/9

objection [30] 8/15 11/2 15/16 15/22 19/9 20/4 34/5 34/10 34/19 48/21 48/22 54/9 54/10 80/15 85/24 85/25 86/25 90/5 90/6 90/7 100/2 107/1 107/13 129/6 143/24 143/25 156/25 160/20 160/21 160/23

objections [3] 8/23 41/7 90/1

objections to [1] 90/1

objective [4] 178/12 178/19 180/4 180/15

observe [1] 145/18

observed [1] 141/8

obviously [8] 28/10 55/5 76/2 76/3 94/1 102/13 129/3 137/2

occasion [4] 10/16 28/22 29/18 96/24

occupants [4] 59/17 75/23 75/23 75/24

occur [1] 27/22

occurred [2] 13/16 186/7

occurring [1] 20/13

off [14] 8/12 9/9 46/12 55/10 67/1 67/15 68/2 68/25 72/10 72/22 103/21 140/8 140/8 145/5

Off-the-record [1] 9/9

offense [19] 12/25 13/16 14/16 15/14 16/6 20/13 25/14 66/24 69/13 99/20 99/22 100/24 100/24 120/10 120/23 139/18 153/19 163/25 171/3

offenses [2] 15/10 27/21

offer [12] 16/2 34/1 41/2 48/17 53/24 89/25 90/1 99/13 106/25 107/3 107/14 143/22

offered [11] 6/4 16/13 20/3 34/4 41/6 48/20 54/2 90/4 99/24 143/19 186/10

offering [4] 16/10 17/20 18/12 19/25

office [22] 7/10 13/10 18/6 23/3 23/21 24/5 27/4 27/14 32/19 35/11 51/19 59/24 69/19 78/21 78/22 79/6 80/1 80/7 88/19 105/11 157/14 157/16

officer [28] 9/23 9/24 10/15 16/16 18/19 19/2 20/20 28/5 61/21 61/25 74/14 74/15 78/24 79/1 96/3 96/10 96/12 102/12 102/14 103/2 136/15 144/12 151/15 173/3 173/15 174/10 174/23 175/1

officer's [2] 69/24 173/11

officers [24] 18/20 23/25 24/9 24/13 24/17 30/3 33/6 35/13 36/12 46/11 74/22 100/25 104/2 110/4

110/19 126/20 157/18 164/10 165/23 170/14 170/18 171/17 171/21 171/22

officers' [1] 171/20

official [5] 1/22 162/9 186/4 186/13 186/17

often [1] 20/22

oh [9] 73/22 98/11 129/2 147/25 149/25 150/1 172/15 180/9 182/2

okay [285]

once [10] 31/15 31/18 34/23 34/23 54/25 84/17 84/18 85/11 143/12 177/2

one [63] 9/17 10/24 11/18 16/18 18/10 20/18 20/21 21/1 24/20 25/1 28/8 28/9 30/1 30/6 32/23 38/4 38/6 39/2 39/21 51/5 51/22 55/24 56/2 63/3 63/19 72/21 89/19 92/16 99/17 100/7 102/12 103/22 106/14 107/5 107/9 115/5 115/10 117/15 119/3 119/4 122/17 143/6 148/8 155/12 155/12 156/18 156/20 157/18 160/8 168/8 169/2 169/15 169/16 171/21 175/13 176/19 176/20 179/16 179/17 179/17 180/20 180/22 183/2

one-page [1] 72/21

ones [1] 38/6

ongoing [1] 98/21

only [21] 12/23 16/3 16/11 16/13 18/10 19/13 50/14 68/9 77/12 93/18 101/21 107/4 108/5 109/12 110/4 110/22 139/13 164/20 165/16 179/20 179/22

open [6] 44/21 54/3 75/19 81/6 117/6 186/7

opened [1] 44/24

opening [3] 22/20 22/23 26/11

operating [1] 36/23

opportunities [1] 63/18

opportunity [4] 41/4 60/14 62/13 160/18

opposed [2] 28/3 56/25

option [1] 66/2

orange [1] 12/7

order [3] 14/11 177/16 184/14

original [1] 72/6

originally [2] 12/18 13/15

other [40] 10/11 12/16 15/9 18/20 21/16 24/5 24/25 32/23 34/19 36/12 39/22 41/7 46/11 53/21 60/24 60/25 61/7 67/23 74/22 80/5 80/5 92/4 92/18 106/7 110/5 115/25 119/23 120/16 139/17 140/25 147/1 148/9 151/22 159/6 159/10 164/20 169/1 182/3 185/2 186/6

others [1] 38/25

otherwise [3] 26/7 105/24 178/12

our [8] 9/18 10/5 17/4 82/16 90/8 100/17 177/1 178/10

ourselves [1] 66/5

out [94] 12/20 12/20 13/18 15/18 18/5 18/6 19/2 21/11 22/3 22/5 23/3 23/25 24/1 24/7 25/13 29/14 29/19 30/19 33/6 37/3 39/12 40/10 40/14 40/21 42/2 42/4 45/10 45/20

46/4 48/14 49/9 50/17 51/7 51/15 52/10 53/20 55/16 55/18 56/19 57/21 61/23 62/23 72/21 78/3 78/5 80/4 82/19 99/2 106/1 108/15 110/17 112/1 112/4 117/1 117/5 118/1 118/23 118/25 119/19 119/19 120/7 121/19 123/11 125/14 126/17 126/24 127/5 128/23 133/11 135/18 135/19 141/3 143/12 153/24 154/6 155/8 158/14 159/6 160/25 161/21 162/2 163/10 164/12 164/14 164/16 170/19 171/4 178/2 178/14 182/24 183/6 183/17 183/19 185/4

outlined [1] 99/21

outside [4] 16/17 19/13 100/8 166/13

outstanding [5] 75/11 80/20 80/24 81/1 83/9

outweigh [2] 14/13 14/14

outweighed [1] 15/1

outweighs [1] 12/11

over [38] 9/21 29/6 29/15 31/21 32/14 32/16 32/24 36/7 43/13 46/8 58/2 71/10 74/25 75/6 85/3 102/2 102/19 108/17 109/19 111/8 113/7 114/7 114/24 117/21 120/15 121/1 126/12 127/4 152/2 155/11 160/8 161/23 166/6 171/9 178/23 179/13 184/1 184/11

over-sized [1] 71/10

overrule [1] 19/8

overruled [3] 15/17 129/9 143/17

oversized [2] 91/18 118/18

own [3] 24/15 106/20 147/2

owned [4] 85/16 85/20 86/16 170/23

owner [3] 62/2 72/6 86/23

ownership [5] 137/19 138/4 142/17 146/5 172/13

owning [1] 147/5

owns [1] 23/7

**P**

p.m [1] 79/25

packed [1] 117/18

packet [1] 20/24

packing [3] 123/7 123/13 124/1

page [6] 3/3 4/3 5/3 72/21 153/14 184/1

paid [2] 186/12 186/12

paid/will [1] 186/12

pair [6] 49/7 49/13 49/15 51/16 64/4 93/4

pants [2] 43/1 145/6

paragraphs [1] 21/15

parents [2] 63/20 179/1

parole [5] 11/24 12/1 12/25 20/20 20/21

part [4] 46/9 96/22 104/15 169/24

partial [3] 46/23 68/6 70/14

participate [3] 28/22 37/5 88/15

participated [1] 37/7

particular [28] 9/14 11/22 12/16 12/24 14/16 29/18 30/6 64/20 65/5 66/4 67/6 68/9 69/9 70/3 83/22 88/4 88/9 89/9 94/20 95/9 101/6

**P**

particular... [7]  105/4 109/21 130/10 147/16 148/20 156/7 163/16
parties [7]  7/23 8/1 8/2 34/12 99/15 186/6 186/10
partners [1]  79/15
pass [22]  57/8 73/12 74/7 76/6 76/7 87/10 91/20 92/19 95/12 97/11 99/5 122/23 137/8 141/12 147/13 150/22 151/18 155/24 156/22 159/14 159/20 184/10
passenger [7]  23/19 37/1 37/12 43/12 43/18 63/12 164/16
passenger's [4]  44/19 44/21 156/7 158/5
past [5]  103/11 109/18 110/16 119/22 124/21
patrol [16]  28/3 29/16 30/2 31/20 31/22 71/4 71/8 84/10 90/25 91/1 138/24 141/5 144/12 145/25 151/12 170/21
pause [3]  9/3 126/1 162/1
peace [2]  78/24 79/1
pending [6]  12/25 103/8 121/4 121/5 121/20 149/5
penitentiary [1]  20/24
people [11]  24/15 24/15 29/15 31/17 47/4 110/10 163/1 175/25 176/19 178/7 178/8
percent [6]  25/25 169/7 171/1 171/14 175/17 179/24
perception [1]  176/24
performed [3]  72/10 74/18 74/20
period [1]  70/19
Permission [1]  34/8
person [28]  20/21 29/1 63/13 68/14 71/18 71/21 87/25 88/1 101/8 101/10 101/19 108/4 108/6 109/4 109/16 109/16 109/18 110/8 111/12 111/15 111/19 111/21 111/22 118/11 149/15 149/23 163/5 177/19
person's [1]  35/7
personal [5]  65/25 74/21 74/24 88/8 166/12
personally [3]  66/16 81/3 81/5
persons [1]  76/4
petite [2]  38/17 118/11
Petraeus [1]  178/16
Phillips [3]  1/22 186/4 186/16
phone [3]  80/10 101/9 141/23
photo [2]  65/12 172/3
photograph [8]  6/7 6/7 6/8 6/8 6/9 6/9 48/9 48/9
photographing [1]  48/14
photographs [3]  24/19 48/19 48/25
physical [1]  85/19
pick [6]  25/4 35/9 39/17 84/12 105/16 180/20
picked [4]  36/6 39/19 127/1 168/9
picking [2]  105/17 175/23
pickup [5]  23/7 23/8 31/1 37/12 48/10
picture [5]  94/4 105/8 172/6

173/17 182/20
pictures [5]  25/3 60/15 60/16 92/23 171/19
piece [5]  67/5 70/4 149/18 169/14 180/20
pieces [6]  37/17 46/23 105/25 165/11 180/23 182/17
pile [1]  117/15
pin [1]  55/8
pistol [22]  25/7 25/22 40/21 41/6 41/17 45/17 48/9 50/14 64/23 66/8 66/9 66/14 69/4 94/20 94/25 95/2 115/18 116/18 116/20 116/22 117/4 179/13
pistols [2]  94/14 94/19
place [5]  12/3 23/5 64/19 114/13 162/10
placed [11]  13/16 63/16 112/11 113/10 113/14 114/2 121/11 140/22 141/4 162/8 170/20
places [1]  32/15
plan [1]  19/25
planned [1]  117/17
play [4]  118/16 163/8 168/16 178/4
playing [6]  144/10 146/13 146/17 151/10 151/17 178/17
plea [3]  7/21 22/18 121/21
plead [1]  22/15
please [11]  26/25 29/4 96/2 157/12 168/21 176/20 177/6 183/12 183/24 184/2 184/11
pocket [10]  25/8 40/2 41/23 41/25 42/5 48/8 48/8 49/15 130/10 164/22
pockets [5]  25/6 39/25 40/1 45/11 47/19
point [38]  10/13 13/22 21/17 29/4 30/4 33/9 38/4 39/2 43/16 44/16 45/9 56/19 57/9 58/15 58/21 73/24 85/2 89/24 90/2 98/13 98/14 99/12 100/17 113/21 120/23 123/25 124/2 132/23 133/21 134/19 135/17 140/21 141/14 142/13 143/18 148/17 175/18 176/14
pointed [3]  33/7 55/11 109/20
points [2]  21/5 21/8
poking [1]  42/4
police [13]  28/5 31/23 32/11 113/7 126/20 128/15 131/4 138/17 142/24 164/10 170/18 174/22 179/4
policies [1]  37/1
policy [17]  6/13 24/5 24/8 35/12 35/17 59/24 60/2 88/19 104/6 105/2 105/11 106/17 106/20 106/25 107/7 107/21 111/4
polled [1]  184/7
ponytail [1]  29/7
poor [1]  105/19
popped [1]  164/13
portion [1]  14/7
portions [2]  143/20 186/5
position [2]  52/9 55/6
possess [2]  52/19 170/2
possessed [11]  167/5 167/8 170/12 170/13 170/15 173/10

175/8 175/10 175/14 175/15 175/16
possessing [1]  164/6
possession [19]  9/20 25/13 25/21 86/24 87/4 87/8 99/18 120/5 164/5 167/2 170/1 170/5 177/17 177/17 177/18 179/8 179/10 179/17 184/4
possibilities [1]  124/22
possibility [6]  21/14 115/12 121/16 124/13 140/23 141/1
possible [15]  59/11 60/24 61/1 65/18 65/21 66/25 67/14 67/19 70/13 92/4 98/1 140/21 174/11 175/13 179/25
potential [3]  59/18 67/8 67/23
potentially [7]  67/5 67/7 68/10 69/23 70/13 101/10 117/6
powder [1]  46/8
power [1]  37/17
precisely [5]  60/20 60/22 105/8 116/21 117/4
prefers [1]  103/22
prejudice [2]  12/11 13/25
prejudicial [5]  12/4 14/2 14/13 15/2 15/8
preparation [1]  186/11
prepare [1]  57/17
prepared [2]  89/19 160/8
preponderance [1]  169/6
presence [4]  16/17 19/13 50/20 100/8
present [4]  36/5 77/24 141/8 157/18
presentation [2]  100/15 160/7
presented [2]  22/14 91/3
preserve [1]  35/7
preserved [1]  69/25
preserving [1]  70/20
Presiding [1]  1/17
presumptive [1]  110/8
presumptively [4]  108/25 109/14 110/9 110/14
pretext [1]  106/18
pretty [13]  9/15 72/16 79/17 82/9 116/3 117/8 124/7 145/9 145/14 149/3 151/6 152/25 158/15
prevent [1]  90/8
previously [10]  34/2 34/10 41/3 92/7 110/15 112/11 143/19 144/3 154/13 173/8
primarily [4]  59/15 60/10 60/11 63/19
primary [2]  106/9 106/10
print [7]  7/7 8/25 21/8 69/9 70/6 70/14 70/14
printed [3]  70/10 70/11 153/13
printing [1]  69/12
prints [6]  47/2 47/9 47/11 69/5 69/8 69/24
prior [14]  20/13 20/14 25/17 32/16 60/4 60/17 88/7 88/13 88/14 93/11 93/13 99/18 129/15 151/7
priors [1]  7/21
probable [3]  109/24 109/25 169/6
probably [15]  7/10 26/2 26/5 29/22 29/23 29/25 30/1 65/7 133/1 140/23 150/10 152/15 170/22

176/7 181/18
probation [7]  120/10 120/18 121/11 121/15 122/3 138/13 170/19
probative [8]  12/11 13/25 14/12 14/14 14/15 14/25 15/2 15/7
probative/prejudice [1]  13/25
problem [7]  8/20 12/2 56/7 59/19 101/7 173/16 175/11
problems [1]  36/7
Procedurally [1]  36/17
procedure [3]  35/6 105/3 106/18
proceed [2]  121/25 168/2
proceedings [5]  1/15 1/18 143/16 186/6 186/9
process [2]  20/24 46/9
prohibitive [1]  14/9
pronounce [1]  96/5
proof [7]  109/23 169/5 169/21 173/2 177/25 178/3 178/17
proper [4]  52/8 95/4 100/20 184/14
properly [1]  95/3
property [6]  24/14 24/15 35/7 35/19 36/13 115/9
pros [2]  20/12 77/2
prosecute [1]  177/16
prosecuted [1]  13/17
Prosecution [1]  57/25
prosecutor [13]  8/16 60/5 61/12 64/2 66/7 68/19 69/3 90/14 118/16 147/17 147/22 150/10 163/5
Prosecutor's [1]  71/16
prosecutors [1]  168/14
prostitution [1]  122/13
protect [4]  36/14 36/14 172/5 180/16
protection [4]  116/11 140/10 142/19 148/21
protects [2]  24/13 24/14
protruded [1]  65/2
prove [8]  20/18 20/19 142/22 163/6 168/22 168/23 175/15 175/17
proven [2]  103/11 109/18
proves [1]  166/1
provide [1]  92/3
provided [1]  34/2
public [1]  24/7
publish [2]  34/8 42/16
published [1]  42/20
publishing [1]  34/13
pull [12]  29/15 31/20 32/14 55/4 55/12 102/19 106/1 108/17 111/8 152/9 159/6 164/11
pulled [21]  32/15 40/10 40/14 40/21 45/9 45/20 53/20 58/2 74/24 102/2 113/7 114/7 114/24 117/21 120/14 121/1 126/12 127/4 159/2 159/2 171/9
pulling [3]  32/24 32/24 58/23
pulls [1]  23/22
purchased [1]  174/7
purpose [9]  16/9 17/13 31/21 61/12 104/3 105/10 178/11 178/19 180/15
purposes [16]  16/2 16/10 16/13

**P**

purposes... [13] 18/13 18/14 18/15 19/12 20/1 33/18 40/7 40/18 48/5 51/10 99/14 109/10 143/21
purse [2] 24/22 38/19
pursuant [4] 24/4 34/14 111/3 143/19
purview [1] 87/1
put [24] 7/14 12/7 34/14 42/1 46/4 50/16 51/4 51/11 52/1 55/6 106/2 114/22 116/21 117/4 118/3 126/7 126/20 130/10 140/6 140/14 165/22 171/14 180/23 182/15
putting [1] 180/19
puzzle [4] 180/20 180/20 182/16 182/18

**Q**

quadruple [1] 19/6
quality [1] 70/7
quarterback [1] 162/22
question [18] 30/13 42/12 46/25 91/7 91/8 98/9 111/1 126/22 129/10 130/20 135/6 149/17 149/21 178/8 178/24 179/3 179/16 181/7
questions [7] 20/7 90/14 92/20 119/23 141/14 146/4 151/19
quick [6] 7/15 80/21 92/20 145/9 153/8 154/4
quicker [1] 20/23
quite [2] 20/22 57/3
quote [1] 125/20
quoting [1] 124/7

**R**

R-I-C-A-R-D-O [1] 78/18
raise [2] 20/8 22/8
range [1] 178/4
Ranger [9] 31/1 37/12 84/6 84/8 85/8 144/22 166/11 166/12 166/14
rape [2] 116/13 148/25
raped [2] 140/5 173/9
reach [2] 45/14 104/14
reached [1] 183/22
reaching [1] 104/16
read [7] 9/15 99/19 160/9 162/4 162/5 162/7 184/2
reading [1] 22/12
ready [13] 15/18 15/19 15/25 17/1 22/3 53/17 78/2 112/1 153/23 153/24 160/13 160/25 183/17
real [18] 7/15 46/17 80/21 98/14 106/22 108/2 134/21 135/1 135/2 168/9 169/25 170/19 183/3 183/4 183/4 183/4 183/4 184/24
realize [2] 25/5 177/11
realized [1] 7/21
really [19] 15/12 59/11 65/15 65/16 72/20 75/20 82/4 101/17 104/8 105/17 124/17 127/11 133/11 133/13 134/10 169/23 177/14 179/8 180/6
realm [1] 178/17
reason [24] 18/10 53/2 59/15 62/25 68/8 104/1 106/6 106/8

126/16 126/23 127/5 128/21 128/23 131/3 148/25 149/15 173/7 178/11 178/17 178/19 180/4 180/8 180/9 180/10
reasonable [25] 110/3 110/4 110/18 110/22 110/25 111/7 165/14 167/8 168/22 168/24 169/5 169/9 169/16 169/22 173/11 174/6 174/17 175/18 176/1 176/11 178/1 178/1 178/6 180/11 182/6
reasons [3] 106/7 106/14 172/4
rebuttal [3] 4/10 142/6 152/14
recall [12] 76/8 76/10 91/12 116/21 117/5 141/22 142/9 154/9 156/3 158/20 171/14 171/24
received [8] 75/8 80/10 81/6 86/22 87/13 88/3 101/3 184/14
receiving [2] 88/7 109/4
recently [2] 62/7 118/22
recess [3] 76/14 153/3 185/16
recognize [11] 31/3 31/5 40/8 40/19 48/6 51/12 96/18 115/5 115/8 115/19 144/12
recognized [1] 23/14
recollection [1] 133/2
record [20] 1/1 7/15 7/18 7/25 8/4 9/9 11/6 16/2 16/10 16/13 18/14 29/8 34/15 108/19 110/11 112/20 122/9 186/7 186/9 186/11
recorded [4] 97/14 97/15 146/2 151/13
recording [4] 33/21 126/3 126/4 168/16
records [4] 71/17 72/17 75/10 97/22
recover [2] 39/2 159/3
recovered [1] 159/5
RECROSS [2] 74/8 93/1
RECROSS-EXAMINATION [2] 74/8 93/1
recuse [1] 8/13
red [2] 82/25 128/9
redacted [1] 143/21
redirect [6] 73/13 91/21 137/9 143/13 150/23 182/2
refer [1] 132/8
reference [2] 89/8 155/11
referenced [1] 109/22
referencing [2] 11/25 107/7
referring [2] 15/12 137/17
reflect [2] 7/25 29/9
reflects [1] 186/9
refresh [1] 168/16
refused [2] 9/24 13/9
regard [1] 38/18
regarding [1] 34/13
regards [6] 18/20 20/16 46/20 51/3 52/13 59/25
registered [3] 31/2 72/25 179/1
reinstate [1] 121/6
related [1] 63/7
relationship [8] 31/10 31/11 92/14 92/18 113/1 113/3 131/9 135/11
released [2] 185/8 185/12
relevance [1] 11/18
relevant [2] 17/9 17/9

reliable [16] 92/1 101/12 102/22 102/24 103/3 103/7 103/12 108/6 108/25 109/14 109/18 110/9 110/14 110/16 111/16 111/17
relive [1] 119/22
rely [1] 106/10
relying [2] 109/7 109/9
remain [1] 184/23
remains [1] 106/4
remember [41] 8/5 8/6 37/17 37/21 60/20 75/17 75/20 82/10 82/13 82/21 84/11 124/17 124/22 124/24 125/2 125/11 125/12 125/13 125/19 125/20 126/19 129/23 131/15 131/19 132/19 134/16 136/16 136/16 136/21 139/8 140/18 140/19 140/20 156/12 165/12 165/15 166/13 168/13 168/21 171/12 175/25
remove [3] 24/1 35/10 159/10
removes [1] 21/14
Rene [3] 5/13 112/15 112/21
rephrase [1] 84/17
replace [1] 12/6
replacement [1] 36/8
report [11] 9/15 57/17 61/12 61/13 61/23 62/5 62/6 89/13 97/17 97/18 97/25
reported [2] 1/18 186/8
reporter [6] 1/22 92/25 123/4 130/13 186/4 186/17
REPORTER'S [4] 1/1 186/7 186/9 186/11
reporting [1] 177/7
represent [1] 9/16
represented [2] 7/19 8/1
request [2] 69/18 183/15
requested [1] 186/6
required [3] 109/19 109/23 110/2
requires [1] 162/4
Reserve [1] 26/12
residue [1] 46/10
respective [1] 186/10
responded [1] 9/24
response [10] 10/1 10/22 86/19 91/4 97/3 97/7 97/9 108/18 113/24 146/7
responsibility [3] 166/22 172/14 173/12
rest [7] 39/7 39/12 74/11 100/3 126/8 142/3 160/3
rested [4] 100/5 100/14 142/4 160/4
rests [1] 100/4
result [2] 72/9 174/6
resulted [1] 7/20
resulting [1] 111/3
resume [1] 151/22
retire [1] 183/12
retired [6] 76/13 100/12 151/25 160/12 183/14 185/12
retrieved [1] 156/18
review [3] 97/19 103/6 160/18
reviewed [5] 33/19 62/5 103/19 150/10 150/13
revisits [1] 173/1
revocation [2] 12/25 13/2

revoke [2] 121/5 121/17
revoked [3] 120/19 121/2 122/1
revolver [4] 40/2 54/23 115/22 115/23
revolvers [1] 95/2
rewind [2] 144/20 145/12
Ricardo [5] 5/14 5/16 78/12 78/17 144/2
Rick [10] 44/11 78/9 131/6 131/7 132/14 135/24 136/5 142/9 166/21 181/20
ride [3] 126/17 136/16 136/19
riding [1] 58/1
rifle [20] 49/23 50/13 50/16 51/5 55/15 56/3 64/10 64/15 64/19 65/25 94/4 94/5 94/10 94/13 94/17 95/1 105/9 156/19 173/15 173/17
right [247]
right-hand [1] 25/8
rights [3] 83/15 83/15 83/19
rip [1] 41/25
ripped [1] 42/7
ripping [1] 37/3
rise [1] 183/24
road [3] 24/4 35/5 181/22
roadside [2] 135/18 181/15
roadway [1] 31/20
roll [1] 145/14
rolling [1] 145/13
roof [1] 45/18
room [6] 100/10 162/10 167/7 177/3 183/12 184/23
rotate [6] 51/8 52/8 55/13 55/21 55/22 64/24
rotates [1] 55/6
rotation [1] 95/4
round [4] 50/14 50/15 55/9 55/13
rounds [2] 52/5 54/6
rule [2] 104/6 176/1
rules [25] 9/25 10/1 10/2 10/8 10/20 10/23 11/20 11/21 12/1 13/10 14/9 14/22 97/1 97/8 97/10 98/10 98/16 98/18 98/18 167/19 167/20 167/21 176/25 177/1 177/1
run [3] 7/10 101/7 174/5
running [2] 15/22 175/12
RYAN [5] 2/4 163/14 165/15 166/5 167/17

**S**

S-H [1] 95/18
sadly [1] 166/3
safe [2] 94/21 98/8
safekeeping [1] 45/18
safety [1] 117/23
said [76] 8/12 17/21 18/20 28/5 29/11 33/5 34/24 49/25 49/25 50/4 51/4 55/15 56/13 56/23 73/9 73/19 74/3 80/11 83/17 85/15 86/13 86/20 90/16 91/2 93/12 93/20 97/21 111/1 111/12 111/16 113/20 115/12 116/23 119/12 121/4 123/6 123/8 123/25 124/1 124/8 124/18 126/6 126/10 128/22 132/4 132/8 133/18 136/9 136/11 136/12 141/1 142/16 143/11 143/13 146/8 146/9 146/11 147/8 147/21 148/2 148/6

## S

said... [15]  148/8 155/2 163/10 165/4 165/4 166/17 170/15 170/16 171/1 172/14 173/15 173/25 175/25 177/15 182/4
Sam [2]  136/15 166/20
same [25]  20/20 35/21 40/13 40/13 40/24 40/24 49/13 51/14 51/22 52/22 53/19 53/20 94/22 99/17 114/23 116/2 154/16 156/9 161/19 161/20 163/5 167/22 171/3 174/3 176/25
sample [2]  67/16 67/20
sat [1]  173/25
satin [1]  128/9
satiny [1]  182/7
satisfied [2]  176/2 176/10
saved [1]  9/5
saw [20]  21/7 23/13 31/19 45/13 46/4 71/6 85/11 116/2 158/4 158/4 159/3 164/8 164/11 164/11 164/14 164/16 165/2 166/15 166/19 182/9
say [61]  13/24 26/6 31/22 38/13 38/21 43/20 60/7 63/8 64/24 65/13 66/21 70/7 71/14 72/3 74/12 75/18 86/4 88/20 98/7 98/8 98/19 98/20 98/23 98/24 103/2 106/14 116/4 116/17 117/23 120/22 121/17 125/4 130/4 130/9 130/13 132/6 134/13 137/22 138/6 139/17 141/6 143/5 146/20 147/4 147/10 148/8 148/11 148/12 148/20 149/16 154/1 164/17 168/13 168/14 172/17 174/25 175/3 176/11 177/16 180/21 183/6
saying [19]  11/10 17/7 36/24 73/7 98/13 123/21 124/11 124/12 125/1 125/6 125/7 125/8 125/9 125/10 125/21 133/5 142/25 170/11 174/20
says [10]  26/2 105/6 149/9 149/24 150/17 150/18 178/22 181/10 181/14 182/25
SBOT [3]  2/4 2/5 2/10
scared [2]  133/13 138/9
scenario [2]  109/21 125/11
scene [9]  59/16 66/24 143/10 143/11 145/9 145/17 146/19 157/23 165/6
scenes [2]  66/18 174/10
SEAL [1]  186/13
search [51]  6/13 16/8 16/25 17/24 25/5 36/12 36/18 36/25 37/6 39/16 59/5 59/8 59/23 60/18 84/22 84/24 85/4 88/15 103/10 103/13 103/16 103/18 103/23 103/23 104/3 104/8 104/16 104/20 105/2 105/12 105/13 105/15 105/17 105/19 105/21 105/23 106/2 106/5 106/7 106/9 106/14 106/15 106/19 107/23 107/24 107/25 108/1 109/22 109/23 111/3 158/2
searched [1]  35/22
searches [1]  104/7
searching [2]  30/19 60/4
seasoned [1]  173/3

seat [14]  22/7 23/19 26/17 42/10 43/18 56/11 78/11 95/20 126/21 156/6 156/7 157/5 164/12 166/20
seated [10]  22/6 78/6 78/7 112/5 112/6 154/7 154/8 161/22 183/20 183/21
seats [5]  37/3 37/22 37/23 39/7 96/17
second [3]  54/16 150/25 162/21
seconds [1]  7/7
secure [4]  35/10 59/16 59/16 59/16
secured [1]  43/16
security [1]  177/7
see [42]  18/5 21/6 21/15 23/8 23/24 24/19 25/3 27/20 29/2 30/20 31/6 31/23 33/22 42/22 45/5 46/12 47/19 55/3 55/19 58/10 58/20 65/17 68/3 71/4 72/6 75/23 76/3 79/19 81/5 82/4 85/7 103/6 108/16 124/15 135/8 145/13 150/2 153/2 159/9 165/18 169/14 175/14
seeing [1]  44/17
seemed [1]  39/21
seems [1]  37/17
seen [8]  49/3 58/16 63/14 63/23 100/25 119/7 181/25 182/13
seize [1]  52/14
seized [1]  69/22
selection [2]  25/17 177/5
self [3]  70/20 140/2 140/4
Self-defense [2]  140/2 140/4
self-preserving [1]  70/20
send [2]  67/15 167/18
sense [10]  21/17 97/20 121/22 149/23 168/19 176/17 177/1 177/6 178/5 178/10
sent [7]  67/1 68/2 68/25 72/10 72/22 122/1 179/4
sentence [2]  20/24 21/11
separate [2]  16/17 156/15
separately [1]  57/18
sequestration [1]  77/24
Sergeant [1]  84/9
serious [1]  149/3
serve [2]  23/4 29/19
set [2]  44/23 168/4
setting [1]  45/17
seven [4]  161/13 161/14 167/24 172/16
several [2]  29/21 134/3
sexual [1]  116/10
shadow [12]  165/16 178/2 178/18 178/25 179/12 179/19 179/21 179/25 180/12 180/13 182/8 182/12
Shakes [1]  122/21
she [137]  24/22 26/2 38/19 43/17 57/7 71/3 71/4 71/6 71/10 71/11 73/16 82/25 84/2 85/23 86/7 86/13 90/16 90/24 91/1 91/2 91/6 91/14 91/14 91/17 92/10 92/12 92/15 93/12 141/16 142/14 142/16 142/17 142/19 142/20 142/23 143/2 143/3 143/6 143/8 143/9 143/10 143/12 143/12 143/13 146/20 147/4 147/8 147/8 147/10

147/10 147/18 147/21 148/2 148/4 148/6 148/8 148/8 148/11 148/11 148/15 148/19 148/19 148/20 148/20 148/24 149/9 149/11 149/12 149/19 149/20 149/24 149/25 150/4 150/5 150/17 150/18 164/18 166/17 166/17 166/18 166/18 170/13 170/14 170/14 170/17 170/25 170/25 171/1 171/3 171/5 171/5 171/7 171/10 171/11 171/11 171/12 171/12 171/13 171/14 171/15 172/8 172/14 172/17 172/21 172/21 172/21 172/22 172/22 172/23 172/23 172/25 173/1 173/7 173/8 173/8 173/9 173/9 173/10 173/13 174/7 174/15 174/15 176/4 180/8 181/14 181/20 181/24 182/2 182/3 182/4 182/7 182/10 182/11 182/14 183/2 183/3 183/6
she's [21]  25/25 38/17 44/6 84/3 142/16 143/1 144/18 144/19 148/23 170/16 170/19 170/20 170/20 170/20 172/12 173/12 173/13 176/3 180/16 181/6 181/25
sheet [7]  57/19 57/20 57/22 89/7 89/19 173/21 173/21
sheets [1]  156/20
shell [14]  64/3 64/12 64/19 65/8 65/13 65/19 66/4 66/15 93/3 93/18 93/24 105/9 173/5 173/14
shells [5]  66/9 68/20 68/24 70/10 95/9
Sheriff's [22]  18/6 23/3 23/16 23/21 24/5 27/4 27/14 32/19 35/11 44/13 51/19 59/23 78/21 78/22 79/6 88/18 96/4 96/10 105/11 136/15 157/14 157/16
shirt [3]  29/7 82/25 145/6
shock [1]  182/24
shocker [1]  170/19
shocking [1]  175/2
shook [1]  86/9
shoot [2]  53/17 178/1
short [13]  50/15 50/15 51/4 53/13 54/6 58/5 64/9 64/14 76/14 94/1 94/8 94/12 94/13
shorter [3]  50/16 65/6 94/10
shorts [2]  68/20 94/19
shot [1]  166/5
should [9]  35/12 77/24 90/8 92/24 95/17 126/15 168/11 168/25 169/22
shouldn't [4]  16/14 17/17 126/25 167/12
show [21]  26/7 33/17 36/5 40/6 40/17 46/2 46/3 48/4 51/9 53/9 55/1 56/2 82/19 93/22 115/4 150/25 155/6 158/21 165/9 165/10 166/3
showed [4]  57/5 68/21 91/3 164/10
shown [2]  49/19 167/7
shows [2]  133/4 172/20
sic [1]  121/5
side [17]  8/12 8/14 39/21 43/12 44/19 44/23 75/25 77/3 103/25

158/5 161/12 169/1 170/9 170/9 181/21 184/6 184/16
sides [2]  160/4 161/11
sigh [6]  91/15 149/10 149/12 149/16 150/7 172/22
sighed [1]  150/4
sighing [1]  91/13
sighs [2]  149/25 172/21
sight [1]  119/19
sign [4]  62/22 103/21 150/15 177/4
signature [3]  62/16 62/20 89/16
signatures [1]  62/14
signed [3]  19/24 61/25 99/15
significant [1]  127/19
silly [2]  30/13 42/12
simple [1]  182/19
simpler [1]  20/23
simply [4]  109/15 171/24 174/19 176/7
since [5]  13/23 27/6 27/9 28/7 92/15
single [3]  51/15 81/17 170/10
sir [344]
sit [2]  55/3 161/23
sitting [7]  24/4 24/7 29/6 35/4 96/17 131/16 144/21
situation [2]  77/24 117/17
situations [1]  63/6
six [1]  29/23
size [11]  56/4 57/1 57/2 64/6 64/17 65/9 70/24 93/4 105/7 166/13 171/3
size-wise [1]  64/17
sized [2]  37/20 71/10
slight [1]  8/5
slump [1]  162/23
small [9]  15/7 37/11 37/21 37/22 37/23 38/15 40/2 108/9 118/11
smudged [1]  70/6
snap [1]  55/7
sold [1]  72/18
sole [2]  13/1 18/3
some [51]  10/11 15/13 16/17 20/7 20/25 23/17 23/17 24/22 24/23 24/24 28/23 28/23 30/4 33/8 36/7 38/7 38/21 38/22 44/23 46/7 46/10 48/25 50/1 55/19 60/24 67/11 73/24 80/4 80/5 80/5 85/2 89/11 90/14 91/14 94/19 113/23 114/10 118/3 118/16 120/20 120/22 124/20 140/21 142/5 145/6 148/17 150/5 150/5 152/21 170/6 178/23
somebody [5]  14/21 23/9 91/7 140/5 177/16
somebody's [1]  35/13
somehow [1]  177/2
someone [5]  14/19 63/11 80/14 81/16 129/7
something [28]  7/14 10/17 19/18 21/20 24/13 33/5 42/1 46/22 47/18 59/12 63/20 80/6 85/4 93/19 106/11 117/2 117/7 117/9 132/4 135/10 149/11 150/1 150/6 171/13 173/13 175/2 176/24 178/13
sometime [1]  12/19
sometimes [6]  68/6 69/8 69/8

**S**

sometimes... [3] 98/23 176/21 176/24
Somewhat [1] 129/17
somewhere [3] 84/7 84/19 101/9
sophomore [1] 162/23
sorry [3] 9/4 81/21 147/25
sort [4] 60/6 71/3 103/25 119/14
sound [1] 181/7
space [1] 113/23
speak [4] 7/22 69/25 83/11 83/18
speaking [2] 84/5 84/5
specific [8] 11/22 15/14 15/14 36/19 108/6 111/8 111/18 111/20
specifically [19] 18/5 18/6 27/7 124/1 124/24 125/2 125/10 125/19 126/19 130/10 134/2 144/17 146/9 146/23 146/25 156/12 163/8 171/12 179/4
specifics [8] 80/23 83/24 108/4 111/14 113/9 139/8 139/16 148/24
specify [2] 94/16 148/19
speculation [3] 71/24 87/1 129/6
speed [1] 58/13
speeding [4] 18/5 23/10 29/15 58/14
speedometer [1] 58/9
spend [1] 163/14
spent [5] 120/20 162/24 163/2 164/5 165/23
splitting [1] 138/4
spoken [1] 125/17
spoliation [1] 69/23
squad [2] 131/16 181/17
stacked [1] 37/13
stage [1] 109/7
stand [5] 164/24 166/16 167/4 168/12 175/15
standard [5] 109/23 110/22 110/23 111/6 167/22
standing [5] 44/20 44/22 158/5 158/7 158/9
stapler [1] 107/17
start [6] 10/3 25/6 37/15 48/11 97/10 168/5
started [7] 37/10 45/10 80/13 101/23 141/2 142/8 172/4
starting [2] 37/3 60/17
state [21] 1/6 2/3 9/17 30/17 77/7 78/9 100/4 100/5 100/14 104/24 112/19 160/2 160/22 162/13 165/24 167/16 168/22 169/20 169/25 186/1 186/4
STATE'S [67] 3/8 4/10 6/3 16/3 16/10 16/12 19/15 19/24 20/2 22/2 33/18 34/1 34/4 34/7 34/8 40/7 40/18 40/21 41/2 41/5 41/11 41/24 42/12 42/16 42/20 46/3 47/7 48/5 48/17 48/19 48/24 49/2 49/5 49/6 49/12 49/18 49/19 51/10 52/23 53/9 53/14 53/24 54/1 54/6 54/12 54/13 54/24 55/24 56/18 74/3 89/25 90/3 90/11 93/22 99/14 99/23 100/1 107/15 127/12 128/23 129/22 143/19 143/22 151/3 155/7 155/18 158/22

stated [3] 97/24 170/1 170/13
statement [12] 10/6 10/24 11/11 11/20 12/12 22/23 26/11 86/2 101/12 102/23 111/16 170/11
statements [1] 22/20
states [3] 106/17 163/7 167/15
stating [1] 164/24
statute [1] 99/22
stay [3] 118/13 119/17 184/22
stayed [1] 119/14
Ste [1] 186/18
stenotype [1] 1/18
step [13] 38/4 41/13 46/15 54/15 76/9 95/14 99/7 100/9 123/19 141/15 151/20 180/24 182/19
stick [3] 55/16 55/18 157/23
sticking [2] 140/18 140/19
sticks [3] 50/17 51/7 52/10
still [16] 8/19 25/14 25/15 44/18 117/24 123/9 123/12 126/10 135/11 139/20 149/5 151/5 153/5 154/10 174/17 176/9
stipulate [2] 21/10 25/12
stipulated [3] 164/3 164/7 169/21
stipulates [1] 99/16
stipulation [16] 6/11 6/12 7/6 19/17 19/21 20/2 20/5 20/12 21/22 21/25 34/13 34/14 99/15 99/23 143/20 163/23
stolen [1] 35/9
stood [1] 162/18
stop [33] 18/4 18/20 19/1 23/9 23/9 23/19 32/1 32/12 32/14 33/1 33/19 58/6 58/24 74/19 74/20 80/21 81/23 82/1 82/3 82/5 83/2 100/23 100/23 109/12 110/2 110/19 110/21 110/23 110/25 120/18 145/8 145/10 164/13
stopped [10] 16/5 17/16 18/10 32/20 73/17 82/7 123/23 128/11 128/15 182/11
stopping [3] 23/11 32/25 75/3
story [1] 77/3
straightforward [1] 153/1
strange [1] 171/7
strategy [1] 21/10
street [7] 1/23 2/6 2/11 19/3 28/3 30/9 186/18
street-level [1] 28/3
strong [1] 176/8
stuck [2] 130/5 140/24
student [1] 63/20
stuff [27] 10/11 24/18 24/22 35/14 37/16 38/22 39/9 39/10 44/1 49/1 49/10 60/9 60/11 60/13 114/11 115/13 117/16 127/1 138/4 141/2 147/2 153/16 159/6 171/11 171/15 173/12 173/25
stuffed [3] 116/24 117/20 130/11
stuffing [1] 141/2
style [1] 153/11
styled [1] 186/7
subject [3] 76/8 76/10 141/22
subsequent [2] 13/18 17/24
substantial [2] 14/25 56/4
substantially [7] 14/12 14/14 15/1 40/13 40/24 50/15 53/19

such [6] 11/19 21/10 37/18 100/19 117/3 122/6
sufficient [3] 103/12 103/20 109/24
Suite [2] 1/23 2/6
supervising [1] 96/22
supervision [2] 20/16 25/18
support [2] 106/13 110/24
supports [1] 108/20
supposed [3] 88/19 120/13 121/12
suppress [6] 16/9 16/21 17/22 18/15 19/13 111/25
suppression [3] 17/5 100/18 106/24
sure [20] 21/19 21/21 25/25 35/8 41/18 50/20 59/17 63/2 72/1 72/2 97/23 98/3 104/21 110/17 115/17 149/17 150/7 159/1 173/16 175/13
surprise [1] 166/21
surprised [4] 86/8 133/11 133/13 133/15
survived [1] 127/18
suspect [1] 68/9
suspect's [1] 67/9
suspects [2] 67/16 67/23
suspended [1] 177/2
suspicion [7] 110/3 110/5 110/18 110/22 110/25 111/7 169/6
sustain [2] 85/25 87/6
swab [4] 66/25 67/6 67/7 67/15
swabbed [1] 68/24
swabs [1] 68/16
swear [1] 22/9
swore [1] 76/15
sworn [13] 20/10 22/10 26/16 26/21 78/10 78/13 95/19 95/23 112/16 144/3 154/13 157/4 157/8
system [3] 163/3 163/4 167/15

**T**

T-H [1] 95/18
T-shirt [1] 145/6
table [3] 29/6 162/10 182/18
tag [1] 36/22
Tahoe [1] 32/23
tailgate [1] 144/22
take [35] 7/12 8/20 9/1 9/10 11/3 12/6 28/19 41/18 46/4 52/14 60/14 60/15 67/14 76/11 84/6 85/15 85/18 97/20 100/10 124/2 126/17 137/19 137/23 142/17 150/16 151/23 160/10 168/18 172/13 172/14 173/12 174/12 175/25 180/24 182/19
taken [11] 15/13 24/11 33/10 66/8 68/20 70/4 83/8 123/20 123/21 157/22 172/3
taking [1] 164/13
talk [19] 7/11 14/4 49/5 57/20 64/8 71/5 84/7 86/14 90/17 101/9 120/3 137/2 152/1 160/14 163/17 165/22 166/5 174/20 185/8
talked [29] 7/17 7/17 9/14 11/1 25/16 41/8 49/1 61/11 64/2 64/9 64/9 66/8 76/17 77/1 84/8 85/1 90/12 92/18 113/16 131/6 136/24 139/13 156/19 163/9 169/4 176/16

177/5 177/25 179/8
talking [28] 12/14 12/24 13/21 15/13 18/19 30/14 35/24 36/13 44/9 46/24 73/23 85/2 85/9 85/21 86/22 109/25 110/1 110/2 124/21 125/13 126/22 143/9 163/13 163/14 169/23 171/23 181/6 181/11
tamper [2] 59/12 104/10
tampered [1] 70/20
tan [1] 29/7
tank [2] 43/1 73/20
tape [1] 150/10
task [2] 27/12 79/11
Telephone [3] 2/7 2/12 186/19
television [1] 166/3
tell [21] 26/1 26/1 46/8 71/25 72/2 89/5 89/11 96/25 123/25 132/4 135/18 135/21 140/3 143/3 165/5 166/16 172/25 174/15 175/24 180/22 182/4
telling [14] 14/21 98/17 101/11 110/15 124/23 125/19 129/23 130/15 130/19 135/22 135/22 136/8 142/18 180/17
tells [1] 178/10
ten [5] 76/11 100/10 152/16 160/10 162/25
ten-minute [3] 76/11 100/10 160/10
tend [2] 118/10 118/11
terms [3] 33/22 54/23 109/8
terrified [1] 173/10
Terry [18] 5/18 5/20 26/15 26/20 27/1 27/2 41/15 42/12 42/21 44/15 54/14 54/18 79/15 154/9 154/12 154/16 158/1 158/5
test [6] 12/10 12/10 67/2 95/7 103/2 173/19
tested [4] 66/16 69/4 173/4 173/6
testified [18] 26/21 78/13 95/23 104/2 108/5 108/5 112/16 127/10 143/1 143/7 144/3 145/7 148/23 154/13 154/16 157/8 171/5 176/3
testify [10] 16/16 20/20 76/18 76/22 76/23 77/3 77/12 77/19 90/9 164/11
testifying [1] 77/2
testimony [26] 9/5 10/5 10/14 17/10 24/19 101/1 123/19 126/2 128/1 128/14 133/14 136/3 136/6 142/12 143/13 147/22 148/2 165/19 170/7 170/8 171/8 173/3 174/12 174/17 180/7 182/1
testing [4] 68/17 68/25 69/12 69/16
tests [1] 66/10
TEXAS [18] 1/6 1/7 1/17 1/22 1/23 2/7 2/12 27/13 30/17 83/15 163/8 165/24 167/16 186/1 186/4 186/16 186/18 186/19
than [19] 7/23 12/16 34/19 39/21 41/8 53/21 57/3 70/18 92/4 110/23 115/25 119/3 120/5 133/2 152/16 169/7 169/11 170/14 170/17
thank [20] 7/13 9/6 15/24 22/22 26/19 41/9 42/10 56/10 57/11

**T**

thank... [11] 112/14 157/2 157/6 159/13 159/24 159/25 160/11 167/23 168/7 185/5 185/11

Thanks [1] 155/23

that [1191]

that's [134] 8/5 10/25 12/3 13/6 13/9 13/14 16/18 17/2 17/4 17/10 17/16 18/22 19/16 20/21 20/21 21/24 23/11 24/11 25/10 31/12 34/20 35/1 36/13 41/21 42/7 43/2 44/5 44/10 45/1 45/2 45/8 55/24 56/20 59/15 61/3 61/4 61/5 61/17 61/18 62/4 63/17 65/14 68/7 71/2 71/20 71/23 72/4 72/4 72/13 72/25 73/7 86/11 87/1 88/3 93/19 94/1 94/3 94/5 94/12 94/24 96/8 100/20 102/11 102/24 103/22 104/6 105/8 106/17 106/20 107/4 107/6 107/7 107/9 107/25 109/19 110/2 110/10 110/11 110/11 110/15 111/17 115/9 116/4 116/7 116/18 116/19 122/10 124/8 125/5 125/9 125/10 125/12 127/12 127/18 132/11 132/14 133/19 134/5 140/5 140/10 142/15 144/16 148/7 150/17 153/19 158/21 164/25 166/7 · 168/25 168/25 169/13 169/19 169/21 170/15 170/22 171/22 174/10 174/21 175/3 175/6 175/11 176/9 176/13 176/20 177/4 177/8 177/12 177/14 177/19 178/3 179/2 179/2 179/3 180/6

thefts [2] 122/12 122/13

their [23] 7/6 11/19 14/17 21/7 35/7 63/20 100/15 101/10 105/2 106/9 106/10 106/17 106/20 107/6 107/7 107/21 111/3 140/7 160/2 170/9 175/16 177/18 177/18

them [45] 12/6 18/9 18/11 22/5 23/5 23/8 23/11 23/14 23/15 23/17 23/17 23/22 23/22 29/22 30/21 30/21 31/18 31/20 48/13 51/20 53/20 54/3 63/21 73/17 75/12 78/5 80/19 82/19 82/19 82/19 91/8 98/15 101/3 110/15 112/4 118/14 152/14 154/5 161/21 162/2 164/11 165/13 171/22 183/17 183/19

themselves [1] 54/4

then [71] 8/20 9/7 12/20 12/20 12/21 13/10 13/18 15/14 17/11 23/21 24/23 25/1 30/2 36/8 48/11 55/7 55/10 61/25 62/1 62/1 62/16 62/19 64/22 67/1 67/15 67/16 68/1 71/11 84/9 98/1 102/16 104/15 105/17 110/6 111/22 114/18 118/18 118/22 119/1 119/18 121/21 122/10 122/10 122/11 123/21 126/6 126/10 132/3 132/17 142/17 148/14 149/9 149/9 149/16 149/25 150/13 150/18 155/15 162/5 166/4 166/6 166/23 171/15 173/24 179/16 181/3 181/8 181/9 181/14 182/1 182/4

there [187]

there's [60] 23/16 24/18 41/25 55/19 63/3 63/6 64/8 65/15 65/16 68/3 71/24 72/9 88/18 88/18 94/11 98/3 100/25 103/15 104/5 106/5 108/10 109/11 110/17 110/17 110/23 110/24 111/1 115/18 119/22 121/8 121/16 124/13 126/16 129/10 130/1 130/19 140/23 140/25 148/25 149/12 149/14 163/23 169/18 170/7 170/11 175/10 175/11 176/7 176/23 176/24 178/11 178/11 178/16 178/18 178/19 180/3 180/4 180/8 180/17 181/9

therefore [4] 17/8 63/1 65/4 109/11

therein [1] 70/11

Theresa [1] 171/4

these [33] 15/9 16/3 16/11 16/22 16/23 17/20 18/12 23/10 23/12 29/19 41/4 48/11 48/12 48/12 48/25 49/1 51/11 51/12 51/14 51/18 51/22 52/11 53/19 55/2 55/15 108/11 110/9 111/15 114/22 143/21 165/12 171/17 182/16

they [149] 13/23 16/5 16/16 17/10 17/10 18/4 18/5 18/9 18/10 20/18 20/19 20/19 21/15 23/7 23/10 23/11 23/13 23/13 23/14 23/14 23/15 23/15 23/19 23/20 23/25 24/1 24/8 24/9 24/21 25/1 25/4 25/5 25/6 25/7 25/7 30/23 30/24 31/1 31/10 31/11 31/18 31/19 32/7 33/12 48/16 51/17 51/24 52/3 52/4 52/22 53/16 53/20 54/8 55/3 55/16 55/18 68/2 68/5 68/6 70/11 70/20 72/16 72/16 75/10 75/21 77/3 80/20 80/24 81/1 81/6 84/12 85/5 85/9 87/1 91/8 92/1 92/24 93/24 94/16 100/15 101/3 101/4 101/5 101/5 101/15 101/17 101/23 102/1 102/1 102/2 102/6 102/4 104/5 104/20 106/4 106/8 106/10 106/14 108/15 108/17 110/16 111/9 111/23 114/21 118/3 120/14 121/4 121/5 121/6 121/16 133/15 134/20 140/6 140/7 141/5 141/9 142/15 144/15 148/1 150/1 157/22 158/4 158/13 162/14 162/19 168/23 168/23 169/1 169/2 169/14 169/16 170/4 170/6 170/7 171/9 171/9 171/10 171/24 172/6 173/24 174/17 174/19 175/4 176/1 179/7 179/7 184/18 184/19 184/24 -

they'll [3] 20/22 55/16 184/24

they're [25] 12/4 23/25 24/3 24/17 24/20 43/16 50/11 51/14 53/21 59/18 59/18 70/19 70/21 82/17 101/11 101/18 104/14 110/10 142/11 154/3 166/1 171/18 171/22 174/19 177/3

they've [3] 108/5 111/11 163/2

thing [19] 9/14 12/23 16/18 35/21 55/8 98/21 101/22 103/22 106/17 129/2 134/9 155/19 156/9 174/3 176/19 176/20 178/16 183/2 183/9

things [29] 8/6 9/17 19/7 24/20 24/25 25/1 29/15 58/9 66/9 72/17 77/1 77/2 89/12 98/23 100/22 108/11 111/15 123/7 123/13 124/2 137/11 139/17 143/6 163/13 168/17 177/8 177/9 177/23 178/6

think [43] 7/5 7/9 7/17 7/23 8/16 9/15 12/9 12/10 14/1 14/11 14/23 14/24 15/6 15/7 37/18 42/15 57/5 65/22 78/1 82/12 85/5 85/5 101/13 104/23 104/24 105/22 105/22 121/4 121/8 124/5 124/6 124/7 124/11 129/8 152/25 153/10 156/17 167/7 171/21 174/21 174/25 175/9 176/8

thinking [2] 118/4 152/5

thinks [1] 171/13

this [254]

thorough [1] 111/4

those [58] 14/19 17/2 17/4 17/7 18/4 18/7 18/7 18/21 19/7 19/12 21/16 23/4 23/5 24/3 32/6 33/11 48/6 48/22 49/19 50/4 52/1 52/5 52/24 53/13 54/6 54/11 56/5 64/6 65/9 67/11 67/15 68/3 68/10 68/20 68/21 68/24 68/24 72/16 72/17 88/16 103/19 105/7 106/2 110/18 114/13 114/18 118/1 122/14 156/20 163/12 168/17 169/13 169/15 171/21 177/8 177/9 180/15 180/23

though [19] 63/6 63/24 64/10 66/1 76/8 94/18 94/19 106/9 106/10 117/4 121/19 128/1 139/18 156/4 159/3 164/15 167/19 172/2 173/18

three [7] 8/11 13/20 51/9 143/7 143/8 181/18 181/19

threw [1] 171/15

through [31] 7/21 20/16 20/23 24/20 25/6 36/3 36/20 37/10 45/10 47/13 47/14 47/19 47/24 48/6 48/12 48/13 48/18 54/25 61/17 81/2 81/3 94/13 126/21 140/17 141/9 153/7 168/11 170/6 170/8 171/17 178/7

throw [2] 178/1 180/22

thrown [1] 127/1

throws [1] 171/11

thumbs [1] 161/24

time [81] 8/16 11/1 11/4 12/23 13/4 13/19 25/15 28/10 28/12 31/10 32/16 33/9 35/22 36/23 43/21 44/16 45/9 55/12 70/19 71/18 71/22 73/6 80/1 97/4 99/12 99/21 103/5 116/2 117/21 117/25 118/8 118/8 119/4 119/15 120/9 120/11 120/20 121/3 121/7 121/7 121/24 123/1 123/22 124/18 124/20 125/16 128/14 129/15 132/23 134/2 134/16 134/19 135/17 138/6 140/9 140/16 141/14 143/18 145/17 145/18 146/18 147/5 147/17 150/7 150/14 151/13 151/24 160/8 160/11 162/12 163/2 163/14 166/24 168/8 170/18 181/12 181/20 183/8 184/19 185/5 185/7

timely [1] 100/18

times [8] 63/10 103/3 103/4 108/4 134/3 139/13 143/7 181/19

tinted [5] 75/16 75/22 76/3 102/13 102/15

tip [5] 108/24 109/4 109/13 109/16 110/9

titled [1] 1/15

Tobacco [1] 72/13

today [13] 25/10 26/2 29/2 40/14 124/23 128/1 128/18 163/13 168/10 180/7 181/8 181/14 183/7

together [10] 23/7 32/8 75/9 115/11 119/15 122/19 167/1 180/19 180/23 182/15

told [55] 8/11 10/22 17/23 19/3 47/14 56/13 74/2 74/22 80/14 93/6 97/8 123/12 123/15 124/5 125/24 127/21 129/2 129/21 132/3 132/7 132/14 133/15 134/3 134/7 134/8 134/23 135/4 135/25 135/25 136/5 136/9 136/19 138/16 139/1 139/23 140/10 142/14 143/9 147/17 154/23 162/19 165/15 176/12 177/12 177/20 179/1 180/9 181/15 181/15 181/16 181/16 181/20 182/7 182/10 183/2

tolerance [1] 55/20

too [11] 11/22 15/15 17/16 50/17 52/11 55/16 71/13 91/18 103/25 139/14 172/5 ·

took [8] 32/13 43/8 85/18 124/25 125/3 141/5 175/22 176/13

tools [1] 37/18

top [6] 43/1 45/14 60/25 60/25 73/20 156/10

torn [1] 48/8

total [2] 28/6 186/11

touching [1] 47/4

tow [3] 24/11 84/16 84/19

toward [1] 44/22

towed [6] 24/6 24/11 24/16 35/14 61/14 62/25

towing [2] 84/14 84/15

town [3] 30/6 30/14 63/8

trace [1] 72/8

traced [1] 72/6

track [2] 176/21 176/23

tracked [1] 72/6

tracking [1] 74/10

traffic [9] 18/4 23/9 23/9 59/2 74/18 74/20 100/24 110/2 145/10

training [3] 28/10 28/16 165/25

transactions [1] 103/11

transcription [1] 186/5

transported [3] 136/14 136/14 137/3

traveled [1] 162/25

traveling [1] 58/10

Travis [1] 1/16

trial [11] 1/3 1/11 19/21 20/1 25/24 100/19 109/11 151/24 166/4 168/9 170/8

tried [2] 65/15 66/8

tries [1] 55/21

trigger [4] 55/4 55/9 55/13 67/12

trip [1] 117/18

trouble [13] 26/3 117/13 119/13

**T**

trouble... [10]   134/10 134/16 136/10 138/15 150/1 166/24 173/13 177/16 181/12 183/4

truck [59]   24/2 24/4 24/18 24/19 24/22 25/2 31/6 31/13 32/11 32/20 33/3 33/7 34/25 37/6 37/9 37/11 37/16 37/16 37/19 38/1 38/1 38/23 39/5 40/11 40/15 44/1 44/16 44/23 45/10 45/14 45/18 46/5 47/14 49/2 52/22 56/1 60/6 61/18 108/9 108/9 111/21 114/19 114/23 114/23 129/23 131/1 131/2 133/12 141/6 147/11 154/23 158/2 158/6 159/7 164/21 179/2 179/2 181/1 182/22

true [10]   104/8 105/23 169/8 169/12 175/19 180/8 182/8 182/13 183/2 186/5

truly [1]   186/9

trunk [1]   37/2

trust [2]   138/16 142/1

truth [7]   101/11 132/5 132/7 143/3 175/24 178/14 180/17

truthful [6]   92/1 138/5 142/23 170/14 170/17 171/21

truthfully [1]   108/5

try [8]   26/6 27/22 46/11 52/1 64/19 66/4 121/9 127/3

trying [2]   98/11 168/4

tuck [1]   118/14

turn [1]   23/15

turned [1]   32/12

turns [1]   24/14

turpitude [3]   77/8 119/25 122/12

TV [3]   27/20 46/15 166/8

twice [2]   50/21 161/8

twiddle [1]   161/24

two [29]   18/7 21/16 28/8 28/9 56/5 96/17 101/18 104/2 105/25 106/2 110/10 113/2 113/4 113/5 117/15 122/13 139/22 143/6 152/14 154/1 154/3 161/16 161/17 162/15 167/1 167/1 168/14 172/4 181/23

type [18]   21/15 28/2 49/22 51/22 52/22 53/1 59/1 59/23 61/15 62/19 82/18 87/24 91/7 91/14 92/14 97/19 122/3 122/12

types [4]   66/25 72/16 72/17 77/7

typo [1]   95/17

**U**

ugly [1]   79/19

Uh [5]   18/8 21/4 21/13 85/22 132/6

Uh-huh [5]   18/8 21/4 21/13 85/22 132/6

ulterior [1]   106/6

ultimately [9]   13/8 13/10 16/7 32/18 80/12 83/8 86/23 87/7 114/18

under [15]   13/16 14/19 23/5 37/2 39/9 63/16 76/15 83/15 110/14 112/12 138/19 141/5 154/10 156/10 185/9

underneath [1]   55/6

understand [16]   13/1 14/6 17/19 19/20 57/25 66/23 97/18 98/11 98/17 121/10 124/20 124/20 125/8 126/22 149/17 150/9

understanding [4]   14/17 16/8 93/23 136/3

understood [1]   31/12

unduly [1]   12/4

uniformed [1]   30/3

uniform [2]   27/15 58/12

United [2]   163/7 167/15

units [4]   30/2 31/20 31/22 74/11

unlawful [1]   184/4

unless [1]   175/1

unlikely [1]   70/5

unmarked [3]   23/21 32/1 32/7

unnamed [1]   103/10

until [3]   12/18 121/20 145/17

up [100]   7/10 8/10 9/10 9/24 11/3 16/16 21/20 24/14 25/4 27/21 32/24 32/25 35/10 36/6 37/13 38/4 39/17 39/20 44/23 45/4 45/6 45/14 45/21 46/15 48/8 49/12 49/24 51/18 51/20 55/13 55/23 61/3 63/2 65/16 66/20 71/4 75/21 80/5 84/12 85/6 85/7 85/18 90/24 92/24 95/4 102/1 113/22 114/8 115/16 116/17 116/25 118/14 121/9 123/13 123/19 124/1 124/8 124/12 124/12 124/13 124/24 125/3 125/20 126/6 126/10 127/1 130/3 130/4 130/5 130/9 130/11 131/15 139/9 140/24 141/21 142/22 145/13 149/1 149/7 151/23 152/9 162/18 165/11 165/13 166/5 166/15 167/6 167/7 167/13 168/4 171/13 174/15 174/16 174/23 175/15 176/20 178/21 179/7 180/20 182/2

upon [6]   17/23 17/24 100/24 102/6 104/16 182/23

upset [6]   98/6 98/9 98/23 119/21 172/22 172/23

urge [2]   100/17 100/21

urgence [1]   90/8

us [16]   9/5 18/1 25/10 29/23 52/1 57/5 72/1 72/2 87/21 97/20 101/13 111/23 120/15 160/11 165/18 178/10

usable [3]   47/1 47/6 47/9

use [4]   12/9 54/23 143/3 166/12

used [3]   106/18 162/24 167/24

using [3]   33/2 110/23 176/17

usually [2]   123/11 125/5

**V**

V.Dire [1]   5/12

vacuum [1]   180/18

vague [1]   140/15

vaguely [1]   125/12

valid [3]   17/8 106/8 106/13

validity [2]   17/12 18/21

Valley [1]   79/11

value [5]   12/11 14/14 14/15 14/25 15/7

van [1]   23/22

vantage [2]   58/21 98/13

variety [1]   28/14

various [5]   24/25 32/3 37/18 38/2 67/16

vehicle [102]   18/10 23/13 24/6 24/7 24/8 24/10 25/9 25/21 30/1 30/23 30/25 31/19 31/19 32/24 32/25 33/1 35/4 35/4 35/5 35/8 35/10 35/14 35/14 35/18 36/4 36/15 36/20 36/22 36/23 37/24 58/1 58/2 58/5 58/23 61/14 62/2 62/25 62/3 63/13 72/24 75/3 75/10 75/15 75/24 80/13 81/16 81/7 81/20 82/2 82/6 84/9 84/10 84/12 84/16 84/18 84/20 87/14 88/4 88/10 89/6 90/20 101/5 101/6 101/20 102/2 102/6 102/7 104/4 105/4 108/9 108/14 108/17 110/6 110/10 110/17 110/19 111/8 111/14 113/7 130/17 137/5 151/12 151/16 159/1 159/2 164/12 164/14 164/17 166/10 166/20 171/11 172/6 175/7 178/22 178/24 178/24 178/25 179/4 179/6 179/14 179/20 179/22

vehicles [9]   23/16 29/24 32/6 32/18 32/19 32/23 33/23 35/22 88/23

veracity [1]   101/11

verbal [1]   91/15

verdict [7]   153/12 153/21 183/22 184/1 184/2 184/10 184/13

version [1]   162/9

very [17]   9/6 12/11 38/14 38/17 54/21 80/23 82/2 108/23 111/2 143/10 143/11 154/4 182/11 182/19 182/20 185/7 185/11

veteran [1]   173/3

victim [7]   59/6 82/4 84/3 92/8 92/16 139/11 148/24

video [37]   6/6 6/6 23/24 33/19 34/4 36/9 42/20 43/10 43/22 57/5 58/16 71/6 98/2 98/3 118/15 144/10 144/11 145/13 146/13 146/17 151/8 151/10 151/17 158/4 164/9 164/10 164/11 164/20 164/25 165/2 165/9 165/25 181/5 181/25 182/9 182/13 183/15

videos [1]   103/6

videotape [2]   132/25 133/4

videotaped [2]   132/22 143/12

view [1]   183/15

violate [1]   121/15

violates [1]   102/25

violation [1]   59/2

virtually [1]   24/5

visit [5]   7/6 119/23 148/14 184/16 184/22

visited [8]   21/2 21/7 90/13 102/12 137/12 139/10 148/16 171/5

voice [4]   166/21 181/6 181/10 183/1

voir [4]   163/15 165/15 176/12 177/20

volume [6]   1/2 3/2 4/2 5/2 6/2 186/6

Volumes [1]   1/2

**W**

waiving [1]   7/24

walked [6]   84/9 85/6 85/7 90/19 90/24 149/7

walking [3]   43/24 45/1 45/2

walks [1]   123/11

wall [1]   119/19

want [54]   7/22 16/16 21/19 21/20 21/21 26/3 28/19 29/23 49/5 51/9 56/22 59/15 61/14 62/11 62/12 69/24 69/25 74/1 74/2 76/23 77/19 83/18 96/16 96/20 98/18 98/19 117/1 117/9 117/12 119/22 121/24 124/14 127/11 132/18 135/8 136/2 138/15 139/16 140/6 142/6 152/8 161/5 161/12 166/22 168/7 168/18 172/13 172/13 176/4 176/5 176/6 178/14 184/18 185/9

wanted [7]   7/25 8/14 11/3 104/19 116/25 116/25 141/2

wanting [1]   119/12

wants [2]   8/12 107/13

WARD [7]   2/5 78/15 91/22 144/5 150/24 162/16 162/17

Ware [7]   5/21 80/2 81/19 81/20 157/3 157/7 157/13

warm [2]   118/13 171/2

warning [1]   161/12

warnings [1]   161/3

warrant [25]   6/5 6/5 11/25 12/20 13/5 13/5 13/17 17/1 17/2 19/2 33/6 59/5 75/5 103/10 103/13 103/16 103/19 103/23 103/23 108/1 109/22 109/24 120/14 121/19 138/11

warrants [33]   16/4 16/13 16/24 17/4 17/8 17/12 17/20 18/4 18/7 18/22 18/25 22/25 23/4 23/5 23/11 23/12 23/25 24/3 28/23 29/19 31/21 33/11 75/4 75/10 75/11 80/24 81/1 81/7 83/9 101/19 108/15 111/2 157/19

was [510]

washing [1]   178/23

wasn't [31]   18/4 52/18 58/11 63/15 65/2 71/11 97/10 108/8 119/12 119/12 126/4 128/7 128/10 132/24 133/13 134/1 135/19 135/25 136/1 139/2 139/14 139/14 142/23 146/25 147/18 164/19 164/20 165/6 166/17 166/18 174/13

waste [2]   11/3 43/21

watch [3]   36/9 46/15 181/4

watched [1]   165/18

watching [2]   58/8 164/20

way [29]   11/19 20/18 20/21 20/23 58/14 58/15 66/4 66/20 67/4 68/13 68/25 86/11 110/18 121/10 121/16 140/4 148/8 153/18 163/9 165/16 171/20 172/1 175/5 175/10 175/11 176/7 178/2 183/1 183/1

ways [7]   20/19 58/12 101/15 105/14 108/24 143/8 181/19

we [246]

we'd [4]   11/17 76/8 159/21

# W

we'd... [1]  177/15

we'll [15]  15/20 22/12 22/20 48/11 89/24 90/1 142/5 142/9 151/21 151/24 153/2 157/3 160/1 162/12 185/13

we're [31]  7/5 12/24 13/21 15/19 15/25 16/18 17/3 17/7 17/12 17/15 21/20 32/3 35/24 36/3 36/7 36/8 42/15 44/4 64/23 105/1 106/1 106/2 109/25 110/1 110/1 110/23 153/23 169/23 175/12 178/15 178/22

we've [12]  50/21 76/17 104/10 105/4 113/16 115/17 118/15 151/22 160/6 167/7 173/17 173/17

weapon [12]  6/10 6/11 46/12 50/25 52/1 52/5 54/2 55/25 56/8 104/15 104/17 177/17

weapons [3]  24/1 33/7 94/16

wear [5]  57/4 118/8 118/10 118/12 171/7

wearing [49]  29/5 29/7 42/25 43/1 43/4 43/7 44/6 57/6 71/10 73/16 73/20 73/20 82/13 82/15 82/16 91/17 108/8 108/8 118/17 118/19 119/1 119/2 119/4 128/3 128/5 128/6 128/7 128/8 128/8 128/10 128/16 128/21 128/22 144/18 144/19 145/3 145/5 145/19 164/14 164/17 164/19 166/9 166/16 166/17 166/19 171/3 171/6 182/7 182/10

wears [1]  170/25

weather [1]  82/11

week [6]  69/17 70/10 72/12 72/12 173/23 174/5

weeks [4]  8/11 146/23 162/18 173/8

weight [1]  111/5

weird [1]  176/25

well [56]  8/4 9/15 12/6 17/9 20/13 35/7 38/4 38/18 46/2 48/12 60/10 60/25 67/20 68/11 69/24 71/11 71/14 82/6 87/3 87/14 89/10 89/16 90/1 97/3 98/15 98/17 101/16 103/3 103/3 103/15 103/17 104/13 106/12 106/16 108/23 122/14 125/13 126/19 128/2 129/3 131/19 133/5 139/9 143/2 146/25 148/4 149/1 149/18 153/23 164/8 170/18 173/25 174/8 178/22 180/21 182/2

went [8]  12/21 13/18 29/19 118/25 120/15 122/16 141/9 171/17

were [193]

weren't [8]  17/7 98/12 128/2 133/12 138/5 145/8 174/3 174/14

what [174]  8/21 9/16 9/22 10/10 10/14 10/22 12/14 13/12 13/24 14/3 15/3 15/12 17/2 17/13 17/23 17/25 17/25 18/20 20/22 21/11 21/21 23/11 25/10 25/19 25/25 27/2 27/14 27/15 27/17 27/18 27/19 30/11 31/12 31/15 32/10 32/22 33/21 33/22 35/6 35/12

35/16 35/20 35/24 36/2 36/5 37/9 37/16 37/25 38/1 39/23 40/1 41/8 42/25 45/4 45/8 45/16 46/8 46/24 48/4 48/14 49/22 51/6 51/12 56/21 56/22 57/3 58/12 58/16 61/4 74/1 74/2 74/22 75/2 79/10 79/24 80/9 80/11 80/11 82/10 82/13 82/15 82/16 83/17 84/16 84/18 84/24 85/7 85/12 85/14 85/19 86/4 86/13 86/19 89/5 90/16 91/2 91/4 91/15 93/12 93/20 96/9 97/3 97/7 97/21 98/19 99/2 100/13 100/20 102/9 102/10 103/22 105/1 107/7 107/8 107/8 110/7 111/12 113/20 113/24 114/9 115/15 115/21 122/3 124/6 124/8 124/22 125/5 125/9 125/10 125/12 129/7 130/2 132/4 132/6 142/15 143/5 144/17 145/3 146/7 147/22 148/20 158/13 158/21 163/17 164/4 164/9 166/13 168/11 168/13 168/25 170/6 170/7 171/12 171/23 172/2 172/3 174/6 174/13 174/25 175/25 176/13 177/14 177/23 177/24 178/20 180/6 180/14 180/15 180/21 180/24 181/4 181/11 181/14 183/5

what's [22]  11/6 24/8 33/17 35/6 35/16 37/20 40/6 40/17 42/4 43/15 44/17 47/20 53/10 79/5 93/22 94/9 103/9 103/13 109/19 110/20 151/1 155/6

whatever [9]  13/23 26/1 35/9 55/11 59/16 114/1 114/12 116/24 149/20

whatsoever [1]  100/25

when [121]  10/22 12/9 12/21 13/16 23/20 25/4 29/19 32/10 35/3 35/13 36/5 37/10 39/19 40/1 40/14 40/25 43/8 45/9 45/20 47/13 47/13 47/18 47/24 53/14 53/20 59/5 59/8 61/5 62/2 69/16 69/21 70/3 71/3 71/5 72/10 73/16 81/17 84/5 84/16 85/7 85/19 85/21 90/13 91/3 91/7 93/6 97/7 98/5 98/15 106/5 109/21 115/11 116/20 117/14 118/17 118/20 118/22 118/25 119/14 119/17 120/14 121/1 121/3 121/4 123/8 123/11 123/12 124/1 124/5 125/24 126/11 126/22 127/1 128/11 128/12 128/15 130/3 130/3 130/9 131/6 131/23 133/10 133/15 136/4 136/13 137/11 138/16 138/18 139/14 139/23 141/4 141/4 142/22 145/8 145/14 148/14 150/4 150/13 150/14 154/22 159/3 159/5 162/10 166/21 167/6 168/18 170/13 170/14 171/4 172/12 172/19 173/1 173/11 173/24 175/9 180/19 181/5 181/6 181/10 182/11 182/18

whenever [7]  55/4 55/21 58/2 68/2 71/4 149/7 175/23

where [56]  18/22 24/9 27/11 30/8 32/1 32/4 35/24 39/5 41/22 43/10 44/15 44/16 60/16 60/22 63/10 63/18 64/13 71/6 73/6 73/9 82/1 82/19 88/3 92/23 94/12 101/9

101/24 103/10 104/14 114/13 114/13 114/18 116/21 117/4 117/17 118/24 119/18 120/7 123/8 127/24 140/14 143/9 150/2 152/22 156/3 158/25 159/1 159/2 159/17 159/19 165/2 171/19 171/24 172/8 172/9 175/18

wherever [1]  116/24

whether [14]  66/14 69/7 94/3 94/16 101/11 102/14 105/23 108/10 117/5 121/5 156/5 156/9 169/18 177/10

which [18]  14/17 16/7 16/24 21/6 21/12 50/14 89/25 94/25 95/3 99/14 99/16 109/24 113/16 115/5 122/12 128/9 142/15 186/7

while [20]  30/19 32/1 34/22 39/16 56/19 84/24 85/2 116/11 127/3 128/24 129/19 131/16 135/17 140/11 140/16 142/20 155/8 158/10 161/24 163/13

whiskey [1]  166/6

white [1]  58/23

who [29]  23/13 23/14 24/15 25/20 29/18 31/6 31/8 36/23 58/1 63/12 72/6 74/14 80/16 81/14 83/5 85/16 85/20 86/23 87/7 102/21 144/15 144/24 145/1 149/8 165/23 167/4 170/23 174/4 175/15

who's [7]  14/16 44/3 44/9 63/12 87/4 103/11 182/21

whoever [1]  185/8

whoever's [1]  149/22

whole [8]  101/22 104/3 105/10 106/17 145/13 153/16 164/5 178/16

whose [11]  24/15 30/25 71/25 71/25 85/13 115/23 132/1 132/20 137/23 167/3 172/20

why [51]  13/14 17/19 38/13 50/11 52/7 52/17 53/2 61/17 65/23 74/18 74/20 74/24 80/3 80/19 83/25 102/12 105/24 105/25 116/9 116/18 116/19 117/11 127/18 138/3 138/8 138/10 140/1 140/3 140/10 149/12 165/4 165/5 171/1 172/21 172/22 174/1 174/2 174/5 176/19 177/4 178/8 178/8 179/14 180/3 180/6 180/13 180/14 181/2 181/25 182/5 182/14

will [39]  9/2 10/14 10/15 10/24 16/11 19/7 22/19 26/1 34/6 35/18 41/9 48/23 52/3 52/4 54/11 55/2 55/7 55/9 55/10 55/13 55/21 94/16 94/19 95/2 95/2 99/13 99/25 100/3 100/8 105/6 107/15 160/11 162/9 172/9 176/2 176/14 177/15 184/14 186/12

WILLIAM [1]  2/5

willingly [1]  8/13

winch [2]  24/24 37/17

windbreaker [1]  82/18

windbreaker-type [1]  82/18

window [3]  164/1 167/11 178/2

windows [7]  75/16 75/19 75/21 75/22 76/3 102/13 102/16

wise [1]  64/17

wish [2]  184/6 184/16

within [11]  25/14 25/15 27/14 99/21 103/19 104/4 105/5 163/25 165/24 166/10 167/10

without [7]  80/11 80/23 83/17 83/24 85/14 86/13 117/2

witness [55]  9/13 20/10 26/16 33/14 40/3 41/12 41/16 42/11 45/24 48/1 50/25 51/25 54/15 54/20 56/12 57/8 59/1 73/12 74/7 76/6 76/7 78/10 86/2 87/10 89/1 91/20 92/19 95/12 95/19 97/11 99/5 99/8 112/12 122/23 127/7 137/8 141/12 142/22 142/22 147/13 150/22 151/18 154/19 155/24 156/22 157/4 158/17 159/14 159/20 164/24 167/4 168/12 170/9 170/10 186/13

witnessed [1]  73/6

witnesses [8]  3/8 4/5 4/10 99/13 152/11 152/14 154/2 166/1

women's [1]  38/14

won't [6]  51/8 52/8 64/22 94/15 111/23 118/23

word [6]  27/25 99/2 132/20 132/20 162/5 162/5

word-for-word [1]  162/5

words [1]  124/6

wore [1]  118/9

work [7]  28/3 28/3 35/2 79/17 96/14 149/1 152/2

worked [6]  66/17 79/11 91/24 92/7 92/12 108/22

working [1]  157/15

works [5]  35/3 36/16 54/23 67/4 121/10

world [2]  111/12 163/1

worth [2]  15/7 174/13

would [103]  11/18 14/24 15/2 16/15 17/8 17/11 21/6 21/6 21/9 21/15 26/24 29/4 34/1 36/24 38/21 38/25 41/2 43/20 45/9 48/17 51/5 51/6 52/23 54/3 57/2 57/4 58/6 65/1 65/4 65/5 65/6 65/7 66/2 67/8 67/11 67/12 67/19 69/21 73/3 73/3 75/22 78/16 93/11 93/12 93/19 94/10 94/18 96/1 98/7 98/8 98/22 100/17 102/13 102/16 102/17 103/22 104/9 105/21 106/4 107/24 109/24 111/4 112/8 116/9 117/6 117/8 117/22 118/4 118/8 119/17 119/18 119/25 120/2 122/12 124/7 125/5 125/9 131/2 132/25 133/2 136/4 141/16 142/3 142/12 142/21 149/12 149/15 149/21 153/11 153/18 156/24 157/11 158/6 161/9 165/4 165/5 171/7 172/7 172/21 172/22 173/18 175/3 176/1

wouldn't [10]  59/11 64/24 101/23 117/9 124/14 149/23 173/15 173/19 175/1 178/12

wrap [3]  124/12 124/13 130/3

wrapped [13]  124/8 124/11 125/7 125/20 126/6 126/10 130/3 130/4 130/5 130/9 130/11 140/24 171/13

wrapping [2]  124/24 125/2

wrecker [4]  35/9 36/6 62/1 62/17

**W**

wrecking [1] 24/12
write [1] 97/25
writing [3] 19/22 19/23 186/6
written [1] 99/14
wrong [4] 106/11 149/12 149/14
165/7
wrote [2] 97/17 97/18

**X**

XL [2] 119/2 119/2

**Y**

y'all [46] 30/4 30/19 30/20 31/3
31/5 31/15 31/17 33/2 33/6 33/22
35/3 35/6 35/11 43/8 43/24 44/16
47/13 47/14 48/14 49/16 52/14
56/19 73/16 80/12 114/24 123/1
123/6 123/23 126/11 126/17
126/23 126/23 127/3 127/5 128/11
128/14 128/15 128/24 131/9
134/20 135/11 135/17 153/4 155/8
161/12 176/17
y'all's [3] 32/18 35/6 36/25
yard [2] 24/11 24/12
yeah [33] 8/17 8/18 18/16 21/23
34/16 73/10 77/14 104/18 107/12
118/3 118/7 120/5 120/13 123/10
123/18 124/10 125/4 126/15 129/5
131/14 131/25 133/3 133/20
134/22 134/25 135/3 137/5 138/15
139/7 143/11 147/25 161/7 161/10
year [7] 22/24 28/20 96/21 120/10
121/1 140/12 167/11
years [17] 20/14 21/12 25/17 28/4
28/6 28/8 49/25 78/23 79/2 79/4
79/9 79/14 113/1 113/4 113/5
162/25 164/1
yes [395]
yesterday [10] 7/16 17/21 17/23
21/3 25/16 51/19 51/25 66/9
125/14 168/10
yet [3] 14/19 109/17 122/1
you [954]
you'd [6] 66/1 70/3 98/5 123/21
176/12 184/22
you'll [5] 24/19 24/21 25/3 63/12
162/5
you're [67] 11/10 16/25 18/12
18/23 20/20 23/24 25/10 25/19
25/23 26/5 27/24 29/11 29/11
29/12 29/16 30/14 35/13 35/25
36/12 38/5 43/13 47/18 60/2 65/7
68/13 76/10 84/19 88/15 88/22
93/23 95/9 96/12 98/17 99/10
105/14 105/17 118/11 118/11
118/25 121/11 121/11 122/6
123/20 125/8 128/24 130/15
130/19 141/18 142/25 157/1
159/23 165/20 166/4 166/25
167/13 168/24 169/2 175/18
176/11 177/11 177/11 178/13
180/19 181/4 185/3 185/7 185/11
you've [18] 28/5 35/21 35/22
63/18 66/17 105/15 105/24 105/25
167/20 172/5 174/21 178/7 180/22

180/24 181/24 182/13 182/21
185/6
you-all [8] 59/5 59/24 95/7 98/5
117/21 162/10 176/2 176/6
Young [16] 5/18 5/20 26/15 26/20
27/1 34/22 79/15 154/9 154/10
154/12 154/16 154/22 158/1 158/5
158/10 158/20
your [119] 9/18 19/8 20/8 20/20
21/21 22/8 26/14 30/5 30/5 34/19
35/16 41/12 45/13 58/9 58/9 58/20
59/8 60/15 66/18 68/1 69/7 76/18
77/3 77/11 77/11 77/16 78/7 79/5
79/21 84/4 88/3 89/22 92/16 94/22
95/15 96/5 96/16 98/13 99/1 99/11
109/20 112/19 113/5 113/21
113/25 114/9 115/11 116/4 116/12
116/21 117/14 117/23 117/25
119/4 121/15 122/9 123/7 123/13
123/19 124/2 124/6 126/2 126/8
126/11 126/14 128/1 128/14
128/19 130/4 130/20 133/2 133/14
135/6 136/3 136/6 136/11 137/25
139/2 140/12 141/23 142/2 145/14
146/18 147/22 148/1 149/17
149/21 149/24 161/24 162/5
162/11 163/19 166/12 167/6 168/8
168/10 168/11 168/16 168/19
168/25 169/22 170/21 176/10
176/17 176/18 177/6 177/10 178/5
178/5 178/7 182/15 182/16 182/18
183/12 183/23 184/8 185/3 185/5
185/5
yours [3] 57/18 123/21 174/24
yourself [10] 26/25 38/5 58/4
78/16 81/17 96/1 157/11 167/3
178/8 181/7
yourselves [1] 166/9

**A P P E A R A N C E S**

ATTORNEY(S) FOR STATE:

    RYAN CHARLES CALVERT
    SBOT NO. 24036308
    WILLIAM LEE WARD
    SBOT NO. 24077302
    Assistant District Attorneys
    300 East 26th Street, Suite 310
    Bryan, Texas    77803
    Telephone:  979-361-4320

ATTORNEY(S) FOR DEFENDANT:

    EARL R. GRAY
    SBOT: 24007265
    Gray, Granberry & Jones
    103 N. Main Street
    Bryan, Texas    77803-3235
    Telephone:  979-822-4759

DENISE C.PHILLIPS, CSR
OFFICIAL COURT REPORTER
272ND DISTRICT COURT

# CHRONOLOGICAL INDEX

November 15, 2012                                    Volume 5

                                                        Page


Enhancement paragraphs presented                          5
Defendant's plea                                          5
Witness sworn                                             6
STATE'S WITNESSES:

BRYAN WADE RUEBUSH:

    Direct Examination By Mr. Ward                       6
    Cross-Examination By Mr. Gray                        8

Witness sworn                                            12

GREG SILBER:

    Direct Examination By Mr. Calvert                   12
    Voir Dire Examination By Mr. Gray                   20
    Direct Examination Continued By Mr. Calvert         25
    Voir Dire Examination By Mr. Gray                   26
    Direct Examination Continued By Mr. Calvert         27
    Cross-Examination By Mr. Gray                       36

State rests                                             36
Witness sworn                                           37
DEFENDANT'S WITNESSES:

KENNETH GREER:

    Direct Examination By Mr. Gray                      37
    Cross-Examination By Mr. Ward                       41
    Redirect Examination By Mr. Gray                    44

Witness sworn                                           45

ANNETTE GREER

    Direct Examination By Mr. Gray                      45
    Cross-Examination By Mr. Ward                       50
    Redirect Examination By Mr. Gray                    52

Defendant rests                                         53
State closes                                            53

# CHRONOLOGICAL INDEX

November 15, 2012                                    Volume 5

                                                         Page

Closing Argument by Mr. Calvert                           54
Closing Argument by Mr. Gray                              56
Ruling of Court                                           58
Reporter's Certificate                                    61

## ALPHABETICAL INDEX

|                       | Direct | Cross | V.Dire |
|-----------------------|--------|-------|--------|
| Greer, Annette        | 45     | 50    |        |
|                       | 52     |       |        |
| Greer, Kenneth        | 37     | 41    |        |
|                       | 44     |       |        |
| Ruebush, Bryan Wade   | 6      | 8     |        |
| Silber, Greg          | 12     |       | 20     |
|                       | 25     |       | 26     |
|                       | 27     | 36    |        |

## EXHIBIT INDEX

### State's Exhibits

| EXHIBIT | DESCRIPTION            | OFFERED | ADMITTED |
|---------|-----------------------|---------|----------|
| 17      | Judgment and Sentence | 15      | 17       |
| 18      | Pen Pack              | 26      | 27       |
| 19      | Pen Pack              | 20      | 25       |
| 19-A    | Judgment and Sentence | 20      | 22       |
| 20      | Judgment and Sentence | 30      | 30       |
| 21      | Judgment and Sentence | 30      | 30       |
| 22      | Indictment            | 28      |          |
| 23      | Judgment and Sentence | 28      | 29       |
| 24      | Fingerprint card      | 36      | 36       |

DENISE C.PHILLIPS, CSR
OFFICIAL COURT REPORTER
272ND DISTRICT COURT

**P R O C E E D I N G S**

**November 15, 2012**

THE COURT: Have a seat.

MR. GRAY: Good morning, Judge.

THE COURT: Good morning, sir. Ready to proceed?

MR. CALVERT: Just about, Judge. If you'll give me just a moment to finish getting stuff marked.

THE COURT: All right.

MR. GRAY: Defense is ready.

MR. CALVERT: I'll tell you what, Judge, to save the Court time, we have a live witness. Do you want to go ahead -- oh, we need to arraign the Defendant on the paragraphs.

THE COURT: Go right ahead.

MR. WARD: Judge, do I need to read the entire --

THE COURT: No, just read the enhancements.

(Enhancement Paragraph One presented.)

THE COURT: Hold up. On that first enhancement, how do you plead, Mr. Greer?

THE DEFENDANT: Not true.

THE COURT: Not true. All right. Go ahead.

(Enhancement Paragraph Two presented.)

THE COURT: On that one, how do you plead?

THE DEFENDANT: Not true.

THE COURT: Not true will be noted in both counts.

Opening statement?

MR. CALVERT: Judge, we'll waive opening.

MR. GRAY: We will as well.

THE COURT: All right. Call your first witness.

MR. WARD: State calls Bryan Ruebush.

(Witness sworn.)

THE COURT: Have a seat. Go right ahead.

**BRYAN WADE RUEBUSH,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

BY MR. WARD:

Q. Good morning, sir. Could you state your name and spell it for the court reporter?

A. Yes. Bryan, with a Y, Wade, W-A-D-E, Ruebush, R-U-E-B-U-S-H.

Q. And you work for BPD; is that correct?

A. Yes, sir.

Q. How long have you worked for BPD?

A. A little over seven years.

Q. And are you a certified peace officer?

A. Yes, sir.

Q. How long have you been a certified peace officer?

A. A little over seven years.

Q. Okay. What's your current assignment with BPD?

A. I'm a patrol officer.

Q. Okay. How long have you been a patrol officer?

A. Roughly five years.

Q. What are your duties as a patrol officer?

A. Take calls for service, patrol my area, you know, self-initiated activity, that kind of thing.

Q. Okay. Now, I'm going to direct your attention to the Defendant. Do you recognize the Defendant?

A. Yes, I do.

Q. How do you recognize the Defendant?

A. I stopped him in 200- -- stopped him in 2007. Also had to go to court on that in Houston working with ATF.

Q. Okay. Do you remember what day it was that you stopped him?

A. It was August 8th of 2007.

Q. Okay. Do you remember why you stopped him?

A. Yes. It was an expired registration on the vehicle he was driving.

Q. Okay. And what happened when you stopped him?

A. He was arrested for outstanding warrants; and during that stop, we found crystal methamphetamine and a

gun.

Q.   Okay.

MR. WARD:   Pass the witness, Judge.

**CROSS-EXAMINATION**

**BY MR. GRAY:**

Q.   This was quite some time ago; is that right?

A.   It was in 2007, yes.

Q.   When you observed him driving, was he violating any traffic laws at all?

A.   Other than the expired registration, no.

Q.   Okay.  So, he wasn't driving recklessly or exceeding the speed limit or endangering anyone that you saw?

A.   No.

Q.   He didn't try to run from you?

A.   No.

Q.   Whenever you actually placed him under arrest, did he use any force against you at all?

A.   No.

Q.   He cooperated fully?

A.   I would say so.

Q.   Okay.  Now, you indicated that you had searched the vehicle; is that correct?

A.   Yes.

Q.   Did you have a search warrant for that vehicle?

A. No.

Q. Okay. When you had placed him under arrest, did you, I guess, as you usually do, place him in handcuffs put him in the back of the patrol car?

A. Yes.

Q. Okay. So, he was not in a position to get to any type of evidence or weapon or anything like that; is that fair to say?

A. Yes.

Q. Okay. And so, you searched the vehicle; and what do you find; and where do you find it at?

A. There was a black leather satchel in the back of a passenger compartment on the very top -- there was a lot of stuff in there, but that was the very -- that was the thing on the very top.

In that black satchel, there was a bank bag; and in that bank bag was where the gun was. Also, in that same leather satchel, there was a sunglass case; and in that sunglass, case was .9 grams of crystal methamphetamine and drug paraphernalia.

MR. GRAY: Judge, we would object to the reference as to this being crystal methamphetamines at this point. That's hearsay. There's been no lab report. There's been no testimony --

THE COURT: Sustained as to that portion

only.

MR. GRAY: Okay.

Q. (By Mr. Gray) So, as to just the -- I guess, the firearm, what type of firearm was that?

A. I know it was a .380 -- B West .380 handgun.

Q. Okay. As to that particular weapon or where you found that, was there any kind of identifying information, a license or anything identifying or linking that pistol and where you found it to David Greer?

A. Yes.

Q. What would that be?

A. There was a card for his parole officer with the date on it. And while he was in the back of my patrol car, he stated to his girlfriend that he had an appointment with his --

MR. GRAY: Objection as to hearsay, Judge.

THE COURT: Sustained.

Q. (By Mr. Gray) Okay. There was some type of a parole card, but did you actually visit with any type of a parole officer to verify any of that information?

A. No, but he did state that that was his bag.

MR. GRAY: Objection as to hearsay.

THE COURT: Sustained.

Q. (By Mr. Gray) All right. As to this gun that was found, was there any kind of testing, any kind of prints

DENISE C. PHILLIPS, CSR
OFFICIAL COURT REPORTER
272ND DISTRICT COURT

run on it or anything of that nature?

A.    Yes.

Q.    Okay.    That was sent off to the lab; is that correct?

A.    Our CSI processed the gun.

Q.    Okay.    Now, he never tried to go for that weapon or anything of that nature; is that right?

A.    Not for the gun, no.

Q.    Okay.    So, he didn't endanger you in any way?

A.    He made -- there were things that he did that were suspicious to me that I thought he might hurt me, yes.

Q.    Okay.    Did he -- did he grab the weapon and point it at you?

A.    No.    There was a club at his right-hand side, though, that I think he was trying to go for when I was talking to him.

Q.    Okay.    You say you think he was trying to go for it.    Did he pick it up and swing it at you?

A.    No.

Q.    Was it in his hand?

A.    No.

Q.    And you did not get permission to search that bag that was back there in the back of the vehicle?

A.    That's correct.

Q. And you didn't actually get any kind of permission to search any of the vehicle; is that correct?

A. That's correct.

MR. GRAY: Judge, we pass the witness.

MR. WARD: Nothing further, Judge.

THE COURT: You can step down, Officer.

THE WITNESS: Thank you.

THE COURT: Call your next.

MR. CALVERT: Call Greg Silber.

Your Honor, may Officer Ruebush be finally excused?

THE COURT: He's finally excused.

(Witness sworn.)

THE COURT: Have a seat. Go right ahead.

**GREG SILBER,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

BY MR. CALVERT:

Q. Would you state your name for the record?

A. Greg Silber, S-I-L-B-, as in boy, -E-R.

Q. And what do you do for a living?

A. I'm an investigator with the Brazos County District Attorney's Office.

Q. How long have you done that?

A. Four years.

DENISE C.PHILLIPS, CSR
OFFICIAL COURT REPORTER
272ND DISTRICT COURT

Q. And prior to that, what did you do?

A. I spent 27 years as a San Antonio police officer before I retired from them; and then, I spent three and a half years with the College Station Police Department before moving to the D.A.'s Office.

Q. So, you've been a certified peace officer for how long?

A. Getting pretty close to 35 years now.

Q. And in your career, have you received specialized training with regards to fingerprint identification, detection and comparison?

A. I have.

Q. And describe for me briefly what that training is.

A. I've had over 500 hours of specialized training in fingerprints and comparison, classification. Besides the training -- just having the training, I've also taught courses in fingerprint classification and fingerprint comparison. Spent over eight years in the San Antonio Police Department Latent Office doing comparison of crime scene prints, going to the morgue, identifying deceased persons that were unknown.

Q. And in your career as a police officer and as an investigator, have you had occasion to put that training to use on actual cases?

A. I have.

Q. On many occasions?

A. Many.

MR. CALVERT: May I approach the witness, Judge?

THE COURT: You may.

Q. (By Mr. Calvert) Investigator Silber, I'm going to show you what I've marked for identification purposes as State's Exhibit 24; and I'll ask you if you recognize that?

A. I do.

Q. And what is that?

A. It's two inked impressions of the Defendant's right thumb.

Q. And who took those fingerprints of the Defendant's right thumb?

A. I did.

Q. And when did you take those? Was it today?

A. Yeah, about 15 minutes ago.

Q. Okay. And when you say, "the Defendant," the person who's thumbprints are on State's Exhibit 24, is that the Defendant in this case, Dave Greer?

A. It is.

Q. I now want to --

MR. CALVERT: Well, first of all, at this

point, Judge, I will offer for all purposes State's Exhibit 17, which is a certified copy of a judgment. It's previously been shown to Defense counsel. This is the one that they stipulated to yesterday.

(State's Exhibit No. 17, Judgment and Sentence, offered.

MR. GRAY: Judge, we would -- well, a couple of things. We would object as to the Judgment and Sentence being hearsay and not properly authenticated. Also, we stipulated to the fact that he had been convicted of a felony and that five years had not expired since his release of supervision. But we did not specifically stipulate to any particular judgment. We just -- there was just -- there was no judgment offered. There was no stipulation to judgment. We stipulated as to those facts.

THE COURT: I understand. Why do you object to the actual judgment when you've already stipulated that it's true?

MR. GRAY: Just that. We have not -- we have stipulated that he is a felon and that it was within five years of the expiration of his being released from the supervision, as to that element of the guilt/innocence phase. But we have in no way stipulated to any Judgment and Sentences, any prints, anything of that nature.

The judgment also contains additional

allegations, Judge, these enhancement paragraphs, which we are not stipulating to; and we are -- we object to as well.

MR. CALVERT: Briefly, Judge. The stipulation that was signed by both the Defendant and his counsel yesterday -- I don't recall the exhibit, but it was offered into evidence in front of the jury -- specifically states that the David Greer who is the Defendant in this case is one and the same individual who was convicted in the cause number from this judgment, State's Exhibit 17, for possession of methamphetamine, which this judgment is for.

And as to the hearsay objection, this is a certified copy of a public document. It's not hearsay. So, the Defendant has already stipulated on the record and in evidence that he is one and the same individual that is listed -- that was convicted in this case right here. That links this judgment to him.

The only other hurdle you have to get over is hearsay, and it's not hearsay because it's a certified copy of a public document.

THE COURT: I overrule the objection.

Q. (By Mr. Calvert) Investigator Silber, I'm going to refer you now --

THE COURT: It's admitted.

(State's Exhibit No. 17 admitted.)

Q. (By Mr. Calvert) I'm going to refer you now to what's just been admitted as State's Exhibit No. 17. Is this a judgment for a felony of possession of methamphetamine --

A. It is.

Q. -- out of Grimes County in 1997?

A. It is.

Q. Now, I'm going to flip to the second page of that -- of State's Exhibit No. 17, and does it appear that this is a judgment from a jury trial?

A. It does.

Q. And is there a finding in State's Exhibit 17 by the jury that the same Defendant was also convicted in Cause No. 15341 in the 85th Judicial District Court in Brazos County of burglary of a habitation?

MR. GRAY: Judge, can I have a running objection, so that I'm not interrupting constantly as to --

THE COURT: Yes, you may have a running objection --

MR. GRAY: -- hearsay?

THE COURT: -- as to State's 17 and any information contained therein.

Q. (By Mr. Calvert) Did the jury find that to be

true?

A. It did.

Q. And with respect to that case, Cause No. 15341, I'm now going to refer you to what I've marked for identification purposes as State's Exhibit 19-A. That's 19-Alpha. I'm going to ask you to look at that and tell me if you recognize what that document is.

A. It's a judgment.

Q. Is that a certified copy of a judgment bearing that same cause number, 15341?

A. It is.

Q. And is that out of the 85th in Brazos County?

A. It is.

Q. Is it for burglary of a habitation?

A. It is.

Q. Now, if you flip to the second page of State's Exhibit 19-A, is there a thumbprint made on the second page of State's Exhibit 19-A?

A. There is.

Q. Did you have occasion this morning to compare the thumbprint on State's Exhibit 19-A to the prints that you took off of the Defendant today?

A. I did.

Q. And what did you find?

A. They were one and the same.

Q.    They came from the same individual?

A.    Correct.

Q.    Okay.   Now, I'm now going to refer you to State's Exhibit 19.  Do you recognize that as a certified copy of what's called a pen pack?

A.    I do.

Q.    And is a pen pack just a certified document from TDC containing judgments, essentially?

A.    Correct.

Q.    Is one of the judgments in this pen pack that same case, Cause No. 15341 out of Brazos County?

A.    It is.

Q.    And does this same pen pack, does it belong to an individual named Dave Greer?

A.    It does.

Q.    And does it assign that individual a particular TDC number?

A.    It does.

Q.    Does this pen pack contain the judgment for -- the same judgment for Cause No. 15341?

A.    It does.

Q.    Does the same pen pack also contain a separate judgment for a separate offense, Cause No. 15269?

A.    It does.

MR. CALVERT:   Judge, at this point, I'm

going to offer State's Exhibits 19 and 19-A. These have previously been shown to Defense counsel, and they -- both of which are certified copies of public documents.

(State's Exhibits No. 19 and 19-A, Pen Packet and Judgment and Sentence, offered.)

MR. GRAY: Can I take the witness on voir dire?

THE COURT: Yes, sir.

**VOIR DIRE EXAMINATION**

**BY MR. GRAY:**

Q. As to State's Exhibit 19, that contains several -- appears to be several fingerprints. You were not able to identify those --

A. No, they're --

Q. As to David Greer; is that right?

A. They're very poor quality. No.

Q. Okay. And there is a photo contained therein, but you're not a photograph expert?

A. No.

Q. Okay.

MR. GRAY: Judge, we would object. We have a running objection as to the Judgment, 19-A. We have no additional objections as to that. But as to 19, we would object, Judge, that it hasn't been properly authenticated. It's hearsay. It may appear to be a Judgment and

Sentence. There is a photograph contained therein, but there is -- has been no testimony to identify this photograph as being one and the same.

In addition, Judge, the prints do not match my client's. And I don't think it's proper --

THE COURT: You mean, you can't compare them?

MR. GRAY: You can't compare them, the quality of -- and I don't think it's proper to simply take one judgment that we've objected to -- and I know it's been admitted, but incorporate it into this judgment; and therefore, this judgment is okay. I don't think that's the way it works, and I don't think that's proper.

If they want to prove up that pen pack, I think they need to have identifying prints or someone from TDC to testify as to that.

MR. CALVERT: May I respond, Judge?

THE COURT: I'm not sure I follow how you're trying to do this. It's all convoluted.

MR. CALVERT: Certainly, Judge, I can explain it.

THE COURT: Okay.

MR. CALVERT: State's Exhibit 19-A, which the Defense, I believe -- and correct me if I'm wrong, Earl -- the Defense has no further objection to 19-A.

MR. GRAY: No further objection.

THE COURT: 19-A is admitted.

(State's Exhibit No. 19-A admitted.)

MR. CALVERT: 19-A is a felony judgment for burglary of a habitation that contains a good fingerprint that has been compared to and matched to this Defendant. So, 19-A, there's no question. It's a certified copy of a good judgment that is linked to this Defendant.

19-A is also listed in -- as one of the priors that the jury found to be true in State's Exhibit 17, which has already been admitted and stipulated to by the Defendant that he is one and the same individual.

So, that conviction for that case, specifically Cause No. 15341, is sufficiently linked to this Defendant. That gets us to State's Exhibit 19, which is a pen pack which also contains that same judgment. The same judgment that is represented by 19-A, Cause No. 15341.

Specifically, State's 19 is a pen pack relating to an individual named Dave Greer; and it is assigned a particular TDC number, 408765. Contained within that same pen pack under that name and that TDC number, as I said, is the same judgment, State's Exhibit 19-A, Cause No. 15341, as well as an additional judgment, Cause No. 15269, also out of Brazos County, also out of

the 85th, also on a defendant named Dave Greer with the same prosecutor, the same defense attorney, the same judge.

THE COURT: So, it's kind of a circumstantial proof of the same?

MR. CALVERT: Certainly, Judge; and that gets to the next thing I was going to talk about.

Mr. Gray refers to the lack of identifiable prints with respect to -- and really the only judgment here we're talking about is Cause No. 15269, because we have a good print on the other one.

And there's lots and lots of case law that goes back a long way on how you prove up judgments, and there are -- there's nothing magical about fingerprints. There's two hurdles you have to get over.

One, you have to show that it's a -- you can get over hearsay. It's a certified copy of a public document.

The second hurdle is you have to link it somehow to the individual who's on trial. But there is no one exclusive way of doing that. There's a variety ways of doing that.

And specifically, one case that I know of is *Flowers v. State*, and the cite for *Flowers v. State* is 220 S.W.3d 919. In that case, they actually didn't have a

certified copy of a -- it was a DWI case. They didn't have a certified copy of the judgment. They had a docket entry off the court's jacket and a certified copy of the defendant's driver's license pack which listed a conviction. But there actually was no certified copy of the judgment.

Another case is *Paschall, P-A-S-C-H-A-L-L, v. State*, that's cited as 285 S.W.3d 166. And like I said, there's a litany of cases on this. These are just two that I grabbed this morning.

The point of this, Judge, is the Court talks about in here -- and I'm reading from *Paschall* -- to establish the defendant has been convicted of a prior offense, the State must prove beyond a reasonable doubt that, one, a prior conviction exists; and, two, the defendant is linked to that conviction. And they cite *Flowers* on that, which is the other case that I just cited. No specific document or mode of proof is required to prove these two elements. While evidence of a certified copy of a final judgment and sentence may be a preferred and convenient means, the State may prove both of these elements in a number of ways, including documentary proof such as a judgment that contains sufficient information to establish both the existence of a prior conviction and the defendant's identity as the

person convicted. Any type of evidence, documentary or testimonial, might suffice.

THE COURT: All right. I'll admit it.

(State's Exhibit No. 19 admitted.)

THE COURT: The objection is overruled.

**DIRECT EXAMINATION (CONTINUED)**

**BY MR. CALVERT:**

Q. All right. State's Exhibit 19, which has just been admitted, Investigator Silber, you told us earlier contains the same judgment for burglary of a habitation that's listed in 19-A; is that correct?

A. That's correct.

Q. Does it also contain a separate judgment for Cause No. 15269 against this Defendant for another burglary of a habitation?

A. It does.

Q. Now, I'm going to refer you to State's Exhibit 18. Is that another pen pack?

A. It is.

Q. Is that a certified copy of a pen pack?

A. It is.

Q. And is there a cause number for the judgment contained in State's Exhibit 18?

A. There is.

Q. And what is that cause number?

A.    It's 1717585.

Q.    Is that the same cause number that is also referenced in and found true in the judgment contained in State's Exhibit 17?

A.    It is.

Q.    And is that also -- does the court in this exhibit, the 85th in Brazos County, match the court referenced in State's Exhibit 17?

A.    It is -- it does.

Q.    Is it also for an individual named Dave Greer?

A.    It is.

Q.    All right.  I'm also going to --

MR. CALVERT:  Well, at this point, Judge, I'm going to offer State's Exhibit 18 on the same basis. It's a pen pack for that cause number.

(State's Exhibit No. 18, pen packet,

offered.)

THE COURT:  Same objection?

MR. GRAY:  Can I take the witness on voir dire, Judge?

THE COURT:  Yes.

**VOIR DIRE EXAMINATION**

BY MR. GRAY:

Q.    In regards to State's Exhibit 18, there's also a set of prints included on the last sheet.  You were not

able to link those prints to my client, David Greer; is that correct?

A. They're not identifiable, no.

Q. Okay.

MR. GRAY: Pass the witness.

Judge, we would -- we would object under the same rationale that we objected to the prior exhibit, that they have not provided sufficient evidence to prove up his identity and link him to that particular judgment.

THE COURT: Overruled. It'll be admitted.

(State's Exhibit No. 18 admitted.)

**DIRECT EXAMINATION (CONTINUED)**

**BY MR. CALVERT:**

Q. Mr. Silber, I now want to refer you to -- well, actually, before we move on, State's Exhibit 18, which was just admitted, is that a Judgment of Conviction for the felony offense of theft?

A. It is.

Q. And was the Defendant sentenced to five years in TDC?

A. He was.

Q. Now, I want to refer you to what I've marked for identification purposes as State's Exhibits 22 and 23. Are both of those certified copies of public documents?

A. They are.

Q.  State's Exhibit 22, is -- is that a certified copy of an indictment?

A.  It is.

Q.  And State's Exhibit 23, is that a certified copy of the judgment that goes along with that indictment?

A.  It is.

Q.  Does State's Exhibit 23 contain a set of fingerprints?

A.  It does.

Q.  And were you able to compare the fingerprints from State's Exhibit 23 to the Defendant in this case and the fingerprints you took from him?

A.  I did.

Q.  And what did you find?

A.  I found that they belonged to the Defendant.

MR. CALVERT:  Judge, at this point, we'll offer State's Exhibits 22 and 23, both of which are certified copies.

(State's Exhibits No. 22 and 23, Indictment and Judgment and Sentence, offered.)

MR. GRAY:  Judge, we would have no additional objections other than what we've -- have a running objection as to State's Exhibit 23.

THE COURT:  Objection is overruled.  22 and 23 are admitted.

(State's Exhibit No. 23 admitted.)

MR. GRAY: Well, as to 22, Judge, I have a separate objection.

THE COURT: Okay.

MR. GRAY: As to 22, there's no prints, and I'd also object to relevance. It's an indictment. An indictment is no indication of guilt, and I would -- I would also object that it's unduly prejudicial. It's also cumulative. We would object to 22.

THE COURT: Why are you offering an indictment?

MR. CALVERT: It shows what he was charged with -- specifically what the allegation was that he ultimately -- they pled him down to a lesser.

MR. GRAY: Judge, I would object as to relevance. It's not relevant as to what he was charged with.

THE COURT: I'm going to sustain the objection to 22.

Q. (By Mr. Calvert) State's Exhibit 23, which was just admitted, is that a Judgment of Conviction for this Defendant from October of 2010, convicting him of theft?

A. It is.

Q. And was he sentenced to serve one year in the Burleson County jail?

A. He was.

Q. I'm now going to refer you to State's Exhibits 20 and 21. Are both of those certified copies of public documents as well?

A. They are.

Q. And do both of those contain a thumbprint?

A. They do.

Q. And did you have occasion to compare the thumbprints in State's 20 and 21 to the Defendant?

A. I did.

Q. And what did you find?

A. I found that the thumbprints in 20 and 21 do match the Defendant.

MR. CALVERT: We would offer State's 20 and 21.

(State's Exhibits No. 20 and 21, Judgment and Sentences, offered.)

MR. GRAY: No additional objections to those two, Judge.

THE COURT: Those objections are overruled. 20 and 21 are admitted.

(State's Exhibits No. 20 and 21 admitted.)

Q. (By Mr. Calvert) With respect to State's 20, is that a Judgment of Conviction for evading arrest from here in Brazos County?

A. It is.

Q. Is that in 1997?

A. It is.

Q. And State's Exhibit 21, is that a conviction for reckless driving?

A. It is.

Q. Here in Brazos County from 1997?

A. It is.

Q. Okay. Now, I want to go back to State's Exhibit 17. This was the original judgment that I asked you about. What's the date of that judgment?

A. It's going to be November 6th of '97.

Q. And is that a conviction of possession of methamphetamine?

A. It is.

Q. And does it indicate that he received a punishment of 40 years, four zero years in TDC?

A. It does.

Q. Okay. Referencing you to State's Exhibit 19, the pen pack that contains two convictions for burglary of a habitation, flipping to the third page of State's Exhibit 19, is that a judgment granting this Defendant deferred adjudication probation?

A. Correct.

Q. Flipping to the next page, does it indicate a

number of violations of his probation that were alleged against the Defendant?

A. It does.

Q. Specifically, that he used marijuana, correct?

A. Correct.

MR. GRAY: Judge, I would object to anything contained therein as hearsay. Also, it's not relevant. It's unduly prejudicial. If they want to bring in those particular people to testify to that, bring in lab reports, testing, that kind of stuff, that's one thing. But to just reference particular bad acts that may or may not exist and violations that may or may not exist, we would object.

THE COURT: This is in the pen pack?

MR. CALVERT: It's in the pen pack, Judge.

THE COURT: What do you say to that?

MR. CALVERT: Judge, this document --

THE COURT: Underlying charges?

MR. CALVERT: Well, if you'll let me, Judge I can clear that up with one question from this witness.

THE COURT: All right.

Q. (By Mr. Calvert) I'm going to flip back to --

THE COURT: I've got your objection under advisement now.

Q. (By Mr. Calvert) I'm going to flip back a couple

of pages in State's Exhibit 19. Is this an Order Revoking Probation and convicting the Defendant of the offense for which he was placed on deferred?

A. It is.

Q. And does this contain the same allegations that were listed violating his probation just a minute ago on that other page?

A. It appears to be.

Q. And were they found true by the Court?

A. Yes, sir.

Q. Okay. Did -- is one of those violations a criminal trespass?

A. Yes.

MR. GRAY: May I continue to have a running objection as to any references contained therein as to any unadjudicated act? In addition, Judge, we're not objecting in regards to 404(b) notice as to any of the judgments. They have given me notice on that. I do not have any notice in regards to bad acts contained within that Judgment and Sentence.

THE COURT: You do have an objection to bad acts within that?

MR. GRAY: Yes, I do.

THE COURT: They weren't furnished to you?

MR. GRAY: That would be notice as well,

Judge. I mean, those weren't listed on 404(b) notice as to -- you know, they're going to go through 57 Condition I violations, that, one, I haven't received 404(b) notice to; two, that we have -- they still have to prove all of this stuff beyond a reasonable doubt for you to consider it.

And I don't think we can just take a Judgment and Sentence -- yes, if it's a certified copy, that J and S may come in for the purpose to establish that he committed this act or revoked or was sentenced, but not every piece of hearsay within hearsay contained within that document.

THE COURT: Well, I'm going to admit the document, but I'm going to take it only as a basis to revoke and not the truth of the prior allegations.

Q. (By Mr. Calvert) Did -- was one of the allegations found true by the court that criminal trespass?

A. Correct.

THE COURT: And your running objection is granted.

MR. GRAY: Okay. Thank you.

Q. (By Mr. Calvert) And is -- what was that violation for?

A. Marijuana.

Q. And the next one?

A. Methamphetamines.

Q. And the next one?

A. Methamphetamines.

Q. Does it also say he was hanging around people that he wasn't supposed to be hanging around?

A. Correct.

Q. Did he also -- does it indicate the Defendant admitted to his probation officer that he left the county without notifying his probation officer or the court?

A. It does.

Q. And did he also have some technical violations for not paying fees and that kind of thing?

A. Correct.

Q. Does it also indicate that he failed and was found true to have failed to participate in counseling that he was ordered to do?

A. It does.

Q. And for this offense, was he sentenced to ten-years confinement in TDC?

A. He was.

Q. In the other judgment that's in here, in this same pen pack, was he sentenced to five-years confinement in TDC?

A. He was.

MR. CALVERT: Judge, I would offer -- just

to keep it all together, I would go ahead and offer State's Exhibit 24, which is the fingerprint card.

(State's Exhibit No. 24, fingerprint card, offered.)

MR. GRAY: Judge, we have no objection to that.

THE COURT: 24 is admitted.

(State's Exhibit No. 24 admitted.)

MR. CALVERT: I'll pass the witness, Judge.

**CROSS-EXAMINATION**

**BY MR. GRAY:**

Q. As to everything that you've testified in regards to the Judgment and Sentences, you don't have any personal or direct knowledge as to any of those allegations or any of the facts contained in any of those allegations; is that right?

A. I do not.

MR. GRAY: Pass the witness.

MR. CALVERT: No further questions, Judge. We'd ask that he be finally excused.

THE COURT: You're finally excused.

THE WITNESS: Thank you, Your Honor.

THE COURT: Call your next.

MR. CALVERT: We'll rest, Judge.

MR. GRAY: Judge, we would waive any kind of

opening at this point, but we would call Kenneth Greer to the stand.

THE COURT: Okay.

(Witness sworn.)

THE COURT: Have a seat.

**KENNETH GREER,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

**BY MR. GRAY:**

Q. Mr. Greer, can you hear me okay?

A. Yes.

Q. Okay. And how are you related to David Greer?

A. He's our first son.

Q. Okay. And do you -- do you and your wife have any other children?

A. We have one.

Q. Okay. Is that a brother?

A. He's got another son.

Q. Okay. And I kind of want to do this in a piecemeal thing. I'd like to talk about the first part of his life with you and the later part with his mom. But going back to his childhood, did -- how far did he get in school?

A. I believe he completed the ninth grade here in Bryan public schools.

Q. Okay. How did he do in school?

A. He did fairly well. I mean, he passed.

Q. Okay. In visiting with his teachers, was it a situation that he could have done better if he applied himself?

A. Oh, yeah, from what his teachers told us, yeah, they said if he had -- he could have done a lot better.

Q. Okay.

A. Because he had the intelligence to do it.

Q. Okay. And, in fact, did -- and I understand this may have occurred while he was incarcerated, but did he obtain his GED?

A. Yes. Yes, he did.

Q. And do you know how well he did?

A. Well, from what we understand, he made one of the highest grades ever made over in Linden School.

Q. Okay. Was he actually required to retake it because they didn't believe he scored so high?

A. Well, I don't know if he retook it, but they tried to make him retake it. But it was never -- I'm not for sure if he had to retake it or not.

Q. Okay. Did he have a normal childhood for the most part?

A. Yes, as far as -- you know, as far as what we consider normal nowadays, you know.

Q.   Okay.  And at some point, he started getting in trouble with the law; is that right?

A.   Yes.

Q.   About when was that, do you think?

A.   Oh, I think, like, 16.  I think he was around 16 years old.

Q.   Okay.  What do you attribute that to, if anything?

A.   Well, we found out he was running with some older guys; and what I've read through the years, these older guys have gotten into trouble themselves and have been adjudicated in cases.

Q.   Not to make any excuses --

A.   Right.

Q.   -- for David.  I mean, he can choose whatever direction in life he wants to go?

A.   Exactly.

Q.   What kind of person is he?

A.   A very good person.  Good natured person.  A helpful person.  When I need help, you know, he's always there, you know.

Q.   Okay.  And I -- and you've heard all the allegations that the State has -- and you were here during the jury trial as well; is that right?

A.   Yes.

Q. Okay. And you've -- you've listened to some of the -- some of the allegations and the judgments and the crimes that the State's alleged that he has committed. So, he's had some problems in the past with the law; is that fair to say?

A. Uh-huh. I have to agree to that.

Q. Okay. He has paid for those convictions. Is that a true indicator of who he is?

A. Not really. I mean, just bad choices and -- but as far as an individual, he's a good person, you know.

Q. Obviously, this is a -- this is the type of case that the Judge has the ability to sentence him in a wide variety of time in the penitentiary. But in all likelihood, he will go to prison for a period of time. Do you understand that?

A. Yes. Uh-huh.

Q. Okay. But obviously, there's an ability to parole out. At that point, do you think if he's given that opportunity to come back out, he'd be okay in society?

A. Well, we've been visiting with him at the jail; and he told us the other day, "I think it's time for a change."

Q. Okay. I know it's late in life, obviously, for him; but I guess folks can change at any time?

A.   Correct.

          MR. GRAY:  I'll pass the witness.

          THE COURT:  How old is he?

          MR. GRAY:  He's 45.

          THE WITNESS:  Forty-five.  Uh-huh.

          THE COURT:  Okay.  Go ahead, sir.

                    **CROSS-EXAMINATION**

BY MR. WARD:

Q.   Mr. Greer, I just have a few questions for you. You said David's your first son?

A.   Yes.

Q.   And you love him?

A.   Oh, yes.

Q.   Love him more than probably anything in the world?

A.   Well, all my family, yeah.  I don't love him any more than I love my other son, you know.

Q.   But you don't want to see anything bad happen to him?

A.   Oh, no.  I don't think anyone -- if anyone ever wants to see something bad with their children, there's something wrong with them.

Q.   And you've been there for him his whole life?

A.   Consistently.

Q.   And you provided him advice about the things that

he's been doing wrong in his life?

A. Oh, yes.

Q. And you know all the bad things that David has done throughout his life?

A. Yes. Uh-huh.

Q. And you know that in order to stop doing the things that he's doing, he's going to have to change his ways?

A. Yes, I sure do. I mean, yeah.

Q. And that he's had multiple opportunities. In fact, this will be his fourth felony conviction; and he still hasn't changed his ways.

A. Is that a question you're making to me?

Q. Yeah.

A. I mean, did you ask me a question?

Q. Did you know this is going to be his fourth felony conviction?

A. I didn't know which number it would be.

Q. But you know he's had multiple felony convictions?

A. Oh, yes, I knew he had two different numbers.

Q. Did you know his last conviction was for 40 years?

A. Yes. Yes.

Q. And you don't think that that would be enough --

enough motivation for him to change his ways back in 1997?

A. I can't say yes or no. I mean, you know, because he paroled out in '05; and, I mean, I know what y'all have shown here; but yes, he's done good, too, you know.

Q. Did you talk to him about changing his ways after he paroled out?

A. Oh, yes. Uh-huh.

Q. Did you know that he was arrested in 2007 for carrying a gun and having suspected drugs on him?

A. That drug part is brand-new to me, but I knew about the gun thing. It was -- it was thrown out, is all I know. He was never prosecuted for it.

Q. Do you know that between the time that he went to jail for 40 years in Grimes County in his first couple of felonies, he had another unlawful possession of a weapon? Did you know that?

A. No, I don't know that one.

Q. Okay. Do you know he was in jail in Burleson County --

A. Yes.

Q. -- in 2010?

A. Yes, which I think was reduced to a misdemeanor. I don't know. I mean, that's what I understood. I don't know.

Q. David has children; is that correct?

A. Yes, three.

Q. All boys or boys and girl?

A. One girl and two boys.

Q. One girl and two boys. Okay. What kind of effect has his life had on his children?

A. Not a positive one, but yet all three of them still love him.

Q. Okay. What do you mean by not a positive effect?

A. I mean, they see what's going on; and they want to not do the same things, put it that way.

Q. Isn't it true that they've been in and out of trouble as well?

A. No, one has.

Q. Okay.

A. And he was a minor at that time, and he's doing good now.

Q. Okay.

A. The other two, the daughter has a -- his first grandchild, our first great grandbaby.

MR. WARD: Nothing further, Your Honor.

**REDIRECT EXAMINATION**

**BY MR. GRAY:**

Q. Mr. Greer, you've -- you've worked very close with my law firm; is that right, over the last, I guess, nine months?

A. Several months.

Q. Several months. And you've assisted in any possible way that you can in his defense, and you've always cooperated with us and everything, didn't you?

A. Yes. Uh-huh.

MR. GRAY: Pass the witness.

MR. WARD: Nothing further, Judge.

THE COURT: You can step down, sir.

Call your next.

MR. GRAY: We would call Ms. Greer, his mom, Judge.

(Witness sworn.)

THE COURT: All right.

**ANNETTE GREER,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

**BY MR. GRAY:**

Q. Can you state your name for the record?

A. Annette Greer.

Q. Annette, I apologize. I know you corrected me yesterday. I think I left you some messages and called you Lynette. So, I apologize for that.

How are you related to David?

A. His mother.

Q. Okay. And we've already heard from his father

that he has another sibling, a brother; is that right?

A. Uh-huh.

Q. Okay. And I know his dad had mentioned his children. What are their -- two boys and one girl; is that right?

A. Uh-huh. Danielle is 23.

Q. Okay. What are their ages?

A. She's 24 and has the grandbaby.

Q. Okay.

A. And David Wayne is 20, fixing to be 21. And Damian, his youngest, is fixing to be this month 16.

Q. Okay. And his daughter just recently had a grand -- a child?

A. Uh-huh. He's two.

Q. He's two. Okay. And has David had an opportunity to see the child?

A. Oh, yeah, they're close.

Q. Okay.

A. That's what possessed him to straighten his life up.

Q. Okay. Now, I guess that would be -- that would be his only grandchild; is that right?

A. Uh-huh.

Q. Is it a boy or girl?

A. A little boy.

DENISE C. PHILLIPS, CSR
OFFICIAL COURT REPORTER
272ND DISTRICT COURT

Q. A boy.

Okay. We've heard some about his growing up as far as his school life and talked a little bit about his children.

Would you agree with your husband, his father, that, at some point, he started getting in trouble with the law?

A. Yeah.

Q. Okay. And I understand that that's probably something you're not horribly proud of; is that fair to say?

A. That's right.

Q. And David is 45; is that right?

A. Uh-huh. Yes.

Q. Is his birthday in December?

A. Yes.

Q. He has been in jail here in Brazos County for a period of time; is that right?

A. Uh-huh.

Q. And that's, I guess, one of the reasons why you-all have worked so well with our office is because he's been in jail; but you guys have been out and able to work with us; is that right?

A. Uh-huh.

Q. Are you aware of any kind of health problems that

he has at all?

A. Oh, yeah.

Q. And what would that be?

A. He's a bad diabetic. He has to have insulin every day. His legs, they're going numb due to a back injury and just his overall health.

Q. Okay. As to the diabetes, has he had that all his life?

A. No, he's had that, like, five years.

Q. About five years?

A. Uh-huh.

Q. And does he have to -- so, he has to take insulin shots?

A. Yes, every day.

Q. Okay. Has there been any problems or any issues while he's in jail as far as his diabetes?

A. Oh, yeah. They don't -- you know, when you have -- when you're a diabetic, you need to be on a special diet; and all they gave him is starches, which makes his blood sugar go sky high.

Q. Spikes, right?

A. Right.

Q. Okay. I know as to his -- his legs, and we haven't had him necessarily walk a lot in this trial or anything like that, but they did seize a couple of canes

in the evidence that came out in the jury trial in the listing. Does he use a cane?

A. Yes, he uses a cane all the time.

Q. Is that due to his legs?

A. Uh-huh. Because his knee just goes out, and he just hits the ground.

Q. As I explained to -- and you were here when I was speaking to his dad, the Judge has a pretty significant range of punishment in the case, depending on what occurs. If no enhancements are found true, this is actually a third-degree felony; so, the punishment range would be two to ten. If one enhancement is true, it's two to twenty; and if two enhancements are true, there's a possibility he'd be looking at a minimum of 25 all the way to life. So, there's everywhere from two technically all the way up to life. So, there's a pretty significant range of punishment. But he will have to do some time in prison for sure. We know that.

You know, what are your concerns as to any kind of a significant or a long sentence?

A. I'm afraid he'll die in prison.

Q. Would that be to -- I guess he's not exactly a spring chicken; is that fair to say?

A. (Nods head.)

Q. And also, some of his health concerns?

A.    (Nods head.)

MR. GRAY:  I'll pass the witness.

### CROSS-EXAMINATION

**BY MR. WARD:**

Q.    Ma'am, I just have a couple questions for you.

Your husband said that David is your first son?

A.    Yes.

Q.    And I'm an only son myself; so, I know that you probably love him more than just about anything, right?

A.    I love them all.

Q.    You want to see him do well.

A.    Yes.

Q.    And you don't want to see him get in trouble?

A.    (Shakes head.)

Q.    You've always been there for him?

A.    We practically raised his kids.  We have two of them now.

Q.    You tried to help him change?

A.    Yep.

Q.    And tried to help him change when he got out of prison the first time; is that right?

A.    We always help him.

Q.    You tried to help him when he got out of prison the second time; is that right?

A.   Yep.

Q.   And you probably really tried to help him when he got out of the prison this last time; is that true?

A.   Yes.

THE COURT:   What's the other son's name?

THE WITNESS:   Will.

THE COURT:   Will?

THE WITNESS:   Uh-huh.  David and Will.

THE COURT:   Okay.

THE WITNESS:   My son's name is Dave Greer, not David.  His name is Dave.

Q.   (By Mr. Ward)  Do you remember when Dave was in prison in 1995?

A.   Yes.

Q.   It seems like a long time ago, doesn't it?

A.   Yes.

Q.   Was he still a young man then?

A.   Yes.

Q.   Did he try to change his ways when he got out?

A.   He always tries to change his ways.

Q.   Do you remember when he went back to prison in 1987?

A.   Yeah.

Q.   And do you remember when he got out, did he try to change his ways then?

A. Yes, pretty much.

Q. And when he went to prison again in 1997, when he got out, did he tell you that he was going to try to change his ways then?

You have to answer yes or no for the court reporter.

A. Yes.

MR. WARD: Nothing further, Judge.

### REDIRECT EXAMINATION

BY MR. GRAY:

Q. We've heard a lot of the bad acts that he's done, the prison sentences; and the Prosecution is continuing to reference those. I mean, there's a good side to --

A. Oh, yeah.

Q. -- Dave, though, isn't there?

A. Uh-huh.

Q. Has he -- have you seen him be generous to others?

A. Oh, yeah.

Q. What would be an example of that?

A. Well, you could be broken down on the side of the road, and Dave's going to be the first one to stop and help you. He'll help anybody.

Q. In fact, there was a witness we had planned to call, human services, Charmaine; and she was not able to

get off of work; but do you have any specific knowledge as to how he might have helped her?

A. Yeah, he was --

MR. WARD: Objection, Judge, hearsay.

MR. GRAY: Not if she has direct knowledge.

THE COURT: I'm going to go ahead and hear it.

Go ahead, sir.

A. Her car air-conditioner had gone out, and she was talking to him, and he got her the part and took it to her that afternoon, and she appreciated it.

Q. (By Mr. Gray) Did he charge her anything for that?

A. No, he did not.

Q. Okay. You've seen him interact with his -- I guess not only his kids, but even more importantly, his grandson; is that right?

A. Oh, yeah.

Q. Okay. And --

A. He takes his kids fishing.

MR. GRAY: Pass the witness.

MR. WARD: Nothing further, Judge.

THE COURT: You can step down, ma'am.

Call your next.

MR. GRAY: Judge, we would rest.

MR. CALVERT: Close.

THE COURT: Final arguments.

**CLOSING ARGUMENT BY MR. CALVERT**

MR. CALVERT: Judge, I can stand here all day and try; but I would never, ever be able to sum this case up any better than the Defendant did when he told that jailer, "I don't follow the rules. I'm not going to start now." And he has spent literally a lifetime showing us and showing you that.

You know, it is not enough that sometimes he's capable of being nice to people. It's not enough that sometimes he takes care of his children. Those are things that all of us are supposed to do and expected to do every day of our lives, anyway. And yet with him, time and time and time and time again here we are with his stated philosophy, "I don't follow the rules. I'm not going to start now."

I mean, he's been to prison three separate times for four separate felonies. He's breaking into people's houses. He's stealing. He's carrying guns. He's involved with drugs. This is somebody who, you know, in 1997, a jury in Grimes County made it very, very clear that they want our community and communities to be done with this individual.

They gave him a 40-year pop, so that law enforcement and people in the community would no longer

have to deal with him because he's not going to stop committing crimes.

And he got the benefit of parole. And, you know, Counsel asked his dad in this case if he gets the benefit of parole, will he change his way -- well, he was on parole. He's on parole until 2037 from the last time that he went to prison. And since he's been out on parole, he's been arrested, I believe, at least three times. He's been convicted of now multiple offenses since he's been on parole.

He got arrested for a felony in 2010 in Burleson County, and they pled it down to a misdemeanor that he got the max on. They could have revoked him right then and sent him back to TDC, and they didn't. He got another benefit; and yet, here we are again.

The Defendant has communicated to you, both through his lifestyle, his choices, his actions and literally his words. He is not going to stop.

And so, Judge, I'm asking you for 50 years because he got 40 on his last one. He's on parole for the next 25 years anyway, so let's do another 25 on top of that.

I agree, it's sad; and it's not easy to stand here and ask for this and say this; but I agree with his mother that he's probably going to die in prison. But

he has put himself in that position and no one else.

There is not a soul in this world that needs to feel bad or guilty about what happens to this individual because he has made his bed, and it's time for him to lie in it.

And so, Judge, I'm asking you on behalf of these individuals right here sitting behind me that they do not have to deal with this person in the community anymore.

THE COURT: Mr. Gray?

**CLOSING ARGUMENT BY MR. GRAY**

MR. GRAY: Judge, normally this offense would be a third-degree felony. It would be two to ten years in prison. The maximum would be ten years. Because he's had some prior convictions and some prior run-ins with the law, he's enhanced.

If you find those allegations as true, as to both enhancement paragraphs, he's looking at 25 to life. If you find one of the enhancement paragraphs, he remains at a second degree, it's two to twenty.

But, Judge, what concerns me in these types of hearings, especially on the punishment, we have judgment after judgment after judgment that we lose focus of the offense itself. Yes, he violated the law. We may not agree with the jury's decision. We may not be happy

with it, but we respect it.

But what occurred? There was a .22 pistol, lowest possible caliber, smallest possible bullets, in a coat behind the seat in a vehicle that he was driving. There's no indications that he led the police officers on any kind of a high speed chase. He did not in any way attempt to get the gun.

It was found in the coat. He didn't try to shoot at the officers, didn't try to resist the officers. There's no evidence from the State of Texas that this is a violent man.

Primarily, everything revolving -- whether it's a gun offense or it's a theft offense, we know where it's all tying. It's all tying to this methamphetamine. If you're in that world of methamphetamines, you're going to carry a gun. It's not good, but that's the life they live. But there's no indication that he ever harmed a person or attempted to harm a person in any way.

You know, if it was you or I or even the prosecutors or really anybody in this entire courtroom, if we were in that vehicle and that pistol was behind us, it's not even against the law. But because he's been to prison, he is under a different set of rules. And that pistol should not have been there.

Judge, as to what they've proven up as to

evidence in their punishment side of the case, again, we do believe there are some issues with those judgments. We would ask that you find those not true and restrict your range of punishment to the two to ten.

However, we respect your decision, whatever that may be. If you do decide to enhance him to the 25 to life, we would obviously ask for something on the low end of the 25.

Judge, 25 years in prison for a 45-year-old that's a diabetic and that has problems is a long time. These other sentences, Judge, yes, they are relevant as to punishment; but he has paid his debt to society for these. I mean, these aren't just judgments that were never punished. He went to prison. He has paid his debt to society for those. So, it's not as if he was never punished for those offenses.

Each and every day he does in prison, Judge, is going to be hard time due to his age and due to his physical problems.

Again, if you decide to find those enhancement paragraphs true, Judge, we would ask that you restrict that punishment to 25 years.

**RULING OF COURT**

THE COURT: All right. Stand up, Mr. Greer.

(Defendant complied.)

THE COURT: The Court finds both enhancement counts to be true and assesses your punishment at 30 years in the Institutional Division of the Texas Department of Criminal Justice. You are hereby sentenced to 30 years.

MR. GRAY: Thank you, Your Honor.

THE COURT: Mr. Greer, you have a right to appeal your case. If you can't afford counsel, I'll appoint one for you.

MR. GRAY: Judge, he's sort of referenced that already. He would like appointed appellate counsel. I would not want to be that appointed appellate counsel. I'd ask that you just appoint somebody off the list.

THE COURT: Okay. All right. Are you hired?

MR. GRAY: No, Judge.

THE COURT: You were appointed?

MR. GRAY: He's indigent.

THE COURT: We'll go ahead and appoint him a lawyer on appeal.

MR. GRAY: Okay. Judge, I appreciate that.

COURT COORDINATOR: The next one on the list is Mary Hennessy.

THE COURT: Stay in touch with your lawyer, Mr. Greer, because if you lose at the first level of

appeal, you can appeal it to the next level; but if you don't know that you lost, you might miss the 30-day deadline to appeal to the next level.

THE DEFENDANT: All right.

(Proceedings concluded.)

**'**

'05 [1] 43/3
'97 [1] 31/12

**-**

-E-R [1] 12/20

**.**

.22 [1] 57/2
.380 [2] 10/5 10/5
.9 [1] 9/19

**/**

/s [1] 61/15

**1**

10-13-00049-CR [1] 1/4
103 [1] 2/11
12 [1] 4/13
12/31/13 [1] 61/20
13 [1] 61/20
15 [5] 3/2 4/2 4/18 5/2 14/19
15269 [4] 19/23 22/25 23/10
25/14
15341 [8] 17/15 18/3 18/10 19/11
19/20 22/14 22/18 22/24
15th [1] 1/14
16 [3] 39/5 39/5 46/11
166 [1] 24/8
17 [14] 4/18 4/18 15/2 15/5 16/11
17/1 17/3 17/10 17/13 17/23 22/11
26/4 26/8 31/10
1717585 [1] 26/1
18 [8] 4/19 25/18 25/23 26/14
26/16 26/24 27/11 27/15
19 [13] 4/19 19/4 20/1 20/4 20/11
20/23 22/15 22/19 25/4 25/8 31/19
31/22 33/1
19-A [18] 4/20 18/5 18/17 18/18
18/21 20/1 20/4 20/22 21/23 21/25
22/2 22/3 22/4 22/7 22/9 22/17
22/24 25/11
19-Alpha [1] 18/6
1987 [1] 51/22
1995 [1] 51/13
1997 [6] 17/7 31/2 31/7 43/1 52/2
54/21

**2**

20 [13] 4/13 4/19 4/20 4/20 30/2
30/9 30/12 30/14 30/16 30/21
30/22 30/23 46/10
200 [1] 7/14
2007 [4] 7/14 7/19 8/7 43/8
2010 [3] 29/22 43/21 55/11
2012 [4] 1/14 3/2 4/2 5/2
2013 [1] 61/13
2037 [1] 55/6
204 [2] 1/23 61/18
21 [10] 4/21 30/3 30/9 30/12
30/15 30/16 30/21 30/22 31/4
46/10
22 [11] 4/20 4/21 27/23 28/1
28/17 28/19 28/24 29/2 29/5 29/9
29/19
220 [1] 23/24

23 [12] 4/22 27/23 28/4 28/7
28/11 28/17 28/19 28/23 28/25
29/1 29/20 46/6
24 [8] 4/23 14/9 14/21 36/2 36/3
36/7 36/8 46/8
24007265 [1] 2/10
24036308 [1] 2/4
24077302 [1] 2/5
25 [10] 4/13 4/19 49/14 55/21
55/21 56/18 58/6 58/8 58/9 58/22
26 [2] 4/13 4/19
26th [3] 1/23 2/6 61/18
27 [3] 4/14 4/19 13/2
272 [1] 1/3
272nd [4] 1/8 1/22 61/4 61/17
28 [2] 4/21 4/22
285 [1] 24/8
29 [1] 4/22

**3**

30 [6] 4/20 4/20 4/21 4/21 59/3
59/5
30-day [1] 60/2
300 [3] 1/23 2/6 61/18
310 [1] 2/6
3235 [1] 2/12
35 [1] 13/8
36 [3] 4/14 4/23 4/23
37 [1] 4/10
3rd [1] 61/13

**4**

40 [4] 31/17 42/22 43/14 55/20
40-year [1] 54/24
404 [3] 33/17 34/1 34/3
408765 [1] 22/21
41 [1] 4/10
4221 [2] 1/24 61/19
4320 [1] 2/7
44 [1] 4/11
45 [3] 4/9 41/4 47/13
45-year-old [1] 58/9
4759 [1] 2/12

**5**

50 [2] 4/9 55/19
500 [1] 13/15
52 [1] 4/9
57 [1] 34/2

**6**

6482 [2] 1/22 61/16
6th [1] 31/12

**7**

77803 [2] 1/23 2/7
77803-3235 [1] 2/12
78703 [1] 61/19

**8**

85th [4] 17/15 18/12 23/1 26/7
8th [1] 7/19

**9**

919 [1] 23/25
979-361-4221 [2] 1/24 61/19
979-361-4320 [1] 2/7

979-822-4759 [1] 2/12

**A**

ability [2] 40/12 40/17
able [6] 20/13 27/1 28/10 47/22
52/25 54/4
about [17] 5/7 14/19 23/7 23/10
23/14 24/12 31/11 37/20 39/4
41/25 43/5 43/11 47/2 47/3 48/10
50/10 56/3
above [3] 1/15 61/5 61/7
above-styled [1] 61/7
above-titled [1] 1/15
act [2] 33/16 34/10
actions [1] 55/17
activity [1] 7/9
acts [4] 32/11 33/19 33/22 52/11
actual [2] 13/25 15/17
actually [8] 8/17 10/19 12/1 23/25
24/5 27/15 38/17 49/10
addition [2] 21/4 33/16
additional [5] 15/25 20/23 22/24
28/22 30/18
adjudicated [1] 39/12
adjudication [1] 31/23
admit [2] 25/3 34/13
admitted [21] 4/17 16/25 17/1
17/3 21/11 22/2 22/3 22/11 25/4
25/9 27/10 27/11 27/16 28/25 29/1
29/21 30/21 30/22 35/8 36/7 36/8
advice [1] 41/25
advisement [1] 32/24
afford [1] 59/8
afraid [1] 49/21
after [3] 43/5 56/23 56/23
afternoon [1] 53/11
again [5] 52/2 54/14 55/15 58/1
58/20
against [4] 8/18 25/14 32/2 57/22
age [1] 58/18
ages [1] 46/7
ago [4] 8/6 14/19 33/6 51/15
agree [5] 40/6 47/5 55/23 55/24
56/25
ahead [10] 5/13 5/15 5/23 6/11
12/14 36/1 41/6 53/6 53/8 59/19
air [1] 53/9
air-conditioner [1] 53/9
all [40] 5/9 5/23 6/7 8/9 8/18
10/24 14/25 15/1 21/19 25/3 25/8
26/12 32/21 34/4 36/1 39/22 40/13
41/16 42/3 43/11 44/2 44/6 45/13
47/21 48/1 48/7 48/19 49/3 49/14
49/15 50/11 54/3 54/12 57/14
57/14 58/24 59/14 60/4 61/5 61/7
allegation [1] 29/13
allegations [9] 16/1 33/5 34/15
34/16 36/14 36/15 39/23 40/2
56/17
alleged [2] 32/1 40/3
along [1] 28/5
Alpha [1] 18/6
ALPHABETICAL [1] 4/7
already [5] 15/17 16/15 22/11
45/25 59/11
also [27] 7/15 9/17 13/17 15/10
15/25 17/14 19/22 22/9 22/16

22/25 22/25 23/1 25/13 26/2 26/6
26/10 26/12 26/24 29/6 29/8 29/8
32/7 35/4 35/7 35/11 35/14 49/25
always [5] 39/20 45/4 50/16 50/23
51/20
Annette [4] 4/9 45/14 45/19 45/20
another [8] 24/7 25/14 25/18
37/18 43/15 46/1 55/15 55/21
answer [1] 52/5
Antonio [2] 13/2 13/19
any [40] 8/9 8/18 9/6 10/7 10/19
10/20 10/25 10/25 11/9 12/1 12/2
15/13 15/23 15/24 17/23 25/1
33/15 33/15 33/17 33/19 36/13
36/14 36/14 36/15 36/25 37/15
39/13 40/25 41/16 45/2 47/25
48/15 48/15 49/19 53/1 54/5 57/6
57/6 57/18 61/10
anybody [2] 52/23 57/20
anymore [1] 56/9
anyone [3] 8/12 41/20 41/20
anything [12] 9/7 10/8 11/1 11/7
15/24 32/6 39/8 41/14 41/18 48/25
50/10 53/12
anyway [2] 54/13 55/21
apologize [2] 45/20 45/22
appeal [5] 59/8 59/20 60/1 60/1
60/3
Appeals [1] 1/4
appear [2] 17/10 20/25
appears [2] 20/12 33/8
appellate [2] 59/11 59/12
applied [1] 38/4
appoint [3] 59/9 59/13 59/19
appointed [3] 59/11 59/12 59/17
appointment [1] 10/15
appreciate [1] 59/21
appreciated [1] 53/11
approach [1] 14/4
are [33] 6/24 7/7 14/21 16/2 16/2
20/3 23/14 24/9 27/24 27/25 28/17
28/25 29/10 30/3 30/5 30/20 30/21
37/12 45/23 46/4 46/7 47/25 49/10
49/13 49/19 54/11 54/12 54/14
55/15 58/2 58/11 59/4 59/14
area [1] 7/8
aren't [1] 58/13
ARGUMENT [2] 54/2 56/11
arguments [1] 54/1
around [3] 35/4 35/5 39/5
arraign [1] 5/13
arrest [3] 8/17 9/2 30/24
arrested [4] 7/24 43/8 55/8 55/11
as [82]
ask [9] 14/9 18/6 36/20 42/15
55/24 58/3 58/7 58/21 59/13
asked [2] 31/10 55/4
asking [2] 55/19 56/6
assesses [1] 59/2
assign [1] 19/16
assigned [1] 22/21
assignment [1] 7/3
Assistant [1] 2/6
assisted [1] 45/2
ATF [1] 7/16
attempt [1] 57/7
attempted [1] 57/18

**A**

attention [1] 7/10
attorney [3] 2/3 2/9 23/2
Attorney's [1] 12/23
Attorneys [1] 2/6
attribute [1] 39/7
August [1] 7/19
authenticated [2] 15/9 20/24
aware [1] 47/25

**B**

back [15] 9/4 9/12 10/13 11/24
 11/24 23/13 31/9 32/22 32/25
 37/22 40/19 43/1 48/5 51/21 55/14
bad [10] 32/11 33/19 33/21 40/9
 41/18 41/21 42/3 48/4 52/11 56/3
bag [4] 9/16 9/17 10/21 11/23
bank [2] 9/16 9/17
basis [2] 26/14 34/14
be [45] 1/15 6/2 10/11 12/10
 17/25 20/12 20/25 22/10 24/20
 27/10 31/12 33/8 33/25 35/5 36/20
 40/19 42/11 42/16 42/18 42/25
 46/10 46/11 46/21 46/22 48/3
 48/18 49/11 49/14 49/22 52/17
 52/20 52/21 52/22 54/4 54/22
 56/13 56/13 56/14 56/25 58/6
 58/18 59/2 59/12 61/6 61/12
bearing [1] 18/9
because [13] 16/20 23/10 38/9
 38/18 43/2 47/21 49/5 55/1 55/20
 56/4 56/14 57/22 59/25
bed [1] 56/4
been [37] 6/13 7/1 7/5 9/23 9/24
 12/16 13/6 15/3 15/10 17/3 20/2
 20/24 21/2 21/11 22/6 22/11 24/13
 25/9 37/7 39/11 40/21 41/23 42/1
 44/11 45/15 47/17 47/22 47/22
 48/15 50/16 54/17 55/7 55/8 55/9
 55/10 57/22 57/24
before [4] 1/16 13/3 13/5 27/15
behalf [1] 56/6
behind [3] 56/7 57/4 57/21
being [5] 9/22 15/9 15/21 21/3
 54/10
believe [5] 21/24 37/24 38/18 55/8
 58/2
belong [1] 19/13
belonged [1] 28/15
benefit [3] 55/3 55/5 55/15
Besides [1] 13/16
better [3] 38/4 38/7 54/5
between [1] 43/13
beyond [2] 24/14 34/5
birthday [1] 47/15
bit [1] 47/3
black [2] 9/12 9/16
blood [1] 48/20
both [12] 6/2 16/5 20/2 24/21
 24/24 27/24 28/17 30/3 30/6 55/16
 56/18 59/1
boy [4] 12/20 46/24 46/25 47/1
boys [5] 44/2 44/2 44/3 44/4 46/4
BPD [3] 6/20 6/22 7/3
brand [1] 43/10
brand-new [1] 43/10

BRAZOS [14] 1/7 1/17 12/22
 17/16 18/12 19/11 22/25 26/7
 30/25 31/7 47/17 61/2 61/4 61/18
breaking [1] 54/18
briefly [2] 13/13 16/4
bring [2] 32/8 32/9
broken [1] 52/21
brother [2] 37/17 46/1
Bryan [11] 1/16 1/17 1/23 2/7
 2/12 4/12 6/9 6/12 6/18 37/25
 61/19
bullets [1] 57/3
burglary [6] 17/16 18/14 22/5
 25/10 25/15 31/20
Burleson [3] 29/25 43/18 55/12

**C**

caliber [1] 57/3
call [9] 6/7 12/8 12/9 36/23 37/1
 45/9 45/10 52/25 53/23
called [2] 19/5 45/21
calls [2] 6/9 7/8
CALVERT [5] 2/4 12/18 25/7
 27/13 54/2
came [3] 1/15 19/1 49/1
can [17] 12/6 17/17 20/6 21/20
 23/16 26/19 32/20 34/7 37/10
 39/15 40/25 45/3 45/8 45/18 53/22
 54/3 60/1
can't [4] 21/6 21/8 43/2 59/8
cane [2] 49/2 49/3
canes [1] 48/25
capable [1] 54/10
car [3] 9/4 10/14 53/9
card [5] 4/23 10/12 10/19 36/2
 36/3
care [1] 54/11
career [2] 13/9 13/23
carry [1] 57/16
carrying [2] 43/9 54/19
case [21] 9/18 9/19 14/22 16/9
 16/17 18/3 19/11 22/13 23/12
 23/23 23/25 24/1 24/7 24/17 28/11
 40/11 49/9 54/5 54/4 58/1 59/8
cases [3] 13/25 24/9 39/12
cause [20] 1/3 1/16 16/10 17/15
 18/3 18/10 19/11 19/20 19/23
 22/14 22/17 22/24 22/25 23/10
 25/14 25/22 25/25 26/2 26/15 61/7
Certainly [2] 21/20 23/6
certified [24] 6/24 7/1 13/6 15/2
 16/14 16/20 18/9 19/4 19/7 20/3
 22/7 23/17 24/1 24/2 24/3 24/5
 24/20 25/20 27/24 28/1 28/4 28/18
 30/3 34/8
certify [3] 61/5 61/9 61/11
chambers [1] 61/7
change [11] 40/23 40/25 42/7
 43/1 50/19 50/21 51/19 51/20
 51/25 52/4 55/5
changed [1] 42/12
changing [1] 43/5
charge [1] 53/12
charged [2] 29/12 29/16
charges [1] 32/18
CHARLES [1] 2/4
Charmaine [1] 52/25

chase [1] 57/6
chicken [1] 49/23
child [2] 46/13 46/16
childhood [2] 37/22 38/22
children [7] 37/15 41/21 43/25
 44/5 46/4 47/4 54/11
choices [2] 40/9 55/17
choose [1] 39/15
CHRONOLOGICAL [2] 3/1 4/1
circumstantial [1] 23/5
cite [2] 23/24 24/16
cited [2] 24/8 24/18
classification [2] 13/16 13/18
clear [2] 32/20 54/21
client [1] 27/1
client's [1] 21/5
close [4] 13/8 44/23 46/17 53/25
CLOSING [2] 54/2 56/11
club [1] 11/15
coat [2] 57/4 57/8
College [1] 13/4
come [2] 34/9 40/19
committed [2] 34/10 40/3
committing [1] 55/2
communicated [1] 55/16
communities [1] 54/22
community [3] 54/22 54/25 56/8
compare [5] 18/20 21/6 21/8
 28/10 30/8
compared [1] 22/6
comparison [4] 13/11 13/16 13/19
 13/20
compartment [1] 9/13
completed [1] 37/24
complied [1] 58/25
computerized [1] 1/18
concerns [3] 49/19 49/25 56/21
concluded [1] 60/5
Condition [1] 34/2
conditioner [1] 53/9
confinement [2] 35/19 35/22
consider [2] 34/5 38/25
Consistently [1] 41/24
constantly [1] 17/18
contain [6] 19/19 19/22 25/13
 28/7 30/6 33/5
contained [11] 17/24 20/17 21/1
 22/21 25/23 26/3 32/7 33/15 33/19
 34/11 36/15
containing [1] 19/8
contains [8] 15/25 20/11 22/5
 22/16 24/23 25/10 31/20 61/5
continue [1] 33/14
CONTINUED [2] 25/6 27/12
continuing [1] 52/12
convenient [1] 24/21
convicted [7] 15/10 16/10 16/17
 17/14 24/13 25/1 55/9
convicting [2] 29/22 33/2
conviction [13] 22/13 24/5 24/15
 24/16 24/25 27/16 29/21 30/24
 31/4 31/13 42/11 42/17 42/22
convictions [4] 31/20 40/7 42/20
 56/15
convoluted [1] 21/19
cooperated [2] 8/20 45/4
copies [4] 20/3 27/24 28/18 30/3

copy [16] 15/2 16/14 16/21 18/9
 19/4 22/7 23/17 24/1 24/2 24/3
 24/5 24/20 25/20 28/2 28/4 34/8
correct [21] 6/20 8/23 11/4 11/25
 12/2 12/3 19/2 19/9 21/24 25/11
 25/12 27/2 31/24 32/4 32/5 34/18
 35/6 35/13 41/1 43/25 61/5
corrected [1] 45/20
correctly [1] 61/9
cost [1] 61/11
could [5] 6/16 38/4 38/7 52/21
 55/13
counsel [8] 15/3 16/6 20/2 55/4
 59/8 59/11 59/12 61/6
counseling [1] 35/15
counts [2] 6/3 59/2
county [20] 1/7 1/17 12/22 17/7
 17/16 18/12 19/11 22/25 26/7
 29/25 30/25 31/7 35/8 43/14 43/19
 47/17 54/21 55/12 61/2 61/18
couple [5] 15/7 32/25 43/14 48/25
 50/5
courses [1] 13/18
court [23] 1/3 1/4 1/6 1/22 1/22
 5/12 6/17 7/15 17/15 24/11 26/6
 26/7 33/9 34/17 35/9 52/5 58/23
 59/1 61/4 61/4 61/7 61/17 61/17
court's [1] 24/3
courtroom [1] 57/20
CR [1] 1/4
CRF [1] 1/3
crime [1] 13/20
crimes [2] 40/3 55/2
criminal [3] 33/12 34/17 59/4
Cross [5] 4/8 8/4 36/10 41/7 50/3
CROSS-EXAMINATION [4] 8/4
 36/10 41/7 50/3
crystal [3] 7/25 9/19 9/22
CSI [1] 11/5
CSR [3] 1/22 61/16 61/16
cumulative [1] 29/9
current [1] 7/3

**D**

D.A.'s [1] 13/5
dad [3] 46/3 49/8 55/4
Damian [1] 46/11
Danielle [1] 46/6
date [2] 10/13 31/11
daughter [2] 44/18 46/12
Dave [9] 14/22 19/14 22/20 23/1
 26/10 51/10 51/11 51/12 52/15
Dave's [1] 52/22
DAVID [16] 1/8 10/9 16/8 20/15
 27/1 37/12 39/15 42/3 43/25 45/23
 46/10 46/15 47/13 50/6 51/8 51/11
David's [1] 41/10
day [10] 1/14 7/17 40/22 48/5
 48/14 54/4 54/13 58/17 60/2 61/13
deadline [1] 60/3
deal [2] 55/1 56/8
debt [2] 58/12 58/14
deceased [1] 13/21
December [1] 47/15
decide [2] 58/6 58/20
decision [2] 56/25 58/5
defendant [33] 2/9 5/13 7/11 7/11

3

**D**

defendant... [29]  7/13 14/20 14/22 16/5 16/9 16/15 17/14 18/22 22/6 22/8 22/12 22/15 23/1 24/13 24/16 25/14 27/19 28/11 28/15 29/22 30/9 30/13 31/22 32/2 33/2 35/7 54/5 55/16 58/25
defendant's [5]  3/16 14/13 14/16 24/4 24/25
defense [7]  5/10 15/3 20/2 21/24 21/25 23/2 45/3
deferred [2]  31/22 33/3
degree [3]  49/11 56/13 56/20
Denise [4]  1/22 61/4 61/15 61/16
Department [3]  13/4 13/20 59/4
depending [1]  49/9
describe [1]  13/13
DESCRIPTION [1]  4/17
detection [1]  13/11
diabetes [2]  48/7 48/16
diabetic [3]  48/4 48/18 58/10
did [51]  8/18 8/25 9/2 10/19 10/21 11/10 11/13 11/13 11/19 11/23 13/1 14/17 14/18 15/12 17/25 18/2 18/20 18/23 18/24 28/13 28/14 30/8 30/10 30/11 33/11 34/16 35/7 35/11 37/22 37/22 38/1 38/2 38/10 38/11 38/13 38/14 38/22 42/15 42/16 42/22 43/5 43/8 43/16 48/25 51/19 51/24 52/3 53/12 53/13 54/5 57/6
didn't [11]  8/15 11/9 12/1 23/25 24/1 38/18 42/18 45/4 55/14 57/8 57/9
die [2]  49/21 55/25
diet [1]  48/19
different [2]  42/21 57/23
dire [4]  20/7 20/9 26/20 26/22
direct [10]  4/8 6/14 7/10 12/17 25/6 27/12 36/14 37/8 45/16 53/5
direction [1]  39/16
DISTRICT [8]  1/6 1/8 1/22 2/6 12/23 17/15 61/4 61/17
Division [1]  59/3
do [58]  5/12 5/16 5/21 5/25 7/11 7/12 7/13 7/17 7/20 9/3 9/11 9/11 12/21 12/21 13/1 14/11 15/16 19/4 19/6 21/4 21/19 30/6 30/7 30/12 32/16 33/18 33/21 33/23 35/16 36/17 37/14 37/14 37/19 38/1 38/9 38/14 39/4 39/7 40/14 40/18 42/9 43/13 43/18 44/8 44/10 49/17 50/12 51/12 51/21 51/24 53/1 54/12 54/13 55/21 56/8 58/2 58/6 61/4
docket [1]  24/2
document [9]  16/14 16/21 18/7 19/7 23/18 24/18 32/17 34/12 34/14
documentary [2]  24/23 25/1
documents [3]  20/3 27/24 30/4
does [30]  17/10 17/12 19/13 19/13 19/15 19/16 19/18 19/19 19/21 19/22 19/24 25/13 25/16 26/6 26/9 28/7 28/9 31/16 31/18 31/25 32/3 33/5 35/4 35/7 35/10 35/14 35/17

48/12 49/2 58/17
doesn't [1]  51/15
doing [7]  13/20 23/21 23/22 42/1 42/6 42/7 44/15
don't [20]  16/6 21/5 21/9 21/12 21/13 34/7 36/13 38/19 41/16 41/18 41/20 42/25 43/17 43/23 43/23 48/17 50/14 54/6 54/15 60/2
done [7]  12/24 38/4 38/7 42/4 43/4 52/11 54/22
doubt [2]  24/14 34/5
down [6]  12/6 29/14 45/8 52/21 53/22 55/12
driver's [1]  24/4
driving [5]  7/22 8/8 8/11 31/5 57/4
drug [2]  9/20 43/10
drugs [2]  43/9 54/20
DUANE [1]  1/8
due [4]  48/5 49/4 58/18 58/18
duly [4]  6/13 12/16 37/7 45/15
during [2]  7/25 39/23
duties [1]  7/7
DWI [1]  24/1

**E**

Each [1]  58/17
EARL [2]  2/10 21/25
earlier [1]  25/9
East [3]  1/23 2/6 61/18
easy [1]  55/23
effect [2]  44/5 44/8
eight [1]  13/19
element [1]  15/22
elements [2]  24/19 24/22
else [1]  56/1
end [1]  58/7
endanger [1]  11/9
endangering [1]  8/12
enforcement [1]  54/25
enhance [1]  58/6
enhanced [1]  56/16
enhancement [9]  5/19 5/21 5/24 16/1 49/12 56/18 56/19 58/21 59/2
enhancements [3]  5/18 49/10 49/13
enough [4]  42/25 43/1 54/9 54/10
entire [2]  5/17 57/20
entry [1]  24/3
especially [1]  56/22
essentially [1]  19/8
establish [3]  24/13 24/24 34/9
evading [1]  30/24
even [3]  53/15 57/19 57/22
ever [4]  38/16 41/20 54/4 57/17
every [5]  34/11 48/5 48/14 54/13 58/17
everything [3]  36/12 45/4 57/12
everywhere [1]  49/15
evidence [10]  9/7 16/7 16/16 24/19 25/1 27/8 49/1 57/10 58/1 61/5
exactly [2]  39/17 49/22
EXAMINATION [14]  6/14 8/4 12/17 20/9 25/6 26/22 27/12 36/10 37/8 41/7 44/21 45/16 50/3 52/9
example [1]  52/20

exceeding [1]  8/12
exclusive [1]  23/21
excused [4]  12/11 12/12 36/20 36/21
excuses [1]  39/13
exhibit [51]  4/15 4/17 14/9 14/21 15/2 15/5 16/6 16/11 17/1 17/3 17/10 17/13 18/5 18/17 18/18 18/21 19/4 20/11 21/23 22/3 22/10 22/15 22/23 25/4 25/8 25/17 25/23 26/4 26/7 26/8 26/14 26/16 26/24 27/7 27/11 27/15 28/1 28/4 28/7 28/11 28/23 29/1 29/20 31/4 31/9 31/19 31/21 33/1 36/2 36/3 36/8
exhibits [10]  4/16 20/1 20/4 27/23 28/17 28/19 30/2 30/16 30/22 61/9
exist [2]  32/12 32/12
existence [1]  24/24
exists [1]  24/15
expected [1]  54/12
expert [1]  20/18
expiration [2]  15/21 61/20
expired [3]  7/21 8/10 15/11
explain [1]  21/21
explained [1]  49/7

**F**

fact [4]  15/10 38/10 42/11 52/24
facts [2]  15/15 36/15
failed [2]  35/14 35/15
fair [4]  9/8 40/5 47/10 49/23
fairly [1]  38/2
family [1]  41/16
far [6]  37/22 38/24 38/24 40/10 47/3 48/16
father [2]  45/25 47/6
feel [1]  56/3
fees [1]  35/12
felon [1]  15/20
felonies [2]  43/15 54/18
felony [10]  15/11 17/4 22/4 27/17 42/11 42/17 42/19 49/11 55/11 56/13
few [1]  41/9
final [2]  24/20 54/1
finally [4]  12/10 12/12 36/20 36/21
find [10]  9/11 9/11 17/25 18/24 28/14 30/11 56/17 56/19 58/3 58/20
finding [1]  17/13
finds [1]  59/1
fingerprint [7]  4/23 13/10 13/18 13/18 22/5 36/2 36/3
fingerprints [7]  13/16 14/15 20/12 23/14 28/8 28/10 28/12
finish [1]  5/8
firearm [2]  10/4 10/4
firm [1]  44/24
first [17]  5/20 6/7 6/13 12/16 14/25 37/7 37/13 37/20 41/10 43/14 44/18 44/19 45/15 50/6 50/22 52/22 59/25
fishing [1]  53/19
five [8]  7/6 15/11 15/21 27/19 35/22 41/5 48/9 48/10
five-years [1]  35/22

fixing [2]  46/10 46/11
flip [4]  17/9 18/16 32/22 32/25
flipping [2]  31/21 31/25
Flowers [3]  23/24 23/24 24/17
focus [1]  56/23
folks [1]  40/25
follow [3]  21/18 54/6 54/15
following [1]  1/14
follows [4]  6/13 12/16 37/7 45/15
force [1]  8/18
foregoing [1]  61/5
Forty [1]  41/5
Forty-five [1]  41/5
found [14]  7/25 10/7 10/9 10/25 22/10 26/3 28/15 30/12 33/9 34/17 35/15 39/9 49/10 57/8
four [3]  12/5 31/17 54/18
fourth [2]  42/11 42/16
front [1]  16/7
fully [1]  8/20
furnished [1]  33/24
further [10]  12/5 21/25 22/1 36/19 44/20 45/7 52/8 53/21 61/9 61/11

**G**

gave [2]  48/19 54/24
GED [1]  38/12
generous [1]  52/17
get [10]  9/6 11/23 12/1 16/19 23/15 23/17 37/22 50/14 53/1 57/7
gets [3]  22/15 23/7 55/4
getting [4]  5/8 13/8 39/1 47/6
girl [5]  44/2 44/3 44/4 46/4 46/24
girlfriend [1]  10/14
give [1]  5/8
given [2]  33/18 40/18
goes [3]  23/13 28/5 49/5
going [37]  7/10 13/21 14/7 16/23 17/2 17/9 18/4 18/6 19/3 20/1 23/7 25/17 26/12 26/14 29/18 30/2 31/12 32/22 32/25 34/2 34/13 34/14 37/22 42/7 42/16 44/9 48/5 52/3 52/22 53/6 54/6 54/16 55/1 55/18 55/25 57/15 58/18
gone [1]  53/9
good [13]  5/4 5/5 6/16 22/5 22/8 23/11 39/19 39/19 40/10 43/4 44/16 52/13 57/16
got [14]  32/23 37/18 50/21 50/24 51/3 51/19 51/24 52/3 53/10 55/3 55/11 55/13 55/14 55/20
gotten [1]  39/11
grab [1]  11/13
grabbed [1]  24/10
grade [1]  37/24
grades [1]  38/16
grams [1]  9/19
Granberry [1]  2/11
grand [1]  46/13
grandbaby [2]  44/19 46/8
grandchild [2]  44/19 46/22
grandson [1]  53/16
granted [1]  34/20
granting [1]  31/22
GRAY [13]  2/10 2/11 8/5 20/10 23/8 26/23 36/11 37/9 44/22 45/17

4

**G**

GRAY... [3] 52/10 56/10 56/11
great [1] 44/19
GREER [26] 1/8 4/9 4/10 5/21
10/9 14/22 16/8 19/14 20/15 22/20
23/1 26/10 27/1 37/1 37/6 37/10
37/12 41/9 44/23 45/10 45/14
45/19 51/10 58/24 59/7 59/25
Greg [4] 4/13 12/9 12/15 12/20
Grimes [3] 17/7 43/14 54/21
ground [1] 49/6
growing [1] 47/2
guess [8] 9/3 10/3 40/25 44/24
46/21 47/20 49/22 53/15
guilt [2] 15/22 29/7
guilt/innocence [1] 15/22
guilty [1] 56/3
gun [10] 8/1 9/17 10/24 11/5 11/8
43/9 43/11 57/7 57/13 57/16
guns [1] 54/19
guys [3] 39/10 39/11 47/22

**H**

habitation [6] 17/16 18/14 22/5
25/10 25/15 31/21
half [1] 13/4
hand [3] 11/15 11/21 61/13
handcuffs [1] 9/3
handgun [1] 10/5
hanging [2] 35/4 35/5
happen [1] 41/18
happened [1] 7/23
happens [1] 56/3
happy [1] 56/25
hard [1] 58/18
harm [1] 57/18
harmed [1] 57/17
hasn't [2] 20/24 42/12
have [76]
haven't [2] 34/3 48/24
having [6] 6/13 12/16 13/17 37/7
43/9 45/15
he'd [2] 40/19 49/14
he'll [2] 49/21 52/23
he's [43] 12/12 37/13 37/18 39/20
40/4 40/10 40/18 41/4 42/1 42/7
42/7 42/10 42/19 43/4 44/15 46/14
46/15 47/22 48/4 48/9 48/16 49/22
52/11 54/10 54/17 54/18 54/19
54/19 54/20 55/1 55/6 55/7 55/8
55/9 55/10 55/20 55/25 56/15
56/16 56/18 57/22 59/10 59/18
head [3] 49/24 50/1 50/15
health [3] 47/25 48/6 49/25
hear [2] 37/10 53/6
heard [4] 39/22 45/25 47/2 52/11
hearings [1] 56/22
hearsay [15] 9/23 10/16 10/22
15/9 16/13 16/14 16/20 16/20
17/22 20/25 23/17 32/7 34/11
34/11 53/4
held [2] 1/15 1/17
help [8] 39/20 50/19 50/21 50/23
50/24 51/2 52/23 52/23
helped [1] 53/2
helpful [1] 39/20

Hennessy [1] 59/23
her [5] 53/2 53/9 53/10 53/10
53/12
here [16] 16/17 23/10 24/12 30/24
31/7 35/21 37/24 39/23 43/4 47/17
49/7 54/3 54/14 55/15 55/24 56/7
hereby [2] 59/4 61/5
high [3] 38/18 48/20 57/6
highest [1] 38/16
him [53] 7/14 7/14 7/18 7/20 7/23
8/8 8/17 9/2 9/3 9/4 11/17 16/18
27/9 28/12 29/14 29/22 38/20
40/12 40/21 40/25 41/12 41/14
41/16 41/19 41/23 41/25 43/1 43/5
43/9 44/7 46/19 48/19 48/24 50/10
50/12 50/14 50/16 50/19 50/21
50/23 50/24 51/2 52/17 53/10
53/14 54/13 54/24 55/1 55/13
55/14 56/5 58/6 59/19
himself [2] 38/5 56/1
hired [1] 59/15
his [85]
hits [1] 49/6
Hold [1] 5/20
Honor [4] 12/10 36/22 44/20 59/6
Honorable [1] 1/16
horribly [1] 47/10
hours [1] 13/15
houses [1] 54/19
Houston [1] 7/15
how [17] 5/21 5/25 6/22 7/1 7/5
7/13 12/24 13/6 21/18 23/13 37/12
37/22 38/1 38/14 41/3 45/23 53/2
However [1] 58/5
huh [17] 40/6 40/16 41/5 42/5
43/7 45/5 46/2 46/6 46/14 46/23
47/14 47/19 47/24 48/11 49/5 51/8
52/16
human [1] 52/25
hurdle [2] 16/19 23/19
hurdles [1] 23/15
hurt [1] 11/11
husband [2] 47/5 50/6

**I**

I'd [3] 29/6 37/20 59/13
I'll [7] 5/11 14/9 25/3 36/9 41/2
50/2 59/8
I'm [32] 7/4 7/10 12/22 14/7
16/23 17/2 17/9 17/18 18/4 18/6
19/3 19/25 21/18 21/24 24/12
25/17 26/12 26/14 29/18 30/2
32/22 32/25 34/13 34/14 38/20
49/21 50/9 53/6 54/6 54/15 55/19
56/6
I've [7] 13/15 13/17 14/8 18/4
27/22 32/23 39/10
identifiable [2] 23/8 27/3
identification [4] 13/10 14/8 18/5
27/23
identify [2] 20/13 21/2
identifying [4] 10/7 10/8 13/21
21/15
identity [2] 24/25 27/9
III [1] 1/16
importantly [1] 53/15
impressions [1] 14/13

incarcerated [1] 38/11
included [2] 26/25 61/6
including [1] 24/22
incorporate [1] 21/11
INDEX [4] 3/1 4/1 4/7 4/15
indicate [4] 31/16 31/25 35/7
35/14
indicated [1] 8/22
indication [2] 29/7 57/17
indications [1] 57/5
indicator [1] 40/8
indictment [7] 4/21 28/2 28/5
28/19 29/6 29/7 29/11
indigent [1] 59/18
individual [12] 16/9 16/16 19/1
19/14 19/16 22/12 22/20 23/20
26/10 40/10 54/23 56/4
individuals [1] 56/7
information [4] 10/7 10/20 17/24
24/24
initiated [1] 7/9
injury [1] 48/6
inked [1] 14/13
innocence [1] 15/22
ins [1] 56/15
Institutional [1] 59/3
insulin [2] 48/4 48/12
intelligence [1] 38/9
interact [1] 53/14
interrupting [1] 17/18
investigator [5] 12/22 13/24 14/7
16/23 25/9
involved [1] 54/20
is [165]
isn't [2] 44/11 52/15
issues [2] 48/15 58/2
It'll [1] 27/10
it's [43] 14/13 15/2 15/18 16/14
16/20 16/20 16/25 18/8 20/25 21/5
21/9 21/10 21/19 22/7 23/4 23/16
23/17 26/1 26/15 29/6 29/8 29/8
29/16 31/12 32/7 32/8 32/15 34/8
40/22 40/24 49/12 54/10 55/23
55/23 56/4 56/20 57/13 57/13
57/14 57/14 57/16 57/22 58/15
itself [1] 56/24

**J**

jacket [1] 24/3
jail [7] 29/25 40/21 43/14 43/18
47/17 47/22 48/16
jailer [1] 54/6
Jones [1] 2/11
judge [67]
judgment [62]
judgments [7] 19/8 19/10 23/13
33/18 40/2 58/2 58/13
JUDICIAL [2] 1/8 17/15
jury [8] 16/7 17/11 17/14 17/25
22/10 39/24 49/1 54/21
jury's [1] 56/25
just [29] 5/7 5/8 5/18 10/3 13/17
15/13 15/14 15/19 17/3 19/7 24/9
24/17 25/8 27/16 29/21 32/11 33/6
34/7 35/25 40/9 41/9 46/12 48/6
49/5 49/6 50/5 50/10 58/13 59/13
Justice [1] 59/4

**K**

keep [1] 36/1
Kenneth [3] 4/10 37/1 37/6
kids [3] 50/17 53/15 53/19
kind [15] 7/9 10/7 10/25 10/25
12/1 23/4 32/10 35/12 36/25 37/19
39/18 44/4 47/25 49/20 57/6
knee [1] 49/5
knew [2] 42/21 43/10
know [44] 7/8 10/5 21/10 23/23
34/2 38/14 38/19 38/24 38/25
39/20 39/21 40/10 40/24 41/17
42/3 42/6 42/16 42/18 42/19 42/22
43/2 43/3 43/4 43/8 43/12 43/13
43/16 43/17 43/18 43/23 43/24
45/20 46/3 48/17 48/23 49/18
49/19 50/9 54/9 54/20 55/4 57/13
57/19 60/2
knowledge [3] 36/14 53/1 53/5

**L**

lab [3] 9/23 11/3 32/9
lack [1] 23/8
last [6] 26/25 42/22 44/24 51/3
55/6 55/20
late [1] 40/24
Latent [1] 13/20
later [1] 37/21
law [9] 23/12 39/2 40/4 44/24
47/7 54/24 56/16 56/24 57/22
laws [1] 8/9
lawyer [2] 59/20 59/24
least [1] 55/8
leather [2] 9/12 9/18
led [1] 57/5
LEE [1] 2/5
left [2] 35/8 45/21
legs [3] 48/5 48/23 49/4
lesser [1] 29/14
let [1] 32/19
let's [1] 55/21
level [3] 59/25 60/1 60/3
license [2] 10/8 24/4
lie [1] 56/5
life [15] 37/21 39/16 40/24 41/23
42/1 42/4 44/5 46/19 47/3 48/8
49/14 49/16 56/18 57/16 58/7
lifestyle [1] 55/17
lifetime [1] 54/7
like [8] 9/7 24/8 37/20 39/5 48/9
48/25 51/15 59/11
likelihood [1] 40/14
limit [1] 8/12
Linden [1] 38/16
link [3] 23/19 27/1 27/9
linked [3] 22/8 22/14 24/16
linking [1] 10/8
links [1] 16/18
list [2] 59/13 59/22
listed [6] 16/17 22/9 24/4 25/11
33/6 34/1
listened [1] 40/1
listing [1] 49/2
litany [1] 24/9
literally [2] 54/7 55/18
little [4] 6/23 7/2 46/25 47/3

5

## L

live [2]  5/12 57/17
lives [1]  54/13
living [1]  12/21
long [9]  6/22 7/1 7/5 12/24 13/7 23/13 49/20 51/15 58/10
longer [1]  54/25
look [1]  18/6
looking [2]  49/14 56/18
lose [2]  56/23 59/25
lost [1]  60/2
lot [4]  9/13 38/7 48/24 52/11
lots [2]  23/12 23/12
love [7]  41/12 41/14 41/16 41/17 44/7 50/10 50/11
low [1]  58/7
lowest [1]  57/3
Lynette [1]  45/22

## M

ma'am [2]  50/5 53/22
machine [1]  1/19
made [6]  11/10 18/17 38/15 38/16 54/21 56/4
magical [1]  23/14
Main [1]  2/11
make [2]  38/20 39/13
makes [1]  48/20
making [1]  42/13
man [2]  51/17 57/11
many [2]  14/2 14/3
marijuana [2]  32/4 34/24
marked [4]  5/8 14/8 18/4 27/22
Mary [1]  59/23
match [3]  21/4 26/7 30/13
matched [1]  22/6
max [1]  55/13
maximum [1]  56/14
may [19]  12/10 14/4 14/6 17/20 20/25 21/17 24/20 24/21 32/11 32/11 32/12 32/12 33/14 34/9 38/11 56/24 56/25 58/6 61/13
mean [15]  21/6 34/1 38/2 39/15 40/9 42/9 42/15 43/2 43/3 43/23 44/8 44/9 52/13 54/17 58/13
means [1]  24/21
mentioned [1]  46/3
messages [1]  45/21
methamphetamine [6]  7/25 9/20 16/11 17/5 31/14 57/14
methamphetamines [4]  9/22 35/1 35/3 57/15
might [4]  11/11 25/2 53/2 60/2
minimum [1]  49/14
minor [1]  44/15
minute [1]  33/6
minutes [1]  14/19
misdemeanor [2]  43/22 55/12
miss [1]  60/2
mode [1]  24/18
mom [2]  37/21 45/10
moment [1]  5/8
month [1]  46/11
months [3]  44/25 45/1 45/2
more [4]  41/14 41/17 50/10 53/15
morgue [1]  13/21

morning [5]  5/4 5/5 6/16 18/20 24/10
most [1]  38/23
mother [2]  45/24 55/25
motivation [1]  43/1
move [1]  27/15
moving [1]  13/5
Mr [26]  5/21 6/15 8/5 12/18 20/10 23/8 25/7 26/23 27/13 27/14 36/11 37/9 37/10 41/8 41/9 44/22 44/23 45/17 50/4 52/10 54/2 56/10 56/11 58/24 59/7 59/25
Ms [1]  45/10
much [1]  52/1
multiple [3]  42/10 42/19 55/9
must [1]  24/14
my [9]  7/8 10/13 21/5 27/1 41/16 41/17 44/24 51/10 61/13
myself [1]  50/9

## N

name [7]  6/16 12/19 22/22 45/18 51/5 51/10 51/11
named [4]  19/14 22/20 23/1 26/10
nature [3]  11/1 11/7 15/24
natured [1]  39/19
necessarily [1]  48/24
need [5]  5/13 5/16 21/15 39/20 48/18
needs [1]  56/2
never [6]  11/6 38/20 43/12 54/4 58/13 58/15
new [1]  43/10
next [12]  12/8 23/7 31/25 34/25 35/2 36/23 45/9 53/23 55/21 59/22 60/1 60/3
nice [1]  54/10
nine [1]  44/25
ninth [1]  37/24
no [76]
No. [2]  1/3 22/18
No. 12-03324-CRF-272 [1]  1/3
No. 15341 [1]  22/18
Nods [2]  49/24 50/1
normal [2]  38/22 38/25
normally [1]  56/12
not [64]
noted [1]  6/2
nothing [6]  12/5 23/14 44/20 45/7 52/8 53/21
notice [6]  33/17 33/18 33/19 33/25 34/1 34/3
notifying [1]  35/9
November [5]  1/14 3/2 4/2 5/2 31/12
now [24]  7/10 8/22 11/6 13/8 14/24 16/24 17/2 17/9 18/4 18/16 19/3 19/3 25/17 27/14 27/22 30/2 31/9 32/24 44/16 46/21 50/18 54/7 54/16 55/9
nowadays [1]  38/25
numb [1]  48/5
number [12]  16/10 18/10 19/17 22/21 22/23 24/22 25/22 25/25 26/2 26/15 32/1 42/18
numbered [2]  1/16 61/7
numbers [1]  42/21

## O

object [13]  9/21 15/8 15/16 16/2 20/21 20/24 27/6 29/6 29/8 29/9 29/15 32/6 32/13
objected [2]  21/10 27/7
objecting [1]  33/17
objection [21]  10/16 10/22 16/13 16/22 17/18 17/21 20/22 21/25 22/1 25/5 26/18 28/23 28/24 29/3 29/19 32/23 33/15 33/21 34/19 36/5 53/4
objections [4]  20/23 28/22 30/18 30/20
observed [1]  8/8
obtain [1]  38/12
obviously [4]  40/11 40/17 40/24 58/7
occasion [3]  13/24 18/20 30/8
occasions [1]  14/2
occurred [3]  38/11 57/2 61/7
occurs [1]  49/9
October [1]  29/22
off [5]  11/3 18/22 24/3 53/1 59/13
offense [9]  19/23 24/14 27/17 33/2 35/18 56/12 56/24 57/13 57/13
offenses [2]  55/9 58/16
offer [7]  15/1 20/1 26/14 28/17 30/14 35/25 36/1
offered [10]  4/17 15/6 15/14 16/7 20/5 26/17 28/20 30/17 36/4 61/10
offering [1]  29/10
office [4]  12/23 13/5 13/20 47/21
officer [14]  6/24 7/1 7/4 7/5 7/7 10/12 10/20 12/6 12/10 13/2 13/6 13/23 35/8 35/9
officers [3]  57/5 57/9 57/9
Official [4]  1/22 61/4 61/13 61/17
oh [14]  5/13 38/6 39/5 41/13 41/20 42/2 42/21 43/7 46/17 48/2 48/17 52/14 52/19 53/17
okay [76]
old [3]  39/6 41/3 58/9
older [2]  39/9 39/10
one [40]  5/19 5/25 15/3 16/9 16/16 18/25 19/10 21/3 21/10 22/9 22/12 23/11 23/16 23/21 23/23 24/15 29/24 32/10 32/20 33/11 34/3 34/16 34/25 35/2 37/16 38/15 43/17 44/3 44/4 44/6 44/13 46/4 47/20 49/12 52/22 55/20 56/1 56/19 59/9 59/22
only [7]  10/1 16/19 23/9 34/14 46/22 50/9 53/15
open [1]  61/7
opening [3]  6/4 6/5 37/1
opportunities [1]  42/10
opportunity [2]  40/19 46/16
order [2]  33/1 42/6
ordered [1]  35/16
original [1]  31/10
other [14]  8/10 16/19 23/11 24/17 28/22 33/7 35/21 37/15 40/22 41/17 44/18 51/5 58/11 61/6
others [1]  52/18
our [6]  11/5 37/13 44/19 47/21

54/13 54/22
out [23]  17/7 18/12 19/11 22/25 22/25 39/9 40/18 40/19 43/3 43/6 43/11 44/11 47/22 49/1 49/5 50/21 50/24 51/3 51/19 51/24 52/3 53/9 55/7
outstanding [1]  7/24
over [9]  6/23 7/2 13/15 13/19 16/19 23/15 23/17 38/16 44/24
overall [1]  48/6
overrule [1]  16/22
overruled [4]  25/5 27/10 28/24 30/20

## P

P-A-S-C-H-A-L-L [1]  24/7
pack [20]  4/19 4/19 19/5 19/7 19/10 19/13 19/19 19/22 21/14 22/16 22/19 22/22 24/4 25/18 25/20 26/15 31/20 32/14 32/15 35/22
packet [2]  20/5 26/16
page [8]  3/3 4/3 17/9 18/16 18/18 31/21 31/25 33/7
pages [1]  33/1
paid [5]  40/7 58/12 58/14 61/12 61/12
paid/will [1]  61/12
Paragraph [2]  5/19 5/24
paragraphs [5]  5/14 16/1 56/18 56/19 58/21
paraphernalia [1]  9/20
parole [11]  10/12 10/19 10/20 40/18 55/3 55/5 55/6 55/6 55/8 55/10 55/20
paroled [2]  43/3 43/6
part [5]  37/20 37/21 38/23 43/10 53/10
participate [1]  35/15
particular [7]  10/6 15/13 19/16 22/21 27/9 32/9 32/11
parties [2]  61/6 61/10
Paschall [2]  24/7 24/12
pass [9]  8/3 12/4 27/5 36/9 36/18 41/2 45/6 50/2 53/20
passed [1]  38/2
passenger [1]  9/13
past [1]  40/4
patrol [6]  7/4 7/5 7/7 7/8 9/4 10/13
paying [1]  35/12
peace [3]  6/24 7/1 13/6
pen [21]  4/19 4/19 19/5 19/7 19/10 19/13 19/19 19/22 20/4 21/14 22/16 22/19 22/22 25/18 25/20 26/15 26/16 31/20 32/14 32/15 35/22
penitentiary [1]  40/13
people [4]  32/9 35/4 54/10 54/25
people's [1]  54/19
period [2]  40/14 47/18
permission [2]  11/23 12/2
person [10]  14/21 25/1 39/18 39/19 39/19 39/20 40/10 56/8 57/18 57/18
personal [1]  36/13
persons [1]  13/22

## P

phase [1] 15/23
Phillips [4] 1/22 61/4 61/15 61/16
philosophy [1] 54/15
photo [1] 20/17
photograph [3] 20/18 21/1 21/3
physical [1] 58/19
pick [1] 11/19
piece [1] 34/11
piecemeal [1] 37/20
pistol [4] 10/8 57/2 57/21 57/24
place [1] 9/3
placed [3] 8/17 9/2 33/3
planned [1] 52/24
plead [2] 5/21 5/25
pled [2] 29/14 55/12
point [11] 9/23 11/13 15/1 19/25
 24/11 26/13 28/16 37/1 39/1 40/18
 47/6
police [5] 13/2 13/4 13/20 13/23
 57/5
poor [1] 20/16
pop [1] 54/24
portion [1] 9/25
portions [1] 61/5
position [2] 9/6 56/1
positive [2] 44/6 44/8
possessed [1] 46/19
possession [4] 16/11 17/4 31/13
 43/15
possibility [1] 49/13
possible [3] 45/3 57/3 57/3
practically [1] 50/17
preferred [1] 24/21
prejudicial [2] 29/8 32/8
preparation [1] 61/11
presented [2] 5/19 5/24
Presiding [1] 1/17
pretty [4] 13/8 49/8 49/16 52/1
previously [2] 15/3 20/2
Primarily [1] 57/12
print [1] 23/11
prints [10] 10/25 13/21 15/24
 18/21 21/4 21/15 23/9 26/25 27/1
 29/5
prior [8] 13/1 24/13 24/15 24/25
 27/7 34/15 56/15 56/15
priors [1] 22/10
prison [18] 40/14 49/17 49/21
 50/22 50/24 51/3 51/13 51/21 52/2
 52/12 54/17 55/7 55/25 56/14
 57/23 58/9 58/14 58/17
probably [5] 41/14 47/9 50/10
 51/2 55/25
probation [6] 31/23 32/1 33/2
 33/6 35/8 35/9
problems [5] 40/4 47/25 48/15
 58/10 58/19
proceed [1] 5/6
proceedings [5] 1/15 1/18 60/5
 61/6 61/9
processed [1] 11/5
proof [3] 23/5 24/18 24/23
proper [3] 21/5 21/9 21/13
properly [2] 15/9 20/24
prosecuted [1] 43/12

Prosecution [1] 52/12
prosecutor [1] 23/2
prosecutors [1] 57/20
proud [1] 47/10
prove [7] 21/14 23/13 24/14 24/19
 24/21 27/8 34/4
proven [1] 57/25
provided [2] 27/8 41/25
public [7] 16/14 16/21 20/3 23/17
 27/24 30/3 37/25
punished [2] 58/14 58/16
punishment [11] 1/11 31/17 49/9
 49/11 49/17 56/22 58/1 58/4 58/12
 58/22 59/2
purpose [1] 34/9
purposes [4] 14/8 15/1 18/5 27/23
put [4] 9/4 13/24 44/10 56/1

## Q

quality [2] 20/16 21/9
question [4] 22/7 32/20 42/13
 42/15
questions [3] 36/19 41/9 50/5
quite [1] 8/6

## R

R-U-E-B-U-S-H [1] 6/19
raised [1] 50/17
range [4] 49/9 49/11 49/16 58/4
rationale [1] 27/7
read [3] 5/16 5/18 39/10
reading [1] 24/12
ready [2] 5/5 5/10
really [4] 23/9 40/9 51/2 57/20
reasonable [2] 24/14 34/5
reasons [1] 47/20
recall [1] 16/6
received [3] 13/9 31/16 34/3
recently [1] 46/12
reckless [1] 31/5
recklessly [1] 8/11
recognize [5] 7/11 7/13 14/9 18/7
 19/4
record [7] 1/1 12/19 16/15 45/18
 61/7 61/9 61/11
REDIRECT [2] 44/21 52/9
reduced [1] 43/22
refer [8] 16/24 17/2 18/4 19/3
 25/17 27/14 27/22 30/2
reference [3] 9/22 32/11 52/13
referenced [3] 26/3 26/8 59/10
references [1] 33/15
Referencing [1] 31/19
refers [1] 23/8
reflects [1] 61/9
regards [5] 13/10 26/24 33/17
 33/19 36/12
registration [2] 7/21 8/10
related [2] 37/12 45/23
relating [1] 22/20
release [1] 15/12
released [1] 15/21
relevance [2] 29/6 29/16
relevant [3] 29/16 32/7 58/11
remains [1] 56/19
remember [5] 7/17 7/20 51/12
 51/21 51/24

report [1] 9/23
reported [2] 1/18 61/8
reporter [5] 1/22 6/17 52/6 61/4
 61/17
REPORTER'S [4] 1/1 61/7 61/9
 61/11
reports [1] 32/10
represented [1] 22/17
requested [1] 61/6
required [2] 24/18 38/17
resist [1] 57/9
respect [5] 18/3 23/9 30/23 57/1
 58/5
respective [1] 61/10
respond [1] 21/17
rest [2] 36/24 53/24
restrict [2] 58/3 58/22
retake [3] 38/17 38/20 38/21
retired [1] 13/3
retook [1] 38/19
revoke [1] 34/15
revoked [2] 34/10 55/13
Revoking [1] 33/1
revolving [1] 57/12
right [43] 5/9 5/15 5/23 6/7 6/11
 8/6 10/24 11/7 11/15 12/14 14/14
 14/16 16/17 20/15 25/3 25/8 26/12
 32/21 36/16 39/2 39/14 39/24
 44/24 45/13 46/1 46/5 46/22 47/12
 47/13 47/18 47/23 48/21 48/22
 50/10 50/22 50/25 53/16 55/13
 56/7 58/24 59/7 59/14 60/4
right-hand [1] 11/15
road [1] 52/22
Roughly [1] 7/6
Ruebush [5] 4/12 6/9 6/12 6/18
 12/10
rules [3] 54/6 54/15 57/23
RULING [1] 58/23
run [3] 8/15 11/1 56/15
run-ins [1] 56/15
running [7] 17/17 17/20 20/22
 28/23 33/14 34/19 39/9
RYAN [1] 2/4

## S

S-I-L-B [1] 12/20
S.W.3d [2] 23/25 24/8
sad [1] 55/23
said [5] 22/23 24/9 38/7 41/10
 50/6
same [29] 9/18 16/9 16/16 17/14
 18/10 18/25 19/1 19/11 19/13
 19/20 19/22 21/3 22/12 22/16
 22/17 22/22 22/23 23/2 23/2 23/2
 23/5 25/10 26/2 26/14 26/18 27/7
 33/5 35/22 44/10
San [2] 13/2 13/19
satchel [3] 9/12 9/16 9/18
save [1] 5/12
saw [1] 8/13
say [11] 8/21 9/8 11/18 14/20
 32/16 35/4 40/5 43/2 47/11 49/23
 55/24
SBOT [3] 2/4 2/5 2/10
scene [1] 13/21
school [4] 37/23 38/1 38/16 47/3

schools [1] 37/25
scored [1] 38/18
SEAL [1] 61/13
search [3] 8/25 11/23 12/2
searched [2] 8/22 9/10
seat [5] 5/3 6/11 12/14 37/5 57/4
second [6] 17/9 18/16 18/17 23/19
 50/25 56/20
see [6] 41/18 41/21 44/9 46/16
 50/12 50/14
seems [1] 51/15
seen [2] 52/17 53/14
seize [1] 48/25
self [1] 7/9
self-initiated [1] 7/9
sent [2] 11/3 55/14
sentence [15] 4/18 4/20 4/20 4/21
 4/22 15/6 15/9 20/5 21/1 24/20
 28/20 33/20 34/8 40/12 49/20
sentenced [6] 27/19 29/24 34/10
 35/18 35/22 59/4
sentences [5] 15/24 30/17 36/13
 52/12 58/11
separate [6] 19/22 19/23 25/13
 29/3 54/17 54/18
serve [1] 29/24
service [1] 7/8
services [1] 52/25
set [3] 26/25 28/7 57/23
seven [2] 6/23 7/2
several [4] 20/12 20/12 45/1 45/2
Shakes [1] 50/15
she [4] 52/25 53/5 53/9 53/11
She's [1] 46/8
sheet [1] 26/25
shoot [1] 57/9
shots [1] 48/13
should [1] 57/24
show [2] 14/8 23/16
showing [2] 54/7 54/8
shown [3] 15/3 20/2 43/4
shows [1] 29/12
sibling [1] 46/1
side [4] 11/15 52/13 52/21 58/1
signed [1] 16/5
significant [3] 49/8 49/16 49/20
Silber [8] 4/13 12/9 12/15 12/20
 14/7 16/23 25/9 27/14
simply [1] 21/9
since [3] 15/11 55/7 55/9
sir [9] 5/5 6/16 6/21 6/25 20/8
 33/10 41/6 45/8 53/8
sitting [1] 56/7
situation [1] 38/4
sky [1] 48/20
smallest [1] 57/3
society [3] 40/20 58/12 58/15
some [16] 8/6 10/18 35/11 39/1
 39/9 40/1 40/2 40/4 45/21 47/2
 47/6 49/17 49/25 56/15 56/15 58/2
somebody [2] 54/20 59/13
somehow [1] 23/20
someone [1] 21/15
something [4] 41/21 41/22 47/10
 58/7
sometimes [2] 54/9 54/11
son [6] 37/13 37/18 41/10 41/17

| S | T | | U |
|---|---|---|---|
| son... [2] 50/7 50/9 | take [8] 7/8 14/18 20/6 21/9 26/19 34/7 34/14 48/12 | 48/25 54/22 54/24 55/12 55/13 55/14 56/7 57/16 58/11 | trying [3] 11/16 11/18 21/19 |
| son's [2] 51/5 51/10 | takes [2] 53/19 54/11 | they're [6] 20/14 20/16 27/3 34/2 46/17 48/5 | twenty [2] 49/12 56/20 |
| sort [1] 59/10 | talk [3] 23/7 37/20 43/5 | they've [2] 44/11 57/25 | two [24] 5/24 14/13 23/15 24/10 24/15 24/19 30/19 31/20 34/4 |
| soul [1] 56/2 | talked [1] 47/3 | thing [7] 7/9 9/15 23/7 32/10 35/12 37/20 43/11 | 42/21 44/3 44/4 44/18 46/4 46/14 46/15 49/11 49/12 49/13 49/15 |
| speaking [1] 49/8 | talking [3] 11/17 23/10 53/10 | things [7] 11/10 15/8 41/25 42/3 42/7 44/10 54/12 | 50/17 56/13 56/20 58/4 |
| special [1] 48/19 | talks [1] 24/11 | think [17] 11/16 11/18 21/5 21/9 21/12 21/13 21/15 34/7 39/4 39/5 | tying [2] 57/14 57/14 |
| specialized [2] 13/9 13/15 | taught [1] 13/17 | 39/5 40/18 40/22 41/20 42/25 43/22 45/21 | type [6] 9/7 10/4 10/18 10/19 25/1 40/11 |
| specific [2] 24/18 53/1 | TDC [10] 19/8 19/17 21/16 22/1 22/22 27/20 31/17 35/19 35/23 55/14 | third [3] 31/21 49/11 56/13 | types [1] 56/21 |
| specifically [7] 15/12 16/8 22/14 22/19 23/23 29/13 32/4 | teachers [2] 38/3 38/6 | third-degree [2] 49/11 56/13 | |
| speed [2] 8/12 57/6 | technical [1] 35/11 | this [75] | **U** |
| spell [1] 6/17 | technically [1] 49/15 | those [24] 14/15 14/18 15/15 20/13 27/1 27/24 30/3 30/6 30/18 | Uh [17] 40/6 40/16 41/5 42/5 43/7 45/5 46/2 46/6 46/14 46/23 47/14 |
| spent [4] 13/2 13/3 13/19 54/7 | Telephone [3] 2/7 2/12 61/19 | 30/20 32/8 33/11 34/1 36/14 36/15 | 47/19 47/24 48/11 49/5 51/8 52/16 |
| Spikes [1] 48/21 | tell [3] 5/11 18/6 52/3 | 40/7 52/13 54/11 56/17 58/2 58/3 | Uh-huh [17] 40/6 40/16 41/5 42/5 43/7 45/5 46/2 46/6 46/14 46/23 |
| spring [1] 49/23 | ten [5] 35/19 49/12 56/13 56/14 58/4 | 58/15 58/16 58/20 | 47/14 47/19 47/24 48/11 49/5 51/8 52/16 |
| stand [4] 37/2 54/3 55/24 58/24 | ten-years [1] 35/19 | though [2] 11/16 52/15 | ultimately [1] 29/14 |
| starches [1] 48/19 | testified [5] 6/13 12/16 36/12 37/7 45/15 | thought [1] 11/11 | unadjudicated [1] 33/16 |
| start [2] 54/7 54/16 | testify [2] 21/16 32/9 | three [5] 13/3 44/1 44/6 54/17 55/8 | under [6] 8/17 9/2 22/22 27/6 32/23 57/23 |
| started [2] 39/1 47/6 | testimonial [1] 25/2 | through [3] 34/2 39/10 55/17 | Underlying [1] 32/18 |
| state [16] 1/6 2/3 6/9 6/16 10/21 12/19 23/24 23/24 24/8 24/14 | testimony [2] 9/24 21/2 | throughout [1] 42/4 | understand [5] 15/16 38/10 38/15 40/15 47/9 |
| 24/21 39/23 45/18 57/10 61/1 61/4 | testing [2] 10/25 32/10 | thrown [1] 43/11 | understood [1] 43/23 |
| STATE'S [62] | TEXAS [14] 1/6 1/7 1/17 1/22 1/23 2/7 2/12 57/10 59/3 61/1 61/4 | thumb [2] 14/14 14/16 | unduly [2] 29/8 32/8 |
| stated [2] 10/14 54/15 | 61/16 61/18 61/19 | thumbprint [3] 18/17 18/21 30/6 | unknown [1] 13/22 |
| statement [1] 6/4 | than [6] 8/10 28/22 41/14 41/17 50/10 54/5 | thumbprints [3] 14/21 30/9 30/12 | unlawful [1] 43/15 |
| states [1] 16/8 | Thank [4] 12/7 34/21 36/22 59/6 | time [23] 5/12 8/6 40/13 40/14 40/22 40/25 43/13 44/15 47/18 | until [1] 55/6 |
| Station [1] 13/4 | that [283] | 49/3 49/17 50/22 50/25 51/3 51/15 | up [12] 5/20 11/19 21/14 23/13 27/8 32/20 46/20 47/2 49/15 54/5 |
| Stay [1] 59/24 | that's [18] 9/23 11/25 12/3 18/5 21/12 21/13 24/8 25/11 25/12 | 54/13 54/14 54/14 54/14 55/6 56/4 58/10 58/18 | 57/25 58/24 |
| Ste [1] 61/18 | 32/10 35/21 43/23 46/19 47/9 | times [2] 54/18 55/9 | us [9] 22/15 25/9 38/6 40/22 45/4 47/23 54/8 54/12 57/21 |
| stealing [1] 54/19 | 47/12 47/20 57/16 58/10 | titled [1] 1/15 | use [3] 8/18 13/25 49/2 |
| stenotype [1] 1/18 | theft [3] 27/17 29/22 57/13 | today [2] 14/18 18/22 | used [1] 32/4 |
| step [3] 12/6 45/8 53/22 | their [4] 41/21 46/4 46/7 58/1 | together [1] 36/1 | uses [1] 49/3 |
| still [4] 34/4 42/12 44/7 51/17 | them [7] 13/3 21/7 21/8 41/22 44/6 50/11 50/18 | told [4] 25/9 38/6 40/22 54/5 | usually [1] 9/3 |
| stipulate [1] 15/13 | themselves [1] 39/11 | too [1] 43/4 | |
| stipulated [8] 15/4 15/10 15/15 15/17 15/20 15/23 16/15 22/11 | then [5] 13/3 51/17 51/25 52/4 55/14 | took [4] 14/15 18/22 28/12 53/10 | **V** |
| stipulating [1] 16/2 | there [36] 9/12 9/13 9/14 9/16 9/18 10/7 10/12 10/18 10/25 11/10 | top [3] 9/13 9/15 55/21 | V.Dire [1] 4/8 |
| stipulation [2] 15/15 16/5 | 11/15 11/24 15/13 15/14 15/14 | total [1] 61/11 | variety [2] 23/21 40/13 |
| stop [5] 7/25 42/6 52/22 55/1 55/18 | 17/13 18/17 18/19 20/17 21/1 21/2 23/14 23/20 24/5 25/22 25/24 | touch [1] 59/24 | vehicle [8] 7/22 8/23 8/25 9/10 11/24 12/2 57/4 57/21 |
| stopped [5] 7/14 7/14 7/18 7/20 7/23 | 39/21 41/23 48/15 50/16 52/15 | traffic [1] 8/9 | verify [1] 10/20 |
| straighten [1] 46/19 | 52/24 56/2 57/2 57/24 58/2 | training [6] 13/10 13/13 13/15 13/17 13/17 13/24 | very [8] 9/13 9/14 9/15 20/16 39/19 44/23 54/21 54/21 |
| Street [4] 1/23 2/6 2/11 61/18 | there's [19] 9/23 9/24 22/7 23/12 23/14 23/15 23/21 24/9 26/24 29/5 | transcription [1] 61/5 | violated [1] 56/24 |
| stuff [4] 5/8 9/14 32/10 34/5 | 40/17 41/21 49/13 49/15 49/16 | Travis [1] 1/16 | violating [2] 8/8 33/6 |
| styled [1] 61/7 | 52/13 57/5 57/10 57/17 | trespass [2] 33/12 34/17 | violation [1] 34/22 |
| such [1] 24/23 | therefore [1] 21/12 | trial [6] 1/3 17/11 23/20 39/24 48/24 49/1 | violations [5] 32/1 32/12 33/11 34/3 35/11 |
| suffice [1] 25/2 | therein [5] 17/24 20/17 21/1 32/7 33/15 | tried [6] 11/6 38/20 50/19 50/21 50/24 51/2 | violent [1] 57/11 |
| sufficient [2] 24/24 27/8 | these [11] 16/1 20/1 24/9 24/19 24/22 39/10 56/7 56/21 58/11 | tries [1] 51/20 | visit [1] 10/19 |
| sufficiently [1] 22/14 | 58/12 58/13 | trouble [5] 39/2 39/11 44/12 47/6 50/14 | visiting [2] 38/3 40/21 |
| sugar [1] 48/20 | they [37] 15/4 18/25 19/1 20/2 21/14 21/15 23/25 24/1 24/2 24/16 | true [22] 5/22 5/23 6/1 6/2 15/18 18/1 22/10 26/3 33/9 34/17 35/1 | voir [4] 20/6 20/9 26/19 26/22 |
| Suite [2] 1/23 2/6 | 27/8 27/25 28/15 29/14 30/5 30/7 | 40/8 44/11 49/10 49/12 49/13 51/3 | volume [4] 1/2 3/2 4/2 61/6 |
| sum [1] 54/4 | 32/8 33/9 33/18 33/24 34/4 38/7 | 56/17 58/3 58/21 59/2 61/5 | Volumes [1] 1/2 |
| sunglass [2] 9/18 9/19 | 38/18 38/19 44/9 44/9 48/17 48/19 | truly [1] 61/9 | |
| supervision [2] 15/12 15/22 | | truth [1] 34/15 | **W** |
| supposed [2] 35/5 54/12 | | try [7] 8/15 51/19 51/24 52/3 54/4 57/8 57/9 | W-A-D-E [1] 6/18 |
| sure [4] 21/18 38/21 42/9 49/18 | | | Wade [3] 4/12 6/12 6/18 |
| suspected [1] 43/9 | | | waive [2] 6/5 36/25 |
| suspicious [1] 11/11 | | | walk [1] 48/24 |
| sustain [1] 29/18 | | | |
| Sustained [3] 9/25 10/17 10/23 | | | |
| swing [1] 11/19 | | | |
| sworn [8] 6/10 6/13 12/13 12/16 37/4 37/7 45/12 45/15 | | | |

**W**

want [14] 5/12 14/24 21/14 27/14 27/22 31/9 32/8 37/19 41/18 44/9 50/12 50/14 54/22 59/12
wants [2] 39/16 41/21
WARD [4] 2/5 6/15 41/8 50/4
warrant [1] 8/25
warrants [1] 7/24
was [99]
wasn't [2] 8/11 35/5
way [12] 11/9 15/23 21/13 23/13 23/21 44/10 45/3 49/14 49/15 55/5 57/6 57/18
Wayne [1] 46/10
ways [10] 23/21 24/22 42/8 42/12 43/1 43/5 51/19 51/20 51/25 52/4
we [62]
We'd [1] 36/20
we'll [4] 6/5 28/16 36/24 59/19
we're [2] 23/10 33/16
we've [6] 21/10 28/22 40/21 45/25 47/2 52/11
weapon [5] 9/7 10/6 11/6 11/13 43/15
well [25] 6/6 14/25 15/7 16/3 22/24 26/13 27/14 29/2 30/4 32/19 33/25 34/13 38/2 38/14 38/15 38/19 39/9 39/24 40/21 41/16 44/12 47/21 50/12 52/21 55/5
went [5] 43/13 51/21 52/2 55/7 58/14
were [16] 11/10 11/11 13/22 18/25 20/12 26/25 28/10 32/1 33/6 33/9 39/23 49/7 57/21 58/13 59/17 61/8
weren't [2] 33/24 34/1
West [1] 10/5
what [46] 5/11 7/7 7/17 7/23 9/10 10/4 10/11 12/21 13/1 13/13 14/8 14/12 18/4 18/7 18/24 25/25 27/22 28/14 28/22 29/12 29/13 29/16 30/11 32/16 34/22 38/6 38/15 38/24 39/7 39/10 39/18 43/3 43/23 44/4 44/8 46/4 46/7 46/19 48/3 49/9 49/19 52/20 56/3 56/21 57/2 57/25
what's [6] 7/3 17/3 19/5 31/11 44/9 51/5
whatever [2] 39/15 58/5
when [22] 7/23 8/8 9/2 11/16 14/18 14/20 15/17 39/4 39/20 48/17 48/18 49/7 50/21 50/24 51/2 51/12 51/19 51/21 51/24 52/2 52/2 54/5
Whenever [1] 8/17
where [5] 9/11 9/17 10/6 10/9 57/13
whether [1] 57/12
which [20] 15/2 16/1 16/12 20/3 21/23 22/11 22/15 22/16 24/4 24/17 25/8 27/15 28/17 29/20 33/3 36/2 42/18 43/22 48/19 61/7
while [4] 10/13 24/19 38/11 48/16
who [5] 14/15 16/8 16/9 40/8 54/20
who's [2] 14/21 23/20

whole [1] 41/23
why [4] 7/20 15/16 29/10 47/20
wide [1] 40/12
wife [1] 37/14
will [11] 6/2 6/6 15/1 40/14 42/11 49/17 51/6 51/7 51/8 55/5 61/12
WILLIAM [1] 2/5
within [6] 15/20 22/22 33/19 33/22 34/11 34/11
without [1] 35/9
witness [21] 5/12 6/8 6/10 8/3 12/4 12/13 14/4 20/6 26/19 27/5 32/20 36/9 36/18 37/4 41/2 45/6 45/12 50/2 52/24 53/20 61/13
WITNESSES [2] 3/6 3/16
words [1] 55/18
work [3] 6/20 47/23 53/1
worked [3] 6/22 44/23 47/21
working [1] 7/15
works [1] 21/13
world [3] 41/15 56/2 57/15
would [44] 8/21 9/21 10/11 12/19 15/7 15/8 20/21 20/23 27/6 27/6 28/21 29/7 29/8 29/9 29/15 30/14 32/6 32/13 33/25 35/25 36/1 36/25 37/1 42/18 42/25 45/10 46/21 46/21 47/5 48/3 49/11 49/22 52/20 53/24 54/4 54/25 56/13 56/13 56/14 58/3 58/7 58/21 59/11 59/12
writing [1] 61/6
wrong [3] 21/24 41/22 42/1

**Y**

y'all [1] 43/3
yeah [15] 14/19 38/6 38/6 41/16 42/9 42/14 46/17 47/8 48/2 48/17 51/23 52/14 52/19 53/3 53/17
year [3] 29/24 54/24 58/9
years [29] 6/23 7/2 7/6 12/25 13/2 13/4 13/8 13/19 15/11 15/21 27/19 31/17 31/17 35/19 35/22 39/6 39/10 42/23 43/14 48/9 48/10 55/19 55/21 56/14 56/14 58/9 58/22 59/3 59/5
Yep [2] 50/20 51/1
yes [56] 6/18 6/21 6/25 7/12 7/21 8/7 8/24 9/5 9/9 10/10 11/2 11/12 17/20 20/8 26/21 33/10 33/13 33/23 34/8 37/11 38/13 38/13 38/24 39/3 39/25 40/16 41/11 41/13 42/2 42/5 42/9 42/21 42/24 42/24 43/2 43/4 43/7 43/20 43/22 44/1 45/5 47/14 47/16 48/14 49/3 50/8 50/13 51/4 51/14 51/16 51/18 52/1 52/5 52/7 56/24 58/11
yesterday [3] 15/4 16/6 45/21
yet [3] 44/6 54/13 55/15
you [200]
you'll [2] 5/7 32/19
you're [8] 20/18 21/18 36/21 42/13 47/10 48/18 57/15 57/15
you've [13] 13/6 15/17 36/12 39/22 40/1 40/1 41/23 44/23 44/23 45/2 45/3 50/16 53/14
you-all [1] 47/21
young [1] 51/17
youngest [1] 46/11

your [30] 6/7 6/16 7/3 7/7 7/10 12/8 12/10 12/19 13/9 13/23 32/23 34/19 36/22 36/23 37/14 41/10 44/20 45/9 45/18 47/5 49/19 50/6 50/6 53/23 58/3 58/5 59/2 59/6 59/8 59/24

**Z**

zero [1] 31/17

THE STATE OF TEXAS

COUNTY OF BRAZOS

I, DENISE C. PHILLIPS, Official Court Reporter in and for the 272nd District Court of Brazos, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $ 330.50 and was paid/will be paid by Brazos County .

WITNESS MY HAND AND OFFICIAL SEAL this the 3rd day of May, 2013.

DENISE C. PHILLIPS, CSR
Texas CSR 6482
Official Court Reporter
272nd District Court
Brazos County, Texas
300 East 26th Street, Ste. 204
Bryan, Texas 78703
Telephone: 979-361-4221
Expiration: 12/31/13

CERTIFIED
TRANSCRIPT

DENISE C. PHILLIPS, CSR
OFFICIAL COURT REPORTER
272ND DISTRICT COURT

# REPORTER'S RECORD

## Volume 6 of 6 Volumes

### Trial Court Cause No. 12-03324-CRF-272

### Court of Appeals No. 10-13-00049-CR

| | | |
|---|---|---|
| THE STATE OF TEXAS | : | IN THE DISTRICT COURT OF |
| VS. | : | BRAZOS COUNTY, TEXAS |
| DAVID DUANE GREER | : | 272nd JUDICIAL DISTRICT |

---

### EXHIBITS

---

## CERTIFIED TRANSCRIPT

Denise C. Phillips, Texas CSR #6482
Official Court Reporter - 272nd District Court
300 East 26th Street, Suite 204
Bryan, Texas    77803
979-361-4221

**A P P E A R A N C E S**

ATTORNEY(S) FOR STATE:

    RYAN CHARLES CALVERT
    SBOT NO. 24036308
    WILLIAM LEE WARD
    SBOT NO. 24077302
    Assistant District Attorneys
    300 East 26th Street, Suite 310
    Bryan, Texas    77803
    Telephone:  979-361-4320


ATTORNEY(S) FOR DEFENDANT:

    EARL R. GRAY
    SBOT: 24007265
    Gray, Granberry & Jones
    103 N. Main Street
    Bryan, Texas    77803-3235
    Telephone:  979-822-4759

THE STATE OF TEXAS

COUNTY OF BRAZOS

I, DENISE C. PHILLIPS, Official Court Reporter in and for the 272nd District Court of Brazos, State of Texas, do hereby certify that the following exhibits constitute true and complete duplicates of the original exhibits, excluding physical evidence, offered into evidence during the jury trial in the above-entitled and numbered cause as set out herein before the Honorable Travis B. Bryan, III, Judge of the 272nd District Court of Brazos County, State of Texas, and a trial, beginning November 13, 2012.

I further certify that the total cost for the preparation of this Reporter's Record is $207.00 and was paid/will be paid by Brazos County.

WITNESS MY OFFICIAL HAND on this, the 3rd day of May, 2013.

_Denise C. Phillips_
DENISE C. PHILLIPS, CSR
Texas CSR 6482
Official Court Reporter
272nd District Court
Brazos County, Texas
300 East 26th Street, Ste. 204
Bryan, Texas 77803
Telephone: 979-361-4221
Expiration: 12/31/13

**CERTIFIED TRANSCRIPT**

# CHRONOLOGICAL INDEX

Volume 6

Reporter's certificate                          3
State's Exhibit No. 1                           5
State's Exhibit No. 2                           6
State's Exhibit No. 3                           7
State's Exhibit No. 4                           8
State's Exhibit No. 5                           9
State's Exhibit No. 6                          10
State's Exhibit No. 7                          11
State's Exhibit No. 8                          12
State's Exhibit No. 9                          13
State's Exhibit No. 10                         14
State's Exhibit No. 11                         15
State's Exhibit No. 12                         16
State's Exhibit No. 14                         17
State's Exhibit No. 15                         18
State's Exhibit No. 16                         19
State's Exhibit No. 17                         20
State's Exhibit No. 18                         21
State's Exhibit No. 19                         22
State's Exhibit No. 19-A                       23
State's Exhibit No. 20                         24
State's Exhibit No. 21                         25
State's Exhibit No. 22                         26
State's Exhibit No. 23                         27
State's Exhibit No. 24                         28

DENISE C. PHILLIPS, CSR
OFFICIAL COURT REPORTER
272ND DISTRICT COURT

State's Exhibit No. 1

Arrest Warrant

(Record Purposes only)

H-024341

Race W     Sex M
Age 45     Dob 12/22/66
Ht 5'11"     Wt 218
Hair Brown     Eyes Brown

THE STATE OF TEXAS

VS.

DAVID DUANE GREER

PID: 26619800
DA Complaint# 12-01051
Book #
Off 22990002 22990001
Cause No. _____
Charge: BURGLARY OF HABITATION
BURGLARY OF BUILDING
Justice Court No. _____
Agency BPD 12-0100799

TO ANY PEACE OFFICER FOR THE STATE OF TEXAS: GREETINGS

WHEREAS complaint has been made by the undersigned Affiant who upon his oath says that he has good reason to believe and does believe that in the County of Brazos and State of Texas one
DAVID DUANE GREER
hereinafter referred to as the Defendant, heretofore on or about January 24, 2012, did

then and there intentionally or knowingly enter a habitation, without the effective consent of Fred Wampler, the owner thereof, and attempted to commit or committed theft of property, to-wit: computer and a razor, owned by Fred Wampler,

PARAGRAPH TWO: and it is further presented in and to said Court, that the said DAVID GREER, in the County of Brazos and State of Texas on or about the 24th day of January, 2012 did

then and there, with intent to commit theft, enter a habitation, without the effective consent of Fred Wampler, the owner thereof.

COUNT TWO: and it is further presented in and to said Court, that the said DAVID GREER, in the County of Brazos and State of Texas on or about the 24th day of January, 2012 did

then and there intentionally or knowingly enter a building or a portion of a building not then open to the public, without the effective consent of Fred Wampler, the owner thereof, and attempted to commit or committed theft of property, to-wit: tools and a bicycle, owned by Fred Wampler.

PARAGRAPH TWO: and it is further presented in and to said Court, that the said DAVID GREER, in the County of Brazos and State of Texas on or about the 24th day of January, 2012 did

then and there, with intent to commit theft, enter a building or a portion of a building not then open to the public, without the effective consent of Fred Wampler, the owner thereof.

STATE OF TEXAS
COUNTY OF BRAZOS
The foregoing is a true and correct copy as the same appears on file and recorded in the appropriate records of Brazos, County, Texas
Thereby certify, on _____

Vera Lara-Hooge
Justice of the Peace
Brazos County, Texas
AGAINST THE PEACE AND DIGNITY OF THE STATE.
Grand Jury Witness:

Sworn to and subscribed before me on _____ February 15, 2012

_____
Affiant

BILL TURNER    DISTRICT ATTORNEY
BRAZOS COUNTY, TEXAS

By:_____ _____
ASSISTANT DISTRICT ATTORNEY

NOW THEREFORE, YOU ARE HEREBY COMMANDED
TO ARREST the defendant and bring him AT ONCE before the undersigned magistrate at his office in Brazos County, Texas, then and there to answer the above charge.
Herein fail not: Return this writ and indicate how it was executed.
Bail is hereby set at $_____ . Given under my hand _____ February 15, 2012
_____
Magistrate, Brazos County, Texas
WRIT RECEIVED 2/15/ 20 12 and EXECUTED 2/16/ 20 12 by arresting the Defendant and (1) placing him in jail in Brazos County, Texas, or (2) taking his bond. (Cross out inapplicable action.)
By _____ Peace Officer

Brazos County, Texas
WARRANT

STATE'S
EXHIBIT
1
PENGAD 800-631-6989

FAXED

State's Exhibit No. 2

Arrest Warrant

(Record Purposes only)

H - 02035-F

Race W     Sex F
Age 27     Dob 07/18/84
Ht 5'5"     Wt 120
Hair Brown     Eyes Hazel

THE STATE OF TEXAS

VS.

MONISHIA CAMPBELL

PID: 17023
DA Complaint# 12-01050
Book #
Off 22990002 22990001
Cause No. _____
Charge: BURGLARY OF HABITATION
BURGLARY OF BUILDING
Justice Court No. ___2-1___
Agency BPD 12-0100799

TO ANY PEACE OFFICER FOR THE STATE OF TEXAS: GREETINGS

WHEREAS complaint has been made by the undersigned Affiant who upon his oath says that he has good reason to believe and does believe that in the County of Brazos and State of Texas one
MONISHIA CAMPBELL
hereinafter referred to as the Defendant, heretofore on or about January 24, 2012, did

then and there intentionally or knowingly enter a habitation, without the effective consent of Fred Wampler, the owner thereof, and attempted to commit or committed theft of property, to-wit: computer and a razor, owned by Fred Wampler,

PARAGRAPH TWO: and it is further presented in and to said Court, that the said MONISHIA CAMPBELL, in the County of Brazos and State of Texas on or about the 24th day of January, 2012 did

then and there, with intent to commit theft, enter a habitation, without the effective consent of Fred Wampler, the owner thereof,

COUNT TWO: and it is further presented in and to said Court, that the said MONISHIA CAMPBELL, in the County of Brazos and State of Texas on or about the 24th day of January, 2012 did

then and there intentionally or knowingly enter a building or a portion of a building not then open to the public, without the effective consent of Fred Wampler, the owner thereof, and attempted to commit or committed theft of property, to-wit: tools and a bicycle, owned by Fred Wampler,

PARAGRAPH TWO: and it is further presented in and to said Court, that the said MONISHIA CAMPBELL, in the County of Brazos and State of Texas on or about the 24th day of January, 2012 did

then and there, with intent to commit theft, enter a building or a portion of a building not then open to the public, without the effective consent of Fred Wampler, the owner thereof,

STATE OF TEXAS
COUNTY OF BRAZOS
The foregoing is a true and correct copy as the same appears on file and recorded in the appropriate records of Brazos, County, Texas
I hereby certify, on ___Johnetta Walker___

Vera Lara-Hooge
Justice of the Peace
Brazos County, Texas

AGAINST THE PEACE AND DIGNITY OF THE STATE.
Grand Jury Witness:

Sworn to and subscribed before me on ___February 15, 2012___

_____
Affiant

BILL TURNER     DISTRICT ATTORNEY
BRAZOS COUNTY, TEXAS

By: _____
ASSISTANT DISTRICT ATTORNEY

NOW THEREFORE, YOU ARE HEREBY COMMANDED
TO ARREST the defendant and bring him AT ONCE before the undersigned magistrate at his office in Brazos County, Texas, then and there to answer the above charge.
Herein fail not: Return this writ and indicate how it was executed.
Bail is hereby set at $_____ . Given under my hand ___February 15, 2012___
_____
Magistrate, Brazos County, Texas

WRIT RECEIVED 2/15/ 20 12 and EXECUTED 2/16/ 20 06 arresting the Defendant and (1) placing him in jail in Brazos County, Texas, or (2) taking his bond. (Cross out inapplicable action.)
By _____ Peace Officer

Brazos County, Texas
WARRANT

STATE'S
EXHIBIT
2

FAXED

State's Exhibit No. 3

Video

DENISE C.PHILLIPS, CSR
OFFICIAL COURT REPORTER
272ND DISTRICT COURT



State's Exhibit No. 4

Photograph

DENISE C. PHILLIPS, CSR
OFFICIAL COURT REPORTER
272ND DISTRICT COURT



State's Exhibit No. 5

Photograph

DENISE C.PHILLIPS, CSR
OFFICIAL COURT REPORTER
272ND DISTRICT COURT



STATE'S
EXHIBIT

PENGAD 800-631-6989

State's Exhibit No. 6

Photograph

DENISE C.PHILLIPS, CSR
OFFICIAL COURT REPORTER
272ND DISTRICT COURT



STATE'S
EXHIBIT

PENGAD 800-631-6989

State's Exhibit No. 7

Photograph

DENISE C.PHILLIPS, CSR
OFFICIAL COURT REPORTER
272ND DISTRICT COURT

# CLERK'S RECORD

VOLUME 1 OF 1
Trial Court Cause No.: 12-03324-CRF-272
In the 272ND DISTRICT COURT
of BRAZOS County, Texas
Honorable TRAVIS BRYAN III, Presiding Judge

THE STATE OF TEXAS
VS
David Duane Greer

Appealed to the 10TH Court of Appeals
for the 272ND DISTRICT COURT
of Bryan, Texas

Attorney for Appellant(s)
MARY HENNESSY
403 Alamo St
Brenham, Tx 77833
PHONE NO: (979) 277-0757
FAX NO (979) 277-0030
SBOT # 09472300

Attorney for Appellee
Doug Howell III (Asst. D.A.)
300 E. 26TH ST STE. 310
BRYAN, TEXAS 77803
PHONE NO: (979) 361-4320
FAX NO (979) 361-4368
SBOT # 10098100

Delivered to the 10TH Court of Appeals for
the 272ND DISTRICT COURT at _____BRYAN_____, Texas on
the 26th day of February, 2013

Marc Hamlin
Brazos County District Clerk
Ashley Morgan
DEPUTY CLERK

Appellate Court Cause No: _____

Filed in the Court of Appeals for the 10TH District of
Texas, at Waco, Texas on this _____ day of
_____, 2013

_____, Clerk          By _____, Deputy

THE STATE OF TEXAS §

COUNTY OF BRAZOS §


In the 272ND DISTRICT COURT of Brazos County, Texas the Honorable TRAVIS BRYAN III Judge Presiding, the following proceedings were held and the following instruments and other papers were filed in this cause to wit:

Trial Court Cause No. 12-03324-CRF-272

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| VS. | § | BRAZOS COUNTY, TEXAS |
| David Duane Greer | § | 272ND DISTRICT COURT |

## CAUSE NO. 12-03324-CRF-272

| | |
|---|---|
| THE STATE OF TEXAS § | IN THE DISTRICT COURT OF |
| VS. § | BRAZOS COUNTY, TEXAS |
| David Duane Greer § | 272ND DISTRICT COURT |

| INDEX | | PAGE |
|---|---|---|
| • INDICTMENT (FILED JUL. 12, 2012) | ......................................... | 1 |
| • WARNING BY MAGISTRATE (FILED JUL. 12, 2012) | ......................................... | 2 |
| • DEFENDANT'S REQUEST TO PROVIDE NOTICE OF OTHER CRIMES, WRONGS OR ACTS, ANY OPINION REGARDING HIS/HER CHARACTER OR GENERAL REPUTATION AND PRIOR CRIMINAL RECORD (FILED JUL. 17, 2012) | ......................................... | 3-6 |
| • DEFENDANT'S REQUEST FOR DESIGNATION OF EXPERT WITNESSES (FILED JUL. 17, 2012) | ......................................... | 7 |
| • REQUEST FOR DISCOVERY (FILED JUL. 17, 2012) | ......................................... | 8-10 |
| • MOTION TO SUPPRESS STATEMENTS (FILED JUL. 17, 2012) | ......................................... | 11-12 |
| • DEFENDANT'S MOTION TO SUPPRESS (SEARCH OF PERSON AND/OR PERSONAL BELONGINGS WITHOUT WARRANT) (FILED JUL. 17, 2012) | ......................................... | 13-14 |
| • DEFENDANT'S MOTION TO SUPPRESS (INVALID SEIZURE/ ARREST/ RESTRAINT/DETENTION WITHOUT WARRANT (FILED JUL. 17, 2012) | ......................................... | 15-17 |

| | | |
|---|---|---|
| • DEFENDANT'S MOTION TO SUPPRESS (SEARCH OF VEHICLE) (FILED JUL. 17, 2012) | ........................................... | 18-19 |
| • ORDER APPOINTING ATTORNEY (FILED JUL. 24, 2012) | ........................................... | 20 |
| • AFFIDAVIT IN SUPPORT OF COURT APPOINTED ATTORNEY (FILED JUL. 24, 2012) | ........................................... | 21-23 |
| • LETTER (FILED JUL. 24, 2012) | ........................................... | 24 |
| • LETTER (FILED JUL. 27, 2012) | ........................................... | 25 |
| • MOTION FOR SPEEDY TRIAL (FILED AUG. 10, 2012) | ........................................... | 26-27 |
| • DISCOVERY ORDER (FILED AUG. 31, 2012) | ........................................... | 28 |
| • MOTION FOR DISCOVERY OF EXCULPATORY AND MITIGATING EVIDENCE (FILED OCT. 28, 2012) | ........................................... | 29-32 |
| • AMENDED COMMITMENT/RELEASE ORDER (FILED NOV. 16, 2012) | ........................................... | 33 |
| • TRIAL COURT'S CERTIFICATION OF DEFENDANT'S RIGHT OF APPEAL (FILED NOV. 16, 2012) | ........................................... | 34 |
| • ORDER APPOINTING ATTORNEY (FILED NOV. 16, 2012) | ........................................... | 35-37 |
| • JURY LIST (FILED NOV. 16, 2012) | ........................................... | 38-39 |
| • STRIKE LIST (FILED NOV. 16, 2012) | ........................................... | 40-45 |
| • COURT'S CHARGE TO THE JURY (FILED NOV. 16, 2012) | ........................................... | 46-51 |
| • JUDGMENT OF CONVICTION BY JURY (FILED NOV. 19, 2012) | ........................................... | 52-58 |
| • SECOND AMENDED COMMITMENT/ RELEASE ORDER (FILED NOV. 19, 2012) | ........................................... | 59 |
| • MOTION FOR NEW TRIAL AND MOTION IN ARREST OF JUDGMENT (FILED DEC. 13, 2012) | ........................................... | 60-63 |

| | | |
|---|---|---|
| • STATE'S OPPOSITION TO DEFENDANT'S MOTION FOR NEW TRIAL AND OBJECTION TO ANY UNTIMELY AMENDED MOTION FOR NEW TRIAL (FILED DEC. 20, 2012) | ............................................. | 64-66 |
| • MOTION FOR NEW TRIAL AND MOTION IN ARREST OF JUDGMENT (FILED JAN. 03, 2013) | ............................................. | 67-69 |
| • LETTER (FILED JAN. 03, 2013) | ............................................. | 70-71 |
| • REQUEST FOR PREPARATION OF REPORTER'S RECORD AND DESIGNATION OF MATTERS TO BE INCLUDED (FILED FEB. 06, 2013) | ............................................. | 72-73 |
| • NOTICE OF APPEAL (FILED FEB. 12, 2013) | ............................................. | 74 |
| • REQUEST FOR PREPARATION OF REPORTER'S RECORD AND DESIGNATION OF MATTERS TO BE INCLUDED (FILED FEB. 12, 2013) | ............................................. | 75-76 |
| • WRITTEN DESIGNATION SPECIFYING MATTERS FOR INCLUSION IN CLERK'S RECORD (FILED FEB. 12, 2013) | ............................................. | 77-78 |
| • DOCKET SHEET | ............................................. | 79 |
| • CLERK'S CERTIFICATE | ............................................. | 80 |

```
                                        Race  W              Sex  M
                                        Age   45             Dob  12/22/66
                                        Ht    5'11"          Wt   210
                                        Hair  Brown          Eyes Brown
```

THE STATE OF TEXAS                      PID: 26619800
                                        DA Complaint# 12-02607
        VS.                             Book #
                                        Off 52030024
DAVID GREER AKA DAVE GREER              Cause No. 12-03314-CRF-8572
                                        Charge: UNLAWFUL POSSESSION FIREARM BY
                                        FELON
                                        Justice Court No. []-02434-F
                                        Agency BCSO 12-1615


IN THE NAME AND BY AUTHORITY OF THE STATE OF TEXAS:

The Grand Jury of Brazos County, State of Texas, duly organized at the July Term, 2012, of the 272nd District
Court of said County, in said Court, at said term, do present that in the County of Brazos and State of Texas one
                        DAVID GREER AKA DAVE GREER
hereinafter referred to as the Defendant, heretofore on or about February 16, 2012, did

then and there, having been convicted of the felony offense of Possession of Methamphetamine on the 6th day of
November, 1997, in Cause No. 13,603 in the 278th District Court of Grimes County, Texas, intentionally or
knowingly possess a firearm before the fifth anniversary of the defendant's release from supervision under
community supervision or parole or mandatory supervision following conviction of said felony,

ENHANCEMENT TO HABITUAL OFFENDER:

PARAGRAPH ONE: and it is further presented in and to said Court that, prior to the commission of the aforesaid
offense, hereafter styled the primary offense, on the 18th day of April, 1984, in Cause No. 15,341 in the 85th
District Court of Brazos County, Texas, the defendant was convicted of the felony offense of Burglary of a
Habitation,

PARAGRAPH TWO: and it is further presented in and to said Court that, prior to the commission of the primary
offense, and after the conviction in cause number 15,341 was final, the defendant committed the felony offense of
Theft and was convicted on the 10th day of June, 1987, in Cause No. 17,175-85 in the 85th District Court of Brazos
County, Texas,

AGAINST THE PEACE AND DIGNITY OF THE STATE


```
                        ┌─────────────────────────┐
                        │ DC      F I L E D        │
                        │ At 4.40  o'clock   P   M │
                        │                          │
                        │      JUL 1 2 2012        │
                        │                          │
                        │ MARC HAMLIN, DIST CLERK  │
                        │   Brazos County, Texas   │
                        │ By_____ Deputy│
                        └─────────────────────────┘
```


                                        _Catti Clune_
                                        Foreman of the Grand Jury

Grand Jury Witness:
INDICTMENT-ORIGINAL

# Page 1

STATE OF TEXAS          **ORIGINAL**  §          WARNING BY MAGISTRATE

COUNTY OF BRAZOS                       §          WARNING #: 426596

THIS IS TO CERTIFY THAT I, ROSE JONES     IN THE CAPACITY OF MAGISTRATE DID, ON 05/15/12, __10:10__ (am/pm) AT BCDC ADMINISTER THE WARNINGS REQUIRED BY ARTICLE 15.17 OF THE TEXAS CODE OF CRIMINAL PROCEDURE TO:

NAME: DAVID DUANE GREER                    PID NO.: 26619800
ADDRESS: 5177 JULIE CIR, BRYAN, TX 77807    DOB(AGE): 12/22/66
PHONE: 979-595-3511                         D L/I D NO: TX-08609286

WHO APPEARED BEFORE ME IN BRAZOS COUNTY, TEXAS. SPECIFICALLY, I INFORMED THIS PERSON AS FOLLOWS:

1       THE ACCUSATION AND ANY AFFIDAVIT CHARGES YOU WITH THE OFFENSE(S) OF.

| Warrant Number | Charge | Bond Amount | Band Type | Warning # |
|---|---|---|---|---|
| 11-02434-F | UNL POSS FIREARM BY FELON | $50,000.00 | SC | 426596 |
| ONSITE | JP22/OPER UNREG MOTOR VEHICLE | $600.00 | JP | 426599 |
| 03329636 | PAROLE VIOLATION/BL/WRNT/TTY | $0.00 | NB | 426623 |

→ NO CONTEST

2.      IF YOU ARE CHARGED WITH ANY FELONY OFFENSE, YOU HAVE THE RIGHT TO AN EXAMINING TRIAL;

3.      YOU HAVE THE RIGHT TO REMAIN SILENT AND MAKE NO STATEMENT AT ALL. ANY STATEMENT YOU MAKE MAY BE USED AS EVIDENCE AGAINST YOU AT YOUR TRIAL;

4.      IF YOU CHOOSE TO MAKE A STATEMENT, YOU MAY TERMINATE THE INTERVIEW AT ANY TIME;

5       YOU HAVE THE RIGHT TO HAVE A LAWYER PRESENT TO ADVISE YOU PRIOR TO AND DURING ANY QUESTIONING OR INTERVIEW WITH PEACE OFFICERS OR ATTORNEYS REPRESENTING THE STATE;

6       IF YOU ARE UNABLE TO EMPLOY A LAWYER, YOU HAVE THE RIGHT TO HAVE A LAWYER APPOINTED TO COUNSEL WITH YOU PRIOR TO AND DURING ANY SUCH QUESTIONING OR INTERVIEW;

7.      IF YOU WISH TO REQUEST A COURT-APPOINTED ATTORNEY:

   a.   YOU MUST COMPLETE A WRITTEN APPLICATION UNDER OATH FOR A COURT-APPOINTED ATTORNEY;

   b.   THE APPLICATION MUST CONTAIN SUFFICIENT FINANCIAL INFORMATION TO ENABLE A JUDGE TO DETERMINE IF YOU ARE INDIGENT;

   c.   REASONABLE ASSISTANCE WILL BE PROVIDED TO COMPLETE THE APPLICATION, IF NEEDED;

8       A REQUEST FOR A COURT-APPOINTED ATTORNEY WILL BE DETERMINED WITHIN THREE (3) WORKING DAYS AFTER THE REQUEST IS RECEIVED IF YOU REMAIN IN JAIL AND DO NOT BOND OUT OF JAIL;

9       IF YOU ARE FOUND TO BE INDIGENT AND AN ATTORNEY IS APPOINTED, THE ATTORNEY WILL ATTEMPT TO CONTACT YOU BY THE END OF THE NEXT WORKING DAY AFTER BEING APPOINTED.

THE ACCUSED _X_ DOES __ DOES NOT WANT TO REQUEST A COURT-APPOINTED ATTORNEY.

   10.  THE COURT FINDS THAT PROBABLE CAUSE __ DOES __ DOES NOT EXIST IN THIS MATTER.

   11   IF YOU ARE NOT A U S CITIZEN, DO YOU WANT YOUR CONSULATE TO BE NOTIFIED? __ NO, __ YES.

COUNTRY? _____

WITNESS: _____

DEFENDANT: X _____          _____
Distribution: __ Court, __ Defendant, __ Magistrate, __ Jail          JUSTICE OF THE PEACE, PRECINCT 4

FILED
DC
At __4:__ o'clock __P__ M
JUL 1 2 2012
MARC HAMLIN, DIST CLERK
Brazos County, Texas
By _____ Deputy

Form # 5015 Warning by Magistrate

**Page 2**

| THE STATE OF TEXAS | X | IN THE 272ND DISTRICT COURT |
|---|---|---|
| VS. | X | OF |
| DAVID GREER | X | BRAZOS COUNTY, TEXAS |

## DEFENDANT'S REQUEST TO PROVIDE NOTICE OF OTHER CRIMES, WRONGS OR ACTS, ANY OPINION REGARDING HIS/HER CHARACTER OR GENERAL REPUTATION AND PRIOR CRIMINAL RECORD

**TO THE HONORABLE JUDGE OF SAID COURT AND THE PROSECUTOR IN THIS CASE:**

Now comes the Defendant and requests pursuant to Rules 404(b) and Rule 609(f), Texas Rules of Criminal Evidence and Art. 37.07, Sec. 3(g) and Art. 38.37 Code of Criminal Procedure, that the State provide notice of other crimes, wrongs or acts, any opinion regarding his/her character or general reputation and prior criminal record and in support thereof would show the following:

**I.**

That Rule 404(b) states:

(a)     Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent preparation, plan, knowledge, identity, or absence of mistake or accident, provided, upon timely request by the accused, reasonable notice is given in advance of trial of intent to introduce in the State's case in chief such evidence other than that arising in the same transaction.

That Rule 609(f) states:

(f)     Evidence of a conviction is not admissible if after timely written request by the adverse party specifying the witness or witnesses, the proponent fails to give to

the adverse party sufficient advance written notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence.

That Art. 37.07 Sec. 3(g) states:

(g)     On timely request of the Defendant, notice of intent to introduce evidence under this article shall be given in the same manner required by Rule 404(b), Texas Rules of Criminal Evidence. If the attorney representing the state intends to introduce an extraneous crime or bad act that has not resulted in a final conviction in a court of record or a probated or suspended sentence, notice of that intent is reasonable only if the notice includes the date on which and the county in which the alleged crime or bad act occurred and the name of the alleged victim of the crime or bad act. The requirement under this subsection that the attorney representing the state give notice applies only if the defendant makes a timely request to the attorney representing the state for the notice.

That Art. 38.072 Sec. 2 (a) states:

(2)     This article applies only to statements that describe the alleged offense that:

      (1)     were made by the child against whom the offense was allegedly committed; and

      (2)     were made to the first person, 18 years of age or older, other than the defendant, to whom the child made a statement about the offense.

      (b)     A statement that meets the requirements of Subsection (a) of this article is not inadmissible because of the hearsay rule if:

      (1)     on or before the 14th day before the date the proceeding begins, the party intending to offer the statement:

      (A)     notifies the adverse party of its intention to do so;

      (B)     provides the adverse party with the name of the witness through whom it intends to offer the statement; and

**Page 4**

     (C)    provides the adverse party with a written summary of the statement;

     (2)    the trial court finds, in a hearing conducted outside the presence of the jury, that the statement is reliable based on the time, content, and circumstances of the statement; and

     (3)    the child testifies or is available to testify at the proceeding in court or in any other manner provided by law.

That Art. 38.37 Sec. 1 states:

(1)    This article applies to a proceeding in the prosecution of a defendant for an offense under the following provisions of the Penal Code, if committed against a child under 17 years of age:

     (1)    Chapter 21 (Sexual Offenses);

     (2)    Chapter 22 (Assaultive Offenses);

     (3)    Chapter 25.02 (Prohibited Sexual Conduct);

     (4)    Chapter 43.25 (Sexual Performance by a Child); or

     (5)    an attempt or conspiracy to commit an offense listed in this section.

That Art. 38.37 Sec. 2 states:

(2)    Notwithstanding Rules 404 and 405, Texas Rules of Criminal Evidence, evidence of other crimes, wrongs, or acts committed by the defendant against the child who is the victim of the alleged offense shall be admitted for its bearing on relevant matters, including:

     (1)    the state of mind of the defendant and the child; and

     (2)    the previous and subsequent relationship between the defendant and the child.

That Art. 38.37 Sec. 3 states:

(3)    On timely request by the defendant, the state shall give the defendant notice of the state's intent to introduce in the case in chief evidence described by Section 2 in the same manner as the state is required to give notice under Rule 404(b), Texas

Rules of Criminal Evidence.

## II.

Defendant requests that he be provided the notice required by the Rules 404(b), 609(f), Art. 37.07 Sec.(g), Art. 38.072 Sec. 2(a); Art. 38.37 Sec. 1; Art. 38.37 Sec. 2; and Art. 38.37 Sec. 3 of other crimes, wrongs or acts other than that arising in the same transaction and any evidence of prior criminal record. Defendant requests this notice to be provided far enough in advance of trial that he will be able to adequately investigate these other acts.

**WHEREFORE, PREMISES CONSIDERED**, defendant prays that this request be noted in the record.

Respectfully submitted,

_(signature)_

Earl Gray
103 N. Main Street
Bryan, TX 77803
(979) 822-4759
(979) 779-0575 Facsimile
SBOT: 24007265
**ATTORNEY FOR DEFENDANT**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Motion has been delivered to the prosecuting attorney on the date it was filed.

_(signature)_

Earl Gray



CAUSE NO. 12-03324-CRF-272

| THE STATE OF TEXAS | X | IN THE 272ND DISTRICT COURT |

THE STATE OF TEXAS      X      IN THE 272ND DISTRICT COURT

VS.      X      OF

DAVID GREER      X      BRAZOS COUNTY, TEXAS

---

## DEFENDANT'S REQUEST FOR DESIGNATION OF EXPERT WITNESSES

---

### TO THE HONORABLE JUDGE OF SAID COURT AND THE PROSECUTOR IN THIS CASE:

Now comes the Defendant, by and through his/her attorney of record, and respectfully requests, pursuant to Texas Code of Criminal Procedure Article 39.14(b), the State in the above styled and numbered cause to provide the Defendant, at least twenty (20) days in advance of trial, the names and addresses of all witnesses they may use at trial to present evidence under Rules 702, 703, and/or 705 of the Texas Rules of Evidence.

The Defendant seeks the information requested to enable proper preparation and to avoid unnecessary delay at trial.

Respectfully submitted,

Earl Gray
103 N. Main Street
Bryan, TX 77803
(979) 822-4759
(979) 779-0575 Facsimile
SBOT: 24007265
**ATTORNEY FOR DEFENDANT**

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Motion has been delivered to the prosecuting attorney on the date it was filed.

Earl Gray

**Page 7**



CAUSE NO. 12-03324-CRF-272

| | | |
|---|---|---|
| THE STATE OF TEXAS | X | IN THE 272ND DISTRICT COURT |
| VS. | X | OF |
| DAVID GREER | X | BRAZOS COUNTY, TEXAS |

## REQUEST FOR DISCOVERY

Now comes Defendant and requests the following items and information be provided:

1. All statements by the Defendant pursuant to Tex. Code Crim. Proc. Art. 38.22 and all written statements made by the Defendant in connection with this offense with which the Defendant is herein charged.

2. All objects and tangible property taken by the State during the course of its investigation of the offense with which the Defendant is herein charged, and any items which may be introduced at trial.

3. Any written waivers or consent forms signed by the Defendant.

4. The name of the case agent who investigated this case.

5. The prior criminal record of the Defendant including all arrests and convictions whether as a juvenile or as an adult.

6. All final adult felony convictions and misdemeanors of moral turpitude on the part of all witnesses called by the State.

7. A complete list of any and all extraneous offenses by the Defendant, evidence of which the State could offer as exception to the general rule prohibiting proof of extraneous offenses, pursuant to Tex. Rules Crim. Evid. 404(b).

8. Any exculpatory and/or mitigating evidence within the possession, custody, or control of the State, the existence of which is known, or by the exercise of due diligence may become known to the State.

9. Any photographic lineups shown in the course of the investigation of this case.

**Page 8**

10. The final results of any laboratory test or any other analytical test pertaining to evidence in this case.

11. Copies of any prior convictions of the Defendant which may be used for jurisdictional, enhancement, or impeachment purposes.

12. All photographs taken, or used, in the course of the investigation of this case.

13. Prior to voir dire, a list of all the names of prospective prosecution witnesses who have knowledge and likely will be used at the guilt/innocence phase and the punishment phase of the trial, with a continuing duty on the part of the State to disclose the names of rebuttal witnesses as soon as they become known.

14. All statements made by any party or witness to this alleged offense, whether written or oral, which might in any manner be material to either the guilt or innocence of the Defendant or the punishment, if any, to be set in this case, pursuant to Tex. Rules Crim. Evid. 615.

15. All handwritten and typed reports prepared by peace officers who investigated and participated in any manner in the preparation of these charges against the Defendant, pursuant to Tex. Rules Crim. Evid. 615.

_____

_____

_____

_____

Defendant requests that discovery be completed within a reasonable time before trial, with the State being under a continuing duty to supplement with any of the above items that comes to its attention.

WHEREFORE, PREMISES CONSIDERED, Defendant prays that this request be noted in the record.

Respectfully submitted,

Earl Gray
103 N. Main Street
Bryan, TX 77803
(979) 822-4759
(979) 779-0575 Facsimile
SBOT: 24007265
**ATTORNEY FOR DEFENDANT**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Motion has been delivered to the prosecuting attorney on the date it was filed.

Earl Gray

| THE STATE OF TEXAS | X | IN THE 272ND DISTRICT COURT |
|---|---|---|
| VS. | X | OF |
| DAVID GREER | X | BRAZOS COUNTY, TEXAS |

## MOTION TO SUPPRESS STATEMENTS

**TO THE HONORABLE JUDGE OF SAID COURT:**

Now comes the Defendant in the above entitled and numbered cause and moves the Court to suppress the statements made by Defendant for the reasons stated below:

I.

Defendant moves to suppress any statements made by the Defendant, whether oral or written including, but not limited to, statements made to the officer, whether in or out of custody, on the following grounds:

A. Any oral or written statement made by the Defendant was not freely and voluntarily made.

B. Any oral statement made by the Defendant was made as the result of a custodial interrogation was not recorded as provided in Article 38.22, Texas Code of Criminal Procedure.

C. In the alternative, if any oral statement was recorded, it was made without the Defendant first having knowingly, voluntarily and intelligently waived any rights set out in the warning and as required by the Miranda case.

D. The Defendant was not properly warned of his rights prior to making the statement.

E. The statement was the product of any illegal detention and/or arrest.

WHEREFORE, PREMISES CONSIDERED, Defendant prays that the above evidence be suppressed and that no mention be made of said evidence directly or indirectly by the prosecutor or any of the witnesses for the state and that the prosecutor be instructed to remind his witnesses that no mention is to be made of this evidence.

Respectfully submitted,

_____
Earl Gray
103 N. Main Street
Bryan, TX  77803
(979) 822-4759
(979) 779-0575 Facsimile
SBOT: 24007265
**ATTORNEY FOR DEFENDANT**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Motion has been delivered to the prosecuting attorney on the date it was filed.

_____
Earl Gray

## O R D E R

On this the ___ day of _____, 2012, came on to be considered the above and foregoing Defendant's Motion to Suppress

Statements and said Motion is hereby GRANTED/DENIED.

_____
JUDGE PRESIDING



CAUSE NO. 12-03324-CRF-272

| | | |
|---|---|---|
| THE STATE OF TEXAS | X | IN THE 272ND DISTRICT COURT |
| VS. | X | OF |
| DAVID GREER | X | BRAZOS COUNTY, TEXAS |

## DEFENDANT'S MOTION TO SUPPRESS
### (SEARCH OF PERSON AND/OR PERSONAL BELONGINGS WITHOUT WARRANT)

TO THE HONORABLE JUDGE OF SAID COURT:

Now comes the Defendant in the above styled and numbered cause, and files this his Motion to Suppress and, in connection herewith, would respectfully show the Honorable Court the following:

**I.**

Members of law enforcement did then and there search Defendant's person and/or personal property and did seize alleged contraband belonging to Defendant without a warrant and:

1) without reasonable suspicion;

2) without probable cause;

3) without exigent circumstances;

4) without said seizure and/or search being reasonably related to the time and scope of the initial detention;

5) without Defendant's consent;

6) upon purported consent of Defendant which was given involuntarily and as the result of coercion;

7) upon purported consent of a person(s) who had no authority to give consent; and/or

8) upon purported consent of a person(s) who gave such consent involuntarily and as the result of coercion.

Wherefore, Defendant prays the Court to set this Motion to Suppress for hearing and, upon hearing evidence adduced in support thereof, find that such search and seizure were unlawful and in violation of the Fourth Amendment of the United States Constitution and Article

**Page 13**

1, § 9 of the Texas Constitution, and order that all evidence obtained as a result thereof be suppressed and excluded pursuant to the exclusionary rule and Code of Criminal Procedure Article 38.23(a).

Respectfully submitted,

Earl Gray
103 N. Main Street
Bryan, TX 77803
(979) 822-4759
(979) 779-0575 Facsimile
SBOT: 24007265
**ATTORNEY FOR DEFENDANT**

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Motion has been delivered to the prosecuting attorney on the date it was filed.

**Earl Gray**

| THE STATE OF TEXAS | X | IN THE 272ND DISTRICT COURT |

THE STATE OF TEXAS     X     IN THE 272ND DISTRICT COURT

VS.     X     OF

DAVID GREER     X     BRAZOS COUNTY, TEXAS

---

## DEFENDANT'S MOTION TO SUPPRESS
## (INVALID SEIZURE/ARREST/RESTRAINT/DETENTION WITHOUT WARRANT)

---

**TO THE HONORABLE JUDGE OF SAID COURT:**

Now comes the defendant in the above styled and numbered cause, and files this his/her Motion to Suppress and, in connection herewith, would respectfully show the Honorable Court the following:

### I.

Defendant was involuntarily seized, arrested, restrained, detained, and/or taken into custody without warrant by law enforcement members whom:

1) did not, at the moment of such seizure, arrest, restraint, detention, and/or taking into custody have probable cause and/or reasonable suspicion to believe that the Defendant was in a suspicious place;

2) did not, at the moment of such seizure, arrest, restraint, detention, and/or taking into custody have probable cause and/or reasonable suspicion to believe that the Defendant had committed some felony or breach of the peace;

3) did not, at the moment of such seizure, arrest, restraint, detention, and/or taking into custody have probable cause and/or reasonable suspicion to believe that the Defendant was wanted in connection with a completed felony;

4) did not, at the moment of such seizure, arrest, restraint, detention, and/or taking into custody have probable cause and/or reasonable suspicion to believe that the Defendant had committed an assault resulting in bodily injury to another person and that there was danger of further bodily injury to that person;

5) did not, at the moment of such seizure, arrest, restraint, detention, and/or taking into custody have probable cause and/or reasonable suspicion to believe that the Defendant

had committed an assault resulting in bodily injury to a member of Defendant's family or household;

6) did not, at the moment of such seizure, arrest, restraint, detention, and/or taking into custody have probable cause and/or reasonable suspicion to believe that the Defendant had committed the offense of Violation of a Protective Order, as defined by Texas Penal Code Section 25.08;

7) did not, at the moment of such seizure, arrest, restraint, detention, and/or taking into custody have probable cause and/or reasonable suspicion to believe that the Defendant was in possession of a weapon and constituted a threat to said law enforcement members or others; and/or

8) did not, at the moment of such seizure, arrest, restraint, detention, and/or taking into custody have probable cause and/or reasonable suspicion that the Defendant was committing an offense within the officer's presence or view.

Wherefore, Defendant prays the court to set this Motion to Suppress for hearing and, upon hearing evidence adduced in support thereof, find that Defendant's seizure, arrest, restraint, detention, and/or taking into custody was unlawful under the 4th Amendment of the United States Constitution and Article I Section 9 of the Texas State Constitution, and order that all evidence obtained incident to, pursuant to and as a result of such unlawful seizure, arrest, restraint, detention, and/or taking into custody, whether tangible or intangible, and/or any oral or written statements made by Defendant, at the time of or following such unlawful seizure, arrest, restraint, detention, and/or taking into custody be suppressed and excluded pursuant to the exclusionary rule and Code of Criminal Procedure Art. 38.23(a).

Respectfully submitted,

_Earl Gray_

Earl Gray
103 N. Main Street
Bryan, TX 77803
(979) 822-4759
(979) 779-0575 Facsimile
SBOT: 24007265
**ATTORNEY FOR DEFENDANT**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Motion has been delivered to the prosecuting attorney on the date it was filed.

_Earl Gray_

Earl Gray

| THE STATE OF TEXAS | X | IN THE 272ND DISTRICT COURT |
| VS. | X | OF |
| DAVID GREER | X | BRAZOS COUNTY, TEXAS |

**DEFENDANT'S MOTION TO SUPPRESS**
**(SEARCH OF VEHICLE)**

**TO THE HONORABLE JUDGE OF SAID COURT:**

Now comes the Defendant in the above styled and numbered cause, and files this his

Motion to Suppress and, in connection herewith, would respectfully show the Honorable Court

the following:

**I.**

Members of law enforcement did then and there enter and search Defendant's vehicle and

did seize property belonging to Defendant without a valid search warrant and:

1)      without reasonable suspicion;

2)      without probable cause;

3)      without exigent circumstances;

4)      without Defendant's consent;

5)      outside the time and scope of the alleged reason for initial detention of the Defendant;

6)      upon purported consent of Defendant which was given involuntarily and as the result of coercion;

7)      upon purported consent of a person(s) who had no authority to give consent;

8)      upon purported consent of a person(s) who gave such consent involuntarily and as the result of coercion; and/or

9)      when Defendant's vehicle was not actually or readily mobile.
        In addition, any search of said vehicle pursuant to any search warrant executed

**Page 18**

on the date of the offense exceeded the scope of said search warrant.

Wherefore, Defendant prays the Court to set this Motion to Suppress for hearing and, upon hearing evidence adduced in support thereof, find that such search and seizure were unlawful and in violation of the Fourth Amendment of the United States Constitution and Article 1, § 9 of the Texas Constitution, and order that all evidence obtained as a result thereof be suppressed and excluded pursuant to the exclusionary rule and Code of Criminal Procedure Article 38.23(a).

Respectfully submitted,

_____
Earl Gray
103 N. Main Street
Bryan, TX 77803
(979) 822-4759
(979) 779-0575 Facsimile
SBOT: 24007265
**ATTORNEY FOR DEFENDANT**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Motion has been delivered to the prosecuting attorney on the date it was filed.

_____
Earl Gray

No. 12-03324 CRF-272

THE STATE OF TEXAS

vs.

David Duane Greer

FILED
At 8:20 o'clock A M
JUL 24 2012
MARC HAMLIN DIST CLERK
Brazos County, Texas
By _____ Deputy

IN THE _____ COURT

COUNTY COURT AT LAW NO. 1

BRAZOS COUNTY, TEXAS

## ORDER APPOINTING ATTORNEY

I hereby appoint ___Earl Gray___, an attorney found by the Court to be competent, to represent the defendant in the above numbered and entitled cause, and to continue to represent the defendant until the case is concluded, including appeal, if any, or until released by written order of this Court.

SIGNED on this ___17___ day of ___May___, 2012.

_____
PRESIDING JUDGE

Copy was:    ☐ Mailed to:    ☑ Delivered to: Fax 779 0575    822 4759

Attorney Appointed          Address          Phone Number

Copy was:    ☐ Mailed to:    ☑ Delivered to: Jail

Defendant          Address          Phone Number

Original to:        District Clerk
Copies to:         Community Supervision and Corrections Department
                   District Attorney

Unl poss Firearm
by Felon

Page 20

Offense(s):_____ Date of Offense:_____ Date of Arrest: 5-14-12

## AFFIDAVIT IN SUPPORT OF COURT APPOINTED ATTORNEY

By signing this application you are swearing, under oath, that an attorney does not now represent you, that your right to representation by an attorney has not been waived and that the information that you are providing is true and correct.

To be considered for court appointed counsel, **every question** on this form **must be answered.** If the question does not apply to you, place an N/A in the blank. Failure to answer every question could result in your application **not** being considered. If you need assistance, notify the person in charge of taking this application.

### Section 1. Personal Information
Last name: GRECA First name: DAVE Middle: DuANE
Address: 5777 Jule Circle Bryan TX Married ☐ Divorced ☐ Single ☑ Other_____
Social Security Number: 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 Texas Driver's License or Identification Number:_____
Date of Birth: 12-22-66 Place of Birth: Bryan Primary Language: English INS Hold ☐ yes ☑ no
Home Phone: (979) 823-5200 Cell Phone: (979) 595-2571 Other Contact No. (___)_____

### Employment Information
Place of Employment: Disabled Length of Employment:_____ ☐ mo ☐ years
Hourly pay rate: $ N/A Number of Hours per week N/A Net monthly salary: $ N/A
List Deductions (except taxes) from payroll and the amount of each deduction: Child support $ N/A Uniforms $ N/A
Savings/retirement $ N/A Cash advance/loans $ N/A Other $ N/A

*If unemployed, give the length of time unemployed, reason for unemployment and explanation as to how your monthly expenses are paid or how you support yourself._____
List names of all employers for last two years and monthly salary for each.

| Employer's Name | Dates of Employment | Monthly Net Income (Take home pay) |
|---|---|---|
| Disabled | N/A | N/A |
| N/A | N/A | N/A |

### Spouse's Information
Spouse's Name N/A Place of Employment _____ Net monthly salary$_____
Hourly pay rate: $_____ Number of hours per week: _____ List Deductions (except taxes) from payroll and the amount of each deduction: Child support $_____ Uniforms $_____ Savings/retirement $_____ Cash advance/loans $_____ Other $_____

### Other Monthly Income:
☐ Investment Income $ N/A  ☐ Child Support $ N/A  ☐ Rental Income $ N/A  ☐ Cash Gifts $ N/A
☐ Unemployment $ N/A  ☐ Pension Payments $ N/A  ☐ Other (Describe) $ N/A

### Government Assistance:
Are you receiving benefits from any other source? ☑ yes ☐ no
☐ Medicaid $ ___ per month  ☐ SSI $ N/A per month  ☐ Disability (SSI) $ N/A per month
☐ Food Stamps $ 200 per month  ☐ Public Housing $ N/A per month  ☐ *TANF $ N/A per month
Other: (Specify type of benefit and amount per month):_____ *(Temporary Assistance for Families)

Do you have any property that you could sell or use as collateral? ☐ yes ☑ no
If yes, then list item with approximate value_____

Do you have any friends or relatives from which you can borrow funds for an attorney? ☐ yes ☑ no
If yes, how long will it take you to obtain the funds?_____

### Real Estate
1. Do you own any real estate? ☐ yes ☑ no  ☐ Homestead ☐ Rental ☐ Business ☐ Other: N/A
   Address of Property: N/A  Date purchased N/A
   Tax Appraisal value $ N/A  Purchase price: $ N/A  Amount owed on property $ N/A

2. Do you own any real estate? ☐ yes ☑ no  ☐ Homestead ☐ Rental ☐ Business ☐ Other N/A
   Address of Property: N/A  Date purchased N/A
   Tax Appraisal value $ N/A  Purchase price: $ N/A  Amount owed on property $ N/A

*(Please use back of sheet to list additional properties owned or being purchased by you)*

**Motor Vehicles:** List all vehicles, including boats, motorcycles, and recreational vehicles titled in your name None
Year, Model and Make of Vehicle: 1999 Ford Truck Estimated value: None
Year, Model and Make of Vehicle: N/A Estimated value: N/A
Year, Model and Make of Vehicle: N/A Estimated value: N/A

FILED
At ___ o'clock ___ M
JUL 2 4 2012
MARC HAMLIN, DIST CLERK
Brazos County, Texas
By_____

Application

**Personal Property:** Clearly indicate all assets currently in your name or subject to your control and the value of each

☐ Securities/Bonds/CDs $_NA_    ☐ Livestock $_NA_    ☐ Whole Life Insurance $_NA_    ☐ Cash money $_NA_
☐ Retirement Plans $_NA_    ☐ Bank Accounts $_NA_    ☐ Savings Accounts $_NA_    ☐ Available credit $_NA_

**Section 2: Debts and Liabilities.** List all dependents living with you.

| | | | |
|---|---|---|---|
| Dave Kam Green | | | |
| Damon Nain Green | | | |
| Dade Anna Green | | | |

**Monthly Expenses:** Necessary monthly expenses are as follows (if amount is $0.00, place a 0 or N/A in the blank

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Rent/House payment | $___ | Food | $50.00 | Utilities | $0 | Telephone | $0 |
| Fuel/Maintenance | $100 | Cell Phone | $0 | Child Care | $0 | School Lunches | $50 |
| School tuition | $0 | Church | $0 | Credit Cards | $0 | Doctor/Dentist | $0 |
| Medical Insurance | $0 | Auto insurance | $0 | Life Insurance | $0 | Auto payment | $0 |
| Other transportation | $0 | Haircuts/Nails | $0 | Bank Loans | $0 | Cable/Satellite | $0 |
| Furniture payments | $0 | Entertainment | $0 | Clothing | $0 | Child Support | $0 |
| Other (Describe) | $0 | Other (Describe) | $0 | **TOTAL MONTHLY EXPENSES:** $600 | | | |

**Section 3: Miscellaneous Information**
Are there any co-defendants in your case? ☑ yes ☐ no
If yes, please name co-defendants to avoid attorney conflicts. _Dut Koon_

**Retained Counsel:**
I have / have not (circle one) attempted to hire an attorney. The names of the attorneys I have contacted are as follows:
_NA_    _NA_    _NA_

**References:** List the name, address and telephone number of 3 individuals who are able to contact you regarding your case.

| Name | Phone number with area code | Address | Relationship |
|---|---|---|---|
| NA | NA | NA | |
| | | | |

**Section 4: Oath**
I do hereby swear that the information given above is true and correct. I understand that making a false statement under oath to the Court is perjury, which is a criminal offense for which I can be punished by imprisonment in the Institutional Division of the Department of Criminal Justice for 2 to 10 years, Fined up to $10,000.00, or both. I also understand that this Application will be filed of record and that it is a crime to intentionally or knowingly file a fraudulent court record or a fraudulent instrument with the clerk.

I have been advised of my right to an attorney in the prosecution of the charge pending against me. I certify that I am without means to employ an attorney of my own choosing and I hereby request the court to appoint an attorney for me. I have been further advised that my failure to answer all questions above will result in the denial of a court appointed attorney. Accordingly, I certify that I have voluntarily prepared this Affidavit and have carefully checked my answers for accuracy.

_____    5-15-12
Defendant's Signature          Date

On this day, personally appeared the above-named defendant, who stated under oath that his/her answers to this Affidavit are true and correct.

SUBSCRIBED AND SWORN TO BEFORE ME on this the _____ day of _____, 200____.

_____
Notary Public, State of Texas
Deputy Clerk

REC'D 05/15/12 #274

Application        **Page 22**        2



* * * Communication Result Report ( May. 17. 2012 3:30PM ) * * *

Fax Header) Brazos County Magistrate 1

Date/Time: May. 17. 2012 3:25PM

| File No. | Mode | Destination | Pg(s) | Result | Page Not Sent |
|---|---|---|---|---|---|
| 8206 | Memory TX | 97790575 | P. 1 | OK | |

Reason for error
E. 1) Hang up or line fail
E. 2) Busy
E. 3) No answer
E. 4) No facsimile connection
E. 5) Exceeded max. E-mail size

No.________________

THE STATE OF TEXAS — IN THE _______ DISTRICT COURT

vs. — COUNTY COURT AT LAW NO. _____

David Duane Greer — BRAZOS COUNTY, TEXAS

**ORDER APPOINTING ATTORNEY**

I hereby appoint Earl Gray, an attorney found by the Court to be competent, to represent the defendant in the above numbered and entitled cause, and to continue to represent the defendant until the case is concluded, including appeal, if any, or until released by written order of this Court.

SIGNED on this 17 day of May 2012.

Dana L. [illegible]
PRESIDING JUDGE

Copy was: ☐ Mailed to: ☒ Delivered to: Fax 779 0575 — 822 4759
Attorney Appointed — Address — Phone Number

Copy was: ☐ Mailed to: ☒ Delivered to: Jail
Defendant — Address — Phone Number

Original to: District Clerk
Copies to: Community Supervision and Corrections Department
District Attorney

F/1 BL/W
UNL Poss Firearm
by Felon

**Earl Gray**
Attorney
Board Certified Criminal Law

**Dan Jones**
Attorney

**Jay Granberry**
Attorney
Board Certified Criminal Law

**Amanda Jouett**
Attorney

May 18, 2012

District Clerk
(Via Fax: 361-0197)

RE:    The State of Texas v. David Duane Greer    F3
Cause#:    Unindicted

Dear Court Coordinator:

The purpose of this letter is to advise you that I received notice that I was appointed to represent the above referenced defendant. I have sent a letter to him/her advising him/her to contact me as soon as possible to set up an appointment.

Thank you for the opportunity to represent the above mentioned defendant.

Sincerely,

Earl Gray

cc: Magistrate Court
cc: District Attorney's Office

FILED
At 8:40 o'clock A M
JUL 2 4 2012
MARC HAMLIN DIST CLERK
Brazos County, Texas
By _____ Deputy

Page 24



### GRAY GRANBERRY & JONES
#### Attorneys At Law
1 0 3 N. Main Street Bryan, TX 77803
(979) 822-4759 Fax: (979) 779-0575

**Earl Gray**
Attorney
Board Certified Criminal Law

**Dan Jones**
Attorney

**Jay Granberry**
Attorney
Board Certified Criminal Law

**Amanda Jouett**
Attorney

July 25, 2012

272nd District Court
Attn: Lisa Parker; Court Coordinator
300 East 26th Street
Bryan, TX 77803



RE: The State of Texas v. David Duane Greer
Cause No: 12-03324-CRF-272

The above named defendant is set in the 272nd District Court of Brazos County for an Arraignment and Pretrial on July 30, 2012. Counsel is requesting said Arraignment and Pretrial be reset for the reason that Counsel's presence is required in the 85th District Court for a Preferentially set Jury Trial in The State of Texas vs. Kenneth Lloyd Holmes; Cause No: 10-05180-CRF-85.

If you have any questions, please contact me at the number above. As always, thank you for your time and consideration in this matter.

Sincerely,

Earl Gray

CC: DISTRICT ATTORNEY'S OFFICE
VIA FAX: 361-4368

**Page 25**

NO. 12-03324-CRF-272

FILED
At _____ o'clock _____ M
AUG 1 0 2012

| STATE OF TEXAS | § | IN THE DISTRICT COURT |
|---|---|---|
| | § | |
| vs. | § | 272ND JUDICIAL DISTRICT |
| | § | |
| DAVID DUANE GREER | § | BRAZOS COUNTY, TEXAS |

## MOTION FOR SPEEDY TRIAL

TO THE HONORABLE JUDGE OF SAID COURT:

Now comes David Duane Greer, Defendant, by and through undersigned counsel, and moves the Court for a speedy trial in this cause, and shows the following:

1.     David Duane Greer is guaranteed the right to a speedy trial under the Sixth and Fourteenth Amendments to the United States Constitution, Article I, Section 10 of the Texas Constitution, and Articles 1.03(3) and 1.05 of the Texas Code of Criminal Procedure. *See* Doggett v. United States, 505 U.S. 647 (1992); Strunk v. United States, 412 U.S. 434 (1973); and Barker v. Wingo, 407 U.S. 514 (1972). *See also* State v. Munoz, 991 S.W.2d 818 (Tex. Crim. App. 1999).

2.     David Duane Greer was arrested on May 14, 2012 for a crime which allegedly occurred on February 16, 2012. Trial has not been scheduled.

3.     David Duane Greer will be prejudiced should trial not be held as soon as possible, for the reason that David Duane Greer has been incarcerated in the Brazos County Jail since May 14, 2012. He has been unable to make bond in this case. David Duane Greer maintains his innocence to the offenses charged.

WHEREFORE, PREMISES CONSIDERED, David Duane Greer moves that trial in this case be scheduled as soon as possible.

**Page 26**

Respectfully submitted,
Gray, Granberry & Jones
103 N. Main St.
Bryan, TX 77803
Tel: (979) 822-4759
Fax: (979) 779-0575

By:_____
Earl Gray
State Bar No. 24007265
Attorney for Earl Gray

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing document was served on the District Attorney's Office, Brazos County, Texas, by hand delivery on the date it was filed.

_____
Earl Gray

CAUSE NO. 12-03324-CVF 272

FILED
At [   ] o'clock [ ] M
AUG 3 1 2012
MARC HAMILTON DIST CLERK
Brazos County, TEXAS
By [   ]

X
X
X

DAVID [   ] AKA
Dave

IN THE DISTRICT COURT
BRAZOS COUNTY, TEXAS
272nd DISTRICT COURT

## DISCOVERY ORDER

On this day the above numbered and entitled cause was called for a pretrial hearing. The defendant, defendant's attorney, and the Assistant District Attorney representing the State appeared. The Court hereby orders that the State produce and permit the inspection of, and the copying and/or photographing of the following items:

1. All statements by the Defendant pursuant to Tex. Code Crim. Proc. Art. 38.22 and all written statements made by the Defendant in connection with this offense with which the Defendant is herein charged.

2. All objects and tangible property taken by the State during the course of its investigation of the offense with which the Defendant is herein charged, and any items which may be introduced at trial.

3. Any written waivers or consent forms signed by the Defendant.

4. The name of the case agent who investigated this case.

5. The prior criminal record of the Defendant including all arrests and convictions whether as a juvenile or as an adult.

6. All final adult felony convictions and misdemeanors of moral turpitude on the part of all witnesses called by the State.

7. A complete list of any and all extraneous offenses by the Defendant, evidence of which the State could offer as exception to the general rule prohibiting proof of extraneous offenses, pursuant to Tex. Rules Crim. Evid. 404(b).

8. Any exculpatory and/or mitigating evidence within the possession, custody, or control of the State, the existence of which is known, or by the exercise of due diligence may become known to the State.

9. Any photographic lineups shown in the course of the investigation of this case.

10. The final results of any laboratory test or any other analytical test pertaining to evidence in this case.

11. Copies of any prior convictions of the Defendant which may be used for jurisdictional, enhancement, or impeachment purposes.

12. All photographs taken, or used, in the course of the investigation of this case.

13. Prior to voir dire, a list of all the names of prospective prosecution witnesses who have knowledge and likely will be used at the guilt/innocence phase and the punishment phase of the trial, with a continuing duty on the part of the State to disclose the names of rebuttal witnesses as soon as they become known.

14. All statements made by any party or witness to this alleged offense, whether written or oral, which might in any manner be material to either the guilt or innocence of the Defendant or the punishment, if any, to be set in this case, pursuant to Tex. Rules Crim. Evid. 615.

15. All handwritten and typed reports prepared by peace officers who investigated and participated in any manner in the preparation of these charges against the Defendant, pursuant to Tex. Rules Crim. Evid. 615.

_____

_____

_____

_____

_____

_____

Discovery is to be completed within a reasonable time before trial, with the State being under a continuing duty to supplement with any of the above items that comes to its attention.

SIGNED this 13th day of August, 20 12.

JUDGE PRESIDING

**Page 28**

| STATE OF TEXAS | § | IN THE 272ND DISTRICT COURT |
|---|---|---|
| | § | |
| vs. | § | OF |
| | § | |
| DAVID DUANE GREER | § | BRAZOS COUNTY, TEXAS |

## MOTION FOR DISCOVERY OF EXCULPATORY AND MITIGATING EVIDENCE

**TO THE HONORABLE JUDGE OF SAID COURT:**

Now comes the Defendant, DAVID DUANE GREER, by and through the undersigned counsel, and respectfully moves this Court to order the State to disclose all evidence in its possession and in the possession of its agents, which is both favorable to Defendant and material either to guilt or to punishment, including impeachment evidence.

1.     Such disclosure is required by the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *See* Brady v. Maryland, 373 U.S. 83, 87 (1963); *see also* United States v. Bagley, 473 U.S. 667, 675-78 (1985). Disclosure is also required under the Due Course of Law provisions of Article I, §§ 13 and 19 of the Texas Constitution.

2.     Rule 3.09(d) of the Texas Disciplinary Rules of Professional Conduct requires prosecutors to "make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, to disclose to the defense and to the tribunal all unprivileged mitigating information known to the prosecutor, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal".

3.     This motion seeks a Court order instructing the State's attorney to make available for Defendant's inspection and copying or photocopying all evidence meeting the following criteria:

a.     evidence or information within the possession, custody or control of the State of Texas, or any of its agencies, and which is known to be in existence or by the exercise of due diligence may become known to the State's attorney, and

b.     which is favorable to the Defendant on the issue of guilt or innocence, or

c.     which may tend to mitigate or lessen punishment in the event the Defendant is found guilty. *Brady v. Maryland*, 373 U.S. 83 S. Ct. 1194, 10 L.Ed.2d. 215 (963).

4.     The request for *Brady* material includes, but is not limited to the following:

a.     Any and all audio and or video recordings of the Defendant, David Greer of the investigation for the charged offense which was to have occurred on or about February 16, 2012.

b.     Any and all audio and or video recordings of the co-defendant, Monishia Campbell of the investigation for the charged offense which was to have occurred on or about February 16, 2012.

c.     The inventory listing collected and or seized and description of all items from David Duane Greer on or about February 16, 2012.

d.     The inventory listing collected and or seized and description of all items from Monishia Campbell on or about February 16, 2012.

e.     Any and all audio and or video recordings of the Defendant, David Greer of the investigation for the charged offense which was to have occurred on or about May 14, 2012.

f.     The inventory listing collected and or seized and description of all items

from David Duane Greer on or about May 14, 2012.

g.  The names and addresses of all persons who have, or who may have, information favorable to the Defendant.

h.  The names and address of all persons interviewed by the State in connection with this case, but whom the State does not intend to call as witnesses in this case.

i.  Any information which may tend adversely to effect the credibility of any person called as a witness by the State, including the arrest and/or conviction record of each State witness, and including any offers of immunity or lenience, whether made directly or indirectly, to any State's witness in exchange for testimony.

**WHEREFORE, PREMISES CONSIDERED**, David Duane Greer prays that this Court order the State to disclose all exculpatory and mitigating evidence in its possession.

Respectfully submitted,
Gray, Granberry and Jones; Attorneys at Law
103 N. Main St.
Bryan, TX 77803
Tel: (979) 822-4759
Fax: (979) 779-0575

By:_____
Earl Gray
State Bar No. 24007265
Attorney for David Duane Greer

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Request has been delivered to the prosecuting attorney at the Brazos County Courthouse on the date it was filed.

_____
EARL GRAY

No. 12-03324-CRF-272

THE STATE OF TEXAS                    §    IN THE 272nd DISTRICT COURT
                                      §
Vs.                                   §
                                      §
David Duane Greer                     §
                                      §    BRAZOS COUNTY, TEXAS

Amended (*)
## COMMITMENT/RELEASE ORDER

**To:    The Sheriff of Brazos County, Texas**

The above named defendant is ordered committed to/released from the custody of the Sheriff of Brazos County, Texas, effective at 12:40 a.m./p.m. on the 15th day of November, 2012 relating to the offense(s) of Unlawful Poss Firearm by Felons :

___ to serve a term of thirty (30) days/months/years:

    ___ in the Brazos County Jail

    ___ in the Institutional Division of the Texas Department of Criminal Justice

    ___ in a State Jail Facility

        ___ as a condition of community supervision

        ___ with referral to the State Boot Camp

        ___ work release is authorized

            ___ each SU M T W Th F Sa from ___ m. until ___ m.

            ___ according to the schedule ___

___ to be held in the Brazos County Jail

    ___ without bail, until further order of this Court

    ___ until transported to a Substance Abuse Felony Punishment Facility

    ___ pending appeal from his conviction of a felony

    ___ until sufficient bail is posted in the amount of $___

        ___ in cash or surety bond form

        ___ in personal bond form

        ___ upon the attached conditions;   ___ without conditions

___ to be released from custody on the above charge(s)

___ CREDIT FOR TIME SERVED

___ UPON RELEASE, Defendant is to report to the Brazos County District Clerk (Collections) to
pay court costs of $___; attorney fees of $___;
fine of $___; restitution of $___;

___ lay-out court costs of $259.00 (*)

___ TO RUN CONCURRENT WITH ___

___ SPECIAL INSTRUCTIONS: ___

___ **YOU ARE ORDERED TO OBTAIN AND BRING PROOF OF TB TESTING ON THE FIRST DAY THAT YOU REPORT TO JAIL. FAILURE TO COMPLY WILL RESULT IN WORK RELEASE BEING REVOKED AND STRAIGHT TIME ORDERED.   Defendant's Initials ___**

SIGNED this the 15th day of November, 2012.

_____
Presiding Judge

This Court Order was received on 11/15/16

Deputy Walters
Brazos County
Sheriff's Office

**Page 33**

CAUSE NO. 12-03324-CRF-272 1140     a

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 272nd DISTRICT COURT |
| | § | |
| VS. | § | |
| David Green | § | |
| | § | OF BRAZOS COUNTY, TEXAS |

## TRIAL COURT'S CERTIFICATION OF DEFENDANT'S RIGHT OF APPEAL*

I, Judge of the trial court, certify this criminal case:

☑ is not a plea-bargain case, and the defendant has the right of appeal. [or]

☐ is a plea-bargain case, but matters were raised by written motion filed and ruled on before trial and not withdrawn or waived, and the defendant has the right of appeal. [or]

☐ is a plea-bargain case, but the trial court has given permission to appeal, and the defendant has the right of appeal. [or]

☐ is a plea-bargain case, and the defendant has NO right of appeal. [or]

☐ The defendant has waived the right of appeal.

_____          11 - 15 - 12
Judge                                     Date Signed

criminal

I have received a copy of this certification. I have also been informed of my rights concerning any appeal of this criminal case, including any right to file a pro se petition for discretionary review pursuant to Rule 68 of the Texas Rules of Appellate Procedure. I have been admonished that my attorney must mail a copy of the court of appeal's judgment and opinion to my last known address and that I have only 30 days in which to file a pro se petition for discretionary review in the court of appeals. TEX. R. APP. P. 68.2 I acknowledge that, if I wish to appeal this case and if I am entitled to do so, it is my duty to inform my appellate attorney, by written communication, of any change in the address at which I am currently living or any change in my current prison unit. I understand that, because of appellate deadlines, if I fail to timely inform my appellate attorney of any change in my address, I may lose the opportunity to file a pro se petition for discretionary review.

_____          _____
Defendant                                 Defendant's Counsel
Mailing address: _____          State Bar of Texas ID number:_____
_____          Mailing address:_____
Telephone number: _____         _____
Fax number (if any): _____       Telephone number:_____
                                          Fax number (if any):_____

* "A defendant in a criminal case has the right of appeal under these rules. The trial court shall enter a certification of the defendant's right to appeal in every case in which it enters a judgment of guilt or other appealable order. In a plea bargain case – that is, a case in which a defendant's plea was guilty or nolo contendre and the punishment did not exceed the punishment recommended by the prosecutor and agreed to by the defendant – a defendant may appeal only: (A) those matters that were raised by written motion filed and ruled on before trial, or (B) after getting the trial court's permission to appeal." TEXAS RULE OF APPELLATE PROCEDURE 25.2(a)(2).

**Page 34**

No. 12-03324-CRF-272

| THE STATE OF TEXAS | 272ND DISTRICT COURT |
| VS. | IN |
| DAVID DUANE GREER | BRAZOS COUNTY, TEXAS |

## ORDER APPOINTING ATTORNEY

On this November 15, 2012, let it be known that the Court found good cause to release the court appointed attorney from this case.

It is therefore, ORDERED, ADJUDGED AND DECREED, that EARL GRAY, a licensed attorney by the State of Texas is hereby released in this case and no longer represents DAVID DUANE GREER , Defendant in the above numbered cause(s).

On this November 15, 2012, let it be known that this Court found good cause to appoint an attorney to represent the Defendant in any post-conviction writ and/or appeal proceedings in the above numbered cause(s).

I hereby appoint **MARY HENNESSY**, an attorney found by the Court to be competent, to represent DAVID DUANE GREER , Defendant in the above numbered and titled cause in any post-conviction writ and/or appeal proceedings, if any, or until released by written order of this Court.

SIGNED on Thursday, November 15, 2012.

TRAVIS B. BRYAN III
Presiding Judge

*Order Appointing Attorney*
*Page 1 of 2*

**Page 35**

Copy was: ☐ Mailed to: ☐ Delivered to: ☐ Transmitted by fax to:

**MARY HENNESSY**          **403 Alamo St.**              **979-277-0757**
                          **Brenham, Tx 77833**         **FAX: 979-277-0030**

| Attorney Appointed | Address | Phone Number |
|---|---|---|

Copy was: ☐ Mailed to: ☐ Delivered to: Custody status:

**DAVID DUANE GREER**
**IN JAIL**

| Defendant | Address | Phone Number |
|---|---|---|

Copy was faxed to Office of the Brazos County District Attorney
VIA FAX NO. (979) 361-4368

*Order Appointing Attorney*
*Page 2 of 2*

Date/Time: Nov. 15. 2012 10:33AM

| File No. | Mode | Destination | Pg(s) | Result | Page Not Sent |
|---|---|---|---|---|---|
| 8961 | Memory TX | 91--979-277-0030----9581832 DISTRICT ATTORNEY | P. 2 | OK OK | |

Reason for error
E. 1) Hang up or line fail
E. 2) Busy
E. 3) No answer
E. 4) No facsimile connection
E. 5) Exceeded max. E-mail size

---

No. 12-03324-CRF-272

| | |
|---|---|
| THE STATE OF TEXAS | 272ND DISTRICT COURT |
| VS | IN |
| DAVID DUANE GREER | BRAZOS COUNTY, TEXAS |

## ORDER APPOINTING ATTORNEY

On this November 15, 2012, let it be known that the Court found good cause to release the court appointed attorney from this case.

It is therefore, ORDERED, ADJUDGED AND DECREED, that EARL GRAY, a licensed attorney by the State of Texas is hereby released in this case and no longer represents DAVID DUANE GREER, Defendant in the above numbered cause(s).

On this November 15, 2012, let it be known that this Court found good cause to appoint an attorney to represent the Defendant in any post-conviction writ and/or appeal proceedings in the above numbered cause(s).

I hereby appoint MARY HENNESSY, an attorney found by the Court to be competent, to represent DAVID DUANE GREER, Defendant in the above numbered and titled cause in any post-conviction writ and/or appeal proceedings, if any, or until released by written order of this Court.

SIGNED on Thursday, November 15, 2012.

TRAVIS B. BRYAN III
Presiding Judge

Order Appointing Attorney
Page 1 of 2

November 13, 2012    No. 12-03324-CRF-272

THE STATE OF TEXAS

vs.

DAVID DUANE GREER

Defendant

In The 272nd District Court,

of

Brazos County, Texas.

**JURY CHOSEN**

1 LORYNN M. NIETO
2 ROBERT R. CESSNA
3 MALATHI R. MANCHI
4 ROBERT L. SMITH
5 MARISA Z. GALIMBERTHI
6 GILBERTO COBOS
7 CHAD D. LAMB
8 SARAH A. HENRY
9 ROBERT B. HASH
10 VICTORIA R. CARTER
11 LUIS C. ESPINO
12 LUCAS J. IRVIN
13
14

1140    a

amorgan

DATE OF TRIAL 11-13-2012

16-2892

No. 12-03324-CRF-272

THE STATE OF TEXAS,

vs.

DAVID DUANE GREER

Defendant.

JURY CHOSEN

FILED

November 13, 2012

Marc Hamlin ____ Clerk,

272nd District ____ Court,

Brazos ____ County, Texas.

By ____ Deputy.

STATE OF TEXAS
Vs
DAVID DUANE GREER
12-03324-CRF-272

November 13, 2012

| | | |
|---|---|---|
| 1. KATHRYN PATRICIA COX | 16. GILBERTO COBOS | 31. PAULA KATHRYN FREDERICK |
| 2. LORYNN MARTINEZ NIETO | 17. MICHAEL LEE HOLT 10:55A | 32. LUIS CARLOS ESPINO |
| 3. MARILYN D. MATHIS | 18. TRACY RENEE | 33. LUCAS JAMES IRVIN |
| 4. JEFF SCOTT SPARKS 9:28A | 19. TONY L. HERNANDEZ | 34. CASEY JOE MOORE |
| 5. RONALD DANIEL KELLING 10:53A | 20. KEVIN SCOTT SMITH | 35. SAMUEL AARON MASTERSON |
| 6. ROBERT RANDALL CESSNA | 21. CHAD DWAYNE LAMB | 36. BETTY UTECHT STECKMAN |
| 7. MALATHI REDDY MANCHI | 22. BRENT KEITH PARKER 10:56A | 37. ANTHONY ARIAS |
| 8. NICHOLAS EDWIN SCHLECHTE | 23. SARAH ANN HENRY | 38. ANTHONY D. PFITZER |
| 9. HALLEY ANN WELSH | 24. DAVID P. MCINTYRE | 39. NANCY HICKS NELSON 12:13P |
| 10. ROBERT LAND SMITH | 25. YIWEI MIAO | 40. KAREN K. BOONE |
| 11. BOBBY JOE SLOVAK | 26. ROBERT BRUCE HASH | 41. JAMES A. DAVIS |
| 12. ELIZA G. BERNAL | 27. CAROL BROWN | 42. VIRGINIA A. FORD |
| 13. REBA LAURIE | 28. STEVEN LAWRENCE LAVENDER | 43. COREY MICHAEL BARKER |
| 14. JACQUELINE MARIE BLAIR | 29. VICTORIA RAY CARTER | 44. MOHAMMED ENAMUL HAQUE |
| 15. MARISA Z. GALIMBERTTI | 30. SHARON ALICE MOORE 10:59A | 45. STEVE A. STRONG |

☐ STATE STRIKES

 DEFENSE STRIKES

 EXCUSED

1140 a

Jury was selected at 12:45,
November 13, 2012.
Remaining panel dismissed at
the same time.

Ernie J. Montoya,
Bailiff

**Page 40**

STATE OF TEXAS
    Vs
DAVID DUANE GREER
12-03324-CRF-272

November 13, 2012

| | | |
|---|---|---|
| 46. JOHN JOSEPH ALBERNAZ | 61. | 76. |
| 47. OMER LLOYD EVERETT | 62. | 77. |
| 48. JEFFREY MATT WATSON | 63. | 78. |
| 49. VENESA ANN HEIDICK | 64. | 79. |
| 50. ERIC KARSTEN BARDENHAGEN | 65. | 80. |
| 51. JULIA ANN GOOD | 66. | 81. |
| 52. BEVERLY THOMPSON KUHN | 67. | 82. |
| 53. JUDITH HILL DRAPER *11:00A* | 68. | 83. |
| 54. SARA CATHERINE DEAN *11:45A* | 69. | 84. |
| 55. BOBBY DOYLE PIWONKA *11:45A* | 70. | 85. |
| 56. CHRISTINE ANNE THOORSELL *11:45A* | 71. | 86. |
| 57. LORETTA DARLENE NICHOLS *11:00A* | 72. | 87. |
| 58. NORMAN D. AUGSBURGER *11:45A* | 73. | 88. |
| 59. RHONDA JOANN JOHNSON *11:45A* | 74. | 89. |
| 60. JENNIFER PETTIT HUDSPETH *11:45A* | 75. | 90. |

[ ]     STATE STRIKES

     DEFENSE STRIKES

     EXCUSED

Jury was selected at _12:45 P_
November 13, 2012.
Remaining panel dismissed at
the same time.

Ernie J. Montoya,
Bailiff

**Page 41**

Marc Hamlin, District Clerk
Brazos County Jury Services
200 S Texas Ave, Suite 167
Bryan TX, 77803
(979) 361-4224
JuryServices@BrazosCountyJury.com

OF BRAZOS

Seat Assignment
STATE OF TEXAS COUNTY OF BRAZOS

After Voir Dire
AM          Voir Dire ID: 1368
ourt

States Strikes
1, 9, 11, 12, 14, 18, 19, 25, 28, 35

| Attendance | | First Name | Middle Name | Date of Birth |
|---|---|---|---|---|
| | | KATHRYN | PATRICIA | October 25, 1965 |
| | | LORYNN | MARTINEZ | December 13, 1972 |
| | HIS | MARILYN | D | November 11, 1948 |
| | RKS | JEFF | SCOTT | August 22, 1967 |
| | LING | RONALD | DANIEL | March 1, 1958 |
| 2 | 220913 | CESSNA | ROBERT | RANDALL | October 31, 1952 |
| 7 | 221163 | MANCHI | MALATHI | REDDY | May 22, 1967 |
| 8 | 221421 | SCHLECHTE | NICHOLAS | EDWIN | May 22, 1987 |
| 9 | 222554 | WELSH | HALLEY | ANN | March 7, 1986 |
| 10 | 223160 | SMITH | ROBERT | LAND | February 8, 1949 |
| 11 | 223308 | SLOVAK | BOBBY | JOE | March 21, 1950 |
| 12 | 223393 | BERNAL | ELIZA | G | July 2, 1971 |
| 13 | 224679 | SCHLITTER | REBA | LAURIE | November 30, 1946 |
| 14 | 224870 | BLAIR | JACQUELINE | MARIE | July 1, 1961 |
| 15 | 224893 | GALIMBERTTI | MARISA | Z | August 6, 1952 |
| 16 | 225220 | COBOS | GILBERTO | | February 21, 1955 |
| 17 | 226198 | HOLT | MICHAEL | LEE | September 29, 1952 |
| 18 | 226243 | DEFRANCESCO | TRACY | RENEE | June 23, 1984 |
| 19 | 226316 | HERNANDEZ | TONY | L | August 4, 1958 |
| 20 | 226494 | SMITH | KEVIN | SCOTT | September 9, 1966 |
| 21 | 226502 | LAMB | CHAD | DWAYNE | January 19, 1976 |
| 22 | 226615 | PARKER | BRENT | KEITH | July 29, 1957 |
| 23 | 226666 | HENRY | SARAH | ANN | December 12, 1985 |
| 24 | 227248 | MCINTYRE | DAVID | P | July 22, 1954 |
| 25 | 227317 | MIAO | YIWEI | | December 29, 1960 |
| 26 | 227331 | HASH | ROBERT | BRUCE | May 28, 1957 |
| 27 | 227377 | FROSCH | CAROL | BROWN | June 2, 1949 |
| 28 | 227569 | LAVENDER | STEVEN | LAWRENCE | June 18, 1976 |
| 29 | 227575 | CARTER | VICTORIA | RAY | December 12, 1957 |
| 30 | 227586 | MOORE | SHARON | ALICE | November 19, 1956 |
| 31 | 227663 | FREDERICK | PAULA | KATHRYN | April 14, 1970 |
| 32 | 227670 | ESPINO | LUIS | CARLOS | October 6, 1988 |
| 33 | 227689 | IRVIN | LUCAS | JAMES | November 24, 1982 |
| 34 | 227799 | MOORE | CASEY | JOE | November 22, 1982 |
| 35 | 227811 | MASTERSON | SAMUEL | AARON | March 1, 1983 |
| 36 | 227995 | STECKMAN | BETTY | UTECHT | May 30, 1950 |
| 37 | 228069 | ARIAS | ANTONIO | | July 21, 1963 |
| 38 | 228100 | PFITZER | ANTHONY | D | September 24, 1956 |
| 39 | 228234 | NELSON | NANCY | HICKS | July 18, 1947 |
| 40 | 228788 | BOONE | KAREN | K. | December 2, 1955 |
| 41 | 228937 | DAVIS | JAMES | A | June 29, 1960 |
| 42 | 228969 | FORD | VIRGINIA | A | June 15, 1965 |

**Page 42**

| | Summons | Last Name | First Name | Middle Name | Date of Birth |
|---|---|---|---|---|---|
| 43 | 229176 | BARKER | COREY | MICHAEL | May 17, 1974 |
| 44 | 229203 | HAQUE | MOHAMMED | ENAMUL | August 3, 1959 |
| 45 | 229285 | STRONG | STEVE | A | June 13, 1960 |
| 46 | 229379 | ALBERNAZ | JOHN | JOSEPH | July 31, 1960 |
| 47 | 229398 | EVERETT | OMER | LLOYD | January 9, 1947 |
| 48 | 229425 | WATSON | JEFFREY | MATT | September 20, 1971 |
| 49 | 229430 | HEIDICK | VENESA | ANN | August 10, 1977 |
| 50 | 229545 | BARDENHAGEN | ERIC | KARSTEN | December 25, 1970 |
| 51 | 229694 | GOOD | JULIA | ANN | March 3, 1962 |
| 52 | 229711 | KUHN | BEVERLY | THOMPSON | April 8, 1966 |
| 53 | 229726 | DRAPER | JUDITH | HILL | November 19, 1948 |
| 54 | 229799 | DEAN | SARA | CATHERINE | August 13, 1992 |
| 55 | 230216 | PIWONKA | BOBBY | DOYLE | August 15, 1950 |
| 56 | 230320 | THOORSELL | CHRISTINE | ANNE | November 20, 1967 |
| 57 | 230422 | NICHOLS | LORETTA | DARLENE | September 17, 1948 |
| 58 | 230700 | AUGSBURGER | NORMAN | D | May 9, 1958 |
| 59 | 230755 | JOHNSON | RHONDA | JOANN | January 14, 1959 |
| 60 | 230847 | HUDSPETH | JENNIFER | PETTIT | November 30, 1964 |

Marc Hamlin, District Clerk
Brazos County Jury Services
200 S Texas Ave, Suite 167
Bryan TX, 77803
(979) 361-4224
JuryServices@BrazosCountyJury.com

Def Strikes
11/13/12

Attendance List Printed During/After Voir Dire
Tue, November 13, 2012 at 8:00 AM      Voir Dire ID: 1368
Court Name: 272nd District Court

| Juror # | Summons | Last Name | First Name | Middle Name | Date of Birth |
|---|---|---|---|---|---|
| 1 | 218979 | COX | KATHRYN | PATRICIA | October 25, 1965 |
| 2 | 219062 | NIETO | LORYNN | MARTINEZ | December 13, 1972 |
| 3 | 219813 | MATHIS | MARILYN | D | November 11, 1948 |
| 4 | 220044 | SPARKS | JEFF | SCOTT | August 22, 1967 |
| 5 | 220079 | KELLING | RONALD | DANIEL | March 1, 1958 |
| 6 | 220913 | CESSNA | ROBERT | RANDALL | October 31, 1952 |
| 7 | 221163 | MANCHI | MALATHI | REDDY | May 22, 1967 |
| 8 | 221421 | SCHLECHTE | NICHOLAS | EDWIN | May 22, 1987 |
| 9 | 222554 | WELSH | HALLEY | ANN | March 7, 1986 |
| 10 | 223160 | SMITH | ROBERT | LAND | February 8, 1949 |
| 11 | 223308 | SLOVAK | BOBBY | JOE | March 21, 1950 |
| 12 | 223333 | BERNAL | ELIZA | G | July 2, 1971 |
| 13 | 224679 | SCHLUTER | REBA | LAURIE | November 30, 1946 |
| 14 | 224879 | BLAIR | JACQUELINE | MARIE | July 1, 1961 |
| 15 | 224893 | GALIMBERTTI | MARISA | Z | August 6, 1952 |
| 16 | 225220 | COBOS | GILBERTO | | February 21, 1955 |
| 17 | 226198 | HOLT | MICHAEL | LEE | September 29, 1952 |
| 18 | 226243 | DEFRANCESCO | TRACY | RENEE | June 22, 1984 |
| 19 | 226310 | HERNANDEZ | TONY | L | August 4, 1958 |
| 20 | 226494 | SMITH | KEVIN | SCOTT | September 9, 1966 |
| 21 | 226502 | LAMB | CHAD | DWAYNE | January 19, 1976 |
| 22 | 226615 | PARKER | BRENT | KEITH | July 29, 1957 |
| 23 | 226666 | HENRY | SARAH | ANN | December 12, 1985 |
| 24 | 227246 | MCINTYRE | DAVID | R | July 22, 1954 |
| 25 | 227317 | MIAO | YIWEI | | December 29, 1960 |
| 26 | 227331 | HASH | ROBERT | BRUCE | May 28, 1957 |
| 27 | 227377 | FROSCH | CAROL | BROWN | June 2, 1949 |
| 28 | 227569 | LAVENDER | STEVEN | LAWRENCE | June 18, 1976 |
| 29 | 227575 | CARTER | VICTORIA | RAY | December 12, 1957 |
| 30 | 227586 | MOORE | SHARON | ALICE | November 19, 1956 |
| 31 | 227663 | FREDERICK | PAULA | KATHRYN | April 14, 1970 |
| 32 | 227670 | ESPINO | LUIS | CARLOS | October 6, 1988 |
| 33 | 227689 | IRVIN | LUCAS | JAMES | November 24, 1982 |
| 34 | 227799 | MOORE | CASEY | JOE | November 22, 1982 |
| 35 | 227811 | MASTERSON | SAMUEL | AARON | March 1, 1983 |
| 36 | 227995 | STECKMAN | BETTY | UTECHT | May 30, 1950 |
| 37 | 228069 | ARIAS | ANTONIO | | July 21, 1963 |
| 38 | 228100 | PFITZER | ANTHONY | D | September 24, 1956 |
| 39 | 228234 | NELSON | NANCY | HICKS | July 18, 1947 |
| 40 | 228700 | BOONE | KAREN | K | December 2, 1955 |
| 41 | 228937 | DAVIS | JAMES | A | June 29, 1960 |
| 42 | 228969 | FORD | VIRGINIA | A | June 15, 1965 |

**Page 44**



CAUSE NO. 12-03324-CRF-272

| STATE OF TEXAS | § | IN THE DISTRICT COURT |
| VS. | § | OF BRAZOS COUNTY, TEXAS |
| DAVID GREER | § | 272nd JUDICIAL DISTRICT |

COURT'S CHARGE TO THE JURY

LADIES AND GENTLEMEN OF THE JURY:

The defendant, David Greer, stands charged by indictment with the offense of Unlawful

Possession of a Firearm by a felon, alleged to have been committed on or about February 16,

2012 in Brazos County, Texas. To this charge, the defendant has pleaded not guilty.

I.

A person who has been convicted of a felony commits an offense if he possesses a

firearm after conviction and before the fifth anniversary of the person's release from

confinement following conviction of the felony or the person's release from supervision

under community supervision, parole, or mandatory supervision, whichever date is later.

"Firearm" means any device designed, made, or adapted to expel a projectile through a barrel

by using the energy generated by an explosion or burning substance, or any device readily

convertible to that use.

"Possess" means the care, custody, control, or management of property.

"Felony" means an offense so designated by law or punishable by death or confinement in a

penitentiary.

-1-

**Page 46**

A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.

A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

## II.

Now, if you find from the evidence beyond a reasonable doubt that on or about the 16th day of February, 2012 in Brazos County, Texas, the defendant, David Greer, did then and there having been convicted of the felony offense of Possession of Methamphetamine on the 6th day of November, 1997 in Cause number 13, 603 in the 278th District Court of Grimes County, Texas, intentionally or knowingly possess a firearm before the fifth anniversary of the Defendant's release from supervision under community supervision, or parole, or mandatory supervision following conviction of said felony, then you will find the defendant guilty of the offense of unlawful possession of a firearm as charged in the indictment.

Unless you so find beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the defendant and say by your verdict "Not Guilty."

## III.

A grand jury indictment is the means whereby a defendant is brought to trial in a felony prosecution. It is not evidence of guilt nor can you consider it in passing upon the question of

-2-

**Page 47**

guilt of the defendant.

IV.

You are instructed that our law provides that the failure of the defendant to testify shall not be taken as a circumstance against him, and during your deliberations you must not allude to, comment on, or discuss the failure of the defendant to testify in this cause, nor will you refer to or discuss any matter not before you in evidence.

V.

All persons are presumed to be innocent and no person may be convicted of an offense unless each element of the offense is proved beyond a reasonable doubt. The fact that a defendant has been arrested, confined, indicted or otherwise charged with an offense gives rise to no inference of guilt at trial. The law does not require a defendant to prove his innocence or produce any evidence at all. The presumption of innocence alone is sufficient to acquit the defendant, unless the jurors are satisfied beyond a reasonable doubt of the defendant's guilt after careful and impartial consideration of all the evidence in the case.

The prosecution has the burden of proving the defendant guilty, and it must do so by proving each and every element of the offense charged beyond a reasonable doubt, and if it fails to do so, you must acquit the defendant.

It is not required that the prosecution prove guilt beyond all possible doubt; it is required that the prosecution's proof excludes all reasonable doubt concerning the defendant's guilt.

VI.

You are the exclusive judges of the facts proved, of the credibility of the witnesses, and

-3-

**Page 48**

the weight to be given to their testimony, but you must be governed by the law you receive in these written instructions.

After you retire to the jury room, you should select one of your members as your Presiding Juror. It is his or her duty to preside at your deliberations, vote with you, and when you have unanimously agreed upon a verdict, to certify to your verdict by using the appropriate form attached, hereto, and signing the same as Presiding Juror.

In deliberating on the case, you must not consider, refer to, nor discuss any matter or issue not shown by the evidence in the case and the reasonable inferences from such evidence. It is only from the witness stand or tangible items admitted into evidence that the jury is permitted to receive evidence regarding the case. You should not consider nor mention any personal knowledge or information you may have about any fact or person connected with this case which is not shown by the evidence before you. In determining the guilt or innocence of the defendant, you shall not discuss or consider the punishment, if any, which may be assessed against the defendant in the event he is found guilty beyond a reasonable doubt.

Do not deliberate with any member of the jury unless all members of the jury are present in the jury room.

You have been permitted to take notes during the testimony in this case. In the event any of you took notes, you may rely on your notes during your deliberations. However, you may not share your notes with the other jurors and you should not permit the other jurors to share their notes with you. You may, however, discuss the contents of your notes with the other jurors. In your deliberations, give no more and no less weight to the views of a fellow

-4-

juror just because that juror did or did not take notes. Your notes are not official transcripts. They are personal memory aids, just like the notes of the judge and the notes of the lawyers. Notes may be valuable as a stimulant to your memory. On the other hand, you might make an error in observing or you might make a mistake in recording what you have seen or heard. Therefore, you are not to use your notes as conclusive authority to persuade fellow jurors of what the evidence was during the trial.

After you have retired, no one has any authority to communicate with you except the bailiff. You may communicate with the judge in writing through the bailiff, but do not attempt to talk to the bailiff, or the attorneys, or the judge, or anyone else concerning any question you may have.

After you have reached a unanimous verdict, and the Presiding Juror has signed the appropriate form, notify the bailiff that you have reached a verdict.

Signed this 14 day of Nov, 2012.

_____
Presiding Judge
272nd District Court

-5-

| | | |
|---|---|---|
| STATE OF TEXAS | § | IN THE DISTRICT COURT |
| VS. | § | OF BRAZOS COUNTY, TEXAS |
| DAVID GREER | § | 272nd JUDICIAL DISTRICT |

<u>VERDICT OF THE JURY</u>

We, the Jury, find the defendant, David Greer, Not Guilty.

_____
Presiding Juror

We, the Jury, find the defendant, David Greer, Guilty, of Unlawful Possession of a Firearm by a Felon as charged in the indictment.

*Robert T. Smith*
_____
Presiding Juror

-6-

INCIDENT NO./TRN: 9206382438

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 272ND DISTRICT |
| | § | |
| V. | § | COURT |
| | § | |
| DAVID GREER | § | BRAZOS COUNTY, TEXAS |
| | § | |
| STATE ID NO.: TX03329636 | § | |

NOV 1 5 2012

# JUDGMENT OF CONVICTION BY JURY

| | | | |
|---|---|---|---|
| Judge Presiding: | HON. TRAVIS BRYAN, III | Date Judgment Entered: | 11/14/2012 |
| Attorney for State: | RYAN CALVERT | Attorney for Defendant: | EARL GRAY |

Offense for which Defendant Convicted:
**UNLAWFUL POSSESSION OF FIREARM BY FELON**

| Charging Instrument: | Statute for Offense: |
|---|---|
| INDICTMENT | 46.04(a) Penal Code |

Date of Offense:
2/16/2012

| Degree of Offense: | Plea to Offense: |
|---|---|
| HABITUAL FELONY | NOT GUILTY |

| Verdict of Jury: | Findings on Deadly Weapon: |
|---|---|
| GUILTY | N/A |

| Plea to 1st Enhancement Paragraph: | NOT TRUE | Plea to 2nd Enhancement/Habitual Paragraph: | NOT TRUE |
|---|---|---|---|
| Findings on 1st Enhancement Paragraph: | TRUE | Findings on 2nd Enhancement/Habitual Paragraph: | TRUE |

| Punished Assessed by: | Date Sentence Imposed: | Date Sentence to Commence: |
|---|---|---|
| COURT | 11/15/2012 | 11/15/2012 |

| Punishment and Place of Confinement: | JUDGE SENTENCED DEFENDANT TO THIRTY(30) YEARS INSTITUTIONAL DIVISION, TDCJ |
|---|---|

THIS SENTENCE SHALL RUN **CONCURRENTLY.**

☐ SENTENCE OF CONFINEMENT SUSPENDED, DEFENDANT PLACED ON COMMUNITY SUPERVISION FOR N/A .

| Fine: | Court Costs: | Restitution: | Restitution Payable to: |
|---|---|---|---|
| $ N/A | $ 259.00 | $ N/A | ☐ VICTIM (see below) ☐ AGENCY/AGENT (see below) |

Sex Offender Registration Requirements do not apply to the Defendant. TEX. CODE CRIM. PROC. chapter 62.

The age of the victim at the time of the offense was N/A .

| | |
|---|---|
| | If Defendant is to serve sentence in TDCJ, enter incarceration periods in chronological order. |
| | From **2/16/2012** to **3/21/2012** From **5/14/2012** to **11/15/2012**   From     to |
| Time Credited: | From     to          From     to          From     to |
| | If Defendant is to serve sentence in county jail or is given credit toward fine and costs, enter days credited below. |
| | **N/A DAYS   NOTES: N/A** |

All pertinent information, names and assessments indicated above are incorporated into the language of the judgment below by reference.

This cause was called for trial in Brazos County, Texas. The State appeared by her District Attorney.

**Counsel / Waiver of Counsel (select one)**

☒ Defendant appeared in person with Counsel.

☐ Defendant knowingly, intelligently, and voluntarily waived the right to representation by counsel in writing in open court.

It appeared to the Court that Defendant was mentally competent and had pleaded as shown above to the charging instrument. Both parties announced ready for trial. A jury was selected, impaneled, and sworn. The INDICTMENT was read to the jury, and Defendant entered a plea to the charged offense. The Court received the plea and entered it of record.

The jury heard the evidence submitted and argument of counsel. The Court charged the jury as to its duty to determine the guilt or innocence of Defendant, and the jury retired to consider the evidence. Upon returning to open court, the jury delivered its verdict in the presence of Defendant and defense counsel, if any.

The Court received the verdict and ORDERED it entered upon the minutes of the Court.

<u>Punishment Assessed by Jury / Court / No election  (select one)</u>

☐ **Jury.** Defendant entered a plea and filed a written election to have the jury assess punishment. The jury heard evidence relative to the question of punishment. The Court charged the jury and it retired to consider the question of punishment. After due deliberation, the jury was brought into Court, and, in open court, it returned its verdict as indicated above.

☒ **Court.** Defendant elected to have the Court assess punishment. After hearing evidence relative to the question of punishment, the Court assessed Defendant's punishment as indicated above.

☐ **No Election.** Defendant did not file a written election as to whether the judge or jury should assess punishment. After hearing evidence relative to the question of punishment, the Court assessed Defendant's punishment as indicated above.

The Court FINDS Defendant committed the above offense and **ORDERS, ADJUDGES AND DECREES** that Defendant is GUILTY of the above offense. The Court FINDS the Presentence Investigation, if so ordered, was done according to the applicable provisions of TEX. CODE CRIM. PROC. art. 42.12 § 9.

The Court ORDERS Defendant punished as indicated above. The Court ORDERS Defendant to pay all fines, court costs, and restitution as indicated above.

<u>Punishment Options  (select one)</u>

☒ **Confinement in State Jail or Institutional Division.** The Court ORDERS the authorized agent of the State of Texas or the Sheriff of this County to take, safely convey, and deliver Defendant to the **Director, Institutional Division, TDCJ.** The Court ORDERS Defendant to be confined for the period and in the manner indicated above. The Court ORDERS Defendant remanded to the custody of the Sheriff of this county until the Sheriff can obey the directions of this sentence. The Court ORDERS that upon release from confinement, Defendant proceed immediately to the Brazos County District Clerk's Collection Department. Once there, the Court ORDERS Defendant to pay, or make arrangements to pay, any remaining unpaid fines, court costs, and restitution as ordered by the Court above.

☐ **County Jail—Confinement / Confinement in Lieu of Payment.** The Court ORDERS Defendant immediately committed to the custody of the Sheriff of Brazos County, Texas on the date the sentence is to commence. Defendant shall be confined in the Brazos County Jail for the period indicated above. The Court ORDERS that upon release from confinement, Defendant shall proceed immediately to the Brazos County District Clerk's Collection Department. Once there, the Court ORDERS Defendant to pay, or make arrangements to pay, any remaining unpaid fines, court costs, and restitution as ordered by the Court above.

☐ **Fine Only Payment.** The punishment assessed against Defendant is for a FINE ONLY. The Court ORDERS Defendant to proceed immediately to the Office of the Brazos County . Once there, the Court ORDERS Defendant to pay or make arrangements to pay all fines and court costs as ordered by the Court in this cause.

<u>Execution / Suspension of Sentence  (select one)</u>

☒ The Court ORDERS Defendant's sentence EXECUTED.

☐ The Court ORDERS Defendant's sentence of confinement SUSPENDED. The Court ORDERS Defendant placed on community supervision for the adjudged period (above) so long as Defendant abides by and does not violate the terms and conditions of community supervision. The order setting forth the terms and conditions of community supervision is incorporated into this judgment by reference.

The Court ORDERS that Defendant is given credit noted above on this sentence for the time spent incarcerated.

<u>**Furthermore, the following special findings or orders apply:**</u>

_____

Signed and entered on the 19 day of November 2012

X _____
JUDGE PRESIDING



# BRAZOS COUNTY OFFICE OF THE SHERIFF
# CHRISTOPHER C. KIRK

Mike Wilson, CHIEF DEPUTY
WAYNE DICKY, JAIL ADMINISTRATOR

1700 HIGHWAY 21 WEST
BRYAN, TEXAS 77803-1300

**TO WHOM IT MAY CONCERN:**

Date of Sentence: _____ 11/15/2012

This letter shall serve as a certification that the below names individual:

| | | | |
|---|---|---|---|
| **Name** | GREER, DAVID D. | **Cause #** | 12-03324-CRF-272 |
| Offense: | UNLAWFUL POSS FIREARM | Offense Date: | 02/16/2012 |

TRN # : _____ 9206382438

TX SID # _____ TX03329636 _____ SO SID # _____ 26619800

DOB: 12/22/1966 RACE: WHT GENDER: MALE

Has the following arrest record with the Brazos County Sheriff's Office:

| | DATE IN | DATE OUT | DAY SERVED |
|---|---|---|---|
| DETAINER PLACED: | DATE IN | DATE OUT | DAY SERVED |
| BOOK #229324 | DATE IN 2/16/2012 | DATE OUT 3/21/2012 | DAY SERVED 35 |
| DETAINER PLACED: | DATE IN | DATE OUT | DAY SERVED |
| BOOK #232201 | DATE IN 05/14/2012 | DATE OUT 11/15/2012 | DAY SERVED 186 |
| DETAINER PLACED: | DATE IN | DATE OUT | DAY SERVED |
| BOOK# | DATE IN | DATE OUT | DAY SERVED |
| DETAINER PLACED: | DATE IN | DATE OUT | DAY SERVED |
| BOOK # | DATE IN | DATE OUT | DAY SERVED |
| DETAINER PLACED: | DATE IN | DATE OUT | DAY SERVED |
| BOOK # | DATE IN | DATE OUT | DAY SERVED |
| DETAINER PLACED: | DATE IN | DATE OUT | DAY SERVED |
| BOOK # | DATE IN | DATE OUT | DAY SERVED |
| DETAINER PLACED: | DATE IN | DATE OUT | DAY SERVED |
| BOOK # | DATE IN | DATE OUT | DAY SERVED |

TOTAL DAYS SERVED _____ 221

ORDER WORKED BY _Cynthia Tomas_ DATE: _____ 11/16/2012 (revised)
979-361-4806

OFFICE (979) 361-4900    ADMINISTRATION (979) 361-4992    FAX (979) 361-4905

**Page 54**

# TEXAS DEPARTMENT OF CRIMINAL JUSTICE
## PEN PACKET DOCUMENT CHECKLIST[1]

CHECK ONE: ☑ Prison ☐ State Jail ☐ SAFPF ☐ SAIP (Boot Camp)

*Please Print*

OFFENDER'S NAME: GREER     DAVID     D

| | | Last | First | MI |
|---|---|---|---|---|

Gender: __M__    TX03329636    12-03324-CRF-272

   M / F     SID/DPS Number    CAUSE Number(s)

272ND     BRAZOS         9206382438

Court Number    County Name/    Co. Offender/    TRN Number    FBI Number
        Number        SPN Number

**Indicate whether offender is regular needs or special needs (mark one):** Regular Needs ☐    Special Needs ☐

*If special needs, explain:*

### REQUIRED DOCUMENTS FOR ALL OFFENDERS:

| | | CHECK |
|---|---|---|
| 1. | Standardized Felony Judgment Form – Official Certified Copy | ☑ |
| 2. | A copy of the defendant's criminal history | ☑ |
| 3. | A written report describing each offense for which the defendant is sentenced to TDCJ | ☑ |
| 4. | A copy of the indictment or information on each offense for which the defendant is sentenced to TDCJ | ☐ |
| 5. | A copy of the Jail Conduct Report | ☐ |

### REQUIRED DOCUMENTS FOR ALL OFFENDERS (IF PREPARED):

| | | CHECK |
|---|---|---|
| 6. | Detainers, Holds or Warrants | ☐ |
| 7. | Pre- or Post-Sentence Investigation Report | ☐ |
| 8. | Revocation Report | ☐ |
| 9. | Psychological/Psychiatric Evaluation | ☐ |
| 10. | Client Supervision Plan | ☐ |
| 11. | Texas Uniform Health Status Update (For **Special Needs** *SAFP sentenced* offenders copy of TUHSU must be provided to TDCJ when Pen Packet Document Checklist is submitted for admissions scheduling. For **ALL** offenders TUHSU must be delivered to the TDCJ unit with the offender at time of physical admission.) | ☐ |
| 12. | Victim Impact Statement | ☐ |

## I CERTIFY THAT ALL DOCUMENTS CHECKED ABOVE ARE ATTACHED
### (*PLEASE WRITE LEGIBLY*):

Printed Name of Person Completing Checklist     Title     Contact Information for Person Completing Checklist
                                                      (Area code, phone number, extension)

____/____/____

Signature of Person Completing Checklist                    Date of Completion

---

[1] Companion Definitions and Guidelines Available

**Page 55**

No. **12-03324-CRF-272**

THE STATE OF TEXAS

VS.

**DAVID DUANE GREER**

IN THE **272ND DISTRICT COURT**

OF

BRAZOS COUNTY, TEXAS

**Fingerprint From:**

_____
Signature Acknowledging Fingerprint

**Date:**_____

**Right Thumb Print**



TEXAS DEPARTMENT OF CRIMINAL JUSTICE
CORRECTIONAL INSTITUTIONS DIVISION
CLASSIFICATION AND RECORDS DEPARTMENT
ADMISSIONS SECTION

## JAIL CONDUCT REPORT

| GREER, DAVID | TX03329636 | 12-03324-CRF-272 |
|---|---|---|
| **OFFENDER NAME** (Last, First, Middle) | **SID NUMBER** | **CAUSE NUMBER** |

_____ I certify that the above captioned offender has committed no serious acts of misconduct while in my custody.

_____ I certify that the above captioned offender committed serious acts of misconduct as follows:

**INCIDENT:**

_____

_____

_____

_____

_____

_____

Dates subject has been arrested and released on the above cause number in chronological order:

| IN | OUT |
|---|---|
| 2/16/12 | 3/21/12 |
| 5/14/12 | 11/15/12 |
|  |  |
|  |  |
|  |  |

_____
TDCJ COORDINATOR

_____
COUNTY SHERIFF'S DEPARTMENT

** This form should accompany all offenders' commitment papers transferred to the Texas Department of Criminal Justice. **

Attention:     CRO State Ready Section

**Page 57**

Brazos County



**Marc Hamlin**
*District Clerk*

*300 E. 26th St., Suite 216*
*Bryan TX 77803*
*(979) 361-4230-4240*

## I HEREBY ACKNOWLEGE RECEIPT OF THE TDC PACKET ON:

**DAVID GREER**

**12-03324-CRF-272**

**CAUSE NO.**

**FROM THE DISTRICT CLERK'S OFFICE.**

**PREPARED BY:** _____A. MORGAN_____ **DATE:** _11/19/12_

**RECEIVED BY:** _____ **DATE:** _11/19_

No. 12-03324-CRF-272

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 272nd DISTRICT COURT |
| | § | |
| Vs. | § | |
| | § | OF |
| David Duane Greer | § | |
| | § | BRAZOS COUNTY, TEXAS |

(X) Second Amended (X)

## COMMITMENT/RELEASE ORDER

To:   The Sheriff of Brazos County, Texas

The above named defendant is ordered committed to/released from the custody of the Sheriff of Brazos County, Texas, effective at 11:40 a.m./p.m. on the 15th day of November, 2012 relating to the offense(s) of Unlawful Poss Firearm by Felony _____ to serve a term of thirty (30) days/months/years:

_____ in the Brazos County Jail
_____ in the Institutional Division of the Texas Department of Criminal Justice
_____ in a State Jail Facility
   _____ as a condition of community supervision
   _____ with referral to the State Boot Camp
   _____ work release is authorized
      _____ each SU M T W Th F Sa  from _____ m. until _____ m.
      _____ according to the schedule _____
_____ to be held in the Brazos County Jail
   _____ without bail, until further order of this Court
   _____ until transported to a Substance Abuse Felony Punishment Facility
   _____ pending appeal from his conviction of a felony
   _____ until sufficient bail is posted in the amount of $_____
      _____ in cash or surety bond form
      _____ in personal bond form
         _____ upon the attached conditions; _____ without conditions
_____ to be released from custody on the above charge(s)
_____ CREDIT FOR TIME SERVED (including time served from 2-16-2012 thru 3-21-2012)
_____ UPON RELEASE, Defendant is to report to the Brazos County District Clerk (Collections) to
   pay court costs of $_____; attorney fees of $_____;
   fine of $_____; restitution of $_____;
_____ lay-out court costs of $259.00 _____ (X)
_____ TO RUN CONCURRENT WITH _____

_____ SPECIAL INSTRUCTIONS: _____

_____ YOU ARE ORDERED TO OBTAIN AND BRING PROOF OF TB TESTING ON THE FIRST DAY THAT YOU REPORT TO JAIL. FAILURE TO COMPLY WILL RESULT IN WORK RELEASE BEING REVOKED AND STRAIGHT TIME ORDERED. Defendant's Initials _____

SIGNED this the 15th day of November, 2012.

_____
Presiding Judge

This Court Order was received on 11/15/16
Deputy Wallace
Brazos County
Sheriff's Office

**Page 59**

NO. 12-03324-CRF-272

| STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| vs. | § | 272nd JUDICIAL DISTRICT |
| | § | |
| DAVID DUANE GREER | § | BRAZOS COUNTY, TEXAS |

DC FILED M
At ___ o'clock ___ M
DEC 13 2012
MARC HAMLIN, DIST CLERK
Brazos County, Texas
Deputy

## MOTION FOR NEW TRIAL AND MOTION IN ARREST OF JUDGMENT

## TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, David Duane Greer, the Defendant in the above styled and numbered cause, and files this Motion for New Trial and Motion in Arrest of Judgment pursuant to Rules 21 and 22 of the Texas Rules of Appellate Procedure, and in support thereof would show this court the following:

1. The Defendant was sentenced on November 15, 2012. This Motion, filed within the thirty-day timetable, is therefore timely. A hearing must be commenced before the 75th day after the sentence, which is January 29, 2012, or this motion is overruled by operation of law.

2. The verdict in this cause is contrary to the law and the evidence. *See* Tex. R. App. P. 21.3.

3. The trial court has the discretion to grant a new trial in the interests of justice, as the Court of Criminal Appeals has emphasized:

For more than one hundred and twenty years, our trial judges have had the discretion to grant new trials in the interest of justice. In Mullins v. State, 37 Tex. 337, 339-340 (1872-73), the Supreme Court, which at that time had criminal jurisdiction, held:

. . . The discretion of the District Court, in granting new trials, is almost the only protection to the citizen against the illegal or oppressive verdicts of prejudiced, careless, or ignorant juries, and we think the District Court should never hesitate to use that discretion whenever the ends of justice have not been attained by those

1

verdicts.

State v. Gonzalez, 855 S.W.2d 692 (Tex. Crim. App. 1993).

4.    For the foregoing reasons, and for such other reasons that may arise on the hearing of this Motion, Defendant requests a new trial.

**WHEREFORE, PREMISES CONSIDERED,** Defendant prays that the Court set aside the judgment of conviction entered in this cause and order a new trial on the merits.

Respectfully submitted,

MARY HENNESSY
P.O. Box 2536
Brenham, Texas 77834
Tel: (979) 277-0757
Fax: (979) 277-0030

By:_____
Mary Hennessy
State Bar No. 09472300
Attorney for David Duane Greer

## CERTIFICATE OF PRESENTMENT

By signature above, I hereby certify that a true and correct copy of the above and foregoing has been delivered by facsimile transmission to the Office for the 272nd Judicial District Court of Brazos County, on this day, December 11, 2012.

## CERTIFICATE OF SERVICE

This is to certify that on December 11, 2012, a true and correct copy of the above and foregoing document was served on the District Attorney's Office, Brazos County, Texas, by

2

facsimile transmission to: 979-361-4368.

_____
Mary Hennessy

3

# MARY B. HENNESSY
ATTORNEY AT LAW
P.O. Box 2536
Brenham, Texas 77834-2536
Tele. (979) 277-0757
Fax: (979) 277-0030

December 11, 2012



Marc Hamlin
Brazos County District Clerk
300 East 26th St., Suite 216
Bryan, TX 77803

Re: 12-03324-CFR-272; *The State of Texas v. David Duane Greer*; In the 272nd District Court, Brazos County, Texas

Dear Mr. Hamlin,

Enclosed please find Defendant's Motion For New Trial and Motion In Arrest of Judgment in connection with the above referenced matter.

Please file in your usual manner.

Thank you for your cooperation.

Sincerely yours,

Mary Hennessy

Enclosure

cc:     Brazos County Assistant District Attorney's Office *Via facsimile # (979) 361-4368*

        Client

No. 12-03324-CRF-272

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| V. | § | OF BRAZOS COUNTY, TEXAS |
| DAVID GREER | § | 272nd JUDICIAL DISTRICT |

**STATE'S OPPOSITION TO DEFENDANT'S MOTION FOR NEW TRIAL**
**AND**
**OBJECTION TO ANY UNTIMELY AMENDED MOTION FOR NEW TRIAL**

Pursuant to Tex. R. App. P. 21.5, the State opposes, in writing, the Defendant's Motion For New Trial.

On November 15, 2012, the Defendant was found guilty of the offense of possession of a firearm by felon, and he was sentenced to 30 years in the IDTDCJ.

On December 13, 2012, the Defendant filed his motion for new trial. He alleges one ground:

1.    that the "verdict in this cause is contrary to the law and the evidence." (Motion, p. 1).

He prays for a new trial. (Motion, p. 2).

A.    **The Defendant's motion should be denied without a hearing because his motion is not supported by affidavit.**

"As a prerequisite to a hearing, and as a matter of pleading, motions for new trial must be supported by an affidavit of either the accused or someone else specifically showing the truth of the grounds asserted." Sandoval v. State, 929 S.W.2d 34, 36 (Tex. App. -- Corpus Christi 1996, pet. ref'd). Each separate allegation in the

**Page 64**

motion must be supported by affidavit. Marquez v. State, 356 S.W.2d 797, 799 (Tex. Crim. App. 1962). The defendant's motion for new trial must contain an affidavit where the affiant has personal knowledge of the facts or be "some other person who was in a position to know the facts." Dugard v. State, 688 S.W.2d 524, 528 (Tex. Crim. App. 1985).

In this case, the motion for new trial is not supported by an affidavit. The Defendant's motion should be denied without a hearing on this basis alone.

**B.     The Defendant's motion should be denied without a hearing because his ground for new trial may be determined from the trial record.**

The Defendant is not entitled to a hearing on his motion where his ground for new trial may be determined from the trial record. See Reyes v. State, 849 S.W.2d 812, 816 (Tex. Crim. App. 1993).

**C.     The State objects to any untimely amended motion for new trial, if filed, and to any order purporting to grant any untimely amended motion for new trial.**

Tex. R. App. P. 21.4 allows a defendant to amend her motion "within 30 days after the date when the trial court imposes or suspends sentence in open court...." The Defendant was sentenced on November 15, 2012. Therefore, the last day to timely file an amended motion for new trial was December 15, 2012.

The State objects to any untimely amended motion for new trial, if filed, and to any order purporting to grant any untimely amended motion for new trial. See State v.

2

**Page 65**

Moore, 225 S.W.3d 556, 570 (Tex. Crim. App. 2007).

## PRAYER

WHEREFORE, the State prays that the Defendant's Motion for New Trial be

denied without a hearing.

Respectfully Submitted,

Douglas Howell, III
Assistant District Attorney
300 East 26th Street, Suite 310
Bryan, Texas 77803
(979) 361-4320
State Bar Number: 10098100

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing State's Opposition to Defendant's Motion for New Trial was delivered to Mary Hennessy, P.O. Box 2536, Brenham, TX 77834 on this the __20__ day of ___DEC___, 2012.

Douglas Howell, III

3

NO. 12-03324-CRF-272

| | | |
|---|---|---|
| STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| vs. | § | 272nd JUDICIAL DISTRICT |
| | § | |
| DAVID DUANE GREER | § | BRAZOS COUNTY, TEXAS |

## MOTION FOR NEW TRIAL AND MOTION IN ARREST OF JUDGMENT

### TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, David Duane Greer, the Defendant in the above styled and numbered cause, and files this Motion for New Trial and Motion in Arrest of Judgment pursuant to Rules 21 and 22 of the Texas Rules of Appellate Procedure, and in support thereof would show this court the following:

1.    The Defendant was sentenced on November 15, 2012. This Motion, filed within the thirty-day timetable, is therefore timely. A hearing must be commenced before the 75th day after the sentence, which is January 29, 2012, or this motion is overruled by operation of law.

2.    The verdict in this cause is contrary to the law and the evidence. *See* Tex. R. App. P. 21.3.

3.    The trial court has the discretion to grant a new trial in the interests of justice, as the Court of Criminal Appeals has emphasized:

> For more than one hundred and twenty years, our trial judges have had the discretion to grant new trials in the interest of justice. In Mullins v. State, 37 Tex. 337, 339-340 (1872-73), the Supreme Court, which at that time had criminal jurisdiction, held:
>
> > . . . The discretion of the District Court, in granting new trials, is almost the only protection to the citizen against the illegal or oppressive verdicts of prejudiced, careless, or ignorant juries, and we think the District Court should never hesitate to use that discretion whenever the ends of justice have not been attained by those

1

**Page 67**

verdicts.

State v. Gonzalez, 855 S.W.2d 692 (Tex. Crim. App. 1993).

4.      For the foregoing reasons, and for such other reasons that may arise on the hearing of this Motion, Defendant requests a new trial.

**WHEREFORE, PREMISES CONSIDERED,** Defendant prays that the Court set aside the judgment of conviction entered in this cause and order a new trial on the merits.

Respectfully submitted,

MARY HENNESSY
P.O. Box 2536
Brenham, Texas 77834
Tel: (979) 277-0757
Fax: (979) 277-0030

By: _____
Mary Hennessy
State Bar No. 09472300
Attorney for David Duane Greer

## CERTIFICATE OF PRESENTMENT

By signature above, I hereby certify that a true and correct copy of the above and foregoing has been delivered by facsimile transmission to the Office for the 272nd Judicial District Court of Brazos County, on this day, December 11, 2012.

## CERTIFICATE OF SERVICE

This is to certify that on December 11, 2012, a true and correct copy of the above and foregoing document was served on the District Attorney's Office, Brazos County, Texas, by

2

facsimile transmission to: 979-361-4368.

_____
Mary Hennessy

3



## 272ND DISTRICT COURT
### BRAZOS COUNTY, TEXAS
Brazos County Courthouse
300 East 26th Street, Suite 204, Bryan, Texas 77803

Telephone: (979) 361-4220      Facsimile: (979) 361-4517

**Travis B. Bryan III**
**Judge Presiding**

Lisa Parker-Court Coordinator            Ernie J. Montoya -Bailiff
Connie Rodriguez-Administrative Secretary      Kaetheryne Kyriell - Court Reporter
                                        Denise C. MacKay – Court Reporter

December 18, 2012

MARY HENNESSY                     DISTRICT ATTORNEY, BRAZOS COUNTY
                                       ATTN: DOUG HOWELL; RYAN CALVERT

VIA FAX NO. 979-277-0030

                                       VIA FAX NO. (979) 361-4368

RE:    Cause No. 12-03324-CRF-272; *State of Texas vs. DAVID DUANE GREER*
        in the 272nd Judicial District Court of Brazos County, Texas

Dear Mrs. Hennessy:

      The Court has received the Motion for New Trial which you filed in the referenced cause. In the Motion, it appears that you are requesting a hearing on the Motion for New Trial. Pursuant to the Local Rules, the 272nd Court requires you to request a hearing by filing a Setting Request form with the District Clerk's office. This setting request form gives me the necessary information I need in setting this matter for hearing. This Setting Request form can be obtained from the County's website at www.brazoscountytx.gov (go under Courts and then under forms).

      Please file this Setting Request form at your earliest opportunity.

      If you have any questions, please do not hesitate to call me.

                               Sincerely,

                               Lisa Parker
                               Court Coordinator

**Page 70**

*  *  * Communication Result Report ( Dec. 18. 2012 12:00PM ) *  *  *

1) Brazos County 272nd Dist. Court
2)

Date/Time: Dec. 18. 2012 11:59AM

| File No. | Mode | Destination | Pg(s) | Result | Page Not Sent |
|----------|------|-------------|-------|--------|---------------|
| 9522 | Memory TX | DISTRICT ATTORNEY<br>HENNESSY MARY | P. 1 | OK<br>OK | |

Reason for error
E. 1) Hang up or line fail.          E. 2) Busy
E. 3) No answer                      E. 4) No facsimile connection
E. 5) Exceeded max. E-mail size



### 272ND DISTRICT COURT
#### BRAZOS COUNTY, TEXAS
Brazos County Courthouse
300 East 26th Street, Suite 204, Bryan, Texas 77803
Telephone: (979) 361-4278          Facsimile: (979) 361-4517

Travis B. Bryan, III
Judge Presiding

Lisa Parker-Court Coordinator
Connie Rodriguez-Administrative Secretary

Arely J. Montoya-Bailiff
Kaethevyn Kovich - Court Reporter
Denise C. MacKay – Court Reporter

December 18, 2012

MARY HENNESSY

VIA FAX NO. 979-277-0030

DISTRICT ATTORNEY, BRAZOS COUNTY
ATTN: DOUG HOWELL; RYAN CALVERT

VIA FAX NO. (979) 361-4368

RE:  Cause No. 12-03324-CRF-272; *State of Texas vs. DAVID DUANE GREER* in the 272nd Judicial District Court of Brazos County, Texas

Dear Mrs. Hennessy:

The Court has received the Motion for New Trial which you filed in the referenced cause. In the Motion, it appears that you are requesting a hearing on the Motion for New Trial. Pursuant to the Local Rules, the 272nd Court requires you to request a hearing by filing a Setting Request form with the District Clerk's office. This setting request form gives me the necessary information I need in setting this matter for hearing. This Setting Request form can be obtained from the County's website at www.brazoscountytx.gov (go under Courts and then under forms)

Please file this Setting Request form at your earliest opportunity.

If you have any questions, please do not hesitate to call me.

Sincerely,

Lisa Parker
Court Coordinator

NO: 12-03324-CRF-272

DC ☐ FILED ☐ M
At ____ ____ o'clock ____ M
FEB 0 6 2013
MARC HAMLIN DIST CLERK
Brazos County Texas

| STATE OF TEXAS | § | IN THE DISTRICT COURT, |
| | § | |
| vs. | § | 272nd JUDICIAL DISTRICT |
| | § | |
| DAVID DUANE GREER | § | BRAZOS COUNTY, TEXAS |

## REQUEST FOR PREPARATION OF REPORTER'S RECORD AND DESIGNATION OF MATTERS TO BE INCLUDED

TO THE CLERK AND COURT REPORTER OF SAID COURT:

Now comes David Duane Greer, Defendant in the above styled and numbered cause, and requests the court reporter or reporters who made the record in this cause to prepare a reporter's record, and that the testimony included in the reporter's record be in question and answer form.

David Duane Greer designates that the following matters be included in the reporter's record:

1.     Testimony of all witnesses, heard in and outside the jury's presence, including questions and objections of counsel and the ruling and remarks of the Court thereon;

2.     Voir dire of jury venire, including objections of counsel and the ruling and remarks of the Court thereon;

3.     Arguments and opening and closing statements of counsel, including objections of counsel and the ruling and remarks of the Court thereon;

4.     All matters heard outside the presence of the jury, including pre-trial, trial and post-trial hearings, charge conferences and bench conferences, objections, rulings, and remarks of the Court thereon;

5.     All bills of exception and testimony thereon, including objections of counsel, and the ruling and remarks of the Court thereon;

6.     Testimony taken during sentencing proceedings, including arguments and objections of counsel, and the ruling and remarks of the Court thereon;

1

**Page 72**

7.    All exhibits offered or introduced into evidence.

**WHEREFORE, PREMISES CONSIDERED**, David Duane Greer respectfully prays that

this Court grant this request, and order preparation of the reporter's record in this case.

Respectfully submitted,

MARY HENNESSY
P.O. Box 2536
Brenham, Texas 77834
Tel: (979) 277-0757
Fax: (979) 277-0030

By: _____
Mary Hennessy
State Bar No. 09472300
Attorney for David Duane Greer

## CERTIFICATE OF SERVICE

This is to certify that on February 4, 2013, a true and correct copy of the above and foregoing

document was served on the District Attorney's Office, Brazos County, Brazos, by facsimile

transmission to 979-361-4368.

_____
Mary Hennessy

2

**Page 73**

NO. 12-03324-CRF-272

| | | |
|---|---|---|
| STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| vs. | § | 272nd JUDICIAL DISTRICT |
| | § | |
| DAVID DUANE GREER | § | BRAZOS COUNTY, TEXAS |

DC FILED At 8:50 o'clock A M FEB 1 2 2013 MARC HAMLIN, DIST CLERK By Brazos County Deputy

## NOTICE OF APPEAL

TO THE HONORABLE JUDGE OF SAID COURT:

Now comes David Duane Greer, Defendant in the above styled and numbered cause, and gives this written notice of appeal to the Court of Appeals of the State of Texas from the judgment of conviction and sentence herein rendered against David Duane Greer.

Respectfully submitted,

MARY HENNESSY
P.O. Box 2536
Brenham, Texas 77834
Tel: (979) 277-0757
Fax: (979) 277-0030

By: _____
Mary Hennessy
State Bar No. 09472300
Attorney for David Duane Greer

## CERTIFICATE OF SERVICE

This is to certify that on February 4, 2013, a true and correct copy of the above and foregoing document was served on the District Attorney's Office, Brazos County, Brazos, by facsimile transmission to 979-361-4368.

_____
Mary Hennessy

1

NO. 12-03324-CRF-272

| | | |
|---|---|---|
| STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| vs. | § | 272nd JUDICIAL DISTRICT |
| | § | |
| DAVID DUANE GREER | § | BRAZOS COUNTY, TEXAS |

## REQUEST FOR PREPARATION OF REPORTER'S RECORD AND DESIGNATION OF MATTERS TO BE INCLUDED

### TO THE CLERK AND COURT REPORTER OF SAID COURT:

Now comes David Duane Greer, Defendant in the above styled and numbered cause, and requests the court reporter or reporters who made the record in this cause to prepare a reporter's record, and that the testimony included in the reporter's record be in question and answer form.

David Duane Greer designates that the following matters be included in the reporter's record:

1. Testimony of all witnesses, heard in and outside the jury's presence, including questions and objections of counsel and the ruling and remarks of the Court thereon;

2. Voir dire of jury venire, including objections of counsel and the ruling and remarks of the Court thereon;

3. Arguments and opening and closing statements of counsel, including objections of counsel and the ruling and remarks of the Court thereon;

4. All matters heard outside the presence of the jury, including pre-trial, trial and post-trial hearings, charge conferences and bench conferences, objections, rulings, and remarks of the Court thereon;

5. All bills of exception and testimony thereon, including objections of counsel, and the ruling and remarks of the Court thereon;

6. Testimony taken during sentencing proceedings, including arguments and objections of counsel, and the ruling and remarks of the Court thereon;

1

7.    All exhibits offered or introduced into evidence.

**WHEREFORE, PREMISES CONSIDERED**, David Duane Greer respectfully prays that

this Court grant this request, and order preparation of the reporter's record in this case.

Respectfully submitted,

MARY HENNESSY
P.O. Box 2536
Brenham, Texas 77834
Tel: (979) 277-0757
Fax: (979) 277-0030

By:_____
Mary Hennessy
State Bar No. 09472300
Attorney for David Duane Greer

## CERTIFICATE OF SERVICE

This is to certify that on February 4, 2013, a true and correct copy of the above and foregoing

document was served on the District Attorney's Office, Brazos County, Brazos, by facsimile

transmission to 979-361-4368.

_____
Mary Hennessy

2

NO. 12-03324-CRF-272

| STATE OF TEXAS | § | IN THE DISTRICT COURT |
|---|---|---|
| | § | |
| vs. | § | 272nd JUDICIAL DISTRICT |
| | § | |
| DAVID DUANE GREER | § | BRAZOS COUNTY, TEXAS |

FILED
At ___ o'clock ___ M
FEB 1 2 2013
MARC HAMLIN DIST CLERK
Brazos County, Texas
By ___ Deputy

## WRITTEN DESIGNATION SPECIFYING
## MATTERS FOR INCLUSION IN CLERK'S RECORD

TO THE CLERK OF SAID COURT:

Now comes David Duane Greer, Defendant in the above styled and numbered cause, and pursuant to Rule 34.5(a)(12) and 34.5(b), Texas Rules of Appellate Procedure, designates the following matters to be included in the Clerk's Record:

1. Complaint;

2. Capias;

3. Affidavit of indigency;

4. Correspondence and communication between Court and counsel;

5. All motions and pleadings filed by the state or the defendant and not otherwise required to be included under Rule 34.5(a), Texas Rules of Appellate Procedure;

6. All orders issued by Court and not otherwise required to be included under Rule 34.5(a), Texas Rules of Appellate Procedure;

7. Jury panel lists;

8. Jury strike lists of the state, the defendant and the Court;

9. Juror information forms;

10. All verdict forms submitted to the jury;

11. Sentence;

12. Commitment;

1

**Page 77**

13.   Motion for New Trial;

14.   Communications between Court and jury;

15.   Objections to Court's Charge and Special Requested Jury Instructions, and rulings by the Court;

16.   All exhibits admitted into evidence;

17.   All defense exhibits offered into evidence but not received in evidence;

18.   Those items identified in Rule 34.5(a)(1) through (11), Texas Rules of Appellate Procedure, and all other matters required by the Texas Code of Criminal Procedure, or any other law.

Respectfully submitted,


MARY HENNESSY
P.O. Box 2536
Brenham, Texas 77834
Tel: (979) 277-0757
Fax: (979) 277-0030

By:_____
Mary Hennessy
State Bar No. 09472300
Attorney for David Duane Greer


## CERTIFICATE OF SERVICE

This is to certify that on February 4, 2013, a true and correct copy of the above and foregoing document was served on the District Attorney's Office, Brazos County, Brazos, by facsimile transmission to 979-361-4368.

_____
Mary Hennessy

2

# CRIMINAL DOCKET - CAUSE NO. 12-03324-CRF-85 272

| NAMES OF PARTIES | ATTORNEYS | KIND OF ACTION | DATE OF FILING |
|---|---|---|---|
| THE STATE OF TEXAS | COMTE, KARA | UNLAWFUL POSSESSION FIREARM BY FELON | 07/13/12 |
| VS | | | CHARGING INSTRUMENT |
| GREER, DAVID DUANE | DEFENSE Earl Gray | | Indictment |

| DATE OF ORDERS Month/Day/Year | | | ORDERS OF THE COURT |
|---|---|---|---|
| 7 | 17 | 12 | ARPT set 7/30 |
| 7 | 26 | 12 | Ltr Rest rec'd. Reset 7/30 ARPT 8/13 |
| 8 | 13 | 12 | —A/P—Reset trial (No status) |
| 8 | 30 | 12 | Set of Status 9/25 DC/JT 10.29/11.13 2.18/2.26-13 5.3/5.14 |
| 9 | 25 | 12 | No agmt no issues (no record) - moves to trial setting |
| 10 | 29 | | Δ ready on cond to audio & vid on arrest. State says don't have it. ~~Have~~ State ordered to have it to Δ by end of week or risk it not being admissable |
| 11 | 14 | 12 | Jury verdict - guilty |
| 11 | 15 | 12 | Court sentences Def to 30 yrs TDC; rights of appeal given/signed (DP, CSR); Order Appointing Attorney Signed (Mary Hennessy) Court found enhancements true |


STATE'S
EXHIBIT

PENGAD 800-631-6989

State's Exhibit No. 8

Photograph



STATE'S
EXHIBIT

PENGAD 800-631-6989

State's Exhibit No. 9

Photograph

DENISE C.PHILLIPS, CSR
OFFICIAL COURT REPORTER
272ND DISTRICT COURT



STATE'S
EXHIBIT

PENGAD 800-631-6989

State's Exhibit No. 10

Leather jacket

DENISE C.PHILLIPS, CSR
OFFICIAL COURT REPORTER
272ND DISTRICT COURT

State's Exhibit No. 11

Weapon

State's Exhibit No. 12

Bullets from weapon

DENISE C.PHILLIPS, CSR
OFFICIAL COURT REPORTER
272ND DISTRICT COURT

State's Exhibit No. 14

Stipulation

<u>STATE OF TEXAS v. DAVID GREER</u>          <u>12-03324-CRF-272</u>

The parties have stipulated that the Defendant in this case is one and the same David Greer that was convicted of the felony offense of Possession of Methamphetamine on the 6th day of November, 1997, in Cause Number 13,603 in the 278th District Court of Grimes County, Texas and that the offense date in this case, February 16, 2012, was before the fifth anniversary of the Defendant's release from supervision following his conviction of that felony.

_____          _____
David Greer                                       Attorney for the State


_____
Attorney for Defendant


STATE'S EXHIBIT 14
PENGAD 800-631-6989

State's Exhibit No. 15

Inventory form

DENISE C.PHILLIPS, CSR
OFFICIAL COURT REPORTER
272ND DISTRICT COURT

95-1418

# BRAZOS COUNTY OFFICE OF THE SHERIFF
## VEHICLE INVENTORY REPORT

| Case Number 17-1613 | Date of Inventory 2-16-12 | Time 1443 | | Location Carter Creek At Brushdale |
|---|---|---|---|---|
| Defendant (last, first, mi) Greer, Dave Duane | | DOB 12-23-66 | | Address 5177 Julie Cr. |
| Charge(s) | | Disposition of Vehicle | | |
| Arresting Officer/Badge Number 144 | | Inventory Officer/Badge Number | | |

| Vehicle Year | Make Ford | Model Ranger | Body Style 2 door | Color Dark Blue |
|---|---|---|---|---|
| License Number 81WDS9 | State TX | Year | Vehicle Identification Number 1FTYR14V62PB60317 | |

{ } Recovered Stolen Vehicle  
{ } Prisoner Vehicle  
{ } Other (Specify) _____

{ } Abandoned Vehicle  
{ } Seized Vehicle

| Quantity | Vehicle Contents Description (brand, color, serial number) | Removed Y or N | Where Stored |
|---|---|---|---|
| 1 | High Lift Jack | N | Bed of Truck |
| 1 | Wench (Elec) | N | " " |
| 1 | Red Metal gas can | N | " " |
| 1 | Black Plastic box w/ paint strips | N | " " |
| 1 | Red plastic gas can | N | " " |
| 2 | Blue large water bottles | N | " " |
| 1 | Pair jumper cables | N | " " |
| 1 | Pair Blk Rubber Boots | N | " " |
| 1 | Wooden Cash w/ Brass Top | N | in vehicle |
| 1 | Brown Coveralls | N | " " |
| 1 | Garmin GPS | N | " " |

*Use reverse side to list additional contents and damage*

| Inventory Officer's Signature Mark Luky 144 | Vehicle Owner's/Drivers Signature |
|---|---|
| Wrecker Driver's Signature Tom S | Towed To: All Star Wrecker |

STATE'S
EXHIBIT
15

PENGAD 800-631-6989

| Quantity | Vehicle Contents<br>Description (brand, color, serial number) | Removed<br>Y or N | Where Stored |
|---|---|---|---|
| 3 | Pair sunglasses | N | in vehicle |
| 2 | Sml Flashlights | N | " " |
| 1 | Tutor kit in Blk case | N | " " |
| 1 | Blk canvas bag w/ | N | " " |
| assx | CD's | N | " " |
| 1 | Spot light Blk | N | " " |
| 1 | wooden cain w/silver top | N | " " |
| 1 | Blk pocket knife | N | " " |
| 1 | Sml Purple blue cooler | N | " " |
| 1 | Pair binoculars n/case | N | " " |
| asst | clothing | | |
| 1 | Box of fishing chain | N | |
| 1 | Silver box w/ Insulin needles<br>Diabetic supplies | N | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Damage to vehicle at time of inventory:

Use additional vehicle forms if necessary

State's Exhibit No. 16

Inventory Search Policy

BRAZOS COUNTY OFFICE OF THE SHERIFF

GENERAL ORDER: 31

DISTRIBUTION:    ALL SWORN PATROL DEPUTIES/RESERVE DEPUTIES/CRIMINAL
INVESTIGATORS

SUBJECT:    INVENTORY OF ALL TOWED VEHICLES / POLICY / PROCEDURE /
REPORT FORM

I.    PURPOSE

The purpose of this directive is to provide guidelines for the inventory of vehicles.

II.    POLICY

It shall be the policy of this department to conduct an inventory of the contents of all
motor vehicles that are recovered, seized, impounded, or taken into the custody of the
Department. This shall include vehicles of arrested persons which are towed from the
scene of an arrest, regardless of where the vehicle is stored. The inventory of
impounded motor vehicles shall be conducted for the following purposes:

1.    The protection of the owner's property while it remains in police custody;
2.    The protection of the Department and it's officers against claims or disputes
over lost or stolen property; and
3.    The protection of officers from potential danger.

This inventory procedure may not be used as a pre-text to conduct an exploratory
search for incriminating evidence. The scope of the inventory shall be restricted to
those areas of the vehicle which are accessible to the officers without having to be
forced open. Vehicle inventories shall be conducted in accordance with the
procedures outlined in this directive.

III.    PROCEDURES

A.    VEHICLE INVENTORY GUIDELINES

1.    The inventory of a vehicle that has been seized, impounded, or taken
in custody of the Department shall be limited to those locations within
the vehicle where items of value could reasonably be stored, including:
a.    the passenger compartment;
b.    under the hood;
c.    inside the trunk, and
d.    within containers located inside the vehicle.



STATE'S
EXHIBIT
16

B.     VEHICLE INVENTORY REPORT

1.   Every vehicle inventory shall be documented on a VEHICLE INVENTORY REPORT FORM.

2.   The Vehicle Inventory Report shall be attached to the appropriate arrest report (if any) and forwarded to the Records Section.

3.   All items of value shall be recorded on the Vehicle Inventory Report.

4.   In most cases, the property should be left inside the impounded vehicle. If, however, the vehicle cannot be reasonably secured or the property is of such value that the officer does not believe it would be safe to leave it in the vehicle, the property shall be   logged into the Property/Evidence unit for safekeeping. Any property removed from the vehicle shall be noted on the Vehicle Inventory Report, indicating where it was stored. Any damage to the vehicle that is noticed at the time of the inventory shall also be noted on the report.

5.   A Vehicle Inventory Report is required whether the vehicle contains any valuable property or not. When there is no property of value to inventory, the officer shall indicate "NONE" in the appropriate location on the form.

6.   The signature of the owner or driver of the inventoried vehicle should be obtained on the Vehicle Inventory Report, when practicable. The signature of the driver of the wrecker towing the vehicle, shall be obtained.

C.     DISCOVERY OF EVIDENCE

1.   If, in the course of a vehicle inventory, the officer discovers an item that constitutes contraband or evidence connected to the commission of a criminal offense, the officer shall seize the evidence and process it according to the established procedures of this Department.

2.   The discovery of contraband or evidentiary items during a vehicle inventory may provide probable cause to believe that inaccessible portions of the vehicle may contain additional contraband or evidence. If so, a search warrant shall be obtained to search those portions of the vehicle which would not ordinarily be subject to inventory.

3.   When contraband or evidentiary items are discovered, the vehicle inventory shall be completed whether a search warrant is obtained to search inaccessible portions of the vehicle or not.

State's Exhibit No. 17

Judgment and Sentence

NO. 13,603

| THE STATE OF TEXAS | X | IN THE 278th JUDICIAL |
| V. | X | DISTRICT COURT OF |
| DAVID GREER | X | GRIMES COUNTY, TEXAS |

JUDGEMENT ON VERDICT OF GUILTY BY JURY
PUNISHMENT FIXED BY JURY
NO PROBATION GRANTED

JUDGE PRESIDING: JERRY SANDEL          DATE OF JUDGEMENT: NOV 6, 1997

ATTORNEY FOR                    ATTORNEY FOR
THE STATE: KELLY WEEKS          THE DEFENDANT: BRENT CAHILL

OFFENSE CONVICTED OF:    POSSESSION OF METHAMPHETAMINE 4-200 GRAMS
                         HABITUAL

DEGREE: FIRST (25-99)
DATE OF OFFENSE: 10-5-95

CHARGING INSTRUMENT: INDICTMENT

PLEA: NOT GUILTY

VERDICT: GUILTY

PLEA TO ENHANCEMENT: TRUE
FINDING: TRUE

FINDING ON USE OF DEADLY WEAPON: N/A

PUNISHMENT ASSESSED BY: JURY

DATE SENTENCE IMPOSED: 11-6-97          COSTS: $159.50

PUNISHMENT AND PLACE OF CONFINEMENT: FORTY (40) YEARS CONFINEMENT IN
TDCJ-ID

DATE TO COMMENCE: 11-6-97

TIME CREDITED: 3 DAYS          RESTITUTION: $140.00 TO TEXAS
                               DEPARTMENT OF PUBLIC SAFETY

CONCURRENT UNLESS OTHERWISE SPECIFIED:

FILED
AT 11:50 O'CLOCK P M
NOV 6 1997
WAYNE RUCKER, District Clerk
By _____ GRIMES COUNTY, TEXAS
                    Deputy

Vol 32 Pg 235

STATE'S
EXHIBIT
17

PENGAD 800-631-6989

On the 3RD day of NOVEMBER, 1997 the above named and numbered cause was called for trial. The parties appeared as follows: the State of Texas by her Assistant District Attorney and the Defendant, DAVID GREER, in person and with counsel, BRENT CAHILL. Both parties announced ready for trial. The Defendant, having requested a jury trial, entered a plea of not guilty to the offense of POSSESSION OF METHAMPHETAMINE 4-200 GRAMS, a felony committed on the 5TH day of OCTOBER, 1995 as charged in the indictment herein; thereupon, a jury, to-wit: STEVEN KEATING, . and eleven others, having been duly selected, impaneled, and sworn, who having heard the indictment read, and the Defendant's plea thereto, and having heard the evidence submitted, and having been duly charged by the Court, retired in the charge of the proper officer to consider their verdict, and afterwards were brought into open court by the proper officer, the Defendant and his counsel being present and in due form of law returned into open court the following verdict, which was received by the court, and is here and now entered on the minutes of the court, to-wit:

"We, the jury, find the defendant, DAVID GREER, guilty of POSSESSION OF METHAMPHETAMINE 4-200 GRAMS."

/S/ STEVEN KEATING
FOREMAN OF THE JURY

Thereupon, the Defendant having elected to have his punishment assessed by a jury, and such jury was called back into the box and heard evidence relative to the question of punishment and thereafter retired in the charge of the proper officer to consider their verdict, and afterwards were brought into open court by the proper officer, the Defendant and his counsel being present, and in due form of law returned the following verdict:

We, the jury, having found the defendant, David Greer, guilty of the offense of Possession of Methamphetamine 4 - 200 grams further find that the allegations in Paragraph II of the indictment with respect to the defendant being the same person who had been convicted of Burglary of a Habitation in Cause Number 15,341 in the 85th Judicial District Court of Brazos County, Texas on the 18th day of April, 1984 and prior to the commission of the offense of Possession of Methamphetamine 4 - 200 grams, for which defendant has been convicted in this case is "True". Furthermore, we find that the allegations in Paragraph III of the indictment with respect to the defendant being the same person who had been convicted of Theft $750.00 - $20,000.00 in cause number 17,175-85 in the 85th Judicial District Court of Brazos County, Texas on the 10th day of June, 1987 after the defendant's conviction for Burglary of a Habitation mentioned above was final prior to the commission of the offense of Possession of Methamphetamine 4 - 200 grams for which the defendant has been convicted in this case is "True". We assess defendant's punishment at confinement in the Texas Department of Criminal Justice - Institutional Division for a term of FORTY (40) years.

/S/ STEVEN KEATING
FOREMAN OF THE JURY

Vol 32 Pg 236

It is therefore ORDERED, ADJUDGED, AND DECREED by the Court that the Defendant, DAVID GREER, is GUILTY of the offense of POSSESSION OF METHAMPHETAMINE 4 - 200 GRAMS and said Defendant committed the offense on the 5TH day of OCTOBER, 1995, and further that the allegations in Paragraph II of the indictment with respect to the defendant being the same person who had been convicted of Burglary of a Habitation in Cause Number 15,341 in the 85th Judicial District Court of Brazos County, Texas on the 18th day of April, 1984 and prior to the commission of the offense of Possession of Methamphetamine 4 - 200 grams, for which defendant has been convicted in this case is "True". Furthermore, we find that the allegations in Paragraph III of the indictment with respect to the defendant being the same person who had been convicted of Theft $750.00 - $20,000.00 in cause number 17,175-85 in the 85th Judicial District Court of Brazos County, Texas on the 10th day of June, 1987 after the defendant's conviction for Burglary of a Habitation mentioned above was final prior to the commission of the offense of Possession of Methamphetamine 4 - 200 grams for which the defendant has been convicted in this case is "True". Punishment has been set at confinement in the Institutional Division of the Texas Department of Criminal Justice for a period of FORTY (40) YEARS.

The Defendant, being asked by the Court if sufficient legal reason existed why the sentence of this Court should not be pronounced, failed to give such reason, whereupon the Court proceeded in the presence of said Defendant and his Attorney to pronounce sentence.

It is the order of this Court that the Defendant, DAVID GREER, who has been adjudged GUILTY of the offense of POSSESSION OF METHAMPHETAMINE 4-200 GRAMS, be, and is hereby, sentenced to confinement in the Institutional Division of the Texas Department of Criminal Justice for FORTY (40) YEARS and that the Defendant be immediately taken by the Sheriff of GRIMES County, Texas and by him safely conveyed and delivered to the Institutional Division of the Texas Department of Criminal Justice there to be confined in the manner and for the term aforesaid.

The Defendant is remanded to the custody of the GRIMES County Sheriff until the Sheriff can obey the directions of this sentence.

Judge Presiding
Date signed: _November 6, 1997_

APPEAL: _yes_

Vol 32 Pg 237

NO. 13,603

| THE STATE OF TEXAS | X | IN THE DISTRICT COURT OF |
| VS. | X | GRIMES COUNTY, TEXAS |
| DAVID GREER | X | 278TH DISTRICT COURT |

## CHARGE OF THE COURT

**LADIES AND GENTLEMEN OF THE JURY:**

The defendant, DAVID GREER, stands charged by indictment with the offense of intentionally and knowingly possessing, with intent to deliver, a controlled substance, namely methamphetamine, in an amount of at least 4 grams but less than 200 grams, by aggregate weight, including adulterants and dilutants, alleged to have been committed on or about the 5th day of October, 1995 in Grimes County, Texas. The defendant has pleaded not guilty.

I.

Our law provides that a person commits an offense if he intentionally or knowingly possesses, with intent to deliver, a controlled substance.

Methamphetamine is a controlled substance.

You are instructed that by the term "possession", as used herein, is meant the actual care, custody, control, or management of the controlled substance at the time in question.

A person commits an offense only if he voluntarily engages in conduct, including an act, an omission, or possession.

With respect to the "possession" charged, you are instructed that such possession is a voluntary act if the possessor knowingly obtains or receives the thing possessed or is aware of his control of the thing for a sufficient time to terminate his control. Such possession need not be

1

FILED
AT 3 O'CLOCK P M
NOV 5 1997
WAYNE RUCKER, District Clerk
GRIMES COUNTY. TEXAS

Vol 32 Pg 238

STATE OF TEXAS
COUNTY OF GRIMES

I, Gay Wells, District Clerk of Grimes County,
Texas, do hereby certify that the foregoing is a
true and correct copy of the original record, now
in my lawful custody and possession, as appears of
record in Vol. ___ Page ___ Minutes of said
court on file in my office.

Witness my official hand and seal of office, this
16th day Nov. 20 12

GAY WELLS, DISTRICT CLERK
Grimes County Texas
By _____ DEPUTY

State's Exhibit No. 18

Pen pack

# AFFIDAVIT

THE STATE OF TEXAS ϶

COUNTY OF WALKER ϶

"My name is **Kelly Enloe,** I am over twenty-one years of age, of sound mind, capable of making this affidavit, and personally acquainted with the facts herein stated.

I am employed as the Chairman of Classification and Records for the Texas Department of Criminal Justice - Correctional Institutions Division, and my office is located in Huntsville, Texas. I do hereby certify that the attached information provided on inmate GREER, DAVE ,
TDCJ/BPP# 454082 ,cause# 1717585, are true and correct copies of the original records now on file in my office maintained in the regular course of business within the Classification and Records Office of the Texas Department of Criminal Justice - Correctional Institutions Division.

In witness whereof, I have hereto set my hand this the 4th day of September 2012.

nh

Kelly Enloe,
Chairman
Classification and Records



The director shall certify under the seal of the Correctional Institutions Division the documents received under Subsections (a) and (c) of Article 42.09 Code of Criminal Procedure. A document certified under this subsection is self-authenticated for the purpose of Rules 901 and 902, Texas Rules of Criminal Evidence.

Article 42.09, Subsection 8(b), as amended by S. B. 1067, Acts 1993, 73d leg.

(Rev.12/02)



STATE'S
EXHIBIT
18



NO. 17,175-85

FILED
At 10:32 o'clock A M
JUN 10 1987
85th DISTRICT, DIST. CLERK
Brazos County, Texas
COURT OF Fay Wilson Deputy

THE STATE OF TEXAS                          X   IN THE 85th DISTRICT, DIST. CLERK

VS.                                         X        COURT OF

DAVE GREER                        ,         X   BRAZOS COUNTY, TEXAS

JUDGMENT ON PLEA OF GUILTY OR NOLO CONTENDERE BEFORE COURT
WAIVER OF JURY TRIAL

| | |
|---|---|
| Judge Presiding: M.T. McDonald, Jr. | Date of Judgment: |
| Attorney for State: Jeffrey R. Casey | Attorney for Defendant: John Paschall |
| Offense Convicted of: Theft $750-$20,000 | |
| Degree: Third | Date Offense Committed: October 12, 1986 |
| Charging Instrument: Indictment/Information | Plea: Guilty/Nolo Contendere |
| Terms of Plea Bargain (In Detail): | 5 (five) years TDC in cause #17,175-85; dismiss #809-F (criminal mischief-water tampering) |
| Plea to Enhancement Paragraph(s)     N/A | Findings on Enhancement:     N/A |
| Findings on Use of Deadly Weapon:     N/A | |
| Date Sentence Imposed     : | Costs: |
| Punishment and Place of Confinement: 5 years TDC | Date to Commence: |
| Time Credited     : | Total Amount of Restitution/Reparation: |
| Concurrent Unless Otherwise Specified | |

Notice of Appeal: Waived

_W. T. McDonald, Jr._
PRESIDING JUDGE

_6/10/87_
DATE SIGNED

FILED
At 12:32 o'clock A M

JUN 1 0 1987

No. 17,175-P5

| | | |
|---|---|---|
| THE STATE OF TEXAS | I | IN THE DISTRICT COURT OF |
| VS | I | BRAZOS COUNTY, TEXAS |
| DAVE GREEB | I | 85TH JUDICIAL DISTRICT |

## JUDGMENT AND SENTENCE

The Defendant having been indicted in the above entitled and numbered cause for the felony offense of ____theft $750-$20,000____ and this cause being this date called for trial, the State appeared by its Assistant/District Attorney, ____Jeffrey Carey____ , and the Defendant, ____DAVE GREEB____ appeared in person and by counsel, ____John Paschall____ , and both parties announced ready for trial. The Defendant, having waived the right of trial by jury in person and in writing in open Court (such waiver being with the consent and approval of the Court and now entered of record on the minutes of the Court, and such waiver being with the written consent and approval of the Assistant/District Attorney and filed in the papers of this case), was arraigned and, in open Court, plead guilty to the charge contained in the indictment. Thereupon, the Defendant was admonished by the Court of the range of punishment attached to the offense and of the fact that any recommendation of the Assistant/District Attorney as to punishment was not binding upon the Court, and the defendant persisted in entering the plea; the Court inquired if there was a plea agreement between the State and the Defendant. The Court informed the Defendant in open Court that if the Court rejected the plea agreement the Defendant would be permitted to withdraw his plea and that any statement made by the Defendant at the hearing would not be admissible against the Defendant nor would the fact that the Defendant entered a plea of guilty or nolo contendere be admissible against him in any subsequent criminal proceeding; and it plainly appearing to the Court that the Defendant was mentally competent and that the plea was freely and voluntarily entered, and the Defendant having consented in writing, in open court, to waive the appearance, confrontation, and cross-examination of witnesses and having consented to the stipulation of evidence and to the introduction of testimony by affidavits, written statements of witnesses, and any other documentary evidence, and such waiver and consent having been approved

by the Court in writing and filed in the papers of this cause, the plea of the Defendant was received and is here now entered of record upon the minutes. The Court further informed the Defendant that if the Court did not exceed the plea recommendation made by the State, and agreed to by the Defendant, the Defendant would not be allowed to appeal without express approval by the Court except for those matters raised by written motion filed prior to trial. The Court, hearing the indictment, the Defendant's plea thereto, the evidence submitted, and the arguments of counsel, found the Defendant guilty of the offense as charged in the indictment _____ theft $750-$20,000 _____ and assessed the punishment at confinement in the Texas Department of Corrections for a term of _____ five (5) _____ years. No permission to appeal was granted by the Court.

IT IS THEREFORE CONSIDERED, ORDERED, ADJUDGED AND DECREED by the Court that the Defendant is guilty of the offense of __ theft $750-$20,000 ___ as charged in the indictment, a felony, and that the Defendant committed the offense on __ October 12 _____, 19 86 , and that the Defendant be punished by confinement in the Texas Department of Corrections for a term of _____ five (5) _____ years and that the State of Texas do have and recover of the Defendant all costs of the prosecution, for which execution will issue.

Thereupon the Defendant was asked by the Court whether he had anything to say why sentence should not be pronounced against him, and he answered nothing in bar thereof. Thereupon the Court proceeded, in the presence of the Defendant, to pronounce sentence against the Defendant as follows, that is the order of the Court that the Defendant, __ DAVE GREER _____ _____ , who has been adjudged to be guilty of the offense of _____ theft $750-$20,000 _____ , a felony, and whose punish- ment has been assessed at confinement in the Texas Department of Corrections for a term of _____ five (5) _____ years be delivered by the Sheriff of Brazos County, Texas, immediately to the Director of Corrections, or other person legally authorized to receive such convicts, and that the Defendant shall be confined in the Department of Corrections for a term of _____ five (5) _____ years in accordance with the provisions of the law governing the Texas Department of Corrections.

PLEA OF GUILTY TO COURT - JURY WAIVED - PENITENTIARY AND/OR FINE

The defendant was remanded to jail until the Sheriff can obey the directions of this sentence.

The defendant shall receive credit on his sentence for the time spent in jail in the above styled and numbered cause from _11-12-86_ _3-10-87_ Cause no. 809F

to _12-20-86_ _6-10-87_ for a total of

_140_ days credit. The Sheriff of Brazos County, Texas, is hereby directed to attach to the committing papers a statement assessing the defendant's conduct while in jail in said cause.

Signed this __10th__ day of __June__, 19_87_.

JUDGE PRESIDING

** DATE IN CUSTODY
1-10-87 - 6-13-87

NAME GREER, DAVE

TX: GREER, DAVE DUANE

ALIAS _____   CLASSIFICATION _____

NO. 454082  RACE _____ SEX MALE  REFERENCE _____

FPC33-9AA

SIGNATURE OF PERSON TAKING PRINTS          SIGNATURE OF PERSON FINGERPRINTED

454082 GREER

Date Received __11-8-85__  Received From __BRAZOS CO.__

Crime __HTFT 0/750(1)__

Sentence __5yrs.__  Sentence Begins __3-10-87__

Returned as PV REID FR BRAZOS CO. NEW CHARGES. REM AS 408765 IS CONC.

Date Returned 5-12-87  Age 20-86  Hair Brown  Eyes Brown  Height 5-9  Weight 166

Complexion Ruddy  Date of Birth 12-22-66  Place of Birth Brazos Co Tx

Residence Bryan Tx  Nationality American

Scars & Marks: tat unicron upr lfted back,oprscar top lft shldr,

Ex-Service: NO

State's Exhibit No. 19

Pen pack

## AFFIDAVIT

THE STATE OF TEXAS     Э
COUNTY OF WALKER     Э

"My name is **Kelly Enloe**, I am over twenty-one years of age, of sound mind, capable of making this affidavit, and personally acquainted with the facts herein stated.

I am employed as the Chairman of Classification and Records for the Texas Department of Criminal Justice - Correctional Institutions Division, and my office is located in Huntsville, Texas.
I do hereby certify that the attached information provided on inmate <u>GREER, DAVE</u>
TDCJ/BPP# <u>408765</u>, cause# <u>15269, 15341</u>, are true and correct copies of the original records now on file in my office maintained in the regular course of business within the Classification and Records Office of the Texas Department of Criminal Justice - Correctional Institutions Division.

In witness whereof, I have hereto set my hand this the <u>4th</u> day of <u>September</u> 2012.

nh

<u>Kelly Enloe</u>
Kelly Enloe,
Chairman
Classification and Records



The director shall certify under the seal of the Correctional Institutions Division the documents received under Subsections (a) and (c) of Article 42.09 Code of Criminal Procedure. A document certified under this subsection is self-authenticated for the purpose of Rules 901 and 902, Texas Rules of Criminal Evidence.

Article 42.09, Subsection 8(b), as amended by S. B. 1067, Acts 1993, 73d leg.

(Rev. 12/02)


STATE'S
EXHIBIT
14
PENGAD 800-631-6989



JUDGMENT AFTER DEFERRED ADJUDICATION

NO. 15,269

| | | |
|---|---|---|
| THE STATE OF TEXAS | ◊ | IN THE DISTRICT COURT OF |
| VS. | ◊ | BRAZOS COUNTY, TEXAS |
| DAVE GREER | ◊ | 85TH/XXXXX JUDICIAL DISTRICT |

FILED
At /1:00 o'clock A M
NOV ...5
W. D. BURLEY, DIST. CLERK
by _____ Deputy

## JUDGMENT AFTER DEFERRING ADJUDICATION

The defendant having been indicted in the above numbered and entitled cause for the felony offense of ___ Burglary of a Habitation ___, and this cause being called for trial on ___ August 22 ___, 19 84, the State appeared by its Assistant/District Attorney, ___ J. D. Langley ___, and the Defendant, ___ Dave Greer ___, appeared in person and by counsel, ___ Travis B. Bryan, III ___, and both parties announced ready for trial. The defendant, having waived the right of trial by jury in person and in writing in open court (such waiver being with the consent and approval of the Court and now entered of record on the minutes of the Court, and such waiver being with the written consent and approval of the District Attorney and filed in the papers of this case), was arraigned and, in open court, plead guilty to the charge contained in the indictment. Thereupon, the defendant was admonished by the Court of the range of punishment attached to the offense and of the fact that any recommendation of the District Attorney as to punishment was not binding upon the Court, and the defendant persisted in entering the plea. It further appeared to the Court that the defendant was mentally competent and that the plea was voluntarily entered. The defendant then consented in writing in open Court to waive the appearance, confrontation and cross-examination of witnesses and consented to the introduction of written statements in evidence. The State then introduced evidence substantiating the defendant's guilt. The Court, pursuant to Art. 42.12 Sec. 3d, further found that the best interest of society and the defendant would be served by deferring further proceedings. Therefore the Court deferred further proceedings without entering an adjudication of guilt and placed the defendant on probation for ten (10) years.

On the 4th day of ___ November ___, 19 85 the State filed a Motion to proceed to final adjudication in this case.

On this the _____4th_____ day of _____November_____, 19 85 , the Defendant appeared in open Court with his attorney, Travis B. Bryan, III _____ who was also present and the State appeared represented by its Assistant/District Attorney, _____Laurie A. Hubbell_____. This Court, after having heard the State's Motion to Adjudicate and hearing evidence offered by both parties, is of the opinion and finds that the Defendant violated the conditions of probation imposed upon him as follows, to wit:

In that the defendant, DAVE GREER, on January 27, 1985, did then and there in Brazos County, Texas, intentionally and knowingly enter the Holiday Inn in College Station, without the consent of the owner and was therefore arrested for criminal trespass:

In that the defendant, DAVE GREER, on November 14, 1984, and February 27, 1985, did then and there ingest an illegal substance, to-wit: marijuana;

In that the defendant, DAVE GREER, On April 4, 1985, May 22, 1985, June 5, 1985, and August 21, 1985, did then and there use a controlled substance, to-wit: methamphetamines:

In that the defendant, DAVE GREER, on July 9, 1985, did then and there use a controlled substance, to-wit: methamphetamines:

In that the defendant DAVE GREER, on September 3, 1985, did then and there admit to his probation officer, Gloria McGowen, that he, the said defendant, had been associating with harmful and disreputable characters;

In that the defendant, DAVE GREER, has failed to maintain suitable and stable employment:

In that the defendant, DAVE GREER, on November 14, 1984, and June 5, 1985, did then and there admit to his probation officer, Gloria McGowen, that he, the said defendant, had left Brazos County, Texas, without the written consent of the Court;

In that the defendant, DAVE GREER, failed to pay probation fees for the months of June, July, August, September, and October of 1985;

In that the defendant, DAVE GREER, failed to keep his curfew on October 31, 1984, and August 7, 1985; and,

In that the defendant, DAVE GREER, failed to participate in drug abuse counseling.

The Court, hearing the Defendant's plea thereto, the evidence submitted, and the arguments of counsel, found the Defendant guilty of the offense of ___Burglary of a Habitation___ as charged in the indictment and assessed the punishment at confinement in the Texas Department of Corrections for a term of ___five (5)___ years.

IT IS THEREFORE CONSIDERED, ORDERED, ADJUDGED AND DECREED by the Court that the Defendant committed the offense on ___December 28___, 19_83_, and that the Defendant be punished by confinement in the Texas Department of Corrections for a term of ___five (5)___ years and that the State of Texas do have and recover of the Defendant all costs of the prosecution, for which execution will issue, and that the Defendant be remanded to jail to await the further orders of the Court.

The Defendant shall receive credit on his sentence for the time spent in jail in the above styled and numbered cause from the ___16th___ day of ___January___, 19_84_, to the ___18th___ day of ___January___, 19_84_, for a total of ___97___ days credit. _To run Concurrent with Cause # 15,341 in 85th District Court, Brazos County_

Signed this ___4___ day of ___November___, 19_85_.

**ADDITIONAL CREDIT 2-29-84 TO 4-18-84 TO 4-11-85 TO 5-4-85**
**2. 10-17-85 TO 1.-8-85.**

___W.C. Davis Jr.___
JUDGE PRESIDING
___85TH___ Judicial District
Brazos County, Texas

NOTICE OF APPEAL WAS NOT PERFECTED.

_W. D. Burley_
W. D. BURLEY, DISTRICT CLERK
BRAZOS COUNTY, BRYAN, TEXAS
BY:

DEPUTY

NO. 15,341

THE STATE OF TEXAS              :        IN THE DISTRICT COURT OF

VS                             :        85th JUDICIAL DISTRICT

DAVE GREER                     :        BRAZOS COUNTY, TEXAS

FILED
...20...
M. AULEY, DIST/CLERK
Brazos County, Texas

### ORDER REVOKING PROBATION - IMPOSITION OF SENTENCE

On the 18th day of April, 19 84, the defendant was duly and legally convicted for the offense of Burglary of a Habitation in the above entitled and numbered cause and punishment was assessed at Ten (10) years/xxxx confinement in the (Texas Department of Corrections) xxxxxxxxxxxxxxxxx and the imposition of the sentence was suspended during the good behavior of the defendant and the defendant was placed on probation for a period of Ten (10) years/xxxx.

On the 10th day of October, 19 85, the State filed a motion to Revoke the probation granted the defendant.

On this 4th day of November, 19 85, the Defendant appeared in open Court in person, his attorney, Travis B. Bryan, III also being present and the State appeared by her Assistant/District Attorney, and the Court, after having heard and considered the State's Motion to Revoke probation and hearing the evidence offered by both the State and the Defendant the Court is of the opinion and finds as a fact that the defendant violated the terms and conditions of his probation as follows, to wit:

In that the defendant, DAVE GREER, on January 27, 1985, did then and there in Brazos County, Texas, intentionally and knowingly enter the Holiday Inn in College Station, without the consent of the owner and was therefore arrested for criminal trespass;

In that the defendant, DAVE GREER, on November 14, 1984, and February 27, 1985, did then and there ingest an illegal substance, to-wit: marijuana;

In that the defendant, DAVE GREER, On April 4, 1985, May 22, 1985, June 5, 1985, and August 21, 1985, did then and there use a controlled substance, to-wit: methamphetamines;

In that the defendant, DAVE GREER, on July 9, 1985, did then and there use a controlled substance, to-wit: methamphetamines;

In that the defendant DAVE GREER, on September 3, 1985, did then and there admit to his probation officer, Gloria McGowen, that he, the said defendant, had been associating with harmful and disreputable characters;

In that the defendant, DAVE GREER, has failed to maintain suitable and stable employment;

In that the defendant, DAVE GREER, on November 14, 1984, and June 5, 1985, did then and there admit to his probation officer, Gloria McGowen, that he, the said defendant, had left Brazos County, Texas, without the written consent of the Court;

In that the defendant, DAVE GREER, failed to pay probation fees for the months of June, July, August, September, and October of 1985;

In that the defendant, DAVE GREER, failed to keep his curfew on October 31, 1984, and August 7, 1985; and,

In that the defendant, DAVE GREER, failed to participate in drug abuse counseling.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED by the Court, that the order suspending the imposition of the sentence, and placing the Defendant on probation, heretofore entered in this said cause be, and the same is hereby revoked.

The Court further finds that the best interest of society and the Defendant will be served by imprisonment in the (Texas Department of Corrections) XXXXXXXXXXXXXXXXXX and therefore the (XXXXXXXXXXXXXXXXXXXXXXXXX) (reduced punishment of) 5 (Five) years/XXXX in the (Texas Department of Corrections) (XXXXXXXXXXXXXXXXX) is hereby ordered to be served.

<center>SENTENCE</center>

ON THIS the 4th day of November , 19 85 , the State appeared by her Assistant/District Attorney, and the Defendant appeared in open Court in person, his attorney also being present, for the purpose of having sentence pronounced in accordance with the judgment herein rendered and thereupon the said defendant was asked by the Court whether the Defendant had any legal reason to say why sentence should not be pronounced; and the Defendant answered nothing in bar thereof, whereupon the Court proceeded, in the presence of the Defendant, to pronounce sentence as follows:

IT IS THE ORDER OF THE COURT that the said Defendant, who has been adjudged guilty of the offense of Burglary of a Habitation and whose punishment has been assessed by the Court at confinement in the (Texas Department of Corrections) XXXXXXXXXXXXXXXXXXXX for a term of five (5) years.

--be delivered by the Sheriff of Brazos County, Texas, to the Warden of the Texas Department of Corrections, or other persons legally authorized to receive such convicts, and that said Defendant shall be confined in said Texas Department of Corrections for XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXX five (5) years, in accordance with the laws governing the Texas Department of Corrections.

--be delivered to the Sheriff of Brazos County, Texas, or other persons legally authorized to receive such convicts, and that said Defendant shall be confined in said Brazos County Jail for a term of _____ (days) (years) in accordance with the laws governing the Brazos County Jail.

It is further Ordered, Adjudged and Decreed by the Court that the Defendant shall pay restitution or reparation in the amount of $ _____ payable to the Brazos County Adult Probation Department for the benefit of _____, the victim of the prisoners crime, as a condition of his parole in accordance with Art. 42.12 Sec. 15 (g).

The Defendant shall receive credit on his sentence for the time spent in jail in the above styled and numbered cause from the 16th day of January , 19 8 , to the 18th day of January , 19 84 , for a total of ___ days credit.

To run concurrent with Cause # 15,269 in 85th District

Signed this 4th day of November , 19 ___ . Court of Brazos County Texas

**ADDITIONAL CREDIT 2-29-84 TO 4-18-84 TO _____
4-11-85 TO 5-4-85 TO 10-17-85 TO 11-8-85.

W.T. McDonald, Jr.
PRESIDING JUDGE

85TH JUDICIAL DISTRICT

<center>BRAZOS COUNTY, TEXAS</center>

NOTICE OF APPEAL WAS NOT PERFECTED.

W. D. BURLEY, DISTRICT CLERK
BRAZOS COUNTY, BRYAN, TEXAS
BY:

DEPUTY

NAME __GREER, DAVE__

ALIAS __IN: GREER, DAVE DUREE__

NO. __408765__ RACE __WHITE__ SEX __MALE__

**TEXAS DEPARTMENT OF CORRECTIONS**
HUNTSVILLE, TEXAS

CLASSIFICATION _____

REFERENCE _____

PERS-34A

### RIGHT HAND

| THUMB 10 | INDEX FINGER 16 | MIDDLE FINGER 8 | RING FINGER 8 | LITTLE FINGER 4 |
|---|---|---|---|---|

### LEFT HAND

| | | MIDDLE FINGER 7 | RING FINGER 1 | LITTLE FINGER 1 |
|---|---|---|---|---|

SIGNATURE OF PERSON TAKING PRINTS

X _____
SIGNATURE OF PERSON FINGERPRINTED

| LEFT HAND | LEFT THUMB | RIGHT THUMB | RIGHT HAND |
|---|---|---|---|

408765 GREER

Date Received ___11-8-65___ Received From ___BRAZOS CO.___

Crime __3 UFG HB IT ( 2 ) ( 2-5yrs)__

Sentence ___5yrs.___ Sentence Begins ___10-17-85___

Returned as _____

Date Returned _____ Age _18-84_ Hair _BROWN_ Eyes _BROWN_ Height _5-10_ Weight _145_

Complexion ___RUDDY___ Date of Birth ___12-22-66___ Place of Birth _BRAZOS CO.TX_

Residence ___BRYAN, TX___ Nationality ___AMERICAN___

Scars & Marks: ___NO MARKS___

Ex-Service:    NO

State's Exhibit No. 19-A

Judgment and Sentence

(Felony Probation - Plea of Guilty/No Contendere - Art. 42.12, Sec. 3, T' °)

NO. 15,341

| THE STATE OF TEXAS | X | IN THE DISTRICT COURT OF |
|---|---|---|

VS DAVE

THE STATE OF TEXAS, COUNTY OF BRAZOS
I, Marc Hamlin, Clerk of the District of Brazos County, Texas,
do hereby certify that the foregoing is a true and correct copy
of the original; this certification reflects that the SSNs have been
redacted in Cause No. 15341 - 85
ATTEST: Marc Hamlin
MARC HAMLIN, District Clerk, Brazos County, Texas
By: Dianne Taylor , Deputy

85th JUDICIAL DISTRICT

FILED
BRAZOS COUNTY, TEXAS
At 3:0 o'clock M
APR 18 1984
W. D. BURLEY, DIST. CLERK
Brazos County, Texas
BY Deputy

JUDGMENT

On this the 18th day of April, 1984, in the above entitled and numbered cause being this day called for trial, the State appeared by her Assistant/District Attorney and the Defendant, David Greer, appeared in person and by Counsel, Travis Bryan, and both parties announced ready for trial. The Defendant, in person and in writing, in open court, having waived his right of trial by jury, such waiver being with the consent and approval of the Court and now entered of record on the minutes of the Court, and such waiver being with the consent and approval of the Assistant/District Attorney in writing and filed in the papers of this cause before the Defendant entered his plea herein, the Defendant was arraigned/waived arraignment in writing, and, in open court, pleaded guilty/nolo contendere to the charge contained in the indictment/information. Thereupon, the Defendant was admonished by the Court of the range of punishment attached to the offense, of the fact that any recommendation of the Assistant/District Attorney as to punishment was not binding upon the Court, and that if the punishment assessed did not exceed the punishment recommended by the prosecuting attorney and agreed to by the Defendant and his attorney, the trial Court must give its permission to the Defendant before he may prosecute an appeal, and that if the Court rejected the plea agreement, the defendant would be allowed to withdraw his plea and the fact that he/she had pled guilty or any evidence introduced may not be admitted against the Defendant on the issue of guilt or punishment in any subsequent criminal proceeding; and it plainly appearing to the Court that the Defendant was mentally competent and that the plea was freely and voluntarily entered, the said plea was accepted by the Court and is here entered of record upon the minutes. The Defendant, having in open court, in writing, waived the appearance, confrontation, and cross-examination of witnesses, consented to the stipulation of evidence and to the introduction of testimony by affidavits, written statements of witnesses, and any other documentary evidence; and such waiver and consent having been approved by the Court in writing and filed in the papers of the cause, the said plea of the Defendant was received and entered of record upon the minutes. The Court, having heard the indictment/information read, or the Defendant's waiver or reading of the indictment/information, the Defendant's plea thereto, the evidence submitted, and the argument of Counsel thereon, found the Defendant guilty as confessed by him of the offense of burglary of a habitation, a felony, and assessed the punishment at confinement in the Texas Department of Corrections/Brazos County Jail for ten (10) (days)(years) and a fine of $ -0- .

IT IS THEREFORE CONSIDERED, ORDERED, AND ADJUDGED by the Court that the Defendant is guilty of the offense of burglary of a habitation , a felony, and that the said Defendant committed the said offense on the 24th day of February, 19 84, and that he be punished by confinement in the Texas Department of Corrections/Brazos County Jail for ten (days) (years), and that the State of Texas do have and recover of the Defendant all costs of the prosecution, for which execution will issue.

HOWEVER, On this 18th day of April, 19 84, the Court after due consideration is of the opinion, and so finds, that the ends of justice and the best interests of both the public and the Defendant will be served if the imposition of the sentence in this cause is suspended and the Defendant is placed on probation under the supervision of the Court.

IT IS THEREFORE FURTHER ORDERED by the Court that the imposition of the sentence in this cause be and the same is hereby suspended during the good behavior of the Defendant, and that the Defendant be and is hereby placed on probation for a period of ten (10) years , beginning on this date, under the supervision of the Court and the duly appointed and acting Adult Probation s County, Texas, provided that the Defendant shall comply with the following terms of probation:

STATE'S
EXHIBIT
19 A

30A677

COURT COPY

PAGE 1 of 2 PAGES

RIGHT THUMB



DATE
4/18/84

THE STATE OF TEXAS      X      IN THE DISTRICT COURT OF

VS *DAVE*

~~DAVID~~ GREER      X      **85th** JUDICIAL DISTRICT

     X      BRAZOS COUNTY, TEXAS

## CONDITIONS OF PROBATION

In accordance with the authority conferred by the Adult Probation and Parole law of the State of Texas, you have been placed on probation on this **18th** day of **April**, 19**84**, for a period of **ten** years for the offense of **burglary of a habitation** by the Honorable **W. T. McDonald, Jr.**, Judge, **85th** Judicial District Court, Brazos County, Texas.

It is the Order of the Court that you comply with the following conditions of probation in that you shall during the period of probation:

✓ (a) Commit no offense against the laws of this State or any other State or of the United States or of any governmental entity; further, you are to report to your Probation Officer within 48 hours if arrested or questioned by a law enforcement officer;

✓ (b) Avoid injurious and vicious habits, refrain from using alcoholic beverages to excess, and abstain from the use of any harmful substance, narcotic drug or other controlled substance in any form, except as prescribed by a licensed physician for legitimate medical purposes.

✓ (c) Avoid persons and places of harmful and disreputable character, including but not limited to, knowingly or voluntarily associating with any person previously convicted of a crime or being present at any location where a criminal act is being committed;

✓ (d) Report to the Probation Officer at the Brazos County Adult Probation Department as directed by the Court and your Probation Officer, at least once each calendar month, beginning immediately and continuing until you are discharged from probation, and obey all rules and regulations of the Probation Department;

✓ (e) Permit your Probation Officer to visit you at your home or elsewhere;

✓ (f) Work faithfully at suitable employment and notify your Probation Officer within 48 hours of any change in said employment;

✓ (g) Remain within Brazos/ _____ County, Texas, unless you have first secured the written consent of the Court to leave the County;

✓ (h) Support your dependents that you now have or that you may acquire during the term of this probation;

✓ (i) Report the sources and amounts of all income or money received and all debts and expenditures to your Probation Officer as directed;

✓ (j) Report to your Probation Officer any change of address or marital status within 48 hours;

✓ (k) Do not enter into any agreement to act as "informer" or special agent for any law enforcement agency;

✓ (l) Freely cooperate and voluntarily submit to medical and/or chemical tests and examinations for the purpose of determining whether or not you are using or are under the influence of alcohol, narcotic drugs, marijuana, or any other controlled substance;

✓ (m) Pay $ **15.00** to the Brazos County Adult Probation Department for the Brazos County Criminal Justice Planning Fund within **ten** days of the date of this Order;

✓ (n) Pay to the Brazos County Adult Probation Department a probation fee of $ **15.00** per month every month of the probationary period between the first and tenth day of the month beginning in the month next following entry of this Order;

And furthermore, during the term of probation you shall strictly follow and observe the following marked terms and conditions:

✓ X (o) Pay to the Clerk of the Court, Court Costs in the sum of $ **104.00** and a Fine of $ **-0-** within **365** days of the date of this Order;

_____ (p) Pay to the Clerk of the Court $ _____ reimbursement for attorney's fees paid Probationer's appointed counsel in equal monthly installments of $ _____ each, between the first and tenth day of every month, beginning in the month next following entry of this Order and continuing until such reimbursement is paid in full;

_____ (q) Pay $ _____ restitution to the Brazos County Adult Probation Department, in equal monthly installments of $ _____ each, between the first and the tenth day of every month, beginning in the month next following the entry of this Order and continuing until such restitution is paid in full; *Sun. through Saturday*

X (r) Observe a curfew and be home each night before **10:00 PM** or within 30 minutes of the end of night employment, whichever is later; *Friday and Saturday before 12:00 p.m.*

_____ (s) Abstain from the use of alcoholic beverages in any form and do not go upon any premises where alcoholic beverages are served;

X (t) Participate in the Probation Orientation Program to be held at 7:00 PM on **May 22, 1984** in the District Courtroom;

_____ (u) Participate in all sessions of Driving While Intoxicated classes to be held at 7:00 PM on four consecutive Wednesdays in the Brazos County Court at Law courtroom, beginning the _____ day of _____, 19_____;

X (v) Report to the Sheriff's Office of Brazos County to serve **30** days in the Brazos County Jail as follows: *Credit for 30 days served.*

X (w) Testify against co-defendants in all criminal cases that are filed and to be filed.

X (x) As an alternative to incarceration you shall be on intensive supervision, effective immediately, for a period not to exceed one year. *two years*

X (y) Obtain a GED certificate or high school diploma within ~~365 days~~ from the date of Order.

FILED

At _____ o'clock _____ M

19 **84**

APR 18 1984

W. D. BURLEY, DIST. CLERK
Brazos County, Texas

BY _____ Deputy

Signed this **18th** day of **April**

PRESIDING JUDGE
**85th** JUDICIAL DISTRICT
BRAZOS COUNTY, TEXAS

I acknowledge receipt from the Clerk of a copy of my conditions of probation.

Dated **April 18, 1984**

PROBATIONER

DEPUTY/CLERK

30A678

I acknowledge that a Probation Officer of Brazos County and the Courts has explained the conditions of my probation, and I understand them.

Dated **April 18, 1984**

PROBATIONER

PROBATION OFFICER

Page 2 of 2 pages

COURT COPY

NO. 15,341

THE STATE OF TEXAS        :    IN THE DISTRICT COURT OF

VS                        :    85th JUDICIAL DISTRICT

DAVE GREER           :    BRAZOS COUNTY, TEXAS

ORDER REVOKING PROBATION - IMPOSITION OF SENTENCE W/O

On the 18th day of April , 19 84 , the defendant
duly and legally convicted for the offense of Burglary of a Habitation
in the above entitled and numbered cause and punishment
was assessed at Ten (10) years/XXXXX confinement in the (Texas
Department of Corrections) (XXXXXXXXXXXXXXXXXXXX) and the imposition of the
sentence was suspended during the good behavior of the defendant and the
defendant was placed on probation for a period of Ten (10) years/
XXXXX

On the 10th day of October , 19 85 , the State filed a
Motion to Revoke the probation granted the defendant.

On this 4th day of November , 19 85 , the Defendant
appeared in open Court in person, his attorney, Travis B. Bryan, III
also being present and the State appeared by her Assistant/District Attorney,
and the Court, after having heard and considered the State's Motion to Revoke
probation and hearing the evidence offered by both the State and the Defendant
the Court is of the opinion and finds as a fact that the Defendant violated
the terms and conditions of his probation as follows, to wit:

In that the defendant, DAVE GREER, on January 27, 1985, did then and there
in Brazos County, Texas, intentionally and knowingly enter the Holiday
Inn in College Station, without the consent of the owner and was therefore
arrested for criminal trespass;

In that the defendant, DAVE GREER, on November 14, 1984, and February 27,
1985, did then and there ingest an illegal substance, to-wit: marijuana;

In that the defendant, DAVE GREER, On April 4, 1985, May 22, 1985, June 5,
1985, and August 21, 1985, did then and there use a controlled substance,
to-wit: methamphetamines;

In that the defendant, DAVE GREER, on July 9, 1985, did then and there
use a controlled substance, to-wit: methamphetamines;

In that the defendant DAVE GREER, on September 3, 1985, did then and
there admit to his probation officer, Gloria McGowen, that he, the said
defendant, had been associating with harmful and disreputable characters;

In that the defendant, DAVE GREER, has failed to maintain suitable and
stable employment;

In that the defendant, DAVE GREER, on November 14, 1984, and June 5,
1985, did then and there admit to his probation officer, Gloria McGowen,
that he, the said defendant, had left Brazos County, Texas, without the
written consent of the Court;

In that the defendant, DAVE GREER, failed to pay probation fees for the
months of June, July, August, September, and October of 1985;

In that the defendant, DAVE GREER, failed to keep his curfew on October
31, 1984, and August 7, 1985; and,

In that the defendant, DAVE GREER, failed to participate in drug abuse
counseling.

THE STATE OF TEXAS; COUNTY OF BRAZOS
I, Marc Hamlin, Clerk of the District of Brazos County, Texas,
do hereby certify that the foregoing is a true and correct copy
of the original; this certification reflects that the SSNs have been
redacted in Cause No. 15341·85
ATTEST: Marc Hamlin
MARC HAMLIN, District Clerk, Brazos County, Texas
By: _____, Deputy

34A550

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED by the Court, that the order suspending the imposition of the sentence, and placing the Defendant on probation, heretofore entered in this said cause be, and the same is hereby revoked.

The Court further finds that the best interest of society and the Defendant will be served by imprisonment in the (Texas Department of Corrections) XXXXXXXXXXXXXXXXXX and therefore the (XXXXXXXXXXXXXXXXXXXXXXXXXXX) (reduced punishment of) 5 (five) years/XXXX in the (Texas Department of Corrections) (XXXXXXXXXXXXXXXX) is hereby ordered to be served.

## SENTENCE

ON THIS the __4th__ day of __November__, 19 85, the State appeared by her Assistant/District Attorney, and the Defendant appeared in open Court in person, his attorney also being present, for the purpose of having sentence pronounced in accordance with the judgment herein rendered and thereupon the said defendant was asked by the Court whether the Defendant had any legal reason to say why sentence should not be pronounced; and the Defendant answered nothing in bar thereof, whereupon the Court proceeded, in the presence of the Defendant, to pronounce sentence as follows:

IT IS THE ORDER OF THE COURT that the said Defendant, who has been adjudged guilty of the offense of __Burglary of a Habitation__ and whose punishment has been assessed by the Court at confinement in the (Texas Department of Corrections) XXXXXXXXXXXXXXXXXXXXXX for a term of __five (5) years.__

--be delivered by the Sheriff of Brazos County, Texas, to the Warden of the Texas Department of Corrections, or other persons legally authorized to receive such convicts, and that said Defendant shall be confined in said Texas Department of Corrections for XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXX __five (5)__ years, in accordance with the laws governing the Texas Department of Corrections.

--be delivered to the Sheriff of Brazos County, Texas, or other persons legally authorized to receive such convicts, and that said Defendant shall be confined in said Brazos County Jail for a term of _____ (days) (years) in accordance with the laws governing the Brazos County Jail.

It is further Ordered, Adjudged and Decreed by the Court that the Defendant shall pay restitution or reparation in the amount of $_____ payable to the Brazos County Adult Probation Department for the benefit of _____, the victim of the prisoners crime, as a condition of his parole in accordance with Art. 42.12 Sec. 15 (g).

The Defendant shall receive credit on his sentence for the time spent in jail in the above styled and numbered cause from the _____ day of _____, 19 ____, to the _____ day of _____, 19, _____, for a total of _____ days credit.

To run Concurrent with cause # 15,269 in 85th District

Signed this __4th__ day of __November__, 19 ____.  Court of Brazos County, Texas

W. C. McDonald Jr.
PRESIDING JUDGE

__85TH__  JUDICIAL DISTRICT

BRAZOS COUNTY, TEXAS

34A551

State's Exhibit No. 20

Judgment and Sentence

No. 1878-97 (cm) 2

| THE STATE OF TEXAS | * | IN THE COUNTY COURT |
|---|---|---|
| VS. | * | AT LAW ~~NO. 1~~/NO. 2 |
| Dave Duane Greer | * | BRAZOS COUNTY, TEXAS |
| w/m 12/22/66 | | |

## JUDGMENT + SENTENCE

On this date the above numbered and entitled cause was regularly reached and called for trial. The State appeared by her County Attorney and _Dave Duane Greer_, hereinafter referred to as defendant, appeared in person and through attorney _Jim James_ (waived his/her right to an attorney in writing) and in open court plead Guilty/~~Nolo Contendre~~ to the charge of _Evading Arrest_ as alleged in the information. Thereupon the defendant was admonished by the Court of the consequences of said plea and the Court, having heard the evidence which substantiates the defendant's guilt as confessed by him/her of the above offense, which occurred on the _28th_ day of _June_, 19_97_.

It is therefore ordered, adjudged, and decreed by the Court that on this date the defendant is guilty of the above offense as charged in the information in this cause, and as confessed by him/her in the plea of guilty herein made, and the Court, having heard evidence on the question of punishment and argument of counsel, thereupon fixed the punishment by payment of a fine in the amount of $_500_ (and by confinement in the Brazos County Jail for a term of _90_ days) and that the State of Texas do have and recover of the said defendant all costs of this proceeding incurred, for which let execution issue in accordance with the laws governing the State of Texas.

SIGNED THIS _25th_ DAY OF _August_, 19_97_.

_Sarah Ryan_
JUDGE PRESIDING
COUNTY COURT AT LAW ~~NO. 1~~/NO. 2
BRAZOS COUNTY, TEXAS

STATE'S
EXHIBIT
26
PENGAD 800-631-6989

RIGHT THUMB PRINT
TAKEN IN COURT

DATE: 6/15/73

THE STATE OF TEXAS, COUNTY OF BRAZOS
I, Marc Hamlin, Clerk of the District of Brazos County, Texas, do hereby certify that the foregoing is a true and correct copy of the original; this certification reflects that the SSNs have been redacted in Cause No. 1878-97
ATTEST: Marc Hamlin
MARC HAMLIN, District Clerk, Brazos County, Texas
By: _____, Deputy

State's Exhibit No. 21

Judgment and Sentence

No. 1878-97 (count )

FILED
At ___ o'clock ___ M
SEP 3 1997
Page 1 of 1
MARC HAMLIN, DIST. CLERK
Brazos County, Texas

| THE STATE OF TEXAS | * | IN THE COUNTY COURT |
|---|---|---|
| VS. | * | AT LAW NO. 1/NO. 2 |
| Dave Duane Greer | * | BRAZOS COUNTY, TEXAS |
| W/M      12/22/66 | | |

## JUDGMENT + SENTENCE

On this date the above numbered and entitled cause was regularly reached and called for trial. The State appeared by her County Attorney and _____ Dave Duane Greer _____, hereinafter referred to as defendant, appeared in person and through attorney _____ Jim James _____ (waived his/her right to an attorney in writing) and in open court plead Guilty/Nolo Contendre to the charge of _____ Reckless Driving _____ as alleged in the information. Thereupon the defendant was admonished by the Court of the consequences of said plea and the Court, having heard the evidence which substantiates the defendant's guilt as confessed by him/her of the above offense, which occurred on the __28th__ day of __June__ , 19 97 .

It is therefore ordered, adjudged, and decreed by the Court that on this date the defendant is guilty of the above offense as charged in the information in this cause, and as confessed by him/her in the plea of guilty herein made, and the Court, having heard evidence on the question of punishment and argument of counsel, thereupon fixed the punishment by payment of a fine in the amount of $ __500__ (and by confinement in the Brazos County Jail for a term of __90__ days) and that the State of Texas do have and recover of the said defendant all costs of this proceeding incurred, for which let execution issue in accordance with the laws governing the State of Texas.

SIGNED THIS __25th__ DAY OF __August__ , 19 97 .

_____ Sarah Ryan _____
JUDGE PRESIDING
COUNTY COURT AT LAW NO. 1/NO. 2
BRAZOS COUNTY, TEXAS

STATE'S
EXHIBIT
21

RIGHT THUMB PRINT
TAKEN IN COURT

DATE: 8/25/97

THE STATE OF TEXAS, COUNTY OF BRAZOS
I, Marc Hamlin, Clerk of the District of Brazos County, Texas, do hereby certify that the foregoing is a true and correct copy of the original; this certification reflects that the SSNs have been redacted in Cause No. 1878-97
ATTEST: Marc Hamlin
MARC HAMLIN, District Clerk, Brazos County, Texas
By:_____ , Deputy

State's Exhibit No. 22

Indictment

(Not admitted)

DENISE C.PHILLIPS, CSR
OFFICIAL COURT REPORTER
272ND DISTRICT COURT

State's Exhibit No. 23

Judgment and Sentence

# CAUSE NO. 13,934
## INCIDENT NO./TRN: 9151867087

| | | | |
|---|---|---|---|
| THE STATE OF TEXAS | § | IN THE 21ST DISTRICT | |
| | § | | |
| V. | § | COURT | |
| | § | | |
| DAVE DUANE GREER | § | BURLESON COUNTY, TEXAS | |
| | § | | |
| STATE ID NO.: TX03329636 | § | | |

## JUDGMENT OF CONVICTION BY COURT—WAIVER OF JURY TRIAL

| | | | |
|---|---|---|---|
| Judge Presiding: | HON. Reva L. Towslee Corbett | Date Judgment Entered: | October 29, 2010 |
| Attorney for State: | Jennifer Lively<br>Elizabeth Whittington | Attorney for Defendant: | Trey Dunne |

Offense for which Defendant Convicted:

Theft less than $1,500

| Charging Instrument: | Statute for Offense: |
|---|---|
| INDICTMENT | 31.03 Texas Penal Code |

Date of Offense:

May 18, 2010

| Degree of Offense: | Plea to Offense: | Findings on Deadly Weapon: |
|---|---|---|
| CLASS "A" MISDEMEANOR | GUILTY | N/A |

Terms of Plea Bargain:

One (1) year in the Burleson County Jail, $1,499.00 restitution ( Restitution is Joint and Several with co-defendants - #13,950 – Jason Ray Greer and #13,951 – Billy Mike Harris, Jr.), court cost and court appointed attorney fee

| Plea to 1st Enhancement Paragraph: | N/A | Plea to 2nd Enhancement/Habitual Paragraph: | N/A |
|---|---|---|---|
| Findings on 1st Enhancement Paragraph: | N/A | Findings on 2nd Enhancement/Habitual Paragraph: | N/A |

| Date Sentence Imposed: | October 29, 2010 | Date Sentence to Commence: | October 29, 2010 |
|---|---|---|---|
| Punishment and Place of Confinement: | One (1) year in the Burleson County Jail | Time Credited: 118 days | |

### THIS SENTENCE SHALL RUN CONCURRENTLY.
[ ] SENTENCE OF CONFINEMENT SUSPENDED, DEFENDANT PLACED ON COMMUNITY SUPERVISION FOR N/A.

[ ] In accordance with Section 12.44(a) Penal Code, the Court finds that the ends of justice would best be served by punishment as a Class A misdemeanor. Defendant is adjudged to be guilty of a state jail felony and is assessed punishment indicated above.

| Fine: | Court Costs: | Restitution: | Restitution Payable to: |
|---|---|---|---|
| $ N/A | $ 229.00 court cost<br>$ 400.00 court appointed attorney fee | $ 1,499.00 | VICTIM (see below)<br>AGENCY/AGENT (see below) |

[ ] Attachment A, Order to Withdraw Funds, is incorporated into this judgment and made a part hereof.

Sex Offender Registration Requirements do not apply to the Defendant. TEX. CODE CRIM. PROC. chapter 62

The age of the victim at the time of the offense was N/A.

All pertinent information, names and assessments indicated above are incorporated into the language of the judgment below by reference.

This cause was called for trial in Burleson County, Texas. The State appeared by her Assistant/District Attorney.
**Counsel / Waiver of Counsel (select one)**
x ] Defendant appeared in person with Counsel.
] Defendant knowingly, intelligently, and voluntarily waived the right to representation by counsel in writing in open court.


STATE'S EXHIBIT
23
PENGAD 800-631-6989

BOOK M117 PAGE 766

Both parties announced ready for trial. Defendant waived the right of trial by jury and entered the plea indicated above to the lesser included offense of the indictment – Theft less than $1,500 – a Class "A" Misdemeanor. The Court then admonished fendant as required by law. It appeared to the Court that Defendant was mentally competent to stand trial, made the plea freely and voluntarily, and was aware of the consequences of this plea. The Court received the plea and entered it of record. Having heard the evidence submitted, the Court found Defendant guilty of the offense indicated above. In the presence of Defendant, the Court pronounced sentence against Defendant.

The Court FINDS Defendant committed the above offense and ORDERS, ADJUDGES AND DECREES that Defendant is GUILTY of the above offense. The Court FINDS the Presentence Investigation, if so ordered, was done according to the applicable provisions of TEX. CODE CRIM. PROC. art. 42.12 § 9.

The Court ORDERS Defendant punished as indicated above. The Court ORDERS Defendant to pay all fines, court costs, and restitution as indicated above.

<u>Punishment Options (select one)</u>

[ ] Confinement in State Jail or Institutional Division. The Court ORDERS the authorized agent of the State of Texas or the Sheriff of this County to take, safely convey, and deliver Defendant to the Director, State Jail Division, TDCJ. The Court ORDERS Defendant to be confined for the period and in the manner indicated above. The Court ORDERS Defendant remanded to the custody of the Sheriff of this county until the Sheriff can obey the directions of this sentence. The Court ORDERS that upon release from confinement, Defendant proceed immediately to the Burleson County District Clerk's Office. Once there, the Court ORDERS Defendant to pay, or make arrangements to pay, any remaining unpaid fines, court costs, and restitution as ordered by the Court above.

[X] County Jail—Confinement / Confinement in Lieu of Payment. The Court ORDERS Defendant immediately committed to the custody of the Sheriff of Burleson County, Texas on the date the sentence is to commence. Defendant shall be confined in the Burleson County Jail for the period indicated above. The Court ORDERS that upon release from confinement, Defendant shall proceed immediately to the Burleson County District Clerk's Office. Once there, the Court ORDERS Defendant to pay, or make arrangements to pay, any remaining unpaid fines, court costs, and restitution as ordered by the Court above.

[ ] Fine Only Payment. The punishment assessed against Defendant is for a FINE ONLY. The Court ORDERS Defendant to proceed immediately to the Burleson County District Clerk's Office. Once there, the Court ORDERS Defendant to pay or make arrangements to pay all fines and court costs as ordered by the Court in this cause.

<u>Execution / Suspension of Sentence (select one)</u>

[X] The Court ORDERS Defendant's sentence EXECUTED.

[ ] The Court ORDERS Defendant's sentence of confinement SUSPENDED. The Court ORDERS Defendant placed on nmunity supervision for the adjudged period (above) so long as Defendant abides by and does not violate the terms and conditions of community supervision as set out in "Conditions of Probation/Community Supervision". The order setting forth the terms and conditions of community supervision is incorporated into this judgment by reference.

The Court ORDERS that Defendant is given credit noted above on this sentence for the time spent incarcerated.

<u>Furthermore, the following special findings or orders apply:</u>

Restitution to be paid to: Jason Wendler; 10720 FM 50; Somerville, Texas 77879 (Restitution is Joint and Several with co-defendants - #13,950 – Jason Ray Greer and #13,951 – Billy Mike Harris, Jr.)

Signed and entered on this 29th day of October, A.D. 2010.

X _____
JUDGE PRESIDING

Cause No. 13,934

APPROVED AS TO FORM:

_____
ASSISTANT/DISTRICT ATTORNEY
100 W. Buck, Suite 407
Caldwell, Texas 77836
79)567-2350
SBT: 24058659

DEFENDANT'S RIGHT THUMB AND RIGHT HAND FINGERPRINTS: See Attached

FILED 1:52 pm
DATE 10/29/10

Joy Brymer
District Clerk, Burleson County
By

BOOK M117 PAGE 76

# FINGERPRINTS OF DEFENDANT

On this the _29_ day of _Oct_ , 20 _10_

Came to be Taken Below the **Right Hand Finger** and **Thumb Prints** of :

_Dave Duane Greer_ the DEFENDANT

In Cause No. _13,934_ in the 21st District Court of Burleson County

By: _W. W. WARREN_

_Signature of DEFENDANT_

_Signature of PERSON TAKING PRINTS_

THE STATE OF TEXAS:
County of Burleson:

I, Joy Brymer District Clerk of B...
County, Texas, do hereby certify...
above is a true and correct copy...
original on file in my office.

BOOK M117 PAGE 768



THE STATE OF TEXAS:
County of Burleson:

I, Joy Brymer District Clerk of Burleson
County, Texas, do hereby certify that the
above is a true and correct copy of the
original on file in my office.

Clerk

By _____ Date 11/5/12

Deputy Clerk

State's Exhibit No. 24

Fingerprint card

DENISE C.PHILLIPS, CSR
OFFICIAL COURT REPORTER
272ND DISTRICT COURT

# APPLICANT

LEAVE BLANK

TYPE OR PRINT ALL INFORMATION IN BLACK

LAST NAME NAM     FIRST NAME     MIDDLE NAME

Greer, DAVE

STATE'S
EXHIBIT
24

PENGAD 800-631-6989

SIGNATURE OF PERSON FINGERPRINTED

ALIASES AKA

ORI

TX021025J
272ND DISTRICT C
BRYAN, TX

RESIDENCE OF PERSON FINGERPRINTED

| CITIZENSHIP CTZ | SEX | RACE | HGT. | WGT. | EYES | HAIR | PLACE OF BIRTH POB |
|---|---|---|---|---|---|---|---|

DATE    SIGNATURE OF OFFICIAL TAKING FINGERPRINTS

YOUR NO. OCA

LEAVE BLANK

EMPLOYER AND ADDRESS

FBI NO. FBI

11/14/12
0930 hrs.

ARMED FORCES NO. MNU

CLASS

REASON FINGERPRINTED

SOCIAL SECURITY NO. SOC

REF.

MISCELLANEOUS NO. MNU

| 1. R. THUMB | 2. R. INDEX | 3. R. MIDDLE | 4. R. RING | 5. R. LITTLE |
|---|---|---|---|---|
| | | | | |

| 6. L. THUMB | 7. L. INDEX | 8. L. MIDDLE | 9. L. RING | 10. L. LITTLE |
|---|---|---|---|---|
| | | | | |

LEFT FOUR FINGERS TAKEN SIMULTANEOUSLY    L. THUMB    R. THUMB    RIGHT FOUR FINGERS TAKEN SIMULTANEOUSLY

# FEDERAL BUREAU OF INVESTIGATION
## UNITED STATES DEPARTMENT OF JUSTICE
### WASHINGTON, D.C. 20537

# APPLICANT

### 1. LOOP



CENTER OF LOOP

DELTA

THE LINES BETWEEN CENTER OF LOOP AND DELTA MUST SHOW

### 2. WHORL

DELTAS

THESE LINES RUNNING BETWEEN DELTAS MUST BE CLEAR

### 3. ARCH



ARCHES HAVE NO DELTAS

FD-258 (REV. 12-29-82)

TO OBTAIN CLASSIFIABLE FINGERPRINTS:

1. USE BLACK PRINTER'S INK.
2. DISTRIBUTE INK EVENLY ON INKING SLAB.
3. WASH AND DRY FINGERS THOROUGHLY.
4. ROLL FINGERS FROM NAIL TO NAIL, AND AVOID ALLOWING FINGERS TO SLIP.
5. BE SURE IMPRESSIONS ARE RECORDED IN CORRECT ORDER.
6. IF AN AMPUTATION OR DEFORMITY MAKES IT IMPOSSIBLE TO PRINT A FINGER, MAKE A NOTATION TO THAT EFFECT IN THE INDIVIDUAL FINGER BLOCK.
7. IF SOME PHYSICAL CONDITION MAKES IT IMPOSSIBLE TO OBTAIN PERFECT IMPRESSIONS, SUBMIT THE BEST THAT CAN BE OBTAINED WITH A MEMO STAPLED TO THE CARD EXPLAINING THE CIRCUMSTANCES.
8. EXAMINE THE COMPLETED PRINTS TO SEE IF THEY CAN BE CLASSIFIED. BEARING IN MIND THAT MOST FINGERPRINTS FALL INTO THE PATTERNS SHOWN ON THIS CARD (OTHER PATTERNS OCCUR INFREQUENTLY AND ARE NOT SHOWN HERE).

### THIS CARD FOR USE BY:

1. LAW ENFORCEMENT AGENCIES IN FINGERPRINTING APPLICANTS FOR LAW ENFORCEMENT POSITIONS.*

2. OFFICIALS OF STATE AND LOCAL GOVERNMENTS FOR PURPOSES OF EMPLOYMENT, LICENSING, AND PERMITS, AS AUTHORIZED BY STATE STATUTES AND APPROVED BY THE ATTORNEY GENERAL OF THE UNITED STATES. LOCAL AND COUNTY ORDINANCES, UNLESS SPECIFICALLY BASED ON APPLICABLE STATE STATUTES DO NOT SATISFY THIS REQUIREMENT.*

3. U.S. GOVERNMENT AGENCIES AND OTHER ENTITIES REQUIRED BY FEDERAL LAW.**

4. OFFICIALS OF FEDERALLY CHARTERED OR INSURED BANKING INSTITUTIONS TO PROMOTE OR MAINTAIN THE SECURITY OF THOSE INSTITUTIONS.

### INSTRUCTIONS:

*1. PRINTS MUST FIRST BE CHECKED THROUGH THE APPROPRIATE STATE IDENTIFICATION BUREAU, AND ONLY THOSE FINGERPRINTS FOR WHICH NO DISQUALIFYING RECORD HAS BEEN FOUND LOCALLY SHOULD BE SUBMITTED FOR FBI SEARCH.

2. PRIVACY ACT OF 1974 (P.L. 93-579) REQUIRES THAT FEDERAL, STATE, OR LOCAL AGENCIES INFORM INDIVIDUALS WHOSE SOCIAL SECURITY NUMBER IS REQUESTED WHETHER SUCH DISCLOSURE IS MANDATORY OR VOLUNTARY, BASIS OF AUTHORITY FOR SUCH SOLICITATION, AND USES WHICH WILL BE MADE OF IT.

**3. IDENTITY OF PRIVATE CONTRACTORS SHOULD BE SHOWN IN SPACE "EMPLOYER AND ADDRESS". THE CONTRIBUTOR IS THE NAME OF THE AGENCY SUBMITTING THE FINGERPRINT CARD TO THE FBI.

4. FBI NUMBER, IF KNOWN, SHOULD ALWAYS BE FURNISHED IN THE APPROPRIATE SPACE.

MISCELLANEOUS NO. - RECORD: OTHER ARMED FORCES NO., PASSPORT NO. (PP), ALIEN REGISTRATION NO. (AR), PORT SECURITY CARD NO. (PS), SELECTIVE SERVICE NO. (SS), VETERANS' ADMINISTRATION CLAIM NO. (VA).

**LEAVE THIS SPACE BLANK**

 ☆ U.S.G.P.O. 1990-262-201/20000

CASE NO. 10-13-00049-CR

IN THE TENTH COURT OF APPEALS
WACO, TEXAS

DAVID GREER,
                                   Appellant

VS.

THE STATE OF TEXAS

ON APPEAL FROM THE 272nd DISTRICT COURT
BRAZOS COUNTY, TEXAS
CAUSE NO. 12-03324-CRF-272

STATE'S BRIEF

JARVIS PARSONS
DISTRICT ATTORNEY
BRAZOS COUNTY, TEXAS

Douglas Howell, III
Assistant District Attorney
State Bar No. 10098100
300 E. 26th Street, Suite 310
Bryan, Texas 77803
(979) 361-4320
(979) 361-4368 (Facsimile)

## IDENTITY OF PARTIES AND COUNSEL

APPELLANT:                          David Greer

Trial Counsel:                      Earl Gray
                                    103 North Main
                                    Bryan, Texas 77803

Appellate Counsel:                  Mary Hennessy
                                    P.O. Box 2536
                                    Brenham, Texas 77834

THE STATE OF TEXAS:                 Jarvis Parsons
                                    District Attorney
                                    300 E. 26th Street, Suite 310
                                    Bryan, Texas 77803

Trial Counsel:                      Ryan Calvert
                                    William Ward
                                    Assistant District Attorneys

Appellate Counsel:                  Douglas Howell, III
                                    Assistant District Attorney

TRIAL COURT:                        Hon. Travis Bryan, III
                                    Presiding Judge

i

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ..................................................................... i

TABLE OF CONTENTS ............................................................................................... ii

INDEX OF AUTHORITIES .......................................................................................... iii

STATEMENT REGARDING ORAL ARGUMENT ...................................................... 1

STATEMENT OF THE CASE ....................................................................................... 1

STATEMENT OF FACTS ............................................................................................. 2

SUMMARY OF THE ARGUMENT ............................................................................. 12

STATE'S REPLY TO APPELLANT'S POINT OF ERROR NO. 1 ...................... 13

 The evidence was legally sufficient to prove that Appellant intentionally and knowingly possessed the revolver.

STATE'S REPLY TO APPELLANT'S POINT OF ERROR NO. 2 ...................... 21

 The trial court did not err in denying Appellant's motion to suppress evidence where the stop was legal. (4 RR 100-103, 108-111).

STATE'S REPLY TO APPELLANT'S POINT OF ERROR NO. 3 ...................... 21

 The trial court did not err in denying Appellant's motion to suppress evidence where the resulting inventory of the vehicle was proper. (4 RR 103-107, 111).

STATE'S REPLY TO APPELLANT'S POINT OF ERROR NO. 4 ...................... 29

 Appellant was not denied effective assistance, for allegedly failing to timely urge his motions to suppress, where the trial court properly overruled his motions.

STATE'S REPLY TO APPELLANT'S POINT OF ERROR NO. 5 ...................... 31

STATE'S REPLY TO APPELLANT'S POINT OF ERROR NO. 5 ...................... 31

    The trial court did not err when it admitted extraneous evidence of a statement made by Appellant over relevance and Rule 403 objections. (4 RR 9-15).

PRAYER .................................................................................................... 39

CERTIFICATE OF SERVICE ...................................................................... 39

CERTIFICATE OF COMPLIANCE WITH TEX. R. APP. P. 9.4 ........................ 40

# INDEX OF AUTHORITIES

**STATUTES**

Tex. Code Crim. Proc. art. 28.01, § 1 .................................................................. 29

Tex. Code Crim. Proc. art. 38.04 .......................................................................... 15

**CASES**

*Alexander v. State*, 740 S.W.2d 749 (Tex. Crim. App. 1987) .............................. 14

*Alvarado v. State*, 912 S.W.2d 199 (Tex. Crim. App. 1995) ............................... 15

*Bollinger v. State*, 224 S.W.3d 768 (Tex. App.—Eastland 2007, pet. ref'd)..... 5, 16

*Broadnax v. State*, no. AP–76207 (Tex. Crim. App. December 14, 2011) .......... 32

*Brown v. State*, 911 S.W.2d 744 (Tex. Crim. App. 1995) ............................... 32, 36

*Calloway v. State*, 743 S.W.2d 645 (Tex. Crim. App. 1988) ............................... 29

*Diltz v. State*, 172 S.W.3d 681 (Tex. App.—Eastland 2005, no pet.) .................... 29

*Easley v. State*, 986 S.W.2d 264 (Tex. App.—San Antonio 1998, no pet.) ........... 14

*Espinosa v. State*,
194 S.W.3d 703 (Tex. App.—Houston [14th Dist.] 2006, no pet.) ........................ 38

*Ex parte Martinez*, 330 S.W.3d 891 (Tex. Crim. App. 2011) ............................... 30

*Garcia v. State*, 919 S.W.2d 370 (Tex. Crim. App. 1994) .................................... 14

*Gigliobianco v. State*, 210 S.W.3d 637 (Tex. Crim. App. 2006) ..................... 34, 38

*Heiselbetz v. State*, 906 S.W.2d 500 (Tex. Crim. App. 1995) .............................. 15

*Hernandez v. State*, 939 S.W.2d 692 (Tex. App.—Fort Worth 1997, pet. ref'd).... 15

*Hurtado v. State,*
881 S.W.2d 738 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd).......................21

*Jackson v. Virginia,* 443 U.S. 307 (1979) .................................................14

*Skillern v. State,* 890 S.W.2d 849 (Tex. App.—Austin 1994, pet. ref'd)................14

*Jagaroo v. State,*
180 S.W.3d 793 (Tex. App.—Houston [14th Dist.] 2005, pet. refd) .....................30

*Jones v. State,* 963 S.W.2d 826 (Tex. App.—Texarkana 1998, pet. ref'd).............36

*King v. State,* 895 S.W.2d 701 (Tex. Crim. App. 1995) ..................................14

*Lockett v. State,* 16 S.W.3d 504 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd)32

*McCoy v. State,* 932 S.W.2d 720 (Tex. App.—Fort Worth 1996, pet. refd)..........15

*Montgomery v. State,* 810 S.W.2d 372 (Tex. Crim. App. 1990) ..........................31

*Moreno v. State,* 755 S.W.2d 866 (Tex. Crim. App. 1988) ................................15

*Powell v. State,* 189 S.W.3d 285 (Tex. Crim. App. 2006)..................................39

*Rachal v. State,* 917 S.W.2d 799 (Tex. Crim. App. 1996)..................................31

*Rojas v. State,* no. 01-94-00550-CR
(Tex. App.—Houston [1st Dist.] March 30, 1995, pet. ref'd) ........................24, 27

*Romero v. State,* 800 S.W.2d 539 (Tex. Crim. App. 1990) ................................31

*Saxton v. State,* 804 S.W.2d 910 (Tex. Crim. App. 1991)..................................15

*State v. Mechler,* 153 S.W.3d 435 (Tex. Crim. App. 2005)............ 33, 35, 36, 37, 38

*Stout v. State,* no. 01–11–00773–CR
(Tex. App.—Houston [1st Dist.] November 8, 2012 no pet.)..........................17, 21

*Strickland v. Washington*, 466 U.S. 668 (1984).........................................................30

*Swarb v. State*,
125 S.W.3d 672 (Tex. App.—Houston [1st Dist.] 2003, pet. dism'd) ...................33

*Thompson v. State*, 9 S.W.3d 808 (Tex. Crim. App. 1999) .....................................30

*U.S. v. Loaiza-Marin*, 832 F.2d 867 (5th Cir. 1987)..............................................28

*Yaws v. State*, 38 S.W.3d 720 (Tex. App.—Texarkana 2001, pet. ref'd)...............24

**RULES**

Tex. R. App. P. 38.1 (i) ..........................................................................................32

Tex. R. Evid. 403 .....................................................................................................33

CASE NO. 10-13-00049-CR

IN THE TENTH COURT OF APPEALS
WACO, TEXAS

---

DAVID GREER,
Appellant

VS.

THE STATE OF TEXAS

---

ON APPEAL FROM THE 272nd JUDICIAL DISTRICT COURT
BRAZOS COUNTY, TEXAS
CAUSE NO. 12-03324-CRF-272

---

STATE'S BRIEF

---

TO THE HONORABLE COURT OF APPEALS:

COMES NOW, the State of Texas, by and through its District Attorney, and files this brief in response to the points of error alleged by Appellant, and would respectfully show the Court the following:

**STATEMENT REGARDING ORAL ARGUMENT**

The State requests oral argument only if granted to Appellant.

**STATEMENT OF THE CASE**

On July 12, 2012, Appellant was indicted for the felony offense of unlawful possession of firearm by felon. (CR at 1). On November 14, 2012, Appellant ple

not guilty to a jury. (4 RR 22). The jury found Appellant guilty of the offense. (4 RR 184). The trial court found the two enhancement paragraphs to be true and assessed punishment at 30 years in the institutional division of the Texas Department of Criminal Justice. (5 RR 59).

## STATEMENT OF FACTS

**Investigator Terry Young** (Brazos County Sheriff's Office) testified that on February 16, 2012, he helped execute arrest warrants against Appellant and Monishia Campbell. (4 RR 28). Young stated that there were at least six officers from the Criminal Investigation Division, all in different unmarked vehicles, that were out attempting to serve the warrant against Appellant. (4 RR 29). Appellant and Campbell were eventually located in a black Ranger pickup that was registered to Greer's father. (4 RR 30-31, 73). Because it was daytime, both Appellant and Campbell were recognized in the truck. (4 RR 31). A marked patrol car was sent in to make the stop of the vehicle. (4 RR 31). The truck did not immediately stop. (4 RR 32). It proceeded for about a block, even though there was a place for the truck to pull over before it did. (4 RR 32). The truck stopped after an unmarked car pulled in front of Appellant's truck, the driver of the unmarked car got out and pointed a weapon. (4 RR 33). State's exhibit 3 (video of the stop) was admitted. (4 RR 34). Appellant was driving, and Campbell was in the front passenger seat. (4 R 43; State's exhibit 3).

2

Young described what is done with a vehicle, that is sitting in the middle of the road, after an arrest of the driver is made. (4 RR 35). The vehicle is towed to a secure location after property in the vehicle is inventoried. (4 RR 35). In this case, the truck was inventoried by Young after Appellant's arrest. (4 RR 36, 38). Young testified that he found the following in the bed of the truck: power winch, pieces of metal and tools. (4 RR 37). The back compartment area (behind the seats) contained clothing, a cane and a bag with more clothing. (4 RR 38). The bag with clothing appeared to belong to Campbell because it contained small women's clothing, and Campbell was "very petite." (4 RR 38). Young also recovered a large, black leather jacket (State's exhibit 10). (4 RR 39). [1] It was also in the back compartment behind the seats and was not in the bag of clothing. (4 RR 39). He checked the pockets and found a .22 revolver (State's exhibit 11) in the pocket. (4 RR 40). [2] State's exhibit 3 (video of the stop) was played; as it played, Young noted that the video showed him taking out the jacket, finding the revolver and then setting it on top of the roof of the truck. (4 RR 45). Young noted that he attempted to find usable fingerprints on the weapon, but could not. (4 RR 47).

Young also inventoried the bag with women's clothing and checked the pockets. (4 RR 47). A pair of blue jeans was located; inside a pocket he found a .22

---

[1]    Photo of jacket admitted as State's exhibit 4. (4 RR 48; 6 RR State's exhibit 4).

[2]    Photo of revolver admitted as State's exhibit 6. (4 RR 48; 6 RR State's exhibit 6).

3

long rifle bullet. (4 RR 49). [3] Young explained that the revolver could not fire the .22 long rifle bullet because the revolver was chambered only for a .22 caliber short round. (4 RR 50). Specifically, the .22 long rifle would stick out of the cylinder of the revolver preventing the cylinder from rotating. (4 RR 51-52). Young noted that he did not seize the .22 long rifle bullet from the jeans as evidence because it did not fit the revolver and was not illegal for Campbell to possess in the first place. (4 RR 53). Young found that the revolver was fully loaded with .22 short bullets, and it was ready to shoot. (4 RR 53).

Young agreed that Appellant was not wearing the jacket when the truck was stopped. (4 RR 56). Appellant was wearing a tank top and camouflage pants. (4 RR 43). Young concluded that the jacket belonged to Appellant because it was an extra large size and would fit Appellant, as opposed to Campbell. The video of the stop and inventory (State's exhibit 3) also showed Campbell to already be wearing a jacket. (4 RR 57).

On cross-examination, Young stated that he assisted Deputy Ficke with the inventory. (4 RR 57). Ficke actually prepared the inventory sheet. Based on the video, Young did not believe that Appellant's truck was speeding at the time it was stopped. (4 RR 58). Nor did he witness the truck commit a traffic violation. (4 RR

---

[3] Photos of jeans and bullet admitted as State's exhibits 8 and 9. (4 RR 48; 6 RR State's exhibits 8 & 9).

4

59). The jeans, that contained the .22 shell, were a size 5. (4 RR 64). Young also agreed that there are three sizes of .22 bullets: .22 short, .22 long and .22 long rifle. (4 RR 64). Although a .22 long rifle bullet would not fit in the revolver, a .22 long bullet would. (4 RR 64-65). Young agreed that the actual shell was not collected, although a photo was taken. (4 RR 65; *see* 6 RR State's exhibit 8). Young believed that the actual shell was a .22 long rifle, and not a .22 long, because he had had "a lot of personal experience with .22s, and my personal belief is that it's a long rifle." (4 RR 65). He had not tested the revolver and did not know if it would fire. [4] (4 RR 66). The revolver was not swabbed for DNA, nor was any DNA testing done. (4 RR 68-69). The revolver was not tested for fingerprints until a week before trial, at the request of the District Attorney's Office. (4 RR 69). The bullets in the revolver were not tested. (4 RR 70). In the video, Campbell was wearing a jacket, which was too big for her to wear. (4 RR 71). An ATF (Alcohol, Tobacco and Firearms) trace was sent off; no report came back on the original owner. (4 RR 72). The truck that Appellant was driving was registered to his dad. (4 RR 72-73). Young did not witness Appellant say that he owned the revolver. (4 RR 73).

Young reiterated that the reason for the stop of the truck was to execute

---

[4] Although this was not argued on appeal, it is noted that the State was not required to prove that the firearm was operable. *See Bollinger v. State*, 224 S.W.3d 768, 775 (Tex. App.–Eastland 2007, pet. ref'd).

5

arrest warrants. (4 RR 75). He did not actually make the stop; Deputy Ficke did. (4 RR 74). Investigator Ledesma had received information that Campbell and Appellant were together in the truck and had warrants; Ledesma confirmed the outstanding warrants. (4 RR 75). Young did not remember if the truck had dark tinted windows. (4 RR 75).

**Investigator Ricardo Ledesma** testified that, on February 16, 2012 at approximately 2:00 p.m., he received a phone call from an informant. (4 RR 80). As a result, he started looking for a vehicle inhabited by Appellant and Campbell; dispatch confirmed that both had outstanding warrants. (4 RR 80-81). During the stop, he was in a car at the very back. (4 RR 82). It was a cool day; he was wearing a wind breaker jacket. (4 RR 82). Campbell had on a red shirt and camouflage jacket. (4 RR 83). Ledesma read Campbell her *Miranda* rights after her arrest. (4 RR 83). She agreed to speak with Ledesma. (4 RR 83). Ledesma knew Campbell as a victim in a previous case he had investigated. (4 RR 84).

Because everyone in the truck was arrested, it had to be towed. (4 RR 84). An inventory search was conducted. (4 RR 84). During the inventory, the revolver was found in the jacket. (4 RR 85). Ledesma took the jacket to Campbell to determine who it belonged to. (4 RR 85). Campbell's demeanor "was more of a surprised look and just kind of shook her head as no." (4 RR 86). Appellant also denied owning the jacket. (4 RR 86). Appellant was ultimately arrested for

6

possession of the revolver. (4 RR 87).

On cross-examination, Ledesma stated that he could not provide the name of the informant. (4 RR 87). The informant provided information that Appellant might be in a particular vehicle. (4 RR 88). Deputy Ficke actually filled out the inventory report (State's exhibit 15) for the truck. (4 RR 89-90). Campbell was in the back of a patrol car when he showed her the jacket; she had a demeanor "when you ask somebody a question – or even children, you ask them a question, and they immediately deny it." (4 RR 91). Again, Campbell was wearing an oversized jacket. (4 RR 91).

On re-direct, Ledesma stated that he had worked with the confidential informant before, and he had proved reliable and truthful. (4 RR 92). The informant only provided a possible location for Appellant. (4 RR 92).

On re-cross, Ledesma was aware that the .22 long rifle bullet was found in the size 5 jeans. (4 RR 93). Ledesma was shown State's exhibit 8, photo of the .22 bullet. (4 RR 94). He opined that the bullet in the photo was a .22 long rifle because of his experience with a .22. (4 RR 94). He did not request any ballistic tests on the revolver or shells. (4 RR 95).

**Officer Laketh McKinney** (Brazos County Sheriff's Department) testified that he was a detention officer in the jail. (4 RR 96). On August 29, 2012, he supervised Appellant in the jail. (4 RR 96). When he told Appellant that he needed

7

to follow the rules, Appellant replied "that he was in jail for not following the rules, and he wasn't about to start now." (4 RR 97).

On cross-examination, McKinney agreed that "every word out of this man's [Appellant's] mouth was exactly what he means." (4 RR 99). McKinney noted that it was an ongoing thing for Appellant to not do what he was being asked to do. (4 RR 98).

State's exhibit 14 (stipulation that Appellant was the same person convicted of possession of methamphetamine, as listed in the indictment) was admitted. (4 RR 99).

***Appellant's evidence during guilt-innocence***

**Monishia Campbell** stated she was in a relationship with Appellant for about two years. (4 RR 113). On February 16, 2012, she and Appellant were arrested. The day before her arrest, she was mad at Appellant and had packed her things; she grabbed whatever clothes and a gun, placed it in a bag and left. (4 RR 114). On the day she was arrested, she had called Appellant to come pick her up; they got pulled over. (4 RR 114). The revolver was hers, and not Appellant's. (4 RR 115-116). She did not remember where she had put the revolver when she left; in the heat of the moment, she just stuffed wherever she could. (4 RR 116). She covered it up because she did not want Appellant to know that she had it; he was a felon, and she did not want to get him in trouble. (4 RR 117).

8

The jacket in question was Appellant's, but she wore all his jackets. (4 RR 118). She opined that Appellant did not know that the gun was back in the truck. (4 RR 119). She admitted that she had a conviction for possession of crack cocaine out of Galveston County, and she was on probation at the time of her arrest. (4 RR 120). She was arrested on the Galveston County warrant when they were pulled over in Bryan. (4 RR 120). Her probation was later revoked, and she did eight months in Galveston County. (4 RR 120). She also had convictions for theft and prostitution. (4 RR 122).

During cross-examination, Campbell agreed that she had spoken with the prosecutor out in the hall the day before she testified. (4 RR 121). During that time, she told the prosecutor that she had wrapped the gun in clothes and put it in a black duffle bag with the rest of her clothes. (4 RR 126). She also said that the gun was still wrapped up in her clothes and in that black duffle bag when they got pulled over. (4 RR 126). Campbell stated that the gun should have been in the duffle bag. (4 RR 126). Before they were pulled over, there was no reason to have the gun out. (4 RR 127).

Campbell stated that the jacket (State's exhibit 10) was Appellant's. (4 RR 129, 130). Appellant's mother had given the jacket to him a few months before the stop; the jacket was significant because it had survived a fire. (4 RR 127). She had told the same thing to Ledesma at the time of her arrest. (4 RR 127, 132).

Campbell stated that Appellant was wearing the camouflage jacket when they were arrested, not her. (4 RR 128). The jacket (State's exhibit 10) was in the duffle bag in the back seat area at the time of her arrest. (4 RR 128). Again, she wrapped the gun in clothes and stuffed it in the duffle bag; she did not stick it in a particular pocket of the jacket. (4 RR 130).

She was not aware that her conversation with Ledesma, after her arrest, was videotaped. (4 RR 132). She now testified that, when Ledesma asked about the gun, she wasn't really surprised, just scared. (4 RR 133). She admitted that she immediately told Ledesma, at time of her arrest, "no, no, no, no, no, that's not my gun...." (4 RR 133). She also told Ledesma "That's Hillbilly's [Appellant's] jacket, and I didn't know that there was a gun. It's not my gun. It's not my gun." (4 RR 134). She also asked Ledesma: "Is Hillbilly going to get in trouble for a long time?" (4 RR 134). She testified that, at the time of their arrest, she knew Appellant was a convicted felon, and it would be bad for Appellant if he were caught with a gun. (4 RR 135). She also told the officer who transported to jail that she "had no idea that there was a gun in the car." (4 RR 136).

On re-direct, Campbell stated that she wasn't completely truthful with Ledesma because she did not know if she had a warrant for her arrest or if she had a felony. (4 RR 138). She was not present when the officers inventoried the truck. (4 RR 141).

10

*State's rebuttal evidence during guilt-innocence*

**Investigator Ricardo Ledesma** was recalled. (4 RR 144). The entire, unredacted video/audio of State's exhibit 3, showing the stop, was played for the jury.[5] (4 RR 143-144). It showed Campbell wearing the camouflage jacket. (4 RR 144). Appellant was wearing a black cut off t-shirt and camouflage pants. (4 RR 145). Appellant was not wearing a jacket at the time of his arrest. (4 RR 145). Again, Appellant told Ledesma that the leather jacket (State's exhibit 10) was not his. (4 RR 146). At no time did Campbell ever tell Ledesma that the revolver was hers. (4 RR 146). A few weeks later, Ledesma spoke to Campbell again in the jail; she did not say that the gun in the truck was hers at that time, either. (4 RR 147).

**Investigator Terry Young** stated that the leather jacket was not found inside the black duffle bag that contained all Campbell's clothing. (4 RR 155).

**Investigator Jason Ware** stated he was on scene when Investigator Young inventoried the truck; when Young recovered the jacket, it was not removed from any kind of bag. (4 RR 159).

On cross-examination, Ware said he did not know exactly where in the truck

---

[5]     The unredacted version of State's exhibit 3 was admitted to impeach the testimony of Campbell. Specifically, the prosecutor noted that:

> ... I asked her [Campbell] three or four different times three or four different ways if that conversation she was talking about with Ledesma where she told him it was not defendant's gun was at the scene that day. She very clearly said: "Yeah, it was at the scene that day." Once she found out she was being videotaped, on redirect, she changed her testimony and said that happened later.

(4 RR 143).

11

it was; just that it was in the backseat area. (4 RR 159).

## SUMMARY OF THE ARGUMENT

**No. 1**

Appellant claims that the evidence is legally insufficient to establish enough links connecting him to the firearm. Here, the evidence shows that Appellant exercised control, management, or care over the revolver.

**Nos. 2 & 3**

Appellant claims, in his second issue, that the trial court erred when it denied Appellant's motion to suppress evidence following an alleged unjustified stop. However, officers had reasonable suspicion to stop the vehicle Appellant was driving in order to identify him and his passenger and serve outstanding arrest warrants.

In his third point of error, Appellant claims that the trial court erred when it denied Appellant's motion to suppress evidence following an alleged illegitimate inventory search. Appellant argues that (1) Appellant's father should have been contacted to retrieve the vehicle and (2) the inventory did not list every item of property, and thus, did not comply with the guidelines and procedures of the Brazos County Sheriff's Department.

Texas courts have generally found impoundment to be reasonable when the driver was alone when arrested or when passengers could not show they were licensed drivers. Here, both Appellant and Campbell were placed under arrest.

12

Both the inventory list and policy were admitted. Although the inventory list did not include every piece of property, there is no evidence in the record that the department's standardized procedures were not followed.

**No. 4**

Appellant argues that trial counsel failed to present the motions to suppress prior to trial; he claims that counsel was ineffective, "in the event that the Court determines that the complaints presented in Points of Error Two and Three were not preserved for review." Because the trial court properly denied the motions to suppress, trial counsel cannot be held to be ineffective.

**No. 5**

Appellant claims that the trial court erroneously admitted extraneous evidence of his statement made to a jailer. Specifically, when the jailer told Appellant that he needed to follow the rules, Appellant replied "that he was in jail for not following the rules, and he wasn't about to start now." Before trial began, counsel objected based on relevance and whether its probative value was substantially outweighed by the danger of unfair prejudice. However, said evidence was properly admitted to show Appellant's intent, which was contested.

## STATE'S REPLY TO APPELLANT'S POINT OF ERROR NO. 1

**The evidence was legally sufficient to prove that Appellant intentionally and knowingly possessed the revolver.**

In his first point of error, Appellant claims that the evidence is legally

13

insufficient to support the jury's verdict. He argues that the "State failed to establish enough links connecting Appellant to the firearm." (Appellant's brief, p. 13).

*Standard of review*

The standard for reviewing the legal sufficiency of evidence is whether, viewing the evidence in the light most favorable to the jury's verdict, any rational trier of fact could have found beyond a reasonable doubt all the essential elements of the offense charged. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Skillern v. State*, 890 S.W.2d 849, 879 (Tex. App.—Austin 1994, pet. ref'd). The standard of review is the same in both direct and circumstantial evidence cases. *King v. State*, 895 S.W.2d 701, 703 (Tex. Crim. App. 1995). The State may prove its case by circumstantial evidence if it proves all of the elements of the charged offense beyond a reasonable doubt. *Easley v. State*, 986 S.W.2d 264, 271 (Tex. App.—San Antonio 1998, no pet.)(*citing Jackson*, 443 U.S. at 319). The sufficiency of the evidence is determined from the cumulative effect of all the evidence; each fact in isolation need not establish the guilt of the accused. *Alexander v. State*, 740 S.W.2d 749, 758 (Tex. Crim. App. 1987).

It is important to remember that all the evidence the jury was permitted, properly or improperly, to consider must be taken into account in determining the legal sufficiency of the evidence. *Garcia v. State*, 919 S.W.2d 370, 378 (Tex. Crim. App. 1994).

The jury is the exclusive judge of the facts proved, the weight to be given the testimony, and the credibility of the witnesses. *See* Tex. Code Crim. Proc. art. 38.04; *Alvarado v. State*, 912 S.W.2d 199, 207 (Tex. Crim. App. 1995). The jury is free to accept or reject any or all of the evidence presented by either party. *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991). The jury maintains the power to draw reasonable inferences from basic facts to ultimate fact. *Hernandez v. State*, 939 S.W.2d 692, 693 (Tex. App.—Fort Worth 1997, pet. ref'd). Moreover, the reconciliation of evidentiary conflicts is solely within the province of the jury. *Heiselbetz v. State*, 906 S.W.2d 500, 504 (Tex. Crim. App. 1995).

Under the *Jackson* standard, the reviewing court is not to position itself as a thirteenth juror in assessing the evidence; rather, it is to position itself as a final due-process safeguard insuring only the rationality of the fact finder. *Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988). It is not the reviewing court's duty to disregard, realign, or weigh the evidence. *Id*. The jury's verdict must stand unless it is found to be irrational or unsupported by more than a "mere modicum" of evidence, with such evidence being viewed in the light of Jackson. *Id*. The legal sufficiency of the evidence is a question of law. *McCoy v. State*, 932 S.W.2d 720, 724 (Tex. App.—Fort Worth 1996, pet. ref'd).

*Applicable caselaw-knowing possession*

Applicable caselaw regarding proof of a knowing possession is found in

15

*Bollinger v. State,* 224 S.W.3d 768 (Tex. App.—Eastland 2007, pet. ref'd):

We analyze the sufficiency of the evidence to prove possession of a firearm by a felon under the rules adopted for determining the sufficiency of the evidence in cases of possession of a controlled substance. *Nguyen v. State,* 54 S.W.3d 49, 52 (Tex.App.-Texarkana 2001, pet. ref'd). The State must prove the following: (1) that the accused exercised actual care, control, or custody of the firearm; (2) that he was conscious of his connection with it; and (3) that he possessed the firearm knowingly or intentionally. *Id.* (citing *Brown v. State,* 911 S.W.2d 744, 747 (Tex.Crim.App.1995)).

*2. Possession.*

A person commits a possession offense only if he voluntarily possesses the prohibited item. TEX. PEN.CODE ANN. § 6.01(a) (Vernon 2003). Possession is a voluntary act "if the possessor knowingly obtains or receives the thing possessed or is aware of his control of the thing for a sufficient time to permit him to terminate his control." TEX. PEN.CODE ANN. § 6.01(b) (Vernon 2003). The State does not have to prove that the accused had exclusive possession of the firearm; joint possession is sufficient to sustain a conviction. *Cude v. State,* 716 S.W.2d 46, 47 (Tex.Crim.App.1986). The State can meet its burden with direct or circumstantial evidence, but it must establish that the defendant's connection with the firearm was more than fortuitous. *Brown,* 911 S.W.2d at 747.

When the firearm is not found on the accused's person or is not in the accused's exclusive possession, additional facts must affirmatively link the accused to the firearm. *Jones v. State,* 963 S.W.2d 826, 830 (Tex.App.-Texarkana 1998, pet. ref'd). Factors that may establish affirmative links include the following: whether the firearms were in a car driven by the accused, whether the firearms were in a place owned by the accused, whether the firearms were conveniently accessible to the accused, whether the firearms were found in an enclosed space, and whether the accused made any affirmative statement connecting him to the firearms. *Corpus v. State,* 30 S.W.3d 35, 38 (Tex.App.-Houston [14th Dist.] 2000, pet. ref'd). No set formula of facts exists to dictate a finding of affirmative links

16

sufficient to support an inference of knowing possession. *Taylor v. State*, 106 S.W.3d 827, 830 (Tex.App.-Dallas 2003, no pet.). The affirmative links ordinarily emerge from an orchestration of several factors and the logical force they have in combination. *Nguyen*, 54 S.W.3d at 53.

*Bollinger v. State*, 224 S.W.3d at 773 -774.

### *Applicable holding-knowing possession of firearm*

In *Stout v. State*, no. 01–11–00773–CR, 2012 WL 5457470 (Tex. App.—Houston [1st Dist.] November 8, 2012, no pet.)(not designated for publication) the court found that the defendant knowingly possessed the firearm in question:

The State's evidence establishes a number of links between Stout and the gun. First, Stout was driving the vehicle at the time the gun was found. *See Bates*, 155 S.W.3d at 217 (relying, in part, on evidence that defendant was driver of borrowed vehicle in which gun was found inside compartment under front passenger seat and that other people who had access to vehicle denied knowledge of gun). Second, the other passengers in the vehicle denied that the gun belonged to them, as did the vehicle's owner; there was no evidence tending to contradict these assertions. *See id.* Third, although Stout did not own the vehicle, the jury could have inferred that he had a greater right to possession of the vehicle than the other two passengers because the vehicle belonged to Stout's mother. [6] *See id.; Bell v. State*, 356 S.W.3d 528, 533 (Tex.App.-Texarkana 2011, pet. granted) (observing that jury could reasonably conclude that defendant had greater right to possession of vehicle than other occupant because vehicle belonged to defendant's wife or girlfriend). Fourth, Stout was in close proximity to the gun and had access to it from the driver's seat. *See Robinson v. State*, 174 S.W.3d 320, 326 (Tex.App.-Houston [1st Dist.] 2005, pet. ref'd) (observing that contraband was "conveniently accessible" to defendant when it was "within the close vicinity of the accused and easily accessible while in the vehicle so as to suggest that the accused had knowledge of the contraband and

---

[6] In this case, the truck, that Appellant was driving, was registered to his father. (4 RR 73). He had a greater right to possession of the vehicle than Campbell.

17

exercised control over it.").
*Stout v. State*, 2012 WL 5457470, \*2.

## Discussion

Here, the following evidence shows that Appellant exercised control, management, or care over the revolver:

- Both Appellant and Monishia Campbell had warrants for their arrest. (4 RR 28, 75).

- A marked patrol car was sent in to make the stop of the vehicle. (4 RR 31). The truck did not immediately stop. (4 RR 32). The truck stopped after an unmarked police car pulled in front of Appellant's truck, and the driver of the unmarked car got out and pointed a weapon. (4 RR 33).

- Appellant was driving the vehicle, and Campbell was in the front passenger seat. (4 R 43; State's exhibit 3). The vehicle was registered to Appellant's father. (4 RR 73).

- The back compartment area (behind the front seats) was a small extended area. (4 RR 37). It contained clothing, a cane and a bag with more clothing. (4 RR 38). The bag with clothing appeared to belong to Campbell because it contained small women's clothing, and Campbell was "very petite." (4 RR 38).

- A large, black leather jacket (State's exhibit 10) was also in the back compartment behind the seats and was not in the bag of clothing. (4 RR 39). A .22 revolver (State's exhibit 11) was found in the pocket. (4 RR 40).

- Appellant was not wearing a jacket when the truck was stopped. (4 RR 56). Although it was a cool day on February 16th (4 RR 82), Appellant was wearing only a tank top and camouflage pants. (4 RR 43). Inv. Young concluded that the jacket belonged to Appellant because it was an extra large size and would fit Appellant, as opposed to Campbell. The video of the stop and inventory (State's exhibit 3) also shows Campbell to already be wearing a jacket. (4 RR 57).

- At the time of his arrest, Appellant denied owning the jacket (State's exhibit 10). (4 RR 86).

- At the time of her arrest, Campbell told Inv. Ledesma "That's Hillbilly's [Appellant's] jacket, and I didn't know that there was a gun. It's not my gun. It's not my gun." (4 RR 134). She also asked Ledesma: "Is Hillbilly going to get in trouble for a long time?" (4 RR 134).

- At trial, Campbell confirmed that the jacket belonged to Appellant because his mother had given it to him. (4 RR 127).

- Campbell testified that, at the time of their arrest, she knew Appellant was a convicted felon, and it would be bad for Appellant if he were caught with a

19

gun. (4 RR 135). She also told the officer, who transported her to jail, that she "had no idea that there was a gun in the car." (4 RR 136).

- When Officer McKinney told Appellant that he needed to follow the rules, Appellant replied "that he was in jail for not following the rules, and he wasn't about to start now." (4 RR 97).

- Although Campbell later testified, on behalf of Appellant, that the revolver was hers, said testimony was impeached:

  ➤ Campbell admitted that she was a convicted felon.(4 RR 120).

  ➤ Campbell erroneously testified that Appellant was wearing the camouflage jacket when they were arrested. (4 RR 128).

  ➤ Campbell erroneously testified that the jacket (State's exhibit 10) was in the duffle bag in the back seat area at the time of her arrest (4 RR 128).

  ➤ She stated that she wrapped the gun in clothes and stuffed it in the duffle bag; she did not stick the revolver in the jacket's pocket. (4 RR 130).

  ➤ Again, the leather jacket was not found inside the black duffle bag that contained all Campbell's clothing. (4 RR 155, 159).

Viewing the evidence in the light most favorable to the verdict, the logical force from the above links is sufficient for the jury to have concluded beyond a

20

reasonable doubt that Appellant exercised care, custody, control, or management over the revolver. *See Stout v. State*, 2012 WL 5457470, *2.

Appellant first point of error is without merit and should be overruled.

**STATE'S REPLY TO APPELLANT'S POINT OF ERROR NO. 2**

**The trial court did not err in denying Appellant's motion to suppress evidence where the stop was legal. (4 RR 100-103, 108-111).**

**STATE'S REPLY TO APPELLANT'S POINT OF ERROR NO. 3**

**The trial court did not err in denying Appellant's motion to suppress evidence where the resulting inventory of the vehicle was proper. (4 RR 103-107, 111).**

In his second point of error, Appellant claims that the trial court erred when it denied Appellant's motion to suppress evidence following an unjustified stop. In his third point of error, Appellant claims that the trial court erred when it denied Appellant's motion to suppress evidence following an illegitimate inventory search. Because Appellant argues both together, the State will respond in kind.

*Applicable law-standard of review and reasonableness of stop*

In *Hurtado v. State*, 881 S.W.2d 738, 741-742 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd), the court held that a police officer's initial stop of the defendant's vehicle was valid:

> A trial court's ruling on a motion to suppress will not be set aside absent a showing of abuse of discretion. *Maddox v. State*, 682 S.W.2d 563, 564 (Tex.Crim.App. 1985); *Santos v. State*, 822 S.W.2d 338, 339 (Tex.App.—Houston [1st Dist.] 1992, pet. ref'd). To

21

determine whether the trial court abused its discretion, the evidence is viewed in the light most favorable to the ruling. *Daniels v. State,* 718 S.W.2d 702, 704 (Tex.Crim.App.1986). At the hearing on a motion to suppress, the trial judge is the sole fact finder and, as such, may believe or disbelieve all of or any part of any witness' testimony. *Taylor v. State,* 604 S.W.2d 175, 177 (Tex.Crim.App. [Panel Op.] 1980); *Santos,* 822 S.W.2d at 339. Any finding supported by the record will not be disturbed on appeal. *Id.*

**The stop**

In his first point of error, appellant contends the trial court erred in overruling his motion to suppress and admitting evidence at trial that was the fruit of an illegal stop.

Appellant urges that outstanding warrants issued to persons using the dealer's paper license tag were insufficient to provide reasonable suspicion that criminal activity was afoot, or that appellant was connected to the activity; therefore, he reasons, the stop was illegal. He first argues that because the State failed at the suppression hearing to present any of the warrants, or any information as to who issued the warrants, there was no evidence of reasonable suspicion of criminal activity to justify the investigative stop. Alternatively, he argues, there was no description of any person to be arrested under any of the warrants to justify the seizure of appellant.

**An officer may briefly stop a suspicious individual in order to determine his identity** or maintain the status quo momentarily while obtaining more information. *Hoag v. State,* 728 S.W.2d 375, 380 (Tex.Crim.App.1987). **To justify such an initial detention, the officer must be able to point to specific and articulable facts which, in light of his experience or personal knowledge, together with inferences drawn from the facts, reasonably warrant the intrusion.** *Id.* at 380. The "specific and articulable facts" must objectively support (1) a reasonable suspicion by the officer that some activity out of the ordinary is occurring or has occurred, (2) some suggestion to connect the person detained with the unusual activity, and (3) some indication that the activity is related to a crime. *Id.*

22

Here, Officer Ortiz initially stopped appellant's automobile because his license check through his patrol car computer showed there were outstanding warrants for several persons who had operated a motor vehicle using this particular dealer's tag. Ortiz's purpose in stopping appellant was to determine if he was a person named in any of the outstanding warrants. Ortiz's suspicion that appellant might be a person named on the warrants was reasonable. Ortiz's reasonable suspicion did not need to rise to the level of probable cause to believe appellant was the subject of one or more of the warrants in order to authorize him to stop appellant's car. *See Stone v. State,* 703 S.W.2d 652, 654 (Tex.Crim.App.1986).

Appellant does not dispute that Officer Ortiz received information through his computer, as Ortiz testified. "A reasonable suspicion [to justify an investigative stop] may be based on articulable facts, even if such facts are ultimately shown to be inaccurate or false." *Kelly v. State,* 721 S.W.2d 586, 587 (Tex.App.—Houston [1st Dist.] 1986, no pet.) (police officer had reasonable suspicion to stop based on erroneous information that vehicle was stolen). The fact that appellant was not named in one of the outstanding warrants did not retroactively diminish Officer Ortiz's ability to stop appellant's vehicle and determine his identity and whether he was the subject of one or more of the warrants. Here, no warrant was introduced [7] because a warrant was not ultimately the basis for appellant's arrest. Having stopped appellant, Ortiz was entitled to, and did, request appellant to present his driver's license and identification. TEX.REV.CIV.STAT.ANN. arts. 6687b, § 13 & 6701h, § 1B(a) (Vernon Supp.1994). By doing so, Ortiz promptly learned that appellant had no driver's license, for which he could be ticketed or arrested. TEX.CODE CRIM.P.ANN. art. 14.01(b) (Vernon 1977). Thus, the initial temporary detention was legal. We overrule appellant's first point of error.

*Hurtado v. State,* 881 S.W.2d at 741-742.

In *Rojas v. State,* no. 01-94-00550-CR, 1995 WL 134876 (Tex. App.—

---

7  Here, the warrants were admitted as State's exhibits 1 and 2 for purposes of the motion to suppress. (4 RR 19). At trial, Appellant did not contest whether the warrants were valid. (4 RR 17).

Houston [1st Dist.] March 30, 1995, pet. ref'd)(not designated for publication), the

court also held that the stop of the vehicle was based on reasonable suspicion:

> The informant told the officer that the appellant and another would be at the house and would leave in a blue Cadillac. Observation by the surveillance officers confirmed the informant's information. When the officers stopped the appellant, Officer Prendergast told the appellant he was conducting a narcotics investigation and asked if he would consent to a search of the car. Based on these facts, the trial court could have reasonably concluded that reasonable suspicion existed at the time of the stop to detain the appellant. *See Fonseca v. State*, 881 S.W.2d 144, 150 (Tex. App.-Corpus Christi 1994, no pet.) (officers had reasonable suspicion relying on information obtained from reliable informant, substantiated by police observation); *Sandoval [v. State]*, 860 S.W.2d [255, 258 (Tex. App. Houston [1ˢᵗ Dist.] March 30, 1995, pet. ref'd)](officers, who were acting on information from the defendant's cousin that was substantiated by their observations, made reasonable investigative detention).

> **Law enforcement officers are not required to look the other way and permit a crime to occur or a criminal to escape.** Sandoval, 860 S.W.2d at 259.

*Rojas v. State*, 1995 WL 134876, *5-6. (emphasis added).

*Applicable law-inventory search*

In *Yaws v. State*, 38 S.W.3d 720, 724 (Tex. App.—Texarkana 2001, pet.

ref'd), the court noted:

> **After making a lawful arrest, an officer may search a suspect's vehicle for the purpose of taking an inventory.** *Colorado v. Bertine*, 479 U.S. 367, 371, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987); *Stephen v. State*, 677 S.W.2d 42, 44 (Tex.Crim.App.1984); *Backer v. State*, 656 S.W.2d 463, 464 (Tex.Crim.App.1983). Such a search is lawful as a valid exception to the warrant requirement of the Fourth Amendment because the policies behind the warrant requirement are not implicated in an inventory search. *Bertine*, 479 U.S. at 371, 107 S.Ct. 738. In fact, issues of probable cause are irrelevant because

24

inventory searches are conducted not to investigate criminal activity, but to protect the owner's property while it is in police custody to ensure against claims of lost, stolen, or vandalized property and to guard the police from danger. *Id.* at 371–72, 107 S.Ct. 738; *Illinois v. Lafayette*, 462 U.S. 640, 643–44, 646–47, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983).

**An inventory search is permissible if it is conducted according to a standard administrative procedure and is not merely "a ruse for a general rummaging in order to discover incriminating evidence."** *Florida v. Wells*, 495 U.S. 1, 4, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990); *see also Lafayette*, 462 U.S. at 646, 103 S.Ct. 2605. The State has the burden of demonstrating compliance with its procedure, and its failure to show evidence that the search was conducted pursuant to its procedure invalidates the search. *Gauldin v. State*, 683 S.W.2d 411, 415 (Tex.Crim.App.1984), *overruled on other grounds, State v. Guzman*, 959 S.W.2d 631 (Tex.Crim.App.1998).

However, adherence to a procedure, by itself, will not justify an inventory search if the initial seizure of the vehicle violates the defendant's rights. *See Stephen*, 677 S.W.2d at 44 n. 1. **Before an inventory search is lawful, there must first be a lawful impoundment.** *Daniels v. State*, 600 S.W.2d 813, 814 (Tex.Crim.App. [Panel Op.] 1980); *Benavides v. State*, 600 S.W.2d 809, 810 (Tex.Crim.App. [Panel Op.] 1980). **An impoundment is lawful if, among other reasons, "the driver is removed from his automobile and placed under custodial arrest and no other alternatives are available other than impoundment to insure the protection of the vehicle."** *Benavides*, 600 S.W.2d at 811; *see also Daniels*, 600 S.W.2d at 814–15.

Yaws contends the sheriff's office policy ignored the reasonable alternative of having his wife come to the scene within fifteen minutes to take possession of his truck. However, Texas courts have generally found impoundment to be reasonable when the driver was alone when arrested or when passengers could not show they were licensed drivers. *Stephen*, 677 S.W.2d at 43–44 (passenger unable to produce identification or driver's license); *Backer*, 656 S.W.2d at 464 (defendant alone when arrested on a public street and police could not contact friend for whom defendant requested the car be left); *Daniels*,

25

600 S.W.2d at 814–15 (passengers did not have operators' licenses and both the defendant's identity and the vehicle's owner were in doubt). Courts have not required police to try to contact a relative or friend of the accused to come to the scene to take possession of the vehicle.

**In the present case, there is no indication that the police were using the inventory search as a pretext for discovering evidence. The officers testified about Bowie County's policy regarding inventory searches and impoundments, and their adherence to that policy.** The officers acted reasonably to protect the truck and its contents. We overrule Yaws' contention.

The trial court's judgment is affirmed.
*Yaws v. State*, 38 S.W.3d at 722 -723.(emphasis added).

## *Discussion*

As to the stop, Appellant simply argues that, while Ledesma testified that the C.I. was reliable, he did not corroborate the C.I.'s tip that Appellant was driving a vehicle of that description. (Appellant's brief, p. 21). Here, Young's and Ledesma's purpose in stopping Appellant was to execute a valid arrest warrant pending on both Appellant and Campbell. Testimony indicated that Appellant was recognized as he was driving. (4 RR 31). Consequently, the tip was corroborated because the arrest warrant was confirmed, and Appellant was determined to be driving the vehicle by police. Even so, *Hurtado* mandates that "[a]n officer may briefly stop a suspicious individual in order to determine his identity...." *Id.* at 741. [8] Thus, the

---

[8] Moreover, law enforcement officers are not required to look the other way and permit a crime to occur or a criminal to escape. *Rojas v. State*, 1995 WL 134876, *6.

26

facts of this case are even stronger than those found in *Hurtado*, where the reason for the stop was to determine if anyone in the vehicle had any of the outstanding warrants. As in *Hurtado* and *Rojas*, the initial stop was legal.

As to the inventory search, Appellant argues that (1) Appellant's father should have been contacted to retrieve the vehicle and (2) the inventory did not list every item of property, and thus, did not comply with the guidelines and procedures of the Brazos County Sheriff's Department. (Appellant's brief, p. 23).

Appellant's initial argument was overruled in *Yaws*, 38 S.W.3d at 724. ("Texas courts have generally found impoundment to be reasonable when the driver was alone when arrested or when passengers could not show they were licensed drivers."). In this case, both Appellant and Campbell were placed under arrest and thus, the impoundment was reasonable.

Although the inventory list [9] did not include every piece of property, there is no evidence in the record that the department's standardized procedures were not followed. As noted in the policy [10], it does not require that every item be inventoried -- only "items of value shall be recorded on the Vehicle Inventory Report." (6 RR State's exhibit 16, III, B., 3)(emphasis added). Here, Young described that the property in the vehicle was inventoried to make sure nothing was

---

[9] The inventory list was admitted during the hearing as State's exhibit 15. (4 RR 90).

[10] The "Inventory Search Policy" was admitted during the hearing as State's exhibit 16. (4 RR 107).

27

damaged or stolen before the vehicle is towed to a secure location. (4 RR 35, 63).

In this case, the truck was properly inventoried by Young and Deputy Ficke after

Appellant's arrest. (4 RR 36, 38). *Compare U.S. v. Loaiza-Marin*, 832 F.2d

867 (5th Cir. 1987):

> …the agent's failure to complete the inventory forms does not mean that the search was not an inventory search. Upon discovering the cocaine, the agent turned Loaiza over to the D.E.A. and therefore had no reason to complete the inventory form. Although the Border Patrol procedures indicate that the forms should have been completed, other courts addressing the same issue have concluded that failure to compile the written inventory does not render the inventory search invalid. *See United States v. Trullo*, 790 F.2d 205, 206 (1st Cir.1986); *United States v. O'Bryant*, 775 F.2d 1528, 1534 (11th Cir.1985). We do likewise.

*Id.* at 869.

There is also no evidence in the record to support Appellant's contention

that the inventory search was a "mere pretext for investigation." Young testified

that the inventory is done "to preserve the person's property in their vehicle, make

sure nothing happens to it, that it's not stolen, damaged, whatever…." (4 RR 35).

Young stated that he was not looking for evidence: "we're just going through and

making a list of all the items that are in the vehicle so that we can show that this is

what was present in it when it was picked up by the wrecker." (4 RR 36). Again,

the inventory was properly conducted after both Appellant and Campbell were

arrested on valid warrants. *See Diltz v. State*, 172 S.W.3d 681 (Tex. App.—

Eastland 2005, no pet.):

28

...inventory search of defendant's vehicle was performed in accordance with standard police department policy. The officer testified that the police department has a written inventory policy. The officer also testified that, pursuant to police department policy, a wrecker was called prior to the inventory search. The officer further testified that the inventory search was not begun until after appellant was placed under arrest. There is no evidence in the record that the department's standardized procedures were not followed. There is also no evidence in the record to support appellant's contention that the inventory search was a "mere pretext for investigation."

*Id.* at 685.

Appellant's second and third points of error are without merit and should be overruled.

## STATE'S REPLY TO APPELLANT'S POINT OF ERROR NO. 4

**Appellant was not denied effective assistance, for allegedly failing to timely urge his motions to suppress, where the trial court properly overruled his motions.**

Appellant argues that trial counsel failed to present the motions to suppress prior to trial [11]; he claims that counsel was ineffective, "in the event that the Court determines that the complaints presented in Points of Error Two and Three were not preserved for review." (Appellant's brief, p. 24). The State adopts its response to points of error two and three, *supra*, and responds as follows.

---

[11] A trial court's decision to hold a pretrial hearing on a suppression motion is discretionary with the court. Tex. Code Crim. Proc. art. 28.01, § 1; *Calloway v. State*, 743 S.W.2d 645, 649 (Tex. Crim. App. 1988). A trial court may elect to determine the merits of the motion during trial when the defendant lodges a proper objection. *Id.* Even if a pretrial motion to suppress is called to the attention of the trial court, no error is presented if the trial court, in its discretion, declines to hear the same. *Calloway*, 743 S.W.2d at 649. While the court is not required to hear any pretrial motion to suppress evidence, the accused retains his right to raise any appropriate objection at trial. *Id.*

29

In order to prove an ineffective assistance of counsel claim, a defendant must show (1) by a preponderance of the evidence, that counsel's performance was so deficient that he was not functioning as acceptable counsel under the Sixth Amendment, and (2) there is a reasonable probability that, but for counsel's error or omission, the result of the proceedings would have been different. *Strickland v. Washington*, 466 U.S. 668, 687–96 (1984); *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999).

Appellant's ineffective-assistance claim fails because he did not meet his burden under the *Strickland* test. With respect to the first *Strickland* prong, to argue successfully that trial counsel's failure to object amounted to ineffective assistance of counsel, Appellant must demonstrate, at a minimum, that the trial court would have committed error in overruling the objection in question. *See Ex parte Martinez*, 330 S.W.3d 891, 901 (Tex. Crim. App. 2011); *Jagaroo v. State*, 180 S.W.3d 793, 800 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd) ("Before this court may conclude counsel was ineffective for failure to make an objection, appellant must show the trial court would have erred in overruling the objection."). Appellant has failed to make this showing. Here, counsel objected, and the trial court properly denied the motion.

Appellant's fourth point of error is without merit and should be overruled.

## STATE'S REPLY TO APPELLANT'S POINT OF ERROR NO. 5

**The trial court did not err when it admitted extraneous evidence of a statement made by Appellant over relevance and Rule 403 objections. (4 RR 9-15).**

Appellant claims that the trial court erroneously admitted extraneous evidence of his statement made to a jailer. Specifically, when the jailer told Appellant that he needed to follow the rules, Appellant replied "that he was in jail for not following the rules, and he wasn't about to start now." (4 RR 97). Before trial began, counsel objected based on relevance (4 RR 11) and whether its probative value was substantially outweighed by the danger of unfair prejudice. (4 RR 12). The trial court overruled the objections. (4 RR 15). Said evidence was properly admitted to show Appellant's intent, which was contested.

*Standard of review*

The admissibility of evidence, including evidence that may have implicated an extraneous offense or other bad act, is reviewed under an abuse of discretion standard. *See Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990). As long as the trial court's ruling is within "the zone of reasonable disagreement," there is no abuse of discretion. *See Rachal v. State*, 917 S.W.2d 799, 807 (Tex. Crim. App. 1996). The trial court is entitled to considerable deference with regard to its determinations of fact, and so long as it is correct on any theory of law, the trial court's ruling should be sustained. *See Romero v. State*, 800 S.W.2d 539, 543-

31

44 (Tex. Crim. App. 1990).

*Relevance*

As noted in *Broadnax v. State*, no. AP–76207, 2011 WL 6225399 (Tex. Crim. App. December 14, 2011):

> Only relevant evidence is admissible. [footnote omitted] Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." [footnote omitted] Therefore, to be relevant, evidence must be material and probative. [footnote omitted] Evidence is material if it is "shown to be addressed to the proof of a material proposition, i.e., any fact that is of consequence to the determination of the action."

*Broadnax v. State*, 2011 WL 6225399, *11.

*Discussion-relevance*

First, it must be noted that the Appellant provided no argument as to why the statement was not relevant. (Appellant's brief, p. 26). This presents nothing for review. Tex. R. App. P. 38.1(i) (stating that a brief must contain a clear and concise argument supporting the contentions made with appropriate citation to authority and the record); *Lockett v. State,* 16 S.W.3d 504, 505 n. 2 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd) (holding that a conclusory statement supported by neither argument nor authority presents nothing for review).

In the alternative, the State was required to prove that Appellant possessed the firearm knowingly or intentionally. (CR at 1). *See Brown v. State,* 911 S.W.2d 744, 747 (Tex. Crim. App. 1995). Here, Appellant placed his intent at issue when

32

he denied owning the jacket that contained the revolver. (4 RR 86). Campbell also testified that she owned the gun (4 RR 116), and that Appellant was not aware that the revolver was in the truck. (4 RR 119). "The extraneous offense evidence is relevant because it logically makes elemental facts—intent and knowledge—more or less probable, and it makes the defense's evidence, attempting to undermine these elemental facts, more or less probable." *Swarb v. State*, 125 S.W.3d 672, 683 (Tex. App.—Houston [1st Dist.] 2003, pet. dism'd).

## Rule 403

Tex. R. Evid. 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." Tex. R. Evid. 403. "Rule 403 favors admissibility of relevant evidence, and the presumption is that relevant evidence will be more probative than prejudicial." *Montgomery*, 810 S.W.2d at 389. "All Rule 403 rulings are subject to three general considerations: 1) the trial judge should exercise his power to exclude evidence under Rule 403 sparingly; 2) the trial judge's discretion under Rule 403 is not an invitation to rule reflexively or without careful reasoning; 3) the trial judge may not exclude evidence merely because he disbelieves the testimony." *State v. Mechler*, 153 S.W.3d 435, 443-444 (Tex. Crim. App. 2005)(Cochran, J. concurring)(footnotes omitted).

33

A Rule 403 analysis regarding unfair prejudice requires the trial court to balance the following factors:

1. the inherent probative force of the proffered item of evidence *along with*

2. the proponent's need for that evidence, *against*

3. any tendency of the evidence to suggest decision on an improper basis,

4. any tendency of the evidence to confuse or distract the jury from the main issues,

5. any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and

6. the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006)(emphasis added).

### *Relevant facts-hearing*

Concerning the Rule 403 objection, the court heard the following:

Mr. Calvert [prosecutor]: Judge I think we limit the prejudicial effect by, of course, limiting the conversation to, you know, not a description of what was going on; and we do not talk about any of the escalation that happened after that.

The Court: I understand you limit it, but is the limited portion even--

Mr. Calvert: I don't believe it is, Judge.

34

The Court: -- prohibitive of the rules.

Mr. Calvert: I don't believe it is, Judge. I think in order for it to be admissible -- or excuse me, inadmissible, the probative effect has to substantially outweigh any -- or excuse me -- the prejudicial effect has to substantially outweigh the probative value.

The probative value in this case is you have a defendant who's in jail on this particular offense, which it's my understanding is – their defense is going to be it was not his gun. He didn't even know it was there. It belonged to someone else. And yet under those circumstances and in the context of that defense, you have him telling somebody "I'm in here for not following the rules."

(4 RR 14).

### Discussion-Rule 403

A balancing of the above *Gigliobianco* factors shows that the trial court did not abuse its discretion in admitting the testimony concerning Appellant's statement.

### 1. Probative Value

This factor "looks to the evidence's probativeness or how compellingly the evidence serves to make a fact of consequence more or less probable." *State v. Mechler*, 153 S.W.3d at 440.

35

Again, the State had to prove the following: (1) that the accused exercised actual care, control, or custody of the firearm; (2) that he was conscious of his connection with it; and (3) that he possessed the firearm knowingly or intentionally. *Brown v. State,* 911 S.W.2d 744, 747 (Tex. Crim. App. 1995). The State can meet its burden with direct or circumstantial evidence, but it must establish that the defendant's connection with the firearm was more than fortuitous. *Brown,* 911 S.W.2d at 747. When the firearm is not found on the accused's person or is not in the accused's exclusive possession, additional facts must affirmatively link the accused to the firearm. *Jones v. State,* 963 S.W.2d 826, 830 (Tex. App.—Texarkana 1998, pet. ref'd).

Here, the revolver was not on Appellant's person. He denied that the jacket was his. Campbell recanted what she had told Ledesma at the time of her arrest and, at trial, stated that the weapon was hers and that Appellant was not aware that it was in the truck. Thus, Appellant's statement (that he was in jail for not following the rules, and he wasn't about to start now) is probative because it assisted the jury in determining his intent. He was acknowledging that he was in jail for an offense where he did not follow the rule -- that a felon cannot possess a firearm. This factor weighs in favor of admissibility.

2.     **Need for the evidence**

This factor includes a consideration of "whether the proponent has other

36

evidence establishing this fact and whether this fact is related to a disputed issue." *Mechler*, 153 S.W.3d at 441. As noted above, Campbell recanted what she had told Ledesma at the time of her arrest and, at trial, stated that the weapon was hers and that Appellant was not aware that it was in the truck. Appellant's statement was related to a disputed issue – his intent. This factor also weighs in favor of admissibility.

Again, the first two factors are weighed against the remaining four factors.

### 3. Unfair prejudice

This factor looks to whether the evidence has the potential to impress the jury in some irrational but indelible way. *Mechler*, 153 S.W.3d at 440. However, Rule 403 does not exclude all prejudicial evidence, only "unfairly" prejudicial evidence. *Id.* As discussed above, the evidence of Appellant's statement was relevant and probative of Appellant's intent and knowledge to commit the offense. Therefore, the evidence is not unfairly prejudicial because it relates directly to the offense charged. *See id.* at 440–41.

### 4. Confusion of the issues

In *Mechler*, the Court of Criminal Appeals noted that because the evidence related directly to the charged offense, "a jury could not be distracted away from the charged offense regardless of the time required to present the results." *Mechler*, 153 S.W.3d at 441.

37

## 5. Misleading the jury

This factor addresses whether the jury will be misled by the evidence when conducting a Rule 403 balancing test. "'Misleading the jury' refers to a tendency of an item of evidence to be given undue weight by the jury on other than emotional grounds." *Gigliobianco,* 210 S.W.3d at 641. As noted in *Espinosa v. State,* 194 S.W.3d 703 (Tex. App.—Houston [14th Dist.] 2006, no pet.):

> Rule 403 of the Texas Rules of Evidence carries a presumption that relevant evidence must be more probative than prejudicial. *Jones v. State,* 944 S.W.2d 642, 652 (Tex.Crim.App.1996); *Ho,* 171 S.W.3d at 301. Evidence should be excluded only when there exists a clear disparity between the danger of unfair prejudice and the probative value of the evidence. *Jones,* 944 S.W.2d at 652. To be unfairly prejudicial, there must be "an undue tendency to suggest [a] decision on an improper basis, commonly, though not necessarily, an emotional one." *Rogers,* 991 S.W.2d at 266. **The jury's lack of familiarity with the interactions between people in jail and those guarding them does not create an undue tendency to suggest the jury will be inflamed by those statements and make a punishment decision on their emotions, rather than the facts before them.**

*Espinosa v. State,* 194 S.W.3d at 710. (emphasis added).

## 6. Undue delay and needless presentation of cumulative evidence

The time to develop the evidence was relatively short; the entire examination of Officer Laketh McKinney took approximately four (4) pages of the reporter's record. (4 RR 96-99).

Weighing all of the factors, while giving deference to the review of a Rule 403 determination, shows that the trial court did not abused its discretion by admitting evidence of Appellant's statement. *See Powell v. State,* 189 S.W.3d 285,

38

289 (Tex. Crim. App. 2006)(holding that probative value of other-acts evidence that defendant was on parole and that firearm was found on ground near driver's side of vehicle was not substantially outweighed by danger of unfair prejudice.).

Appellant's fifth point of error is without merit and should be overruled.

## PRAYER

Wherefore, premises considered, the State of Texas respectfully prays that the judgment of the trial court be affirmed.

<div style="margin-left:50%">

Respectfully submitted,
JARVIS PARSONS
DISTRICT ATTORNEY
BRAZOS COUNTY, TEXAS

Douglas Howell, III
Assistant District Attorney
State Bar No. 10098100

</div>

## CERTIFICATE OF SERVICE

I do hereby certify that a true and correct copy of the State's Brief was mailed to Mary Hennessy, P.O. Box 2536, Brenham, TX 77833 on this _27_ day of _Nov_____, 2013.

<div style="margin-left:50%">

Douglas Howell, III

</div>

39

## CERTIFICATE OF COMPLIANCE WITH TEX. R. APP. P. 9.4

I certify that the foregoing document has a word count of   10,007    based on the word count program in Word 2003.

Douglas Howell, III

CASE NO. 10-13-00049-CR

IN THE COURT OF APPEALS
FOR THE TENTH DISTRICT
AT WACO, TEXAS

---

**DAVID DUANE GREER**
**VS.**
**STATE OF TEXAS**

---

Appeal from the 272nd Judicial District Court of
Brazos County, Texas
Cause No. 12-03324-CRF-272

---

BRIEF OF APPELLANT

---

**Attorney for Appellant:**
Mary Hennessy
Law Office of Mary Hennessy
P.O. Box 2536
403 West Alamo Street
Brenham, Texas 77833
Telephone: 979-277-0757
Facsimile: 979-277-0030

**Attorney for Appellee:**
Jarvis Parsons
Brazos County District Attorney
Brazos County Courthouse
300 East 26th Street, Suite 310
Bryan, Texas 77803
Telephone: 979-361-4320
Facsimile: 979-361-4368

ORAL ARGUMET WAIVED

i

# NAMES OF ALL PARTIES

Appellant: **David Duane Greer**
TDC #809333
295-IH-45
Huntsville, TX 77320-8443

Appellate Counsel: **Mary Hennessy**
State Bar No. 09472300
P.O. Box 2536
Brenham, Texas 77833
Telephone: 979-277-0757
Facsimile: 979-277-0030

Trial Counsel: **Earl R. Gray**
State Bar No. 24007265
103 N. Main Street
Bryan, Texas 77803
Telephone: 979-822-4759

Appellee: **State of Texas**

Counsel: **Ryan Charles Calvert**
State Bar No. 24036308
**William Lee Ward**
State Bar No. 24077302
Assistant Brazos County District Attorneys
300 East 26th Street, Suite 310
Bryan, Texas 77803
Telephone: 979-361-4320
Facsimile: 979-361-4368

Trial Court: **The Honorable Travis B. Bryan, III**
272nd Judicial District Court
300 East 26th Street, Suite 204
Bryan, Texas 77803
Telephone 979-361-4221

ii

# TABLE OF CONTENTS

Names of all Parties ......................................................................... ii

Table of Authorities .........................................................................iv

Issues Presented ..............................................................................vii

Summary of Argument .....................................................................vii

Statement of the Case .........................................................................2

Statement of Facts ..............................................................................3

Argument............................................................................................9

    **Point of Error No. 1:** ............................................................... 9
    THE EVIDENCE IS LEGALLY INSUFFICIENT TO SUPPORT A CONVICTION
    FOR THE OFFENSE OF POSSESSION OF A FIREARM BY A FELON

    **Point of Error No. 2:** ................................................................14
    THE TRIAL ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS
    EVIDENCE FOLLOWING AN UNJUSTIFIED STOP

    **Point of Error No. 3:** ................................................................14
    THE TRIAL ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS
    EVIDENCE FOLLOWING AN ILLEGITIMATE INVENTORY SEARCH

    **Point of Error No. 4:** ................................................................24
    APPELLANT WAS DENIED EFFECTIVE ASSITANCE OF COUNSEL DUE TO
    TRIAL COUNSEL'S FAILURE TO TIMELY URGE HIS MOTIONS TO SUPPRESS
    AND TO TIMELY OBJECT TO THE ADMISSION OF EVIDENCE SEIZED AS A
    RESULT OF AN IMPROPER STOP AND SEARCH

    **Point of Error No. 5:** ................................................................26
    THE TRIAL COURT ERRED IN ADMITTING, OVER APPELLANT'S OBJECTIONS
    UNDER TEXAS RULES OF EVIDENCE 401, 403, A STATEMENT MADE BY
    APPELLANT

Prayer ..................................................................28

Certificate of Service ..........................................28

# TABLE OF AUTHORITES

CASES:

*Balentine v. State*, 71 S.W.3d 763 (Tex. Crim. App. 2002)     20

*Benavides v. State*, 600 S.W.2d 809 (Tex. Crim. App. 1980)     23

*Bollinger v. State*, 224 S.W.3d 768 (Tex. App. – Eastland 2007, pet. ref'd)     12

*Brooks v. State*, 323 S.W.3d 893 (Tex. Crim. App. 2010)     9

*Brown v. State*, 911 S.W.2d 744 (Tex. Crim. App. 1985)     13

*Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000)     14, 15

*Carter v. State*, 851 S.W.2d 390 (Tex. App. – Fort Worth 1993, pet ref'd.)     26, 27, 28

*Christian v. State*, 592 S.W.2d 625 (Tex. Crim. App. 1980)     22

*Clayton v. State*, 235 S.W.3d 772 (Tex. Crim. App. 2007)     11

*Daniels v. State*, 600 S.W.2d 813 (Tex. Crim. App. 1980)     23

*Davis v. State*, 93 S.W.3d 664 (Tex. App. – Texarkana 2002, pet. ref'd     12

*Davis v. State*, 947 S.W.2d 240 (Tex. Crim. App. 1997)     20

*Edwards v. State*, 813 S.W.2d 572 (Tex. App.- Dallas, 1991, pet ref'd)     9

*Evers v. State*, 576 S.W.2d 46 (Tex. Crim. App. 1978)     22

*Ex parte Felton*, 815 S.W.2d 733 (Tex. Crim. App. 1991)     25

*Florida v. Wells*, 495 U.S. 1, 109 L.Ed.2d 1, 110 S.Ct. 1632 (1990)     23

*Garcia v. State*, 43 S.W.3d 527 (Tex. Crim. App. 2001)     20

*Gill v. State*, 625 S.W.2d 307 (Tex. Crim. App. 1981)     22, 23

*Grant v. State*, 989 S.W.2d 428 (Tex. App.--Houston [14th Dist.] 1999, no pet.)     11

*Hall v. State*, 86 S.W.3d 235 (Tex.App.-Austin 2002, pet. ref'd)     11

*Hereford v. State*, 339 S.W.3d 111 (Tex. Crim. App. 2011)     15

*Jackson v. Virginia*, 443 U.S. 307 (1979) — 9, 11

*King v. State*, 953 S.W.2d 266 (Tex. Crim. App. 1997) — 27

*Laster v. State*, 275 S.W.3d 512 (Tex. Crim. App. 2009) — 11

*Mapp v. Ohio*, 367 U.S. 643 (1961) — 19

*Matson v. State*, 819 S.W.2d 839 (Tex. Crim. App. 1991) — 10

*McGoldrick v. State*, 682 S.W.2d 573 (Tex. Crim. App. 1985) — 13

*McMann v. Richardson*, 397 U.S. 759 (1970) — 24

*Montgomery v. State*, 810 S.W.2d 372 (Tex. Crim. App 1990) (op. on reh'g) — 27

*Morales v. State*, 32 S.W.3d 862 (Tex. Crim. App. 2000) — 27

*Oliver v. U.S.*, 466 U.S. 170 (1984) — 20

*Poindexter v. State*, 153 S.W.3d 402 (Tex. Crim. App. 2005) — 13

*Powell v. Alabama*, 287 U.S. (1932) — 24

*Rojas v. State*, 797 S.W.2d 41 (Tex. Crim. App. 1990) — 20

*South Dakota v. Opperman*, 428 U.S. 364, 96 S. Ct. 3092, 49 L.Ed.2d 1000 (1976) — 22

*State v. Rudd*, 255 S.W.3d 293, (Tex. App. – Waco 2008, pet. ref'd.) — 20

*Strickland v. Washington*, 466 U.S. 668 (1984) — 24

*Texas v. Griffey*, 241 S.W.3d 700 (Tex. App.-Austin 2007) — 22

*United States v. Muniz-Melchor*, 894 F.2d 1430 (5th Cir. [Tex.] 1990) — 20

*United States v. Martinez*, 486 S.W.3d 855 (5th Cir. 2007) — 21

*Weeks v. State*, 894 S.W.2d 390 (Tex. App.—Dallas 1994, no pet.) — 25

*Wicker v. State*, 667 S.W.2d 137 (Tex. Crim. App. 1984) — 9

*Williams v. State*, 235 S.W.3d 742 (Tex. Crim. App. 2007) — 11

*Woods v. State*, 956 S.W.2d 33 (Tex. Crim. App. 1997) — 20

*Wong Sun v. U.S.,* 371 U.S. 471, 83 S. Ct. 407, 9 L.Ed.2d 441 (1963)     22

*Wright v. State*, 603 S.W.2d 838 (Tex. Crim. App. 1980)     12


STATUTES

TEX. PENAL CODE ANN. § 46.04     12

TEX. PENAL CODE ANN. §1.07     12

TEX. CODE CRIM. PROC. ANN. ART. 38.07 (Vernon 2009)     18


RULES

Rule 401, TEX. R. EVID.     26

Rule 402, TEX. R. EVID.     26

Rule 403, TEX. R. EVID.     26

## ISSUES PRESENTED

**Point of Error No. 1**

> THE EVIDENCE IS LEGALLY INSUFFICIENT TO SUPPORT A CONVICTION FOR THE OFFENSE OF POSSESSION OF A FIREARM BY A FELON

**Point of Error No. 2**

> THE TRIAL ERRED IN DENYING APPELANT'S MOTION TO SUPPRESS EVIDENCE FOLLOWING AN UNJUSTIFIED STOP

**Point of Error No. 3**

> THE TRIAL ERRED IN DENYING APPELANT'S MOTION TO SUPPRESS EVIDENCE FOLLOWING AN ILLEGITIMATE INVENTORY SEARCH

**Point of Error No. 4**

> APPELLANT WAS DENIED EFFECTIVE ASSITANCE OF COUNSEL DUE TO TRIAL COUNSEL'S FAILURE TO TIMELY URGE HIS MOTIONS TO SUPPRESS AND TO TIMELY OBJECT TO THE ADMISSION OF EVIDENCE SEIZED AS A RESULT OF AN IMPROPER STOP AND SEARCH

**Point of Error No. 5**

> THE TRIAL COURT ERRED IN ADMITTING, OVER APPELLANT'S OBJECTIONS UNDER TEXAS RULES OF EVIDENCE 401, 403, A STATEMENT MADE BY APPELLANT

## SUMMARY OF THE ARGUMENT

Appellant raises three issues for the Court's review. Appellant contends that no rational trier of facts could have found beyond a reasonable doubt that Appellant intentionally or knowingly possessed a firearm and that the evidence in support of the conviction is legally insufficient and the case should be reversed and an acquittal entered.

Appellant also contends that the trial court erred in denying Appellant's challenge to the stop of the vehicle he was driving. The stop resulted in a search of the vehicle that yielded the firearm that Appellant was convicted of unlawfully possessing. Alternatively,

in the event the Court determines that Appellant's challenge to the search was waived, Appellant complains that he was denied effective assistance of counsel due to trial counsel's failure to properly and timely urge the Motion to Suppress.

TO THE HONORABLE JUSTICES OF THE COURT OF APPEALS:

COMES NOW David Duane Greer, Appellant, by and through his attorney of record, Mary Hennessy, and files this brief on appeal.

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to TEX.R.APP.P.38.1(e), Appellant does not request oral argument. Although this is a meritorious appeal of a criminal case, Appellant believes that the facts and legal arguments are adequately presented in this brief and does not believe the Court would be significantly aided by oral argument.

## SUMMARY OF THE ARGUMENTS

Appellant was charged and convicted of possession of a firearm by a felon. Appellant brings five grounds of error for the Court's review.

Appellant in his first point complains that the evidence presented against him at trial was insufficient to support the jury's verdict of guilt against him because no rational fact finder could have found beyond a reasonable doubt that he intentionally or knowingly was in possession of the firearm found in the vehicle he was driving.

His next points, numbers two through four, challenge the search of the vehicle he was driving that was stopped and searched. Specifically, Point of Error Two asks the Court to review the justification behind the initial stop. The vehicle Appellant was driving was stopped as a result of a tip from a confidential informant that Appellant, who was the subject of an arrest warrant, would be in the vehicle. The tip contained no information other than that one fact and there was

1

no corroboration by law enforcement that Appellant was, in fact, in the vehicle before it was stopped.

Appellant also complains that the warrantless search that ensued was unconstitutional. The State justified the search as an inventory search. However, the State failed to establish that an inventory search was necessary, since the vehicle was owned by Appellant's father and law enforcement mad no attempt to contact him to come retrieve the vehicle. And, the officer conducting the inventory did not follow the procedure established by the Brazos County Sheriff's Department for an inventory search.

Appellant also asks that if the Court should determine that trial counsel did not timely urge the motion to suppress, that the Court find he was denied effective assistance of counsel.

Finally, Appellant complains that the trial court erred in overruling his objection to a statement he purportedly made to a jailer that he contends was not relevant to any issue in dispute, or, if found relevant, that its prejudicial effect far outweighed its probative value.

### STATEMENT OF THE CASE

Appellant was indicted on July 12, 2012 for the offense of possession of a firearm by a felon, alleging that, on or about February 16, 2012, Appellant did then and there, having been previously convicted of the felony offense of Possession of Methamphetamine intentionally and knowingly possess a firearm before the fifth anniversary of the defendant's release from community supervision or parole. The indictment also contained two enhancement paragraphs. (C.R. 1).

Trial was to the jury commencing on November 14, 2012. (C.R. 79). Appellant was convicted on November 14, 2012. Punishment was to the Court and on January 27, 2012,

2

Appellant was sentenced to thirty years confinement in the Texas Department of Correction-Institutional Division.

Appellant gave timely Notice of Appeal.

## STATEMENT OF FACTS

Terry Young, an investigator for the Brazos County Sheriff's Department, testified that on February 16, 2012, he participated, along with other members of the Criminal Investigation Division and some uniformed officers, in the execution of arrest warrants for David Greer and Monishia Campbell in Bryan, Texas. Mr. Greer and Ms. Campbell were in a black Ranger pickup and were pulled over by patrol officers, detained at gunpoint and arrested. (R.R. Vol. 4, pp 26-32).

Subsequent to the arrest, Deputy Young conducted a vehicular inventory search. He described the vehicle as an extended cab Ford Ranger pickup with a passenger compartment that had a small, extended area behind the seats. In the cab, he found "All kinds of clothing, just various items, a cane, a bag that had a lot more clothing in it." (R.R. Vol. 4, 36-38).

He testified:

Q: The clothing that was in the bag, did it appear to belong to Mr. Greer or Ms. Campbell?
A: It appeared to belong to Ms. Campbell.
Q: Why do you say that?
A: Most of it was women's clothing, and it was very small.
Q: Okay. And, Ms. Campbell is a little girl, right?
A: Yes, she's very petite.
Q: With regard to the – well, did Ms. Campbell, for example, did she have a purse in there?
A: Yes.
Q: So, it would be fair to say that some of the stuff – some of the items that were in the cab of the trunk clearly were associated with Ms. Campbell, right?
A: Yes, sir.

3

Q: And others were clearly not. Would that be fair?
A: Yes, sir.
(R.R. Vol. 4, 38).

Deputy Young testified that he recovered a large, black leather jacket in the back compartment area behind the seats, just lying with the rest of the items. It was not in the bag of what he referred to as Ms. Campbell's clothing. He found a .22 revolver in the pocket of the jacket. (R.R. Vol. 4, 39-40).

He further testified that Appellant was wearing a tank top and that a lot of the officer's seen in the video were wearing jackets. Ms. Campbell was also wearing a coat. (R.R. Vol. 4, 43-44).

He was unsuccessful in his attempt to find usable fingerprints on the revolver. (R.R. Vol. 4, 47).

He further testified that he found a .22 long rifle bullet in the pocket of a pair of Ms. Campbell's jeans found in a duffle bag. (R.R. Vol. 4, 49-50).

Deputy Young opined that the .22 long rifle bullet could not be used in the .22 revolver, which is chambered only for a .22 short bullet and a .22 short is substantially shorter. (R.R. Vol. 4, 50).

Using 3 bullets, of the same type he stated were found in the jeans, Deputy Young testified that, while they could be loaded in the chamber of the .22 revolver, the chamber could not rotate to the proper point and would not fire. (R.R. Vol. 4, 51-52, 55).

The actual bullet recovered from the jeans pocket was returned to Ms. Campbell, as it was not illegal to possess such. (R.R. Vol. 4, 52-53). The revolver was loaded at the time it was discovered. (R.R. Vol. 4, 53).

4

Deputy Young said the basis for his belief that the jacket belonged to Appellant was, as follows:

A: The fact that the jacket is an extra large size, and that would be about the right size to fit the defendant, being quite a bit bigger than what Ms. Campbell was.
Q: Okay. As I think you showed us in the video earlier, Ms. Campbell was earlier wearing a jacket.
A: Yes, sir. She was.
(R.R. Vol. 4, 57).

On cross, Deputy Young agreed that the truck was disorganized and that there was a lot of stuff "everywhere". (R.R. Vol. 4, 60).

No pictures were taken of the interior of the cab of the truck prior to the search. And, Investigator Young could not remember precisely where the jacket was found in the back compartment and agreed that there may have been other clothes on top of the jacket. There was no identifying information in the jacket. (R.R. Vol. 4, 60-61).

Deputy Young further testified on cross, that there is, in addition to the .22 short bullet and the .22 long rifle bullet, a .22 long shell that falls between the other two in size. He acknowledged that a .22 long bullet would likely fit the revolver. (R.R. Vol. 4, 60-61).

The following was adduced on cross regarding the bullet found in Ms. Campbell's jeans:

Q (Mr. Gray): ... you did actually try to place the .22 long rifle shell in the -- in the chamber of this particular gun; is that right?
A. We did with counsel, yes.
Q: Okay. And then – we won't do it in front of the jury, so we're not loading the pistol in the courtroom, but fair to say it wouldn't rotate?
A: Correct.
Q: Okay. Now, you would agree with me it just protruded by a hair. It wasn't that much, right?
A: That is correct.
Q: Okay. Would you, therefore, agree with me that a .222 long would likely fit in there, in that particular chamber as it would be a little shorter?
A: Yes, you're right. It probably would.
Okay. And as to that .22 caliber shell that was found in the size 5 jeans, that was not collected; is that correct?

5

A: That is correct.
Q: Okay. We have a photo of it, but we don't have the shell; is that fair to say?
A: That's correct, sir.
Q: Okay. And there's not really – I tried to blow it up. There's really no marking or indications that I could see as far as a brand or anything of that nature. Is it at least possible that that could have been a .22 long, that shell?
A: I don't believe it was, sir.
Q: But is it possible?
A: I don't think so, sir.
Q: Why is that?
A: I've had a lot of experience with .22s, and my personal belief is that it's a long rifle.
Q: You'd agree with me though, that if we actually had it here, that would be the better option, correct?
A: Yes sir.
(R.R. Vol.4, 65-66).

In addition, Deputy Young acknowledged that the gun could have been swabbed in different key areas, such as the trigger, hammer and handle, and sent, along with Appellant's and Ms. Campbell's samples, to determine a possible match. He admitted this had not been done. The shells inside the chamber were not subjected to DNA analysis either, Nor were the shells dusted for fingerprints.

(R.R. Vol. 4, 67-68).

Deputy Young confirmed that the jacket Ms. Campbell was wearing as captured on the video, was oversized. (R.R. Vol. 4, 71).

The registered owner of the vehicle driven by Appellant was Kenneth Greer, Appellant's father. (R.R. Vol. 4, 72-73).

Ricardo Ledesne, a Brazos County Sheriff's Department investigator, testified that, while on duty on February 16, 2012, he received a call from a confidential informant and, based upon the call, began looking for Appellant and Monishia Campbell in a particular vehicle with the intent of executing arrest warrants. (R.R. Vol. 4, 78-80).

6

The weather was cloudy and cool and Investigator Ledesne was wearing a windbreaker and he recalled that Ms. Campbell was wearing a red shirt and a camouflage jacket. (R.R. Vol. 4, 82).

As part of his involvement in the investigation, he spoke with Ms. Campbell and, when the gun was found, took the jacket over to her to question her about who owned it. He said she looked surprised and shook her head no. He further testified that Appellant denied the jacket was his. (R.R. Vol. 4, 83-86).

On cross, Investigator Ledesne confirmed that Ms. Campbell was wearing an oversized jacket. He also offered his opinion that the picture of the bullet found in the small jeans was from a .22 long rifle and said that it would not fire from a .22 revolver. (R.R. Vol. 4, 91-95).

Leketh McKinney, a Brazos County Sheriff's Department jailer, testified regarding an exchange he said he had with Appellant in the jail in August of 2013. Wherein, according to Deputy McKiney, upon being instructed to follow the rules, Appellant said that he "was in jail for not following the rules and wasn't about to start now." (R.R. Vol. 4, 96-97).

After the State rested, Appellant urged his Motion To Suppress, which was denied.

Defense called Monisha Campbell, who identified herself as being Appellant's live-in girlfriend at the time of the arrest. She stated that she and Appellant had fought the day preceding the arrest and as a result she had intended to move out. She testified, that:

I grabbed whatever clothes and items I could grab, and I grabbed a gun and placed it in my bag and left. (R.R. Vol. 4, 110-114).

According to Ms. Campbell, the jacket inside of which law enforcement claimed to have found the gun, was not hers, but she thought she may have taken it into her possession in the rush to gather her property. (R.R. Vol. 4, 115).

7

Ms. Campbell testified that she was certain that Appellant had no knowledge of the gun, as she kept its existence from him due to the fact that he was on parole. Her reason for having the gun was for self-defense because she had been the victim of a kidnapping and a rape and her assailant was out on bond. She testified that she was on probation out of Galveston County for possession of cocaine at the time of the incident and was later revoked. She also admitted to theft and prostitution convictions. (R.R. Vol. 4, 115-121, 140).

On cross, Ms. Campbell stated that she had believed she would have wrapped the gun up in clothes when packing to leave, and, when pressed, said she had a vague recollection of doing so. She further stated that the jacket in question did belong to Appellant and she told Officer Ledesne at the scene that it was 'Hillbilly's' jacket, referring to Appellant. She agreed with the prosecutor that, if Appellant was unaware of the gun in the pocket, he would have no reason to deny ownership of the jacket. She admitted that she had not accepted ownership of the gun when questioned at the scene by Officer Ledesne and then again claimed it was not hers, when questioned in the patrol car by Deputy Belew. (R.R. Vol 4, 127-136).

Her explanation, given on redirect, for not being truthful at the scene regarding her ownership of the weapon was that she was concerned about her probation. (R.R. Vol. 4, 137-139).

After the defense rested, Detective Ledesne was called in rebuttal and a video was played that showed Appellant in custody at the scene wearing no jacket, denying ownership of the black jacket and claiming ownership of the camouflage jacket. (R.R. Vol. 4, 144-146).

On re-cross, after the playing of the scene video for the jury, Detecitve Ledesne, acknowledged Ms. Campbell did sigh when asked about ownership of the jacket, despite his earlier testimony to the contrary. (R.R. Vol. 4, 150).

8

Upon being recalled, Investigator Young testified that the black jacket containing the gun was not in the duffle bag. (R.R. Vol. 4, 154-155). He, again, on cross admitted he did not recall exactly where in the back of the cab the jacket was found and could not say if it was on or under the other clothing. (R.R. Vol. 4, 155-156).

Jason Ware, a Brazos County Sheriff's Department investigator, testified that he saw Investigator Young recover the black jacket from the vehicle. He could not say exactly from where Investigator Young found he jacket, but he did not believe it was in a bag full of other stuff. (R.R. Vol. 4, 159).

## POINT OF ERROR NUMBER ONE

THE EVIDENCE IS INSUFFICIENT TO SUPPORT THE VERDICT OF GUILT BECAUSE A RATIONAL JUROR COULD NOT HAVE FOUND BEYOND A REASONABLE DOUBT THAT APPELLANT WAS IN POSSESSION OF A FIREARM.

## STANDARD OF REVIEW

In conducting a sufficiency review, the Court views the evidence in the light most favorable to the verdict and determines whether any rational trier of fact could have found the essential elements beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The standard is the same for both direct and circumstantial evidence. *Edwards v. State*, 813 S.W.2d 572, 575 (Tex. App.- Dallas, 1991, pet ref'd). In evaluating a legal sufficiency challenge, the issue is not whether the court believes the State's evidence or believes the defense's evidence outweighs the State's evidence. *Wicker v. State*, 667 S.W.2d 137, 143 (Tex. Crim. App. 1984). The verdict may not be overturned unless the verdict is irrational or unsupported by proof beyond a reasonable doubt.

9

*Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991).

## *Facts Relevant to Point of Error One*

Appellant's challenge to the sufficiency of the evidence presented at trial is directed at

the issue of whether or not Appellant was intentionally or knowingly in possession of the firearm

found in the search of the vehicle that he was driving. The relevant evidence is as follows:

The vehicle was in complete disarray with stuff everywhere. (R.R. Vol. IV, 60).
There was no evidence that the gun would have been apparent to Appellant, as no pictures were taken demonstrating where property was located before the search. (R.R. Vol. IV, 60-61, 159).
There was no evidence that it was found in close proximity to Appellant or that he could have reached it while driving. (R.R. Vol. IV, 60-61, 159).
The vehicle was not owned by Appellant but by his father, Kenneth Greer. (R.R. Vol. IV, 72-73).
There was no forensic evidence that connected Appellant with the firearm. (R.R. Vol. IV, 61, 67-68).
The testimony was that law enforcement's attempt at lifting fingerprints from the firearm was unsuccessful and no attempt was made to print the shells found inside the firearm. (R.R. Vol. IV, 67-68).
Despite acknowledging that DNA could well have yielded evidence of who had handled the weapon, such testing was not done. (R.R. Vol. IV, 68).
Law enforcement had sent a request to the ATV to determine history of the firearm, but had done so just before trial and had net yet received the information. (R.R. Vol. IV, 72).
The firearm was found in the pocket of a men's large jacket. (R.R. Vol. IV, 39-40).
Appellant was not wearing a jacket and the weather was cool and some of the people on the scene were wearing jackets. (R.R. Vol. IV, 57, 82).
Ms. Campbell was wearing a large man's jacket when stopped. (R.R. Vol. IV, 71,91).
A .22 bullet was found in the pocket of a pair of Ms. Campbell's jeans, that Officers opined was a long bullet and would not have been usable in the .22 pistol. The bullet was not available to the jury as it has been released. (R.R. Vol. IV, 49-50).
Ms. Campbell testified that the firearm was hers and she had obtained it as protection after being the victim of a kidnapping and rape case and her accused assailant was released on bond.
She testified that Appellant had no knowledge of it, as she had carefully hidden it from him. Her explanation for its presence in the vehicle was that she and Appellant, with whom she was living, had argued the day before the arrest and she had gathered all her belongings up in a hurry and loaded them in the truck. (R.R. Vol. IV, 110-121).
Ms. Campbell testified that the jacket containing the bullet had been a gift to Appellant from his mother. At the scene, she told officers that it belonged to "hillbilly," her nickname for Appellant. (R.R. Vol. IV, 127-136).
At the scene, Ms. Campbell denied ownership, or any knowledge, of the firearm. The explanation she offered was that she was concerned about it possibly being a violation of her probation. (R.R. Vol. IV, 144-146)
When questioned at the scene, Appellant denied ownership of the jacket. (R.R. Vol. IV, 83-86)

10

## ARGUMENT AND AUTHORITIES

Evidence is insufficient to support a conviction if considering all the record evidence in the light most favorable to the verdict, no rational finder of fact could have found that each essential element of the charged offense was proven beyond a reasonable doubt. See *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979); *Laster v. State,* 275 S.W.3d 512, 517 (Tex. Crim. App. 2009); *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Viewed in the light most favorable to the verdict, the evidence is insufficient under this standard in two circumstances: (1) the record contains no evidence, or merely a "modicum" of evidence, probative of an element of the offense; or (2) the evidence conclusively establishes a reasonable doubt. *Jackson v. Virginia, 443 U.S.* at 314; *Laster v. State*, 275 S.W.3d at 518; *Williams v. State*, 235 S.W.3d at 750.

In conducting a sufficiency review, the appellate court considers both direct and circumstantial evidence and all reasonable inferences that may be drawn there from in making its determination. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). An appellate court determines whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict. Id.

Proof amounting to a strong suspicion or a probability of guilt will not suffice to establish guilt beyond a reasonable doubt. *Hall v. State,* 86 S.W.3d 235, 240 (Tex.App.-Austin 2002, pet. ref'd). The proof must generate more than a strong suspicion or even a probability. *Grant v. State*, 989 S.W.2d 428, 433 (Tex. App.--Houston [14th Dist.] 1999, no pet.). Appellant challenges the sufficiency of the evidence on the element of knowing or intentional possession.

To prove possession of a firearm by a felon, the State was required to show that

11

Appellant intentionally or knowingly possessed the firearm.

TEX. PENAL CODE ANN. § 46.04.

Possess" means care, custody, control, or management.

TEX. PENAL CODE ANN. §1.07.

The jury was properly charged, in part, that in order to convict, they must find as follows:

.. beyond a reasonable doubt that on or about the 16th day of February, 2012 in Brazos County, Texas, the defendant, David Greer, did then and there having been convicted of the felony offense …. intentionally or knowingly possess a firearm.

The charge correctly defined intentionally and knowingly, as follows:

A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.

A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. (C.R.46-47).

To support a conviction for possession of a firearm, the state must show (1) that the accused exercised care, control, or custody of the firearm, (2) that the accused was conscious of his connection with the firearm, and (3) that he possessed the firearm knowingly or intentionally. *Davis v. State*, 93 S.W.3d 664, 667 (Tex. App. – Texarkana 2002, pet. ref'd). The State must establish that the defendant's connection with the firearm was more than just fortuitous. *Bollinger v. State*, 224 S.W.3d 768, 774 (Tex. App. – Eastland 2007, pet. ref'd).

The State is charged with the burden of proving each essential element of the charged offense beyond a reasonable doubt. *Wright v. State*, 603 S.W.2d 838, 840 (Tex. Crim. App. 1980).

12

In viewing the evidence, detailed above, in the light most favorable to the verdict, the evidence was insufficient to support the jury's finding, implicit in its verdict, that Appellant was responsible for placing the gun inside the jacket. The State failed to establish enough links connecting Appellant to the firearm. Further, the testimony of Monishia Campbell conclusively established reasonable doubt.

When the accused is not in exclusive possession or control of the place where the contraband is found, it cannot be concluded that he has knowledge of or control over the contraband unless there are additional independent facts and circumstances linking him to the contraband. *Poindexter v. State*, 153 S.W.3d 402 at 405 (Tex. Crim. App. 2005). As with any element of the offense, an accused's knowledge or control of the contraband may be established by circumstantial evidence. Id at 405-406; *McGoldrick v. State*, 682 S.W.2d 573, 578 (Tex. Crim. App. 1985). However, the evidence must establish, to the requisite level of confidence, that the accused's connection with the contraband was more than just fortuitous. *Poindexter*, 105 S.W.2d at 406; *Brown v. State*, 911 S.W.2d 744, 747 (Tex. Crim. App. 1985).

The State will likely argue that the testimony that Appellant denied ownership of the jacket proves to a sufficient degree that he knew the firearm was inside. As argued by defense counsel, when confronted with such a question, Appellant would certainly have understood that the question was being asked because something had been discovered in the jacket. While his statement might reasonably caused suspicion, it surely does not rise to level of proof beyond reasonable doubt.

A review of the evidence as a whole makes clear the necessity for the Court to reverse the judgment of the Court and enter an order of acquittal in order to prevent manifest injustice. When the record is considered in its entirely, the evidence is insufficient to support a finding

13

beyond a reasonable doubt by a rational fact-finder that Appellant's connection with the firearm was conscious and that his possession of the firearm was knowing or intentional.

## POINT OF ERROR NUMBER TWO

## THE TRIAL ERRED IN DENYING APPELANT'S MOTION TO SUPPRESS EVIDENCE FOLLOWING AN UNJUSTIFIED STOP

## POINT OF ERROR NUMBER THREE

## THE TRIAL ERRED IN DENYING APPELANT'S MOTION TO SUPPRESS EVIDENCE FOLLOWING AN ILLEGITIMATE INVENTORY SEARCH

The factual basis and legal authority relevant to points of error numbers two and three being substantially the same, the points are discussed jointly herein in the interest of brevity.

## STANDARD OF REVIEW

The standard of review of a Trial Court ruling on a Motion to Suppress is abuse of discretion. In reviewing the Trial Court's ruling, the Appellate Court applies a bifurcated standard of review. The reviewing Court gives almost total deference to the Trial Court's determination of historical facts, while conducting a *de novo* review of the Trial Court's application of law to those facts. *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000).

If the Trial Court's findings are supported by the record, a reviewing Court will not disturb them and will only address questions of whether the Trial Court improperly applied the law to the facts. Absent explicit findings of historical fact, the evidence is viewed in a light most

14

favorable to the Trial Court's ruling. *Carmouche v. State*, 10 S.W.3d at 327. In the instant case, there were no findings of fact or conclusions of law requested. Therefore if any theory supports the court's overruling of the Motion To Suppress then there is no error.

The Appellate Court in reviewing pure questions of law and mixed questions of law and fact that do not depend on credibility determinations do not afford the trial judge the same degree of deference as is afforded in the trial court's factual findings. Such topics might include determinations of reasonable suspicion or probable cause as well as other applications of the law of search and seizure. An appellate court reviews these questions *de novo*. *Hereford v. State*, 339 S.W.3d 111 (Tex. Crim. App. 2011).

*Procedural history underlying suppression motion*

Appellant filed three separate motions to suppress the evidence seized in the search of the vehicle:

Defendant's Motion To Suppress (Invalid Seizure/Arrest/Restraint/Detention Without Warrant), specifically attacking the initial seizure of Appellant (C.R. 15-17).

Defendant's Motion To Suppress (Search of Person And/Or Personal Belongings Without Warrant), specifically attacking the search of Appellant's person and personal property without a warrant or other exigent circumstances (C.R. 13-14).

Defendant's Motion To Suppress (Search of Person And/Or Personal Belongings Without Warrant), specifically attacking the search of the vehicle that resulted in the seizure of the firearm following the seizure and detention of Appellant (C.R. 18-19).

It is clear that trial counsel had notified the Court prior to commencement of the trial that he was moving to suppress the evidence on both the grounds that the initial stop was unlawful and that inventory search was improper, as evidenced by the pretrial discussion that ensued when

15

the State offered into evidence outside the presence of the jury, arrest warrants for Appellant and

Monishia Campbell and Appellant's trial counsel objected:

THE COURT: I don't understand. Why are you offering these warrants?
MR. CALVERT: Judge, Mr. Gray said yesterday that he was moving to suppress the evidence in this case based upon·– what he told the Court yesterday was based upon the detention and the subsequent inventory search, and that was what he advised the Court, and that was what he you know, advised us. That he's challenging the initial detention.
        The sole basis for the initial detention was those warrants. It wasn't a traffic stop. They didn't see him speeding. They were out there specifically to – the Sheriff's office was out there specifically to execute those warrants on those two individuals.
THE COURT: Uh-huh.
MR. CALVERT: They located them driving the vehicles, and that was the one and only reason they stopped them.
THE COURT: And your not offering these in front of the jury, just for the purpose –
MR. CALVERT: Just for record purposes, just fro purposes of the motion to suppress.
THE COURT: Yeah.
MR. GRAY: Judge, you know, we – I am going to – I'm not going to allow hearsay to come in. I am going to object o hearsay. If an officer is talking about what other officers said in regard to the stop. But I'm not attacking the validity cf those arrest warrants. That's not where I'm going at all.
THE COURT: You're attacking the existence of the – or the –
MR. GRAY: The arrest warrants? No, not at all. Just the basis for the stop. I mean, just because an arrest warrant existed, b=how did the officer find out that information? Was he told on the street? Did he get it from dispatch? Was it –
THE COURT: Al right.
MR. GRAY: -- triple hearsay. Because those kind of things I will object to.
THE COURT: I'm going to overrule your objection.
(R.R. Vol. IV, 18-19).

Subsequently, during the case in chief, the State offered into evidence the firearm and the

jacket in which it was found and Appellant's trial counsel stated:

No additional objections other than what we talked about earlier, Judge.
At which point both exhibits were admitted before the jury.
(R.R. Vol. IV, 40-41).

Then, when the State rested, Appellant's trial counsel urged his motion to suppress:

MR. GRAY: Judge, the State has rested, and they have concluded their presentation of the evidence in the case-in-chief.

16

Judge, at this point, we would urge our suppression motion. It was timely filed, and the law is such that we can carry that into the trial for judicial economy, and that's what we did. But this is the proper junction to urge that motion.

A couple of things, Judge, the – we believe that the basis of the stop was an illegal stop. It was not based upon any traffic offense or any offense whatsoever that was seen by any of the officers. There's no testimony as to that.

Investigator Ledesma had indicated that the information that they received linking them to my client and Monishia was that there was a description that they were -- and that they were in this vehicle, and they were driving this particular vehicle.

The problem we run into, if this was a identifiable person, if even Dispatch had a name or a phone number or an address, somewhere where we could talk to this person, we could potentially determine their veracity, whether they're telling he truth or not. Just the generalized statement that this is a reliable confidential informant, I don't think that gets us there.

Trial counsel argued to the Court that the only evidence tying the arrest warrants to the vehicle that was stopped was the informant saying they would be in the vehicle. Pointing out for the Court that the officers did not identify Appellant as being in the vehicle before stopping it, the officers were not able to see in the tinted windows, officers did not have a license plate number, and in fact, had nothing to hang their hats o other than the confidential informant's tip. (R.R. Vol. IV, 100-102).

Appellant's trial counsel further argued to the Court that the search of the vehicle without warrant could not be justified on the basis of an inventory search. The rationale being that it was not a full inventory search as required by department policy, rather it was a pretext investigatory search. (R.R. Vol. 104-106).

The Court denied the Motion To Suppress. (R.R. Vol. IV, 111).

*Facts relevant to legality of stop*

As set out above in the Statement of Facts, only two officers testified regarding the stop and search of the vehicle, Office Terry was called to describe his duties assisting Deputy Ficke with the inventory search of the vehicle Appellant was driving, and his discovery of the firearm.

On the issue of the initial stop, Officer Terry testified that there were at least six officers with the Criminal investigation Division in at least six vehicles, plus a number of marked vehicles, involved in the execution of the arrest warrants for Appellant and Ms. Campbell. (R.R.

Vol. IV, 29-30). Some of the officers got out with weapons drawn pointed at the truck Appellant was stopped in. (R.R. Vol. IV, 33).

On direct, Officer Terry testified, when asked if the officers were able to identify Appellant and Ms. Campbell in the vehicle, that, "we were." (R.R. Vol, IV, 31). However, on cross, Officer Terry stated that he was a block or so behind everybody else when the stop occurred. He also confirmed that if the vehicle had tinted windows it would be difficult to identify occupants from the side of the vehicle. (R.R. Vol. IV, 58, 76).

In regard to the initial stop, Investigator Ledesma testified that he received a phone call from an informant after which he started looking for vehicle with David Greer and Monishia Campbell, who had outstanding arrest warrants. Investigator Ledesma testified that he was involved in the stop, but was "a pretty good distance back." (R.R. Vol. IV, 81-82).

On cross, Investigator Ledesma testified that he was given a description of the vehicle by the informant, who he could not identify, that he was given no further information, and that, prior to the call, he had no knowledge tying Appellant to that particular vehicle. (R.R. Vol. IV, 87-88).

On redirect, Ledesma testified that he had worked with the confidential informant before and he was reliable and truthful and they did not provide any information other than the possible location for Appellant. (R.R. Vol. IV, 91-92).

*Facts relevant to the legality of the inventory search*

Officer Terry testified that he assisted Deputy Ficke in the inventory search and that Deputy Ficke prepared the inventory sheet. According to Investigator Terry, there was "stuff everywhere" in the truck. (R.R. Vol. IV, 57-58). He acknowledged on cross that the purpose of the inventory search was to list all items in the vehicle to avoid liability issues (R. R. Vol. IV,

18

60-61). He admitted that on occasion he allows a detained person to call a family member to retrieve the vehicle, but not in this case. (R.R. Vol. IV, 63).

The inventory form was admitted into evidence. (R.R. Vol. IV, 90, SE# 15). Appellant's trial counsel argued that the inventory form did not comply with the stated procedure of the department, in that it did not list all items of property in the vehicle. The inventory form did not include the firearm, the bullet found in the jeans, and did not specify the items of clothing found, such as the jeans and the jacket. (R.R. Vol. IV, 105).

The vehicle was registered to Kenneth Greer, Appellant's father. (R.R. Vol. IV, 72).

A copy of the Brazos County Sheriff's Department Inventory Policy was admitted into evidence. It specifically requires that all items of value be listed in the inventory report. It further specifically directs that the inventory procedure not be used as a pretext to conduct an exploratory search for incriminating evidence. (SE# 16).

## ARGUMENT AND AUTHORITIES

It is axiomatic that persons are protected from unreasonable searches and seizures through the Fourth Amendment to the United States Constitution and Art. 1, Sec. 9, of the Texas Constitution. Under these provisions, a search or seizure conducted without a warrant is pre se unreasonable and therefore illegal under both constitutions unless the state shows proof of a valid exception to the warrant requirement. The Fourth Amendment to the United States Constitution, which applies to states through the due process clause of the Fourteenth Amendment, governs all searches and seizures conducted by government agents. All evidence obtained by searches and seizures in violation of U.S. Const. amend IV is, by that same authority, inadmissible in a state court. See U.S. CONST. amend. IV & XIV; Mapp v. Ohio, 367 U.S. 643 (1961). The statutory exclusionary rule in Texas encompasses any evidence obtained by an officer in violation of any

19

law. TEX. CODE CRIM. PRO. ANN. Art. 38.23(a).

A search is a governmental invasion of a person's privacy. *Oliver v. U.S.*, 466 U.S. 170, 177-178 (1984). A property seizure occurs when a governmental intrusion meaningfully. For Fourth Amendment purposes, any stop of a vehicle is a seizure and must be reasonable to be lawful. *Davis v. State*, 947 S.W.2d 240, 243 (Tex. Crim. App. 1997).

Unless the law enforcement officer has a valid reasonable suspicion to believe that an individual is violating the law, a temporary detention is unlawful *Balentine v. State*, 71 S.W.3d 763 (Tex. Crim. App. 2002). Reasonable suspicion only exists where the officer has specific articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably suspect a particular person will soon be, or has been engaged in criminal activity. *Garcia v. State*, 43 S.W.3d 527 (Tex. Crim. App. 2001); *State v. Rudd*, 255 S.W.3d 293, 299 (Tex. App. – Waco 2008, pet. ref'd.) ; *Woods v. State*, 956 S.W.2d 33 (Tex. Crim. App. 1997).

*Confidential Informant tip alone is not sufficient to justify stop*

The theory that the law enforcement officers had a legitimate reasonable suspicion to stop the vehicle based solely on the tip from the confidential informant that Appellant was driving a vehicle of that description is not valid. While probable cause is not for required for a brief stop or detention, reasonable suspicion is. *United States v. Muniz-Melchor*, 894 F.2d 1430, 1438 (5th Cir. [Tex.] 1990).

The facts at issue in this case are similar to those under consideration by the Court of Criminal Appeals in *Rojas v. State*, 797 S.W.2d 41, 43-44 (Tex. Crim. App. 1990) where it was held that an anonymous tip not sufficient when it merely described vehicle and stated that contraband would be found inside it, but provided no facts confirming accuracy of tip.

An anonymous tip that a particular vehicle would be at a particular location is not

20

reasonable suspicion. A tip that a certain vehicle would be traveling on a certain roadway at a certain time does not provide sufficient factual basis to confirm credibility of the tip. *Gilmer v. State,* No. 06-09-00233-CR (TX APP-Texarkana-8/12/10).

In the instant case, the informant was known by Investigator Ledesma and believed by him to be truthful and reliable. However, Investigator Ledesma not only failed to provide any specific situation where the informant had been proved so, he admitted that the informant provided him no information other than that Appellant would be in such a vehicle. In addition, Investigator Ledesma decline to identify the informant, denying Appellant the opportunity to explore the basis of Investigator Ledesma's opinion. And, while Ledesma testified that he did check and confirm that Appellant and Ms. Campbell had active warrants he did not run the license tag of the vehicle in question before the officers stopped the vehicle. The manner of the stop, with upward of six law enforcement vehicles converging on the vehicle and officers approaching with weapons drawn, makes the stop even more intrusive and problematic.

The U.S. Fifth Circuit Court of Appeals, when confronted with a similar question determined that the trial court reversibly erred in denying defendant's motion to suppress the firearms that formed the basis for his felon-in-possession conviction. The Court found that the defendant's Fourth Amendment rights were violated when the police conducted a stop of his vehicle for purposes of investigating another crime; the tip of an informant as to whom the government failed to adduce any evidence of his reliability, credibility, or past track record did not supply reasonable suspicion for a stop where the only information corroborated from the tip was innocent information as to defendant's identity and location. *United States v. Martinez,* 486 S.W.3d 855 (5th Cir. 2007). In this case, while there was testimony of reliability, there was absolutely no corroboration of the tip.

21

As held by the Third Court of Appeals, a known informant's tip is not reasonable suspicion when law enforcement fails to corroborate the tip. In that case, the manager of a restaurant contacted police about a person who was asleep in the fast food lane. However, when the police arrived the person was awake and appeared normal. The evidence of the DWI arrest was suppressed because the informant's tip was not corroborated and, therefore, reasonable suspicion based on the officer's observations alone did not exits. *Texas v. Griffey*, 241 S.W.3d 700 (Tex. App.-Austin 2007).

Once it is established that the initial stop of the vehicle was not warranted, the discovery of Appellant in the vehicle and the execution of the arrest warrant does not cure the taint of the initial invalid stop. If it is established that the search or seizure was illegal, then not only is any evidence obtained thereby inadmissible, but any evidence discovered as the result or exploitation of that primary illegality is as well inadmissible as "fruit of the poisonous tree". *Wong Sun v. U.S.*, 371 U.S. 471, 83 S. Ct. 407, 9 L.Ed.2d 441 (1963).

Even were this Court to find that the officers acted properly in stopping the vehicle, the search of the vehicle that followed cannot be justified. The only theory offered by the State in support of the warrantless search of the vehicle was that it was an inventory search, and that rationale falls for two reasons. An inventory search of a vehicle is warranted only when the driver is arrested and no other person is available to drive the vehicle or "no other alternatives are available other than impoundment to insure the protection of the vehicle." *South Dakota v. Opperman*, 428 U.S. 364, 96 S. Ct. 3092, 49 L.Ed.2d 1000 (1976); *Evers v. State*, 576 S.W.2d 46 (Tex. Crim. App. 1978); *Christian v. State*, 592 S.W.2d 625 (Tex. Crim. App. 1980); *Gill v. State*, 625 S.W.2d 307 (Tex. Crim. App. 1981). In the instant case, the vehicle was not owned by Appellant but by his father Kenneth Greer. According to Investigator Terry, he will on occasion

22

call a family member to come retrieve a car when the driver is being arrested. The fact that the car was actually owned by Kenneth Greer would seem all the more reason to contact him. Clearly, the intent of law enforcement in not doing so was to justify an investigatory search as an inventory search.

Furthermore, the inventory search was not conducted in compliance with the guidelines and procedures dictated by the Brazos County Sheriff's Department, which require the officer to list every item of property on the inventory form. The inventory form did not include the firearm, the bullet found in the jeans, and did not specify the items of clothing found, such as the jeans and the jacket.

A true inventory search of an automobile occurring outside the legal concepts of probable cause or a search incident to valid arrest, is just that and nothing more. It means that, using a standard inventory form prepared pursuant to standard police procedure, a police officer or his agent lawfully inventories the contents of a lawfully impounded motor vehicle. *Daniels v. State,* 600 S.W.2d 813 (Tex. Crim. App. 1980); *Benavides v. State,* 600 S.W.2d 809 (Tex. Crim. App. 1980); *Gill v. State,* 625 S.W.2d 307 (Tex. Crim. App. 1981).

The Supreme Court has insisted that there be a real policy or regulation and that same be directed at producing an inventory, not an exploratory criminal investigation:

The policy or practice governing inventory searches should be designed to produce an inventory. The individual officer must not be allowed so much latitude that inventory searches are turned into 'a purposeful and general means of discovering evidence of crime'..." *Florida v. Wells,* 495 U.S. 1, 109 L.Ed.2d 1, 110 S.Ct. 1632 (1990)

In the insist case, while there was a specific policy in effect that was designed at producing an inventory, the policy was not followed and, therefore, the search is not justified as an inventory search. The trial court erred and abused its discretion in denying the Motion to

23

Suppress. The firearm seized from the vehicle was the result of an illegal stop and an illegal search and should have been suppressed.

## POINT OF ERROR NUMBER FOUR

**APPELLANT WAS DENIED EFFECTIVE ASSITANCE OF COUNSEL DUE TO TRIAL COUNSEL'S FAILURE TO TIMELY URGE HIS MOTIONS TO SUPPRESS AND TO TIMELY OBJECT TO THE ADMISSION OF EVIDENCE SEIZED AS A RESULT OF AN IMPROPER STOP AND SEARCH**

Appellant urges this Point of Error only in the event that the Court determines that the complaints presented in Points of Error Two and Three were not preserved for review. Appellant incorporates here the facts and legal authority set out in Points of Error Two and Three.

Appellant has an absolute right to effective assistance of counsel at trial. U.S. CONST. VI & XIV; *Powell v. Alabama*, 287 U.S. (1932). Counsel must act within a range of competence demanded of counsel·in criminal cases. *McMann v. Richardson*, 397 U.S. 759 (1970)

Trial counsel's failure to present the Motions to Supress filed prior to trial and discussed pre-trial constitutes deficient performance. The applicable standard is *Strickland v. Washington*, 466 U.S. 668 (1984):

As held by the United States Supreme Court, in *Strickland v. Washington*:

The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.
Strickland v. Washington 104 S.Ct. at 2064.

The *Strickland* standard applies to a claim of ineffective assistance of counsel arising under article I. §10 of the Texas Constitution and under the Sixth Amendment to the U.S.

24

Constitution. *Hernandez v. State*, 726 S.W.2d 53 (Tex. Crim. App. 1986).

The Court of Criminal Appeals of Texas, stated that:

Under *Strickland* there are two tests a defendant who seeks relief must meet: 'First, the defendant must show that counsel's performance was deficient.... Second, the defendant must show that the deficient performance prejudiced the defense.

And, in elaborating on the second prong, the Court said:

The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.
*Butler v. State*, 716 S.W.2d 48, 54.

The effectiveness of counsel is ordinarily gauged by the totality of the representation, but a single error, if sufficiently egregious, can constitute ineffective assistance. *Ex parte Felton*, 815 S.W.2d 733 (Tex. Crim. App. 1991). An Appellate Court does not inquire into trial strategy unless no possible basis in trial strategy or tactics exists, *Weeks v. State*, 894 S.W.2d 390, 391 (Tex.App.—Dallas 1994, no pet.).

This is such a case. Trail counsel was clearly aware of the pivotal role the suppression issue had to the outcome of the case. Considering the totality of the circumstances, trial counsel's performance was outside the range of professionally competent assistance. His actions were not the result of reasonable professional judgment. There is no rational trial strategy that would warrant failing to present the suppression motion or objecting to the admission of the firearm. The fact that trial counsel did finally urge his motion underscores that his failure to do so timely was not a strategy.

Appellant's conviction should be reversed and he should be granted a new trial.

25

## POINT OF ERROR NUMBER FIVE

## THE TRIAL COURT ERRED IN ADMITTING, OVER APPELLANT'S

## OBJECTIONS UNDER TEXAS RULES OF EVIDENCE 401, 403, A

## STATEMENT MADE BY APPELLANT

Prior to the commencement of the trial, the State made known to the Court their intention of eliciting the testimony of Lakesh McKinney, a Brazos County Sheriff's Department jailer, who claimed that he confronted Appellant about a rule infraction and Appellant replied "I don't follow rules. I'm in here for not following the rules; and so, I'm not going to start now." Appellant objected on the basis of relevance and argued that it should be kept out under Texas Rule of Evidence 403, as the prejudicial effect substantially outweighed the probative value of the alleged statement. The Court overruled the objection and Deputy McKinney testified as to Appellant's alleged statement before the jury. (R.R. Vol. IV, 9-15, 96-97).

## ARGUMENT AND AUTHORITIES

Evidence is "relevant" if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." TEX. R. EVID. 401 Relevancy is "predicated on a subjective relationship between the proffered evidence and a fact that is of consequence to the determination of the action. *Carter v. State.* 851 S.W.2d 390, 391 (Tex. App. – Fort Worth 1993, pet ref'd.) Evidence that is not relevant is not admissible. TEX. R. Evid. 402.

Even if this Court determines that the statement was relevant, its prejudicial effect substantially outweighed any probative value, and it, therefore should not have been admitted into evidence. TEX. R. EVID. 403. The effect upon the jury would clearly be to convey to them that 1) Appellant was guilty of some other wrong or infraction while in custody; 2) that

26

Appellant was in custody for this or another offense; and 3) that Appellant, if he was not referring to the charged offense, was a criminal generally. Unfair prejudice means the tendency of the evidence "to prove some adverse fact not properly in issue or unfairly to excite emotions against the defendant." *Montgomery v. State*, 810 S.W.2d 372, 387 (Tex. Crim. App. 1990) (op. on reh'g). Therefore, Appellant's objection to the evidence should have been sustained. Failure to do so was error.

Upon determining that the admission of evidence was erroneous in a case where the error wan non-constitutional, as here, the appellate court should then consider whether admission of the evidence was harmful. The error in admission will be disregarded error in admission if it did not affect Appellant's substantial rights. TEX. R. APP. P., 44.2(b). A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). The conviction will not be reversed for non-constitutional error if, after examining the record as a whole, the Court has a fair assurance the error "did not influence the jury, or had but a slight effect." *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000). If the Court does not have fair assurance that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected and the conviction must be reversed. *Carter*, 145 S.W.3d at 710.

In the instant case, by the very nature of the charge itself, the jury was already apprised of the fact that Appellant had previously been convicted of a felony. To add to that testimony complained of certainly had a strong negative impact on the view of Appellant by the jury. It is certainly likely that it could be the very thing that caused them to convict on the basis of evidence that was far from overwhelming. Jurors would very likely be swayed by the evidence of complained of that Appellant was simply a bad guy and, therefore, jurors would be naturally

27

inclined to infer guilt on the charged offense. See *Carter*, 145 S.W.3d at 710. For that reason, Appellant's conviction should be reversed.

## PRAYER

WHERFORE, PREMISES CONSIDERED, Appellant, David Duane Greer, prays that based upon the argument and authorities herein, this Honorable Court reverse the judgment and set aside Appellant's conviction.

Respectfully submitted,

MARY HENNESSY
P.O. Box 2536
Brenham, Texas 77834
Tel: (979) 277-0757
Fax: (979) 277-0030

By: _____
Mary Hennessy
State Bar No. 09472300
Attorney for David Duane Greer

## CERTIFICATE OF SERVICE

This is to certify that on July 27, 2013, a true and correct copy of the above and foregoing document was served on the Brazos County District Attorney's Office, by U.S. Mail.

_____
Mary Hennessy

28